MICHAEL A. COLUMBO (SBN: 271283)
SHAWN COWLES (SBN: 163826)
MARK P. MEUSER (SBN: 231335)
**DHILLON LAW GROUP INC.**
4675 MacArthur Court, Suite 1410
Newport Beach, CA 92660
Telephone: (415) 433-1700
Fax: (415) 520-6593

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

**DAVID TANGIPA; ERIC CHING; SAUL AYON; PETER HERNANDEZ; ROXANNE HOGE; JOEL GUITERREZ CAMPOS; SOLOMON VERDUZCO; PAUL RAMIREZ; JANE ORTIZ-WILSON; VERNON COSTA; RACHEL GUNTHER; DOUG BUCHANAN; SAYRS MORRIS; MIKE NETTER; CHRISTINA RAUGHTON; KRISTI HAYS; JAMES REID; MICHAEL TARDIF; ALEX GALICIA;** and **CALIFORNIA REPUBLICAN PARTY;**

            Plaintiffs,

      vs.

**GAVIN NEWSOM**, in his official capacity as the Governor of California; **SHIRLEY WEBER**, in her official capacity as California Secretary of State;

          Defendants.

CASE NO. _____

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF (42 U.S.C. § 1983; U.S. CONST. amend. XIV) REQUEST FOR CONVENING OF THREE-JUDGE COURT (28 U.S.C. § 2284) DEMAND FOR PRELIMINARY AND PERMANENT INJUNCTION**

**ACTION SEEKING STATEWIDE RELIEF**

**VIOLATION OF THE FOURTEENTH AND FIFTEENTH AMENDMENTS – RACIAL GERRYMANDER**



Plaintiffs David Tangipa, a California resident and Assemblyman from District 8; Eric Ching a California resident and Congressional Candidate; Saul Ayon, a California resident; Peter Hernandez, a California resident; Roxanne Hoge, a California resident; Joel Guiterrez Campos, a California resident; Solomon Verduzco, a California resident; Paul Ramirez, a California resident; Jane Ortiz-Wilson, a California resident; Vernon Costa, a California resident; Rachel Gunther, a California resident; Doug Buchanan, a California resident; Sayrs Morris, a California resident; Mike Netter, a California resident; Christina Raughton, a California resident; Kristi Hays, a California resident; James Reid, a California resident; Michael Tardif, a California resident; Alex Galicia, a California resident; and the California Republican Party, a political party (collectively "Plaintiffs"), by through their attorneys, the Dhillon Law Group, Inc., bring claims against Gavin Newsom, in his official capacity as Governor of California, and Shirley Weber, in her official capacity as California Secretary of State. Plaintiffs allege and show the Court as follows (this "Complaint"):

1.     This lawsuit challenges the constitutionality of California's congressional district maps that will be implemented following the passage of Proposition 50. Specifically, the California Legislature violated the Fourteenth and Fifteenth Amendments to the Constitution when it drew new congressional district lines based on race, specifically to favor Hispanic voters, without cause or evidence to justify it.

2.     The Equal Protection Clause of the Fourteenth Amendment guarantees every citizen the equal protection of the laws and the Supreme Court has held that its central mandate is racial neutrality in governmental decision making. *Miller v. Johnson*, 515 U.S. 900, 904 (1995); U.S. Const., amend. 14, § 1. While the Constitution entrusts States with designing congressional districts, the Supreme Court has also held that states may not, without a compelling reason backed by evidence that was in fact considered, separate citizens into different voting districts on the basis of race. *Cooper v. Harris*, 581 U.S. 285, 291 (2017). As that Court has found, race-based districting embodies "the offensive and demeaning assumption that voters of a particular race, because of their race, think alike, share the same political interests, and will prefer the same candidates at the polls," *Miller* at 912, which "is more likely to reflect racial prejudice than legitimate public concerns." *Palmore v. Sidoti,*

1
**COMPLAINT**

466 U.S. 429, 432 (1984). This, the Court found, "may balkanize us into competing racial factions" and "threatens to carry us further from the goal of a political system in which race no longer matters—a goal that the Fourteenth and Fifteenth Amendments embody, and to which the Nation continues to aspire." *Shaw v. Reno*, 509 U.S. 630, 657 (1993). The Court also feared that race-based districting encourages elected representatives "to believe that their primary obligation is to represent only the members of that group, rather than their constituency as a whole," which is "altogether antithetical to our system of representative democracy." *Id. at* 648. And "[w]hen racial or religious lines are drawn by the State, the multiracial, multireligious communities that our Constitution seeks to weld together as one become separatist; antagonisms that relate to race or to religion rather than to political issues are generated; communities seek not the best representative but the best racial or religious partisan." *Wright v. Rockefeller,* 376 U.S. 52, 66–67 (1964)(dissenting opinion)

3.      When a state unlawfully engages in racial gerrymandering, it also violates the Fifteenth Amendment, which provides that the right of citizens to vote cannot be denied or abridged on account of race or color. U.S. Const., amend. 15, § 1. The Supreme Court has held that the Fifteenth Amendment "establishes a national policy ... not to be discriminated against as voters in elections to determine public governmental policies or to select public officials, national, state, or local." *Terry v. Adams,* 345 U.S. 461, 467 (1953). Therefore, a racial gerrymander, "the deliberate and arbitrary distortion of district boundaries ... for [racial] purposes," is a form of circumvention of the Fifteenth Amendment. *Shaw* at 640. "[S]tate authority over the boundaries of political subdivisions, extensive though it is, is met and overcome by the Fifteenth Amendment to the Constitution." *Rice v. Cayetano*, 528 U.S. 495, 522 (2000).

