1  MICHAEL A. COLUMBO (SBN: 271283)
   SHAWN COWLES (SBN: 163826)
2  MARK P. MEUSER (SBN: 231335)
3  **DHILLON LAW GROUP INC.**
   4675 MacArthur Court, Suite 1410
4  Newport Beach, CA 92660
   mmeuser@dhillonlaw.com
5  Telephone: (415) 433-1700
   Fax: (415) 520-6593
6
7  *Attorneys for Plaintiffs*

8              **UNITED STATES DISTRICT COURT**
9
10            **CENTRAL DISTRICT OF CALIFORNIA**

11 **DAVID TANGIPA**; *et al.*,              CASE NO. 2:25-cv-10616 JLS (KESx)
12              Plaintiffs,
13        vs.                                **MEMORANDUM OF POINTS AND
                                             AUTHORITIES IN SUPPORT OF
14 **GAVIN NEWSOM**, in his official         PLAINTIFFS' MOTION FOR
   capacity as the Governor of California;  PRELIMINARY INJUNCTION**
15 *et al.*;
16              Defendants.                  **REQUEST FOR CONVENING OF
                                             THREE-JUDGE COURT
17                                           (28 U.S.C. § 2284)**

18                                           **ACTION SEEKING STATEWIDE
                                             RELIEF**
19
20                                           Assigned to Hon. Josephine L. Staton
21
22                                           Action Filed:  November 5, 2025
23
24
25
26
27
28



**MEMORANDUM OF POINTS AND AUTHORITIES        CASE NO. 2:25-cv-10616**

**TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES ........................................ 1

INTRODUCTION ................................................................................................ 1

BACKGROUND .................................................................................................. 5

LEGAL STANDARD ........................................................................................... 6

ARGUMENT: PLAINTIFFS ARE ENTITLED TO PRELIMINARY

INJUNCTIVE RELIEF ........................................................................................ 7

I.    Plaintiffs Not Only Raised Serious Questions Going to the Merits, But Also There Is a Strong Likelihood They Will Succeed in Proving Their Claim. ................................................................................................ 7

  A.    The U.S. Constitution's Equal Protection Clause Limits Race-Based Redistricting ........................................................................ 7

  B.    If Race Was the Predominant Factor in Redistricting, the State Must Satisfy Strict Scrutiny ....................................................... 9

  C.    Racial Considerations Predominated in Drawing Districts in Proposition 50's Map and Therefore Strict Scrutiny Applies .............................. 9

    1.    California Legislators and their Consultant Announced that Race Was the Predominant Factor Motivating the Drawing of at Least Sixteen Challenged Districts ................................................................ 10

    2.    Proposition 50's Congressional District 13 Was Racially Gerrymandered ............................................................................... 13

  D.    Compliance with the Voting Rights Act Can be a Compelling Interest ........... 15

  E.    Proposition 50's Race Based Sorting of Voters is Not "Narrowly Tailored" to its asserted Compelling Interest. ....................................... 15

    1.    The Prior Congressional District Map Complied with the VRA ....................... 17

    2.    No Majority Race Has Prevented Hispanic Voters from Electing Their Preferred Candidates ............................................................. 17

    3.    The Legislature Lacked a Strong Basis in Evidence of a VRA Violation that Required Race-Based Districting ........................................... 19

  F.    Proposition 50's Congressional Map Violates the 15th Amendment ................. 23

i



II.   There is a Likelihood of Irreparable Injury to Plaintiffs if Preliminary Relief is Not Granted ................................................................. 24

III.  The Balance of Hardships Tips Sharply in Plaintiffs' Favor ..................... 26

IV.   An Injunction Advances the Public Interest ............................................ 27

CONCLUSION ............................................................................................ 28



**MEMORANDUM OF POINTS AND AUTHORITIES          CASE NO. 2:25-cv-10616**

# TABLE OF AUTHORITIES

**Cases**

*Alabama Legislative Black Caucus v. Alabama,*
    575 U.S. 254 (2015) ................................................................... 15

*All. for Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011) ...................................................... 7

*Am. Bev. Ass'n v. City & Cnty. of San Francisco,*
    916 F.3d 749 (9th Cir. 2019) ...................................................... 27

*Am. Encore v. Fontes,*
    152 F.4th 1097 (9th Cir. 2025) .................................................... 25

*Bethune–Hill v. Virginia State Bd. of Elections,*
    580 U.S. 178 (2017) ............................................................... 7, 9

*Bush v. Vera,*
    517 U.S. 952 (1996) ................................................................. 16

*Charles H. Wesley Educ. Found., Inc. v. Cox,*
    408 F.3d 1349 (11th Cir. 2005) .................................................. 27

*Cooper v. Harris,*
    581 U.S. at 291 (2017) .................... 7, 9, 11, 13, 15, 16, 17, 19

*Davis v. Guam,*
    932 F.3d 822 (9th Cir. 2019) ...................................................... 23

*Earth Island Inst. v. United States Forest Serv.,*
    351 F.3d 1291 (9th Cir. 2003) ...................................................... 6

*Gomillion v. Lightfoot,*
    364 U.S. 339 (1960) ................................................................. 24

*Growe v. Emison,*
    507 U.S. 25 (1993) ................................................................... 16

*Johnson v. De Grandy,*
    512 U.S. 997 (1994) ................................................................. 22

*Lackey v. Stinnie,*
    604 U.S. 192 (2025) ................................................................... 6

*League of United Latin Am. Citizens v. Perry,*
    548 U.S. 399 (2006) ................................................................. 22

iii



**MEMORANDUM OF POINTS AND AUTHORITIES          CASE NO. 2:25-cv-10616**

*League of Women Voters of N. Carolina v. North Carolina*,
769 F.3d 224 (4th Cir. 2014) .................................................................. 25

*McLaughlin v. Florida*,
379 U.S. 184 (1964)............................................................................... 16

*Metro Broadcasting*,
497 U.S. 547 (1990) ................................................................................ 8

*Miller v. Johnson*,
515 U.S. 900 (1995)................................. 3, 7, 8, 9, 15, 19, 22, 26

Obama for Am. v. Husted,
697 F.3d 423 (6th Cir.2012) ................................................................. 25

*Palmore v. Sidoti*,
466 U.S. 429 (1984)............................................................................. 3, 8

*Prejean v. Foster*,
227 F.3d 504 (5th Cir. 2000) ................................................................ 23

*Regents of Univ. of Cal. v. Bakke*,
438 U.S. 265 (1978)................................................................................ 7

*Rice v. Cayetano*,
528 U.S. 495 (2000)..................................................................... 3, 23, 24

*Richmond v. J.A. Croson Co.*,
488 U.S. 469 (1989) ................................................................... 7, 16, 19

*Shaw v. Hunt*,
517 U.S. 899 (1996).................................................................. 15, 19, 20

*Shaw v. Reno*,
509 U.S. 630 (1993)............................................................ 3, 4, 8, 9, 22, 23

*Terry v. Adams*,
345 U.S. 461 (1953).......................................................................... 3, 23

*Thornburg v. Gingles*,
478 U.S. 30 (1986)........................................................................... 15, 16

United States v. City of Cambridge,
799 F.2d 137 (4th Cir.1986) ................................................................. 25

*University of Tex. v. Camenisch*,
451 U.S. 390 (1981)................................................................................ 6



**MEMORANDUM OF POINTS AND AUTHORITIES        CASE NO. 2:25-cv-10616**

*Wesberry v. Sanders*,
  376 U.S. 1 (1964)..................................................................................27

Williams v. Salerno,
  792 F.2d 323 (2d Cir.1986)....................................................................25

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)................................................................6, 24, 26, 27

*Wright v. Rockefeller*,
  376 U.S. 52 (1964)............................................................................4, 9

*Zepeda v. U.S.I.N.S.*,
  753 F.2d 719 (9th Cir. 1983) ................................................................26

**Constitutional Provisions**

Cal. Const. art. II, § 8(c) ...........................................................................5

Cal. Const. art. XVIII, § 4..........................................................................5

Cal. Const. art. XXI ...................................................................................5

U.S. Const. amend. XV, § 1......................................................................23

U.S. Const., amend. 14, § 1........................................................................7

**Statutes**

52 U.S.C. § 10301 ....................................................................................15

52 U.S.C. § 10301(a) ...............................................................................15

52 U.S.C.A. § 10301 ................................................................................18

79 Stat. 437 ..............................................................................................15

**Other Authorities**

*About the Hispanic Population and its Origin*, available at
  https://www.census.gov/topics/population/hispanic-
  origin/about.html?utm_source=chatgpt.com (last visited on Nov. 6, 2025) .......................1

