JESUS A. OSETE*
Principal Deputy Assistant Attorney General
MATTHEW ZANDI (CA No. 203329)
Chief of Staff & Special Counsel
MAUREEN RIORDAN (NY No. 2058840)
Acting Chief, Voting Section
ANDREW BRANIFF (IN No. 23430-71)
Acting Chief, Appellate Section
DAVID GOLDMAN (VA No. 98922)
JOSHUA R. ZUCKERMAN (DC No. 1724555)
GRETA GIESEKE (TX No. 24132925)
Attorneys
    Civil Rights Division
    United States Department of Justice
    950 Pennsylvania Avenue, NW
    Washington, D.C.  20530
    Telephone: (202) 514-3847
    E-Mail:     matt.zandi@usdoj.gov

BILAL A. ESSAYLI
First Assistant United States Attorney
JULIE A. HAMILL (CA No. 272742)
Assistant United States Attorney
    United States Attorney's Office
    300 North Los Angeles Street, Suite 7516
    Los Angeles, California 90012
    Telephone: (213) 894-2464
    E-Mail:     julie.hamill@usdoj.gov

Attorneys for Plaintiff-Intervenor
UNITED STATES OF AMERICA

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID TANGIPA, *et al.*,<br>                    *Plaintiffs*,<br>     and<br><br>UNITED STATES OF AMERICA,<br>                    *Plaintiff-Intervenor*,<br>     v.<br><br>GAVIN NEWSOM, in his official capacity as the Governor of California, *et al.*,<br>                    *Defendants*, | Case No.   2:25-cv-10616-JLS-KES<br>Three-Judge Court<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF UNITED STATES' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Honorable Josephine L. Staton<br>United States District Judge<br><br>Hearing Date:  December 5, 2025<br>Time:  10:30 am<br>Courtroom:  8A |

* Assistant Attorney General Harmeet K. Dhillon is recused from this matter.

# **TABLE OF CONTENTS**

PAGE

I.     INTRODUCTION ..................................................................................1

II.    BACKGROUND ...................................................................................2

III.   ARGUMENT .........................................................................................6

       A.    The United States is Likely to Succeed on the Merits ...................6

             1.    *Race Predominated in Drawing the Proposition 50 Map* ..................8

             2.    *Defendants cannot satisfy strict scrutiny* ...........................................11

       B.    Absent an Injunction, the Proposition 50 Map Will Cause
             Irreparable Harm ....................................................................13

       C.    The Balance of Equities and the Public Interest Favor
             an Injunction .........................................................................15

IV.    CONCLUSION.....................................................................................17

# TABLE OF AUTHORITIES

PAGE

**Cases:**

*Allen v. Milligan*,
    599 U.S. 1 (2023)...................................................................................7

*Alpha Phi Alpha Fraternity Inc. v. Raffensperger*,
    700 F. Supp. 3d 1136 (N.D. Ga. 2023)..................................................2

*American Encore v. Fontes*,
    152 F.4th 1097 (9th Cir. 2025) ............................................................16

*Arizona Dream Act Coal. v. Brewer*,
    757 F.3d 1053 (9th Cir. 2014) ......................................................13, 15

*Baird v. Bonta*,
    81 F.4th 1036 (9th Cir. 2023) ..............................................................15

*Bush v. Vera*,
    517 U.S. 952 (1996)................................................................................8

*Callais v. Landry*,
    732 F. Supp. 3d 574 (W.D. La. 2024),
    *appeal pending sub nom. Louisiana v. Callais*,
    No. 24-109 (U.S. reargued Oct. 15, 2025) .............................................1

*Chisom v. Roemer*,
    501 U.S. 380 (1991)................................................................................7

*Cooper v. Harris*,
    581 U.S. 285 (2017)......................................................................7-9, 11-13

*Democratic Nat'l Comm. v. Hobbs*,
    948 F.3d 989 (9th Cir. 2020) (en banc),
    *rev'd on other grounds sub nom. Brnovich v. Democratic Nat'l Comm.*,
    594 U.S. 647 (2021).......................................................................7-8, 11

*Elrod v. Burns*,
    427 U.S. 347 (1976)..............................................................................13

*Environmental Prot. Info. Ctr. v. Carlson*,
    968 F.3d 985 (9th Cir. 2020) .................................................................6

ii

**Cases (continued):** <u>PAGE</u>

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
    82 F.4th 664 (9th Cir. 2023) ...................................................................15

*Harris v. McCrory*,
    159 F. Supp. 3d 600 (M.D.N.C. 2016),
    *aff'd sub nom. Cooper v. Harris*, 581 U.S. 285 (2017) ..........................................2

*Hecox v. Little*,
    104 F.4th 1061 (9th Cir. 2024),
    *cert. granted*, No. 24-38 (U.S. to be argued Jan. 13, 2026) ........................... 13-14

*Hunter v. Underwood*,
    471 U.S. 222 (1985) ...............................................................................8

*League of Women Voters of Fla., Inc. v. Florida Sec'y of State*,
    32 F.4th 1363 (11th Cir. 2022) (per curiam) ....................................................16

*League of Women Voters of N.C. v. North Carolina*,
    769 F.3d 224 (4th Cir. 2014) ...................................................................14

*L.W. ex rel. Williams v. Skrmetti*,
    No. 3:23-cv-00376, 2023 WL 3513302 (M.D. Tenn. May 16, 2023) ...................7

*Massachusetts v. Mellon*,
    262 U.S. 447 (1923) ...............................................................................6

*McMillan v. Escambia Cnty.*,
    748 F.2d 1037 (5th Cir. 1984) ...................................................................7

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) ...................................................................13

*Merrill v. Milligan*,
    142 S. Ct. 879 (2022) ........................................................................ 15-16

*Miller v. Johnson*,
    515 U.S. 900 (1995) ............................................................................ 7-8

