JESUS A. OSETE*
Principal Deputy Assistant Attorney General
MATTHEW ZANDI (CA No. 203329)
Chief of Staff & Special Counsel
MAUREEN RIORDAN (NY No. 2058840)
Acting Chief, Voting Section
ANDREW BRANIFF (IN No. 23430-71)
Acting Chief, Appellate Section
DAVID GOLDMAN (VA No. 98922)
JOSHUA R. ZUCKERMAN (DC No. 1724555)
GRETA GIESEKE (TX No. 24132925)
Attorneys
  Civil Rights Division
  United States Department of Justice
  950 Pennsylvania Avenue, NW
  Washington, D.C.  20530
  Telephone: (202) 514-3847
  E-Mail:   matt.zandi@usdoj.gov

BILAL A. ESSAYLI
First Assistant United States Attorney
JULIE A. HAMILL (CA No. 272742)
Assistant United States Attorney
  United States Attorney's Office
  300 North Los Angeles Street, Suite 7516
  Los Angeles, California 90012
  Telephone: (213) 894-2464
  E-Mail:   julie.hamill@usdoj.gov

Attorneys for Plaintiff-Intervenor
UNITED STATES OF AMERICA

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID TANGIPA, *et al.*,<br>        *Plaintiffs*,<br>   and<br><br>UNITED STATES OF AMERICA,<br>        *Plaintiff-Intervenor*,<br>   v.<br><br>GAVIN NEWSOM, in his official capacity as the Governor of California, *et al.*,<br>        *Defendants*, | Case No.  2:25-cv-10616-JLS-KES<br>Three-Judge Court<br><br>**UNITED STATES' COMPLAINT IN INTERVENTION**<br><br>Honorable Josephine L. Staton<br>United States District Judge |

---

   * Assistant Attorney General Harmeet K. Dhillon is recused from this matter.

# INTRODUCTION

Race cannot be used as a proxy to advance political interests, but that is precisely what the California General Assembly did with Proposition 50—the recent ballot initiative that junked California's pre-existing electoral map in favor of a rush-job rejiggering of California's congressional district lines. In the press, California's legislators and governor sold a plan to promote the interests of Democrats in the upcoming midterm elections. But amongst themselves and on the debate floor, the focus was not partisanship, but race.

"[T]he first thing" that map drawer Paul Mitchell "did in drawing the new map"—the "number one thing that [he] first started thinking about"—was to create a new "majority/minority Latino district." And legislators focused—not on the purported vote dilution of *Democrats* elsewhere across the country—but on the supposed dilution of the voting power of *racial groups* in other states. They feared that a "Latino voice in Texas is worth one third of the representation as a white voice." That Texas would "slid[e] back" to the days of "Black Codes and Jim Crow." And that Texas legislators would "silence the voices of Latino voters." Proposition 50 would serve as a "shield" against "racist maps," they told each other, so that minorities in California could "stand up and be counted." The end result is a map that manipulates district lines in the name of bolstering the voting power of Hispanic Californians because of their race.

Our Constitution does not tolerate this racial gerrymander. "At the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial … class." *Miller v. Johnson*, 515 U.S. 900, 911 (1995) (citation omitted). Although the Supreme Court has allowed race-conscious redistricting to rectify prior violations of the Voting Rights Act, the Department of Justice has approved California's pre-existing election system as recently as President Barack Obama's term. No one, let alone California, contends that its pre-existing map unlawfully discriminated on the basis of race. Because the Proposition 50 map does, the United States respectfully requests that this Court enjoin Defendants from using it in the 2026 election and future elections.

1

\*\*\*

The United States brings this Complaint in Intervention pursuant to the Civil Rights Act of 1964, 42 U.S.C. § 2000h-2, and the Voting Rights Act of 1965, 52 U.S.C. § 10308(d), and alleges:

1. "The Constitution entrusts States with the job of designing congressional districts. But it also imposes an important constraint: A State may not use race as the predominant factor in drawing district lines unless it has a compelling reason" to do so. *Cooper v. Harris*, 581 U.S. 285, 291 (2017); *see* U.S. Const. amend. XIV.

