**ARNOLD & PORTER KAYE SCHOLER LLP**
SEAN O. MORRIS (SBN 200368)
Sean.Morris@arnoldporter.com
777 South Figueroa Street
44th Floor
Los Angeles, CA  90017
T: (213) 243-4000
F: (213) 243-4199

JOHN A. FREEDMAN[*]
John.Freedman@arnoldporter.com
601 Massachusetts Ave, NW
Washington, DC  20001
T: (202) 942-5000
F: (202) 942-5999

**DEMOCRACY DEFENDERS ACTION**
NORMAN L. EISEN[*]
TIANNA MAYS[*]
SOFIA FERNANDEZ GOLD[*]
JACOB KOVACS-GOODMAN[*]
norman@democracydefenders.org
tianna@democracydefenders.org
sofia@democracydefenders.org
jacob@democracydefenders.org
600 Pennsylvania Ave SE, Unit 15180
Washington, DC 20003
T: (202) 594-9958

**JUSTICE LEGAL STRATEGIES PLLC**
JON M. GREENBAUM (SBN 166733)
jgreenbaum@justicels.com
P.O. Box 27015
Washington, DC 20038
T: (202) 601-8678

*Counsel for Intervenor-Defendant*
*League of United Latin American Citizens*

*\*Admitted pro hac vice*

OPPOSITION OF LEAGUE OF UNITED LATIN AMERICAN CITIZENS (LULAC) TO MOTIONS FOR
PRELIMINARY INJUNCTION

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| DAVID TANGIPA. *et al.*,<br><br>            Plaintiffs,<br><br>   v.<br><br>GAVIN NEWSOM, *et al.*,<br><br>            Defendants,<br><br>and<br><br>LEAGUE OF UNITED LATIN AMERICAN CITIZENS (LULAC),<br><br>            Intervenor-Defendant. | Case No. 2:25-cv-10616-JLS-WLH-KKL<br><br>**OPPOSITION OF INTERVENOR-DEFENDANT LEAGUE OF UNITED LATIN AMERICAN CITIZENS (LULAC) TO MOTIONS FOR PRELIMINARY INJUNCTION**<br><br>Hon. Josephine L. Staton<br>Hon. Wesley L. Hsu<br>Hon. Kenneth K. Lee<br><br>Hearing Date:  December 15, 2025<br>Time:         9 a.m.<br>Courtroom:    One |

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 3

I.    Proposition 50 is a partisan gerrymander, not a racial gerrymander ................. 3

    A.    Plaintiffs and the United States fail to show that Proposition 50 is a
    racial gerrymander that violates the Equal Protection Clause ................3

        1.    Plaintiffs in racial gerrymandering claims have a demanding
        and especially stringent threshold burden of demonstrating
        that race predominated over traditional districting principles .......4

        2.    Plaintiffs and the United States cannot satisfy step one of the
        racial gerrymandering test ............................................................5

            a.    Partisan considerations, not racial ones, were the
            driving force behind Proposition 50 ....................................5

            b.    Plaintiffs fail to produce sufficient evidence
            demonstrating that the sixteen majority Latino
            districts are racially gerrymandered ....................................9

            c.    Plaintiffs' factual showing regarding District 13
            falls well short of meeting its burden ................................11

    B.    Plaintiffs have failed to make out a claim for racial gerrymandering
    under the Fifteenth Amendment ...........................................................13

II.   The United States fails to establish an intentional vote dilution claim .......... 14

III.  Movants cannot meet the standard for a preliminary injunction.................... 15

CONCLUSION .......................................................................................................... 16

# <u>TABLE OF AUTHORITIES</u>

<u>**Page(s)**</u>

## <u>Cases</u>

*Abbott v. Perez,*
    585 U.S. 579, 586 (2018) ................................................................14, 15

*Ala. Legis. Black Caucus v. Alabama,*
    575 U.S. 254 (2015)..............................................................................10

*Alexander v. South Carolina State Conference of the NAACP,*
    602 U.S. 1 (2024)............................................................................*passim*

*Backus v. South Carolina,*
    857 F. Supp. 2d 553 (D.S.C. 2012), *aff'd* 568 U.S. 801 (2012)........................14

*Cooper v. Harris,*
    581 U. S. 285 (2017) ..............................................................................5

*Gomillion v. Lightfoot,*
    364 U.S. 339 (1960)..............................................................................13

*League of United Latin American Citizens v. Abbott,*
    2025 WL 3215715 (W.D. Tex. Nov. 18, 2025) ...................................9

*Miller v. Johnson,*
    515 U.S. 900 (1995)................................................................2, 4, 5, 10

*Purcell v. Gonzalez,*
    549 U.S. 1 (2006)..................................................................................15

*Shaw v. Reno,*
    509 U.S. 630 (1993)........................................................................4, 5, 14

