1   ROB BONTA
    Attorney General of California
2   ANYA M. BINSACCA
    LARA HADDAD
3   Supervising Deputy Attorneys General
    RYAN EASON
4   DAVID GREEN
    IRAM HASAN
5   S. CLINTON WOODS
    JENNIFER E. ROSENBERG
6   Deputy Attorneys General
    State Bar No. 275496
7    300 South Spring Street, Suite 1702
     Los Angeles, CA  90013-1230
8    Telephone:  (213) 269-6617
     Fax:  (916) 731-2124
9    E-mail:  Jennifer.Rosenberg@doj.ca.gov
    *Attorneys for Defendants California Governor
10  Gavin Newsom and Secretary of State Shirley
    Weber*

11

12

13                IN THE UNITED STATES DISTRICT COURT

                FOR THE CENTRAL DISTRICT OF CALIFORNIA
14
                        WESTERN DIVISION
15

| | |
|---|---|
| 16   **DAVID TANGIPA, *et al.*,** | 2:25-cv-10616-JLS-WLH-KKL |
| 17                          Plaintiffs, | Three-Judge Court |
| 18      and | **DEFENDANTS' OPPOSITION** |
| 19   **UNITED STATES OF AMERICA,** | **TO PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S** |
| 20                   Plaintiff-Intervenor | **MOTIONS FOR PRELIMINARY INJUNCTION** |
| 21      **v.** | Date:        Dec. 15, 2025 |
| 22   **GAVIN NEWSOM, in his official** | Time:        9:00 a.m. |
|      **capacity as the Governor of California,** | Courtroom:   1 |
| 23   ***et al.*,** | Judges:      Hon. Josephine L. Staton, Hon. Kenneth |
| 24                          Defendants, | K. Lee, and Hon. Wesley L. Hsu |
| 25      and | Trial Date:  None Designated |
| 26   **DEMOCRATIC CONGRESSIONAL** | Action Filed: Nov. 5, 2025 |
|      **CAMPAIGN COMMITTEE, *et al.*,** | |
| 27                   Defendant-Intervenors. | |

28

1

# **TABLE OF CONTENTS**

2

**Page**

INTRODUCTION ...........................................................................................1

BACKGROUND ............................................................................................4

I.  The Legislature Placed Prop 50 on the Ballot in Response to
President Trump's Redistricting Demands in Other States .................4

    A.  The California Legislature Placed Prop 50 Before the
Voters for Partisan Advantage .................................................5

    B.  Challengers and Prop 50 Opponents Repeatedly
Acknowledge Defendants' Partisan Purpose ............................7

    C.  The Materials Put Before the Voters Were Clear:  Prop 50
Was Placed on the Ballot for a Partisan Purpose .....................9

II.  The Instant Challenges to Prop 50........................................................11

LEGAL STANDARD......................................................................................12

ARGUMENT....................................................................................................13

I.  Challengers Have Established No Chance of Success on the
Merits of Their Racial Gerrymandering Claims ...............................13

    A.  Challengers Have Not Shown That Racial Considerations
Predominated .........................................................................14

        1.  Challengers' Direct Evidence Does Not Show That
Race Predominated ......................................................15

            a.  Statements by Individual Legislators .................16

            b.  Statements by Mapmaker Paul Mitchell.............26

        2.  Challengers' Circumstantial Evidence Also Fails to
Establish That Race Predominated................................32

            a.  District 13's Borders.........................................32

            b.  Alternative Maps of District 13...........................36

            c.  Statewide Effects on Latino Voting Power........37

    B.  Without Predominance, Strict Scrutiny Does Not Apply.........40

    C.  Plaintiffs' Fifteenth Amendment Racial Gerrymandering
Claim Is Considered Under the Same Rubric as Their
Fourteenth Amendment Claims................................................40

II.  Plaintiff-Intervenor Has Not Shown Any Chance of Success on
the Merits of Its Voting Rights Act Claim..........................................41

III.  Challengers Cannot Establish the Remaining Preliminary
Injunction Factors ..............................................................................43

    A.  Irreparable Harm......................................................................43

    B.  Public Interest and Balance of the Equities ............................44

IV.  Challengers' Requested Remedy Is Wholly Improper.......................47

CONCLUSION ................................................................................................48

i

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Abbott v. Perez*
585 U.S. 579 (2018)..................................................................................40

*Adarand Constructors v. Pena*
515 U.S. 200 (1995)..................................................................................42

*Alabama Legislative Black Caucus v. Alabama*
575 U.S. 254 (2015).................................................................31, 36, 46

*Alexander v. S.C. State Conf. of the NAACP*
602 U.S. 1 (2024)..............................................................................*passim*

*All. for the Wild Rockies v. Cottrell*
632 F.3d 1127 (9th Cir. 2011)................................................................45

*Allen v. Milligan*
599 U.S. 1 (2023)....................................................................................15

*Amoco Prod. Co. v. Village of Gambell*
480 U.S. 531 (1987)..................................................................................44

*Apartment Ass'n of L.A. Cnty., Inc. v. City of L.A.*
10 F.4th 905 (9th Cir. 2021)....................................................................12

*Backus v. South Carolina*
857 F.Supp.2d 553 (D.S.C. 2012) ..........................................................41

*Bartlett v. Strickland*
556 U.S. 1 (2009)....................................................................................38

*Bethune-Hill v. Virginia State Bd. of Elections*
580 U.S. 178 (2017)...........................................................................15, 33

*Branch v. Smith*
538 U.S. 254 (2003)..................................................................................47

*Brnovich v. Democratic Nat'l Comm.*
594 U.S. 647 (2021)..................................................................................18

1

2

## TABLE OF AUTHORITIES
### (continued)

**Page**

3

4

*Bush v. Vera*
517 U.S. 952 (1996)...................................................................14

5

6

*Chen v. City of Houston*
206 F.3d 502 (5th Cir. 2000)..................................................14, 15

7

8

*City of L.A. v. Cnty. of Kern*
462 F. Supp. 2d 1105 (C.D. Cal. 2006)............................................22

9

*City of Mobile v. Bolden*
446 U.S. 55 (1980)...................................................................41

10

11

*Cooper v. Harris*
581 U.S. 285 (2017).............................................................*passim*

12

13

*Crawford v. Bd. of Educ. of City of L.A.*
458 U.S. 527 (1982)...................................................................15

14

15

*Democratic Nat'l Comm. v. Hobbs*
948 F.3d 989 (9th Cir. 2020) (en banc)...........................................42

16

17

*Democratic Nat'l Comm. v. Reagan*
904 F.3d 686 (9th Cir. 2018)..................................................42, 43

18

19

*Easley v. Cromartie*
532 U.S. 234 (2001) (*Cromartie II*)...........................................*passim*

20

21

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*
98 F.4th 1180 (9th Cir. 2024)..................................................12, 13

22

*Gill v. Whitford*
585 U.S. 48 (2018)...................................................................47

23

24

*Gomillion v. Lightfoot*
364 U.S. 339 (1960)...................................................................41

25

26

*Hunt v. Cromartie*
526 U.S. 541 (1999) (*Cromartie I*)..................................................3

27

28

*Hunter by Brandt v. Regents of the Univ. of Cal.*
971 F.Supp. 1316 (C.D. Cal. 1997)................................................42

iii

1

2

### TABLE OF AUTHORITIES
### (continued)

Page

3

4

*Lee v. City of Los Angeles*
    908 F.3d 1175 (9th Cir. 2018)....................................................27

5

6

*LULAC v. Abbott*
    No. 3:21-cv-00259, slip op. (W.D. Tex. Nov. 18, 2025) ...............5, 40

7

8

*Maryland v. King*
    567 U.S. 1301 (2012)...............................................................45

9

10

*McClure v. Jefferson Cnty. Comm'n*
    No. 25-13253, 2025 WL 2977740 (11th Cir. Oct. 16, 2025)............47

11

*Merrill v. Milligan*
    142 S. Ct. 879 (2022)..........................................................46, 47

12

13

*Miller v. Johnson*
    515 U.S. 900 (1995)........................................................*passim*

14

15

*North Carolina v. Covington*
    581 U.S. 486 (2017)................................................................47

16

17

*Pierce v. N. Carolina State Bd. of Elections*
    __ F.Supp.3d __, No. 4:23-CV-193-D, 2025 WL 2841008
    (E.D.N.C. Sept. 30, 2025)........................................................37

18

19

*Prejean v. Foster*
    227 F.3d 504 (5th Cir. 2000)................................................27, 41

20

21

*Purcell v. Gonzalez*
    549 U.S. 1 (2006)...................................................................46

22

23

*Robert L. v. Superior Ct.*
    30 Cal. 4th 894 (2003) ........................................................15, 22

24

25

*Rucho v. Common Cause*
    588 U.S. 684 (2019)............................................................2, 31

26

27

*Thornburg v. Gingles*
    478 U.S. 30 (1986).................................................................38

28

**TABLE OF AUTHORITIES**
(continued)

Page

*U.S. v. Hays*
515 U.S. 737 (1995)..................................................................41, 44

*United States v. O'Brien*
391 U.S. 367 (1968).........................................................................18

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*
429 U.S. 252 (1977)..................................................................42, 43

*Winter v. Nat. Res. Def. Council, Inc.*
555 U.S. 7 (2008)......................................................................12, 43

STATUTES

Assemb. Bill 604, 2025 Cal. Stat., ch. 96.....................................5, 47

Assemb. Const. Amend. No. 8, 2025 Cal. Stat., ch. 156.......................5

H.B. 4, 89th Leg., 2nd Special Sess. (Tex. 2025) ................................5

CONSTITUTIONAL PROVISIONS

Cal. Const. Article XVIII, § 1 ...............................................................6

Cal. Const. Article XVIII, § 4 ...............................................................6

OTHER AUTHORITIES

ABC10, Aug. 16, 2025, Video at 1:18-37,
https://tinyurl.com/wde26vz6...........................................................32

Fox Business, *Rep. Kevin Kiley: We can defeat this gerrymandering*
(Nov. 6, 2025).....................................................................................9

No on Prop 50 – Stop Sacramento's Power Grab, *Power Grab (30)*
(Oct. 4, 2025), Video .........................................................................9

*Proposed Congressional Map*, CALIFORNIA STATE ASSEMBLY –
COMMITTEE ON ELECTIONS..............................................................38

## INTRODUCTION

**"This special election is about one thing and one thing only:**

**Democrats want to GUARANTEE a Democrat House majority[.]"**

—Plaintiff California Republican Party on Proposition 50[1]

On November 4, 2025, voters were asked whether to approve Proposition 50 ("Prop 50"), a proposed amendment to California's Constitution that would temporarily allow use of a new congressional district map for the express purpose of countering mid-decade redistricting in Texas that was expected to result in Texas Republicans gaining seats in Congress. Unofficial results show that California voters overwhelmingly approved Prop 50. The Prop 50 map is expected to empower Democrats to flip five California Congressional seats currently held by Republicans—exactly the result the Legislature intended.

Prop 50's partisan aim was no secret. Public statements by Plaintiffs and Plaintiff-Intervenors (together, "Challengers") acknowledge that Prop 50's map was drawn for partisan purposes:



---

[1] Declaration of Ryan Eason, Ex. 1 at CA084.

1

1  *See* Eason Decl., Ex. 2 at CA388.  Now, having failed to convince voters to reject

2  Prop 50 at the ballot box—and because partisan gerrymandering claims are

3  nonjusticiable, *Rucho v. Common Cause*, 588 U.S. 684 (2019)—Challengers

4  attempt to block Prop 50's map by applying a flimsy veneer of racial

5  gerrymandering.  But Challengers face an "especially stringent" burden to sustain a

6  racial gerrymandering claim:  they must establish that race "predominate[d]" over

7  all other factors in the drawing of the new map.  *Alexander v. S.C. State Conf. of the*

8  *NAACP*, 602 U.S. 1, 7, 11 (2024).

