RICHARD L. HASEN (SBN 157574)
385 Charles E Young Dr E.
Los Angeles, California 90095
Tel: (310) 206-3103
E-mail: hasenr@gmail.com

FREDRIC D. WOOCHER (SBN 96689)
DALE K. LARSON (SBN 266165)
JULIA MICHEL (SBN 331864)
STRUMWASSER & WOOCHER LLP
1250 6th Street, Suite 205
Santa Monica, California 90401
Tel: 310-576-1233 • Fax: 310-319-0156
E-mail: fwoocher@strumwooch.com
         dlarson@strumwooch.com
         jmichel@strumwooch.com

*Attorneys for Amicus Curiae Professor Richard L. Hasen*

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DAVID TANGIPA, et al., <br><br>                                      Plaintiffs, <br><br> and <br><br> UNITED STATES OF AMERICA, <br><br>                         Plaintiff-Intervenor. <br><br>    v. <br><br> GAVIN NEWSOM, in his official capacity as the Governor of California, et al., <br><br>                                     Defendants, <br><br> and <br><br> DEMOCRATIC CONGRESSIONAL CAMPAIGN COMMITTEE, et al., <br><br>                    Defendant-Intervenors. | Case No. 2:25-cv-10616-JLS-WLH-KKL <br> Three-Judge Court <br><br> **[PROPOSED] BRIEF OF *AMICUS CURIAE* PROFESSOR RICHARD L. HASEN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> Judge:       Hon. Josephene L. Staton <br>                  Hon. Wesley L. Hsu <br>                  Hon. Kenneth K. Lee, and <br><br> Date Action Filed: November 5, 2025 |

Printed on Recycled Paper

[PROPOSED] BRIEF OF *AMICUS CURIAE* PROFESSOR RICHARD L. HASEN IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................3

INTEREST OF AMICUS ......................................................................................4

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................5

ARGUMENT ..........................................................................................................5

THE VOTERS' INTENT, NOT THE LEGISLATURE'S INTENT, MATTERS IN DETERMINING IF PROPOSITION 50 IS AN UNCONSTITUTIONAL RACIAL GERRYMANDER. THE OFFICIAL BALLOT MATERIALS CONCERNING PROPOSITION 50 DEMONSTRATE THAT INTENT TO SEPARATE VOTERS ON THE BASIS OF RACE DID NOT PREDOMINATE ........................................5

    I.    Only Redistricting Plans Adopted with a Predominant Motive to Separate Voters on the Basis of Race Violate the Supreme Court's Test for Racial Gerrymandering Under the Equal Protection Clause ...........................................5

    II.   In Determining Whether Race Predominated in a Redistricting Plan Enacted by Voters via a Ballot Measure, the Voters' Intent Should Matter, Not That of the Legislature Proposing the Plan .................................6

    III.  The Voters' Intent Should Matter in Determining if the State Enacted an Unconstitutional Racial Gerrymander, Even If the Redistricting Plan Originated as a Proposal from the State Legislature ...............................8

    IV.  This Court Should Follow the Lead of California Courts in Relying Upon Ballot Measure Materials in Determining the Voters' Intent. ..................................10

    V.   The Proposition 50 Ballot Measure Materials Demonstrate Unequivocally that California Voters Were Supporting a Partisan Gerrymander, Not Intending to Make Race the Predominant Factor in Adopting the New Redistricting Plan .................12

CONCLUSION ......................................................................................................13

CERTIFICATE OF COMPLIANCE ..................................................................15

2

[PROPOSED] BRIEF OF AMICUS CURIAE PROFESSOR RICHARD L. HASEN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES

**Federal Cases**

*Abbott v. Perez*, 585 U.S. 579 (2018) .................................................................................9

*Alexander v. S.C. State Conference of NAACP*, 602 U.S. 1 (2024) .........................................6

*Brnovich v. DNC*, 594 U.S. 647 (2021) ...............................................................................9

*Bush v. Vera*, 517 U.S. 952 (1996) ......................................................................................7

*City of Mobile v. Bolden*, 446 U.S. 55 (1980) .....................................................................5

*Cooper v. Harris*, 581 U.S. 285 (2017) ...............................................................................6

