JESUS A. OSETE*
Principal Deputy Assistant Attorney General
MATTHEW ZANDI (CA No. 203329)
Chief of Staff & Special Counsel
MAUREEN RIORDAN (NY No. 2058840)
Acting Chief, Voting Section
ANDREW BRANIFF (IN No. 23430-71)
Acting Chief, Appellate Section
DAVID GOLDMAN (VA No. 98922)
JOSHUA R. ZUCKERMAN (DC No. 1724555)
GRETA GIESEKE (TX No. 24132925)
Attorneys
    Civil Rights Division
    United States Department of Justice
    950 Pennsylvania Avenue, NW
    Washington, D.C.  20530
    Telephone: (202) 514-3847
    E-Mail:    matt.zandi@usdoj.gov

TODD BLANCHE
Deputy Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
JULIE A. HAMILL (CA No. 272742)
Assistant United States Attorney
    United States Attorney's Office
    300 North Los Angeles Street, Suite 7516
    Los Angeles, California 90012
    Telephone: (213) 894-2464
    E-Mail:    julie.hamill@usdoj.gov

Attorneys for Plaintiff-Intervenor
UNITED STATES OF AMERICA

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

DAVID TANGIPA, *et al.*,

        *Plaintiffs*,

   and

UNITED STATES OF AMERICA,

        *Plaintiff-Intervenor*,

   v.

GAVIN NEWSOM, in his official capacity as the Governor of California, *et al.*,

        *Defendants*,

Case No.   2:25-cv-10616-JLS-WLH-KKL
Three-Judge Court

**UNITED STATES' REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF-INTERVENOR'S MOTION FOR A PRELIMINARY INJUNCTION**

Honorable Josephine L. Staton
Honorable Wesley L. Hsu

---

* Assistant Attorney General Harmeet K. Dhillon is recused from this matter.

Honorable Kenneth K. Lee

Hearing Date: December 15, 2025
Time:          9:00 a.m.
Courtroom:     One

# TABLE OF CONTENTS

Introduction…………………………………………………...…....…………1

I.   Plaintiff-Intervenors Have Established a Likelihood of Success on the
     Merits……………………………………………………………….….…..4

     A. The California Legislature and Paul Mitchell Are the Relevant State
        Actors………………………………………………...………….…...……4

        1. The voters did not choose the
           map……………………………………………….……………....4

        2. As the map drawer, Paul Mitchell is a relevant state
           actor……………………………………………...…...……………6

     B. Plaintiffs Have Established a VRA Violation Through the Intentional Use of
        Race in Redistricting……………………………………………………...8

     C. Plaintiffs Have Established an Equal Protection Violation Through the
        Intentional Use of Race in Redistricting Without a Compelling
        Interest…………………………………………………………….…..…13

II.  The United States Has Demonstrated Irreparable Harm………………….……14

III. The Balance of Equities and the Public Interest Favor Injunctive
     Relief………………………………………………………………………….15

IV.  The 2021 Map Should Be Used While Litigation Proceeds…………..…..……16

CONCLUSION……………………………………………...…………..…..18

1

# TABLE OF AUTHORITES

**Cases**                                                                                    **Page**

*Abbott v. League of United Latin American Citizens*,
    No. 25A608, 2025 WL 3484863 (U.S. Dec. 4, 2025) ……………….…7, 12

*Allen v. Milligan*,
    599 U.S. 1 (2023) ……………………………………….………6, 8

*Alexander v. South Carolina State Conf. of the NAACP*,
    602 U.S. 1 (2024) ………………………………….………*passim*

*Village of Arlington Heights v. Metro. Housing Dev. Corp.*,
    429 U.S. 252 (1977) …………………………….………8, 9, 11

*Baird v. Bonta*,
    81 F.4th 1036 (9th Cir. 2023) ……………………………..15

*Bethune-Hill v. Virginia State Bd. of Elections*,
    580 U. S. 178 (2017) …………………………………...…..13

*Brnovich v. DNC*,
    594 U.S. 647 (2021) …………………...……………8

*Chisom v. Roemer*,
    501 U.S. 380 (1991) …………………………………8

*City of Los Angeles v. County of Kern*,
    462 F. Supp. 2d 1105 (C.D. Cal. 2006) …………………………………..5

*Cooper v. Harris*,
    581 U.S. 285 (2017) ……………………….…………..*passim*

*Crawford v. Board of Educ. of City of Los Angeles*,
    458 U.S. 527 (1982) …………………..………….…...……………5

*DNC v. Hobbs*,
    948 F.3d 989 (9th Cir. 2020) …………………………..8, 9, 11

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,
    98 F.4th 1180 (9th Cir. 2024) ……………………..…....………3

*Fusilier v. Landry*,
    963 F.3d 447 (5th Cir. 2020) …………………………..………9

*Garza v. County of Los Angeles*,
    918 F.2d 763 (9th Cir. 1990) …………………..…...…………11

2

*Harris v. McCrory,*
    159 F. Supp. 3d 600 (M.D.N.C. 2016) ……………….....…………………..17

*Hollingsworth v. Perry*,
    570 U.S. 693 (2013) ………………….…………………………………5

*Johnson v. Miller,*
    864 F. Supp. 1354 (S.D. Ga. 1994) …………....……….….…….....………9

*La Union del Pueblo Entero v. Abbott,*
    93 F.4th 310 (5th Cir. 2024) …………….……………….…….………... 7

*League of United Latin Am. Citizens v. Abbott*,
    708 F. Supp. 3d 870 (W.D. Tex. 2023) ………………………………….2

*League of Women Voters of N.C. v. North Carolina,*
    769 F.3d 224 (4th Cir. 2014) ………………………………….…………15