4.      The California Legislature issued a press release announcing that Proposition 50 creates two new districts to "empower Latino voters to elect their candidates of choice," adding them to the pre-existing fourteen such districts. The Legislature characterized these sixteen districts as "Voting Rights Act districts," meaning districts that are specifically designed to favor one race or ethnicity of voters. The consultant who drew the lines also explained that the first thing that he did when drawing the Proposition 50 map was to add a "Latino District" that the Independent Citizens



2
**COMPLAINT**

District had previously eliminated and that he altered the lines of a district to make it a "Latino-influenced district" by ensuring its voting age population was "35 percent Latino."

5.      While compliance with the federal Voting Rights Act ("VRA") may justify race-based districting under current law notwithstanding the Equal Protection Clause, *Cooper v. Harris*, 581 U.S. 285, 285, 292 & 301, the Supreme Court requires states to prove that, among other things, they in fact adopted the new district lines based on evidence that a minority race usually could not elect its preferred candidates due to the concerted opposition of voters of a white majority race. *Cooper*, 581 U.S. at 292–93, 301-302. Without proof of this condition, states have no lawful basis to enact race-based congressional districts.

6.      However, California's Hispanic voters have successfully elected their preferred candidates to both state and federal office, without being thwarted by a racial majority voting as a bloc. This is unsurprising because Latinos are the most numerous demographic in the state and California voters nearly always vote based on their party affiliation, not their race.

7.      The Legislature not only had no evidence that the existing Citizen Redistricting Commission's 2021 maps violated the VRA and therefore racial gerrymandering was justified. But also, the consultant who drew the Proposition 50 map acknowledged two studies, one before and one after he drew the map, that confirmed the Commission's map complied with the VRA.

8.      Therefore, Defendants engaged in unconstitutional racial gerrymandering when they created the Proposition 50 congressional district map.

9.      Plaintiffs ask the Court to invalidate the unconstitutional racially gerrymandered Proposition 50 map and require that any future use of race in drawing lines comply with the Equal Protection Clause to ensure all Californians enjoy equal protection under the law.

### JURISDICTION AND VENUE

2.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 because Plaintiffs assert federal constitutional claims under 42 U.S.C. § 1983.

3.      Declaratory relief is authorized by 28 U.S.C. §§ 2201–2202.

4.      Venue is proper here under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to these claims occurs here: namely, the administration and conduct of elections using the challenged congressional map in this District (including Los Angeles, Orange, Riverside, San Bernardino, Ventura, Santa Barbara, and San Luis Obispo Counties), where Plaintiffs reside and vote. Venue is also proper under § 1391(b)(1) because Defendants are residents of California and perform official duties statewide, including within this District.

5.      Plaintiffs request a three-judge court under 28 U.S.C. § 2284 because this case challenges the constitutionality of statewide redistricting.

## PARTIES

6.      Plaintiff David Tangipa is a registered voter and Assemblyman residing in Congressional District 21 in Fresno County. He is the first Legislator in California's history of Polynesian decent, the smallest and least represented minority group in the state and was elected by a majority white district. He sits on the Assembly Elections Committee. He plans to vote in the 2026 congressional election. The challenged plan assigns him to a district drawn with race as the predominant factor, causing stigmatic and representational injury.

7.      Plaintiff Eric Ching is an Asian voter and Congressional Candidate who resides in Congressional District 31 in Los Angeles County, where he has resided for about forty-two years. He was formerly a city councilman, and he plans to run for election to and vote in the 2026 District 31 Congressional election. The challenged plan assigns him to a district drawn with race as the predominant factor, causing stigmatic and representational injury.

8.      Plaintiff Saul Ayon is a Latino voter who resides in Congressional District 22 in Kern County, where he has resided for forty-nine years. He was formerly a city councilman. He plans to vote in the 2026 congressional election. The challenged plan assigns him to a district drawn with race as the predominant factor, causing stigmatic and representational injury.

9.      Plaintiff Peter Hernandez is a Hispanic voter who resides in Congressional District 18 in San Benito County, where he has resided for fifty-one years. He formerly served as a school board member and on the board of supervisors. He plans to vote in the 2026 congressional election. The



challenged plan assigns him to a district drawn with race as the predominant factor, causing stigmatic and representational injury.

10.     Plaintiff Roxanne Hoge is an immigrant from Jamaica who is a registered voter who resides in Congressional District 29 in Los Angeles County, where she has resided since 1988. She plans to vote in the 2026 congressional election. The challenged plan assigns her to a district drawn with race as the predominant factor, causing stigmatic and representational injury.

11.     Plaintiff Joel Guiterrez Campos is a Latino voter who resides in Congressional District 13 in Stanislaus County, where he has resided for roughly thirty-four years. He plans to vote in the 2026 congressional election. The challenged plan assigns him to a district drawn with race as the predominant factor, causing stigmatic and representational injury.

12.     Plaintiff Solomon Verduzco is a Hispanic voter who resides in Congressional District 21 in Fresno County, where he has resided for his entire life. He plans to vote in the 2026 congressional election. The challenged plan assigns him to a district drawn with race as the predominant factor, causing stigmatic and representational injury.

13.     Plaintiff Paul Ramirez is a Hispanic voter who resides in Congressional District 41 in Los Angeles County where he has resided since 1962. He plans to vote in the 2026 congressional election. The challenged plan assigns him to a district drawn with race as the predominant factor, causing stigmatic and representational injury.

14.     Plaintiff Jane Ortiz-Wilson is a Hispanic voter who resides in Congressional District 9, in San Joaquin County, where she has resided for fifteen years. She plans to vote in the 2026 congressional election. The challenged plan assigns her to a district drawn with race as the predominant factor, causing stigmatic and representational injury.

15.     Plaintiff Vernon Costa is a Portuguese voter who resides in Congressional District 22 in Kings County, where he has resided for sixty-eight years. He plans to vote in the 2026 congressional election. The challenged plan assigns him to a district drawn with race as the predominant factor, causing stigmatic and representational injury.