Assemb. B. 604, 2025–26 Reg. Sess. (Cal. 2025) ......................................6

Assemb. Const. Amend. 8, 2025–26 Reg. Sess. (Cal. 2025)........................6

Cal Poly Pomona & CalTech, *Proposition 50: Projected Impacts on Latino
  Voting Power* (Oct. 2025) .....................................................................12



v

**MEMORANDUM OF POINTS AND AUTHORITIES          CASE NO. 2:25-cv-10616**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Capitol Weekly Podcast, *Interview with Paul Mitchell* ........................................................ 12

*Hispanic Americans in Congress*: https://history.house.gov/Education/Fact-
    Sheets/HAIC_fact_sheet/?utm_source=chatgpt.com (Last visited on Nov. 6,
    2025) ........................................................................................................................... 10

*Louisiana v. Callais*, Miscellaneous Order (Aug. 1, 2025), Order List: 606 U.S.,
    No. 24-109 ................................................................................................................... 15

Sen. B. 280, 2025–26 Reg. Sess. (Cal. 2025) ....................................................................... 6



vi

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

The California Legislature violated the Fourteenth and Fifteenth Amendments to the Constitution when it drew new congressional district lines adopted through Proposition 50 based on race, specifically to favor Hispanic voters, the state's *most numerous* racial demographic, without cause or evidence to justify it. Specifically, the map of fifty-two California congressional districts approved by Proposition 50 represent an official state policy to favor Hispanic voters in approximately sixteen of those districts (nearly 31%) even though they have been successful electing candidates of their choice to Congress under the prior map and the state's analysis of the prior map (as well as the analysis of an independent group) concluded that there was no Voting Rights Act ("VRA") violation that required a remedy.

The consultant who drew the congressional district lines in Proposition 50 has explained that the first thing that he did was to add a "Latino district" that the Citizens Redistricting Commission had previously eliminated and that he altered the lines of another district to make it a "Latino-influenced district" by ensuring its voting age population was "35 percent Latino." The California Legislature also issued a press release announcing that Proposition 50 creates two new districts to "empower Latino voters to elect their candidates of choice," adding them to the pre-existing fourteen such districts. The Legislature characterized these sixteen districts as "Voting Rights Act districts," meaning districts that are specifically designed to favor one race or ethnicity of voters over others.[1]

The state legislature achieved the stated racial gerrymandering objective by creating a

---

[1] Per the U.S. Census, "OMB defines 'Hispanic or Latino' as a person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin regardless of race. People who identify with the terms 'Hispanic' or 'Latino' are those who classify themselves in one of the specific Hispanic or Latino categories listed on the decennial census questionnaire and various Census Bureau survey questionnaires – 'Mexican, Mexican Am., Chicano' or 'Puerto Rican' or 'Cuban' – as well as those who indicate that they are 'another Hispanic, Latino, or Spanish origin.'" *See About the Hispanic Population and its Origin*, available at https://www.census.gov/topics/population/hispanic-origin/about.html?utm_source=chatgpt.com (last visited on Nov. 6, 2025). Though subtly different, the terms are functionally interchangeable.



map in which the favored race comprised 51.8 to 65.4 percent of the voting age citizen population of each of those districts. The Legislature's policy choice was, therefore, that the votes of the other 34.6 to 48.2 percent of the voting age citizens in those districts falling outside the government's favored racial classification should not interfere with the election of the candidate preferred by the government's favored race. Considering there are approximately 760,000 citizens in each district, the Legislature effectively decided that millions of Californians' votes should not matter in elections to determine who will represent them in Congress.

The Fourteenth Amendment to the Constitution guarantees American citizens the equal protection of the law. The Supreme Court has for decades determined that the Fourteenth Amendment can only tolerate racial gerrymandering if a state meets specific and stringent requirements to satisfy strict scrutiny. While compliance with the federal Voting Rights Act ("VRA") may justify race-based districting under current law notwithstanding the Equal Protection Clause, *Cooper v. Harris*, 581 U.S. 285, 285, 292, 301, the Supreme Court requires states to prove that, among other things, they in fact adopted the new district lines based on evidence that a minority race usually could not elect its preferred candidates due to the concerted opposition of voters of a majority race. *Cooper*, 581 U.S. at 292, 302. Without proof of this condition, states have no lawful basis to enact race-based congressional districts.

The Defendants will not be able to satisfy these requirements because, among other things, there was no prior VRA violation to remedy, no evidence was presented to legislators of any such VRA mandate to justify the proposed racially-gerrymandered map, Hispanic voters have successfully elected candidates of their choice, including fifteen members of the state's fifty-two-member congressional delegation, Hispanic citizens of voting age are the plurality or majority eleven out of eighteen of the voters in the counties in which the gerrymandered districts are located, and California's voters overwhelmingly vote strictly along party lines. Accordingly, Proposition 50's congressional district map fails the strict scrutiny test and, therefore, violates the Fourteenth Amendment's Equal Protection Clause. That is, California state law embodied in Proposition 50 does not lawfully treat citizens of different races equally.

2

The Fifteenth Amendment to the Constitution guarantees that a citizen's vote cannot be "abridged" (lessened, deprived, etc.) based on their race. The Supreme Court has held that the Fifteenth Amendment "establishes a national policy ... not to be discriminated against as voters in elections to determine public governmental policies or to select public officials, national, state, or local." *Terry v. Adams,* 345 U.S. 461, 467 (1953). Therefore, a racial gerrymander, "the deliberate and arbitrary distortion of district boundaries ... for [racial] purposes," is a form of circumvention of the Fifteenth Amendment. *Shaw v. Reno*, 509 U.S. 630, 640 (1993). "[S]tate authority over the boundaries of political subdivisions, extensive though it is, is met and overcome by the Fifteenth Amendment to the Constitution." *Rice v. Cayetano*, 528 U.S. 495, 522 (2000).

The California legislature through Proposition 50 "abridged" Plaintiffs' right to vote, that is curtailed, reduced in extent, or restricted their right to vote, based on race. Specifically, the California legislature violated the 15th Amendment because it drew Proposition 50's congressional district boundaries based on race, and did so to ensure that the votes of millions of California's voters across those districts could not decide the election if their preferred candidate was different from the candidate preferred by the Legislature's favored race.

In decisions over the decades, the Supreme Court has consistently understood how racial gerrymandering can illegally poison American democracy and politics. The Court has held that by allocating whole districts and the officials who represent them to a favored race, it embodies assumptions that are likely racist, risks having representatives understand their role as only representing one race among of their constituency, and it divides and pits citizens against each other based their race.

Race-based districting embodies "the offensive and demeaning assumption that voters of a particular race, because of their race, think alike, share the same political interests, and will prefer the same candidates at the polls," *Miller v. Johnson*, 515 U.S. 900, 912 (1995), which "is more likely to reflect racial prejudice than legitimate public concerns." *Palmore v. Sidoti,* 466 U.S. 429, 432 (1984). This, the Court found, "may balkanize us into competing racial factions" and "threatens to carry us further from the goal of a political system in which

3

race no longer matters—a goal that the Fourteenth and Fifteenth Amendments embody, and to which the Nation continues to aspire." *Shaw*, 509 U.S. at 657. The Court also feared that race-based districting encourages elected representatives "to believe that their primary obligation is to represent only the members of that group, rather than their constituency as a whole," which is "altogether antithetical to our system of representative democracy." *Id. at* 648. And "[w]hen racial or religious lines are drawn by the State, the multiracial, multireligious communities that our Constitution seeks to weld together as one become separatist; antagonisms that relate to race or to religion rather than to political issues are generated; communities seek not the best representative but the best racial or religious partisan." *Wright v. Rockefeller,* 376 U.S. 52, 67 (1964) (Douglas, J. dissent).

The allowance for any racial gerrymandering must therefore be carefully considered. America is marvelously diverse and California is the most diverse state in the nation. Because of its fantastic diversity, California therefore has the most to lose if the government taints its elections through unlawful official racial discrimination. The California legislature's ham-fisted and brazen, if not exuberant, embrace of racial gerrymandering is therefore not consistent with the Constitution or American and Californian democratic norms.