*Montana Pub. Interest Research Grp. v. Jacobson*,
    No. 24-2811, 2024 WL 4023781 (9th Cir. Sept. 3, 2024) ....................................14

*Monterey Mech. Co. v. Wilson*,
    125 F.3d 702 (9th Cir. 1997) ...................................................................13

iii

**Cases (continued):**                                                                 <u>PAGE</u>

*Obama for Am. v. Husted,*
    697 F.3d 423 (6th Cir. 2012) ...................................................................14

*Pasadena City Bd. of Educ. v. Spangler,*
    427 U.S. 424 (1976).......................................................................................6

*Pierce v. North Carolina State Bd. of Elections,*
    97 F.4th 194 (4th Cir. 2024) ......................................................................17

*Purcell v. Gonzalez,*
    549 U.S. 1 (2006) (per curiam).............................................................15-16

*Republican Nat'l Comm. v. Democratic Nat'l Comm.,*
    589 U.S. 423 (2020) (per curiam)..........................................................16-17

*Reynolds v. Sims,*
    377 U.S. 533 (1964)....................................................................................16

*Singleton v. Merrill,*
    582 F. Supp. 3d 924 (N.D. Ala. 2022) (per curiam),
    *aff'd sub nom. Allen v. Milligan*, 599 U.S. 1 (2023) ..................................1

*Thornburgh v. Gingles,*
    478 U.S. 30 (1986)................................................................................12-13

*Valle del Sol Inc v. Whiting,*
    732 F.3d 1006 (9th Cir. 2013) ...................................................................15

*Vermont Agency of Nat. Res. v. United States ex rel. Stevens,*
    529 U.S. 765 (2000)......................................................................................6

*United States v. Berks Cnty.,*
    250 F. Supp. 2d 525 (E.D. Pa. 2003).........................................................14

*United States v. Charleston Cnty.,*
    318 F. Supp. 2d 302 (D.S.C. 2002) ...........................................................14

*United States v. Raines,*
    362 U.S. 17 (1960)................................................................................6, 14

*United States v. Town of Thornapple,*
    143 F.4th 793 (7th Cir. 2025).....................................................................14

*United States v. Village of Port Chester,*
    704 F. Supp. 2d 411 (S.D.N.Y. 2010) ......................................................14

**Cases (continued):** <span style="float:right">PAGE</span>

*Winter v. Natural Res. Def. Council,*
    555 U.S. 7 (2008)..................................................................................6


**Constitution:**

Fourteenth Amendment ...............................................................1, 5, 7

Fifteenth Amendment ......................................................................5, 7


**Statutes:**

Civil Rights Act of 1964, Section 902,
    42 U.S.C. § 2000h-2 ....................................................................7, 14

Voting Rights Act, Section 5,
    52 U.S.C. § 10301, *et seq.* .................................................................11
    52 U.S.C. § 10304................................................................................2

Cal. Const. art. XXI, § 1 .......................................................................2

Cal. Elections Code § 8162(a) ............................................................15


**Other Authorities:**

CADEM, *Yes On Prop 50:  FAQ,*
    https://tinyurl.com/4nwm69mt .............................................................3

California Secretary of State, Key Dates and Deadlines:
    *Primary Election—June 2, 2026,*
    https://tinyurl.com/y7dvfdtu (last visited Nov. 10, 2025) ....................15

California State Assembly, Committee on Elections,
    *AB 604 Districts Atlas,*
    https://tinyurl.com/5fbnr5bh (last visited Nov. 11, 2025)....................10

California State Assembly, Committee on Elections,
    *Proposed Congressional Map,*
    https://tinyurl.com/yfpbj2zv (last visited Nov. 11, 2025) ................. 9-10

**Other Authorities (continued):**                                      <u>PAGE</u>

Dr. Raquel Centeno & Dr. Jarred Cuellar,
*Latino Voters and the November 2025 Special Election:
Redistricting and Representation,*
https://tinyurl.com/5pjj9x7r ...................................................................5, 9, 12

Hispanas Organized for Political Equality (HOPE), *About HOPE,*
https://tinyurl.com/4umns8x5 .........................................................................3

Mike McGuire, Press Release, Legislative Democrats Announce
Plan Empowering Voters to Protect California (Aug. 19, 2025),
https://tinyurl.com/6ctwe4sf ...........................................................................5

Public Policy Institute of California, *How Would the Prop 50
Redistricting Plan Affect Racial and Geographic Representation?,*
https://tinyurl.com/33j8fjwe (Oct. 8, 2025)........................................9, 12

U.S. Census Bureau, California: 2020 Census,
https://tinyurl.com/kc5rknhj (last visited Nov. 10, 2025) .....................12

**INTRODUCTION**

Last week, California passed Proposition 50, which amended its constitution to replace the congressional voting districts created by an independent districting commission with those created by an outside map drawer, and endorsed by the California State Legislature, to sort voters by race.[1]  Proposition 50 results in a mandate that requires the use of a new, racially gerrymandered congressional map in 2026-2030 federal elections.  The Constitution does not tolerate such racial sorting.  Yet absent an injunction, California primary efforts, obstructed by unlawful discrimination, will officially begin next month.  Accordingly, the United States respectfully moves under Federal Rule of Civil Procedure 65(a) to preliminarily enjoin Defendants from implementing Proposition 50's congressional-district map and to require Defendants to use the 2021 map (used in the 2022 and 2024 congressional elections) for the 2026 congressional election.