2. Race is a "predominant factor" when traditional districting factors (such as "compactness, respect for political subdivisions, partisan advantage," etc.) are "subordinated" to "racial considerations." *Cooper*, 581 U.S. at 291.

3. Although partisan gerrymanders lie "beyond the reach of the federal courts," *Rucho v. Common Cause*, 588 U.S. 684, 718 (2019), racial gerrymanders are unconstitutional; States generally may not use race as a "predominant criterion" in achieving partisan goals. *Cooper*, 581 U.S. at 291 n.1; *see Miller v. Johnson*, 515 U.S. 900, 914 (1995) (prohibiting the "use of race as a proxy" for "political interest[s]").

4. To justify the use of race as a predominant factor in drawing district lines, a State must "prove that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." *Cooper*, 581 U.S. at 292 (citation omitted).

5. The need for such a demanding test is clear: "When a State assigns voters on the basis of race, it engages in the offensive and demeaning assumption that voters of a particular race, because of their race, 'think alike, share the same political interests, and will prefer the same candidates at the polls." *Miller*, 515 U.S. at 911-912 (quoting *Shaw v. Reno*, 509 U.S. 630, 647 (1993)). Such a pernicious approach to governance that "evaluat[es individuals'] thoughts and efforts—their very worth as citizens—according to a criterion barred to the Government by history and the Constitution," *id.* at 912 (quoting *Metro Broadcasting, Inc. v. FCC*, 497 U.S. 547, 604 (1990) (O'Connor, J., dissenting)), "can only 'cause continued hurt and injury,' contrary as it is to the 'core purpose' of the

Equal Protection Clause" of the Fourteenth Amendment, *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 221 (2023) (brackets and citations omitted).

6. The Supreme Court "has long assumed that one compelling interest is complying with operative provisions of the Voting Rights Act of 1965 (VRA)." *Cooper*, 581 U.S. at 292; *see* 52 U.S.C. § 10301, *et seq.*

7. The VRA is an exercise of Congress's power to "enforce" the Fifteenth Amendment's guarantee that the "right of citizens of the United States to vote shall not be denied or abridged by … any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV; *South Carolina v. Katzenbach*, 383 U.S. 301, 327-328 (1966).

8. Section 2 of the VRA prohibits States from implementing any "practice[] or procedure … that results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). A violation of this prohibition "is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State … are not equally open to participation by members of a class of citizens protected by [52 U.S.C. § 10301(a)] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b).

9. "When a State invokes the VRA to justify race-based districting, it must show (to meet the 'narrow tailoring' requirement) that it had a 'strong basis in evidence' for concluding that the statute required its action." *Cooper*, 581 U.S. at 292 (quoting *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 278 (2015)). In other words, "the State must establish that it had 'good reasons' to think that it would transgress the [VRA] if it did *not* draw race-based district lines." *Id.* at 293.

3

# PARTIES

10.     Based on information and belief, the United States incorporates Paragraphs 6-27 of the Plaintiffs' Complaint regarding the Plaintiffs to this action.

11.     Plaintiff-Intervenor is the United States of America. As sovereign, the United States suffers a legal injury when a State violates federal law, including the United States Constitution. *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000); *see Pasadena City Board of Educ. v. Spangler*, 427 U.S. 424, 430-431 (1976) (standing under 42 U.S.C. § 2000h-2 to enforce the Equal Protection Clause). Additionally, the United States may sue as *parens patriae* to protect the federal rights of its citizens. *Massachusetts v. Mellon*, 262 U.S. 447, 485-486 (1923); *see United States v. Raines*, 362 U.S. 17, 27 (1960) (standing to enforce voting rights).

12.     The United States is authorized to intervene in this action pursuant to 42 U.S.C. § 2000h-2. Plaintiffs David Tangipa, *et al.*, seek relief from the denial of the equal protection of the laws under the Fourteenth Amendment on account of race (*see* Compl. (Doc. 1)), and the Attorney General of the United States has certified that this case is one of general public importance. 42 U.S.C. § 2000h-2; Hamill Decl. Ex. A.