## <u>Other Authorities</u>

Official Voter Information Guide, available at
    https://vig.cdn.sos.ca.gov/2025/special/pdf/complete-vig.pdf ...........................6

# **INTRODUCTION**

The Supreme Court's most recent racial gerrymandering decision—*Alexander v. South Carolina State Conference of the NAACP*, 602 U.S. 1, 11 (2024)—made clear that courts "must be wary of plaintiffs who seek to transform federal courts into 'weapons of political warfare' that will deliver victories that eluded them 'in the political arena.'" The Court expressed concern that "future litigants and lower courts [will seek] to sidestep our holding in *Rucho* [*v. Common Cause*] that partisan-gerrymandering claims are not justiciable in federal court" by "repackag[ing] a partisan-gerrymandering claim as a racial-gerrymandering claim." *Id.* at 21.

Here, Plaintiffs have repackaged a nonjusticiable partisan gerrymander and called it an impermissible racial gerrymander, despite a flood of contrary evidence. The congressional redistricting plan enacted by the Legislature and passed by voters in Proposition 50 is a partisan gerrymander favoring Democrats, driven by partisan considerations to counter gerrymandering in Texas and other states. But Plaintiffs, who include the California Republican Party, a Republican elected official, and voters, assert that Proposition 50 is a racial gerrymander because, as they allege in the opening paragraph of their Complaint, it "favor[s] Hispanic voters," Dkt. 1 ¶ 1. They allege two bases for this purported favor: "Proposition 50's map creates sixteen Congressional districts where the Hispanic population makes up more than 50% of the voters in the Congressional district," Dkt. 16-1 at 11, and Proposition 50 minimally increased the Hispanic citizen age voting population in Congressional District 13, an already Hispanic-majority district. *Id.* at 13-14.

Plaintiffs' evidence, and that of Plaintiff-Intervenor United States—who only challenge District 13, Dkt. 75 at 9—does not come close to meeting the "demanding" and "especially stringent" burden of satisfying the first step of the two-part test in racial gerrymandering claims, *Alexander*, 602 U.S. at 11, 17, which requires establishing that there is any particular district where "the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and

respect for political subdivisions or communities defined by actual shared interests, to racial considerations." *Miller v. Johnson*, 515 U.S. 900, 916 (1995).

Plaintiffs' claims are flatly contrary to established law: each challenged district is reasonably configured, neither Plaintiffs nor their experts identify any traditional redistricting principles that were subordinated, and there is nothing unconstitutional about a clearly partisan gerrymander that keeps the same number of majority Latino districts and marginally increases Latino voting strength where there are longstanding communities of interest. Plaintiffs' bizarre theory would effectively impose a presumption of unconstitutionality any time a districting plan creates majority-Latino districts—even when the map is driven by partisanship.

The remaining claims are also unavailing. Plaintiffs allege a racial gerrymandering claim under the Fifteenth Amendment but lack the facts to support it. And the United States asserts an intentional vote dilution claim but fails to cite any evidence of a racial or ethnic group that was purposely targeted under Proposition 50 and that has been harmed, as such claims require.

Plaintiffs' attempt to detract focus from what is clearly a partisan gerrymander by targeting Latino voters is an affront to LULAC, its members, and the Latino communities who have had to fight tooth and nail to secure their right to vote and to have an equal opportunity to elect their candidates of choice. *See* Dkt. 39-3, Decl. of Juan Proaño in Supp. LULAC's Mot. Inter. ("Proaño Decl."); Dkt. 39-4 ¶¶ 7,9; Decl. of Jacob Sandoval in Supp. LULAC's Mot. Inter. ("Sandoval Decl.") ¶¶ 8-11.

It is *Plaintiffs* who are expressly targeting Latino communities based on their ethnicity, including longstanding, established, and compact Latino neighborhoods and communities. To grant the relief Plaintiffs request would violate the very constitutional prohibitions Plaintiffs are purporting to vindicate.

# ARGUMENT

## I.    Proposition 50 is a partisan gerrymander, not a racial gerrymander

### A.    Plaintiffs and the United States fail to show that Proposition 50 is a racial gerrymander that violates the Equal Protection Clause

Though both Plaintiffs and the United States note that plaintiffs in racial gerrymandering cases must initially demonstrate that race predominated over traditional districting principles, Dkt. 16-1 at 9; Dkt. 29-1 at 8, they fail to acknowledge what the Supreme Court has called a "demanding" and "especially stringent" standard. *Alexander*, 602 U.S. at 11, 17.