9      Challengers cannot meet this burden.  Instead, they attempt to reframe the test

10  as requiring Defendants to prove that *no* California legislator mentioned race *in any*

11  *context* while the new map was being considered, or to show a compelling

12  justification for the mere existence of any majority-minority district in the new

13  map.  But that is not the test—as the United States recently made clear in a brief

14  before the Supreme Court in the Texas racial gerrymandering case, where it

15  emphasized that it is "especially difficult" for plaintiffs to prove racial

16  gerrymandering in the face of evidence that partisanship was the principal

17  motivation.  U.S. Br., *Abbott v. LULAC*, No. 25A608, Eason Decl., Ex. 4 at CA404

18  ("U.S. Br., *Abbott*").  Here, the overwhelming evidence demonstrates that Prop 50

19  was a plainly partisan effort to capture more Democratic congressional seats in

20  California.

21      Official materials provided to voters conveyed a consistent message:  Prop 50

22  was a response to partisan redistricting in other states.  Voters' ballots noted that

23  express partisan purpose.  And all official information provided to voters regarding

24  Prop 50—including the ballot title and summary and official Yes and No arguments

25  in the Voter Information Guide—informed voters of its partisan goal.  The intense

26  social media coverage of Prop 50 had the same focus:  Prop 50 is California's direct

27  partisan response to Republicans' power grab in Texas and other states.  Even

28  Challengers and other Prop 50 opponents declared Prop 50 a partisan power grab.

2

1    Despite overwhelming evidence that Prop 50 was perhaps the most well-

2 publicized partisan gerrymandering effort since *Rucho*, Challengers seize on a

3 handful of out-of-context statements by a few legislators and one private consultant

4 to claim that the Legislature's predominant goal in placing Prop 50 on the ballot

5 was not actually to gain seats for Democrats, but instead to create more Latino-

6 majority districts.[2]  But the Prop 50 map does not do that.  Indeed, it contains the

7 exact same number of Latino-majority districts as the 2021 map drawn by the

8 independent California Citizens Redistricting Commission ("the Commission").[3]

9    Challengers provide no compelling evidence to suggest that race

10 predominated in the design of any new district—including the single district they

11 challenge specifically.  And Challengers proffer *no* evidence at all to establish that

12 the ultimate decisionmakers here—California voters—had any racial motive

13 whatsoever.

14    As to partisanship, Challengers ignore the overwhelming evidence showing

15 that the driving consideration behind the Legislature's redistricting effort was

16 offsetting Republican gains in other States that drew new maps—and the fact that a

17 partisan gain for Democrats is exactly what Prop 50 would ultimately accomplish.

18    Assessing a legislature's motivations in drawing district maps is "an inherently

19 complex endeavor," *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) (*Cromartie I*),

20 requiring federal courts to "exercise extraordinary caution," *Alexander*, 602 U.S. at

21 7 (citation modified).  This Court is required to "start with a presumption that the

22 legislature acted in good faith."  *Id.* at 6.  Challengers have not shown that they are

23 likely to succeed in overcoming that presumption to establish that race

---

[2] The federal government defines a "Hispanic or Latino" person as one of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin regardless of race.  *See* Eason Decl., Ex. 3 at CA390-CA391.  The terms are often used interchangeably.  Defendants use "Latino" herein to describe members of either group.

[3] This fact becomes apparent when comparing both maps using 2023 Citizen Voting Age Population (CVAP) data—the most recent available CVAP data.  Declaration of Bernard Grofman, Ex. A ("Grofman Report") at 11.

predominated in the Legislature's creation of the Prop 50 map—much less in the voters' ratification of the Legislature's mapdrawing.

Despite this failure and Challengers' vanishingly slim evidentiary record, Challengers ask this Court to enjoin the use of the Prop 50 map on an extraordinarily expedited timeline and limited factual record. Yet granting a preliminary injunction would irreparably disrupt the June 2, 2026 primary election process, preparations for which are well underway. It would "transform federal courts into weapons of political warfare." U.S. Br., *Abbott*, at 4, Eason Decl., Ex. 4 at CA400 (quoting *Alexander*, 602 U.S. at 11). And granting Challengers the relief they seek—reversion to the Commission's map—would not redress their alleged injury from the claimed increase in the number of Latino-majority districts, since the Prop 50 map and Commission map contain the same number of Latino-majority districts. The Court should deny this attempt to subvert the will of the millions of California voters who chose to approve Prop 50 in November.

## BACKGROUND

California's Proposition 50 is a partisan gerrymander in purpose and effect: it was designed by California lawmakers and approved by voters to increase the number of Democrats in California's congressional delegation to offset gains by Republicans in Texas and other States.

### I. THE LEGISLATURE PLACED PROP 50 ON THE BALLOT IN RESPONSE TO PRESIDENT TRUMP'S REDISTRICTING DEMANDS IN OTHER STATES

States generally draw congressional district maps once every decade. In California, the Legislature traditionally drew these maps. But in 2008, California voters transferred this power to an independent, nonpartisan California Citizens Redistricting Commission ("the Commission"). Eason Decl., Ex. 5 at CA423. For the past two census cycles, the Commission prepared California's congressional maps.

Earlier this year, President Trump urged Republican-led States to redistrict to

1  increase the Republican Party's advantage in the House of Representatives. *See*
2  Eason Decl., Ex. 6 at CA425-CA429.  In August, Texas deviated from the regular
3  redistricting cycle and redrew its congressional district lines in a manner that would
4  likely result in a Republican advantage. *See* H.B. 4, 89th Leg., 2nd Special Sess.
5  (Tex. 2025).[4]

### A. The California Legislature Placed Prop 50 Before the Voters for Partisan Advantage

6
7  California responded with the Election Rigging Response Act ("ERRA"), a
8  multi-part legislative package to offset the partisan gains from Texas's mid-decade
9  redistricting.  Both before and after the ERRA became law, Governor Newsom
10  repeatedly noted California's partisan purpose on social media and in press
11  releases, among other outlets:
12

 **cagovernor** ✓ › **California Redistricting** 8/18/25

California is proposing to hold a special election on November 4th to give voters the power to fight back against Donald Trump's tyranny.

We will not sit back while Trump and his Republican lapdogs in Texas attempt to rig the next election.

 **cagovernor** ✓ › **California Redistricting** 8/21/25

California is countering @realDonaldTrump's attempt to rig the 2026 election and redistrict his way out of accountability in states like Texas.

We're fighting fire with fire — giving the power to the people to fight back and demand nationwide independent redistricting.

19  Eason Decl., Ex. 7 at CA431, Ex. 8 at CA432; *see also*, *e.g.*, Eason Decl., Ex. 9 at
20  CA435, Ex. 10 at CA437-CA444, Ex. 11 at CA447-CA451.
21  One part of the ERRA, Assembly Bill 604 ("AB 604"), set forth a new
22  congressional district map.  AB 604, 2025 Cal. Stat., ch. 96.  Another, Assembly
23  Constitutional Amendment 8 ("ACA 8"), would authorize the use of AB 604's map
24  instead of that prepared by the Commission for the next three congressional
25  elections.  ACA 8, 2025 Cal. Stat., ch. 156.  ACA 8 is a legislatively referred

26
27  [4] A three-judge panel recently determined that race was Texas's predominant reason for redistricting. *LULAC v. Abbott*, No. 3:21-cv-00259, slip op. at 3, 134 (W.D. Tex. Nov. 18, 2025), https://tinyurl.com/3d3smk2w.  That decision has been appealed to the U.S. Supreme Court.
28

constitutional amendment that requires voter approval to take effect.  *See* Cal. Const. art. XVIII, §§ 1, 4.  Both laws were passed by the Legislature and signed by Governor Newsom on August 21, 2025.[5]

On November 4, 2025, California held a special election in which voters considered Prop 50, the measure that asked them to approve ACA 8 and authorize the new congressional map.  Declaration of Joanna Southard ("Southard Decl."), ¶¶ 7-8.  County elections officials will finalize their official election tallies by December 4, 2025, and the Secretary of State will certify the statewide results on December 12, 2025.  *Id.* ¶ 10.

The Legislature's express statements and the legislative history show that partisan considerations motivated the drafting of the ERRA.  In its statement of findings, the Legislature described ACA 8 as an attempt "to neutralize the partisan gerrymandering being threatened by Republican-led states without eroding fair representation for all communities" to ensure that the "2026 United States midterm elections for Congress" are "conducted on a level playing field without an extreme and unfair advantage for Republicans."  ACA 8 Findings (*l*), (n).  Committee hearing materials for ACA 8 and AB 604 emphasized the same point.  *See*, *e.g.*, Eason Decl., Ex. 12 at CA453 (the ERRA "neutraliz[es] partisan gerrymandering" by other states); *id.*, Ex. 13 at CA461 (the new redistricting map "provide[s] an effective response to the partisan gerrymander attempted by Texas and other states").

The Prop 50 map achieves its partisan aim.  Dr. Bernard Grofman, a political scientist with significant redistricting experience, analyzed the Prop 50 map and concluded that it would make "five of the nine Republican-held seats more likely to elect a Democrat"; "increas[e] (at least slightly) the reelection chances of potentially vulnerable Democrats"; and "mak[e] sure that none of the previously

---

[5] The Governor also signed Senate Bill 280, which called a statewide special election on November 4, 2025 for voters to consider ACA 8.

solid Democratic-held seats [are] going to be anything other than 'solid Democratic' in 2026." Grofman Report at 10. He further concluded that "[t]his combination of different types of benefits for the party doing the gerrymandering effects is the defining hallmark of a successful partisan gerrymander." *Id.*

### B. Challengers and Prop 50 Opponents Repeatedly Acknowledge Defendants' Partisan Purpose

ERRA opponents similarly understood that Prop 50 was designed to serve a partisan end. State Senator Ochoa-Bogh's declaration includes several documents she states she received while the ERRA was being considered. One consists of talking points for Republican State Senators opposing the ERRA, asserting that the Legislature's restricting plan would "allow[] politicians to redraw lines for partisan gain rather than adhering to established democratic principles." ECF 16-6 at 13. Another shows that the Senate Republican Policy Office concluded that the plan would create "a highly partisan gerrymandered congressional district map drawn to eliminate 5 Republican congressional seats while making numerous Democrat seats far less competitive." *Id.* at 27, 32. The Senate Republican Policy Office also stated that Democratic politicians "are really . . . attempting to improve the chances for Democrats to take the House of Representatives Majority in 2026 from Republicans." *Id.* at 29.

Challengers themselves expressly acknowledged that Prop 50's map was drawn to achieve partisan aims. Plaintiff Assemblymember Tangipa admitted just ten days ago that this case is really a "fight" about "partisan gerrymandering." Eason Decl., Ex. 2 at CA388. He also earlier called the ERRA "[a]dmitted partisan politics," ECF 42-4 at 100:3-4, saying the redistricting map "shows that there is so much political gains [sic] and political partisanship that has been played," ECF 42-5 at 37:21-23. Documents produced in discovery show that Plaintiff California Republican Party similarly characterized Prop 50 in partisan terms in dozens of emails and text messages it sent to its followers condemning Prop 50 as a partisan

power grab meant to gain Democratic seats in Congress. *See, e.g.*, Eason Decl., Ex. 1 at CA012-CA386, Ex. 14 at CA465-CA512. In one example, they proclaimed Prop 50 to be "Gavin Newsom's scheme to wipe out Republican congressional seats." *Id.*, Ex. 1 at CA110. Even Plaintiffs' own expert, Dr. Sean Trende, attested in a declaration filed in a separate case that "it seems obvious that the purpose of [the Prop 50] map is to favor one party or the other, as leaders in the state have not been particularly shy that the purpose of the map is to 'neutralize' a Republican gerrymander in Texas." *Id.*, Ex. 15 at CA517.

Attorney General Pamela Bondi characterized Prop 50 as an "attempt to entrench one-party rule" in the press release announcing Plaintiff-Intervenor's complaint in this action. *Id.*, Ex. 16 at CA532. She also posted the following on her official social media account the day Intervenor-Defendant filed its preliminary injunction motion:

 **Attorney General Pamela Bondi**  ⋯
@AGPamBondi

Today @TheJusticeDept sued @CAgovernor over his brazen Proposition 50 redistricting power grab.

Newsom should be concerned about keeping Californians safe and shutting down Antifa violence, not rigging his state for political gain.

*Id.*, Ex. 17 at CA537.

Those who campaigned against Prop 50 similarly characterized it as purely partisan. Reform California, an organization led by Assemblymember Carl DeMaio, led a campaign calling Prop 50 a "partisan redistricting scheme" to "protect partisan politicians" with the "clear intent of eliminating Republican-held seats and cementing one-party rule." *Id.*, Ex. 18 at CA540, Ex. 19 at CA545, Ex. 20 at CA550-CA551. The official opponents listed on the Voter Information Guide had a similar perspective. The "No on Prop 50 – Protect Voters First" website

1   home page labels Prop 50 as an "extreme partisan gerrymander." *Id.*, Ex. 21 at

2   CA557.  And Californians who viewed television ads from opponents heard them

3   describe Prop 50 as a "political power grab."  No on Prop 50 – Stop Sacramento's

4   Power Grab, *Power Grab (30)* (Oct. 4, 2025), Video, https://votenoprop50.org/tv-

5   ads/.