*Easley v. Cromartie*, 532 U.S. 234 (2001) ..........................................................................6

*Miller v. Johnson*, 515 U.S. 900 (1995) ..........................................................................6, 9

*Shaw v. Reno*, 509 U.S. 630 (1993) .............................................................................5, 6, 7

*Staub v. Proctor Hospital*, 562 U.S. 411 (2011) .................................................................9

**State Cases**

*C-Y Development Co. v. City of Redlands*, 187 Cal. Rptr. 370 (Ct. App. 1982) ...............11

*Knight v. Superior Court,* 26 Cal. Rptr. 3d 687 (Ct. App. 2005) .......................................11

*Legislature v. Deukmejian,* 669 P.2d 17 (Cal. 1983) ..........................................................7

*Mobileparks West Homeowners' Association v. Escondido Mobileparks West*,
    41 Cal. Rptr. 2d 393 (Ct. App. 1995) ..........................................................................11

*People v. Rizo*, 996 P.2d 27 (Cal. 2000) ............................................................................10

*Robert L. v. Superior Court*, 69 P.3d 951 (Cal. 2003) .......................................................11

**Other Authorities**

2A Sutherland, Statutory Construction (4th ed. 1973) § 48.12 ..........................................11

Official Voter Information Guide, Special Statewide Election, Tuesday, November 4, 2025 .........12, 13

Pildes & Niemi, Expressive Harms, 'Bizarre Districts,' and Voting Rights: Evaluating
    Election–District Appearances after *Shaw v. Reno*, 92 Mich. L.Rev. 483 (1993) ...............8

3

[PROPOSED] BRIEF OF *AMICUS CURIAE* PROFESSOR RICHARD L. HASEN IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# INTEREST OF AMICUS[1]

Richard L. Hasen is Professor of Law and Political Science at UCLA School of Law, where he directs the Safeguarding Democracy Project. Professor Hasen is an internationally recognized expert in election law, and the author of many books on elections and election law including, most recently, *A Real Right to Vote* (Princeton University Press 2024).

From 2001-2010, Professor Hasen served as founding co-editor of the quarterly peer-reviewed publication, *Election Law Journal*. He is the author of over 100 articles on election law issues, published in numerous journals including the *Harvard Law Review*, *Stanford Law Review*, and *Supreme Court Review*. He was elected to The American Law Institute in 2009 and serves as Co-Reporter on the Institute's law reform project, Restatement (Third) of Torts: Remedies.

Professor Hasen submits this brief to explain an issue of first impression involving the intersection of constitutional law and California law related to ballot measures. He submits this brief on his own behalf in support of Defendants Governor Gavin Newsom and Secretary of State Shirley Weber.

Professor Hasen was co-author of a recent *amicus* brief in a case involving the state constitutionality of California's Proposition 22, briefing an issue concerning the relationship between legislative powers and voter powers via ballot measures. The Court of Appeal adopted his brief's position and respondents did not appeal on that issue to the California Supreme Court. *Castellanos v. State of California*, 305 Cal. Rptr. 3d 717, 742–52 (Ct. App. 2023), *aff'd in part*, 552 P.3d 406 (Cal. 2024). Earlier, Professor Hasen was counsel in *Mobileparks West Homeowners' Association v. Escondido Mobileparks West*, 41 Cal. Rptr. 2d 393, 399 n.6 (Ct. App. 1995), in which the Court of Appeal adopted his position on the irrelevance of the intent of ballot measure sponsors in interpreting that measure's meaning.

---

[1] *Amicus* submits this brief in his personal capacity; organizations are listed for identification purposes only. No party or its counsel had any role in authoring this brief. No person or entity—other than *amicus curiae* and his counsel—contributed money that was intended to fund preparing or submitting this brief.