*Lee v. City of Los Angeles,*
    908 F.3d 1175 (9th Cir. 2018*)* ……………………………....…..………7, 8

*LULAC v. Abbott,*
    2025 WL 3215715 (W.D. Tex. Nov. 18, 2025) ……………………7, 8, 12

*McMillan v. Escambia County,*
    748 F.2d 1037 (5th Cir. 1984) ………………………………………….8

*Merrill v. Milligan,*
    142 S. Ct. 879 (2022) ……………………………………....……………17

*Michigan State A. Philip Randolph Inst. v. Johnson,*
    833 F.3d 656 (6th Cir. 2016) …………………………………………14

*Miller v. Johnson,*
    515 U.S. 900 (1995) …………………………………………..…………*passim*

*Perry v. Brown*,
    671 F.3d 1052 (9th Cir. 2012) …………………………………....…….5

*Regents of Univ. of Cal. v. Bakke,*
    438 U.S. 265 (1978) ……………………………………………...……..10

*Robert L. v. Superior Court*,
    69 P.3d 951 (Cal. 2003) ……………………………….……....…….…6

*Romer v. Evans*,
    517 U.S. 620 (1996) ……………….……………………..….………5

3

*Shaw v. Reno,*
        509 U.S. 630 (1993). ……………………..…………………..……..………15

*Shelby County v. Holder*,
        570 U.S. 529 (2013) ………………………………………………………3

*South Carolina v. Katzenbach,*
        383 U.S. 301 (1966) ………………………………………………………8

*Students for Fair Admissions v. President & Fellows of Harvard Coll.,*
        600 U.S. 181 (2023) ……………………………………………………..10

*United States v. Bilzerian,*
        926 F.2d 1285, 1292 (2d Cir. 1991) ………………………………..………2

*Washington v. Seattle School District No. 1,*
        458 U.S. 457 (1982) ………………………………………………..………6

*Wise v. Lipscomb,*
        437 U.S. 535 (1978) ………………………..…………………..…………..17

*Veasey v. Abbott,*
        796 F.3d 487 (5th Cir. 2015) ………………………………………...…10

**Statutes:**

Cal. Code AB 604,
        codified at Cal. Elecs. Code § 21400 *et seq.* …………………………… *passim*

Cal. Const. art. XXI, §§ 1, 2, 4 ...................................................... *passim*

**Other Sources**

2020 Cal. Citizens Redistricting Comm'n,
    *Report on Final Maps* 19-26 (Dec. 26, 2021)
    https://tinyurl.com/4khu3szb …………...............……...……….............……17

Britannica, *What's the Difference Between Hispanic and Latino?*,
    https://tinyurl.com/49mcy9xk …………...............……...……….............……1

Cal. Legislative Info., AB-604 Redistricting: congressional districts,
    *Bill History*, available at https://tinyurl.com/52nz92yy ………..……...............5

Dr. Raquel Centeno & Dr. Jarred Cuellar,
    *Latino Voters and the November 2025 Special Election:*
    *Redistricting and Representation* at 1, https://tinyurl.com/5pjj9x7 .........11, 13

# INTRODUCTION

California redrew its congressional districts with the intent of empowering Latinos at the expense of other racial groups.[1] But intentionally drawing congressional districts based on the race of voters violates the Voting Rights Act. And using race as the predominant factor in creating congressional districts without a compelling interest to do so violates the Equal Protection Clause. On August 21, 2025, the California legislature did both. The illegal racial sorting of voters cannot be later cured by a ballot initiative or post-hoc salesmanship that attempts to retcon a race-based redistricting into a purely political play. To be sure, the California legislature sought to increase Democrat voting power. But from the start, unlawful racial targets dwarfed partisan ambitions.

Direct evidence reveals this racial priority. Paul Mitchell, who drew the map, shamelessly admitted in an interview with Hispanas Organized for Political Equality's ("HOPE") on October 17, 2025, that "the first thing [he] did in drawing the new map," was implement racial targets that HOPE lobbied for in a 2021 letter to alleviate concerns "about the elimination of a majority/minority Latino district within the area of Los Angeles gateway cities."[2] *See* Doc. 28-2 at 48.

---

[1] "The terms [Hispanic and Latino] are often used interchangeably, though the words can convey slightly different connotations." Britannica, *What's the Difference Between Hispanic and Latino?*, https://tinyurl.com/49mcy9xk (last visited Dec. 8, 2025). "Latino" "refers to (almost) anyone born in or with ancestors from Latin America and living in the U.S., including Brazilians." *Id.* "'Hispanic' is generally accepted as a narrower term that includes people only from Spanish-speaking Latin America, including those countries/territories of the Caribbean or from Spain itself." *Id.* The United States will use these terms interchangeably.

[2] Plaintiffs and Plaintiff-Intervenors had sought timely discovery of Paul Mitchell and had negotiated a deposition on December 10, 2025 at 10:00 am PST. *See* App. A. *Corresp. from Kimon Manolius re: Mitchell Resp. and Obj. to Non-Party* at 1. However, at 1:17 am EST on December 10, 2025, Paul Mitchell's attorney notified Plaintiffs that they would be objecting and asserting legislative and other privileges "to deposition inquiries that relate to the mapping work Mr. Mitchell undertook after July 2, the first date he was in conversation with the legislature about drawing the map that would become the

1

1    HOPE's requested racial targets that Mitchell discussed were two-fold: (1) create a

2    new Gateway Cities District centered around Downey, *allowing for the creation of five*

3    *Latino majority-minority districts where there are currently four*; and (2) take the current

4    LB North seat to the south, through Seal Beach into Huntington Beach, making a Latino-

5    influenced district at 35 percent Latino by voting age population. *Id*. at 24-25. Creating

6    the new Gateway Cities District, according to the HOPE Letter, would necessitate

7    "meld[ing] together two white-majority districts elsewhere." App. B, Nov. 24, 2021 Letter

8    from HOPE to Commissioners at 8. Nonetheless, Mitchell boasted that he accomplished

9    both racial targets. *See* Doc. 28-2 at 49-50.