16.     Plaintiff Rachel Gunther is a Filipino voter who resides in Congressional District 41 in



Los Angeles County, where she has lived since 1971. She plans to vote in the 2026 congressional election. The challenged plan assigns her to a district drawn with race as the predominant factor, causing stigmatic and representational injury.

17.     Plaintiff Doug Buchanan is a White voter who resides in Congressional District 13 in Stanislaus County where he has lived for forty-six years. He plans to vote in the 2026 congressional election. The challenged plan assigns him to a district drawn with race as the predominant factor, causing stigmatic and representational injury.

18.     Plaintiff Sayrs Morris is a White voter who resides in Congressional District 25 in Imperial County where she has resided for fourteen years. She plans to vote in the 2026 congressional election. The challenged plan assigns her to a district drawn with race as the predominant factor, causing stigmatic and representational injury.

19.     Plaintiff Mike Netter is a White voter who resides in Congressional District 31 in Los Angeles County where he has resided for six years. He plans to vote in the 2026 congressional election. The challenged plan assigns her to a district drawn with race as the predominant factor, causing stigmatic and representational injury.

20.     Plaintiff Christina Raughton is a White voter who resides in Congressional District 33 in San Bernardino County where she has been a resident since 2005. She plans to vote in the 2026 congressional election. The challenged plan assigns her to a district drawn with race as the predominant factor, causing stigmatic and representational injury.

21.     Plaintiff Kristi Hays is a White voter who resides in Congressional District 35 in Riverside County where she has been a resident for fourteen years. She plans to vote in the 2026 congressional election. The challenged plan assigns her to a district drawn with race as the predominant factor, causing stigmatic and representational injury.

22.     Plaintiff James Reid is a White voter who resides in Congressional District 35 in San Bernardino County where he has lived for roughly forty years. He plans to vote in the 2026 congressional election. The challenged plan assigns him to a district drawn with race as the predominant factor, causing stigmatic and representational injury.



6
**COMPLAINT**

23.   Plaintiff Michael Tardif is a White voter who resides in Congressional District 46 in Orange County where he has lived for over seventy years. He plans to vote in the 2026 congressional election. The challenged plan assigns him to a district drawn with race as the predominant factor, causing stigmatic and representational injury.

24.   Plaintiff Alex Galicia is a Hispanic voter who resides in Congressional District 52 in San Diego County where he has lived for over 19 years. He plans to vote in the 2026 congressional election. The challenged plan assigns him to a district drawn with race as the predominant factor, causing stigmatic and representational injury.

25.   Plaintiff California Republican Party (CAGOP) is a political party in California with its principal place of business in Sacramento. The CAGOP exercise its "federal and state constitutional rights, as set forth in the First and Fourteenth Amendments to the United States Constitution, and Article IV, Section 5 ... to represent and speak for its members [and] to endorse and to nominate candidates for all partisan elective offices." Section 1.04.01 of the CAGOP Bylaws.

26.   The CAGOP represents over 5.8 million registered Republican voters in California as of October 20, 2025.

27.   The CAGOP has a vital interest in protecting the ability of Republican voters to vote in elections where the districts are an unconstitutional racial gerrymander. The CAGOP brings this suit to vindicate its own rights in this regard, and in a representational capacity to vindicate the rights of its member voters and candidates.

28.   Defendant Gavin Newsom is made a party to this Action in his official capacity as Governor of California. *See, e.g., Ex Parte Young*, 209 U.S. 123 (1908). The California Constitution vests the "supreme executive power of the State" in the Governor, who "shall see that the law is faithfully executed." Cal. Const. Art. V, § 1. Also, Newsom signed the laws that enabled Proposition 50 to be placed on the ballot.

29.   Defendant Shirley Weber is made a party to this Action in her official capacity as the Secretary of State of California. The California Secretary of State is the chief elections officer and is responsible for implementing the Proposition 50 maps that are challenged in this Action.

## STANDING

30.    Each Plaintiff other than the CAGOP is a registered voter who has a right to vote and plans to vote in the 2026 congressional election.

31.    Plaintiff Eric Ching had announced he was running for Congress in Congressional District 38. However, because of the passage of Proposition 50, he now lives in Congressional District 41. Ching has not yet announced if he will still run for Congress or if he does, which district.

32.    Plaintiffs have standing to challenge Proposition 50 because the law classifies and segregates them into distinct districts based on their races for purposes of voting. *See North Carolina v. Covington*, 138 S. Ct. 2548, 2552-54 (2018) (per curiam) (holding that plaintiffs can establish a cognizable injury by showing "they had been placed in their legislative districts on the basis of race"); *see also Miller v. Johnson*, 515 U.S. 900, 911 (1995); *Shaw v. Reno* (Shaw I), 509 U.S. 630, 650 (1993); *Harding v. Cnty of Dallas, Tex.*, 948 F.3d 302 (5th Cir. 2020). They all reside in racially gerrymandered districts. Plaintiffs have thereby suffered a constitutional injury that is traceable to the challenged law and redressable by this Court.

33.    Plaintiffs also have standing because they suffered unlawful, intentional discrimination based on race when the State used a racial quota to create sixteen Latino districts. *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 1 (2023); *Adarand Constructors v. Pena*, 515 U.S. 200 (1995); *Richmond v. J.A. Croson Co.,* 488 U.S. 469 (1989).

34.    Plaintiffs also have standing because they have suffered an abridgement of their rights to vote. *Shaw v. Hunt* (Shaw II), 517 U.S. 899, 917 (1996); *Gomillion v. Lightfoot*, 364 U.S. 339 (1960).

35.    These injuries are traceable to Proposition 50, which directly and intentionally caused these injuries.

36.    Plaintiffs are personally subjected to the racial sorting embodied in the challenged districts, suffer representational harms, and face imminent electoral injuries absent relief. These injuries are concrete, particularized, and redressable by the Court.