On November 5, 2025, Plaintiffs filed this lawsuit against the California Governor and Secretary of State in their official capacities under 42 U.S.C. § 1983, the morning after the election in which Proposition 50 was approved by California's voters. Plaintiffs now request a Preliminary Injunction. Because the Plaintiffs are likely to succeed on the merits, the balance of harms strongly favor preservation of the status quo to prevent a grave and irreparable violation of our clients' core Fourteenth and Fifteenth Amendment rights, and 2026 congressional election candidates must know the district lines by December 19, 2025, Plaintiffs respectfully request that this court grant an order enjoining the implementation of Proposition 50's congressional district map while this matter proceeds, request a three-judge panel pursuant to 28 U.S.C. § 2284.

MEMORANDUM OF POINTS AND AUTHORITIES          CASE NO. 2:25-cv-10616

**BACKGROUND**

California's Constitution establishes a once-a-decade system for drawing congressional districts through an independent Citizens Redistricting Commission (CRC), which prohibits partisan gerrymandering. *See* Cal. Const. art. XXI.

In July 2025, several California Congressional Democrats devised a plan by which they would threaten to have the California legislature draw a new set of maps to discourage the redistricting that the state of Texas was considering. (Compl. ¶ 38, ECF No. 1). To implement the congressional map in Proposition 50, state officials had to amend the Constitution with the approval of the voters in a special statewide election. *See* Cal. Const. art. XVIII, § 4; *see also* Cal. Const. art. II, § 8(c).

After these members of Congress heard Governor Newsom say that California would redistrict, the Congressional Democrats retained an expert who drafted the maps. (Meuser Decl. Ex. 24). The Congressional Democrats' map was presented to the public on Friday, August 15, 2025, just days before the legislature came back from their summer recess. (Meuser Decl. Ex. 25). Due to the date on which Governor Newsom desired the special election to occur, they published, debated, and approved the Legislative Package that became Proposition 50 within 4 days. (Compl. ¶ 38, ECF No. 1).

In August 2025, California's Governor and state legislative leadership announced a coordinated package to replace the congressional map adopted by the Citizens Redistricting Commission ("CRC") with a new congressional map for use in 2026, 2028, and 2030, subject to voter approval at a special election on November 4, 2025. The package consisted of:

(a) ACA 8 (Rivas & McGuire), a legislatively-referred constitutional amendment authorizing temporary use of a legislature-enacted congressional map through 2030;

(b) AB 604 (Aguiar-Curry & Gonzalez), the statute specifying the new congressional district boundaries; and

(c) SB 280 (Cervantes & Pellerin), the bill calling the special election, appropriating funds, and making conforming calendar changes. *See* Assemb. B. 604, 2025–26

5



1    Reg. Sess. (Cal. 2025); Sen. B. 280, 2025–26 Reg. Sess. (Cal. 2025); Assemb.

2    Const. Amend. 8, 2025–26 Reg. Sess. (Cal. 2025).

3    (Compl. ¶ 39, ECF No. 1). From the very beginning, there were signs and portents that

4    the redistricting through Proposition 50 would be used to racially gerrymander California's

5    districts under the cover of rhetoric about President Trump and events outside California. On

6    August 9, 2025, the Office of the Speaker of the Assembly published a press release titled

7    *Speaker Rivas Joins California, Texas Democrats to Fight Back Against Trump's Redistricting*

8    *Power Grab*, quoting Assemblymember Avelino Valencia, a member of the California Latino

9    Legislative Caucus, accusing President Trump and Texas Republicans of using redistricting to

10   "drown out the voices they do not want to hear, underline communities of color" and therefore

11   promising to "make sure our democracy reflects communities like mine." (Meuser Decl., Ex.

12   9) (underscoring added).

13                                   **LEGAL STANDARD**

14   The Supreme Court has ruled that the "purpose of a preliminary injunction is to

15   preserve the status quo until a trial can occur." *Lackey v. Stinnie*, 604 U.S. 192, 193 (2025)

16   citing *University of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). The *Camenisch* Court stated

17   that the "preliminary injunction is merely to preserve the relative positions of the parties until

18   a trial on the merits can be held. The Ninth Circuit has established two sets of criteria for

19   evaluating a request for injunctive relief. *Earth Island Inst. v. United States Forest Serv*., 351

20   F.3d 1291, 1297-1298 (9th Cir. 2003). Under the "traditional" criteria, a plaintiff must show

21   (1) a strong likelihood of success on the merits, (2) a likelihood of irreparable injury to plaintiff

22   if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4)

23   advancement of the public interest. *See, e.g., Winter v. Natural Res. Def. Council, Inc*., 555

24   U.S. 7, 20 (2008).

25   Alternatively, a preliminary injunction may be appropriate when a movant raises

26   "serious questions going to the merits" and the "balance of hardships tips sharply in the

27   plaintiff's favor," provided that the plaintiff is able to show there is a likelihood of irreparable

28   injury and that the injunction is in the public interest. *All. for Wild Rockies v. Cottrell*, 632 F.3d

**MEMORANDUM OF POINTS AND AUTHORITIES          CASE NO. 2:25-cv-10616**

1127, 1131 (9th Cir. 2011).

## ARGUMENT: PLAINTIFFS ARE ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF.

In this case, the Plaintiffs are challenging the constitutionality of the new congressional district map for California approved by Proposition 50.

### I. Plaintiffs Not Only Raised Serious Questions Going to the Merits, But Also There Is a Strong Likelihood They Will Succeed in Proving Their Claim.

#### A. The U.S. Constitution's Equal Protection Clause Limits Race-Based Redistricting

"The Equal Protection Clause of the Fourteenth Amendment provides that no State shall 'deny to any person within its jurisdiction the equal protection of the laws.'" *Miller*, 515 U.S. at 904; U.S. Const., amend. 14, § 1. "Its central mandate is racial neutrality in governmental decisionmaking." *Miller*, 515 U.S. at 904.

"Racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination.... This perception of racial and ethnic distinctions is rooted in our Nation's constitutional and demographic history." *Id.* (quoting *Regents of Univ. of Cal. v. Bakke,* 438 U.S. 265, 291 (1978) (opinion of Powell, J.)). "This rule obtains with equal force regardless of 'the race of those burdened or benefited by a particular classification.'" *Id.* (quoting *Richmond v. J.A. Croson Co.,* 488 U.S. 469, 494 (1989) (plurality opinion) (citations omitted).

"The Constitution entrusts States with the job of designing congressional districts. But it also imposes an important constraint: A State may not use race as the predominant factor in drawing district lines unless it has a compelling reason." *Cooper v. Harris*, 581 U.S. at 291 (2017). Specifically, "[t]he Equal Protection Clause . . . prevents a State, in the absence of 'sufficient justification,' from 'separating its citizens into different voting districts on the basis of race.'" *Id.* (quoting *Bethune–Hill v. Virginia State Bd. of Elections,* 580 U.S. 178, 187 (2017)).

MEMORANDUM OF POINTS AND AUTHORITIES        CASE NO. 2:25-cv-10616

In *Shaw v. Reno*, the Supreme Court recognized that a state violates the Equal Protection clause when it uses race as a basis for separating voters into districts which, like segregating citizens on the basis of race in its public parks, buses, golf course, beaches, and schools, requires extraordinary justification. *Miller*, 515 U.S. at 911 (citations omitted); *Shaw*, 509 U.S. at 652. "The idea is a simple one: At the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class." *Miller*, 515 U.S. at 911 (citations and quotations omitted).

Race-based districting embodies "the offensive and demeaning assumption that voters of a particular race, because of their race, 'think alike, share the same political interests, and will prefer the same candidates at the polls.'" *Miller*, 515 U.S. at 912 (quoting *Shaw* at 647); *Palmore,* 466 U.S. at 432 ("Classifying persons according to their race is more likely to reflect racial prejudice than legitimate public concerns; the race, not the person, dictates the category").

> Racial classifications with respect to voting carry particular dangers. Racial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions; it threatens to carry us further from the goal of a political system in which race no longer matters—a goal that the Fourteenth and Fifteenth Amendments embody, and to which the Nation continues to aspire. It is for these reasons that race-based districting by our state legislatures demands close judicial scrutiny.

*Shaw* at 657. While redistricting may involve a political calculus that recognizes competing interests, "it does not follow from this that individuals of the same race share a single political interest" and "[t]he view that they do is 'based on the demeaning notion that members of the defined racial groups ascribe to certain 'minority views' that must be different from those of other citizens,' the precise use of race as a proxy the Constitution prohibits." *Miller*, 515 U.S. at 914 (quoting *Metro Broadcasting,* 497 U.S. 547, 636 (1990) (KENNEDY, J., dissenting)).