In recent years, on several occasions, district courts have enjoined the use of congressional maps because they violated the Equal Protection Clause of the Fourteenth Amendment to the Constitution or Section 2 of the Voting Rights Act ("VRA").  *See Callais v. Landry*, 732 F. Supp. 3d 574, 614 (W.D. La. 2024) (holding that Louisiana's congressional map violated the Fourteenth Amendment's Equal Protection Clause "as an impermissible racial gerrymander" and entering an injunction prohibiting Louisiana from using the map "for any election"), *appeal pending sub nom. Louisiana v. Callais*, No. 24-109 (U.S. reargued Oct. 15, 2025); *Singleton v. Merrill*, 582 F. Supp. 3d 924, 936 (N.D. Ala. 2022) (per curiam) (holding that plaintiffs were substantially likely to establish that Alabama's congressional map was racially gerrymandered in violation of Section 2 and preliminarily enjoining the Alabama Secretary of State from "from conducting any congressional elections according to the Plan"), *aff'd sub nom. Allen v. Milligan*, 599 U.S.

---

[1]  The enactment of the Proposition 50 map (Assembly Bill 604) was paired with a constitutional amendment authorizing the temporary use of the legislature-enacted congressional map through 2030 (Assembly Constitutional Amendment 8) and a bill calling for the special election, appropriating funds, and making conforming calendar changes (Senate Bill 280).  *See* Assembly Bill 604, 2025-26 Reg. Sess. (Cal. 2025).

1 (2023); *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 700 F. Supp. 3d 1136, 1181 (N.D. Ga. 2023) (holding that Georgia's congressional and legislative maps violated Section 2 of the VRA because "in certain areas of the State, the political process is not equally open to Black voters" and enjoining "their use in any future elections"), *appeals pending*, Nos. 23-13916, 23-13914, 23-13921 (filed Nov. 28, 2023); *Harris v. McCrory*, 159 F. Supp. 3d 600, 604 (M.D.N.C. 2016) (holding that race predominated in North Carolina's congressional redistricting plan in violation of the Equal Protection Clause and "requir[ing] that new congressional districts be drawn forthwith to remedy the unconstitutional districts"), *aff'd sub nom. Cooper v. Harris*, 581 U.S. 285 (2017). The same result is appropriate here.

## I.    BACKGROUND

This case arises out of a new congressional district map created by California's legislature and adopted by California's voters in a November 2025 referendum ("Proposition 50"). Before 2010, the California legislature drew the State's congressional district maps. In 2010, California voters transferred this authority from the legislature to an independent California Citizens Redistricting Commission (CCRC) that would "adjust the boundary lines of the congressional … districts" every ten years in "the year following the year in which the national census is taken." Cal. Const. art. XXI, § 1.

In 2011, the Commission redrew four congressional districts "to comply with the Voting Rights Act." Maureen Riordan Decl. in Support of U.S. Mot. for Preliminary Injunction Ex. 1 at 1. The Commission submitted the maps to the United States Department of Justice for preclearance, as was then required by Section 5 of the VRA. 52 U.S.C. § 10304. The Commission explained that it "maintained or increased the Latino[2]

---

[2] "The terms [Hispanic and Latino] are often used interchangeably, though the words can convey slightly different connotations." Britannica, *What's the Difference Between Hispanic and Latino?*, https://tinyurl.com/49mcy9xk (last visited Nov. 13, 2025). "Latino" "refers to (almost) anyone born in or with ancestors from Latin America and living in the U.S., including Brazilians." *Ibid.* "'Hispanic' is generally accepted as a narrower term that includes people only from Spanish-speaking Latin America, including those countries/territories of the Caribbean or from Spain itself." *Ibid.* The United States will use these terms as they appear in the documents being cited.

Voting Age Population in each district" and "complied with the requirements of Section 5." Riordan Decl. Ex. 1 at 1. The Department of Justice did "not impose any objection to the specified changes" or otherwise indicate concerns about the 2011 map's compliance with the VRA. Riordan Decl. Ex. 2. The Commission revised its map in 2021, following the 2020 census. According to Paul Mitchell, the head of the demography firm Redistricting Partners, which has worked with state and local governments on redistricting efforts, the 2021 map also complied with the VRA. Hamill Decl. in Support of United States' Complaint (Doc. 28-2) Ex. B at 26:14–21.

In summer 2025, Texas began a redistricting process and California decided to retaliate. They retained Mitchell to draft a new map ostensibly intended to "negate the five Republican seats drawn by Texas" by adding "up to 5 [Democrat] seats in the U.S. House of Representatives." CADEM, *Yes On Prop 50: FAQ*, https://tinyurl.com/4nwm69mt (last visited Nov. 13, 2025). In the press, California's legislators and governor sold a plan to promote the interests of Democrats in the upcoming midterm elections. But amongst themselves and on the debate floor, the focus was not partisanship, but race.

One of Mitchell's stated goals in drafting the new map was to increase Latino political power. Mitchell discussed the new map during a presentation with advocacy group Hispanas Organized for Political Equality ("HOPE"), a self-described "nonprofit, nonpartisan organization committed to ensuring political and economic parity for Latinas." HOPE, *About HOPE*, https://tinyurl.com/4umns8x5 (last visited Nov. 13, 2025). He explained that when asked to draw the new map, he "sent a text to [his] little chat [to] all [his] Redistricting Partners staff … And [he] started listing out this concept of drawing a replacement Latino majority/minority district in the middle of Los Angeles." Doc. 28-2, Ex. B at 23:18–24:1. Creating this "Latino majority/minority district" "was the *number one thing* [he] first started thinking about." *Id.* at 24:2—5 (emphasis added). Specifically, Mitchell lamented the "disappear[ance]" of "the most Latino district in the country" and decided to "put that district back." *Id.* at 24:13–15; 25:14. The result, according to

3

Mitchell, was a map that "will be great for the Latino community" in that it "bolster[s]" "Latino districts … in order to make them most effective." *Id.* at 30:6–10.

The California Legislature enacted a series of statutes to codify the new map. The Legislature approved the new map (Assembly Bill 604) alongside a constitutional amendment authorizing the temporary use of the legislature-enacted congressional map through the 2030 election (Assembly Constitutional Amendment 8) and a bill establishing the necessary referendum, known as "Proposition 50." (Senate Bill 280).