13.     The United States is also authorized to seek "preventive relief, including an application for a temporary or permanent injunction, restraining order, or other order" whenever "there are reasonable grounds to believe that any person is about to engage in any act or practice prohibited by" Section 2 of the VRA. 52 U.S.C. § 10308(d).

14.     Defendant Gavin Newsom is a party to this action in his official capacity as Governor of California. *See Ex Parte Young*, 209 U.S. 123 (1908). The California Constitution vests the "supreme executive power of the State" in the Governor, who "shall see that the law is faithfully executed." Cal. Const. Art. V, § 1. Also, Newsom signed the laws that enabled Proposition 50 to be placed on the ballot.[1]

---

[1] The Democratic Congressional Campaign Committee has intervened in support of Defendants. Dkt. 26.

15. Defendant Shirley Weber is a party to this action in her official capacity as the Secretary of State of California. *See Young*, 209 U.S. 123. The California Secretary of State is the chief elections officer and is responsible for implementing the Proposition 50 map that is challenged in this action.

## JURISDICTION AND VENUE

16. This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.

17. This Court is authorized to grant the requested declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

18. Venue is proper in this District because a substantial part of the events or omissions giving rise to these claims, including elections in the challenged districts, will occur in this District. *See* 28 U.S.C. § 1391(b)(2).

19. Because this action "challeng[es] the constitutionality of the apportionment of congressional districts" in California, the United States requests that the Court convene a three-judge court pursuant to 28 U.S.C. § 2284.

## FACTS

### I. Background on California Elections

**A. California's Demographics**

20. According to the most recent decennial census, performed in 2020, California has a population of 39,538,223. U.S. Census Bureau, California: 2020 Census, https://www.census.gov/library/stories/state-by-state/california.html#race-ethnicity (last visited Nov. 10, 2025) Hispanic individuals are a plurality and make up 39.4% of California's population. Non-Hispanic white individuals are 34.7% of that population. Non-Hispanic Asians are about 15.1% of that population. And Non-Hispanic black individuals make up about 5.4% of that population. Brunell Decl. Ex. 2 at 2 (Doc. 16-7 at 28). In other words, there is no ethnic majority group in California.

21. As of 2023, California has a citizen voting-age population (CVAP) of 26,040,825; with a Hispanic CVAP of 8,318,075; a non-Hispanic black CVAP of 1,658,255; a non-Hispanic Asian CVAP of 3,766,450; and a non-Hispanic white CVAP of 11,316,085. *See* U.S. Census Bureau, *Citizen Voting Age Population by Race and Ethnicity*, https://www.census.gov/programs-surveys/decennial-census/about/voting-rights/cvap.2023.html#list-tab-1518558936 (last visited Nov. 11, 2025).

22. "Latino[2] communities are not a uniform constituency; they differ significantly across urban, suburban, and rural regions in terms of socioeconomic status, citizenship rates, linguistic backgrounds, and political participation." Dr. Raquel Centeno & Dr. Jarred Cuellar, *Latino Voters and the November 2025 Special Election: Redistricting and Representation* 2, politico.com/f/?id=0000019a-0e13-dc69-abda-fed37ace0000 (last visited Nov. 10, 2025) [hereinafter Centeno & Cuellar Report].

**B. Partisan Voting in California**

23. Recent elections show that Hispanics have not struggled to elect politicians of their choice in California. That is because results in California are largely driven by party-bloc voting, not race-bloc voting. *See* Brunell Decl. Ex. 2 at 10 (Doc. 16-7 at 36). Indeed, Hispanic voters "are increasingly flexing voting power" in California. Centeno & Cuellar Report 1.