To begin with, "in assessing a legislature's work, [the court] start[s] with a presumption that the legislature acted in good faith." *Id.* at 6. Racial gerrymandering plaintiffs must put forth *district-by-district* evidence demonstrating that race predominated over traditional districting principles such as compactness, contiguity, respect for political subdivisions, or communities defined by actual shared interests. This typically requires expert testimony showing race predominated in each specifically challenged district, in addition to any direct evidence. Additionally, where, as here, there is a partisan defense, "a party challenging a map's constitutionality must disentangle race and politics if it wishes to prove that the legislature was motivated by race as opposed to partisanship." *Id.*

Plaintiffs and the United States come nowhere close to meeting this challenging burden. The legislature's clear message was that Proposition 50 was a partisan gerrymander in response to the 2025 Texas congressional redistricting. Regarding their leading claim—that all sixteen districts with a Latino citizen voting age population ("CVAP") majority are racial gerrymanders—both the Plaintiffs and the United States fail to show how traditional districting principles like compactness and maintaining communities of interest were subordinated to race. Moreover, Plaintiffs fail to explain how the Proposition 50 map is a racial gerrymander when the previous Commission map also had sixteen majority Latino CVAP districts. Indeed, Plaintiffs'

- 3 -

expert, Dr. Sean Trende—who notes he was "asked to evaluate whether the revised California Districts were drawn, in whole or in part, with race as a predominant motive," Dkt. 16-5, Ex. 2, Expert Report of Sean P. Trende, Ph. D ("Trende Report") at 1—only identifies one district, District 13, where he opines that race may have predominated. *Id.* at 4-22.

Plaintiffs and the United States' evidence for the secondary claim—that District 13 is racially gerrymandered—is similarly insufficient. Under the 2021 Commission plan, District 13 was *already* a majority Latino district reflecting well-established communities of interest—which Plaintiffs ignore. Moreover, Latino CVAP in District 13 increased by .07 percentage points where Democratic performance increased by nearly four percentage points, Exh. 1, Response Report of Anthony E. Fairfax on the 2025 California Congressional District Plan ("Fairfax Report") tbl. 1, hardly indicative of a racial gerrymander. In addition, Dr. Trende provides no analysis of how District 13 fares under traditional redistricting principles.

    1.    Plaintiffs in racial gerrymandering claims have a demanding and especially stringent threshold burden of demonstrating that race predominated over traditional districting principles

In *Shaw v. Reno*, 509 U.S. 630 (1993), the Supreme Court recognized a racial gerrymandering claim under the Equal Protection Clause. The question in a racial gerrymandering case is whether "a reapportionment plan rationally cannot be understood as anything other than an effort to segregate citizens into separate voting districts on the basis of race without sufficient justification." *Id.* at 652.

Later, in *Miller*, the Supreme Court set forth a two-step test for racial gerrymandering cases. Step one requires that the plaintiff demonstrate "that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations." *Miller*, 515 U.S. at 916. What the plaintiff must show in step one is that the decisionmakers classified voters based on race such that the configuration of the district is

- 4 -

"'unexplainable on grounds other than race.'" *Id*. at 905 (quoting *Shaw*, 509 U.S. at 644).

Only if a plaintiff can prove step one does the inquiry proceed to step two, where the defendant has the burden of demonstrating that the racial predominance in a particular district is narrowly tailored to further a compelling interest. *Id*. at 920.

In the subsequent thirty years since *Shaw*, the Supreme Court has analyzed racial gerrymandering claims numerous times, most recently in *Alexander*. Though the Court has continued to refine its analysis, the core features of the claim largely follow from *Shaw/Miller*. These core features are discussed in the next subsection and compared with Plaintiffs' evidence.

> 2.    Plaintiffs and the United States cannot satisfy step one of the racial gerrymandering test

In racial gerrymandering cases where there is a partisanship defense, at step one plaintiffs must show that race predominated over partisan interests, *Alexander*, 602 U.S. at 9-10, in addition to showing that race predominated over "traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests." *Miller*, 515 U.S. at 916. Plaintiffs and the United States cannot do either, let alone both.

> a.    Partisan considerations, not racial ones, were the driving force behind Proposition 50

A "State's partisan-gerrymandering defense . . . raises 'special challenges' for plaintiffs. To prevail, a plaintiff must 'disentangle race from politics' by proving 'that the former drove a district's lines.' That means, among other things, ruling out the competing explanation that political considerations dominated the legislature's redistricting efforts." *Alexander*, 602 U.S. at 9-10 (emphasis in original) (quoting *Cooper v. Harris*, 581 U. S. 285, 308 (2017)).

The evidence here, including the Official Voter Information Guide from Proposition 50 published by Defendant Secretary of State Weber, the floor statement

from lead plaintiff Assemblymember David Tangipa, and documents submitted by Plaintiffs' declarant Senator Rosilicie Ochoa Bogh, demonstrate that Proposition 50's supporters were driven by partisan considerations, not racial ones, and that Proposition 50's opponents challenged Proposition 50 based on its partisan, not racial, intent and effects.