6        Republican politicians affected by Prop 50 similarly understood the map's

7   partisan intent.  A spokesperson of the National Republican Congressional

8   Committee, an organization that works to elect House Republicans, said the aim of

9   Prop 50 was to "consolidat[e] radical Democrat power."  Eason Decl., Ex. 22 at

10  CA561.   Representative Ken Calvert, whose prior District 41 was redrawn to favor

11  Democrats, said Prop 50 was about "pure political power."  *Id.*, Ex. 23 at CA563.

12  Representative Darrell Issa, whose prior Republican-leaning District 48 has become

13  more competitive for Democrats, said the Prop 50 campaign was "purely partisan"

14  and designed to deliver "an undeserved advantage to Democrats."  *Id.*, Ex. 24 at

15  CA565.  Representative Kevin Kiley, whose prior District 3 now leans Democratic,

16  said that Governor Newsom's goal was to make an "explicitly political

17  gerrymander" to "make California a whole lot bluer and to pick up five seats."  Fox

18  Business, *Rep. Kevin Kiley: We can defeat this gerrymandering* (Nov. 6, 2025),

19  Video, https://tinyurl.com/mwecztb5.

20      **C.**   **The Materials Put Before the Voters Were Clear:  Prop 50 Was**

21          **Placed on the Ballot for a Partisan Purpose**

22       The ballot label on voters' ballots made clear that voters were asked to choose

23  whether to vote for redistricting "in response to Texas' partisan redistricting":

24

25

26

27

28

9

Proposition 50                                                              August 27, 2025
                                                                                    ACA 8

**BALLOT LABEL**

**AUTHORIZES TEMPORARY CHANGES TO CONGRESSIONAL DISTRICT MAPS IN RESPONSE TO TEXAS' PARTISAN REDISTRICTING. LEGISLATIVE CONSTITUTIONAL AMENDMENT.** Requires temporary use of new congressional district maps through 2030. Directs independent Citizens Redistricting Commission to resume enacting congressional district maps in 2031. Establishes policy supporting nonpartisan redistricting commissions nationwide. **Fiscal Impact:** One-time costs to counties of up to a few million dollars statewide to update election materials to reflect new congressional district maps.

Southard Decl. at 10.

The Official Voter Information Guide, sent to all registered voters, also confirmed to the electorate that Prop 50 was developed to serve partisan ends. The official summary for Prop 50 stated that "[i]n response to Texas' mid-decade partisan congressional redistricting, this measure temporarily requires new congressional district maps, as passed by the Legislature in August 2025, to be used in California's congressional elections through 2030":

PROPOSITION **50** **AUTHORIZES TEMPORARY CHANGES TO CONGRESSIONAL DISTRICT MAPS IN RESPONSE TO TEXAS' PARTISAN REDISTRICTING. LEGISLATIVE CONSTITUTIONAL AMENDMENT.**

OFFICIAL TITLE AND SUMMARY                          PREPARED BY THE ATTORNEY GENERAL

The text of this measure can be found on page 18 and the Secretary of State's website at *voterguide.sos.ca.gov.*

- In response to Texas' mid-decade partisan congressional redistricting, this measure temporarily requires new congressional district maps, as passed by the Legislature in August 2025, to be used in California's congressional elections through 2030.

- Retains California's independent Citizens Redistricting Commission and directs the Commission to resume enacting congressional district maps in 2031 after the 2030 census and every ten years thereafter.

- Establishes state policy supporting use of fair, independent, and nonpartisan redistricting commissions nationwide.

**SUMMARY OF LEGISLATIVE ANALYST'S ESTIMATE OF NET STATE AND LOCAL GOVERNMENT FISCAL IMPACT:**

- One-time costs to counties of up to a few million dollars statewide. County costs would be to update election materials to reflect new congressional district maps.

*See* Southard Decl. at 19.

The official argument in favor of Prop 50 asserted that it "makes sure the 2026

1   mid-term elections are conducted on a level playing field without an unfair

2   advantage for Republicans," "ensure[s] our voices aren't silenced by partisan

3   gerrymandering in other states," and "keep[s] MORE cities and counties combined,

4   and communities together than California's existing maps." *Id.* at 27-28.

5   Similarly, the official argument against Prop 50 called it a "political power grab"

6   that "draw[s] partisan seats without transparency or citizen input, solely to protect

7   incumbents," argued the measure would create "the most partisan maps in

8   California's history," and encouraged voters to "[v]ote NO on partisan

9   gerrymandering." *Id.* (italics removed). And the text of the proposed constitutional

10  amendment presented to the voters in the guide explained that "[i]t is the intent of

11  the people that California's temporary maps be designed to neutralize the partisan

12  gerrymandering being threatened by Republican-led states without eroding fair

13  representation for all communities." *See id.* at 29; ACA 8 Findings (n).

14       Initial reporting shows that California voters—presented with this solely

15  partisan framing for Prop 50—"overwhelmingly" approved the measure. *See* Eason

16  Decl., Ex. 25 at CA567. Unofficial election results show 64.4% of voters

17  approving Prop 50 as of Dec. 3, 2025. *Id.* Exit polling showed support from

18  members of all racial groups. *See id.*, Ex. 26 at CA572-CA592.

19  **II.   THE INSTANT CHALLENGES TO PROP 50**

20       On November 5, 2025—the day after the election and nearly three months

21  after the Legislature publicly posted the proposed Prop 50 map—Plaintiffs filed

22  their complaint. ECF 1. Two days later, they moved for a preliminary injunction.

23  ECF 15. In both their complaint and motion, Plaintiffs bring three racial

24  gerrymandering claims: (1) the Legislature violated the Fourteenth Amendment

25  when it drew sixteen congressional district lines allegedly on the basis of race, (2)

26  the Legislature violated the Fifteenth Amendment when it drew the same sixteen

27  congressional district lines allegedly on the basis of race, and (3) the Legislature

28  violated the Fourteenth and Fifteenth Amendments when it drew District 13, one of

the sixteen districts Plaintiffs attack in their first two claims. *See* ECF 1 ¶¶ 94-126; ECF 16-1 at 8. Although Plaintiffs attack only the sixteen Latino-majority districts in the Prop 50 map, they ask the Court to preliminarily enjoin implementation of the entire map and order the State to use the Commission's map (which also contains sixteen Latino-majority districts, Grofman Report at 11) during the pendency of this litigation. ECF 16-1 at 35.

Plaintiff-Intervenor seeks the same relief through two claims: (1) a racial gerrymandering claim alleging that the Legislature relied on race when drawing "at least" one district in violation of the Fourteenth Amendment and (2) a statutory claim alleging that the Legislature adopted the Prop 50 map with the purpose of denying or abridging the right to vote based on race or color in violation of Section 2 of the Voting Rights Act. ECF 29-1 at 8; ECF 42 ¶¶ 67, 70.[6]

## LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Apartment Ass'n of L.A. Cnty., Inc. v. City of L.A.*, 10 F.4th 905, 911 (9th Cir. 2021) (citation modified). To warrant a preliminary injunction, a plaintiff generally "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).[7]

---

[6] At least five prior challenges to Prop 50 and the ERRA—none of which alleged racial gerrymandering—failed. *See* Eason Decl., Ex. 27 at CA602, Ex. 28 at CA604, Ex. 29 at CA606-CA610, Ex. 30 at CA613-CA626, Ex. 31 at CA628-CA634.

[7] The Ninth Circuit has also adopted "a sliding scale variant of the *Winter* test—under which a party is entitled to a preliminary injunction if it demonstrates (1) serious questions going to the merits, (2) a likelihood of irreparable injury, (3) a balance of hardships that tips sharply towards the plaintiff, and (4) the injunction is in the public interest." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024) (citation modified). "[T]he serious questions standard is 'a lesser showing than likelihood of success on the merits,'" *id.*, but
(continued...)

**ARGUMENT**

Challengers have not shown even "a fair chance of success on the merits," let alone the likelihood of success generally necessary to support preliminary injunctive relief. *Flathead-Lolo-Bitterroot*, 98 F.4th at 1192 (citation modified). Nor have they satisfied their burden on the remaining factors.

## I.    CHALLENGERS HAVE ESTABLISHED NO CHANCE OF SUCCESS ON THE MERITS OF THEIR RACIAL GERRYMANDERING CLAIMS

The Equal Protection Clause of the Fourteenth Amendment prohibits the State from "separating its citizens into different voting districts on the basis of race" absent "sufficient justification." *Cooper v. Harris*, 581 U.S. 285, 291 (2017) (citation modified). Courts conduct a two-prong analysis to determine whether a map is an illegal racial gerrymander under the Fourteenth Amendment. *Id.* "First, the plaintiff must prove that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Id.* (citation modified). To make this showing, the plaintiff must demonstrate that "the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations." *Miller v. Johnson,* 515 U.S. 900, 916 (1995). "Second, if racial considerations predominated over others, the design of the district must withstand strict scrutiny." *Cooper*, 581 U.S. at 292.

Challengers' motions fail to cite the leading Supreme Court authority on constitutional claims for impermissible racial gerrymandering, *Alexander v. South Carolina State Conference of the NAACP*, 602 U.S. 1 (2024). *Alexander* explains that because "[r]edistricting constitutes a traditional domain of state legislative authority," "federal courts must exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race." *Id.* at 7 (citation

imposes a heavier burden on the balance-of-equities factor and still requires showing of a "'fair chance' of success," *id.* at 1192.

1  modified).  The Court "start[s] with a presumption that the legislature acted in good

2  faith." *Id.* at 6.  That presumption renders a plaintiff's "evidentiary burden in these

3  cases [] especially stringent." *Id.* at 11.  "To prevail, a plaintiff must disentangle

4  race from politics by proving that the former *drove* a district's lines." *Id.* at 9

5  (citation modified).  "That means, among other things, ruling out the competing

6  explanation that political considerations dominated the legislature's redistricting

7  efforts." *Id*. at 9-10.  "If either politics or race could explain a district's contours,

8  the plaintiff has not cleared its bar." *Id.* at 10.

9      Challengers cannot clear that high bar.  They offer only threadbare allegations

10  relying on cherry-picked quotations from a non-state actor, a handful of statements

11  of individual legislators, and an expert declaration which points to two of three

12  small subparts of one district out of fifty-two that, in his opinion, seem not to be

13  partisan enough.  None of this is sufficient to overcome the presumption of good

14  faith accorded to the Legislature or to clear Plaintiffs' "demanding" burden to show

15  that race predominated. *Easley v. Cromartie*, 532 U.S. 234, 241 (2001) (*Cromartie*

16  *II*).

17      **A.   Challengers Have Not Shown That Racial Considerations**
       **Predominated**

18

19       Challengers' racial gerrymandering claims fail at prong one.  It is not enough

20  to prove that "redistricting [was] performed with consciousness of race." *Bush v.*

21  *Vera*, 517 U.S. 952, 958 (1996) (plurality opinion); *see also Chen v. City of*

22  *Houston*, 206 F.3d 502, 514 (5th Cir. 2000) ("[T]he mere presence of race in the

23  mix of decision making factors . . . does not alone automatically trigger strict

24  scrutiny."); *Miller,* 515 U.S. at 916 (legislatures "will . . . almost always be aware

25  of racial demographics").  Instead, Challengers must demonstrate that the State

26  "subordinated other factors . . . to racial considerations." *Cooper*, 581 U.S. at 291

27  (citation modified).  They must show that "race was *the* criterion that, in the State's

28  view, could not be compromised in the drawing of district lines." *Alexander*, 602

14

U.S. at 7 (emphasis added and citation modified).

This Challengers fail to do.  First, there is insufficient evidence "that race was the predominant factor motivating the *legislature's* decision" to approve the Prop 50 redistricting plan.  *Cooper*, 581 U.S. at 291 (emphasis added).  And Challengers identify no evidence that race played a part in the decision of the *voters*, who in addition to—or perhaps even more than—the Legislature are "relevant state actor[s]" with respect to the Prop 50 map.  *Alexander*, 602 U.S. at 8; *see also Crawford v. Bd. of Educ. of City of L.A.*, 458 U.S. 527, 532 n.5, 545 (1982) (evaluating the voters' intent in approving a legislatively referred measure); *Robert L. v. Superior Ct.*, 30 Cal. 4th 894, 904 (2003) (same, stating that absent evidence that voters were "aware" of the "motive or purpose of the drafters" of a statute, the purpose of the drafters "does not represent the intent of the electorate") (citation modified).  Second, to the extent that some legislators considered race, they considered this factor only as one among a "mix of decision making factors," *Chen*, 206 F.3d at 514, and expressly subordinate to the partisan aims driving the redistricting effort.[8]  Third, Challengers produce no circumstantial evidence for any district sufficient to overcome the presumption of legislative good faith that applies here—especially in light of the overwhelming evidence of partisan motive.

1. **Challengers' Direct Evidence Does Not Show That Race Predominated**

A plaintiff can prove a racial gerrymandering claim by pointing to "[d]irect evidence . . . of a relevant state actor's express acknowledgement that race played a role in the drawing of district lines."  *Alexander*, 602 U.S. at 8.  Here, the most relevant state actors are the Legislature and the voters.  *See Crawford*, 458 U.S. at

---

[8] Even where a State used an express racial target, the Supreme Court "was unwilling to conclude that a State's maps were produced in a racially predominant manner"; it instead "explain[ed] that 'the use of an express racial target' was just one factor among others that the court would have to consider as part of '[a] holistic analysis.'"  *Allen v. Milligan*, 599 U.S. 1, 32 (2023) (plurality opinion) (discussing *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178 (2017)).