4

[PROPOSED] BRIEF OF *AMICUS CURIAE* PROFESSOR RICHARD L. HASEN IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**INTRODUCTION AND SUMMARY OF ARGUMENT**

This case concerns an issue of first impression: In evaluating a claim that "race predominated" in the adoption of a redistricting plan in violation of the Equal Protection Clause, how should a court determine whether intent to separate voters on the basis of race predominated when that plan was adopted by voters via a ballot measure? As set forth below, because California's voters were the ones who enacted Proposition 50—which put into effect a new congressional district map—the *voters'* intent, and not that of the California Legislature that proposed the ballot measure, should matter in determining whether race was the predominant factor motivating the redistricting plan. Moreover, in discerning the voters' intent, this Court should follow well-established California law holding that courts should principally consider the official ballot materials made available to and relied upon by the voters when they voted on the proposed measure. In the present case, the relevant Proposition 50 ballot measure materials unequivocally demonstrate that an intent to separate voters on the basis of race did not predominate when voters adopted the new districts. Instead, voters intended to enact a partisan gerrymander to help Democrats win additional seats in Congress in response to Republican gerrymandering efforts in Texas and, potentially, in other states.

**ARGUMENT**

**THE VOTERS' INTENT, NOT THE LEGISLATURE'S INTENT, MATTERS IN DETERMINING IF PROPOSITION 50 IS AN UNCONSTITUTIONAL RACIAL GERRYMANDER. THE OFFICIAL BALLOT MATERIALS CONCERNING PROPOSITION 50 DEMONSTRATE THAT INTENT TO SEPARATE VOTERS ON THE BASIS OF RACE DID NOT PREDOMINATE.**

I.   **ONLY REDISTRICTING PLANS ADOPTED WITH A PREDOMINANT MOTIVE TO SEPARATE VOTERS ON THE BASIS OF RACE VIOLATE THE SUPREME COURT'S TEST FOR RACIAL GERRYMANDERING UNDER THE EQUAL PROTECTION CLAUSE.**

The United States Supreme Court has long recognized that a state violates the Equal Protection Clause of the Fourteenth Amendment when it engages in intentional racial discrimination, such as intentional vote dilution, in designing its rules for electing members of legislative bodies. *City of Mobile v. Bolden*, 446 U.S. 55 (1980). In 1993, the Supreme Court first recognized an "analytically distinct" racial gerrymandering claim, also under the Equal Protection Clause. *Shaw v. Reno*, 509 U.S. 630, 652 (1993). This claim is not one based upon intentional discrimination, but one in which a state

[PROPOSED] BRIEF OF *AMICUS CURIAE* PROFESSOR RICHARD L. HASEN IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

enacts a redistricting plan with predominant racial intent, and without a compelling justification for doing so.

As the Supreme Court explained in *Miller v. Johnson*, 515 U.S. 900, 917 (1995), "the plaintiff's burden is to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district. To make this showing, a plaintiff must prove that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations." *Id.* Where these or other considerations, such as partisan gerrymandering, are the basis for redistricting legislation, and they are not subordinated to race, a state can "'defeat a claim that a district has been gerrymandered on racial lines.'" *Id.* (quoting *Shaw*, 509 U.S. at 647). Further, "if racial considerations predominated over others," the state must prove that "the design of the district" satisfies "strict scrutiny" by showing "that its race-based sorting of voters serves a compelling interest and is narrowly tailored to that end." *Cooper v. Harris*, 581 U.S. 285, 292 (2017) (internal quotations and citations omitted).

Since *Miller*, the Supreme Court has decided a number of cases determining whether race or partisanship predominated in drawing district lines, including *Easley v. Cromartie*, 532 U.S. 234 (2001), *Cooper*, and *Alexander v. S.C. State Conference of NAACP*, 602 U.S. 1 (2024). It is currently considering this issue, as well as whether compliance with Section 2 of the Voting Rights Act can serve as a compelling interest to justify racial predominance, in *Louisiana v. Callais*, 145 S.Ct. 2608 (2025) (setting the case for reargument).

The case before this Court raises the same question: whether race or other considerations, including partisanship, predominated in the drawing of California's new congressional districts.