10    HOPE also suggested moving Latino populations from districts that were "likely

11    overpacked beyond what is required to definitively allow for the election of a Latino

12    candidate of choice," and deemed 52-54% Hispanic Citizen Voting Age Population

13    ("CVAP") an optimal racial quota to "still be very likely to elect Latino candidates of

14    choice." App. B at 5. Circumstantial evidence indicates that Mitchell adopted this racial

15    target too: According to data from Defendant-Intervenor LULAC's expert, 14/16

16    majority-Hispanic districts in the Proposition 50 Map have Hispanic CVAPs of 51.76-

17    55.01%, whereas only 5/16 districts in the 2021 were in this compact range. *Compare*

18

19    _____

20    Proposition 50 map." *Id.* Mitchell was the primary map drawer for the legislation that
      became AB 604 and without additional testimony regarding the maps he drew, and any
21    changes made by the California legislature, this Court's only evidence as to his intent are
      his public statements to HOPE. While Mitchell should not be allowed to use legislative
22    privilege "as a shield and a sword," by "selectively disclos[ing] portions of
      communications or documents but withhold[ing] others in a way that favors [him],"
23    *League of United Latin Am. Citizens v. Abbott*, 708 F. Supp. 3d 870, 886 (W.D. Tex. 2023)
      (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991)), his public
24    statements are sufficient direct evidence for the United States to prevail, especially under
25    the "serious questions" standard that Defendants agree applies. *See* Def. Opp. 12, n.7.
26    Nonetheless, the United States reserves the right to supplement this reply following
27    Mitchell's deposition.

28

2

Doc. 111-1 at 86-87 (2021 map's Hispanic CVAP percentages) *with id.* at 161-62 (Proposition 50 map's Hispanic CVAP percentages).

Defendants pitch several partisan explanations for the November 4, 2025, referendum vote. But this case is not about the ballot initiative. It is about the map that the legislature adopted in Assembly Bill 604 ("AB 604") and enrolled and presented to the Governor on August 21, 2025. Post-enactment sales tactics used to convince voters to amend their constitution to make the new map operable are not relevant. The referendum vote did not change the boundaries of the map, offer voters an alternative map, or retroactively cure the race-based criteria used to draw the map. Defendants' numerous but spurious post-hoc reasons for the new districts are red herrings, intended to distract from the reality that Mitchell's stated goal, when drawing the map, was to increase Latino political power.

As Defendants concede, *see* Def. Opp. 12, n.7, the Ninth Circuit has adopted "a sliding scale variant of the *Winter* test—under which a party is entitled to a preliminary injunction if it demonstrates (1) serious questions going to the merits, (2) a likelihood of irreparable injury, (3) a balance of hardships that tips sharply towards the plaintiff, and (4) the injunction is in the public interest." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024) (quotation marks omitted). "[T]he serious questions standard is 'a lesser showing than likelihood of success on the merits,'" *id.*, a burden that the United States has met. "Any racial discrimination in voting is too much." *Shelby County v. Holder*, 570 U.S. 529, 557 (2013). And the evidence demonstrates that Mitchell purposefully drew the map using race-based considerations to bolster the power of Latino voters, thereby diminishing the political power of all other races and demeaning the very Latino voters the California legislature sought to prioritize. Defendants have not, and cannot, contradict this evidence. Consequently, the United States has established the necessary basis for a preliminary injunction.

## I.    The United States Has Established a Likelihood of Success on the Merits

Defendants do not rebut the United States' evidence that the California legislature both had a race-based purpose in drawing the new map in violation of the Voting Rights Act ("VRA") and used race as the predominant factor in drawing the new map in violation of the Equal Protection Clause.

### A.    The California Legislature and Paul Mitchell Are the Relevant State Actors

Before addressing the evidence of discrimination, it is important to clarify who are the "relevant state actor[s]" for purposes of assessing the legality of the Proposition 50 map. *See Alexander v. South Carolina State Conf. of the NAACP*, 602 U.S. 1, 8 (2024). Defendants try to divert attention from the plainly racial overtones of California legislators' discussions and debates (U.S. P.I. Mot., Doc. 29-1 at 4-5, 9) and statements by map-drawer Mitchell (*id.* at 3-4, 8-9) by insisting that the "'relevant state actor[s]'" are "the voters" in California. Def. Opp. 22 (quoting *Alexander*, 602 U.S. at 8). Their argument fails.

#### 1.    The voters did not choose the map

The voters did *not* choose the actual Proposition 50 map—the legislature did. The map was enacted pursuant to AB 604, which was enacted by the legislature. AB 604, 2025 Cal. Legis. Serv. Ch. 96 (West) (codified at Cal. Elecs. Code § 21400 *et seq.*). But because Article 21 of the California Constitution had vested redistricting authority in the California Citizens' Redistricting Commission (the "Commission"), AB 604 was constitutionally prohibited from going into effect. Cal. Const. art. XXI, §§ 1-2. So, the legislature proposed to the voters Assembly Constitutional Amendment 8 ("ACA 8"), known as "Proposition 50," which would temporarily lift the state constitution's prohibition to allow the legislature to use its preferred map. Assemb. Const. Amend. 8, 2025-26 Reg. Sess. (Cal. 2025) (codified at Cal. Const. art. XXI, § 4). The United States does not suggest that returning redistricting authority to the legislature—all that the California voters did, albeit temporarily—is unlawful. What is unlawful is the map itself, as contained in AB 604 and

4

1    approved by the legislature *before* the 2025 Special Election.