37.    Plaintiff CAGOP has standing to represent its members in each of the challenged congressional districts who have been harmed. CAGOP works to elect Republican candidates to

**COMPLAINT**



Congress. The passage of Proposition 50 will result in CAGOP diverting resources and spending significant amounts of money educating voters on the new lines and their congressional representation.

**FACTUAL BACKGROUND**

38.     In July 2025, several California Congressional Democrats devised a plan by which they would threaten to have the California legislature draw a new set of maps in order to discourage the redistricting that the state of Texas was considering. After these Congressmen heard Governor Newsom say that California would redistrict, they retained an expert who drafted the maps. These maps were published on Friday, August 15, 2025, just days before the legislature came back from their summer recess. Due to the date on which Governor Newsom desired the special election to occur, they published, debated, and approved the Legislative Package that became Proposition 50 within 4 days.

**A. The Three-Bill Package that Placed "Proposition 50" on the Ballot and Enacted a Legislature-Drawn Map**

39.     In August 2025, California's Governor and state legislative leadership announced a coordinated package to replace the congressional map adopted by the Citizens Redistricting Commission ("CRC") with a new congressional map for use in 2026, 2028, and 2030, subject to voter approval at a special election on November 4, 2025. The package consisted of:

> (a) ACA 8 (Rivas & McGuire), a legislatively-referred constitutional amendment authorizing temporary use of a legislature-enacted congressional map through 2030;
> (b) AB 604 (Aguiar-Curry & Gonzalez), the statute specifying the new congressional district boundaries; and
> (c) SB 280 (Cervantes & Pellerin), the bill calling the special election, appropriating funds, and making conforming calendar changes. *See* Assemb. B. 604, 2025–26 Reg. Sess. (Cal. 2025); Sen. B. 280, 2025–26 Reg. Sess. (Cal. 2025); Assemb. Const. Amend. 8, 2025–26 Reg. Sess. (Cal. 2025).

(hereinafter collectively "Legislative Package").

**B. Expedited Timeline**

40.     From introduction to final floor vote, the key measures were advanced with extraordinary

9
**COMPLAINT**



speed. The Legislative Package moved from first reading (August 18, 2025) to a vote in less than four days.

41.    On August 21, 2025, the Assembly and Senate approved the Legislative Package.

42.    On that same day, multiple procedural safeguards were suspended to expedite the process. The Senate suspended Joint Rule 10.5 and Senate Rule 19 by a recorded vote of Ayes 30, Noes 9.

43.    Additionally, the Assembly suspended Assembly Rule 63 and Assembly Rule 69(b)(1), facilitating rapid referral from committee and bypassing standard amendment-reprint and notice requirements.

44.    Because of the rule suspensions and the compressed timeline, the Legislative Package proceeded with limited public transparency. The suspension of the referral and reprint rules meant that legislators and stakeholders had little if any time to review changing versions of the bills, including major amendments to district boundaries and operative triggers.

**C. The Bill Was Amended and the Maps Changed Repeatedly**

45.    Throughout the brief and rushed legislative process, the Legislative Package underwent multiple substantive amendments, including to the map itself.

**D. The Legislature Acted Without Furnishing District-Specific VRA Analyses**

46.    During this accelerated, unconstitutional, and convoluted process, no district-by-district analysis under Section 2 of the VRA or "strong-basis-in-evidence" memorandum was provided to legislators before their votes.

47.    Public bill materials and committee analyses for the Legislative Package contain no district-specific assessment of minority citizen voting-age population, racial cohesion, crossover or white-bloc voting, or functional performance for any proposed district.

48.    The committee analysis for the Legislative Package summarizes the bills but presents no district-level VRA study or analysis.

49.    Multiple sitting legislators including Assemblyman Tangipa and Senator Ochoa-Bogh stated that they were not provided any evidence for them to determine if the state of California was



required to draw VRA districts.

**E. The Legislature Did Not "Draw" These Lines; It Adopted a Map Created by a Partisan-Aligned Consultant and Submitted by the DCCC**

50.     The map codified by the Legislative Package was not drawn by legislators or paid for by the state of California. It was drafted by Paul Mitchell of Redistricting Partners.

51.     The Democratic Congressional Campaign Committee ("DCCC") campaign disclosures show that they paid Redistricting Partners to draw the map.

**F. Use of Race and the Voting Rights Act in Drawing the Proposition 50 Maps**

52.     Public statements by Paul Mitchell, the consultant who drew the Legislature's congressional map, confirm that race and Latino demographics were intentionally and directly used as criteria in designing the Proposition 50 map.

53.     Mitchell acknowledged during a public presentation that his work on the Legislature's plan was guided by racial considerations and that his "number one thing that [he] first started thinking about" was "drawing a replacement Latino majority/minority district in the middle of Los Angeles," a district he had "worked with HOPE on in the last redistricting process."

54.     Mitchell further explained that he relied on advocacy from Hispanas Organized for Political Equality ("HOPE"), reading from a 2021 HOPE letter that expressed "concern about the elimination of a majority/minority Latino district within the area of Los Angeles gateway cities." He stated that the letter "illustrated what HOPE wanted to see done … allowing for the creation of five Latino majority/minority districts in an area where there are currently four."

55.     Mitchell admitted that those racial goals dictated his line-drawing decisions. He stated: "That [sic] two bullet points was the first thing we did in drawing the new map. We essentially reversed the Redistricting Commission's decision to eliminate a Latino district from L.A., the old Ed Roybal district … We put that district back … eliminating the Ken Calvert district in Riverside … in order to fill in."

56.     Mitchell further confirmed that a formal "Voting Rights Act analysis" was conducted to measure Latino electoral performance and that this analysis directly informed the map's boundaries.