> The message that such districting sends to elected representatives is equally pernicious. When a district obviously is created solely to effectuate the perceived common interests of one racial group, elected officials are more likely to believe that their primary obligation is to represent only the members

---

8

**MEMORANDUM OF POINTS AND AUTHORITIES        CASE NO. 2:25-cv-10616**

of that group, rather than their constituency as a whole. This is altogether antithetical to our system of representative democracy.

*Shaw*, 509 U.S. at 648; *see also Wright v. Rockefeller,* 376 U.S., at 66–67 (Douglas, J. dissent) ("When racial or religious lines are drawn by the State, the multiracial, multireligious communities that our Constitution seeks to weld together as one become separatist; antagonisms that relate to race or to religion rather than to political issues are generated; communities seek not the best representative but the best racial or religious partisan. Since that system is at war with the democratic ideal, it should find no footing here.").

### B.  If Race Was the Predominant Factor in Redistricting, the State Must Satisfy Strict Scrutiny

When a plaintiff alleges that congressional districts violate the Equal Protection Clause, there are two steps to the analysis: "First, the plaintiff must prove that 'race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'" *Cooper*, 581 U.S. at 291 (quoting *Miller*, 515 U.S. at 916). That is, "the legislature 'subordinated' other factors—compactness, respect for political subdivisions, partisan advantage, what have you—to 'racial considerations.'" *Id.* This can be shown "through 'direct evidence' of legislative intent, 'circumstantial evidence of a district's shape and demographics,' or a mix of both." *Id.*

"Second, if racial considerations predominated over others," the burden shifts to the state to prove "the design of the district" satisfies "strict scrutiny" by showing "that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." *Cooper*, 581 U.S. at 292 (quoting *Bethune–Hill,* 580 U.S. at 192); *Miller*, 515 U.S. at 920.

### C.  Racial Considerations Predominated in Drawing Districts in Proposition 50's Map and Therefore Strict Scrutiny Applies

Evidence that race predominated when the legislature drew Proposition 50's congressional district map includes direct evidence in the form of statements by the consultant who drew the map and in the Legislator's statements made while debating the legislation and press releases.

9

DILLON LAW GROUP INC.

**1.    California Legislators and their Consultant Announced that Race Was the Predominant Factor Motivating the Drawing of at Least Sixteen Challenged Districts**

Statements by California legislators and their districting consultant confirm that the Proposition 50's map was drawn to add more congressional districts based on race than the prior map prepared by the Independent Citizens Redistricting Commission just four years earlier.

The Independent Citizens' Redistricting Commission recently created California's congressional district map based on the most recent (2020) census data. The Commission set aside fourteen districts to specifically favor Hispanic voters. (Brunell Decl., Ex. 2 at 2). Paul Mitchell, the consultant who drew the Proposition 50's map, explained in a presentation that the first thing he did was to add a "Latino district," specifically reversing the Commission's decision to eliminate that district. Mitchell explained that the Commission had eliminated a district considered "the most Latino district in the country," which was "the first Latino majority/minority district in the country" and one that elected "the first Latino member of Congress in the country."[2] Declaration of Mark Meuser ("Meuser Decl.") Ex. 2 (Hope Presentation) at 25. Mitchell explained that Hispanas Organized for Political Equality ("HOPE") lobbied the Commission "for the creation of five Latino majority/minority districts in an area where there are currently four" and that "the first thing we did in drawing the new [Proposition 50] map" was that "[w]e essentially reversed the Redistricting Commission's decision to eliminate [that] Latino district from LA . . . We put that district back." *Id.* (underscoring added). Mitchell further acknowledged that he implemented a second HOPE objective, to "take the district that was called LB North, which is now the Robert Garcia district, take that district to the south through Seal Beach into Huntington Beach, making a

---

[2] Contrary to Paul Mitchell's statement, the first Hispanic Representative elected to Congress was Romualdo Pacheco from Santa Barabara, not Los Angeles. Pacheco was first elected to Congress in 1877. *See*, *Hispanic Americans in Congress*: https://history.house.gov/Education/Fact-Sheets/HAIC_fact_sheet/?utm_source=chatgpt.com (Last visited on Nov. 6, 2025).

---

10

Latino-influenced district at 35 percent Latino by voting age population." *Id.* (underscoring added).

Upon introducing the Proposition 50's map, California Senate Democrats also issued a press release in which they claimed that "The new map … expands Voting Rights Act districts that empower Latino voters to elect their candidates of choice." Meuser Decl. Ex. 8, at 2 (press release of Senate President pro Tempore Mike McGuire, "Legislative Democrats Announce Plan Empowering Voters to Protect California").

The language used in these statements are unambiguous in terms of race being the predominant purpose for drawing the Proposition 50's map. VRA districts mean districts that are specifically designed to favor one race or ethnicity of voters living within those districts.

Consistent with these explicit statements of intent to use the redistricting process to increase the electoral power of one race or ethnicity, that is, to racially gerrymander, we note the Commission had indeed previously created fourteen districts favoring Hispanic voters and the Legislature's Proposition 50's map creates sixteen Congressional districts where the Hispanic population makes up more than 50% of the voters in the Congressional district. (CD 13, 18, 21, 22, 25, 29, 31, 33, 34, 35, 38, 39, 42, 44, 46, and 52). (Brunell Decl., Ex. 2 at 4).

The statements of Mitchell and the California Legislature boasting of increasing the number of Hispanic-dominated congressional districts above the fourteen previously created by the Independent Commission to "empower Latino voters to elect their candidates of choice," are similar statements by the North Carolina legislature that triggered strict scrutiny review in *Cooper v. Harris*. In that case, the record evidence "show[ed] that the State's mapmakers . . . purposefully established a racial target," that "African–Americans should make up no less than a majority of the voting-age population" in the district map at issue. *Cooper*, 581 U.S. at 299.

In the case at hand, race was consciously and predominantly used to draw Proposition 50's district lines, rather than them being the product of race-neutral redistricting criteria. On the *Capitol Weekly Podcast*, Paul Mitchell confirmed that internal discussions explicitly referenced the VRA and Latino communities and districts. He described advocates who wanted

**MEMORANDUM OF POINTS AND AUTHORITIES        CASE NO. 2:25-cv-10616**

to "throw away the VRA" and pursue a "52/0 map," (a map that would result in Democrats being elected in all 52 of California's congressional districts) contrasted with crafting "a five-district pick-up map," a map that would change five districts currently won by Republicans to districts that would be won by Democrats, which would comply with the VRA. He noted that California "gained the Latino population," referenced preserving the historic heavily Latino Roybal-Allard district, and remarked that some states were "oftentimes violating the Voting Rights Act." *See* Meuser Decl. Ex 1, Capitol Weekly Podcast, *Interview with Paul Mitchell*, at 10:9–20, 15:23–25, 27:17–23.

On October 23, 2025, Mitchell posted on X (formerly Twitter), that the "proposed Proposition 50 map will further increase Latino voting power over the current Commission map," citing a joint report from Cal Poly Pomona and CalTech. *See* Paul Mitchell (@paulmitche11), *If you're keeping track at home…*. (Oct. 23, 2025, 10:00 AM PT), (Meuser Decl. Ex. 3); *see also* Cal Poly Pomona & CalTech, *Proposition 50: Projected Impacts on Latino Voting Power* (Oct. 2025). (Meuser Decl. Ex. 22).

Indeed, as here, legislators in *Cooper* "were not coy in expressing that goal" and "repeatedly told their colleagues that District 1 had to be majority-minority, so as to comply with the VRA," "that District 1 'must include a sufficient number of African–Americans'" to make it 'a majority black district,'" and it must have 'a majority black voting age population.'" *Id*. At 299-301.

On August 15, 2025, the Office of the Speaker of the Assembly published a press release, stating: "The new map retains the voting rights protections enacted by the independent commission." *See* Meuser Decl. Ex.6. On August 19, 2025, the Office of the Speaker of the Assembly published a press release, stating: "The new map . . . retains both historic Black districts and Latino-majority districts." *See* Meuser Decl. Ex. 7.

But despite these benign coatings, in the Assembly Appropriations Committee, Speaker Isaac Bryan suggested that the racial considerations in ACA 8 were designed to counterbalance efforts in other states that they believed diminished minority voting strength: "ACA 8 exists because Trump and the Republican-controlled Texas Legislature and other states, like Indiana

**MEMORANDUM OF POINTS AND AUTHORITIES          CASE NO. 2:25-cv-10616**

and Florida, are attempting to redraw congressional districts in the middle of a decade, pre-census, with the explicit aim of diluting Black and Brown representation and power." This statement indicates that the Proposition 50's map was deliberately designed to increase Latino voting power in California to counteract what legislators believed was occurring in other states rather than being compelled by conditions in California and the need to comply with the VRA here. *See* Meuser Decl. Ex. 5.