During the Legislature's consideration and debate of Proposition 50, several legislators gave racial—not political—reasons in favor of their votes for the new map. They described other states' redistricting efforts as efforts that were meant to suppress minority voters. Assembly member Mark González framed the Texas redistricting as "racism" "shield[ed] … with [the] party line." Doc. 28-2, Ex. C at 38:9–11; *see also* Doc. 28-2, Ex. D. at 158:11–13 (State Senator Sabrina Cervantes) ("They want to silence the voices of Latino voters, Black voters, API voters, and LGBTQ voters."). Or, as Assembly member Isaac G. Bryan put it, "[a] Latino voice in Texas is worth one third of the representation as a white voice" and "[a] black voter in Texas is worth one fifth of the representation of a white voter in Texas." Doc. 28-2, Ex. C at 49:6–9; Doc. 28-2, Ex. E at 149:22–150:1 (State Senator Lola Smallwood-Cuevas) ("In Texas, what this looks like is that black Texans will lose much of their power, being reduced to about a fifth of what their power was before this gross attack.").

California legislators expressed additional concerns that other states' proposed new maps threatened the ability of racial minorities to elect candidates of their choice. State Senator Lola Smallwood-Cuevas accused Texas of "sliding back" to the pre–VRA era in which "black Codes, and Jim Crow, and racial terror, poll taxes, [and] white-only primaries … cut black voter rolls in Texas from over 100,000 to just a few thousand." Doc. 28-2, Ex. E at 150:22–25. According to Assembly member González, "[t]his is about whether a Latino child in Texas, a black family in Florida, or an immigrant community in California has a voice in their own democracy." Doc. 28-2, Ex. C at 40:2–5.

Assemblyman Mike Gipson spoke similarly: "It's about the next generation that we may not even have any black people serving in office to have representation. It's about 10 African American members of Congress that could be wiped away in Congress if we don't stand up and be counted." *Id.* at 53:12–17. The Proposition 50 map therefore would serve as a "shield" to combat "racist maps" elsewhere. *Id.* at 40:9–11 (González); *see also id.* at 39:21–22 (González) ("If Florida wants to silence voters of color, we will not sit quietly.").

State Senator and Senate President pro Tempore Mike McGuire echoed Mitchell's desire to increase Latino voting strength. In a press release, he boasted that the Proposition 50 map would "retain[] and expand[] Voting Rights Act districts that empower Latino voters to elect their candidates of choice." Legislative Democrats Announce Plan Empowering Voters to Protect California (Aug. 19, 2025), https://tinyurl.com/4ppfwns6.

On November 4, California's voters passed Proposition 50. On November 5, the California Republican Party and several California residents (collectively, "Plaintiffs") filed this lawsuit challenging the new map under the Fourteenth and Fifteenth Amendments.

Statistical evidence suggests that Mitchell, McGuire, and the legislators were successful in their efforts to increase Latino voting power. A detailed study concluded that "the proposed Proposition 50 map [would] further increase Latino voting power over the current Commission map" and "likely increase Latino voting power, given its creation of two new Latino community influence districts and the expansion of the Latino electorate in other districts." Dr. Raquel Centeno & Dr. Jarred Cuellar, *Latino Voters and the November 2025 Special Election: Redistricting and Representation* at 1, https://tinyurl.com/5pjj9x7r (emphasis omitted) [hereinafter Centeno & Cuellar Report]; *see id.* at 9–10 (explaining how Latino voting power was increased in districts that were majority-Latino under the prior map by shifting Latino voters across district lines). The study further explained that District 13, in the Central Valley between San Jose and Fresno, "increases from 50.2% Latino CVAP" (citizen voting-age population) "to about 54%

Latino CVAP … allowing greater opportunity for Latino voters to choose the winning candidate." *Id.* at 12.

Plaintiffs' expert Sean Trende also determined that District 13 increases Hispanic voting power. Trende's report concludes that the new map's "boundaries between districts 5, 9 and 13 [near Los Angeles] appear to have been crafted to enhance the Hispanic Voting Age Population and Hispanic Citizen Voting Age Population in the district." Doc. 16-5, at 3. According to Trende, the District's "twisted shapes cannot be explained by traditional redistricting principles, nor can they be explained by politics. Race predominated in these lines." *Ibid.*

## II.    ARGUMENT

When deciding whether to issue a preliminary injunction, courts consider four factors: whether the requesting party has shown "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Environmental Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020) (quoting *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008)).

### A.    The United States is Likely to Succeed on the Merits

"Likelihood of success on the merits is a threshold inquiry and is the most important factor." *Environmental Prot. Info. Ctr.*, 968 F.3d at 989. At the threshold, the United States has standing to vindicate its own sovereign interests in this case. It is "beyond doubt" that the United States suffers "an injury to … its sovereignty" when a State violates federal law, *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000), including the United States Constitution, *see Pasadena City Bd. of Educ. v. Spangler*, 427 U.S. 424, 430-431 (1976). There is similarly no "doubt[]" that "the United States" may "represent[ its' citizens] as *parens patriae*" to "enforce their [federal] rights" in court, *Massachusetts v. Mellon*, 262 U.S. 447, 485-486 (1923) (emphasis added), including the sacred right to vote, *see United States v. Raines*, 362 U.S. 17, 27 (1960). Additionally, the United States, as plaintiff-intervenor, seeks the exact same relief as the

6

original plaintiffs. When the United States intervenes in an equal-protection case under Section 902 of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000h-2, it, at a minimum, has standing to seek the same relief as the original plaintiffs. *See L.W. ex rel. Williams v. Skrmetti*, No. 3:23-cv-00376, 2023 WL 3513302, at *1–3 (M.D. Tenn. May 16, 2023).