24. For example, in 2022, Democrat Alex Padilla (a Hispanic candidate) won 61.1% of the statewide vote for the U.S. Senate seat compared to his opponent, Republican nominee Mark Meuser (a white candidate) who won 38.9%. November 8, 2022, General Election, Statement of Vote Summary Pages 6, https://elections.cdn.sos.ca.gov/sov/2022-

---

[2] "The terms [Hispanic and Latino] are often used interchangeably, though the words can convey slightly different connotations." Britannica, *What's the Difference Between Hispanic and Latino?*, https://www.britannica.com/story/whats-the-difference-between-hispanic-and-latino (last visited Nov. 10, 2025). "Latino" "refers to (almost) anyone born in or with ancestors from Latin America and living in the U.S., including Brazilians." *Ibid.* "'Hispanic' is generally accepted as a narrower term that includes people only from Spanish-speaking Latin America, including those countries/territories of the Caribbean or from Spain itself." *Ibid.* The United States will use these terms as they appear in the documents being cited.

general/sov/06-summary.pdf (last visited Nov. 10, 2025). The result (and vote margin) was also nearly the same in the 2022 statewide election for Insurance Commissioner between Ricardo Lara (a Democratic Hispanic candidate) and Robert Howell (a Republican white candidate). *Id.*

25. These results and vote margins mirrored those in other 2022 statewide elections in which Democratic candidates of various ethnicities beat their Republican opponents of various ethnicities by comfortable margins. *See id.*

26. In the 2020 presidential election, Joseph R. Biden (a Democratic white candidate) defeated Donald J. Trump (a Republican white candidate) in California by a similar margin. November 3, 2020, General Election, Statement of Vote Summary Pages 8, https://elections.cdn.sos.ca.gov/sov/2020-general/sov/08-sov-summary.pdf (last visited Nov. 10, 2025).

27. In the 2018 general election, Hispanic Democrat candidates also beat white Republican candidates by comfortable margins in statewide races. Padilla beat Meuser for Secretary of State, 64.5% to 35.5%. November 6, 2018, General Election, Statement of Vote Summary Pages 7, https://elections.cdn.sos.ca.gov/sov/2018-general/sov/07-summary.pdf (last visited Nov. 10, 2025). Xavier Becerra (a Hispanic Democrat) beat Steven Bailey (a white Republican) for Attorney General, 63.6% to 36.4%. *Id.* In a race pitting a Hispanic Democrat candidate against a white Independent candidate, the result was similar though closer, with Lara winning Insurance Commissioner over Steve Poizner, 52.9% to 47.1%. *Id.*

28. In other statewide elections in 2018, Democratic candidates of various ethnicities defeated their Republican opponents of various ethnicities with similar margins. *See id.*

29. In other words, division amongst California voters is attributable primarily to partisan differences, not racial divide.

**C. Preclearance by the Department of Justice**

30. Prior to the Supreme Court's decision in *Shelby County v. Holder*, 570 U.S. 529 (2013), four counties in California were subject to preclearance by the Department of Justice (DOJ) under Section 5 of the VRA. DOJ, Civil Rights Division, *Jurisdictions Previously Covered By Section 5*, https://www.justice.gov/crt/jurisdictions-previously-covered-section-5 (last visited Nov. 11, 2025).

31. Under Section 5, the Attorney General or a three-judge court needed to approve any change in voting procedure before it could be implemented in those covered jurisdictions. *See generally* 52 U.S.C. § 10304; *Shelby County*, 570 U.S. at 537-539.

32. The DOJ reviewed California's Proposition 14 in 2011. Proposition 14 established a top-two voter-nominated primary election system. Rather than one nominee from each party moving from the primaries to the general election, the top two voters overall from the primaries would be placed on the ballot in the general election.

33. In response to various concerns about how Proposition 14 would impact Hispanic voters in California's covered counties, the DOJ concluded that Proposition 14 was unlikely to harm Hispanic voters' ability to elect candidates of their choice and that the submitted changes had neither the purpose nor likely effect of discriminating on account of race. The DOJ thus precleared Proposition 14.