In the Official Voter Information Guide, the title of Proposition 50 indicates that it is California's response to redistricting in Texas: "PROP 50: AUTHORIZES TEMPORARY CHANGES TO CONGRESSIONAL DISTRICT MAPS IN RESPONSE TO TEXAS' PARTISAN REDISTRICTING. LEGISLATIVE CONSTITUTIONAL AMENDMENT." https://vig.cdn.sos.ca.gov/2025/special/pdf/complete-vig.pdf at 5 (last visited Nov. 29, 2025). The summary prepared by the Attorney General begins with this explanation: "[i]n response to Texas' mid-decade partisan congressional redistricting, this measure temporarily requires new congressional district maps, as passed by the Legislature in August 2025, to be used in California's congressional elections through 2030." *Id.* at 8. Unlike the specific mention of partisanship, there is no mention of race.

Similarly, the "Argument in favor of Proposition 50"—co-authored by Defendant Governor Newsom—explains that Proposition 50 aims to serve as a counterweight to efforts by President Trump and "Republican states" to create more Republican seats. Race is not mentioned. *Id.* at 16. And, in the "Argument Against Proposition 50" voter guide section, opponents attack the political and partisan nature of Proposition 50. No opposition argument suggests Proposition 50 is a racial gerrymander. *Id.* at 17.

The materials that Plaintiff State Senator Ochoa Bogh attached to her declaration provide further evidence that the driving purpose of Proposition 50 was partisan. Dkt. 16-6, Decl. of Senator Rosilicie Ochoa Bogh (SD-19) in Supp. Pl.'s Mot. Prelim. Inj. ("Ochoa Bogh Decl."). In fact, Senator Ochoa Bogh's declaration notes that "[o]n the floor . . . Proponents' principal theme was to 'counteract what

Texas was doing.'" *Id.* at ¶ 13. In the Comments section of the Concurrence in Senate Amendments attached to her declaration, the opening sentence of the "According to the Author" statement echoes the partisan nature of the endeavor: "AB 604 will protect Californians' interests in the national democratic process by presenting the voters with a temporary congressional district map to use if Texas or other states decide to conduct mid-decade, partisan gerrymandering of their congressional district maps." *Id.* at 11.

The Senator's materials also contain talking points in opposition to AB 604 that critique the bill for its partisan intentions: "This mid-cycle redistricting plan undermines the state's constitution by . . . allowing politicians to redraw lines for partisan gain rather than adhering to established democratic principles." *Id.* at 13. The talking points go on: "[T]he plan flouts the constitution's explicit prohibition against partisan gerrymandering, which states that districts 'shall not be drawn to favor or discriminate against an incumbent, political candidate, or political party.'" *Id.* at 14. Senator Ochoa Bogh used these talking points when she spoke in a Senate hearing on the plan. Dkt. 42-6 (California Senate Floor Session, Aug. 21) at 78-84. The talking points never suggest that the plan is a racial gerrymander.

The final document attached to Senator Ochoa Bogh's declaration is from the Senate Republican Policy Office. Ochoa Bogh Decl. at 27-33. The document includes "Arguments In Opposition" to AB 604, which focus almost exclusively on Republicans' objections to the partisan nature of the bill. The first argument in opposition reads: "Disenfranchises Republican Voters with A Hyper-Partisan Gerrymandered Map Intended to Eliminate 5 California Republican Congressional Districts." *Id.* at 29. It goes on: "The Congressional map in AB 604 is an unfair, unjustified, unconstitutional, highly-partisan, power grab intended to overturn the will of the people and eliminate up to 5 Republican congressional seats while making several existing Democrat [sic] even less competitive." *Id.* These documents do not suggest the map is a racial gerrymander.

1      Plaintiffs never address all the information demonstrating that partisanship, not

2  race, was the driving force behind Proposition 50.

3      Next, the United States makes the incredible claim that "[i]n the press,

4  California's legislators and governor sold a plan to promote the interests of Democrats

5  in the upcoming midterm elections. But amongst themselves and on the debate floor,

6  the focus was not partisanship, but race." Dkt. 29-1 at 3. Not so. The floor statement

7  of lead Plaintiff Tangipa undermines this claim:

> Californians can look at their districts today, and they know that they
> were not manipulated for partisan advantage. And now, in just four
> days, with two rushed committee hearings and almost no opportunity
> for real public comment, we are on the verge of throwing all of that
> away. Let me remind this body. During committee hearings, one of our
> colleagues brazenly admitted that this entire thing was about partisan
> gerrymandering. Admitted partisan politics. This was a direct response
> to the question about protecting voters and underserved communities.