545.  Challengers' efforts to identify direct evidence that either the Legislature or the voters acted with a predominantly racial intent in adopting Prop 50's map fall woefully short.

The only purportedly "direct" evidence of legislative or voter intent that Challengers offer is a series of scattered statements by (1) individual legislators, and (2) a private consultant retained by a third party to submit maps to the Legislature.  But none of these statements indicates that "race was the 'predominant factor'" motivating the Legislature's district-drawing decisions or the voters' ratification of them.  *Alexander*, 602 U.S. at 7 (citation modified).  To the contrary, many other statements by legislators and all of the material presented to voters indicate that Prop 50 was motived by partisan concerns.

### a.    Statements by Individual Legislators

Challengers attempt to show that race predominated by relying on a handful of statements from legislators mentioning race.  They cite Senate President Pro Tem Mike McGuire's press release stating that the new map "retains and expands Voting Rights Act districts that empower Latino voters to elect their candidates of choice." Eason Decl., Ex. 32 at CA637; ECF 16-3 at 34.  They also cite Assembly Speaker Robert Rivas's press releases suggesting that the new map would not change Latino voters' ability to elect their candidates of choice and would maintain the status quo. ECF 16-3 at 25 (new map retains existing "voting rights protections"); *id*. at 29 (new map retains existing "historic Black districts and Latino-majority districts"); *see also* ECF 16-1 at 19.

But Plaintiffs ignore that political considerations were the primary focus of these two lawmakers' statements.  Both acknowledge that the new map "will take effect only if other states effectuate partisan gerrymanders" to benefit Republicans. Eason Decl., Ex. 32 at CA637; ECF 16-3 at 25, 29.  Both also highlighted the traditional redistricting principles that Prop 50's map reflects, including "[k]eeping cities and communities together."  *Id*.  These press releases provide only generic

16

descriptions of the completed map's anticipated effects, not an expression of the Legislature's intent to draw the map based on impermissible racial considerations. *See Alexander*, 602 U.S. at 22 (statements of state actors considering race after map was drawn "mean[] little on [their] own" to establish intent). And while some legislators might have been "'*conscious*'" of race, that does not suffice to establish racial gerrymandering. *Id.* at 9 (citation modified). Nor would it suffice even if race were "*a* motivation for the drawing of a majority-minority district," for race must be "the '*predominant* factor' motivating the legislature's districting decision[.]" *Cromartie II*, 532 U.S. at 241 (citation modified); *see also id.* at 253 (finding a legislator's statement that a map would provide a fair "racial" balance insufficient to show that race predominated, even if it "shows that the legislature considered race").

Plaintiff-Intervenor takes a different tack, inferring racial intent on behalf of the Legislature because a few individual legislators made comments about an entirely *different* State's district map. ECF 29-1 at 11-12. But legislators' comments about the potential effects of Texas' redistricting on minority voting power do not prove that California's *response* to Texas' redistricting was an impermissible racial gerrymander. As the Supreme Court and U.S. Department of Justice recognize, race and partisanship are often highly correlated. *Alexander*, 602 U.S. at 6; U.S. Br., *Abbott*, at 8, Eason Decl., Ex. 4 at CA404. Such is the case in California. Grofman Report at 16 (seeking to add Democrats to a district, especially while also removing Republicans, "may well increase the Hispanic proportion"). The record here shows only that California legislators were concerned about the partisan gains that the Texas gerrymander would provide Republicans. *Supra* Background § (I)(A). And these statements fall woefully short of meeting Plaintiff-Intervenor's considerable burden to show that race predominated. *See, e.g.*, *Cromartie II*, 532 U.S. at 242 ("Caution is especially appropriate . . . where the State has articulated a legitimate political explanation for

1    its districting decision, and the voting population is one in which race and political

2    affiliation are highly correlated.").

3        At any rate, a few generic statements from a handful of lawmakers do not

4    establish an intent to engage in racially predominant redistricting.  This is so even

5    though some of the quoted lawmakers were proponents of the ERRA bills.  *See*

6    *United States v. O'Brien*, 391 U.S. 367, 384 (1968) ("What motivates one legislator

7    to make a speech about a statute is not necessarily what motivates scores of others

8    to enact it, and the stakes are sufficiently high for us to eschew guesswork.");

9    *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 689-90 (2021) (individual

10   statements of legislators cannot be imputed to the legislature as a whole because

11   "legislators who vote to adopt a bill are not the agents of the bill's sponsor or

12   proponents" and "[u]nder our form of government, legislators have a duty to

13   exercise their judgment").

14       Even if the Court credited those few statements in Challengers' favor, the vast

15   weight of the available evidence makes clear that the Legislature's repeatedly stated

16   goal in redistricting was to increase the number of Democratic-held congressional

17   districts in response to Texas' likely partisan gains.  ECF 16-3, Exs. 6-9; *supra*

18   Background § (I).  The Legislature expressly declared in passing ACA 8 that the

19   intent of the redistricting was to "neutralize the partisan gerrymandering being

20   threatened by Republican-led states without eroding fair representation for all

21   communities."  ACA 8 Findings (n).  Legislators' statements in favor of

22   redistricting, including on social media and during the legislative hearings on the

23

24

25

26

27

28

18

ERRA, confirm that intent:



Eason Decl., Ex. 33 at CA641.



*Id*., Ex. 34 at CA643. *See also*, *e.g.*, ECF 42-4 at 16-17 (Assm. Berman: "President Trump and Republicans in other states are attempting to redraw congressional districts mid decade in an effort to rig the upcoming election. . . . the [ERRA] is our response to these undemocratic and un-American power grabs."); *id.* at 27 (Assm. Lowenthal: "If unaddressed Texas actions . . . will disenfranchise Californians and we must not allow Californians voices to be silenced.  It is imperative that

Californians have a voice in selecting the political party that controls Congress in 2026."); *id*. at 29 (Assm. Quirk-Silva: "[Redistricting] was forced upon us by a president who has threatened, cheated, and tried to steal congressional seats to cling to power."); *id*. at 79 (Assm. Aarons: "We must take decisive action to stand up to Donald Trump's unprecedented call for Republican led states like Texas and Florida to redraw the Congressional lines and unfairly rig the 2026 midterm elections for Republican politicians to benefit."); *id*. at 82 (Assm. Berner: "[F]ight partisanship with partisanship. . . ."); ECF 42-6 at 23 (Sen. Gonzalez: "I rise today as a proud joint author to present AB 604 . . . a reasonable and rational response to the anti-Democratic actions of the Republican party as they attempt to rig our congressional elections."); *id*. at 66 (Sen. Umburg: "[W]e would not be here but for the President of the United States ordering Texas to create five new seats.").

Assemblymember Tangipa engaged in this exchange in a committee hearing considering AB 604, which proposed Prop 50's map:

> Assm. Tangipa: [H]ow did we take into consideration communities of interest? You know, were they done to protect race, religion, all the ideologies that we have right now to make sure that we're protecting the voters of California? Was that done in that consideration?
>
> Sen. Gonzalez: **It's a partisan gerrymander**. That's what we're talking about here. **This is partisan politics is what we're talking about here**. If Texas wants to—again, if Trump gives them a call and says, literally, as he did with Governor Abbott, find me five seats, well, we're not going to sit back and just say, well, it's okay, find the five seats. And you know what? Six million people will be taken off of [Medicaid] in California. . . . **So no, this is completely partisan politics here**.

ECF 42-5 at 246-47 (emphasis added).

Legislators opposed to redistricting—including Plaintiff Assemblymember Tangipa—also understood the partisan nature of the ERRA. *See* ECF 42-4 at 100 (Assm. Tangipa: "During committee hearings, one of our colleagues brazenly admitted that this entire thing [the ERRA] was about partisan gerrymandering. Admitted partisan politics. . . . An open admission to partisan gain."); *id*. at 35 (Assm. Gallagher: "It's about power on both sides, rigging congressional districts

to get partisan results."); *id*. at 48-49 (Assm. DeMaio: "You [supporters of ERRA] are openly admitting you're doing [redistricting] for partisan advantage."); *id*. at 76 (Assm. Patterson: "[History] certainly won't look highly on the partisan gerrymandered maps here in California."); ECF 42-6 at 30-31 (Sen. Strickland, to Sen. Gonzalez: "Would you, therefore, agree with Governor Newsom that the predominant purpose . . . of this constitutional amendment is to redraw these maps to elect more members of the Democratic party to the House of Representatives? . . . So it sounds like the answer is yes."); *id*. at 45 (Sen. Niello: "Governor Newsom wants five more democratic congressional seats.").

Assemblymember Tangipa even doubled down on confirming his understanding of Prop 50 redistricting as having been motivated by partisan aims in the last month:



**David Tangipa** ✔
@DavidTangipa

Prop 50 cost $300M, I warned we didn't have the money, & they cut my mic. Partisan gain mattered more than Californians, & now we'll pay the price

When cuts come, remember: "what about Texas" mattered more than you. Other states have surpluses. California has deficits.

Eason Decl., Ex. 35 at CA645; *accord id.*, Ex. 2 at CA388; *see also id.*, Ex. 36 at CA652 (Prop 50 "manipulates congressional boundaries for partisan gain under the false pretense of protecting voting rights").

Notably, in the three hearings on the ERRA included in exhibits to Plaintiff-Intervenor's complaint in intervention, speakers mentioned the terms "partisan" or "partisanship" 86 times, "Trump" 182 times, and "Republican" or "Republicans" 270 times. *See* ECF 42-4, 42-5, 42-6. In contrast, speakers mentioned "Latinos," "Latino," "Latinas," "Latina," "Hispanic," or "Hispanics" just eight times in those hearings. And not once in these hearings did anyone state that racial considerations were paramount above all other considerations or allege that the Legislature was

1    engaging in racial gerrymandering.

2        To the extent that the Legislature had goals beyond partisan aims in drawing

3    the Prop 50 map, those additional goals adhered to "traditional race-neutral

4    districting principles." *Miller*, 515 U.S. at 916.  The legislative history shows that

5    AB 604's authors sought to draw the Prop 50 map "follow[ing] the principles that

6    California voters value most in establishing legislative districts":

7    (1) "maintain[ing] the geographic integrity of even more cities than the current map

8    adopted by the Citizens Redistricting Commission," (2) "ensur[ing] that

9    communities of interest remain intact—a key principle of the constitutional

10   amendment establishing the Citizens Redistricting Commission—to exercise their

11   collective voice and vote to elect officials who truly represent them," and (3) doing

12   so "without diluting or favoring the voting power of any one voter over another."

13   Eason Decl., Ex. 13 at CA460-CA461.

14       In addition to the many direct statements from legislators indicating that Prop

15   50 was crafted to boost Democratic performance, the official materials presented to

16   the voters made plain Prop 50's partisan goal.  This is especially important here,

17   where the voters were "relevant state actor[s]" with respect to the adoption of the

18   Prop 50 map, *Alexander*, 602 U.S. at 8, and Challengers have offered *zero* evidence

19   of the electorate's intent in passing Prop 50.  In cases assessing equal protection and

20   other constitutional claims challenging voter-approved initiatives, courts "may look

21   to the nature of the initiative campaign to determine the intent of the drafters and

22   voters in enacting it." *City of L.A. v. Cnty. of Kern*, 462 F. Supp. 2d 1105, 1114

23   (C.D. Cal. 2006) (citing *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 471

24   (1982)).  And in determining the intent of a California voter-approved initiative, the

25   "ballot materials"—including the language of the initiative itself and "analyses and

26   arguments contained in the . . . ballot pamphlet" or Voter Information Guide—are

27   considered the best indicia of voters' intent in adopting the law.  *Robert L.*, 30

28   Cal.4th at 903-04 (citation modified).

The Official Voter Information Guide for Prop 50, which was mailed to every voter in California, included the full text of ACA 8.  Southard Decl. at 29.  And—like the ballot label that voters viewed when casting their votes, *see supra* Background § (I)(C); Southard Decl. at 10—the Legislature's express findings and declaration of intent in ACA 8 unequivocally informed voters of its partisan focus: "President Donald Trump has called on Republican-led states to undertake an unprecedented mid-decade redistricting of congressional seats to rig the 2026 United States midterm elections," with "[t]he State of Texas ha[ving] convened a special session of its Legislature to redraw congressional district maps to unfairly advantage Republicans."  ACA 8, Findings (a)-(e).  As such, ACA 8 stated "the intent of the people that California's temporary maps be designed to neutralize the partisan gerrymandering being threatened by Republican-led states without eroding fair representation for all communities."  *Id.* (n).

The official argument in favor of Prop 50 in the Voter Information Guide also expressly promoted Prop 50's partisan nature, encouraging voters to "*STOP TRUMP FROM RIGGING THE 2026 ELECTION*" and referencing "Texas Republicans['] . . . unprecedented power grab to steal congressional seats":

23

PROPOSITION **50** AUTHORIZES TEMPORARY CHANGES TO CONGRESSIONAL DISTRICT MAPS IN RESPONSE TO TEXAS' PARTISAN REDISTRICTING. LEGISLATIVE CONSTITUTIONAL AMENDMENT.