**II.   IN DETERMINING WHETHER RACE PREDOMINATED IN A REDISTRICTING PLAN ENACTED BY VOTERS VIA A BALLOT MEASURE, THE VOTERS' INTENT SHOULD MATTER, NOT THAT OF THE LEGISLATURE PROPOSING THE PLAN.**

When the Supreme Court set out the elements of the racial gerrymandering cause of action in *Miller*, it framed the issue in terms of "legislative purpose." *Miller*, 515 U.S. at 916; *see also id.* (holding that plaintiffs must prove "that *the legislature* subordinated traditional race-neutral districting

6

principles") (emphasis added). It is unsurprising that the Supreme Court focused on the intent of the state legislature in framing the issue in that case: Not only did *Miller* concern a redistricting plan adopted solely by the state legislature, but the Supreme Court has never considered a racial gerrymandering claim in the context of districts adopted by any state actor *other than* a state legislature, such as a plan enacted by voters through a ballot measure or by a state-appointed redistricting commission.[2]

As a matter of first impression, however, it should be the body that actually enacted the redistricting plan, rather than some other body that proposed the plan, whose purpose should matter in the first prong of the racial gerrymandering inquiry. After all, the gravamen of a racial gerrymandering claim is that of an expressive harm—that adoption of the redistricting plan sends a message to the public that voters are being separated into different districts by the state on the basis of race. As the Supreme Court explained in *Shaw*, "[a] reapportionment plan that includes in one district individuals who belong to the same race, but who are otherwise widely separated by geographical and political boundaries, and who may have little in common with one another but the color of their skin, bears an uncomfortable resemblance to political apartheid. It reinforces the perception that members of the same racial group—regardless of their age, education, economic status, or the community in which they live—think alike, share the same political interests, and will prefer the same candidates at the polls." 509 U.S. at 647; *see also Bush v. Vera*, 517 U.S. 952, 984 (1996) (plurality opinion) (recognizing the harm in racial gerrymandering cases as "expressive harm"); *id.* at 1054 (Stevens, J., dissenting) (explaining that a racial gerrymandering "injury is probably best understood as an 'expressive harm,' that is, one that 'results from the idea or attitudes expressed through a governmental action, rather than from the more tangible or material consequences the action brings about.'" (quoting Pildes & Niemi, Expressive Harms, 'Bizarre Districts,' and Voting Rights: Evaluating Election–District Appearances

---

[2] Under California law, it is well-established that the state's voters—"the ultimate source of legitimate political power"—are acting in a legislative capacity in adopting a redistricting plan through a ballot measure. *Legislature v. Deukmejian*, 669 P.2d 17, 30 (Cal. 1983). In that case, the California Supreme Court affirmed that the adoption of district boundaries was an exercise of "legislative" power, even when accomplished by a ballot measure, and that "the power of the people through the statutory initiative is coextensive with the power of the Legislature." *Id*. at 22, 26–27.

7

after *Shaw v. Reno*, 92 Mich. L.Rev. 483, 506–507 (1993))).

Therefore, when voters or a redistricting commission enact a plan, it should be that body's intent that matters. It is the voters in passing a redistricting ballot measure who risk sending a message that they are subordinating traditional redistricting principles to make race predominate.

### III. THE VOTERS' INTENT SHOULD MATTER IN DETERMINING IF THE STATE ENACTED AN UNCONSTITUTIONAL RACIAL GERRYMANDER, EVEN IF THE REDISTRICTING PLAN ORIGINATED AS A PROPOSAL FROM THE STATE LEGISLATURE.

In the case before this Court, California voters approved Proposition 50, a ballot measure that enacted a congressional redistricting plan proposed by the California Legislature. The California Legislature could not have enacted a congressional redistricting plan on its own because California voters had taken away the Legislature's power to draw district lines for congressional elections though a 2010 voter initiative amending the California Constitution to give that power to an independent citizens' commission.[3] So the only authority that the state legislature possessed to create new congressional districts was to propose that the voters pass another ballot measure amending the state Constitution to enact a new redistricting plan for use in the 2026 through 2030 Congressional elections. It was ultimately up to the voters to decide whether to adopt the proposed districts, and therefore it is the voters' intent that is relevant for the racial gerrymandering inquiry.

Thus, even if—as Plaintiffs allege—there were evidence that the California Legislature had proposed a plan with racial predominance,[4] it is the voters' intent in enacting the plan that should matter. *See* Defendants' Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction, ECF 113, at 15. Voters enacting redistricting plans are entitled to a presumption of good faith, the same presumption of good faith that the Supreme Court has recognized is appropriate in evaluating a legislature's intent. *Alexander*, 602 U.S. at 10 ("This presumption of legislative good faith directs district courts to draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions. This approach ensures that 'race for its own sake,

---

[3] The voter initiative was Proposition 20, whose text is available online. Redistricting of Congressional Districts, UC Law SF Scholarship Repository (2010), https://repository.uclawsf.edu/cgi/viewcontent.cgi?article=2334&context=ca_ballot_props/.