2        The relevant intent behind the map was locked in when AB 604 was passed by the

3    legislature and signed by the Governor on August 21, 2025. *See* Cal. Legislative Info.,

4    AB-604 Redistricting: congressional districts, *Bill History*, https://tinyurl.com/52nz92yy

5    (last visited Dec. 8, 2025). Voters' authorization to lift an otherwise applicable barrier to

6    using AB 604 did not cleanse the taint.

7        In any event, there is no rule of constitutional law whereby unlawful discrimination

8    can be laundered through popular referendum and cleansed of its discriminatory purpose.

9    For example, when Colorado voters amended their constitution to prohibit any state action

10   designed to protect gay and lesbian individuals from discrimination on the basis of their

11   sexual orientation, the amendment violated the Equal Protection Clause and "classifie[d]

12   homosexuals not to further a proper legislative end but to make them unequal to everyone

13   else." *Romer v. Evans*, 517 U.S. 620, 623-24, 635 (1996). Likewise, in *Perry v. Brown*,

14   California violated the Equal Protection Clause when enacting Proposition 8—a ballot

15   initiative that "amended the state constitution to eliminate the right of same-sex couples

16   to marry." 671 F.3d 1052, 1063 (9th Cir. 2012), *vacated on other grounds sub nom.*

17   *Hollingsworth v. Perry*, 570 U.S. 693 (2013), *and dismissed on remand*, 725 F.3d 1140

18   (9th Cir. 2013) (order).

19       Defendants' cited authorities are not to the contrary. *See* Def. Opp. 15, 22. To be

20   sure, where campaign materials for a ballot initiative expressly advertise the drafters'

21   discriminatory intent, that is relevant evidence that the ballot measure has such a

22   discriminatory purpose. *See City of Los Angeles v. County of Kern*, 462 F. Supp. 2d 1105,

23   1113-14 (C.D. Cal. 2006) (analyzing, in dormant Commerce Clause challenge, ballot

24   materials that demonstrated an intent "to burden out-of-county economic interests"). And

25   on the flipside, where there is no evidence that *either* the drafters *or* the voters harbored

26   discriminatory intent, courts are wary of inferring such an intent. *See Crawford v. Board*

27   *of Educ. of City of Los Angeles*, 458 U.S. 527, 544-45 (1982). These cases do not suggest,

28

however, that where the legislative history of a ballot initiative betrays legislators' intent to discriminate on the basis of race that the voters can sanitize this intent at the ballot box.[3]

Even further afield are California cases regarding statutory interpretation in the context of ballot initiatives. *See* Def. Opp. 15 (citing *Robert L. v. Superior Court*, 69 P.3d 951, 957 (Cal. 2003)); Br. of Prof. Hasen as *Amicus Curiae* 10-12 (arguing that California cases on the topic of "statutory interpretation … can and should guide the Court" here). California law is irrelevant. State law has nothing to say about whether California acted with discriminatory intent in violation of the United States Constitution or a federal statute. Moreover, these California cases answer a question that differs from the one presented here. Those cases used extratextual materials to elucidate ambiguities in statutory text. *E.g.*, *Robert L.*, 69 P.3d at 955. But Proposition 50 is unambiguous, and as in similar Equal Protection Clause (or Voting Rights Act) cases, the pertinent question is whether a facially neutral law was *created* with an impermissible intent to discriminate. *See Allen v. Milligan*, 599 U.S. 1, 11 (2023); *Cooper v. Harris*, 581 U.S. 285, 291 (2017). Regardless of how that test applies in cases involving other California ballot initiatives, it is clear that AB 604—on which California voters had no say—was created in the legislature.

### 2. As the map drawer, Paul Mitchell is a relevant state actor

Defendants state (Def. Opp. 26) that Mitchell "is not a state actor and was not hired by the Legislature." But courts routinely consider the factors used by the map drawer in assessing whether race predominated over other redistricting criteria in the map adopted by the legislature. *See, e.g.*, *Alexander*, 602 U.S. at 22-23; *Cooper*, 581 U.S. at 299.

---

[3] Defendants also cite (Def. Opp. 22) *Washington v. Seattle School District No. 1*, but that case involved a ballot initiative under Washington's constitution, which "reserves to the people of the State 'the power to propose bills, laws, and to enact or reject the same at the polls, *independent of the legislature*.'" 458 U.S. 457, 462 n.4 (1982) (emphasis added) (quoting Wash. Const. art. II, § 1); *see id.* at 461-62 (describing residents' efforts to put the initiative on the ballot). There, only the voters' intent could have been relevant.

1    Regardless of whether the California legislature approached Mitchell, or he
2    approached them (Def. Opp. 26), he was "involved in the legislative process." *La Union*
3    *del Pueblo Entero v. Abbott*, 93 F.4th 310, 322 (5th Cir. 2024) (citation omitted). As
4    already noted, *supra* note 2, Mitchell has invoked legislative privilege over "deposition
5    inquiries that relate to the mapping work [he] undertook after July 2, the first date he was
6    in conversation with the legislature about drawing the map that would become the
7    Proposition 50 map" App. A at 2. Because legislative privilege "extends to material
8    provided by or to third parties *involved in the legislative process*." *La Union del Pueblo*
9    *Entero*, 93 F.4th at 322 (emphasis added), Mitchell apparently concedes that he was
10   "involved in the legislative process" with leaders of California's legislature, *id.*, and thus
11   qualifies as a "relevant state actor," *Alexander*, 602 U.S. at 8.