**COMPLAINT**



However, he admitted that the existing map drawn by the Independent Citizens Redistricting Commission was "compliant with Section 2" of the VRA and yet the Proposition 50 map he created, consistent with his initial work to realize the objectives of HOPE "improves the opportunity for Latino voters to elect candidates of choice in two more districts than the existing plan."

57.    Mitchell also admitted that he changed another district to create a "Latino-influenced district at 35 percent Latino by voting age population."

58.    Mitchell further stated that the Public Policy Institute of California conducted an analysis after the Legislature adopted his map that confirmed it "maintained the status quo in terms of the Voting Rights Act," indicating the prior map did not violate the VRA, and yet the Proposition 50 map "added one more Latino-influenced district." Mitchell also stated "The Prop. 50 maps I think will be great for the Latino community in … that they ensure that the Latino districts that are the VRA seats are bolstered in order to make them most effective, particularly in the Central Valley."

59.    On the Capitol Weekly Podcast, Mitchell again confirmed that internal discussions explicitly referenced the VRA and Latino communities and districts. He described advocates who wanted to "throw away the VRA" and pursue a "52/0 map," that is, violate the VRA to eliminate the possibility of Republicans winning any congressional districts, contrasted with crafting "a five-district pick-up map [that would] follow the [VRA], [and] keep communities of interest together."

60.    On October 23, 2025, Mitchell in a post on X (formerly Twitter), wrote that the "proposed Proposition 50 map will further increase Latino voting power over the current Commission map," citing a joint report from Cal Poly Pomona and CalTech; that the "proposed map likely will increase Asian American voting power," citing the UCLA AAPI Policy Initiative; and that "the proposed plan matches the current one almost exactly: it adds one more Latino influence district but otherwise replicates the status quo," citing the Public Policy Institute of California.[1]

---

[1] *See also* Cal Poly Pomona & CalTech, Proposition 50: Projected Impacts on Latino Voting Power (Oct. 2025), https://cpp.edu/class/political-science/docs/media/proposition-50.pdf; UCLA AAPI Policy Initiative, Special Elections and Asian American Representation: November 2025 Report (Oct. 2025), https://aasc.ucla.edu/resources/policyreports/SpecialElectionsNovember2025.pdf; Public Policy Institute of California (PPIC), How Would the Prop 50 Redistricting Plan Affect Racial and Geographic Representation? (Oct. 2025), https://ppic.org/blog/how-would-the-prop-50-redistricting-plan-affect-racial-and-geographic-representation/.



61.     These statements constitute direct admissions that race and Latino population data were consciously used to draw district lines in the Proposition 50 map. The Proposition 50 map was not the product of race-neutral redistricting criteria but of an intentional, race-conscious process.

**G. Legislators' Own Statements Framed the Effort in Race-Linked Terms**

62.     During the week that the California legislature was approving Proposition 50, there were multiple statements made by various legislators that they believed that the maps that they were approving complied with the VRA. That is, the legislature was creating sixteen VRA congressional district where race was the predominate factor in the gerrymandered districts.

63.     Proponents, include the Senate President pro Tempore in a press release, publicly emphasized that the new map "retains and expands Voting Rights Act districts that empower Latino voters" and "retains both historic Black districts and Latino-majority districts." By "Voting Rights Act districts," the press release is referring to districts deliberately drawn to favor one race of voters over others.

64.     On August 15, 2025, the Office of the Speaker of the Assembly published a press release titled *Legislative Democrats Announce Plan Empowering Voters to Protect California*, stating: "Protecting the rights of all voters. The new map retains the voting rights protections enacted by the independent commission."

65.     On August 19, 2025, the Office of the Speaker of the Assembly published a press release titled *California Assembly Democrats Support Empowering Voters to Stop Trump's Power Grab*, stating: "Protecting the rights of all voters. The new map retains the voting rights protections enacted by the independent commission, and retains both historic Black districts and Latino-majority districts."

66.     On August 19, 2025, the Office of the Senate President pro Tempore published a press release titled *Legislative Democrats Announce Plan Empowering Voters to Protect California*, stating that lawmakers "pushed for key provisions in the legislation to ensure fidelity to independent commissions, protections for the Voting Rights Act, and preservation of California cities and communities," and to further protecting "communities of color and historically marginalized voters." It clarified that "[t]he new map makes no changes to historic Black districts in Oakland and the Los



Angeles area, and retains and expands Voting Rights Act districts that empower Latino voters to elect their candidates of choices."

67.    On August 9, 2025, the Office of the Speaker of the Assembly published a press release titled *Speaker Rivas Joins California, Texas Democrats to Fight Back Against Trump's Redistricting Power Grab*, which quoted Assemblymember Avelino Valencia as stating: "Redistricting should be about making sure every voice counts. President Trump and Texas Republicans are using it to drown out the voices they do not want to hear, especially communities of color and working families. Their manipulation of our democracy is wrong and we will not sit on the sidelines. We will call out the injustice, protect representation, and make sure our democracy reflects communities like mine."

68.    During committee and floor debate, the mentions of race and the VRA continued. Assemblymember Berman, presenting ACA 8 before the Assembly Elections Committee, emphasized: "A big distinction between these maps that were drawn in California and the maps that are currently being passed by the State of Texas, for example, are California's maps strictly abide by the federal *Voting Rights Act*, which the Texas maps don't. And so we've actually put ourselves in a very good position to defend the maps that have been drawn because the *Voting Rights Act* and the principles of the *Voting Rights Act* were taken into very high consideration when those maps were drawn."

69.    In the Assembly Appropriations Committee, Speaker Isaac Bryan reiterated that ACA 8 was designed to counter efforts in other states that sought to diminish minority voting strength: "ACA 8 exists because Trump and the Republican-controlled Texas Legislature and other states, like Indiana and Florida, are attempting to redraw congressional districts in the middle of a decade, pre-census, with the explicit aim of *diluting Black and Brown representation and power*." This statement demonstrates that the Proposition 50 maps were deliberately designed to increase Latino voting power in California to counteract what was occurring in other states rather than being compelled by California's compliance with the VRA.