As in *Cooper*, this Court is "[f]aced with [a] body of evidence—showing an announced racial target that subordinated other districting criteria and produced boundaries amplifying divisions between" people of different races, the Court can hardly conclude "anything but" that "race predominated in drawing" the challenged map. 581 U.S. at 300-01 (also noting the district court concluded the map was a "'textbook example' of race-based districting").

### 2. Proposition 50's Congressional District 13 Was Racially Gerrymandered

According to expert analysis, the boundary between districts 5, 9 and 13 of Proposition 50's map appears to have been crafted specifically to enhance the Hispanic Voting Age Population and Hispanic Citizen Voting Age Population in district 13. The boundary's twisted shape cannot be explained by traditional redistricting principles, nor can it be explained by a motive to simply increase Democratic Party voting power politics.

Congressional District 13 is in California's Central Valley and includes western Madera County, a portion of Fresno County, all of Merced County, southwestern Stanislaus County, and then a portion of San Joaquin County. (Trende Decl., Ex 2 at 5.) As Trende explains, two aspects of District 13's lines appear to have been drawn predominantly to improve Hispanic performance in the district, and not to improve the prospects of Democratic Party candidates.

In the South, the new lines keep Republican areas outside and Democrat areas inside District 13. (Trende Decl., Ex 2 at 6.) Although the Defendants may contend that this was as a gambit to increase the influence of Democratic voters, the District's boundary near Ceres and Modesto bulges out to split Modesto while keeping Ceres intact and capturing some areas

---

13

**MEMORANDUM OF POINTS AND AUTHORITIES        CASE NO. 2:25-cv-10616**

outside of Ceres. (Trende Decl., Ex 2 at 11.) The map omits a significant Democratic population in Modesto while capturing a large Republican population in and around Ceres. *Id*. However, "the motivation for the split appears more obvious" when the race of the populations included and excluded are considered. (Trende Decl., Ex 2 at 13.)

Most of the Democrat territory left in Modesto outside of District 13 is White and the Republican brought into the district around Ceres is heavily Hispanic. *Id*. Accordingly, if the motivating factor of the district shape was partisanship, the district would have dropped some of the Republican areas in Ceres and added Democratic areas in Modesto. *Id*. Changes to the northern side of the District are even more obviously based on race. There is a large "plume" that incorporates Democrats, but more democrats were available to the West. Again:

> What differentiates them is that the portion at the northern end of the district are heavily Hispanic, while the areas left out to the west of the district are more heavily White. In other words, this appendage bypasses white Democrats, making the district less compact, to gain Hispanic areas that are less heavily compact. From a [political] gerrymandering perspective, this makes little sense.

(Trende Decl., Ex 2 at 19.)

Trende further prepared three hypothetical maps that could have been drafted demonstrating that it would have been possible to draw the map to achieve a partisan political goal (favoring Democratic Party voters) with a more regular configuration that does not target race. (Trende Decl., Ex 2 at 23-26.) Trende concluded that the Proposition 50's map "boundaries between districts 9 and 13 appear to have been crafted to enhance the Hispanic Voting Age Population and Hispanic Citizen Voting Age Population in the district. The twisted shapes cannot be explained by traditional redistricting principles, nor can they be explained by politics." (Trende Decl., Ex 2 at 27.)

Accordingly, the Court should conclude that race predominated over other factors in the Proposition 50's map and shift the burden to the state to prove that the map was narrowly tailored to serve a compelling state interest.

### D.  Compliance with the Voting Rights Act Can be a Compelling Interest

Because racial considerations predominated over others in nearly one third of the 52 congressional districts, which also impacted numerous neighboring districts, the burden shifts to the state to satisfy strict scrutiny by showing "that its race-based sorting of voters serves a compelling interest and is narrowly tailored to that end." *Cooper*, 581 U.S. at 292 (internal quotation omitted); *Miller*, 515 U.S. at 920.

The Supreme Court "has long assumed that one compelling interest" justifying race-based districting "is compliance with the Voting Rights Act of 1965 (VRA or Act)," 79 Stat. 437, as amended, 52 U.S.C. § 10301 *et seq*. *Cooper*, 581 U.S. at 285, 292, 301; *Shaw v. Hunt,* 517 U.S. 899, 915-916 (1996) (*Shaw II* ). "Section 2 [of the VRA] prohibits any 'standard, practice, or procedure' that 'results in a denial or abridgement of the right ... to vote on account of race.'" *Cooper*, 581 U.S. at 292 (2017) (quoting 52 U.S.C. § 10301(a)). The Supreme Court has "construed that ban to extend to 'vote dilution'—brought about, most relevantly here, by the 'dispersal of [a group's members] into districts in which they constitute an ineffective minority of voters.'" *Cooper*, 581 U.S. at 292 (2017) (quoting *Thornburg v. Gingles,* 478 U.S. 30, 46, n. 11 (1986).

In a case currently pending before the Supreme Court, *Louisiana v. Callais*, the Court is considering "Whether the State's intentional creation of [] majority-minority congressional district violates the Fourteenth or Fifteenth Amendments to the U.S. Constitution." *Callais*, Miscellaneous Order (Aug. 1, 2025), Order List: 606 U.S., No. 24-109 (Meuser Decl. Ex. 23).

### E.  Proposition 50's Race Based Sorting of Voters is Not "Narrowly Tailored" to its asserted Compelling Interest.

"When a State invokes the VRA to justify race-based districting, it must show (to meet the 'narrow tailoring' requirement) that it had 'a strong basis in evidence' for concluding that the statute required its action." *Cooper*, 581 U.S. at 292–93 (quoting *Alabama Legislative Black Caucus v. Alabama,* 575 U.S. 254, 278 (2015)). That is, "that it had 'good reasons' to think that it would transgress the Act if it did *not* draw race-based district lines." *Id.*

**MEMORANDUM OF POINTS AND AUTHORITIES          CASE NO. 2:25-cv-10616**

1    California's Democrat legislators stated that the new map "expands Voting Rights Act

2 districts that empower Latino voters to elect their candidates of choice." (Meuser Decl., Ex. 8)

3 But, by itself, the "mere recitation of a 'benign' or legitimate purpose for a racial classification

4 is entitled to little or no weight." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 500

5 (1989). "[W]hen a legislative body chooses to employ a suspect classification, it cannot rest

6 upon a generalized assertion as to the classification's relevance to its goals." *Id.* at 500 (citing

7 *McLaughlin v. Florida*, 379 U.S. 184, 190-192 (1964)).

8    To evade the Equal Protection Clause with a claim that race-based redistricting was

9 compelled by the VRA, the Supreme Court identified in *Thornburg v. Gingles* "three threshold

10 conditions for proving vote dilution under § 2 of the VRA" that would justify creation of a

11 VRA district. *Cooper*, 581 U.S. at 301 (citing *Gingles*, 478 U.S., at 50–51).

12       First, a "minority group" must be "sufficiently large and geographically
         compact to constitute a majority" in some reasonably configured legislative
13       district. *Id.,* at 50, 106 S.Ct. 2752. Second, the minority group must be
         "politically cohesive." *Id.,* at 51, 106 S.Ct. 2752. And third, a district's white
14       majority must "vote [ ] sufficiently as a bloc" to usually "defeat the minority's
         preferred candidate." *Ibid*.
15

16 *Cooper*, 581 U.S. at 301-02. "Those three showings . . . are needed to establish that 'the

17 minority [group] has the potential to elect a representative of its own choice' in a possible

18 district, but that racially polarized voting prevents it from doing so in the district as actually

19 drawn because it is 'submerg[ed] in a larger white voting population.'" *Cooper*, 581 U.S. at

20 302 (quoting *Growe v. Emison,* 507 U.S. 25, 40 (1993)).

21    "If a State has good reason to think that all the '*Gingles* preconditions' are met, then so

22 too it has good reason to believe that § 2 requires drawing a majority-minority district. But if

23 not, then not." *Cooper*, 581 U.S. at 302 (internal citation omitted); *Bush v. Vera,* 517 U.S. 952,

24 978 (1996) (plurality opinion). "[U]nless *each* of the three *Gingles* prerequisites is established,

25 'there neither has been a wrong nor can be a remedy.'" *Cooper*, 581 U.S. at 306 (quoting

26 *Growe,* 507 U.S., at 41).