Proposition 50 constitutes a racial gerrymander in violation of the Fourteenth Amendment's Equal Protection Clause and the VRA. An equal-protection claim that a redistricting map unlawfully uses "race-based lines … call[s] for a two-step analysis." *Cooper v. Harris*, 581 U.S. 285, 291 (2017). "First, the plaintiff must prove that 'race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Ibid.* (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)). "Second, if racial considerations predominated over others," then the burden shifts to the State to satisfy "strict scrutiny." *Id.* at 292. Because race predominated in drawing the Proposition 50 map, and California cannot satisfy strict scrutiny, the United States is likely to prevail on its equal-protection claim.

The VRA likewise prohibits intentionally dividing voters up by race. *Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989, 1037-1038 (9th Cir. 2020) (en banc), *rev'd on other grounds sub nom. Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647 (2021). Although a plaintiff "need not prove a discriminatory purpose … to establish a violation" of the VRA, "intent" to discriminate is sufficient to establish a violation. *Chisom v. Roemer*, 501 U.S. 380, 394 n.21 (1991) (citation omitted); *see Allen v. Milligan*, 599 U.S. 1, 11 (2023) ("The Fifteenth Amendment—and thus § 2—prohibits States from acting with a 'racially discriminatory motivation' or an 'invidious purpose' to discriminate." (citation omitted)). Because the same showing of intentional racial discrimination that is "sufficient to constitute a violation of the fourteenth amendment" "is sufficient to constitute a violation of section 2," *McMillan v. Escambia Cnty.*, 748 F.2d 1037, 1046 (5th Cir. 1984), the United States addresses jointly the equal-protection and VRA claims in discussing why

race was a predominant factor in the drawing of the Proposition 50 map.[3]

One slight distinction between the two claims is that, for the VRA, once an intent to discriminate is shown, "the burden shifts to the [State] to demonstrate that the [map] would have been enacted without this factor." *Hobbs*, 948 F.3d at 1038 (quoting *Hunter v. Underwood*, 471 U.S. 222, 228 (1985)). Trende's analysis shows that, had California not taken race into account and focused primarily on partisan goals (its purported mission), it would have enacted a different map. p. 6, *supra*; *see also* Doc. 16-5.

### 1.    *Race Predominated in Drawing the Proposition 50 Map*

Race is the predominant factor when the legislature has "'subordinated' other factors—compactness, respect for political subdivisions, partisan advantage, [etc.]—to 'racial considerations.'" *Cooper*, 581 U.S. at 291 (quoting *Miller*, 515 U.S. at 916). Importantly, nothing changes if race is "use[d] . . . as a proxy" to advance political goals. *Id.* at 291 n.1 (citing *Bush v. Vera*, 517 U.S. 952, 968-970 (1996) (plurality opinion); *Miller*, 515 U.S. at 914). A plaintiff may rely on "'direct evidence' of legislative intent, 'circumstantial evidence of a district's shape and demographics,' or a mix of both." *Id.* at 291 (quoting *Miller*, 515 U.S. at 916).

In a presentation to HOPE, Mitchell, the author of the Proposition 50 map, left no doubt that race was at the forefront of his mind when creating certain districts. *See Cooper*, 581 U.S. at 299 (focusing on evidence that "the State's mapmakers … established a racial target"). The "number one thing that [he] first started thinking about" when creating the map was "drawing a replacement Latino majority/minority district in the middle of Los Angeles." Doc. 28-2, Ex. B at 23:24–24:5. Stated differently, the "first thing" he and his team did in "drawing the new map" was to "reverse[]" a move by the CCRC that had eliminated a prior "Latino district from LA" and "put that district back." *Id.* at 25:6–14; *see also* pp. 3-4, *supra*.

---

[3] Notably, though plaintiffs in an equal-protection challenge must show that "race was *the predominant* factor motivating the legislature's decision," *Miller*, 515 U.S. at 916, plaintiffs in a VRA challenge need only show that race was "*a motivating* factor," *Hobbs*, 948 F.3d at 1038 (citation omitted; emphasis altered).

Mitchell's racial aims went beyond resurrecting a Latino-majority district eliminated by California's independent and nonpartisan redistricting commission.  He told HOPE that the "[t]he Prop. 50 maps [would] be great for the Latino community in … that they [would] ensure that the Latino districts that are the VRA seats are *bolstered* in order to make them *most* effective, particularly in the Central Valley."  Doc. 28-2, Ex. B at 30:6–11 (emphasis added).  Mitchell also emphasized in the same presentation to HOPE that he had redrawn another district to create a "Latino-influenced district at 35 percent Latino by voting age population."  *Id.* at 24:25–25:5.

When California legislators considered Proposition 50, race also played a predominant role in their discussions.  *See Cooper*, 581 U.S. at 299–300 (examining statements made in legislative debate).  Legislators viewed the Proposition 50 map as necessary to protect racial minorities' political power against perceived threats posed by other states' maps.  pp. 4-5, *supra*.  Analyses of the resulting map confirm that race predominated.  *See Cooper*, 581 U.S. at 291 (explaining that "circumstantial evidence" that race predominated may include "a district's shape and demographics" (citation omitted)).  The Public Policy Institute of California (PPIC) concluded that "the proposed plan matche[d]" the pre-existing map in terms of compliance with the VRA "almost exactly" but "add[ed] one more Latino influence district."  PPIC, *How Would the Prop 50 Redistricting Plan Affect Racial and Geographic Representation?* (Oct. 8, 2025), https://tinyurl.com/33j8fjwe; *see* Doc. 28-2, Ex. B 26:22–25 (referencing the PPIC analysis).  Drs. Centeno and Cuellar concluded in their own report that "the proposed map [would] likely increase Latino voting power, given its creation of two new Latino community influence districts and the expansion of the Latino electorate in other districts."  Centeno & Cuellar Report 1 (emphasis omitted).