**D. Hispanic Representation Amongst California Political Leaders**

34. Of California's 52 current Congressional delegates, at least 15 are Hispanic. *See* Congressional Hispanic Caucus, *Members*, https://chc.house.gov/members (last visited Nov. 10, 2025).

35. Of California's 40 current state senators, at least 12 are Hispanic. *See* California Latino Legislative Caucus, *Member Directory*, https://latinocaucus.legislature.ca.gov/member-directory (last visited Nov. 10, 2025).

36. Of California's 80 current state assemblymen, at least 22 are Hispanic. *See id.*

## II. Redistricting in California

### A. Pre-2025 California Congressional Maps

37. Before 2010, the California Legislature drew the State's congressional district maps.

38. In 2010, California voters transferred this authority from the Legislature to an independent California Citizens Redistricting Commission (CCRC) that would "adjust the boundary lines of the congressional … districts" every ten years in "the year following the year in which the national census is taken." Cal. Const. art. XXI, § 1.

39. The CCRC last drew a congressional map for California in 2021 following the 2020 census (the "2021 map").

40. According to VRA analyses considered by the drafter of the Proposition 50 map, the 2021 map complied with the VRA. Hamill Decl. Ex. B.

### B. The Proposition 50 Map

41. In the summer of 2025, Paul Mitchell was retained to draft new congressional maps for California. Mitchell heads Redistricting Partners, a demography firm that has worked with various state and local governments on redistricting efforts.

42. The professed purpose for the new map was to "negate the five Republican seats drawn by Texas" by adding "up to 5 [Democrat] seats in the U.S. House of Representatives." CADEM, *Yes On Prop 50: FAQ*, https://cadem.org/yes-on-proposition-50-faq/ (last visited Nov. 9, 2025); *see* Official Voter Information Guide, California Statewide Special Election November 4, 2025, *Prop 50*, https://voterguide.sos.ca.gov/quick-reference-guide/50.htm (last visited Nov. 9, 2025).

43. However, in a presentation regarding the draft maps, Mitchell stated that the "number one thing that [he] first started thinking about" was "drawing a replacement Latino majority/minority district in the middle of Los Angeles." HOPE Tr. 23-24.

44. Mitchell told HOPE that he followed HOPE's requests to create additional "Latino majority/minority districts" in California. *See id.* at 24. Indeed, the "first thing"

9

he and his team did in "drawing the new map" was to "reverse[]" the CRRC's earlier elimination of a "Latino district from LA" and "put that district back." *Id.* at 25.

45. Mitchell stated that he changed another district to create a "Latino-influenced district at 35 percent Latino by voting age population." *Id.*

46. He believed that "[t]he Prop. 50 maps [would] be great for the Latino community in … that they [would] ensure that the Latino districts that are the VRA seats are bolstered in order to make them most effective, particularly in the Central Valley." *Id.* at 30. He made a similar comment on X, where he boasted (with applause emojis and a photo of an applauding Speaker Nancy Pelosi ) that the "proposed Proposition 50 map will further increase Latino voting power over the current Commission map" and "likely will



increase Asian American voting power." The proposed map, Mitchell posted on X, would "replicate[] the status quo" except that it would "add[] one more Latino influence district." *Id.* https://x.com/paulmitche11/status/1981401714101236067?s=46 (last visited Nov. 9,

2025). Similarly, Mitchell told HOPE that the Public Policy Institute of California "just put out an analysis … that said that our plan maintained the status quo in terms of the Voting Rights Act and added one more Latino-influenced district." Hamill Decl. Ex. B at 26:22–25.

47. His efforts paid off. In the congressional maps in place before the 2025 Special Election, there were "14 Hispanic VRA districts," *see* Brunell Decl., Ex. 2 at 2 (Doc. 16-7 at 28), meaning that these "Latino-majority districts … frequently elect candidates preferred by Latino voters," Centeno & Cuellar Report 1. "In the Proposition 50 map, [Mitchell stated] that he increased that number to 16." Brunell Decl., Ex. 2 at 3 (Doc. 16-7 at 29).