Dkt. 42-4 at 97-98. Numerous statements by Democratic and Republican lawmakers

reflect Democratic partisan motivation. *See, e.g.,* Dkt. 16-3 Ex. 6 (Speaker of the

Assembly Press Release, Aug. 15) at 25-26 (quoting the Speaker of the Assembly as

stating, "Trump sparked this national crisis when he called Texas to rig the election.

California is fighting back" and the Senate Pro Tempore as stating, "[t]his is about

more than drawing lines on a map, it's about drawing a line in the sand to stop Texas

and Trump from rigging the election"); Dkt. 42-4 (California Assembly Floor

Session, Aug. 21) at 158 (statement of Majority Leader Garcia) ("This temporary map

will only take effect. . . because Republicans force partisan maps on voters in other

states"); *id.* at 46-47 (statement of Assemblymember DeMaio) ("You are openly

admitting that you're [drawing the maps] for partisan advantage"); Dkt. 42-5

(California Assembly Elections Committee's Meeting, Aug. 19) at 214 (establishing

that legislators in the majority "weren't planning on redistricting until [Texas

Republicans] made attempts to rig the 2026 election"); *id.* at 138 (condemning ACA

8, SB 280, and AB 604 as a "blatant attempt to gerrymander congressional districts

for partisan gain"); Dkt. 42-6 (California Senate Floor Session, Aug. 21) at 165

- 8 -

(noting that the map was introduced "to neutralize what is happening in Texas" and "create an additional five Democratic seats to stop this"). The claim that race drove the redistricting is merely a convenient *post hoc* litigation strategy.

Plaintiffs conspicuously omit *Alexander* from their briefing. But *Alexander* is not only instructive regarding statements of law but also on the facts. In *Alexander*, the Supreme Court accepted South Carolina's partisan defense of its congressional map, even though the legislature never claimed a partisanship motivation *during* the legislative process and only raised the defense during litigation. 602 U.S. at 20-21. As detailed above, here the Democrats' partisanship defense is much stronger than in *Alexander*.

The recent redistricting decision out of Texas provides a useful contrast. *League of United Latin American Citizens v. Abbott*, 2025 WL 3215715 (W.D. Tex. Nov. 18, 2025). There, the direct evidence of race predominating was overwhelming. The Department of Justice sent a letter to the State asserting that three "unconstitutional race-based congressional districts" needed to be redrawn into majority single-race districts, effectively setting a 50% racial target for Texas to meet. *Id.* at 7. Throughout the subsequent redistricting process, the Texas governor and legislators repeatedly referenced the need to adjust the districts in question because of their racial makeup and in response to the Department's statements. *Id.* at 21-33. They never said they were amending the congressional map for partisan advantage. Based on the overwhelming direct evidence of racial intent, the court concluded the presumption of legislative good faith could not hold. *Id.* at 31. The redistricting in Texas presents a textbook case of racial predominance. The facts in California do not.

          b.     **Plaintiffs fail to produce sufficient evidence demonstrating that the sixteen majority Latino districts are racially gerrymandered**

In light of the governing standard and the overwhelming evidence that Proposition 50 was driven by partisan and not racial concerns, Plaintiffs face a practically insurmountable burden.

- 9 -

1       Plaintiffs make a sweeping assertion that all sixteen districts with a majority

2  Latino citizen voting age population are racially gerrymandered. Dkt. 16-1 at 11.

3  Their only support for this claim is a handful of statements by the mapdrawer

4  regarding the creation of an additional majority Latino district in Southern California

5  and statements by the mapdrawer and Democratic legislators about an increase in

6  Latino voting strength in the map and about the need to protect VRA districts. *Id.* at

7  10-13.

8       Plaintiffs cannot meet their burden with so little. To begin with, claims apply

9  to an individual district, not to states as a whole.

10     A racial gerrymandering claim . . . applies to the boundaries of individual

11     districts. It applies district-by-district. It does not apply to a State

12     considered as an undifferentiated "whole." We have consistently described
       a claim of racial gerrymandering as a claim that race was improperly used

13     in the drawing of the boundaries of one or more *specific electoral districts*.

14  *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 262-63 (2015) (emphasis in

15  original).

16       Instead of providing district-by-district evidence, Plaintiffs note the

17  mapdrawer's and legislators' use of the term "VRA districts"—arguing such "race-

18  linked terms" and indeed "mentions of race and the VRA" in and of themselves

19  suggest discriminatory intent. But such terms are normal in redistricting. *Miller*, 515

20  U.S. at 916 (noting that courts must be mindful of "[t]he distinction between being

21  aware of racial considerations and being motivated by them."). More to the point,

22  Proposition 50 did not "create[] VRA districts" at all. Dkt. 16-1 at 17. The Proposition

23  50 map has the same number of majority Latino districts as the Commission plan it

24  replaced—sixteen. Fairfax Report at 11 tbl. 1. Plaintiffs state elsewhere that the

25  previous plan "[c]omplied with the VRA" and seem to concede it was constitutional.