**★ ARGUMENT IN FAVOR OF PROPOSITION 50 ★**

*STOP TRUMP FROM RIGGING THE 2026 ELECTION*

Donald Trump and Texas Republicans are making an unprecedented power grab to steal congressional seats and rig the 2026 election before voting even begins.

Other Republican states are following suit. They want to steal enough seats to control Congress even if voters overwhelmingly reject their agenda.

This isn't politics as usual. It's an emergency for our democracy.

*ENSURE FAIR REPRESENTATION IN CONGRESS*

We have already seen how Trump has recklessly imposed tariffs and hurt California families, denied disaster assistance to fire victims, and ordered mass arrests without warrants. The 2026 election for Congress represents our only chance to provide an essential check and balance on Trump's dangerous agenda.

If Californians don't act now, Donald Trump will seize total power for two more years. Proposition 50, the Election Rigging Response Act, will put a stop to their anti-democratic scheme. Here's what it does.

• *LEVELS THE PLAYING FIELD.* Prop. 50 makes sure the 2026 mid-term elections are conducted on a level playing field without an unfair advantage for Republicans.

• *COMMITS TO FAIR REDISTRICTING.* Prop. 50 reaffirms California's commitment to independent redistricting and calls for a nationwide commitment to fair and impartial maps.

• *GIVES VOTERS THE POWER.* Prop. 50 puts the power in the hands of the People of California, not backroom politicians, to approve emergency congressional district maps in response to Trump's election rigging scheme.

• *IS FAIR AND PROPORTIONAL.* Prop. 50 provides emergency maps only because Republicans moved forward with their power grab.

• *IS TEMPORARY.* These maps expire in 2030. Prop. 50 preserves California's award-winning redistricting reforms and

reaffirms the California Citizens Redistricting Commission's authority to draw congressional districts after the next census. The stakes couldn't be higher. If Republicans rig the election and steal control of Congress next year, they'll continue to eliminate healthcare for millions of Americans, slash funding for schools, and cut essential services for veterans to pay for tax breaks for billionaires and big corporations.

*PROTECT DEMOCRACY IN ALL 50 STATES*

California has a duty to defend democracy. To do that, we can't unilaterally disarm or fight with both hands tied behind our backs. When Trump tries to rig elections, we must fight back with every tool available.

Prop. 50 draws fair maps that represent California's diverse communities and ensure our voices aren't silenced by partisan gerrymandering in other states.

California leads the nation in protecting voting rights and fair elections. When other states try to silence our voices and rig the system, we must respond decisively.

Join President Barack Obama, Governor Gavin Newsom, Senator Alex Padilla, Senator Adam Schiff, Speaker Emerita Nancy Pelosi, election experts, independent redistricting commissioners, Planned Parenthood, the NAACP, California veterans, teachers, and nurses.

Vote YES on Prop. 50 to stop Trump's election rigging scheme.

Vote YES for checks and balances.

Vote YES to protect democracy in all 50 states.

**Governor Gavin Newsom**

**U.S. Senator Alex Padilla**

**U.S. Speaker Emerita Nancy Pelosi**

Southard Decl., Ex. B at 16.  Moreover, the official argument *against* Prop 50 in the guide *also* acknowledged this reality, telling voters that Prop 50 "gives voters a take-it-or-leave-it decision on the most partisan maps in California's history":

24

AUTHORIZES TEMPORARY CHANGES TO CONGRESSIONAL DISTRICT MAPS IN RESPONSE TO TEXAS' PARTISAN REDISTRICTING. LEGISLATIVE CONSTITUTIONAL AMENDMENT.

**PROPOSITION 50**

★ **ARGUMENT AGAINST PROPOSITION 50** ★

**50**

**PROPOSITION 50: A POWER GRAB BY POLITICIANS**

Prop. 50 was written by politicians, for politicians. Prop. 50 dismantles constitutional safeguards that keep election maps fair. It removes requirements to keep cities, counties, and local communities together, and eliminates voter protections that ban maps designed to favor incumbents or political parties—putting politicians back in charge of drawing their own districts, or those of their friends.

A "NO" vote protects fair elections and keeps the people of California—not politicians—in charge of redistricting.

**NO ON PROP. 50: IT REPEALS LANDMARK VOTER-APPROVED ELECTION REFORMS**

For decades, Sacramento politicians drew their own district boundaries behind closed doors with no public oversight—guaranteeing their reelection, denying voters a real choice, and shutting out many women and people of color from elected office.

In 2008, California voters approved historic election reform—creating the independent California Citizens Redistricting Commission. Voters decided district lines should be drawn by a balanced panel of everyday citizens—not by politicians who stood to benefit.

Prop. 50 throws out citizen-drawn congressional maps created through a transparent public process with input from over 35,000 Californians. Instead, politicians secretly drew maps—leaving voters with NO real say.

**NO ON PROP. 50: ANOTHER SCHEME TO PERMANENTLY END INDEPENDENT REDISTRICTING**

In 2008 and 2010, the Democratic Party and special interests spent millions of dollars to stop citizen redistricting. Later, the California Republican Party even sued to overturn citizen-drawn maps—and lost. Now, Sacramento politicians are scheming to regain control with Prop. 50.

Make no mistake: Prop. 50 is not temporary. For over half a decade, politicians get to impose their gerrymandered maps. Worse, it sets a dangerous precedent—opening the door for

Sacramento to keep drawing election maps beyond 2031—giving politicians permanent power to shield themselves and their allies from accountability for California's high cost of living, skyrocketing housing costs, and rising energy bills.

**NO ON PROP. 50: DON'T BE MISLED BY POLITICAL SPIN**

The same politicians who opposed independent redistricting from the start now claim Prop. 50 will "save democracy." In truth, Prop. 50 weakens fair representation by shutting the public out and bringing gerrymandering back to California.

Prop. 50 is not democratic; it gives voters a take-it-or-leave-it decision on the most partisan maps in California's history—a product of politicians' secretive backroom deals with ZERO meaningful public engagement.

Prop. 50 divides communities to benefit politicians, splitting counties 114 times and cities 141 times—far more than the citizen-drawn maps.

*"When politicians gerrymander, they divide our neighborhoods and weaken the voice of communities of color. Whatever happens in Texas, we cannot save democracy by destroying it in California. Vote NO on Prop. 50."—Reverend Mac Shorty, Civil Rights Leader*

**NO ON PROP. 50: A MASSIVE WASTE OF TAXPAYER MONEY**

The Legislature has called a special election just to pass this politician-protecting constitutional change—costing taxpayers $200,000,000.

With a massive budget deficit, Sacramento politicians are making painful cuts to health care, housing, education, and public safety. Instead of protecting important programs, they're spending it on a political power grab.

Vote NO on Prop. 50.

VotersFIRSTAct.org

**Roberto Moncada**, Board Member
United Latinos Action

**Faith Bautista Tamashiro**, President
National Diversity Coalition

**Taylor Shorty**, Board Member
Community RePower Movement

*Id.* p. 17.

The press releases, social media posts, and press coverage of Prop 50—from the Yes on 50 and No on 50 campaigns, from the Governor, from the California Republican Party, and from legislators on both sides of the aisle—likewise conveyed to voters the singular message that Prop 50 was aimed at securing more Democratic congressional seats. Put simply, Challengers have not provided the kind of direct evidence from legislators demonstrating that race predominated in the map drawing that is necessary to show any chance of success on the merits of Challengers' racial gerrymandering claims. And, of course, Challengers have provided *no* direct evidence that race predominated in the minds of majority of the

1    California electorate who chose to approve the Prop 50 map.

2              **b.    Statements by Mapmaker Paul Mitchell**

3         Plaintiffs' only other direct evidence focuses on out-of-context statements by

4    Paul Mitchell, a redistricting consultant who prepared a map that was submitted to

5    the Legislature by a third party and, with some modifications, was ultimately

6    passed by the Legislature and put to voters through Prop 50.  Mitchell is not a state

7    actor and was not hired by the Legislature.  *See* ECF 20-1 ¶ 5.  Even so, read in

8    context, his statements make plain that race did not predominate his map drawing

9    decisions.

10        Initially, Mitchell prepared a map.  Defendant-Intervenor the Democratic

11   Congressional Campaign Committee ("DCCC") learned about Mitchell's map and

12   proposed revisions to further increase Democratic performance in various districts.

13   ECF 20-1 ¶¶ 5-6.  DCCC then paid Mitchell to obtain a copy of the revised map

14   and submitted it to the Legislature, which made additional changes before adopting

15   it and sending it to the voters for approval.  *Id.*

16        Mitchell is not the decisionmaker whose motives matter to the analysis here.

17   In redistricting cases, the question is generally whether "the *legislature* was

18   motivated by race as opposed to partisanship."  *Alexander*, 602 U.S. at 6.  Courts

19   have considered statements and actions by unelected state employees and even

20   independent consultants hired by States in attempting to ascertain a legislature's

21   intent.  *See*, *e.g.*, *id.* at 13 ("nonpartisan staffer"); *Cooper*, 581 U.S. at 300

22   ("consultant" hired and directed by two legislators).  But such cases have involved

23   employees or consultants acting at a legislature's behest.  Here, by contrast, the

24   order of operations was reversed:  Mitchell prepared the map *first*, and then the map

25   was submitted (after modification by DCCC) to the Legislature.  Challengers offer

26   no theory explaining why offhand remarks by a private consultant should be

27   attributed to the Legislature as a whole to determine the Legislature's intent, let

28

1    alone the intent of the California voters who overwhelmingly adopted Prop 50 as it

2    was posed to them:  a partisan measure to gain Democratic congressional seats.

3        *Lee v. City of Los Angeles*, 908 F.3d 1175 (9th Cir. 2018), is instructive.  That

4    case concerned city council districts drawn by the City of Los Angeles.  Plaintiffs

5    pointed to statements from two officials involved in drafting the challenged district

6    that suggested a predominantly racial motive.  *Id.* at 1183.  The Ninth Circuit found

7    that evidence that suggested those officials had a primarily racial motive was

8    insufficient to show that "race was the *predominant* factor motivating the

9    *legislature's* decision."  *Id.* at 1184 (citing *Cooper*, 581 U.S. at 291).  In affirming

10   the district court's grant of summary judgment against the plaintiffs, the Ninth

11   Circuit noted that the two officials who made racial statements were "only two

12   people in a process that incorporated multiple layers of decisions and alterations"

13   and the map was not adopted "as is."  *Id*.  These layers of review and input from

14   multiple sources were crucial because "[e]ven viewed in the light most favorable to

15   Plaintiffs, the record fail[ed] to show that [] successive amendments were driven

16   predominantly by racial considerations."  *Id*.; *see also Prejean v. Foster*, 227 F.3d

17   504, 510 (5th Cir. 2000) (statements of mapmaker who drew district cannot be

18   taken as conclusive evidence of the intent of the legislature).  As in *Lee* and

19   *Prejean*, here the evidence of Mitchell's intent may at best support *inferences* about

20   intent in drawing the original map lines, but even those weak inferences cannot be

21   imputed to the Legislature—especially considering that DCCC proposed changes to

22   the original map to further advance partisan goals and the Legislature later amended

23   Mitchell's proposed map before adopting it.

24       Even considering the substance of Mitchell's statements, their context makes

25   clear that his motives were predominantly partisan, not racial.  At most, his

26   statements indicate that in working toward partisan objectives, Mitchell maintained

27   a legally permissible background awareness of race, sought to minimize changes to

28   the composition existing 2021 map while improving Democratic performance

redistricting history, and the requirements of the Voting Rights Act.  *Cf. Alexander*, 602 U.S. at 22 ("we expect that 'redistricting legislatures will . . . almost always be *aware* of racial demographics'") (emphasis added).

Challengers rely on two sets of remarks:

First, they point to a *Capitol Weekly* podcast interview with Mitchell published on August 15, 2025, the day DCCC submitted its proposed map to the Legislature. Mitchell explained that he had been asked by "people in the Democratic eco stream" if it was possible to create a map with "six or seven or eight Democratic pick-ups" or even a "52/0 map."  ECF 16-3, at 8.  Mitchell said he had responded to questions like this by explaining that "we can create a five district pick-up map" while still "follow[ing] the Voting Rights Act, keep[ing] communities of interest together," and minimizing changes that would split cities or neighborhoods.  *Id.* at 8-9; *see also Cooper*, 581 U.S. at 291, 308 (listing respect for political subdivisions as a traditional redistricting principle).  Mitchell's suggestion that he sought to create a partisan advantage, while *also* considering other permissible criteria, does not suffice to show that race *predominated* in his drawing of the map lines.  *See Cromartie II*, 532 U.S. at 253.