[4] *Amicus* takes no position on the intent of the California Legislature in proposing Proposition 50 and its incorporated proposed maps.

8

and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines.'" (first citing *Abbott v. Perez*, 585 U.S. 579, 610–612 (2018); and then quoting *Miller*, 515 U.S. at 913). One reason for this presumption is to "be wary of plaintiffs who seek to transform federal courts into weapons of political warfare that will deliver victories that eluded them in the political arena." *Id.* (citations and internal quotation marks omitted).

In *Abbott*, for example, the Supreme Court held that there could be no presumption of unconstitutional racial intent when the Texas Legislature readopted a map that the district court had found two years earlier to have been enacted with such unconstitutional intent. The Court rejected the idea of "original sin" and held that even if the state had originally enacted its plan with unconstitutional intent, it was entitled to a presumption of good faith in reenacting the same plan. 585 U.S. at 603–05. If, under *Abbott*, the same legislative body reenacting the same plan is entitled to the presumption of good faith even after the plan had been judicially determined to have initially been adopted with an unconstitutional intent, then surely the voters— who are distinct from and act independently of the state legislature—should be entitled to the same presumption of good faith when they enact a new redistricting plan. That is especially true when the voter-enacted plan has not previously been adjudicated to be unconstitutional. Any "original sins" of the legislature should not be transmuted to the voters.

Indeed, even when considering the intent of the legislative body itself, the Supreme Court has instructed that courts should not infer unconstitutional legislative intent from the views or motives of the legislation's sponsors. In *Brnovich v. DNC*, 594 U.S. 647, 689 (2021), the Supreme Court rejected the Ninth Circuit's adoption of a "cat's paw" theory to determine a legislature's intent:

> A "cat's paw" is a "dupe" who is "used by another to accomplish his purposes." Webster's New International Dictionary 425 (2d ed. 1934). A plaintiff in a "cat's paw" case typically seeks to hold the plaintiff's employer liable for "the animus of a supervisor who was not charged with making the ultimate [adverse] employment decision." *Staub v. Proctor Hospital*, 562 U.S. 411, 415 (2011). The "cat's paw" theory has no application to legislative bodies. The theory rests on the agency relationship that exists between an employer and a supervisor, but the legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents. Under our form of government, legislators have a duty to

9

[PROPOSED] BRIEF OF *AMICUS CURIAE* PROFESSOR RICHARD L. HASEN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

exercise their judgment and to represent their constituents. It is insulting to suggest that they are mere dupes or tools.

Voters are not dupes or tools, either. Just as courts should not infer that state legislatures are "dupes" of the sponsors of bills who may harbor an unconstitutional intent, this Court should not infer that voters are dupes of the Legislature that proposed Proposition 50 for their consideration.

### IV. THIS COURT SHOULD FOLLOW THE LEAD OF CALIFORNIA COURTS IN RELYING UPON BALLOT MEASURE MATERIALS IN DETERMINING THE VOTERS' INTENT.

Determining the voters' intent in passing a ballot measure is different from establishing the intent of a legislature, which typically holds hearings, hears from witnesses, and debates the finer points of legislation before a statute's passage. Voters do none of these things. Instead, in California, voters receive official materials related to the ballot measure, including the text of the measure, a summary prepared by the Attorney General, an analysis by the state's Legislative Analyst, and arguments for and against the measure. Voters are also sometimes exposed to campaign-related advertising, news coverage, and other materials addressing the proposed measure.

Amicus is aware of no court that has had to determine whether voters had an unconstitutional intent to make race predominant in enacting a redistricting plan, much less what evidence is relevant to such an inquiry. But there are many cases in which California courts have been called upon to determine voters' intent in an analogous context, that of statutory interpretation. These cases can and should guide the Court in determining what evidence best establishes voters' intent in the present case. *See* ECF 113, at 15, 22.