12   Mitchell was not just part of the legislative process; the legislature adopted his work
13   product and endorsed it as its own with only minute changes.[4] *Cf. LULAC v. Abbott*, --- F.
14   Supp. 3d ---, 2025 WL 3215715, at *93 (W.D. Tex. Nov. 18, 2025) (Smith, J., dissenting)
15   (explaining that the panel majority had improperly prioritized "evidence on the White
16   House's pressure, outside media coverage, the DOJ's letter, the Texas AG's letter, and
17   Governor Abbott's statements, *none* of which can easily be attributed to the Legislature"
18   over the testimony of the map drawer and relevant legislators), *stay pending appeal*
19   *granted*, No. 25A608, 2025 WL 3484863 (U.S. Dec. 4, 2025). Mitchell is therefore unlike
20   the Council President and his appointee to the Redistricting Commission in *Lee v. City of*
21   *Los Angeles*, 908 F.3d 1175 (9th Cir. 2018), discussed by Defendants (Opp. 27).
22   Statements and actions from these two officials in *Lee* "certainly show[ed] that race was

---

[4] Mitchell testified to this at his deposition on December 10, 2025. Mitchell also
testified that he spoke to several legislators, but notable is Sen. Sabrina Cervantes (Chair
of Senate Election Committee) and Assemblymember Macedo (Vice Chair of House
Election Committee), but he is asserting legislative privilege over what was said. The
United States will supplement this brief with the deposition transcript when it is available.

7

*a* motivation in drawing" a particular City Council district. 908 F.3d at 1183. But the redistricting process in that case "incorporated multiple layers of decisions and alterations from the entire Commission, as well as the City Council," including to the very district that the officials had purportedly sought to draw along racial lines. *Id.* at 1184. That is not the case here.

### B. Plaintiffs Have Established a VRA Violation Through the Intentional Use of Race in Redistricting

The VRA prohibits intentionally dividing voters by race. *See South Carolina v. Katzenbach*, 383 U.S. 301, 315 (1966) ("The Voting Rights Act of 1965 reflects Congress' firm intention to rid the country of racial discrimination in voting."). Although a plaintiff "need not prove a discriminatory purpose … to establish a violation" of the VRA, such an "intent" is sufficient to establish a violation. *Chisom v. Roemer*, 501 U.S. 380, 394 n.21 (1991) (citation omitted); *DNC v. Hobbs*, 948 F.3d 989, 1037-38 (9th Cir. 2020) (en banc), *rev'd on other grounds sub nom. Brnovich v. DNC*, 594 U.S. 647 (2021); *see Allen*, 599 U.S. at 11 ("The Fifteenth Amendment—and thus § 2 [of the VRA]—prohibits States from acting with a 'racially discriminatory motivation' or an 'invidious purpose' to discriminate." (citation omitted)); *McMillan v. Escambia County*, 748 F.2d 1037, 1046-47 (5th Cir. 1984) (holding that Section 2 included both a Results Test and an Intent Test, and that the at-large system violated both).

Even when race does not predominate for purposes of the Equal Protection Clause, *see* Section I.C., *infra*, it may nevertheless be an impermissible motivating factor for purposes of the VRA, which imposes a lower burden than the Equal Protection Clause on plaintiffs at step one of the analysis. *Hobbs*, 948 F.3d at 1038; *see Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) (explaining that a "motivating factor" need not be either "dominant" or "primary"). If race is a motivating factor, the burden then shifts "to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hobbs*, 948 F.3d at 1038. Here, Defendants must

demonstrate that AB 604 would have been enacted by the legislature absent the purpose of increasing Latino influence—with evidence that *predates* the passage of AB 604. *See* p. 3, *supra*. They have failed to do this. *Cf.* Def. Opp. 4-13 (detailing post-hoc evidence for the voters' passage of Proposition 50.)

Determining whether discriminatory intent is a motivating factor requires "a sensitive inquiry" into direct and circumstantial evidence, including: (1) the historical background of the decision, particularly if it reveals a series of decisions undertaken with discriminatory intent; (2) the sequence of events leading to enactment, including any substantive or procedural departures from the normal legislative process; (3) the legislative history, especially where there are contemporary statements by members of the decisionmaking body; and (4) the impact of action and whether it bears more heavily on one race than another. *Arlington Heights*, 429 U.S. at 266-68; *see also Hobbs*, 948 F.3d at 1039-41.

This inquiry is not difficult here. First, the discriminatory intent behind the Proposition 50 map is "overwhelming, and practically stipulated by the parties involved." *Miller v. Johnson*, 515 U.S. 900, 910 (1995) (quoting *Johnson v. Miller*, 864 F. Supp. 1354, 1375 (S.D. Ga. 1994)). "While it is true that it is unlikely for a legislator to stand in the well of the state house or senate and articulate a racial motive," *Fusilier v. Landry*, 963 F.3d 447, 464 (5th Cir. 2020) (quoting *Veasey v. Abbott*, 796 F.3d 487, 503 n.16 (5th Cir. 2015), *reh'g en banc granted*, 830 F.3d 216 (5th Cir. 2016)), that is precisely what occurred in this case. As already recounted (U.S. P.I. Mot. 4-5, 9), the legislative history is replete with statements by legislators who gave racial reasons for voting for the Proposition 50 map.