70.    There is no publication by the State of California, Gavin Newsom, Shirley Weber, the California legislature, or Paul Mitchell that identifies which of California's 52 Congressional districts are the new Voting Rights districts. However, on information and belief, the following sixteen districts



are the racial gerrymanders subject to this Action that were paid for by the DCCC, drawn by Paul Mitchell, adopted by the California legislature and are about to be implemented by Defendants Gavin Newsom and Shirley Weber: CD 13, 18, 21, 22, 25, 29, 31, 33, 34, 35, 38, 39, 41, 44, 46, and 52. On information and belief, CD 42 is the Congressional district identified by Mitchell as a "Latino-influenced district.



**(Red = VRA Congressional District; Beige = VRA adjacent Congressional District)**

## H. Historical Background of Redistricting

71.    The United States Constitution requires the states to periodically redistrict. Article I, Section 2 mandates that congressional representation be recalculated every ten years "according to their respective Numbers." U.S. Const. art. I, § 2, cl. 3. This decennial adjustment reflects the Framers' judgment that representative government must rest upon current population, not historical boundaries or political convenience. Having witnessed how fixed representation in Parliament produced "rotten boroughs" and denied growing communities a voice, the Framers embedded population-based

redistricting as a safeguard against the same decay. *Reynolds v. Sims*, 377 U.S. 533, 562 (1964) ("Legislators represent people, not trees or acres."); *Wesberry v. Sanders*, 376 U.S. 1, 8 (1964) (the Framers intended representation to be "as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's"). Thus, redistricting every decade after the census is not a matter of policy preference but a constitutional command ensuring that government continues to reflect the people it serves.

72.     California's own Constitution implements this same federal principle through its once-per-decade limitation on redistricting. Article XXI, section 1, provides that "in the year following the year in which the national census is taken under the direction of Congress at the beginning of each decade, the Citizens Redistricting Commission shall adjust the boundary lines of the Congressional, State Senatorial, Assembly, and Board of Equalization districts." Cal. Const. art. XXI, § 1, subd. (a). The text leaves no ambiguity: redistricting is a decennial act tethered to the federal census, not a recurring policy choice available to each Legislature. The one-map-per-decade rule ensures that representation remains stable between censuses and that partisan or transient majorities cannot continually manipulate district lines for advantage.

73.     The California Constitution only permits the redistricting of Congressional districts after the Commission has published their maps in two scenarios: a voter referendum, and because of a court order. Cal. Const. art. XXI, §§ 2(i), 3(b)(3).

**I. Procedural Posture and Scope**

74.     Despite this constitutional structure, Proposition 50 does not arise from the decennial redistricting process that followed the 2020 Census. That process was completed by the independent Citizens Redistricting Commission in 2021, and the resulting maps have never been challenged by any party in any state or federal court.

75.     Proposition 50 represents a mid-decade redistricting, precisely the kind of legislative interference that the California Constitution was designed to prevent. It attempts to substitute a legislative map for the one lawfully adopted by the Commission, without any intervening census or constitutional authorization. It attempts to create a third option way for legislators to interpose



themselves on a process in which they otherwise were barred from participating in.

76.     On November 4, 2025, Proposition 50 was passed by the voters.

**J. No Evidence of A White Majority that Votes as a Bloc to Ensure Hispanics are Never Elected**

77.     In 2010, California enacted Proposition 14, which implemented the top two primary system.

78.     As a result of Proposition 14, California was required to file with the Obama Department of Justice a Notice of Submission under Section 5 of the VRA.

79.     By law, the Obama Department of Justice was required to evaluate California's past elections to determine if Hispanics were able to win elections in the state and if Proposition 14 would result in it being made impossible for Hispanics to get elected.

80.     Based on information and belief, the Obama Department of Justice concluded that Hispanics were regularly elected in California and pre-cleared Proposition 14 into law.

81.     According to the 2020 Census, Whites are not a majority in California. In fact, they are not even a plurality. The 2020 Census shows that Whites are the second largest ethnic population in California.



California
2020
Diversity Index: **69.7%**

Percentage of Total Population

| | |
|---|---|
| White alone, not Hispanic or Latino | 34.7% |
| Black or African American alone, not Hispanic or Latino | 5.4% |
| American Indian and Alaska Native alone, not Hispanic or Latino | 0.4% |
| Asian alone, not Hispanic or Latino | 15.1% |
| Native Hawaiian and Other Pacific Islander alone, not Hispanic or Latino | 0.3% |
| Some Other Race alone, not Hispanic or Latino | 0.6% |
| Two or More Races, not Hispanic or Latino | 4.1% |
| Hispanic or Latino | 39.4% |



82.     While Hispanics are the plurality of total population, Non-Hispanic Whites are a plurality in the Citizen Voting Age Population (CVAP). No ethnic group is a majority in California.

83.     Even if there was a White majority in California (which there is not), Whites do not vote as a bloc to usually defeat the candidates chosen by Hispanics.

84.     Votes received by candidates of the same party across offices in the same election year are stable, indicating high levels of partisan straight ticket voting regardless of race.

85.     In 2022, U.S. Senator Alex Padilla who is Hispanic won election against a White Republican Mark Meuser.

86.     In 2022, California Governor Gavin Newsom who is White won election against a White Republican, Brian Dahle.

87.     If California White voters voted in a bloc against Hispanic voters, one would expect to find that Senator Alex Padilla would not have won, or that his margin of victory was significantly lower than that of Governor Gavin Newsom. However, the exact opposite is true. Alex Padilla, a Hispanic received more votes and obtained a larger margin of victory then Gavin Newsom who was White.