27

28

---

16

**MEMORANDUM OF POINTS AND AUTHORITIES        CASE NO. 2:25-cv-10616**

The State of California cannot satisfy all three *Gingles* factors to demonstrate that the VRA required the racial gerrymandering in Proposition 50 because, among other things, the Commission's map comply with the Act, there is no "majority" race voting together to thwart Hispanic voters' preferred candidate choices, Hispanic Voters regularly elect candidates of their choice, and the Legislature did not consider any evidence to the contrary.

### 1. The Prior Congressional District Map Complied with the VRA

The consulting expert who drew the Legislature's map unequivocally stated that the map created by the Independent Citizens Redistricting Commission was analyzed twice for compliance with the VRA. The VRA analysis he received determined the Commission map was "compliant with Section 2" of the VRA and another group's analysis determined that vis-a-vis the Commission map, the Proposition 50's map "maintained the status quo":

> **The Voting Rights Act analysis that we got back said** -- and, again, I'll read -- while both **the Commission map** and the draft map are **compliant with Section 2**, the empirical evidence shows that the public submission map, which is the Proposition 50 map, improves the opportunity for Latino voters to elect candidates of choice in two more districts than the existing plan. · · · · And then PPIC just put out an analysis last week that said that **our plan maintained the status quo in terms of the Voting Rights Act** and added one more Latino-influenced district.

(Meuser Decl. Ex. 2 (Hope Presentation) (emphasis added)). Accordingly, the VRA did not compel drawing a new map to favor Hispanic voters to avoid a pre-existing VRA violation.

### 2. No Majority Race Has Prevented Hispanic Voters from Electing Their Preferred Candidates

For three reasons, the state cannot prove the third *Gingles* factor, *i.e.*, that Hispanic voters are prevented from electing representatives of their choice due to "a district's [non-Hispanic] white majority" defeating the Hispanic's "preferred candidate" by "voting sufficiently as a bloc." *Cooper,* 581 U.S. at 287.

*First*, White voters are not a majority in California or even the majority in most of its counties where Proposition 50's map created VRA districts. (Brunell Decl., Ex. 2 at 2). Whites are merely a plurality statewide, with 43.5 percent of voting age citizens, compared to 31.9 for

---

17

**MEMORANDUM OF POINTS AND AUTHORITIES        CASE NO. 2:25-cv-10616**

1    Hispanics. (Brunell Decl., Ex. 2 at 4). Moreover, looking specifically at the Counties where

2    Proposition 50 racially gerrymandered congressional districts to favor Hispanic voters,

3    Hispanics are a majority or a plurality of voting age adults in 11 of the 18 affected counties

4    (Fresno, Imperial, Kern, Kings, Los Angeles, Madera, Merced, Riverside, San Benito, San

5    Bernardino, and Tulare counties). (Brunell Decl., Ex. 2 at 5). In one further county (Monterey),

6    voting age Whites outnumber Hispanics by only .7%. *Id*. In two other counties, Orange and

7    San Joaquin, voting age Whites outnumber Hispanic voters, but are still not a majority. *Id*. In

8    fact, in only two counties (San Diego and Santa Cruz) do voting age Whites comprise the

9    majority. *Id*.

10   *Second*, according to the VRA, "[t]he extent to which members of a protected class

11   have been elected to office in the State or political subdivision is one circumstance which may

12   be considered: *Provided,* That nothing in this section establishes a right to have members of a

13   protected class elected in numbers equal to their proportion in the population." 52 U.S.C.A. §

14   10301. In California, Hispanic voters have been able to elect their preferred candidates. The

15   diverse California delegation to the U.S. House of Representatives already reflects the diversity

16   of the state's citizens. California has fifty-two members of the House. Based on the three major

17   caucuses in Congress (Black, Hispanic, and Asian Pacific American), there are twenty-six total

18   members of California's congressional delegation who are associated with these caucuses,

19   including fifteen Hispanic members of Congress, three Black members of Congress, and nine

20   Asian Pacific Islander members of Congress. (Brunell Decl., Ex. 2 at 19). California voters are

21   willing and able to vote for Representatives from all the major racial and ethnic groups in the

22   state. Hispanics in particular are 31.9% of California's citizens of voting age and its fifteen

23   members of Congress already represented 28.85% of the fifty-two member Congressional

24   delegation.

25   In addition, minorities are regularly elected to California state office. At least twenty

26   of California's forty state senators are an ethnic minority and at least 15 are Hispanic. *See*

27   Meuser Decl. Exhibits 10-21. At least forty-five of California's eighty state assemblymen are

28   an ethnic minority. Of those, at least 27 are Hispanic. *See* Meuser Decl. Exhibits 10-21.

18

**MEMORANDUM OF POINTS AND AUTHORITIES          CASE NO. 2:25-cv-10616**

This is no anomaly: Brunell examined recent statewide elections that "pitted a Hispanic Democrat against a White Republican and the Hispanic candidate prevailed in each contest." (Brunell Decl., Ex. 2 at 5). Brunell found that in 2018, Alex Padilla, Xavier Becerra, and Ricardo Lara, all Hispanics, won statewide election. *Id.* In 2022, Alex Padilla and Ricardo Lara again won statewide election. *Id.* Brunell also compared the statewide results of several races and examined the data at a county-by-county level. Brunell stated that there "appears to be a great deal of stability across statewide elections in terms of the votes that candidates from each party receive at aggregate levels." (Brunell Decl., Ex. 2 at 9). Brunell discovered that "there are very strong correlation between the percent of the vote that any Democrat receives in any election in these 18 counties. This suggests that party may be the primary driver of vote choice, rather than campaigns or candidates." (Brunell Decl., Ex. 2 at 10). Brunell concluded the majority of California voters, regardless of race of the voter or the candidate, vote democrat and thus in California there is "high levels of partisan straight ticket voting." (Brunell Decl., Ex. 2 at 20).

### 3. The Legislature Lacked a Strong Basis in Evidence of a VRA Violation that Required Race-Based Districting

As noted above, a State may only resort to race in redistricting if it has a "strong basis in evidence" that § 2 liability would otherwise arise (i.e., that the *Gingles* preconditions are satisfied) for a reasonably configured district before the State adopts race-based lines for each district. *Miller*, 515 U.S. at 922; *Cooper*, 581 U.S. at 292, 304 & n.5 (North Carolina legislators violated the Equal Protection Clause when they drew two Black-majority districts because the state legislature lacked a strong basis in evidence that it needed to make the changes to avoid potential Section 2 liability); *see also Richmond*, 488 U.S. at 500 (requiring a "strong basis in evidence for its conclusion that remedial action was necessary").

The Supreme Court has held that "the institution that makes the racial distinction must have had a strong basis in evidence to conclude the remedial action was necessary *before* it embarks on an affirmative-action program." *Shaw II*, 517 U.S. at 910 (underscoring added).

---

19

**MEMORANDUM OF POINTS AND AUTHORITIES        CASE NO. 2:25-cv-10616**

1    Therefore, post-hoc rationalization is not enough; the compelling interest must be the

2    Legislature's "actual purpose," supported by contemporaneous evidence. *Shaw II* at 908 & n.4.

3         The legislative text and public legislative record did not contain findings (or adopted

4    findings) demonstrating that the *Gingles* factors required the drawing of at least fourteen VRA

5    districts, much less district-specific findings justifying racial line-drawing and the addition of

6    two more VRA districts. Moreover, state legislators have provided sworn declarations that they

7    were not given any kind of evidence or analysis indicating that VRA districts were required

8    from any source and it did not appear that their colleagues had seen any such analyses, either.

9    Assemblymember David Tangipa avers that he is a member of the Assembly Elections

10   Committee and in the days before the Legislature enacted the legislation that proposed the

11   Proposition 50's map, he sought any analyses that would establish that the state would violate

12   the VRA if it did not use race to redistrict. (Tangipa Decl. ¶ 4, 13, 14, 19, 21, 29, 32). Between

13   the preliminary map and press release regarding Proposition 50 published on Friday August

14   15, 2025, and his committee considering the Proposition 50 legislation on Tuesday, August 19,

15   he had received "[n]o official communication, analysis, or other documents" other than what

16   was released to the public. (Tangipa Decl. ¶ 8). During his committee's hearing, he still "was

17   unable to ascertain any basic information regarding who drew the maps, as the bill language

18   falsely stated that members of the Assembly Elections Committee drew the lines, let alone

19   information required by the VRA to determine if VRA districts were necessary." (Tangipa

20   Decl. ¶ 13).

21        As of a hearing on the morning of August 19, he again still "had not been provided any

22   of the district-by-district technical materials [he] would expect to see if the Legislature were

23   relying on the VRA to justify race-conscious line-drawing of the original maps[.]" (Tangipa

24   Decl. ¶ 14). In fact, just as the hearing was about the begin, he was informed that "the map

25   lines had been changed late the night before." (Tangipa Decl. ¶ 15). During the hearing, he was

26   not given substantive answers to basic questions, such as "who changed the lines, when those

27   changes occurred, the nature and extent of the changes, and the reasons for them." (Tangipa

28

20

**MEMORANDUM OF POINTS AND AUTHORITIES          CASE NO. 2:25-cv-10616**

Decl. ¶ 18). As to the new map, he also "did not receive any analysis or explanation of the lines or how the racial drawn VRA districts were determined." (Tangipa Decl. ¶ 20).