The subordination of other districting criteria to considerations of race is evidenced by District 13.  District 13 is made up of parts of five counties:  part of San Joaquin County, southwestern Stanislaus County, all of Merced County, western Madera County, and part of Fresno County.  Doc. 16-5, at 20; *see* California State Assembly, Committee on

9

Elections, *Proposed Congressional Map*, https://tinyurl.com/yfpbj2zv (last visited Nov. 11, 2025).

Judged by either total population or citizen voting age population ("CVAP"), District 13 contains a notably higher percentage of Hispanic individuals than the counties within the District.  Looking at total population, the 2020 census indicates that three of these counties are majority-Hispanic by total population (Fresno at 53.6%, Madera at 60.5%, and Merced at 61.9%).  Doc. 16-7, at 28-29 (tbl. 1).  In the two other counties, Hispanic individuals are a plurality of the total population (Stanislaus at 48.1% and San Joaquin at 41.8%).  *Id.* at 29 (tbl. 1).  As drawn, District 13 is made up of 64.8% Latinos. California State Assembly, Committee on Elections, *AB 604 Districts Atlas* 3, https://tinyurl.com/5fbnr5bh (last visited Nov. 11, 2025) [hereinafter *AB 604 Districts Atlas*].  Looking at CVAP, Hispanic individuals are a majority in one of these counties (Merced at 51.1%), a plurality in two (Fresno at 45.5% and Madera at 46.8%), and a sizable minority in two (San Joaquin at 33.5% and Stanislaus at 39%).  Doc. 16-7, at 31 (tbl. 3).  As drawn, District 13 is made up of 53.8% Latino CVAP.  *AB 604 Districts Atlas* 3.

The borders of District 13 do not make sense as a partisan gerrymander.  District 13 "bulges out" near Ceres and Modesto—two cities in Stanislaus County—in the northern part of the District, "splits Modesto," "keeps Ceres intact," and "captures some areas outside of Ceres."  Doc. 16-5, at 26.  The map "leaves a significant Democratic population on the table in Modesto, to the north of the district boundary.  In addition, it captures a large Republican population in and around Ceres."  *Ibid.*  When one "examine[s the map] from a racial angle, the motivation for the split appears more obvious.  Most of the Democratic territory left in Modesto is White.  More importantly, the Republican territory captured around Ceres is heavily Hispanic.  If partisanship were really the motivating factor for this division, the district would drop some of the Republican areas in Ceres and pick up Democratic areas in Modesto."  *Id.* at 28.

Similarly, the "northern split" of District 13, near Stockton—a city in San Joaquin

County—"leaves a lot of Democrats on the table. In particular, areas to the west of the District are heavily Democratic, more so than some of the precincts at the District's northern boundary." Doc. 16-5, at 31. "What differentiates them is that the portion at the northern end of the district [is] heavily Hispanic, while the areas left out to the west of the district are more heavily White. In other words, this appendage bypasses white Democrats, making the district less compact, to gain Hispanic areas that are less heavily compact. From a [partisan] gerrymandering perspective, this makes little sense." *Id.* at 34.

"One, often highly persuasive way to disprove a State's contention that politics drove a district's lines is to show that the legislature had the capacity to accomplish all its partisan goals without moving so many members of a minority group into the district." *Cooper*, 581 U.S. at 317. As shown in Trende's analysis, at least three alternative maps "demonstrate that it is possible to achieve the political goals of the map"—purportedly to increase Democratic representation in the Congress—"with a more regular configuration that does not target race." Doc. 16-5, at 37. Indeed, each of these alternative maps show *better* projected Democratic performance than the Proposition 50 map and is more in line with traditional districting principles. *Id.* at 38-42. These alternative designs demonstrate that the Proposition 50 map would have differed but for the predominance of race as a factor, which both shows that the Proposition 50 map violates the VRA, *see Hobbs*, 948 F.3d at 1038, and resolves any doubt that Defendants must satisfy strict scrutiny under the Equal Protection Clause, *see Cooper*, 581 U.S. at 292.

### 2.     *Defendants cannot satisfy strict scrutiny*

Although statutes cannot supply an interest for violating the Constitution, the Supreme Court "has long assumed that one compelling interest is complying with operative provisions of the [VRA]." *Cooper*, 581 U.S. at 292; *see* 52 U.S.C. § 10301, *et seq.* Defendants have no plausible claim that the Proposition 50 map was necessary to comply with the VRA.

Mitchell explained that he had reviewed a VRA analysis confirming that the 2021

map complied with the VRA.  Doc. 28-2, Ex. B at 26:14–21.  The PPIC analysis, also referenced by Mitchell (*see* p. 9, *supra*), likewise acknowledged that the 2021 map complied with the VRA.  Drs. Centeno and Cuellar explained that the 2021 map had already increased Hispanic voting power even before the Proposition 50 map.  Centeno & Cuellar Report 1.  And a former member of the CCRC explained in California Senate testimony that the CCRC's work beginning in 2010 had already resulted in "significant changes to the [State] Legislature over the last two Commissions, including the percentage of women in the Legislature doubled, AAPI representation tripled, Black representation nearly doubled, and Latinos increased by 8[] percent."  Doc. 28-2, Ex. D at 47:24–48:4. (Jeanne Raya).

Moreover, Hispanic voters in California do not satisfy the third element of the three-part test laid out *Thornburgh v. Gingles*, 478 U.S. 30 (1986) to establish a vote-dilution claim under Section 2 of the VRA.  Under *Gingles*, "a 'minority group' must be 'sufficiently large and geographically compact to constitute a majority' in some reasonably configured legislative district." *Cooper*, 581 U.S. at 301 (quoting *Gingles*, 478 U.S. at 50).  "Second, the minority group must be 'politically cohesive.'" *Id.* at 301-302 (quoting *Gingles*, 478 U.S. at 51).  "And third, a district's white majority must 'vote [] sufficiently as a bloc' to usually 'defeat the minority's preferred candidate.'" *Id.* at 302 (quoting *Gingles*, 478 U.S. at 51 (alteration in original)).