48. An analysis from Drs. Centeno (California State Polytechnic University, Pomona) and Cuellar (Caltech Linde Center for Science, Society, and Policy) concluded that "the proposed Proposition 50 map [would] increase Latino voting power over the current Commission map" and "likely *increase* Latino voting power, given its creation of two new Latino community influence districts and the §expansion of the Latino electorate in other districts." Centeno & Cuellar Report 1; *see id.* at 9-10 (explaining how Hispanic voting power was increased in districts that were majority-Hispanic under the prior map by shifting Hispanic voters across district lines).

49. An analysis of the Proposition 50 map shows that the professed goal of increasing Democratic representation was subordinated to increasing Hispanic-majority districts, as particularly evidenced by District 13.

50. District 13 is made up of parts of five counties: part of San Joaquin County, southwestern Stanislaus County, all of Merced County, western Madera County, and part of Fresno County. Trende Decl. Ex. 2 at 5 (Doc. 16-5 at 20); *see* California State Assembly, Committee on Elections, *Proposed Congressional Map*, https://aelc.assembly.ca.gov/proposed-congressional-map (last visited Nov. 11, 2025).

51. According to the 2020 census, three of these counties are majority Hispanic by total population (Fresno at 53.6%, Madera at 60.5%, and Merced at 61.9%). Brunell

11

Decl. Ex. 2 at 5 (tbl. 1) (Doc. 16-7 at 28-29). In the two other counties, Hispanic individuals make up a plurality of the total population (Stanislaus at 48.1% and San Joaquin at 41.8%). *Id.* at 3 (tbl. 1) (Doc. 16-7 at 29). As drawn, District 13 is made up of 64.8% Latinos. California State Assembly, Committee on Elections, *AB 604 Districts Atlas* 3, https://aelc.assembly.ca.gov/media/2610 (last visited Nov. 11, 2025) [hereinafter *AB 604 Districts Atlas*].

52. Looking at CVAP, Hispanic individuals make up a majority of one of these counties (Merced at 51.1%), a plurality of two (Fresno at 45.5% and Madera at 46.8%), and a sizable minority of two (San Joaquin at 33.5% and Stanislaus and 39%). Brunell Decl. Ex. 2 at 5 (tbl. 3) (Doc. 16-7 at 31). As drawn, District 13 is made up of 53.8% Latino CVAP. *AB 604 Districts Atlas* 3.

53. District 13 "bulges out" near Ceres and Modesto—two cities in Stanislaus County—in the northern part of the District, "splits Modesto," "keeps Ceres intact," and "captures some areas outside of Ceres." Trende Decl. Ex. 2 at 11 (Doc. 16-5 at 26). The map "leaves a significant Democratic population on the table in Modesto, to the north of the district boundary. In addition, it captures a large Republican population in and around Ceres." *Id.* When one "examine[s the map] from a racial angle, the motivation for the split appears more obvious. Most of the Democratic territory left in Modesto is White. More importantly, the Republican territory captured around Ceres is heavily Hispanic. If partisanship were really the motivating factor for this division, the district would drop some of the Republican areas in Ceres and pick up Democratic areas in Modesto." *Id.* at 13 (Doc. 16-5 at 28).

54. Similarly, the "northern split" of District 13, near Stockton—a city in San Joaquin County—"leaves a lot of Democrats on the table. In particular, areas to the west of the District are heavily Democratic, more so than some of the precincts at the District's northern boundary." *Id.* at 16 (Doc. 16-5 at 31). "What differentiates them is that the portion at the northern end of the district are heavily Hispanic, while the areas left out to the west of the district are more heavily White. In other words, this appendage bypasses

1 | white Democrats, making the district less compact, to gain Hispanic areas that are less
2 | heavily compact. From a [partisan] gerrymandering perspective, this makes little sense."
3 | *Id.* at 19 (Doc. 16-5 at 34).