26  Dkt. 16-1 at 17. They fail to explain how the sixteen districts in the Commission plan

27  could be constitutional while the sixteen districts in the current plan are not, even

28

OPPOSITION OF LEAGUE OF UNITED LATIN AMERICAN CITIZENS (LULAC) TO MOTIONS FOR
PRELIMINARY INJUNCTION

though fifteen of those majority Latino districts are the same majority Latino districts in both plans. The one change is that Proposition 50 restored from the pre-2021 map a majority Latino district, District 41, by reuniting a longstanding community of interest that had been divided under the Commission's map. Despite Plaintiffs' suggestions to the contrary, there is nothing unconstitutional about creating a majority Latino district in an area that shares a community of interest, given that maintaining communities of interest is a traditional redistricting principle. *Bethune-Hill*, 580 U.S. at 183.

Other than District 41 and District 13, which is discussed below, Plaintiffs have not submitted any district-specific evidence of a racial gerrymander. Perhaps most damning, Plaintiffs' expert, Dr. Trende, who was "asked to evaluate whether the revised California Districts were drawn, in whole or in part, with race as a predominate motive," Dkt. 16-5 at 3, only identifies one district—District 13—where race predominated. *See* Dkt. 16-5. In terms of quantitative analysis, the United States has not even retained an expert. Instead, the United States cites to an academic analysis of Proposition 50. Dkt. 29-1 at 5-6. This analysis is irrelevant because it does not analyze whether Proposition 50 is a racial gerrymander or whether traditional districting principles were subordinated to race.

c.    Plaintiffs' factual showing regarding District 13 falls well short of meeting its burden

The only district-specific evidence Plaintiffs offer that District 13 is a racial gerrymander is Dr. Trende's report. The United States does not offer any district-specific evidence of its own, instead piggybacking off of Plaintiffs' evidence. But Dr. Trende's report does not meet Plaintiffs' demanding burden.

To begin with, Dr. Trende's report does not conclude that race predominated in District 13. Instead, the section of the report is entitled "California District 13 shows signs of racial predominance in line drawing," a far more equivocal assessment. Trende Report at 4. And Dr. Trende's analysis is sparse and incomplete. He identifies two areas where the legislature could have made District 13 more

Democratic and less Hispanic: (1) an area near the cities of Modesto and Ceres, where District 13 shares a boundary with District 5, and (2) an area in and near Stockton, where District 13 shares a boundary with District 9. *Id.* at 11-22. He then presents three alternative maps where he makes changes he claims show a more Democratic, less Hispanic district could be achieved. *Id.* at 23-27.

But Dr. Trende's report displays the precise flaw the Supreme Court identified in *Alexander*: he provides an analysis "that do[es] not replicate the myriad considerations that a legislature must balance as part of its redistricting efforts." *Alexander*, 602 U.S. at 24 (quotation omitted). Without more, such a report "cannot sustain a finding that race played a predominant role in the drawing" of a district's lines." *Id.*

Altogether, Dr. Trende's report contains multiple fatal flaws. Among them, the report does not:

- Assess whether or assert that District 13 was problematic with respect to traditional redistricting principles, such as compactness, contiguity, precinct splits, or splitting of cities.

- Compare District 13 in the Proposition 50 plan to the 2021 Commission plan on those traditional redistricting criteria.

- Acknowledge that both the Proposition 50 and the 2021 Commission plan respect longstanding Latino communities of interest.

Discuss District 13 as a whole and compare its demographic and political data to District 13 under the 2021 Commission plan. Notably, under both plans, District 13 had a majority Latino CVAP; Proposition 50 added less than a tenth of a percentage point to the Latino CVAP of District 13 (from 53.66% to 53.73 %), while improving Democrat performance by more (from 54.05% to 57.94%). Fairfax Report at 11 tbl. 1.

- Acknowledge that the "bulge" in the Modesto/Ceres area that he claims is a sign of racial predominance, Trende Report at 11, was present in the Commission

Map as well or acknowledge that the changes to Modesto/Ceres area were modest. Fairfax Report at 16.

- Acknowledge that the "plume" in the Stockton area that he claims is a sign of racial predominance, Trende Report at 16, was present in the Commission Map as well, Fairfax Report at 20.

- Acknowledge that the portion of the Stockton area added to the Proposition 50 map is mostly composed of majority-Democratic precincts. *Id.* at 24.

Dr. Trende's Demonstration Maps also fail to meet the *Alexander* standard for a demonstration map: all three maps were generated using unequal populations and containing unacceptable incontiguities. Fairfax Report at 29-31. Compared to the Proposition 50 plan, Dr. Trende's maps split 13-17 more municipalities statewide and one more municipality in District 13. *Id.* at 32. Presumably Dr. Trende does not think *his* plans subordinated traditional districting principles to race, and if *his* plans did not, Proposition 50's District 13 does not either.