Second, Challengers highlight remarks made by Mitchell several months after his work on the map ended and while the campaign to pass Prop 50 was nearing its end.  According to Challengers, Mitchell gave a Zoom presentation at a meeting organized by Hispanas Organized for Political Equality ("HOPE").  During the previous redistricting cycle, that group expressed concern about the elimination of Representative Roybal-Allard's district—which they noted had been "called by the LA Times the most Latino district in the country"—and had made two requests to the Redistricting Commission in response.  ECF 42-3 at 25-26.  The first was to create a new "gateway cities district centered around Downey."  *Id.* at 25.  The second was to extend the "LB [Long Beach] North" district, "now the Robert Garcia District," through Seal Beach into Huntington Beach, which would result in

1   a district "35 percent Latino by voting age population." *Id.* at 26.  On the Zoom

2   presentation with HOPE, Mitchell stated that addressing the organization's two

3   prior suggestions were "the first thing we did in drawing the new map." *Id.*

4        In reality, though, neither of these two changes appears in the Prop 50 map.

5   As an initial matter, the district on the Prop 50 map that includes Downey—District

6   41—is the district that Mitchell characterized as essentially "the old . . . Roybal-

7   Allard district" (former District 40).  ECF 16-3 at 14; Eason Decl., Ex. 37 at

8   CA658.  Rep. Roybal-Allard—a Democrat—won this district in 2020 with over

9   70% of the vote.  *Id.*, Ex. 38 at CA660.  According to 2011 data, that district had an

10  86.5% Latino population.  *Id.*, Ex. 39 at CA681.  But after California lost a seat in

11  the prior redistricting cycle, the Commission chose to eliminate this district.  ECF

12  16-3, at 10.  Mitchell explained that "the first thing we did" was "kind of und[o]

13  what the Commission did last time in putting that [Rep. Roybal-Allard's district]

14  back in LA and kind of eliminating that [Republican Rep. Ken] Calvert seat."  ECF

15  16-3 at 10.  But while the new "kind of" restored version of the Roybal-Allard

16  district in the Prop 50 map still leans Democratic, it has only a 60.8% Latino

17  population—much lower than its predecessor.  Eason Decl., Ex. 40 at CA691.  In

18  other words, although Mitchell observed that Rep. Roybal-Allard's district had

19  "historically" been home to "a Latino community," the new district's significantly

20  lower Latino population is indirect evidence that Mitchell's motive was more likely

21  partisan than racial, especially combined with the portion of this statement

22  Challengers omit:  this move allowed Mitchell to "eliminat[e] the Ken Calvert

23  district," ECF 42-3 at 26, a key component of achieving the partisan goal of

24  flipping five seats.

25

26

27

28

Moreover, the new iteration of this district bears little resemblance to its predecessor that Mitchell purported to have "essentially" restored. Shown below is District 41 in the Prop 50 map. *See* Eason Decl., Ex. 40 at CA733.



And shown below is former District 40. *See* Eason Decl., Ex. 41 at CA746.



30

Second, as to the Long Beach district currently represented by Representative Garcia—District 42, *see* Eason Decl., Ex. 42 at CA748—Plaintiffs emphasize that Mitchell told HOPE he had implemented their objective and made this district "a Latino-influenced district at 35 percent Latino by voting age population," *see* ECF 16-1 at 17-18.  But despite Mitchell's representations to HOPE, the Long Beach district included in the Prop 50 map does not actually implement HOPE's request.  The Prop 50 version of this district extends not only into Seal Beach and parts of Huntington Beach, as HOPE had requested, but also much further south into Newport Beach and Costa Mesa, *see* Eason Decl., Ex. 40 at CA734, and has a Latino citizen voting age population ("CVAP") under 25%, not 35%, *id.*[9]

Moreover, Challengers ignore the fact that in the same HOPE presentation, Mitchell *also* emphasized that before anything else, he started with the "the Redistricting Commission's criteria and the Redistricting Commission's actual maps."  ECF 42-3 at 24-25.  "One of [his] first rules of the process [of mapdrawing] was that [h]e would follow the Commission process and have a lot of respect for the Commission work product," as well as "preserve communities of interest."  ECF 42-3 at 24.  These statements reflect his emphasis on adherence to traditional race-neutral redistricting principles, including "keeping communities of interest together," *Rucho*, 588 U.S. at 706–707, and "minimizing change," *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 259 (2015).

Challengers also ignore many other statements Mitchell made closer in time to his work on the map in which he underscores his partisan motive.  For example, on August 15th, Mitchell said, "We have these five Democrat pickups, but we also have about five seats where we have Democrats who [] maybe won by a couple hundred votes in the last election and we can't afford for a Republican to pick that

---

[9] According to sources Plaintiff-Intervenors rely upon, a CVAP under 30% no longer qualifies as an "influence" district.  ECF 29-1 at 9.  Moreover, a district is not an influence district simply because it exceeds 30% threshold.  Grofman Report at 15.

seat up and eat into these potential gains.  So *we did a lot to bolster democratic candidates up and down the state that are potentially in tough races like Adam Gray in the Central Valley.*"  California Redistricting Latest: Mapmaker says politics played a role, ABC10, Aug. 16, 2025, Video at 1:18-37, https://tinyurl.com/wde26vz6 (emphasis added).  In another interview, Mitchell further clarified his purpose, saying, "[t]here's the changes where *we sought to increase the partisanship of a district* so that we could get a Democrat elected in order to combat what Trump is doing."  Eason Decl., Ex. 43 at CA751.  And he explained that in other districts, "you might see people moving because of all the other" adjustments to district lines.  *Id.*

In short, the few scattered statements by Mitchell on which Challengers rely do not suggest that race predominated in his decisions during the drafting of what ultimately became the AB 604 map.  Indeed, his own statements confirm his overarching motivation was partisan gain.  Mitchell's statements do not support the conclusion that race predominated the decision-making of either the Legislature or California voters.

### 2.    Challengers' Circumstantial Evidence Also Fails to Establish That Race Predominated

Having failed to establish through direct evidence that race predominated, Challengers attempt to bolster their racial gerrymandering claims with circumstantial evidence.  Challengers' circumstantial evidence and arguments do not overcome the presumption of legislative good faith or suggest that race predominated the Legislature's or voters' decision-making over traditional race-neutral redistricting principles.

### a.    District 13's Borders

The analysis conducted by Plaintiffs' expert, Dr. Sean Trende—relied upon by all Challengers—is flawed on several grounds.

First, he inappropriately focuses on three "very small" subparts of District

13, and only criticizes two of those subparts, without analyzing the entire district.[10]
ECF 16-5 at 20-21; *see also* Report of Dr. Jonathan Rodden, ECF 112-3 at 4;
Grofman Report at 12.   Notably, Dr. Trende credits the Legislature for drafting a
small subpart around Madera without race as a predominant factor.  *See* ECF 16-5
at 21 (noting that the small area "does not appear to be motivated by race").  Then,
using misleading choropleth visuals, *see* ECF 112-3 at 11, he suggests that the
Legislature prioritized Latino inclusion over partisanship in the two small subparts
he does criticize.

     This piecemeal approach is flawed.  "[T]he basic unit of analysis for racial
gerrymandering claims in general, and for the racial predominance inquiry in
particular, is the district." *Bethune-Hill*, 580 U.S. at 191.  "Courts evaluating racial
predominance therefore should not divorce any portion of the lines—whatever their
relationship to traditional principles—from the rest of the district." *Id.* at 191-92.
Courts can review evidence smaller or larger than the district, but "[t]he ultimate
object of the inquiry . . . is the legislature's predominant motive for the design of
the district as a whole." *Id.* at 192.  Challengers do not analyze District 13 on a
district-wide level except to say that it has "relatively unremarkable boundaries,"
ECF 16-5 at 20, and that "the district performs better politically for Democratic
Representative Adam Gray than did the previous iteration of the district," *id.* at 21.
Defendants agree—and that conclusion is entirely consistent with the State's
purpose of bolstering partisan aims when drawing the boundaries of the "relatively
unremarkable" District 13.  *Id.* at 20.

     If Challengers and their expert *had* properly analyzed the entirety of District
13, the data would have required them to conclude there is no evidence—

---

[10] Though Plaintiffs attempt no district-wide analysis of District 13, Plaintiff-Intervenor impugns District 13 as a whole by adding that "District 13 contains a notably higher percentage of Hispanic individuals than the counties within the District."  ECF 29-1 at 17.  Plaintiff-Intervenor fails to explain why a district must not have a Latino CVAP greater than that of the counties partially included within that district.

circumstantial or otherwise—of racial predominance.  The prior iteration of District

13 approved by the Commission, which Plaintiffs seek to reinstate, had a Latino

CVAP of 54.0%.  Grofman Report at 15, 20.  The new District 13 under the Prop

50 map has a Latino CVAP of 53.8%—a very slight decrease.[11]  *Id.*  The minor

decrease in this population directly contradicts Challengers' assertion that the

Legislature drew District 13 with the primary purpose of increasing Latino vote

share.  Rather, the 2.9% increase in Democrats' 2024 Presidential vote share within

the new boundaries of District 13, *see id.* at 20, shows that Plaintiffs cannot "rul[e]

out the competing explanation that political considerations dominated," *Alexander*,

602 U.S. at 9.[12]

Second, the nature of Dr. Trende's critique—that the two subparts of District

13 do not maximize Democratic vote share—is also unsound.  Dr. Trende presumes

that race must have predominated because the Legislature potentially *could* have

included some additional Democrats in the new District 13.  But he ignores obvious

countervailing considerations.  First, it is not always possible to include every

conceivable party voter in a district due to the need to equalize population across

districts and avoid unnecessary splits of county and municipal boundaries.  ECF

112-3 at 23.  Second, the Legislature did not leave Democratic voters "on the table"

in the Stockton area, as Dr. Trende suggests—it strategically divided them between

two Democratic districts.  The Democrats to which Dr. Trende refers reside in

---

[11] Dr. Grofman's figures use 2023 adjusted CVAP.  Using 2019 CVAP data, which the Commission relied upon in drawing its map, Latino CVAP decreased more significantly in the new District 13, from 50.2% to 49.5%. *See* Grofman Report at 20.  Citing an article from Drs. Raquel Centeno and Jarred Cuellar, Plaintiff-Intervenor claims the Latino CVAP for District 13 instead increases under the Prop 50 map.  ECF 29-1 at 5-6.  But the cited authors relied on a flawed use of data, improperly comparing the Commission map (while using 2019 data) to the Prop 50 map (while using 2023 data).  *See* Grofman Report at 14-15.

[12] Using 2020 data rather than 2023 data, Defendant-Intervenor DCCC's expert shows that Latino CVAP increased in the new District 13 by a negligible 0.06% while Democratic vote share increased by 3.23%.  ECF No. 112-3 at 9-10.  These figures are consistent with Dr. Grofman's findings in showing that Latino CVAP barely changed while Democratic vote share increased substantially.

District 9, a "crossover" district that in 2024 voted for Democrat Josh Harder for Congress and Republican Donald Trump for President. *See* Eason Decl., Ex. 44 at CA758-CA764. In fact, in 2024, Districts 9 and 13 were the only two such crossover districts in California. *See id*. Dr. Trende's analysis ignores the reality that the only way to move these additional Democratic votes in Stockton to District 13 would be to weaken Democratic performance in District 9.

Third, Dr. Trende selectively ignores and consequently fails to rebut evidence of the Legislature's partisan intent. For example, Dr. Trende incorrectly asserts that the Legislature primarily focused on picking up Latino votes in District 13. However, the Prop 50 version of District 13 also excluded areas with many Latino voters in a way that advantaged Democrats. One such area is the geographically large, rural segment of the prior District 13 that was heavily Latino but less Democratic than the areas added in Stockton. ECF 112-2 at 5-6. Excluding this area fits the Legislature's general pattern for District 13 of excluding rural census blocks of the former District 13 (which favor Republicans), and including urban census blocks of other former districts (which favor Democrats). *Id.*

Dr. Trende also fails to consider how the Legislature clearly drew District 13 to protect the Democratic Party's most vulnerable incumbent, Representative Adam Gray, who in 2024 won this previously Republican district by less than 200 votes. Eason Decl., Ex. 45 at CA769. Dr. Grofman found that the Legislature had a partisan motivation behind including Ceres in District 13. Despite Dr. Trende's characterization of the city as "Republican territory," Ceres "consistently voted for [Representative] Gray in all seven general elections in which he had appeared on the ballot" as an Assemblymember. Grofman Report at 14; Eason Decl., Ex. 45 at CA773-CA777. The partisan purpose behind this decision is evident—bring Representative Gray's former constituents into District 13 under the reasonable assumption they will vote for him again.