In determining the meaning of California ballot measures for purposes of statutory interpretation, the unambiguous text of course controls. But when a measure's text is ambiguous and California courts are called upon to determine the underlying "legislative intent," they look primarily to the official ballot measure materials, which are the only materials that courts can be confident were available to all California voters when voting on the measure. As the California Supreme Court explained in *People v. Rizo*:

> In interpreting a voter initiative like Proposition 187, we apply the same principles that govern statutory construction. Thus, we turn first to the language of the statute, giving the words their ordinary meaning. The statutory language must also be construed in the context of the statute as a whole and the overall statutory scheme. When the language is ambiguous,

> we refer to other indicia of the voters' intent, particularly the analyses and
> arguments contained in the official ballot pamphlet.

996 P.2d 27, 30 (Cal. 2000) (citations and internal quotation marks omitted).

Of particular note for the present case, California caselaw makes clear that the courts must consider the understanding and intent of the voters in *enacting* a ballot measure—as reflected in the official ballot materials— and not the views and intent of the drafters who *proposed* the measure to the voters for their adoption. As the California Supreme Court summarized in *Robert L. v. Superior Court*, "[t]his court has made it clear that the motive or purpose of the drafters of a statute is not relevant to its construction, absent reason to conclude that the body which adopted the statute was aware of that purpose and believed the language of the proposal would accomplish it. The opinion of drafters or legislators who sponsor an initiative is not relevant since such opinion does not represent the intent of the electorate and we cannot say with assurance that the voters were aware of the drafters' intent." 69 P.3d 951, 957 (Cal. 2003) (citations and internal quotation marks omitted).

Thus, in *Mobileparks West Homeowners' Association v. Escondido Mobileparks West*, 41 Cal. Rptr. 2d 393, 399 n.6 (Ct. App. 1995), a California Court of Appeal rejected declarations submitted from the sponsors of an initiative to shed light on its meaning, holding that "such evidence is not persuasive as to voter intent, and . . . the ballot arguments are the only proper extrinsic aid which could be considered on that subject." *See also Knight v. Superior Court*, 26 Cal. Rptr. 3d 687, 695 n.4 (Ct. App. 2005) (same); *C-Y Development Co. v. City of Redlands*, 187 Cal. Rptr. 370, 374 (Ct. App. 1982) (rejecting declarations of initiative proponents purporting to interpret its meaning, and adding: "The general rule is that, in determining legislative intent, the views of individual drafters are not considered as grounds upon which to construe a statute. There is no necessary correlation between what the drafter understood the text to mean and what the voters enacting the measure understood it to mean" (quoting 2A Sutherland, Statutory Construction (4th ed. 1973) § 48.12, pp. 214–215)).

This Court should follow the lead of the California courts in the present case by looking to the official ballot materials made available to the voters regarding Proposition 50 in determining whether race or other considerations predominated in the drawing of California's new congressional districts. And as set forth below, those materials make it abundantly clear that *partisan* considerations, not racial considerations, were the predominant and motivating factors in the voters' adoption of the new

11

[PROPOSED] BRIEF OF *AMICUS CURIAE* PROFESSOR RICHARD L. HASEN IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

redistricting plan.

## V. THE PROPOSITION 50 BALLOT MEASURE MATERIALS DEMONSTRATE UNEQUIVOCALLY THAT CALIFORNIA VOTERS WERE SUPPORTING A PARTISAN GERRYMANDER, NOT INTENDING TO MAKE RACE THE PREDOMINANT FACTOR IN ADOPTING THE NEW REDISTRICTING PLAN.

The Proposition 50 ballot measure materials provide the relevant evidence for this Court to consider on voter intent. Official Voter Information Guide, Special Statewide Election, Tuesday, November 4, 2025, https://vig.cdn.sos.ca.gov/2025/special/pdf/complete-vig.pdf. That evidence shows that California voters were asked to adopt, and they ultimately enacted, a partisan gerrymander of the state's congressional seats to benefit Democrats in order to counteract a partisan gerrymander favoring congressional Republicans in Texas. *See* ECF 113, at 22.