Defendants fault the United States for not specifying "a particular minority group" that California has sought to harm. Def. Opp. 42; *see also id*. 44 (arguing that the United States has also therefore not demonstrated irreparable harm). Their claim that a racial gerrymander drawn with a desire to "benefit Latino voters" does not equate to an "inten[t]

to harm" other groups resembles the once-familiar view that race discrimination is simply "a matter of whose ox is gored." *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 296 n.35 (1978) (opinion of Powell, J.). That mistaken understanding of race discrimination is not the law. *See Students for Fair Admissions v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 218-19 (2023). Just as a map drawn to favor white voters would necessarily harm all other groups, a map drawn to favor Latino voters harms all other California voters—not to mention the Latino voters that have been "treat[ed]" as "the product of their race." *Miller*, 515 U.S. at 912.

Second, the enactment of the Proposition 50 map departed from normal procedures so much so that it required amending California's constitution. Since 2010, California voters have entrusted an independent commission, rather than the state legislature, to draw the State's congressional district maps every ten years, in "the year following the year in which the national census is taken." Cal. Const. art. XXI, § 1. Yet here, the legislature scrapped the 2021 map after just four years, bypassed the normal mapmakers, and secretly enlisted Mitchell to draw a new map—a map that he has repeatedly and unabashedly attributed to racial favoritism (U.S. P.I. Mot. 3-4, 8-9).

And finally, the Proposition 50 map achieved the legislators' and Mitchell's stated racial goals. Mitchell declared that he increased the number of Latino-influence districts from 14 to 16. *See* Doc. 16-7 at 28. One detailed statistical study concluded that "the proposed Proposition 50 map [would] further increase Latino voting power over the current Commission map" and "likely increase Latino voting power, given its creation of two new Latino community influence districts and the expansion of the Latino electorate in other districts." Dr. Raquel Centeno & Dr. Jarred Cuellar, *Latino Voters and the November 2025 Special Election: Redistricting and Representation* at 1, https://tinyurl.com/5pjj9x7r (emphasis omitted) [hereinafter Centeno & Cuellar Report]; *see id.* at 9–10 (explaining how Latino voting power was increased in districts that were majority-Latino under the prior map by shifting Latino voters across district lines). The

study further explained that District 13, in the Central Valley between San Jose and Fresno, "increases from 50.2% Latino CVAP" (citizen voting-age population) "to about 54% Latino CVAP … allowing greater opportunity for Latino voters to choose the winning candidate." *Id.* at 12.

Likewise, Plaintiffs' expert Sean Trende determined that District 13 prioritized Hispanic voting power. Trende's report concludes that the new map's "boundaries between districts 5, 9 and 13 [near Los Angeles] appear to have been crafted to enhance the Hispanic Voting Age Population and Hispanic Citizen Voting Age Population in the district."[5] Doc. 16-5 at 3. According to Trende, the District's "twisted shapes cannot be explained by traditional redistricting principles, nor can they be explained by politics." *Id.*; *see Alexander*, 602 U.S. at 9-10 (explaining that it is important to "rul[e] out the competing explanation that political considerations dominated the legislature's redistricting efforts"). And Trende's alternative maps demonstrate that maximizing political gain came second to satisfying the optimal racial quota to elect a Latino candidate of choice. Doc. 16-5 at 37-42. Because "[r]ace predominated in these lines," *id.* at 3, it was necessarily a motivating factor. *See Arlington Heights*, 429 U.S. at 265. The burden thus shifts to Defendants to demonstrate that the Proposition 50 map would have been enacted without this racial motivation. Defendants' brief fails to do this.

Defendants' partisan goals do not neutralize their impermissible focus on race: "[I]ntentionally targeting a particular race's access to the franchise because its members vote for a particular party, in a predictable manner, constitutes discriminatory purpose." *Hobbs*, 948 F.3d at 1038; *Garza v. County of Los Angeles*, 918 F.2d 763, 771 (9th Cir. 1990) (stating that it is sufficient that legislators "chose fragmentation of the Hispanic voting population as the avenue by which to" protect incumbents); *see also Bush v. Vera*,

---

[5] The United States understands that Trende will be filing an additional statement in response to the Defendants' updated evidence and reserves the right to update this reply once that statement is filed.

517 U.S. 952, 968 (1996) (plurality opinion) (explaining in the equal-protection context that "to the extent that race is used as a proxy for political characteristics, a racial stereotype requiring strict scrutiny is in operation").

Whether the former District 13 had a slightly higher percentage of Latinos than the current district (*see* Def. Opp. at 33-34) is immaterial to and consistent with the optimal racial quota established by HOPE.[6] To be sure, Mitchell sought to increase democrat voting power. But when push came to shove, his priority was ensuring that majority-Hispanic districts met the racial target necessary for Latino voters to elect their candidate of choice. *See* Centeno & Cuellar Report 9-10; Doc. 16-5 at 37-42.

Finally, Defendants' reliance on *Abbott v. League of United Latin American Citizens*, No. 25A608, 2025 WL 3484863 (U.S. Dec. 4, 2025), is similarly misplaced. *See* Doc. 139 at 2. The Supreme Court's opinion in *Abbott* followed a lengthy hearing before a three-judge panel, followed by the entry of a preliminary injunction, *see LULAC v. Abbott*, 2025 WL 3215715, at *69 (W.D. Tex. Nov. 18, 2025). The conclusions drawn by the Supreme Court were thus made with the benefit of evidence provided to the Texas three-judge panel. That has yet to happen in this case, and the Court does not yet have the benefit of the evidence of racial bias in the creation of the map in AB 604. Moreover, as the Supreme Court noted in *Abbott*, the central flaw in the challenge to the Texas redistricting was the lack of an alternate map. *Abbott*, 2025 WL 3484863, at *3. As Defendants concede, Plaintiffs' expert has created an alternate map. Finally, the timing concerns noted by Defendants can still be avoided in this case unlike in Texas should this Court enter an injunction by December 18. *See* Doc. 113-2 at 7.