88.     The current senior Senator for the State of California is a Hispanic. In addition, the current Insurance Commissioner is a Hispanic. The current ethnic breakdown of California statewide elected leaders also includes three Whites (U.S. Senator, Governor, Lt. Governor), three Blacks (Secretary of State, State Controller, and State Superintendent of Public Instruction), and two Asians (Attorney General, and Treasurer).

89.     California has a racially diverse (but not politically diverse) set of elected officials statewide.

90.     At least 27 of California's 52 Congressional delegation are an ethnic minority. Of those, at least 15 are Hispanic.

91.     At least 20 of California's 40 state senators are an ethnic minority. Of those, at least 15 are Hispanic.

92.     At least 45 of California's 80 state assemblymen are an ethnic minority. Of those, at least 27 are Hispanic.



93.     California was not required to draw Voting Rights District and thus the drawing of sixteen Voting Rights Districts constitutes an unconstitutional racial gerrymander.

## CLAIMS FOR RELIEF

### COUNT I

**Violation of the Equal Protection Clause of the Fourteenth Amendment**

**(Racial Gerrymandering in Sixteen Districts)**

94.     Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint.

95.     Defendants violated the Equal Protection Clause of the Fourteenth Amendment by using race as a predominant factor in drawing the boundaries of sixteen congressional districts, Districts 13, 18, 21, 22, 25, 29, 31, 33, 34, 35, 38, 39, 41, 44, 46, and 52.

96.     Defendants issued a press release announcing that they had created districts to "empower Latino voters to elect their candidates of choice," adding them to the fourteen such districts created by the prior Commission. The Legislature characterized these new Proposition 50 districts as "Voting Rights Act districts," meaning districts that are specifically designed to favor one race or ethnicity of voters over others living within those districts.

97.     The consultant who drew the lines also explained that the first thing that he did when drawing the map was to add a "Latino District" that the Independent Citizens District had previously eliminated and that he altered the lines of a district to make it a "Latino-influenced district" by ensuring its voting age population was "35 percent Latino."

98.     Consistent with these statements, the Proposition 50 congressional district map increased the number of districts favoring Hispanic voters, in which their population makes up the most voters in a Congressional district, from fourteen to sixteen.

99.     Further, the boundaries of Proposition 50's District 13 appear to have been drawn predominantly to improve Hispanic performance in the district, and not predominantly to improve the prospects of Democratic Party candidates. Near Ceres and Modesto, the District's boundary bulges out to split Modesto while keeping Ceres intact and capturing some areas outside of Ceres. This omits a

**COMPLAINT**



1  significant White Democratic population in Modesto while capturing a heavily Hispanic Republican

2  population in and around Ceres. Changes to the northern side of the District include a large plume that

3  that incorporates a smaller number of Democrats than was possible in order to absorb more Hispanic

4  voters.

5    100.    The burden shifts to the Defendants to prove that they had a strong basis in evidence to

6  justify their race-based districting, that is, that it was narrowly tailored to achieve a compelling state

7  interest.

8    101.    Engaging in race-based districting to remedy a violation of the VRA may be a

9  compelling interest under current law. However, the Defendants' have never asserted that this was their

10  motivation. Moreover, their consultant who drew the Proposition 50 map admitted that one VRA

11  analysis concluded that the prior Commission-drawn map did not violate the VRA and a second analysis

12  concluded that the Proposition 50 map merely maintained the status quo with respect to the VRA.

13    102.    Defendants cannot satisfy the test established by the Supreme Court in *Gingles* to

14  demonstrate that the VRA compels race-based districting. Specifically, Defendants cannot meet the

15  third factor, which is that a minority population's preferred candidates generally cannot get elected due

16  to the concerted opposition of the population of a different race's majority.

17    103.    White voters are not a majority in California or even the majority in most of its counties.

18  Whites are merely a plurality statewide, with 43.5 percent of voting age citizens, compared to 31.9 for

19  Hispanics. Moreover, looking specifically at the Counties where Proposition 50 racially gerrymandered

20  congressional districts to favor Hispanic voters, Hispanics are a majority or a plurality of voting age

21  adults in eleven of the eighteen affected counties (Fresno, Imperial, Kern, Kings, Los Angeles, Madera,

22  Merced, Riverside, San Benito, San Bernardino, and Tulare counties). In one further county (Monterey),

23  voting age Whites outnumber Hispanics by only .7%. In two other counties, Orange and San Joaquin,

24  voting age Whites outnumber Hispanic voters, but are still not a majority. In fact, in only two of the

25  eighteen counties (San Diego and Santa Cruz) do voting age Whites comprise the majority.

26    104.    Hispanic voters in California have been able to elect their preferred candidates, including

27  congressional candidates. The diverse fifty-two member California delegation to the U.S. House of

28

**COMPLAINT**

Representatives already includes fifteen Hispanic members of Congress, three Black members of Congress, and nine Asian Pacific Islander members of Congress. Hispanics in particular are 31.9% of California's citizens of voting age and its fifteen members of Congress already represent 28.85% of the fifty-two member Congressional delegation.

105. In fact, nearly all Californians vote to an extreme degree based purely on party affiliation.

106. Finally, the Defendants cannot satisfy the third factor of *Gingles* with a post-hoc rationalization. To meet the test and avoid an Equal Protection Clause violation, a state must have in fact had strong evidence at the time of its decision that it relied upon when making the decision to engage in race-based districting.

107. The California Legislature had no such evidence. The Proposition 50 map had largely been developed outside of the legislature, by a consultant working for Californian members of Congress. The map was foisted upon the California Legislature, which approved it within a week. Whatever analyses had been done (see above), whether they concluded that race-based districting was needed or not to avoid a VRA violation, any such analyses were not provided to legislators.

108. In fact, the map was changed at the last minute, the day before the Legislature adopted it. There was no discussion of the reasons for the changes. Accordingly, any prior VRA analysis would be obsolete.