"The lack of knowledge of the late-night changes to the maps was apparent for both Republican and Democratic members of the committee during the hearing." (Tangipa Decl. ¶ 22). "To [his] knowledge, no district-by-district VRA analysis or written justification of the new map lines was presented to members of any party at or before that hearing and voting on the map lines." (Tangipa Decl. ¶ 25). Even as the Assembly considered the Measure on the floor on August 21, 2025, the Assembly, he had not been "provided any district-specific VRA materials, expert reports, RPV studies, election-performance simulations, CVAP tables, or analysis of alternatives," and no materials "identif[ied] a particular district as legally required by Section 2" or explained "how such a conclusion had been reached." (Tangipa Decl. ¶ 29). Asm. Tangipa, upon information and belief, believes "no such materials exist in the legislative process" and even "[a]fter reasonable diligence," he has "not seen district-specific RPV findings, expert submissions, or race-neutral alternatives that were available to members before their votes on the Measures." (Tangipa Decl. ¶ 30).

A California state Senator provided a similar account of Senate proceedings. Senator Rosilicie Ochoa Bogh averred that the only information she received "through official committee channels contained basic information about what the Measures did: placed a Constitutional Amendment on the ballot for a November 2025 special election to do a mid-cycle redistricting effort." (Ochoa Bogh Decl., ¶ 9). "In this information and in all of the official proceedings" she participated in, "no one ever told us who drew the maps" and "[t]he materials [she] saw did not identify any map author, consultant, or mapping source, and [she] received no district-by-district technical work explaining or justifying the lines." (Ochoa Bogh Decl. ¶ 10). Even as of the considering of the measures on the Senate Floor on August 21, 2025, she "had no say in the map-drawing process, no background about the maps, and [she] was forced to vote on the Measures with very little information. (Ochoa Bogh Decl. ¶ 11). To date, she has "not been provided any of the district-by-district technical materials I would expect to see if the Legislature were relying on the VRA to justify race-conscious line-drawing." (Ochoa

**MEMORANDUM OF POINTS AND AUTHORITIES    CASE NO. 2:25-cv-10616**

1  Bogh Decl. ¶ 14). To her knowledge, "even after the Measures passed through the legislative

2  process, no such materials exist elsewhere in the legislative process." "If such materials

3  existed, they were not provided to [her]." (Ochoa Bogh Decl. ¶ 16).

4      Reportedly, Paul Mitchell conducted his own VRA analysis while drawing the

5  Proposition 50's map. (Meuser Decl., Ex. 2 – "Hope Presentation") at 23:14–17. However,

6  Paul Mitchell was not paid by the state to draw the lines, he was paid by the DCCC. (Meuser

7  Decl., Ex. 24). There is no evidence that anyone other than his own team ever saw that analysis

8  and no indication that any legislator who voted on the maps cast their vote for these particular

9  lines based upon evidence of a need to resolve past racial voting.

10     As a factual matter, the record shows that defendants set out to increase Latino voting

11  power as an objective, there is an acknowledgment by the consultant who drew the map that

12  his analysis showed that the prior map did not violate the VRA, and the data and expert

13  testimony establishes that Hispanic voters have been able to elect candidates of their choice. If

14  the Defendants were to assert that the VRA nonetheless broadly authorizes them to racially

15  gerrymander under these circumstances, their interpretation would call the constitutionality of

16  Section 2 of the VRA into question.

17     Any new map must be "reasonably necessary <u>under a constitutional reading and

18  application of those laws</u>." *Miller*, 515 U.S. at 921 (citing *Shaw*, 509 U.S. at 653-655)

19  (underscoring added). An improper interpretation of Section 2 which "unnecessarily infuse

20  race into virtually every redistricting," would "rais[e] serious constitutional questions." *League

21  of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 446 (2006). Rather than relying on the

22  law to remedy a lack of political success, the VRA should not be improperly exploited to

23  achieve "more success in place of some." *Johnson v. De Grandy*, 512 U.S. 997, 1012-13

24  (1994).

25     Absent conditions in existence at the time of redistricting that demand and justify a

26  race-based remedy (which are absent here), the VRA cannot and does not authorize a state to

27  engage in race-based districting. Congress would not have the power to use the VRA to nullify

28

---

**MEMORANDUM OF POINTS AND AUTHORITIES        CASE NO. 2:25-cv-10616**

the Fourteenth and Fifteenth Amendments rather than enforce them in such a circumstance. It would be the statutory exception that swallowed the constitutional rule.

On this record, the State cannot prove that the *Gingles* third factor has been met, that is, that it had a strong basis in evidence that a White majority votes sufficiently as a bloc to usually defeat Hispanics' preferred candidate, submerging Hispanics in a larger White voting population. Accordingly, race predominated in the drawing of these lines which, as explained above, triggers a strict scrutiny analysis which shifts the burden to the Defendant to prove that the VRA compelled the use of race to draw lines to avoid a VRA violation.

**F.  Proposition 50's Congressional Map Violates the 15ᵗʰ Amendment**

The Fifteenth Amendment provides that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV, § 1. "Consistent with the design of the Constitution, the [Fifteenth] Amendment is cast in fundamental terms, terms transcending the particular controversy which was the immediate impetus for its enactment." *Rice*, 528 U.S. at 512. The Fifteenth Amendment "establishes a national policy ... not to be discriminated against as voters in elections to determine public governmental policies or to select public officials, national, state, or local." *Terry v. Adams,* 345 U.S. 461, 467 (1953). Under the Fifteenth Amendment voters are treated not as members of a distinct race but as members of the whole citizenry. *Rice,* 528 U.S. at 523. "The Fifteenth Amendment's prohibition on race-based voting restrictions is both fundamental and absolute." *Davis v. Guam*, 932 F.3d 822, 832 (9th Cir. 2019) (citing *Shaw*, 509 U.S. at 639; see also *Prejean v. Foster*, 227 F.3d 504, 519 (5th Cir. 2000) ("Unlike the Fourteenth Amendment claim, there is no room for a compelling state interest defense, as the Fifteenth Amendment's prohibition is absolute."). "Moreover, the Fifteenth Amendment applies with equal force regardless of the particular racial group targeted by the challenged law." *Davis*, 932 F.3d at 832.

A racial gerrymander is a form of circumvention of the Fifteenth Amendment. *Shaw*, 509 U.S. at 640 ("Another of the weapons in the States' arsenal [against the 15th Amendment]

---

23

was the racial gerrymander—"the deliberate and arbitrary distortion of district boundaries ... for [racial] purposes.'".").

> The question before us is not the one-person, one-vote requirement of the Fourteenth Amendment, but the race neutrality command of the Fifteenth Amendment. . . . We held four decades ago that state authority over the boundaries of political subdivisions, "extensive though it is, is met and overcome by the Fifteenth Amendment to the Constitution.

*Rice*, 528 U.S. at 522 (quoting *Gomillion v. Lightfoot*, 364 U.S. 339, 345 (1960)).

For the same reasons explained above with respect to the Fourteenth Amendment (i.e., the race-based districting in Proposition 50, including the creation of sixteen congressional districts to favor one race, increasing the number of Hispanic-dominated districts from fourteen to sixteen, the creation of a "Latino district" and a "Latino-influenced district," and the apparent drawing the district boundaries of district 13 based on race), Defendants abridged the right to vote of the Plaintiffs and millions of California voters in the affected districts who were not part of the state's favored class.

According to Webster's 1828 Dictionary, the dictionary in common usage at the time the Fifteenth Amendment was drafted, the word "abridge" means "to lessen" or "to deprive." That is, they lessen or deprived Plaintiffs' right to vote, based on race. Specifically, the California legislature violated the Fifteenth Amendment because it drew Proposition 50's congressional district boundaries based on race and specifically did so to ensure that the votes of millions of California's voters across those districts could not decide the election if their preferred candidate was different from the candidate preferred by the legislature's favored race.