Hispanic individuals are the largest racial group in California.  *See* U.S. Census Bureau, California: 2020 Census, https://tinyurl.com/kc5rknhj (last visited Nov. 10, 2025). They make up 31.9% of the CVAP, compared to whites' 43.5% of the CVAP, statewide. Doc. 16-7, at 31 (tbl. 3).  And they are "increasingly flexing [their] voting power." Centeno & Cuellar Report 1.  Recent statewide elections show that "Hispanics are not struggling to win these elections." *Ibid.*  In multiple races in the 2018 and 2022 elections, Hispanic Democrats beat white Republicans.  *Id.* at 31-32.  The margin of victory for Hispanic Democrats in these statewide elections against white Republicans has mirrored the margin of victory for non-Hispanic Democrats against non-Hispanic Republicans.  *See*

Doc. 28-2 ¶¶ 23-29.  This shows that Californians cast their votes based on candidates' political party, not candidates' race.  And an analysis from Plaintiffs' expert Tom Brunell shows that vote totals for Democratic candidates in California are stable "across all kinds of offices with all kinds of candidates."  Doc. 16-7, at 38.  There is no evidence that "white majorit[ies]" in the counties affected by the Proposition 50 map (or anywhere else) "'vote [] sufficiently as a bloc' to usually 'defeat the [Hispanics'] preferred candidate.'"  *Cooper*, 581 U.S. at 302 (quoting *Gingles*, 478 U.S. at 51 (alteration in original)).  Rather, "estimates indicate that majorities of Non-Hispanic Whites, Hispanics, Non-Hispanic Blacks, and Non-Hispanic Asians, all vote Democratic" with "high levels of partisan straight ticket voting."  Doc. 16-7, at 46.

As the Supreme Court has stated:  "If a State has good reason to think that all the 'Gingles preconditions' are met, then so too it has good reason to believe that § 2 [of the VRA] requires drawing a majority-minority district.  But if not, then not."  *Cooper*, 581 U.S. at 302 (citation omitted).  California had no good reason to think the VRA required race-based districting in 2025 and accordingly had no good reason to discriminate on the basis of race.

**B.    Absent an Injunction, the Proposition 50 Map Will Cause Irreparable Harm**

Irreparable harm is "harm for which there is no adequate legal remedy, such as an award of damages."  *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).  "[T]he deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'"  *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  Merely "alleg[ing] constitutional infringement will often alone constitute irreparable harm" where government "classifies by ethnicity."  *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997) (citation omitted).

Because the United States is likely to succeed on the merits of its equal-protection and VRA claims, *see* pp. 6-13, *supra*, "it follows inexorably" that it has "carried [its] burden as to irreparable harm."  *Hecox v. Little*, 104 F.4th 1061, 1088 (9th Cir. 2024),

(citation omitted), *cert. granted*, No. 24-38 (oral argument scheduled for Jan. 13, 2026). No ex post monetary damages or other legal remedy can compensate Californians for being forced to vote in a certain district—and denied the opportunity to participate in other congressional elections—on account of their race. *See, e.g.*, *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("[O]nce the election occurs, there can be no do-over and no redress. The injury to these voters is real and completely irreparable if nothing is done to enjoin this law."); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("A restriction on the fundamental right to vote therefore constitutes irreparable injury."); *cf. Montana Pub. Int. Rsch. Grp. v. Jacobson*, No. 24-2811, 2024 WL 4023781, at *4 (9th Cir. Sept. 3, 2024) (mem.) ("[D]iscourag[ing] individuals from registering to vote in Montana by threatening criminal penalties for doing so … carries the risk of irreparable harm.").

This injury to California voters satisfies the irreparable-harm factor. Whether as plaintiff or intervenor, the United States need only show that "the holding of an upcoming election in a manner that will violate the Voting Rights Act constitutes irreparable harm to voters." *United States v. Berks Cnty.*, 250 F. Supp. 2d 525, 540–541 (E.D. Pa. 2003) ("The impact of the discouragement of equal participation in the democratic system cannot be redressed by money, or any other remedy, following trial."); *see also United States v. Village of Port Chester*, 704 F. Supp. 2d 411, 416 (S.D.N.Y. 2010) (irreparable harm from at-large districts in violation of the Voting Rights Act); *United States v. Charleston Cnty.*, 318 F. Supp. 2d 302, 326 (D.S.C. 2002) (same); *cf. United States v. Town of Thornapple*, 143 F.4th 793, 799–800 (7th Cir. 2025) (finding that the United States suffered irreparable harm where a town functionally deprived disabled people of the right to vote, in violation of the Help America Vote Act). Proposition 50 discriminates against American citizens on the basis of race and harms the United States by undermining its overwhelming interest in enforcing the Fourteenth Amendment and the VRA and in protecting Americans from racial discrimination at the ballot box. *See* 42 U.S.C. § 2000h-2; *Raines*, 362 U.S. at 27.

Without a preliminary injunction, starting next month, unlawful racial sorting and

uncertainty regarding district boundaries could stunt political involvement, burden candidates with unnecessary expenses, and ultimately affect election outcomes.[4]  The public interest accordingly favors an injunction.

## C.    The Balance of Equities and the Public Interest Favor an Injunction

"When, like here, the nonmovant is the government," the third and fourth factors— the balance of equities and public interest— "merge." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (citation omitted).  And "it is always in the public interest to prevent the violation of a party's constitutional rights." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 695 (9th Cir. 2023) (citation omitted).  So "by establishing a likelihood that [a state's] policy violates the U.S. Constitution, [a plaintiff] . . . also establishe[s] that both the public interest and the balance of the equities favor a preliminary injunction." *Arizona Dream Act Coal.*, 757 F.3d at 1069.  After all, "it would not be equitable or in the public's interest to allow the state to violate the requirements of federal law, especially when there are no adequate remedies available." *Ibid.* (quoting *Valle del Sol Inc v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013)) (alterations adopted).  As already established, the United States is likely to succeed on the merits.  *See* pp. 6-13, *supra*.  The balance of equities and the public interest therefore favor an injunction too.