4 | 55. Alternative maps "demonstrate that it is possible to achieve the political goals
5 | of the map"—purportedly to increase Democratic representation in the Congress—"with
6 | a more regular configuration that does not target race." *Id.* at 22 (Doc. 16-5 at 37); *see id.*
7 | at 23-27 (Doc. 16-5 at 38-42).

**C. Proposal and Passage of Proposition 50**

56. The enactment of the Proposition 50 map (Assembly Bill 604) was paired with a constitutional amendment authorizing the temporary use of the legislature-enacted congressional map through 2030 (Assembly Constitutional Amendment 8) and a bill calling for the special election, appropriating funds, and making conforming calendar changes (Senate Bill 280).

57. During the Legislature's consideration and debate of Proposition 50, several legislators gave racial—not political—reasons in favor of their votes for the new map. They described other states' redistricting efforts as efforts meant to suppress minority voters. Assemblymember Mark González framed the Texas redistricting as "racism" "shield[ed] … with [the] party line." Hamill Decl. Ex. C at 38:9-11; *see also* Hamill Decl. Ex. D. at 158:11-13 (Senator Sabrina Cervantes) ("They want to silence the voices of Latino voters, Black voters, API voters, and LGBTQ voters."). Or, as Assembly member Isaac G. Bryan put it, "[a] Latino voice in Texas is worth one third of the representation as a white voice" and "[a] black voter in Texas is worth one fifth of the representation of a white voter in Texas." Hamill Decl. Ex. C at 49:6–9; Hamill Decl. Ex. E at 149:22–150:1 (Senator Lola Smallwood-Cuevas) ("In Texas, what this looks like is that black Texans will lose much of their power, being reduced to about a fifth of what their power was before this gross attack.").

58. According to California legislators, other states threatened the ability of racial minorities to elect candidates of their choice. State Senator Lola Smallwood-Cuevas

13

accused Texas of "sliding back" to the pre–Voting Rights Act days in which "black codes and Jim Crow, and racial terror, poll taxes, [and] white-only primaries … cut black voter rolls in Texas from over 100,000 to just a few thousand." Hamill Decl. Ex. E at 150:22-25. According to Assemblyman González, "[t]his is about whether a Latino child in Texas, a black family in Florida, or an immigrant community in California has a voice in their own democracy." Hamill Decl. Ex. C at 40:2-5. Assemblyman Mike Gipson spoke similarly: "It's about the next generation that we may not even have any black people serving in office to have representation. It's about 10 African American members of Congress that could be wiped away in Congress if we don't stand up and be counted." *Id.* at 53:14-16. The Proposition 50 map would serve as a "shield" to combat "racist maps" elsewhere. *Id.* at 40:9-11 (González); *see also id.* at 39:21-22 (González) ("If Florida wants to silence voters of color, we will not sit quietly.").

59. According to a press release issued by State Senator and Senate President pro Tempore Mike McGuire, the Proposition 50 map would "retain[] and *expand[]* Voting Rights Act districts that empower Latino voters to elect their candidates of choice[]." *Legislative Democrats Announce Plan Empowering Voters to Protect California* (Aug. 19, 2025), https://sd02.senate.ca.gov/news/legislative-democrats-announce-plan-empowering-voters-protect-california (emphasis added).

60. On November 4, 2025, the voters of California approved Proposition 50.

**D. Immediate Impacts of Proposition 50**

61. The first major date for the 2026 primary elections is December 19, 2025. California Secretary of State, Key Dates and Deadlines: *Primary Election—June 2, 2026*, https://www.sos.ca.gov/elections/upcoming-elections/primary-election-june-2-2026/key-dates-and-deadlines#fn-1-2 (last visited Nov. 10, 2025).

62. On that date, individuals will have the opportunity to begin gathering signatures to qualify as a Congressional candidate. Cal. Elections Code § 8162(a); Jt. Stipulation (Doc. 17), ¶ 3.

# CLAIMS

## COUNT I:

**Racial Gerrymandering in Violation of the Equal Protection Clause of The Fourteenth Amendment of the U.S. Constitution**

63. The United States restates and incorporates herein the allegations set forth in each of the preceding paragraphs of this Complaint.