"If either politics or race could explain a district's contours, the plaintiff has not cleared its bar." *Alexander*, 602 U.S. at 10. Because of the overwhelming evidence suggesting Proposition 50 is a partisan gerrymander, Plaintiffs have not cleared their bar here.

**B.    Plaintiffs have failed to make out a claim for racial gerrymandering under the Fifteenth Amendment**

Plaintiffs claim that Proposition 50 is a racial gerrymander under the Fifteenth Amendment but do not provide an accompanying analysis.

The Fifteenth Amendment bars voting procedures that intentionally deny or abridge the right to vote of a racial group. *Gomillion v. Lightfoot*, 364 U.S. 339 (1960). In *Gomillion*, the City of Muskogee drew its boundaries around the Black population to prevent them from voting in city elections, which the Court found violated the Fifteenth Amendment. 364 U.S. at 347.

A claim of racial gerrymandering under the Equal Protection Clause differs from intentional vote denial claims such as *Gomillion*, in that latter claims require that

1  the Plaintiffs identify and prove that a racial group was intentionally discriminated
2  against. *Abbott v. Perez*, 585 U.S. 579, 586 (2018). Racial gerrymandering claims
3  under the Equal Protection Clause have no such intent requirement. *Shaw*, 509 U.S.
4  at 652. This is why racial gerrymandering claims are not typically brought under the
5  Fifteenth Amendment. In one case involving a Fifteenth Amendment racial
6  gerrymandering claim, *Backus v. South Carolina*, 857 F. Supp. 2d 553, 569-70
7  (D.S.C. 2012), *aff'd* 568 U.S. 801 (2012), the three-judge court explained this
8  distinction and found that a racial gerrymandering claim under the Fifteenth
9  Amendment could only be brought when a racial group was completely denied the
10  vote, as in *Gomillion.* Though Plaintiffs allege they "will suffer disenfranchisement,"
11  Dkt. 16-1 at 25, they have offered no evidence that they cannot vote.

12  **II.    The United States fails to establish an intentional vote dilution claim**

13        Finally, the United States appears to claim both that it is bringing an intentional
14  vote dilution claim and that the legal standard for such a claim is the same as the
15  standard for a racial gerrymander. Dkt. 29-1 at 7-8.

16        The United States is flatly wrong that the standards for racial gerrymandering
17  claims and intentional vote dilution claims are the same. The Supreme Court has made
18  clear that racial gerrymandering claims are "analytically distinct" from intentional
19  vote dilution claims. *Shaw*, 509 U.S. at 652. In *Shaw*, the Supreme Court
20  differentiated between intentional vote dilution claims, which apply to districting
21  plans "adopted with a discriminatory purpose and [that] have the effect of diluting
22  minority voting strength," *Shaw*, 509 U.S. at 641, and racial gerrymandering claims,
23  which are not based on discrimination against a racial or ethnic group.

24        Moreover, the evidence submitted by Plaintiffs and the United States is
25  insufficient and, in one respect, actually undermines an intentional vote dilution
26  claim.

27        First, the heart of an intentional vote dilution claim is that plaintiffs need to
28  identify one or more racial or ethnic groups that were discriminated against. *See*

*Abbott*, 585 U.S. at 586. Neither the Plaintiffs nor the United States does this.

Second, to show intentional vote dilution, the districting plan must be adopted with a purpose to harm that racial group(s) and have the effect of doing so. Plaintiffs' second expert, Dr. Thomas Brunell, concludes that based on "the evidence from four statewide elections in the state in 2022 and 2024, estimates indicate that majorities of Non-Hispanic Whites, Hispanics, Non-Hispanic Blacks, and Non-Hispanic Asians, all vote Democratic." Dkt. 16-7, Ex. 2, Expert Report of Thomas Brunell, Ph.D. at 20. But this observation undermines the notion that any racial group is harmed by Proposition 50 because majorities of every racial group support the same candidates (in this case, Democrats).

## III.  Movants cannot meet the standard for a preliminary injunction

As discussed in Sections I and II, Plaintiffs and the United States cannot establish a substantial likelihood of success on the merits. Plaintiffs and the United States also cannot satisfy the third and fourth requirements for a preliminary injunction that the balance of harms and the public interest favor their case. Proposition 50 was not just a legislative decision, but a decision by a landslide majority of voters–7,408,128 (64.4%) yes votes to 4,095,372 (35.6%) no votes—demonstrating what the public thinks its interest is. And there are important countervailing harms: to grant the relief Plaintiffs seek would undermine decades of work Latino communities undertook to secure their equal opportunity to elect their candidates of choice and improperly suggest that a map is "racially discriminatory simply because it provides electoral opportunities for the Latino population." Proaño Decl. at ¶ 9; *see also* Sandoval Decl. at ¶¶ 10-11.