1        At bottom, then, District 13 was drawn consistent with—rather than in

2    conflict with—traditional redistricting criteria such as geographic considerations

3    and partisan concerns such as "protecting [the] incumbent[]." *Alabama Legislative*

4    *Black Caucus*, 575 U.S. at 259.  Rather than recognizing the well-settled

5    presumption of legislative "good faith," *Miller*, 515 U.S. at 915-16, Challengers

6    wield the "offensive and demeaning" accusation that the Legislature racially

7    gerrymandered District 13 because the Legislature did not perfectly enhance

8    political gain and maximally distribute racial demographic groups.  *Alexander*, 602

9    U.S. at 11.  This contradicts decades of Supreme Court precedent that puts the onus

10    on Challengers to prove their claims of racial gerrymandering.  Because

11    Challengers cannot "disentangle race from politics" to prove that race "*drove*

12    [District 13's] lines," their claims have no chance of success on the merits.  *Id.* at 9

13    (emphasis in original), citing *Cooper*, 581 U.S. at 308.

14                 **b.**    **Alternative Maps of District 13**

15        Plaintiffs' expert also proffers three alternative maps for District 13, but these

16    maps do not satisfy Plaintiffs' burden to "show[] how the State could have achieved

17    its legitimate political objectives" in District 13—much less in any other challenged

18    district—while producing "significantly greater racial balance." *Alexander*, 602

19    U.S. at 34 (citation modified).  Plaintiff-Intervenor proffers no alternative map.

20        Plaintiffs assert that Dr. Trende's alternative maps show how the Legislature

21    could have drawn District 13 with a "more regular configuration" to achieve its

22    political goals without "target[ing]" race.  ECF 16-1.  But Dr. Trende does not

23    show why District 13 needs a more regular configuration, as District 13 "is one of

24    the most compact districts in the Prop 50 map."  Grofman Report at 0013.  And Dr.

25    Trende's alternative maps make only "subtle" changes to District 13 that, as Dr.

26    Trende's own data shows, result in minimal or no improvement in compactness or

27    Democratic performance.  *See* ECF 16-5 at 38, 40, 42; Grofman Report at 0012-

28    0013; ECF 112-3 at 26-28.

1    Plaintiffs' proposed alternative maps are unhelpful solutions to a non-existent

2    problem, and do not support a conclusion that the actual District 13 map was

3    motivated by race.  Having failed to proffer alternative maps for any of the other

4    challenged districts or any direct evidence that race predominated, Challengers

5    cannot "defeat our starting presumption that the legislature acted in good faith" as

6    to those districts.  *Alexander*, 602 U.S. at 10.

7                    **c.    Statewide Effects on Latino Voting Power**

8        Challengers' only other purported circumstantial evidence of racial

9    predominance in the remaining districts is an asserted change in Latino voting

10   power relative to the prior map—a change that did not actually occur.

11       Plaintiffs contend that the 2021 Commission map included "fourteen districts

12   favoring Hispanic voters," referring to majority-minority districts drawn for the

13   express purpose of complying with the VRA (commonly known as a "VRA

14   district").  ECF 16-1, at 18.  Plaintiffs then note that the Prop 50 map includes

15   sixteen majority-Latino districts, ECF 16-1 at 11; ECF 16-7, at 30, tbl. 2,

16   suggesting that the Legislature created two additional districts in the Prop 50 map

17   to favor Latino voters.  ECF 16-1 at 18.  But that suggestion "is wrong[,]" because

18   both the Prop 50 map and the prior map contain sixteen Latino-majority districts.

19   Grofman Report at 0011.  In suggesting otherwise, Plaintiffs appear to "conflate[]

20   Hispanic CVAP majority districts with districts that elect a person . . . of Hispanic

21   heritage, who is also a Hispanic community's candidate of choice," *id.*, or a VRA

22   district with any district that has a majority-minority population.  But they are not

23   the same.  *See Pierce v. N. Carolina State Bd. of Elections*, __ F.Supp.3d __, No.

24   4:23-CV-193-D, 2025 WL 2841008, at *13 (E.D.N.C. Sept. 30, 2025) (explaining

25   that VRA districts are "districts 'required by' the VRA").

26       A VRA district is drawn to allow a minority group an opportunity to elect their

27   candidates of choice.  Whether such a district is required involves careful

28   consideration of several factors, including determining whether the minority group

37

is geographically compact and politically cohesive and whether the majority votes as a bloc to defeat the minority group's candidate of choice.  *See Thornburg v. Gingles*, 478 U.S. 30, 46-51 (1986).  And VRA districts must consider the totality of the circumstances, including a history of official discrimination in the state.  *Id.* at 36-38.  This *may* result in the creation of a majority-minority district, but the analysis does not require that outcome.  Further, a majority-minority district may occur for the simple reason that a significant number of one minority group resides in a geographic area without the other *Gingles* factors being present.  *See*, *e.g.*, Grofman Report at 0015-0016.  Comparing apples to oranges, Plaintiffs seek to confuse the Court by pointing to the fourteen *VRA districts* in the Commission map and the sixteen *majority-Latino* districts in the Prop 50 map and concluding that the Legislature added two new VRA districts.  But comparing apples to apples, the Commission map has sixteen majority-Latino districts and the Prop 50 map has sixteen majority-Latino districts.  Grofman Report at 11.

Thus, notwithstanding Challengers' scattershot allegations of racial gerrymandering, the map enacted by Prop 50 would have the *exact same number* of majority-Latino districts as the map it replaces.  And the fact that Latino voters constitute a majority in some districts is no more evidence of racial gerrymandering than the existence of several majority white districts in California.[13]

Plaintiff-Intervenor also alleges that the Legislature created one or two new "Latino-influence" districts in the Prop 50 map, and argues that this evidences racial predominance.[14]  Not so.  The only evidence Plaintiff-Intervenor cites for its proposition is two independent studies, neither of which supports their central

---

[13] The Prop 50 map contains twenty-two districts that have a white CVAP greater than 50%.  *See Proposed Congressional Map*, CALIFORNIA STATE ASSEMBLY – COMMITTEE ON ELECTIONS (last visited 5:45 p.m., Nov. 30, 2025), https://tinyurl.com/3ac2cnuz.

[14] An "influence district" is one where "a minority group can influence the outcome of an election even if its preferred candidate cannot be elected."  *Bartlett v. Strickland*, 556 U.S. 1, 13 (2009).

claim.  One, by the Public Policy Institute of California ("PPIC"), is a blog post claiming that the Prop 50 map contains one additional unspecified Latino-influence district.  ECF 29-1 at 16.  But the PPIC's post—which Plaintiff-Intervenor cites but does not provide to the Court—concludes that "[t]he proposed redistricting plan has a single overriding goal: *to elect more Democrats*."  Eason Decl., Ex. 47 at CA821 (emphasis added).  It also states that "[t]he plan as a whole is very similar to the [Commission map] in most respects; it deviates mostly by creating more Democratic seats." *Id*.

The other is a study by Drs. Centeno and Cuellar that identifies Districts 20 and 48 as the new Latino-influence districts.  *See* ECF 29-1 at 16; ECF 16-4, Ex. 22.  The authors' use of data was flawed, as noted in footnote 11 above.  More fundamentally, neither Plaintiffs nor Plaintiff-Intervenor explicitly claims that District 20 or District 48 is an unconstitutional racial gerrymander.  Instead, Challengers vaguely assert that the addition of two "influence" districts suggests more generally that "legislators were successful in their efforts to increase Latino voting power."  ECF 29-1, at 12.  But in addressing these supposed new "influence" districts, Challengers do not even attempt to "rul[e] out the competing explanation that political considerations dominated." *Alexander*, 602 U.S. at 9; *see also Cromartie II*, 532 U.S. at 249 ("[T]he Constitution does not place an affirmative obligation upon the legislature to avoid creating districts that turn out to be heavily, even majority, minority.  It simply imposes an obligation not to create such districts for predominantly racial . . . motivations.").

In sum, Challengers' alleged direct and circumstantial evidence of discrimination here does not show that race predominated in drafting the Prop 50 map.  And it bears no resemblance to the evidence the district court in the recent *LULAC* ruling held did meet the high burden of showing that race predominated.  There, the majority of the three-judge district court found (among other things) that Texas redistricted in response to a letter from the federal government—Plaintiff-

1    Intervenor here—that effectively "directed Texas to engage in racial

2    gerrymandering," *LULAC*, slip op. at *59; that Texas lawmakers initially turned

3    down redistricting efforts based on partisan considerations and only adopted new

4    maps in response to Plaintiff-Intervenor's letter and proposals for race-based

5    gerrymandering, *see id.* at *66-79; that the Governor of Texas disavowed any

6    partisan objective and stated that the goal of the redistricting effort was to address

7    the race-based concerns raised by Plaintiff-Intervenor, including redistricting in a

8    special legislative session only after receiving the letter, *id.* at *61-64; and that four

9    districts were redrawn along lines that strongly suggested a racial target—in

10   particular, a target of "on-the-nose attainment of" majority status for certain racial

11   groups, *id.* at *105 (internal quotation marks omitted); *see also id.* at *35-40.

12   Challengers have demonstrated nothing remotely comparable here to carry their

13   burden.

14       **B.    Without Predominance, Strict Scrutiny Does Not Apply**

15       Challengers have failed to carry their heavy burden to show that race was the

16   predominating factor in the Legislature's proposal of the Prop 50 map or the voters'

17   adoption of it.  This is fatal to Challengers' claims.  The Court's analysis stops

18   there; it need not address whether the State had a compelling interest in race-

19   motivated districting since no such race-motivated districting occurred.

20       **C.    Plaintiffs' Fifteenth Amendment Racial Gerrymandering Claim
              Is Considered Under the Same Rubric as Their Fourteenth**

21   **Amendment Claims**

22       Plaintiffs purport to plead a separate racial gerrymandering claim under the

23   Fifteenth Amendment.  *See* ECF 16-1 at 23.  However, the Supreme Court's racial

24   gerrymandering case law has clearly developed under the Equal Protection Clause

25   of the Fourteenth Amendment.  *See, e.g.*, *Miller*, 515 U.S. at 904; *Abbott v. Perez*,

26   585 U.S. 579, 585 (2018); *Cromartie II*, 532 U.S. at 237; *Cooper*, 581 U.S. at 285.

27   Regardless of the amendment, though, the test remains the same.

28       Claims brought under the Fifteenth Amendment are reserved for government

actions that *deny or abridge* the right to vote.  *See City of Mobile v. Bolden*, 446 U.S. 55, 65 (1980) (plurality opinion) (emphasis added), *superseded by statute on other grounds*; *accord Gomillion v. Lightfoot*, 364 U.S. 339, 345 (1960) (striking down municipal boundaries under Fifteenth Amendment on the grounds that boundaries wholly and discriminatorily denied Black voters the right to vote in municipal elections).  For example, a court found that a redistricting plan did not amount to a violation of the Fifteenth Amendment absent a showing that any voter was denied the *ability* to vote.  *See Backus v. South Carolina*, 857 F.Supp.2d 553, 569 (D.S.C. 2012), *affirmed* 568 U.S. 801 (2012).  Thus, the Fifteenth Amendment does not on its own provide a vehicle to redress Plaintiffs' alleged "stigmatic and representational" harms, *see* ECF 1 ¶¶ 6-24, that do not in any way deny or abridge their right to vote.  *See also U.S. v. Hays*, 515 U.S. 737, 744 (1995) (describing abstract racial classifications as "stigma[tic]" and "representational" harms), citing *Shaw v. Reno*, 509 U.S. 630, 643, 648 (1993) (*Shaw I*).[15]

## II.    PLAINTIFF-INTERVENOR HAS NOT SHOWN ANY CHANCE OF SUCCESS ON THE MERITS OF ITS VOTING RIGHTS ACT CLAIM

Conflating the applicable law, Plaintiff-Intervenor attempts to graft a meritless claim under Section 2 of the Voting Rights Act onto its Fourteenth Amendment racial gerrymandering claim.  *See* ECF 29-1 at 14-15.  Plaintiff-Intervenor argues that Prop 50 "was adopted with the purpose of denying or abridging the right to vote on account of race or color in violation of Section 2."  ECF 42 ¶ 70.  However,

---

[15] Plaintiffs suggest that courts should analyze racial gerrymandering claims under the Fifteenth Amendment differently than they would under the Fourteenth Amendment, citing a case they suggest eliminates the compelling interest defense for racial gerrymandering claims.  *See* ECF 16-1 at 23 (citing *Prejean*, 227 F.3d at 519).  However, *Prejean* does not hold that a State cannot assert a compelling interest as a defense to a racial gerrymandering claim.  In fact, it says the opposite.  The plaintiffs there challenged a Louisiana judicial district as a racial gerrymander, and the court's analysis of that claim proceeded exclusively under the Fourteenth Amendment, *Prejean*, 227 F.3d at 509, including reviewing Louisiana's proposed compelling interest, *id.* at 515.  The language Plaintiffs cite suggesting that there is no compelling interest defense to a Fifteenth Amendment claim actually concerns disenfranchisement claims, not racial gerrymandering claims.  *Id.* at 519.

it ignores (and consequently fails to carry) its burden to provide "[p]roof of racially discriminatory intent or purpose" to deny or abridge the right to vote of an identified minority group. *Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989, 1038 (9th Cir. 2020) (en banc), *rev'd on other grounds sub nom. Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647 (2021).