The quick-reference guide describes Proposition 50 as follows: "AUTHORIZES TEMPORARY CHANGES TO CONGRESSIONAL DISTRICT MAPS IN RESPONSE TO TEXAS' PARTISAN REDISTRICTING." *Id.* at 3. This same language appears on the header of *every page* in the pamphlet from pages 9-17 containing the Legislative Analyst's analysis and the arguments for and against the proposition.

The guide also summarizes an argument in support of Proposition 50 on the grounds that it would "counter Donald Trump's scheme to rig next year's congressional election." *Id.* at 5. It also includes a summary of the argument against adoption on the grounds that Proposition 50 would remove "protections that ban maps designed to favor political parties." *Id*.

The Attorney General's title and summary describes Proposition 50 as a response to "Texas' mid-decade partisan redistricting." *Id.* at 8. The California Legislative Analyst's Office, the nonpartisan body responsible for, among other things, analyzing the impact of ballot measures offers an analysis of Proposition 50. The analysis addresses the background events motivating Proposition 50, describes the unusual nature of mid-decade redistricting, and explains the impact of Proposition 50 as adopting new maps drawn in compliance with "federal law," but without the limitations otherwise imposed by California law on the redistricting commission. *Id*. at 8. The analysis notes projected fiscal impacts, and the proposition's call for federal redistricting reform, but it does not comment on the potential partisan impacts of Proposition 50's proposed maps; the analysis likewise does not mention race once. *Id*. at 8–15.

Finally, the ballot pamphlet contains two pages (approximately 1,473 words) of double-column arguments for and against adoption of Proposition 50. In favor of adoption, a statement submitted by Governor Gavin Newsom and other California Democrats describes the purpose of Proposition 50 as ensuring Californians "aren't silenced by partisan gerrymandering in other states" and calls on voters to "STOP TRUMP FROM RIGGING THE 2026 ELECTION." *Id.* at 16. Newsom's statement does not mention race, aside from a passing reference to California's "diverse communities," which he claims will be fairly represented by Proposition 50. *Id.*

Likewise, the argument against Proposition 50 contained in the ballot pamphlet urges voters to reject the ballot measure not because it will constitute a racial gerrymander, but rather because it would put "politicians back in charge of drawing their own districts, or those of their friends." *Id.* at 17. Among the arguments and rebuttals included in the ballot pamphlet, the only appeals to racial considerations comes in opposition to Proposition 50. The argument against Proposition 50 includes this quote: "'When politicians gerrymander, they divide our neighborhoods and weaken the voice of communities of color. Whatever happens in Texas, we cannot save democracy by destroying it in California. Vote NO on Prop. 50.'—Reverend Mac Shorty, Civil Rights Leader." The rebuttal to Newsom's argument in favor of the measure claims that the redistricting commission should not be suspended because its maps have led to "Better Representation," shown by the fact that, in the California Legislature, "Asian representation tripled, Black representation nearly doubled, and Latino seats grew by 8%" since the commission was established. *Id.* at 16. If anything, these arguments from those opposed to Proposition 50 show that adopting the maps proposed by Proposition 50 would make race *less* important in California redistricting.

**CONCLUSION**

For the foregoing reasons, this Court should reject the argument that California voters via Proposition 50 enacted a racial gerrymander. Voters' intent matters for this inquiry, and the relevant evidence shows that voters had no intent to make race the predominant factor in approving the new maps.

DATED: December 4, 2025          Respectfully Submitted,

                                                Richard L. Hasen

                                                STRUMWASSER & WOOCHER LLP
                                                Fredric D. Woocher
                                                Dale K. Larson
                                                Julia Michel

                                                By _____
                                                        Dale K. Larson

                                                *Attorneys for Amicus Curiae Professor Richard L. Hasen*

Case 2:25-cv-10616-JLS-WLH-KKL    Document 122-1    Filed 12/04/25    Page 15 of 15
Page ID #:5731


**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Amicus Curiae Professor Richard L. Hasen, certifies that this brief contains 3,950 words, which complies with the word limit set by L.R. 11-6.1. *See also* ECF 72 (setting 14,000 word limit for opposition brief); FRAP 29(a)(5) (limiting *amicus* briefs to half the length of briefs they are supporting).

DATED:  December 4, 2025

_____
Dale K. Larson