---

[6] *But see* Centeno & Cuellar Report at 12 (providing that Latino CVAP in District 13 increased in the Proposition 50 map).

**C.** **Plaintiffs and United States Have Established an Equal Protection Violation Through the Intentional Use of Race in Redistricting Without a Compelling Interest**

The Equal Protection Clause forbids a State, absent a compelling justification, from "separat[ing] its citizens into different voting districts on the basis of race." *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 187 (2017). Under this rubric, plaintiffs must show that race was the "predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Alexander*, 602 U.S. at 7. Here, Plaintiffs and the United States have introduced both "'direct evidence' of legislative intent, [and] 'circumstantial evidence of a district's shape and demographics.'" *Cooper*, 581 U.S. at 291 (quoting *Miller*, 515 U.S. at 916); *see generally* U.S. P.I. Mot. 3-6, 8-11; Pls.' P.I. Mot. 10-14.

Defendants state that "Plaintiff-Intervenor proffers no alternative map." Def. Opp. 36. First, an alternative map is not required where, like here, there is more than "meager direct evidence of racial gerrymander." *See Cooper*, 581 U.S. at 322. Even so, the United States has relied (U.S. P.I. Mot. 11) on the alternative maps submitted in Trende's expert report. There is no requirement that *each* plaintiff submit *separate* alternative maps. *See Alexander*, 602 U.S. at 10 (explaining that "an alternative map" provides evidence "that a rational legislature sincerely driven by its professed partisan goals would have drawn a different map with greater racial balance"). As for Defendants' expert, Dr. Grofman, he cannot testify to why Mitchell drew the lines he did, because Grofman was not involved in the map-drawing process. *See generally* Doc. 113-1.

Besides insisting (Def. Opp. 22-27) that only the voters' intentions count, Defendants respond that the Proposition 50 map was meant to further California's *political* objectives only by focusing on the campaign prior to the Special Election. Def. Opp. 14-40. It is no doubt true that Proposition 50 *also* furthered some political objectives. *See id.* 6-7. But it was not the vote on Proposition 50 that decided the map here. AB 604 was

13

enacted on August 21, 2025. In any event, concurrent political objectives do not save Defendants' case. It is still unconstitutional to racial gerrymander "in order to advance [non-race-based] goals, including political ones." *Cooper*, 581 U.S. at 291, n.1.[7]

Notably, in their response, Defendants do not even attempt to establish a compelling interest for "us[ing] race as their predominant districting criterion with the end goal of advancing their partisan interests." *Id.* at 308 n.7; *see* Def. Opp. 40. So the Court's Equal Protection analysis ends with the United States' satisfaction of step one. *See Cooper*, 581 U.S. at 322.

## II. The United States Has Demonstrated Irreparable Harm

Defendants claim that the United States has not shown irreparable harm because: "Plaintiffs make no showing that any voters will *lose* their right to vote because of Prop 50." Def. Opp. 43 (emphasis added). But this is not the correct standard for claims under the VRA or the Equal Protection Clause. These maps were not designed to *erase* the votes of non-Latino voters in California, but to *diminish* them in an unconstitutional race-based manner that also violates the precepts of the VRA. "[W]hen constitutional rights are threatened or impaired, irreparable injury is presumed. A restriction on the fundamental right to vote therefore constitutes irreparable injury." *Michigan State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 669 (6th Cir. 2016) (citation omitted). And "discriminatory voting procedures in particular are 'the kind of serious violation of the Constitution and

---

[7] Defendants' reliance on the United States Attorney General's characterization of the Proposition 50 map (or comments from political challengers to the Proposition 50 map) as partisan is misplaced. *See* Def. Opp. 7-9. It is the intent of the "relevant state actor[s]," not outside voices, that determine whether race played an unlawful role in the map-drawing process. *Alexander*, 602 U.S. at 8. Outsiders, including the United States, may object in the first instance to the Proposition 50 map's partisan results and then, upon seeing the evidence of discriminatory intent, appreciate and object that the map is a racial gerrymander.

the Voting Rights Act for which courts have granted immediate relief.'" *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (citation omitted).

### III.    The Balance of Equities and the Public Interest Favor Injunctive Relief

The balance of equities and the public interest weigh heavily in favor of preventing a government from segregating its citizens into voting districts based on their race. *See Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (stating that the third and fourth factors of the preliminary-injunction analysis "merge" when "the nonmovant is the government"); U.S. P.I. Mot. 15-17. Time and again, the Supreme Court has emphasized the importance of the right to vote in our constitutional republic and the improper and invidious nature of using race as a proxy to sort its citizens for voting districts. *See Miller*, 515 U.S. at 911.

"The idea is a simple one: At the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class." *Id.* (citations and internal quotation marks omitted). "When the State assigns voters on the basis of race, it engages in the offensive and demeaning assumption that voters of a particular race, because of their race, 'think alike, share the same political interests, and will prefer the same candidates at the polls.'" *Id.* at 912 (citations omitted).

The California legislature improperly treated Latino voters as a stereotypical monolith, assuming that when the Hispanic CVAP in a given district hits the optimal racial quota, Latino voters will "be very likely to elect Latino candidates of choice." App. B at 5. *See Miller*, 515 U.S. at 912 ("Race-based assignments 'embody stereotypes that treat individuals as the product of their race….'" (internal citations omitted)). This invidious stereotyping always "cause[s] society serious harm," *Miller*, 515 U.S. at 912, "may balkanize us into competing racial factions," and "threatens to carry us further from the goal of a political system in which race no longer matters—a goal that the Fourteenth and Fifteenth Amendments embody, and to which the Nation continues to aspire," *Shaw v. Reno*, 509 U.S. 630, 657 (1993).