109. In sum, in the Proposition 50 map adopted by the Defendants, race predominated over traditional, race-neutral districting principles such as compactness, contiguity, respect for political subdivisions, and communities of interest. No data, findings, or analyses demonstrated that the three *Gingles* preconditions were satisfied and therefore justified the creation of race-based districts favoring Latino voters to avoid violating the VRA. The resulting districts therefore constitute unconstitutional racial gerrymanders, designed and adopted without lawful justification and in violation of the Equal Protection Clause.

110. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the Proposition 50 maps.



**COMPLAINT**

111.    Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

## COUNT II

### Violation of the Fifteenth Amendment

### (Racial Gerrymandering in Sixteen Congressional Districts)

112.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint.

113.    The Fifteenth Amendment provides that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." "Consistent with the design of the Constitution, the [Fifteenth] Amendment is cast in fundamental terms, terms transcending the particular controversy which was the immediate impetus for its enactment." *Rice v. Cayetano*, 528 U.S. 495, 512 (2000). The Fifteenth Amendment "establishes a national policy ... not to be discriminated against as voters in elections to determine public governmental policies or to select public officials, national, state, or local." *Terry v. Adams*, 345 U.S. 461, 467 (1953). Under the Fifteenth Amendment voters are treated not as members of a distinct race but as members of the whole citizenry. *Rice,* 528 U.S. at 523. "Unlike the Fourteenth Amendment claim, there is no room for a compelling state interest defense, as the Fifteenth Amendment's prohibition is absolute." *Prejean v. Foster*, 227 F.3d 504, 519 (5th Cir. 2000).

114.    A racial gerrymander is a form of circumvention of the Fifteenth Amendment. *Shaw v. Reno*, 509 U.S. 630, 640 (1993) ("Another of the weapons in the States' arsenal [against the 15th Amendment] was the racial gerrymander—"the deliberate and arbitrary distortion of district boundaries ... for [racial] purposes."").

> The question before us is not the one-person, one-vote requirement of the Fourteenth Amendment, but the race neutrality command of the Fifteenth Amendment. . . . We held four decades ago that state authority over the boundaries of political subdivisions, "extensive though it is, is met and overcome by the Fifteenth Amendment to the Constitution.

*Rice v. Cayetano*, 528 U.S. 495, 522 (2000) (quoting *Gomillion v. Lightfoot*, 364 U.S. 339, 345 (1960)).

115.    Defendants are intentionally placing non-Hispanic voters in districts where it is state

**COMPLAINT**



policy that these voters should not be able to elect a candidate of their choice because the government has officially determined that district's representative should reflect the preferences of Hispanic voters, and the government has drawn the district lines to help achieve that goal. This is a race-based abridgment of the right to vote in violation of the 15th Amendment.

116. As alleged above, the Defendants intentionally redistricted based on race, including by setting out to increase the number of Hispanic VRA districts from fourteen to sixteen, even though they did not have to remedy a violation of the VRA. This was a deliberate distortion of district boundaries for racial purposes.

117. Accordingly, Defendants violated Plaintiffs' Fifteenth Amendment rights.

118. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the Proposition 50 maps.

119. Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

## COUNT III

### Violation of the Fourteenth and Fifteenth Amendments

### (Racial Gerrymandering of District 13)

120. Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint.

121. Defendants further violated the Equal Protection Clause of the Fourteenth Amendment and the Fifteenth Amendment's protection against the denial or abridgement of the right to vote on account of race or color by drawing Congressional Districts 13 (as summarized above) with race as the predominant factor and without any legal justification. In this district, racial composition, not traditional districting principles or genuine partisan considerations, drove the boundary lines.

122. District 13 under the Commission map was already 65.9% Hispanic and only 22.5% White. Accordingly, the VRA did not compel race-based redistricting.

123. No evidence presented to the Legislature supported the belief that race-based line



1   drawing was necessary to comply with the VRA or any other federal mandate.

2       124.    As such, the design of District 13 cannot be narrowly tailored to any compelling interest

3   and instead reflects unconstitutional racial sorting of voters, in direct violation of the Fourteenth and

4   Fifteenth Amendments.

5       125.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and

6   temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the

7   Proposition 50 maps.

8       126.    Plaintiffs found it necessary to engage the services of private counsel to vindicate their

9   rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C.

10  § 1988.

11

12      **WHEREFORE,** Plaintiffs respectfully request that this Court enter judgment against

13  Defendants as follows:

14      A.  An order and judgment declaring Proposition 50 maps, as applied to Plaintiffs, violate the

15          Fourteenth Amendment's Equal Protection Clause;

16      B.  An order and judgment declaring Proposition 50 maps, as applied to Plaintiffs, violate the

17          Fifteenth Amendment;

18      C.  An order temporarily, preliminary, and permanently enjoining and prohibiting Defendants

19          from enforcing the Proposition maps or otherwise interfering with Plaintiffs' constitutional

20          rights;

21      D.  For attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and for any other legal basis for

22          such fees and costs as apply;

23      E.  Such other and further relief as the Court deems appropriate and just.

24

25

26

27  Date: November 5, 2025                              DHILLON LAW GROUP

28

**COMPLAINT**



1

2          By:    /s Mark P. Meuser

3                 MICHAEL A. COLUMBO (SBN: 271283)
                  mcolumbo@dhillonlaw.com
4                 **DHILLON LAW GROUP INC.**
                  177 Post Street, Suite 700
5                 San Francisco, California 94108
                  Telephone: (415) 433-1700
6

7                 SHAWN COWLES (SBN: 163826)
                  scowles@dhillonlaw.com
8                 MARK P. MEUSER (SBN: 231335)
                  mmeuser@dhillonlaw.com
9                 **DHILLON LAW GROUP INC.**
10                4675 MacArthur Court, Suite 1410
                  Newport Beach, CA 92660
11

12                Attorneys for Plaintiffs

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



**COMPLAINT**