## II. There is a Likelihood of Irreparable Injury to Plaintiffs if Preliminary Relief is Not Granted

Plaintiffs readily satisfy the second element for issuance of a preliminary injunction as they will suffer irreparable injury unless the requested preliminary relief is granted. A moving party must show, among other things, that irreparable harm will likely result if the relief is not granted. *Winter*, 555 U.S. at 20, 22.

---

24

**MEMORANDUM OF POINTS AND AUTHORITIES        CASE NO. 2:25-cv-10616**

DILLON LAW GROUP INC.

1    Courts recognize that infringement of the fundamental right to vote constitutes

2    irreparable injury. *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224,

3    247 (4th Cir. 2014); *Obama for Am. v. Husted,* 697 F.3d 423, 436 (6th Cir.2012); *Williams v.*

4    *Salerno,* 792 F.2d 323, 326 (2d Cir.1986). Additionally, "discriminatory voting procedures in

5    particular are 'the kind of serious violation of the Constitution and the VRA for which courts

6    have granted immediate relief.'" *League of Women Voters*, 769 F.3d at 247 citing *United States*

7    *v. City of Cambridge,* 799 F.2d 137, 140 (4th Cir.1986).

8    "The loss of First Amendment freedoms, for even minimal periods of time,

9    unquestionably constitutes irreparable injury." *Am. Encore v. Fontes*, 152 F.4th 1097, 1120

10    (9th Cir. 2025) (enjoining election rule allegedly violating plaintiffs' First Amendment rights).

11    Once an election is conducted under a legally deficient map, the lost opportunity to elect a

12    preferred candidate cannot be undone and thus qualifies as irreparable harm. *League of Women*

13    *Voters*, 769 F.3d at 247. The temporal urgency of elections means delay compounds harm

14    because remedies post-election cannot recreate lost voice. *Obama for Am.*, 697 F.3d at 436.

15    Here, Plaintiffs face harms that cannot be fully remedied by money damages. Plaintiffs

16    will suffer disenfranchisement, dilution of rights, or other harms to protected voting interests

17    that cannot be quantified or remedied later. Such injuries are not adequately compensable by

18    legal remedies and hence are irreparable. Candidates must know where the congressional

19    districts are located in order to run for office starting on December 19, 2025 (Meuser Decl. Ex.

20    26).

21    If the Proposition 50's congressional district lines are implemented and candidates,

22    voters, and political parties organize their speech, association, and fundraising around them

23    only for the map to subsequently found to be unconstitutional as described here, it will throw

24    California's congressional election campaigns into chaos. Not just the sixteen districts at the

25    center of this case, but all of the surrounding districts whose voters were unlawfully poached

26    or placed ("cracked" or "packed" in the parlance of redistricting) into the surrounding districts.

27    If candidates, voters, and political parties, including Plaintiffs, do not know who will be

28    running for office or where, or if the lines are in doubt, it will substantially and immediately

**MEMORANDUM OF POINTS AND AUTHORITIES        CASE NO. 2:25-cv-10616**

chill their political speech, activity, and association. That harm is not reparable.

In short, absent immediate relief, Proposition 50's congressional map will permanently and irreparably harm Plaintiffs' constitutional rights. That risk firmly supports issuance of preliminary relief.

### III. The Balance of Hardships Tips Sharply in Plaintiffs' Favor

The third factor, the balance of hardships (or equities), also overwhelmingly favors Plaintiffs. Under the four-factor test articulated in *Winter*, the court must consider "the extent to which the balance of equities tip in favor of the moving party." 555 U.S. at 20 (2008).

Proposition 50's racial gerrymander violates the Fourteenth and Fifteenth Amendment constitutional rights of California voters of any race who have been districted based on their race and presumed racial voting characteristics. Proposition 50 intentionally places non-Hispanic voters in districts where it is the state's policy to reduce or eliminate their ability to elect a candidate of their choice because the government has officially determined that district's representative should reflect the preferences of Hispanic voters, and the government has drawn the district lines to help achieve that goal. The result is that non-Hispanic voters do not have equal power to elect their representatives. The harms to all voters go even deeper; when the State engages in race-based redistricting, it stereotypes all voters "as the product of their race, evaluating their thoughts and efforts—their very worth as citizens—according to a criterion barred to Government by history and the Constitution." *Miller*, 515 US at 912 (1995).

Compare to this, the State's interests are minimal. The State "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. U.S.I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983). That is especially true in the election context, given that:

> No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right.

---

**MEMORANDUM OF POINTS AND AUTHORITIES**        **CASE NO. 2:25-cv-10616**

*Wesberry v. Sanders*, 376 U.S. 1, 17-18 (1964). Indeed, if preliminary relief is denied and Proposition 50's map is implemented only to later be found unconstitutional, the state government (and county governments) will have wasted extensive public resources beginning to implement a map that must be jettisoned and quickly replaced, sowing confusion among voters, candidates, and political parties in the middle of an election.

Moreover, Plaintiffs requested remedy simply keeps the status quo and allows the State to continue to use the Congressional districts that were approved by the Citizen Redistricting Commission that, but for the passage of the unconstitutional racially gerrymandered map, would have been in effect through the 2030 elections. The voters are familiar with these districts and keeping the Commission maps during this litigation does not create great confusion about what district voters live in and who represents them in Congress.

Without relief Plaintiffs will be deprived of their fundamental rights, statutory protections, or meaningful access to the democratic process under Proposition 50.

## IV. An Injunction Advances the Public Interest

Finally, the fourth factor, the public interest, likewise supports granting preliminary relief. In *Winter*, the Court confirmed that courts must ask whether the requested injunctive relief "is in the public interest." 555 U.S. at 20 (2008).

Granting preliminary relief advances the public interest in protecting the fundamental right to vote and ensuring fair access to the electoral process. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Am. Bev. Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (en banc) (citation omitted). The "protection of the Plaintiffs' franchise-related rights is without question in the public interest." *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005).

Here, the public interest is served by enforcing the rights and protections afforded under the VRA and Equal Protection Clause of the U.S. Constitution, ensuring fair access to the electoral process, and preserving the integrity of the franchise. Denying relief, in contrast, risks

27

1  undermining public confidence in equal access to the ballot and allowing potentially unlawful

2  government action to proceed unchecked pending final resolution.

3       As between the constitutionally dubious Proposition 50's map drawn in secret by

4  partisan political actors outside the Legislature and hastily adopted by the Legislature in

5  violation of its own rules before the legislature even had the constitutional authority to

6  redistrict, and the existing map drawn by the Citizens Redistricting Commission four years ago

7  after extensive and transparent months-long process involving numerous public hearings and

8  which has been used successfully in two congressional election cycles already and survived at

9  least two VRA analyses, the choice is clear: The Proposition 50's map that the Legislature and

10 the map drawing consultant announced was designed to benefit one race should be enjoined

11 pending the conclusion of this matter.

12      In sum, issuance of a preliminary injunction both aligns with and advances the public

13 interest in safeguarding equal electoral participation, promoting compliance with the statutory

14 scheme, and maintaining the status quo while the merits of this dispute are resolved.

15                       **CONCLUSION**

16      For the foregoing reasons, Plaintiffs respectfully request that this court grant a

17 preliminary injunction enjoining the implementation of Proposition 50's congressional

18 districts map, and order the State to use the Citizen Redistrict Commission congressional

19 district map during the pendency of this litigation. Plaintiffs request a three-judge panel

20 pursuant to 28 U.S.C. § 2284.

21

22 Date: November 7, 2025           DHILLON LAW GROUP

23

24                By:     /s Mark P. Meuser_____

25                    MICHAEL A. COLUMBO (SBN: 271283)
                      mcolumbo@dhillonlaw.com

26                    **DHILLON LAW GROUP INC.**

27                    177 Post Street, Suite 700
                      San Francisco, California 94108

28                    Telephone: (415) 433-1700

28

SHAWN COWLES (SBN: 163826)
scowles@dhillonlaw.com
MARK P. MEUSER (SBN: 231335)
mmeuser@dhillonlaw.com
**DHILLON LAW GROUP INC.**
4675 MacArthur Court, Suite 1410
Newport Beach, CA 92660

Attorneys for Plaintiffs



**MEMORANDUM OF POINTS AND AUTHORITIES        CASE NO. 2:25-cv-10616**