Moreover, *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam), does not prohibit preliminary relief.  *Purcell* "reflects a bedrock tenet of election law:  When an election is close at hand, the rules of the road must be clear and settled." *Merrill v. Milligan*, 142 S. Ct. 879, 880–881 (2022) (Kavanaugh, J., concurring in grant of applications for stays). That is because "[c]ourt orders affecting elections … can themselves result in voter confusion and consequent incentive to remain away from the polls." *Purcell*, 549 U.S. at 4-5.  The risk of voter confusion "will increase" "[a]s an election draws closer." *Id.* at 4-

---

[4] California Secretary of State, Key Dates and Deadlines:  *Primary Election—June 2, 2026*, https://tinyurl.com/y7dvfdtu (last visited Nov. 10, 2025); *see also* Cal. Elec. Code § 8162(a) (West 2025).

6 (declining to "enjoin operation of voter identification procedures just weeks before an election").

"[T]he Supreme Court has never specified precisely what it means to be 'on the eve of an election' for *Purcell* purposes." *League of Women Voters of Fla., Inc. v. Florida Sec'y of State*, 32 F.4th 1363, 1371 (11th Cir. 2022) (per curiam) (quoting *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (per curiam)). A key consideration is whether intervention would "lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others." *Merrill*, 142 S. Ct. at 881 & n.1 (Kavanaugh, J., concurring in grant of applications for stays); *see Republican Nat'l Comm.*, 589 U.S. at 424-425 (highlighting the complications in election administration caused by the district court's order and the necessity to issue further orders to mitigate the complications as "further underscor[ing] the wisdom of the *Purcell* principle"); *American Encore v. Fontes*, 152 F.4th 1097, 1121 (9th Cir. 2025). The Ninth Circuit therefore has explained that "[o]nly 'under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress' is *Purcell* implicated." *Ibid.* (quoting *Reynolds v. Sims*, 377 U.S. 533, 585 (1964)).

Here, the challenged map was approved just over a week ago and was challenged the very next day. The "State's election machinery is [not yet] in progress." *American Encore*, 152 F.4th at 1121. The United States' requested relief would require California to return to a map that has represented the status quo for four years. Voting is nearly a year away, so there is minimal risk of voter confusion from immediate preliminary relief. Nor would prompt relief prejudice potential congressional candidates, who did not know until last week that the Proposition 50 map would pass. Because the map was challenged in this Court the very next day, these potential candidates can only have placed relatively minimal reliance on that map since the Special Election.

Enjoining California's new map poses at most a minimal risk of voter confusion. The next congressional election will be held on November 3, 2026, approximately one year from now, so granting the United States' motion for a preliminary injunction would

not impermissibly "alter the election rules on the eve of an election."  *Republican Nat'l Comm.*, 589 U.S. at 424.

In contrast, leaving the Proposition 50 map in place until a resolution on the merits risks precisely the dangers that the *Purcell* principle is meant to avoid.  Because the United States is likely to succeed on the merits, waiting until closer to the 2026 election to do the inevitable—enjoin the use of the new map and require returning to the 2021 map—poses a substantial risk of confusing voters on the eve of the election.

The contrary conclusion—that *Purcell* counsels *against* preliminary relief here—would create perverse incentives for States.  California created a new electoral map the month before individuals could begin qualifying as candidates for the next election. Plaintiffs filed suit the next day (Doc. 1), and the United States filed suit just over one week after that.  Were the Court to determine that litigation, which began the day after the Special Election, resulting in an injunction concerning the results of the Special Election was too close in time to the 2026 election to be entered, it would necessarily mean that the results of the Special Election themself should not implemented under the same legal framework for the 2026 election.  "[R]elying on a standalone *Purcell* principle to leave maps in place under circumstances like this permits legislatures to insulate themselves from judicial review—and subvert federal courts' role in ensuring that states comply with the Voting Rights Act—by waiting until the last minute to enact new maps.  We cannot let one of our country's most important pieces of civil rights legislation be nullified by clever timing."  *Pierce v. North Carolina State Bd. of Elections*, 97 F.4th 194, 248 (4th Cir. 2024) (Gregory, J., dissenting).

## CONCLUSION

For the foregoing reasons, the Court should grant the United States' motion for a preliminary injunction.

DATED: November 13, 2025          Respectfully submitted:

BILAL A. ESSAYLI
First Assistant United States Attorney
*s/ Julie A. Hamill*
JULIE A. HAMILL
 Assistant United States Attorney
United States Attorney's Office

JESUS A. OSETE*
Principal Deputy Assistant Attorney General
*s/ Matthew Zandi*
MATTHEW ZANDI
Chief of Staff & Special Counsel
MAUREEN RIORDAN
Acting Chief, Voting Section

ANDREW BRANIFF
Acting Chief, Appellate Section

DAVID GOLDMAN
JOSHUA R. ZUCKERMAN
GRETA GIESEKE
Attorneys

Civil Rights Division
United States Department of Justice

Attorneys for Plaintiff-Intervenor
UNITED STATES OF AMERICA

---

* Assistant Attorney General Harmeet K. Dhillon is recused from this matter.

18

## **<u>CERTIFICATE OF COMPLIANCE</u>**

The undersigned, counsel of record for the United States of America certifies that this brief contains 6,094 words, which complies with the word limit of L.R. 11-6.1.


Dated: November 13, 2025          *<u>s/ Matthew Zandi</u>*
                                  Matthew Zandi
                                  Chief of Staff & Special Counsel