64. California's Congressional redistricting plan, Proposition 50, is racially gerrymandered, in violation of the Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States.

65. The Supreme Court has reaffirmed that federal courts may remedy two forms of anti-democratic gerrymandering. "In two areas—one-person, one-vote and racial gerrymandering—our cases have held that there is a role for the courts with respect to at least some issues that could arise from a State's drawing of congressional districts." *Rucho*, 588 U.S. at 699.

66. Racial gerrymandering is unconstitutional when traditional redistricting principles have been subordinated to racial considerations in ways that do not satisfy a narrowly tailored, compelling state interest. *E.g.*, *Alabama Legislative Black Caucus*, 575 U.S. at 272. "If district lines were drawn for the purpose of separating racial groups, then they are subject to strict scrutiny because 'race-based decisionmaking is inherently suspect.'" *Rucho*, 588 U.S. at 711 (quoting *Miller*, 515 U.S. at 915).

67. Race was a predominant factor in drawing at least District 13 in the Proposition 50 map.

68. California cannot satisfy strict scrutiny because it had no "'strong basis in evidence' for concluding that the [VRA] required" as much. *Cooper*, 581 U.S. at 292 (quoting *Alabama Legislative Black Caucus*, 575 U.S. at 278). The Hispanic CVAP in California does not satisfy the test set out in *Thornburgh v. Gingles*, 478 U.S. 30 (1986) for a minority group that can be the subject of a VRA vote-dilution claim. *See Cooper*, 581 U.S. at 302 ("If a State has good reason to think that all the '*Gingles* preconditions'

15

are met, then so too it has good reason to believe that § 2 requires drawing a majority-minority district. But if not, then not.") (citation omitted). And the map drawer had received analyses affirmatively showing that the 2021 map satisfied the VRA.

## COUNT II:

**Intentional Racial Discrimination in Violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301**

69. The United States restates and incorporates herein the allegations set forth in each of the preceding paragraphs of this Complaint.

70. Proposition 50 was adopted with the purpose of denying or abridging the right to vote on account of race or color in violation of Section 2 of the VRA, 52 U.S.C. § 10301.

71. Unless enjoined by order of this Court, Defendants will continue to violate Section 2 by administering, implementing, and conducting elections using the districting map created by Proposition 50.

## PRAYER FOR RELIEF

WHEREFORE, the United States prays that the Court grant the following relief:

(a) Declare that the Proposition 50 map constitutes unlawful racial gerrymandering in violation of the Fourteenth Amendment and does not satisfy strict scrutiny;

(b) Declare that Proposition 50 was adopted with the purpose of denying or abridging the right to vote on account of race or color, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301;

(c) Enter a preliminary and permanent injunction prohibiting Defendants from implementing or using Proposition 50's congressional district map in any future elections, including, without limitation, the 2026 election;

(d) Enter a preliminary and permanent injunction requiring Defendants to use the 2021 map (drawn by the CCRC) for all elections covered by Proposition 50, including 2026, 2028, and 2030;

16

(e)　　Order such other relief as the interests of justice may require.

DATED: November 13, 2025

Respectfully submitted:

BILAL A. ESSAYLI
First Assistant United States Attorney
*s/ Julie A. Hamill*
JULIE A. HAMILL
Assistant United States Attorney
United States Attorney's Office

JESUS A. OSETE*
Principal Deputy Assistant Attorney General
*s/ Matthew Zandi*
MATTHEW ZANDI
Chief of Staff & Special Counsel

MAUREEN RIORDAN
Acting Chief, Voting Section

ANDREW BRANIFF
Acting Chief, Appellate Section

DAVID GOLDMAN
JOSHUA R. ZUCKERMAN
GRETA GIESEKE
Attorneys

Civil Rights Division
United States Department of Justice

Attorneys for Plaintiff-Intervenor
UNITED STATES OF AMERICA

---

* Assistant Attorney General Harmeet K. Dhillon is recused from this matter.

17