Moreover, in cases concerning voting changes close to elections, the Supreme Court has repeatedly applied the special principle first articulated in *Purcell v. Gonzalez*, 549 U.S. 1 (2006). In *Merrill v. Milligan*, the Court applied *Purcell* to stay a lower court preliminary injunction of a just-enacted Congressional map. 142 S. Ct. 879 (2022). In his concurring opinion, Justice Kavanaugh explained:

> This Court has repeatedly stated that federal courts ordinarily should not enjoin a state's election laws in the period close to an election, and this Court in turn has often stayed lower federal court injunctions that contravened that principle . . . . When an election is close at hand, the rules of the road must be clear and settled. Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences[.]"

*Merrill,* 142 S. Ct. at 880-81 (Kavanaugh, J., concurring) (noting plaintiffs failed to satisfy requirements that merits were "clearcut" in its favor and that changes were "feasible without significant cost, confusion, or hardship"). Here, Plaintiffs and the United States have failed to show that the merits are clearcut in their favor and have not offered any evidence that the last-minute changes are feasible without significant cost, confusion, or hardship.

## CONCLUSION

For the foregoing reasons, Applicant respectfully requests that the Court deny the motions for preliminary injunction of Plaintiffs and the United States.

DATED: December 3, 2025

*/s/ John A. Freedman*
**ARNOLD & PORTER KAYE SCHOLER LLP**

JOHN A. FREEDMAN[*]
John.Freedman@arnoldporter.com
601 Massachusetts Ave, NW
Washington, DC  20001
T: (202) 942-5000
F: (202) 942-5999

SEAN O. MORRIS (SBN 200368)
Sean.Morris@arnoldporter.com
777 South Figueroa Street
44th Floor
Los Angeles, CA  90017
T: (213) 243-4000
F: (213) 243-4199

Respectfully submitted,

**DEMOCRACY DEFENDERS ACTION**
NORMAN L. EISEN[*]
TIANNA MAYS[*]
SOFIA FERNANDEZ GOLD[*]
JACOB KOVACS-GOODMAN[*]
norman@democracydefenders.org
tianna@democracydefenders.org
sofia@democracydefenders.org
jacob@democracydefenders.org
600 Pennsylvania Ave SE,
Unit 15180
Washington, DC 20003
T: (202) 594-9958

OPPOSITION OF LEAGUE OF UNITED LATIN AMERICAN CITIZENS (LULAC) TO MOTIONS FOR PRELIMINARY INJUNCTION

1  **JUSTICE LEGAL STRATEGIES**
2  **PLLC**
   JON M. GREENBAUM (SBN 166733)
3  jgreenbaum@justicels.com
   P.O. Box 27015
4  Washington, DC 20038
5  T: (202) 601-8678

6
   *Counsel for Intervenor-Defendant*
7  *League of United Latin American*
   *Citizens*
8
9  *Admitted pro hac vice*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION OF LEAGUE OF UNITED LATIN AMERICAN CITIZENS (LULAC) TO MOTIONS FOR
PRELIMINARY INJUNCTION

**CERTIFICATION OF COMPLIANCE WITH LOCAL RULE 11-6.2**

The undersigned, counsel for Defendant-Intervenor LULAC, certifies that this brief contains 4,986 words, which complies with the word limit of L.R. 11-6.1.

*/s/ John A. Freedman*
John A. Freedman

**ATTESTATION PURSUANT TO LOCAL RULE 5-4.3.4**

This certifies, pursuant to Local Rule 5-4.3.4, that all signatories to this document concur in its content and have authorized this filing.

*/s/ John A. Freedman*
John A. Freedman

OPPOSITION OF LEAGUE OF UNITED LATIN AMERICAN CITIZENS (LULAC) TO MOTIONS FOR PRELIMINARY INJUNCTION

# CERTIFICATE OF SERVICE

Case Name:  Tangipa et al v. Newsom et al   No. 2:25-cv-10616-JLS-WLH-KKL

I hereby certify that on <u>December 3, 2025</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**OPPOSITION OF INTERVENOR-DEFENDANT LEAGUE OF UNITED LATIN AMERICAN CITIZENS (LULAC) TO MOTIONS FOR PRELIMINARY INJUNCTION**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on <u>December 3, 2025</u>, in Washington, D.C.

<u>/s/ John A. Freedman</u>
Signature

OPPOSITION OF LEAGUE OF UNITED LATIN AMERICAN CITIZENS (LULAC) TO MOTIONS FOR PRELIMINARY INJUNCTION