Indeed, Plaintiff-Intervenor's intentional discrimination claim under the VRA fails at the outset because it does not even identify which minority group's voting rights the Prop 50 map supposedly seeks to deny or abridge. *See* ECF 29-1 at 15-20, 42 ¶¶ 69-71. Because claims of intentional discrimination under Section 2 seek to remedy government action taken with "invidious" racially discriminatory purpose, *see Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977), to impose "adverse effects upon an identifiable group," *see Democratic Nat'l Comm. v. Reagan*, 904 F.3d 686, 717 (9th Cir. 2018) (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)), they are distinct from racial gerrymandering claims, which provide a remedy regardless of whether a legislature intended to harm a particular minority group's ability to elect their preferred candidate, *see Hunter by Brandt v. Regents of the Univ. of Cal.*, 971 F.Supp. 1316, 1322 (C.D. Cal. 1997); *Adarand Constructors v. Pena*, 515 U.S. 200, 227-28 (1995).

Plaintiff-Intervenor does not claim that the Legislature here intended to harm a particular minority group. Nor does it claim that the Legislature denied or abridged anyone's right to vote. It instead claims that the Legislature drew the Prop 50 map to benefit Latino voters because it contains Latino-majority districts and Latino-influence districts. Defendants deny that this motivated the Legislature's drawing of the Prop 50 map or the voters' adoption of it, but in any case, governing precedent soundly rejects the notion that the mere existence of majority-minority districts reflects invidious intent. *See*, *e.g.*, *Cromartie II*, 532 U.S. at 249. Plaintiff-Intervenor thus confuses the relevant standards. It cannot show that the Legislature

42

had any "invidious" racially discriminatory purpose to impose "adverse effects upon an identifiable group," *Arlington Heights*, 429 U.S. at 266; *Reagan*, 904 F.3d at 717, so it attempts to import racial gerrymandering case law that does not require proof of invidious intent into its Section 2 claim. And unable to satisfy its high burden to show that race was the predominant motivator of the Legislature's line-drawing, *Alexander*, 602 U.S. at 7, Plaintiff-Intervenor also improperly attempts to import a portion of Section 2's standard that invidious racial intent need only be a motivating factor into its Fourteenth Amendment racial gerrymandering claim. But Plaintiff-Intervenor's constitutional and statutory claims are separate, and it fails to show any chance of success on either.

## III. CHALLENGERS CANNOT ESTABLISH THE REMAINING PRELIMINARY INJUNCTION FACTORS

### A. Irreparable Harm

Plaintiffs argue they "will suffer disenfranchisement, dilution of rights, or other harms to protected voting interests that cannot be quantified or remedied later." ECF 16-1 at 32. But Plaintiffs make no showing that any voters will lose their right to vote because of Prop 50. Nor have Plaintiffs presented any evidence to support their asserted "dilution of rights." And Plaintiffs' vague reference to "other harms" cannot provide a basis for finding irreparable harm.

Plaintiffs also appear to argue that because the Commission's map includes fourteen districts drawn to comply with the VRA and the Prop 50 map (allegedly) adds two more districts drawn to comply with the VRA, voters living in these new districts—which Challengers never identify—might be irreparably harmed if they must vote in them. *See* ECF 16-1 at 17; ECF 1 ¶ 70. But the "possibility" of harm does not demonstrate irreparable harm. *Winter*, 555 U.S. at 22. Plaintiffs make no showing that any of them lives in the two unidentified districts they allege are new VRA districts, raising a threshold question as to whether they even have standing to assert their claims; voters generally lack standing to bring racial gerrymandering

1    claims against districts in which they do not reside.  *Hays*, 515 U.S. at 744-45.

2           Further, as discussed above, Plaintiffs' claim that the Prop 50 map creates two

3    new VRA districts relies on a faulty premise, and both the Commission map and

4    the Prop 50 map contain the same number of Latino-majority districts.  Left with

5    two maps that include an equal number of Latino-majority districts, and no

6    allegation that any individual Plaintiff will move from a non-Latino-majority

7    district into a Latino-majority district under the new map lines, Plaintiffs do not

8    explain how they would suffer irreparable harm if the Court does not mandate use

9    of the Commission's map containing sixteen Latino-majority districts rather than

10   Prop 50's map containing sixteen Latino-majority districts.

11          Plaintiff-Intervenor's attempt to show irreparable harm with respect to their

12   Section 2 claim is likewise lacking foundation.  ECF 29-1 at 21-22.  Beyond a bare

13   assertion of the United States' sovereign interest in ensuring that States follow

14   federal law, *id.* at 6, Plaintiff-Intervenor does not identify any minority group

15   whose right to vote would be impeded by the Prop 50 map.  Plaintiff-Intervenor's

16   sovereign interest in the enforcement of Section 2 is thus not related to any

17   possibility of irreparable harm.  Plaintiff-Intervenor also claims to stand in *parens*

18   *patriae* to enforce its citizens' federal rights in court, including the right to vote.

19   *Ibid.*  However, Plaintiff-Intervenor does not allege that the Prop 50 map will result

20   in *any* person's inability to vote.  Rather, Plaintiff-Intervenor relies on the same

21   vague, unparticularized allegations of irreparable harm based on the existence of

22   sixteen Latino-majority districts as Plaintiffs.  This is insufficient to show any

23   harm, let alone one that is irreparable.

24          **B.     Public Interest and Balance of the Equities**

25          In evaluating the balance of harms and public interest factors of the *Winter*

26   test, the Court must weigh the competing claims of injury by examining "the effect

27   on each party of the granting or withholding of the requested relief."  *Amoco Prod.*

28   *Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987).  Challengers' arguments

reveal a fundamental misunderstanding of the harms the State and the public would experience in the face of an injunction preventing implementation of the Prop 50 map. "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people"—or, as here, by its people directly—"it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1304 (2012) (Roberts, C.J., in chambers) (brackets omitted).

That injury is especially acute in this districting case, where enjoining use of the State's congressional map "represents a serious intrusion on the most vital of local functions." *Alexander*, 602 U.S. at 7 (quotation omitted). Challengers discount the monumental task for state and county officials administering the election, harm to candidates running for office, voter confusion, and damage to the integrity of the State's electoral system by simply and incorrectly claiming that the State need only be concerned with the November 2026 general election, ECF 29-1 at 23, wholly overlooking the upcoming June 2, 2026 Primary Election and myriad preceding deadlines, *id*.; Southard Decl. ¶¶ 9, 11-12 & Ex. D; ECF 16-1 at 27-28. Challengers cannot establish that the balance of equities tips in their favor at all, much less *sharply* so, by choosing to ignore the reality of the State's electoral process and the will of the voters. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011) (under the "'serious questions' test," the balance of hardships must tip "*sharply* toward the plaintiff") (emphasis added).

Nothing about Challengers' request is consistent with the public interest. Apart from raising meritless claims, they seek to set aside the voters' will on an extraordinarily fast timeline, with an extraordinary accusation, and with a limited record pulled together in a few weeks. The result is a process that defies Supreme Court precedent advising federal courts to exercise extraordinary caution in matters involving alleged racial gerrymandering, *Alexander*, 602 U.S. at 7—the opposite of the rushed decision-making that Challengers seek. Caselaw shows these cases to be complex, often involving voluminous expert reports and testimony and an extensive

evidentiary record, with courts required to evaluate "'the complex interplay of forces that enter a legislature's redistricting calculus,'" *id.* at 7, and to do so on a "district-by-district" basis, *Alabama Legislative Black Caucus*, 575 U.S. at 262. Challengers' rushed approach attempts to short-circuit this process.  This preliminary injunction proceeding allows only extremely limited time for development of expert declarations and discovery, and improperly heightens the risk for error.  Together with Challengers' abysmal evidentiary showing, these considerations weigh heavily against granting injunctive relief now.

   *Purcell v. Gonzalez*, 549 U.S. 1 (2006) raises another hurdle.  *Purcell*, together with subsequent Supreme Court caselaw, stands for the principle "that federal district courts ordinarily should not enjoin state election laws in the period close to an election."  *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring).  In *Merrill*, the Court stayed a district court's preliminary injunction that had enjoined a State from using its newly drawn congressional districts and would have required  that the districts be redrawn when primary elections were about four months away.  *Id.* at 879.  Concurring, Justice Kavanaugh offered the only written reasoning for the Court's decision, grounding his explanation on *Purcell* after noting potential chaos and logistical issues for candidates, voters, government officials, and others.  *Id.* at 879-80.

   Similar reasoning favors applying *Purcell* here.  Several key statutory deadlines for the 2026 Primary Election are imminent; for example, the period for candidates to collect signatures in lieu of part or all of the filing fee for the office they seek begins on December 19, 2025.  Southard Decl. ¶¶ 11-12 & Ex. D.  Plaintiff-Intervenor attempts to distinguish *Purcell* by mischaracterizing the dates on which voting and other primary-related events will occur, ignoring impacts to voters and candidates who have already acted to accommodate the new map.  ECF 29-1 at 23; Southard Decl. ¶¶ 11-12, 14-15.  It also ignores the many parallels with *Merrill*.  There, challengers "'commenced their lawsuits within hours or days of the

1   enactment' of Alabama's plan in November 2021," with the primary election about

2   four months away.  142 S. Ct. at 888 (Kagan, J. dissenting).  Yet the Court still

3   refused to interfere with the State's elections law.  This Court should decline to

4   grant Challengers' request to interfere by imposing a preliminary injunction.  *See*,

5   *e.g.*, *McClure v. Jefferson Cnty. Comm'n*, No. 25-13253, 2025 WL 2977740, at *2

6   (11th Cir. Oct. 16, 2025) (applying *Purcell* when primary election was about seven

7   months away).

8   **IV.  CHALLENGERS' REQUESTED REMEDY IS WHOLLY IMPROPER**

9        If the Court determines that Challengers have shown a likelihood of

10  establishing unlawful racial gerrymandering in any discrete district, the remedy

11  would not be to enjoin altogether the use of the Prop 50 map, as Challengers

12  demand.  ECF 16-1 at 35, 29-1 at 8.  "Plaintiffs who complain of racial

13  gerrymandering in their State cannot sue to invalidate the whole State's legislative

14  districting map; such complaints must proceed 'district by district.'"  *Gill v.*

15  *Whitford*, 585 U.S. 48, 66-67 (2018) (quoting *Alabama Legislative Black Caucus*,

16  575 U.S. at 262).  And when a district court finds relief is necessary, it "must

17  undertake an equitable weighing process to select a fitting remedy for the legal

18  violations it has identified, taking account of what is necessary, what is fair, and

19  what is workable."  *North Carolina v. Covington*, 581 U.S. 486, 488 (2017)

20  (citation modified).  The text of both AB 604 and ACA 8 also contemplate a narrow

21  remedy in the event any part of this redistricting plan is invalidated.  AB 604, 2025

22  Cal. Stat., ch. 96, § 2; *see also* ACA 8.

23       If Challengers are entitled to any remedy, it must be tailored to address the

24  specific violations shown and no more—even on preliminary injunction.  *See*

25  *Covington*, 581 U.S. at 488.  Any mandated revision should be made in a manner

26  consistent with California voters' clear intent to neutralize partisan gerrymandering

27  in Republican-led States.  *See Branch v. Smith*, 538 U.S. 254, 274 (2003) (plurality

28  opinion) (court "must follow the 'policies and preferences of the State'" for

1    redistricting).

2                                **CONCLUSION**

3        Defendants respectfully request that the Court deny Challengers' motions for

4    the extraordinary relief of a preliminary injunction.

5

6

7    Dated:  December 3, 2025                Respectfully submitted,

8                                            ROB BONTA
                                             Attorney General of California
9                                            ANYA M. BINSACCA
                                             Supervising Deputy Attorney General
10                                           RYAN EASON
                                             DAVID GREEN
11                                           IRAM HASAN
                                             S. CLINTON WOODS
12                                           Deputy Attorneys General

13

14                                           */s/ Jennifer E. Rosenberg*
                                             JENNIFER E. ROSENBERG
15                                           Deputy Attorney General
                                             *Attorneys for Defendants California*
16                                           *Governor Gavin Newsom and*
                                             *Secretary of State Shirley Weber*

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendants California Governor Gavin Newsom and Secretary of State Shirley Weber, certifies that this brief contains 13,749 words, which complies with the word limit set by court order dated November 20, 2025.  *See* ECF 72.


Dated:  December 3, 2025                          Respectfully submitted,

                                                                      Rob Bonta
                                                                      Attorney General of California


                                                                      */s/ Jennifer E. Rosenberg*
                                                                      Jennifer E. Rosenberg
                                                                      Deputy Attorney General
                                                                      *Attorneys for Defendants California*
                                                                      *Governor Gavin Newsom and*
                                                                      *Secretary of State Shirley Weber*

49