15

## IV.    The 2021 Map Should Be Used While Litigation Proceeds

The appropriate remedy is to prohibit California from using its unlawful Proposition 50 map. Ordinarily, courts should "make every effort not to pre-empt" the "legislative task" of "redistricting and reapportioning legislative bodies" and "afford a reasonable opportunity for the legislature to … adopt[] a substitute measure." *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978) (opinion of White, J.). However, when "the state legislature cannot or will not adopt a remedial map that complies with federal law in time for use in an upcoming election," then "the job of drawing an interim map fall[s] to the courts." *Singleton v. Merrill*, 582 F. Supp. 3d 924, 1033 (N.D. Ala. 2022) (citing *Wise*, 437 U.S. at 540).

Under California's constitution, the power to redistrict lies with the Commission. Cal. Const. art. XXI, §§ 1-2. Proposition 50 only temporarily vested that authority with the legislature to instead use the map adopted in AB 604. Given the extensive and lengthy process that the Commission must undertake to draw a new map, *see* 2020 Cal. Citizens Redistricting Comm'n, *Report on Final Maps* 19-26 (Dec. 26, 2021) [Comm'n 2021 Report], https://tinyurl.com/4khu3szb (last visited Dec. 7, 2025), it is unrealistic to expect the Commission to develop a new map in time for the 2026 election.

The Commission's 2021 map provides a ready solution to balance the needs to prevent California from violating federal law and protect the voting rights of Californians, with the comity and federalism principles that make courts wary of imposing their own maps on states. First, the United States and California agree that the 2021 map complies with the VRA. Second, use of the 2021 map promotes principles of comity and federalism. State policy supports a return to a Commission-drawn map. The California Constitution provided that the Commission would draw congressional maps. Cal. Const. art. XXI, §§ 1-2; *see also id.* § 4(a) ("It is the policy of the State of California to support the use of fair, independent, and nonpartisan redistricting commissions nationwide."). Proposition 50 provided only a temporary break from this rule, *id.* § 4(d). The Commission also has had—

16

and continues to have—strong bipartisan support amongst California legislators. For example, during the debates on Proposition 50, Assembly Majority Leader Garcia, a Democrat, declared that "[i]f California Democrats had our way, the midterms would continue under the maps drawn by our independent Citizens Redistricting Commission." Doc. 42-5 at 215. Assemblymember Pellerin, a Democrat who chaired the Assembly's Election Committee hearings on Proposition 50, likewise proclaimed that "California believes in independent redistricting. We want every state to adopt it." *Id.* at 9. And Senator Strickland, a Republican, argued that the new map "demonstrate[s] why we need a Nonpartisan Citizens' Redistricting Commission, and why it was passed in the first place." Doc. 42-6 at 38.

Third, a return to the 2021 map would reduce voter confusion. When forced to impose a new map on states, federal courts should ensure "that the changes [are] feasible without significant cost, confusion, or hardship." *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring in the grant of applications for stays). The 2021 map already has been used in two congressional elections and was in effect until November 4, 2025. A return to this map is the least disruptive option for California voters.

Defendants allege that "the text of both AB 604 and ACA 8 also contemplate a narrow remedy in the event any part of this redistricting plan is invalidated." Def. Opp. 47. But that is not clear from the text. And any change to even just District 13 would necessarily impact every other district that intersects with it. That is why it is sometimes necessary to use an entirely new map when even a small number of districts are deemed unlawful under the Equal Protection Clause or the VRA. *See, e.g.*, *Harris v. McCrory*, 159 F. Supp. 3d 600, 627 (M.D.N.C. 2016) ("requir[ing] the North Carolina General Assembly to draw a new congressional district plan"), *aff'd sub nom. Cooper v. Harris*, 581 U.S. 285.

## CONCLUSION

For the foregoing reasons and those in the United States' memorandum in support of its motion for a preliminary injunction, the Court should grant the United States' motion.

DATED: December 10, 2025                    Respectfully submitted:

TODD BLANCHE                              JESUS A. OSETE*
Deputy Attorney General                   Principal Deputy Assistant Attorney General
BILAL A. ESSAYLI                          *s/ Matthew Zandi*
First Assistant United States Attorney    MATTHEW ZANDI
*s/ Julie A. Hamill*                      Chief of Staff & Special Counsel
JULIE A. HAMILL
Assistant United States Attorney          MAUREEN RIORDAN
United States Attorney's Office           Acting Chief, Voting Section

                                          ANDREW BRANIFF
                                          Acting Chief, Appellate Section

                                          DAVID GOLDMAN
                                          JOSHUA R. ZUCKERMAN
                                          GRETA GIESEKE
                                          Attorneys

                                          Civil Rights Division
                                          United States Department of Justice

                                          Attorneys for Plaintiff-Intervenor
                                          UNITED STATES OF AMERICA

---

* Assistant Attorney General Harmeet K. Dhillon is recused from this matter.

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for the United States of America certifies that this brief contains 6000 words, which complies with the word limit required by the court in Doc. No 82.

Dated: December 10, 2025            s/ Matthew Zandi
                                    Matthew Zandi
                                    Chief of Staff & Special Counsel


# ATTESTATION

PURSUANT TO LOCAL RULE 5-4.3.4 This certifies, pursuant to Local Rule 5-4.3.4, that all signatories to this document concur in its content and have authorized this filing.


Dated: December 10, 2025            s/ Matthew Zandi
                                    Matthew Zandi
                                    Chief of Staff & Special Counsel