JESUS A. OSETE*
Principal Deputy Assistant Attorney General
MATTHEW ZANDI (CA No. 203329)
Chief of Staff & Special Counsel
MAUREEN RIORDAN (NY No. 2058840)
Acting Chief, Voting Section
ANDREW BRANIFF (IN No. 23430-71)
Acting Chief, Appellate Section
DAVID GOLDMAN (VA No. 98922)
JOSHUA R. ZUCKERMAN (DC No. 1724555)
GRETA GIESEKE (TX No. 24132925)
Attorneys
    Civil Rights Division
    United States Department of Justice
    950 Pennsylvania Avenue, NW
    Washington, D.C.  20530
    Telephone: (202) 514-3847
    E-Mail:     matt.zandi@usdoj.gov

TODD BLANCHE
Deputy Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
JULIE A. HAMILL (CA No. 272742)
Assistant United States Attorney
    United States Attorney's Office
    300 North Los Angeles Street, Suite 7516
    Los Angeles, California 90012
    Telephone: (213) 894-2464
    E-Mail:     julie.hamill@usdoj.gov

Attorneys for Plaintiff-Intervenor
UNITED STATES OF AMERICA

MICHAEL A. COLUMBO (SBN: 271283)
mcolumbo@dhillonlaw.com
SHAWN COWLES (SBN: 163826)
scowles@dhillonlaw.com
MARK P. MEUSER (SBN: 231335)
mmeuser@dhillonlaw.com
AMBER R. HULSE (Admitted PHV)
ahulse@dhillonlaw.com
DHILLON LAW GROUP INC.
4675 MacArthur Court, Suite 1410
Newport Beach, CA 92660
Telephone: (415) 433-1700
Fax: (415) 520-6593

Attorneys for Plaintiffs

---

\* Assistant Attorney General Harmeet K. Dhillon is recused from this matter.

1
2

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

3
4
5
6
7
8
9
10
11
12
13

| | |
|---|---|
| DAVID TANGIPA, *et al.*,<br><br>                              *Plaintiffs*,<br><br>    and<br><br>UNITED STATES OF AMERICA,<br><br>                    *Plaintiff-Intervenor*,<br><br>            v.<br><br>GAVIN NEWSOM, in his official capac[...]<br>as the Governor of California, *et al.*,<br><br>                    *Defendants*, | Case 2:25-cv-10616-JLS-WLH-KKL<br>Three-Judge Court<br><br>**PLAINTIFF-INTERVENOR'S MOTION TO COMPEL THE TESTIMONY OF PAUL MITCHELL**<br><br>**Hon. Josephine L. Staton<br>Hon. Wesley L. Hsu<br>Hon. Kenneth K. Lee**<br><br>**Hearing Date: December 15, 2025<br>Time: 9 a.m.<br>Courtroom: One** |

14

## TABLE OF CONTENTS

15
16
17
18
19
20
21
22
23
24
25
26
27

BACKGROUND ........................................................................................... 1

ARGUMENT ................................................................................................ 4

   I.    Request No. 1 Seeks Relevant Documents................................................5

   II.   Mitchell Has Not Met His Burden to Show That the
       Legislative Privilege Applies......................................................................6

   III. Any Applicable Legislative Privilege Must Yield to the
       Compelling Interests in Disclosure .........................................................8

   IV. The First Amendment Privilege Does Not Apply ................................. 13

   V.  The Deliberative-Process Privilege Does Not Apply.......................... 14

   VI. The Proper Remedy Is to Compel Immediate Disclosure or
       Draw an Adverse Inference ....................................................... 15

CONCLUSION............................................................................................ 19

28

i

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. S. Car. State Conf. of NAACP,*
    602 U.S. 1 (2024)................................................................. 17

*Alliance Atlantis Releasing Ltd. v. Bob Yari Prods.,*
    2009 WL 10672591 (C.D. Cal. May 14, 2009)........................................ 17

*Apple v. Match Grp., Inc.,*
    2021 WL 3727067 (N.D. Cal. Aug. 19, 2021) ......................................13, 14

*Arlington Heights,*
    429 U.S. 252 (1977)..........................................................5, 9, 10

*Baldus v. Members of the Wis. Gov. Accountability Bd.,*
    843 F. Supp. 2d 955 (E.D. Wis. 2012)................................................ 12

*Benisek v. Lamone,*
    263 F.Supp.3d 551 (D. MD. 2017) ................................................... 8

*Bethune-Hill v. Va. State Bd. of Elections,*
    114 F. Supp. 3d. 323 (E.D. Va. 2015) ................................................ 9

*Cano v. Davis,*
    193 F. Supp. 2d 1177 (C.D. Cal. 2002) .............................................. 12

*Cerro Gordo Charity v. Fireman's Fund Am. Life Ins. Co.,*
    819 F.2d 1471 (8th Cir. 1987) ...................................................... 18

*Chi. Coll. of Osteopathic Med. v. George A. Fuller Co.,*
    719 F.2d 1335 (7th Cir. 1983) ...................................................... 17

*Coquina Investments v. T.D. Bank, N.A.,*
    760 F.3d 1300 (11th Cir. 2014) ..................................................17, 18

*Doe v. Horne,*
    737 F. Supp.3d 758 (D. Ariz. 2024) ................................................. 15

*Favors v. Cuomo,*
    285 F.R.D. 187 (E.D.N.Y. 2012)................................................... 10, 19

*Fla. Ass'n of Rehab. Facilities, Inc. v. State of Fla. Dep't of Health & Rehab. Servs.,*

164 F.R.D. 257 (N.D. Fla. 1995) ................................................................... 6

*Hickman v. Taylor*,
329 U.S. 495 (1947) ..................................................................................... 4

*In re Grand Jury*,
821 F.2d 946 (3d Cir. 1987) ......................................................................... 8

*Jeff D. v. Otter*,
643 F.34d 278 (9th Cir. 2011) ...................................................................... 6

*Kaufman v. Bd. of Trustees*,
168 F.R.D. 278 (C.D. Cal. 1996) ................................................................. 4

*Kay v. City of Rancho Palos Verdes*,
2003 WL 25294710 (C.D. Cal. Oct. 10, 2023) ...................................... 8, 10

*La Unión Del Pueblo Entero v. Abbott*,
2022 WL 1667687 (W.D. Tex. May 25, 2022) ............................................ 5

*La Union del Pueblo Entero v. Abbott*,
93 F.4th 310 (5th Cir. 2024) ........................................................................ 7

*League of Women Voters of Florida, Inc. v. Lee,*
340 F.R.D. 446 (N.D. Fla. 2021) ............................................................... 11

*League of Women Voters of Mich. v. Johnson*,
2018 WL 2335805 (E.D. Mich. May 23, 2018) .......................................... 5

*LiButti v. United States*,
107 F.3d 110 (2d Cir. 1997) ................................................................. 17, 18

*LULAC v. Abbott*,
601 F. Supp. 3d 147 (W.D. Tex. 2022) ................................................. 18, 19

*Mi Familia Vota v. Fontes*,
129 F.4th 691 (9th Cir. 2025) ...................................................................... 6

*Newport Pac. Inc. v. Cty. of San Diego*,
200 F.R.D. 628 (S.D. Cal. 2001) .......................................................... 10, 12

*Page v. Virginia State Board of Elections*,
15 F. Supp. 3d 657 (E.D. Va. 2014) ..................................................... 12, 16

*Pasadena City Bd. of Educ. v. Spangler*,
    427 U.S. 424 (1976) ............................................................................ 11

*Perez v. Texas*,
    891 F. Supp. 2d 808 (W.D. Tex. 2012) ............................................... 5

*Perry v. Schwarzenegger*,
    591 F.3d 1147 (9th Cir. 2010) ...................................................... 12, 13

*Petteway v. Galveston Cnty.*,
    2023 WL 3452065 (S.D. Tex. May 15, 2023)....................................... 6

*Pulte Home Corp. v. Montgomery Cnty., Md.*,
    2017 WL 2361167 (D. Md. May 31, 2017)......................................... 11

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006)................................................................................ 15

*Reynolds v. Sims*,
    377 U.S. 533 (1964)............................................................................. 9

*S. Car. State Conf. of NAACP v. McMaster*,
    584 F. Supp. 3d 152 (D.S.C. 2022)................................................. 5, 7

*Shoen v. Shoen*,
    5 F.3d 1289 (9th Cir. 1993) ................................................................ 4

*Turtle Mountain Band of Chippewa Indians v. Jaeger*,
    344 F.R.D. 89 (D.N.D. 2022) ........................................................... 12

*United States v. Gillock*,
    445 U.S. 360 (1980)....................................................................... 8, 10

*United States v. Irvin*,
    127 F.R.D. 169 (C.D. Cal. 1989).................................................. 11, 18

*United States v. Mallory*,
    989 F.3d 730 (4th Cir. 2021) ............................................................ 18

*Veasey v. Perry*,
    2014 WL 1340077 (S.D. Tex. Apr. 3, 2014)...................................... 5

*Vermont Agency of Nat. Res. v. United States*,

529 U.S. 765 (2000) .................................................................................. 9

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ............................................................................... 5

*Williams v. Rhodes*,
    393 U.S. 23 (1968) ................................................................................. 9

*Yick Wo v. Hopkins*,
    118 U.S. 356 (1886) .............................................................................. 10

**Rules**

Fed. R. Civ. P. 26(b)(1) ............................................................................... 4

Fed. R. Evid. 401(b) ..................................................................................... 5

Paul Mitchell drew the Proposition 50 Map.  He spoke to key legislators in doing so.  Indeed, except for minor changes, the map he drew was ultimately the map the legislature enacted.  But when pressed under oath "how" he drew his map and "why" he drew it the way he did, he invoked legislative privilege and refused to answer these questions.  Indeed, his counsel instructed him over 100 times not to answer the questions posed, including whether Mitchell made changes to the map in order "to preserve a racial quota … in certain districts in the Proposition 50 map."  Declaration of Julie A. Hamill (Hamill Decl., ¶ 12, Ex. 3 at 41:15-21).  After an unsuccessful meet-and-confer, Plaintiffs and Plaintiff-Intervenor seek to compel information from Mitchell.  Short of live testimony at a second deposition, the Court should draw an adverse inference over Mitchell's refusal to testify.  Otherwise, Plaintiffs and Plaintiff-Intervenor have no other timely remedy before *Purcell* arguably kicks in.

## BACKGROUND

Paul Mitchell, the head of the demography firm Redistricting Partners, drew the map approved by the California Legislature in Assembly Bill 604 and ultimately adopted by voters in Proposition 50.  Compl. ¶ 50.  Mitchell has made several public statements acknowledging that he considered race when drawing the map and intentionally sought to empower Latino voters.

For example, in a presentation to the advocacy group Hispanas Organized for Political Equality ("HOPE"), Mitchell explained that when asked to draw the new map, he "sent a text to [his] little chat [to] all [his] Redistricting Partners staff … And [he] started listing out this concept of drawing a replacement Latino majority/minority district in the middle of Los Angeles."  Doc. 28-2, Ex. B at 23:18–24:1.  Creating this "Latino majority/minority district" "was the number one thing [he] first started thinking about." *Id.* at 24:2–5. Mitchell claimed that the resulting map "will be great for the Latino community" in that it "bolster[s]" "Latino districts … in order to make them most effective." *Id.* at 30:6–10.

1

Mitchell further explained that he considered a HOPE letter that expressed "concern about the elimination of a majority-minority Latino district within the area of Los Angeles Gateway cities." Doc. 141-2 at 2. He stated that the letter "illustrated what HOPE wanted to see done … allowing for the creation of five Latino majority/minority districts in an area where there are currently four." *Id.*

On the Capitol Weekly Podcast, Mitchell again confirmed that internal discussions explicitly referenced the Voting Rights Act [VRA] and Latino communities and districts. He described unidentified advocates who wanted to "throw away the VRA" and pursue a "52/0 map," that is, eliminate the possibility of Republicans winning any congressional districts, contrasted with crafting "a five-district pick-up map [that would] follow the [VRA], [and] keep communities of interest together." Dkt. 42-3 at 24, 28.

Plaintiffs and Plaintiff-Intervenor (collectively, "Plaintiffs"), sought to depose Mitchell about his public statements and his consideration of race throughout the map-drawing process. On December 1, Plaintiffs served Mitchell with a subpoena and notice of deposition to take place on December 5, 2025. Hamill Decl., ¶ 6, Ex. 1. Plaintiffs and Mitchell agreed to hold the deposition on December 10 to accommodate Mr. Mitchell's schedule. Hamill Decl., ¶ 7.

At 1:17 A.M. PST on December 10—the day of Mitchell's deposition—counsel for Mitchell emailed counsel for Plaintiffs, acknowledging the "late hour" and asserting that Mitchell would be unable to "produce relevant non-privileged documents … before the December 15 hearing concludes." Hamill Decl., ¶ 8, Ex. 2. Counsel also attached formal objections to Plaintiffs' single request for production. *Id.* Plaintiffs had requested Mitchell's "files, including, without limitation, all correspondence, memoranda, analyses, reports, tables, figures, charts, invoices, slide decks, talking points, electronic maps and data files, and other documents, relating to [his] conception, drafting, revision, analysis, or presentation of the California congressional map placed on the November 2025 ballot as Proposition 50." ("Request No 1"). Hamill Decl., ¶ 6, Ex. 1. In relevant part, Mitchell

objected to Plaintiffs' Request to "the extent it requires disclosure of information protected by the First Amendment privilege … Mr. Mitchell further objects to this Request as it would reveal legislators' deliberations and/or information relied on by legislators within the legislative process and as such is protected by the legislative and/or deliberative process privileges." Hamill Decl., ¶ 8, Ex. 2 at 3:1-4.  Mitchell further objected that "[s]uch a broad request with a short time provided to respond is not proportional to needs of the parties for this proceeding especially in light of the Supreme Court's recent ruling in the Texas redistricting case that it is now too late for a court to order changes for the 2026 elections." *Id.* at 3:12-14.

Mitchell's obstruction was only beginning.  During the deposition Mitchell's attorney repeatedly objected to questions concerning the facts of Mitchell's role in the process of creating and to a small extent, augmenting the map of California voting districts that later became codified in AB 604.  He asserted legislative privilege when asked whether "anyone in the Legislature ask[ed] [him] to draw the Proposition 50 maps." Hamill Decl., ¶ 12, Ex. 3 at 21:16–20.  He asserted legislative privilege when asked to identify the "factors" he considered and his "methodology" while drawing the map, *Id.* at 26:6–12, and when asked "what data was available" to him while he was "drawing the Proposition 50 map." *Id.* at 28:9–14.  He asserted privilege when asked if he "consider[ed] race at all in reviewing the proposed changes from the DCCC and making changes to the map" and whether his changes were "designed to preserve a racial quota or racial target." *Id.* at 41:12–23.  He declined to answer based on privilege whether "the point of that exercise was to create a fifth Latino majority district." *Id.* at 123:12–15.  He asserted privilege when asked whether he merged "two white majority districts like the HOPE letter suggested." *Id.* at 139:116–20.  He asserted privilege when asked about a letter DCCC submitted to the public legislative portal, *Id.* at 56:11–4, and when asked whether DCCC submitted his map to the Legislature. *Id.* at 64:13–19.

3

Most incredibly, he asserted privilege on matters completely outside of the legislative process.  When asked whether he told HOPE that "creating a Latino majority district … was the start point," *Id.* at 121:22–122:4, he asserted privilege. He similarly stymied questions about his internal process.  He asserted privilege when asked whether he "drew the districts to protect the voting power of protected classes." *Id.* at 69:25–70:4.  He also asserted privilege when asked whether his staff collected "community of interest data." *Id.* at 73:22–74:1.  Even benign questions were not above an assertion of privilege as he declined to answer when asked whether "racial communities of interest" were considered, *Id.* at 74:6–11, or even what was his "starting point for Proposition 50." *Id.* at 112:11–12.

## ARGUMENT

Plaintiffs are entitled to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1).  The "discovery provisions" of Rule 26 "are to be applied as broadly and liberally as possible," and any "privilege limitation must be restricted to its narrowest bounds." *Hickman v. Taylor*, 329 U.S. 495, 506 (1947); *see also Shoen v. Shoen*, 5 F.3d 1289, 1292 (9th Cir. 1993) ("[P]re-trial discovery is ordinarily accorded a broad and liberal treatment.") (quotation marks omitted).  "Toward this end, Rule 26(b) is liberally interpreted to permit wide-ranging discovery of all information reasonably calculated to lead to the discovery of admissible evidence.  The burden of proof is on the party opposing discovery to claim lack of relevancy and privilege." *Kaufman v. Bd. of Trustees*, 168 F.R.D. 278, 280 (C.D. Cal. 1996).

Mitchell must produce documents responsive to Request No. 1.  These documents are highly relevant to Plaintiffs' claims that Proposition 50 constitutes a racial gerrymander and violates the Equal Protection Clause and the Voting Rights Act.  These documents also are unprotected by the asserted First Amendment, legislative, and deliberative-process privileges.

## I.    Request No. 1 Seeks Relevant Documents

The dispositive question in this case is whether race predominated or otherwise was improperly considered in the drawing of the Proposition 50 map.  There is no dispute that Mitchell drew the map.  Therefore, any consideration of race by Mitchell supports Plaintiffs' claims that Proposition 50 constitutes an illegal racial gerrymander and therefore is of the utmost "consequence in determining the action."  Fed. R. Evid. 401(b).  Request No. 1 plainly seeks these consequential documents relating to Mitchell's "drafting, revision, analysis, or presentation" of the Proposition 50 map.

Draft redistricting plans, the data used in drafting those plans, the Legislators' communications (especially with map-drawers), and other legislative materials are not only relevant to this case but bear directly on whether "invidious discriminatory purpose was a motivating factor" in California's redistricting.  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).  There can be no serious dispute that "documents reflect[ing] the State Legislators' [and their agents'] contemporaneous thoughts and motivations in drafting and enacting" legislation are "highly relevant" in cases involving a discriminatory purpose.  *La Unión Del Pueblo Entero v. Abbott*, 2022 WL 1667687, at *6 (W.D. Tex. May 25, 2022).  Thus, courts have consistently found that legislative materials are relevant in Voting Rights Act enforcement actions. *See, e.g.*, *La Unión Del Pueblo Entero*, 2022 WL 1667687, at *6; *S. Car. State Conf. of NAACP v. McMaster*, 2022 WL 425011, at *6 (D.S.C. Feb. 10, 2022); *League of Women Voters of Mich. v. Johnson*, 2018 WL 2335805, at *4, 6 (E.D. Mich. May 23, 2018); *Veasey v. Perry*, 2014 WL 1340077, at *2 (S.D. Tex. Apr. 3, 2014); *Perez v. Texas*, 891 F. Supp. 2d 808, 833 n.94 (W.D. Tex. 2012) (three-judge court).

The same is true here. If documents relating to Mitchell's "drafting, revision, analysis, or presentation" of the Proposition 50 map indicate that Mitchell considered race or —despite his public boastings—did not consider race, then those materials plainly are relevant to the at-issue claims and defenses.

## II.    Mitchell Has Not Met His Burden to Show That the Legislative Privilege Applies

Legislative privilege "is a qualified privilege that generally shields legislators from compulsory evidentiary process." *Mi Familia Vota v. Fontes*, 129 F.4th 691, 731 (9th Cir. 2025).  It can "extend … to legislative aides and assistants" who are agents of a legislator. *Jeff D. v. Otter*, 643 F.34d 278, 290 (9th Cir. 2011).  At his deposition, Mitchell asserted legislative privilege as to anything regarding how the maps were drawn, any of his communications with the DCCC or the California legislature and whether there was a racial quota. Mitchell's assertion of legislative privilege as to all of these topics fail.

*First*, the legislative privilege is limited to "documents or information that contains or involves opinions, motives, recommendations, or advice" given to legislators.  *Petteway v. Galveston Cnty.*, 2023 WL 3452065, at *7 (S.D. Tex. May 15, 2023) (citation omitted).  It does not extend to "[f]actual matter collected for the information and use of legislators [or] [f]actual summaries in an advisory communication." *Fla. Ass'n of Rehab. Facilities, Inc. v. State of Fla. Dep't of Health & Rehab. Servs.*, 164 F.R.D. 257, 267 (N.D. Fla. 1995).

In short, "information which does not reveal the content of communications with a legislator should not be privileged." *Fla. Ass'n of Rehab. Facilities*, 164 F.R.D. at 267–68.  Thus, any documents containing purely factual information that Mitchell considered when drawing the map, such as demographic statistics or past election results, is unprotected by the legislative privilege.  These documents "do not reflect opinions, motives, recommendations, or advice about legislative decisions ***between legislators*** or ***between legislators and their staff***." *Petteway v. Galveston Cnty.*, 2023 WL 3452065, at *8 (S.D. Tex. May 15, 2023) (holding that legislative privilege does not protect notes of a meeting with redistricting counsel).

As listed above, *supra* at pp. 4-5, Mitchell's objections went far beyond any internal communications or deliberations with California legislative members or staff. He refused

6

to answer questions about his own internal process. He refused to answer questions about his considerations when drawing his maps and his process, prior to their presentation to the DCCC. He refused to answer questions about radio interviews he did after AB 604 had already passed and been enrolled as law.

*Second,* legislative privilege does not apply to responsive documents created before July 2 or actions that Mitchell took before July 2 because that is when he first communicated with a California legislator. *See* Ex. 2. Legislative privilege applies only to "acts done at the direction of, instruction of, or for the legislator." *La Union del Pueblo Entero v. Abbott*, 93 F.4th 310, 322 (5th Cir. 2024). Though much of Mitchell's work was undoubtedly done at legislative direction and instruction, he cannot establish this necessary element for anything before July 2.

Many of the supposedly privileged documents and actions here cannot possibly relate to acts done at a legislator's direction. According to Mitchell's counsel, July 2 was "the first date he was in conversation with the legislature about drawing the map that would become the Proposition 50 map." Ex. 2. Any documents or actions that predate July 2 therefore are unprotected by the legislative privilege.

*Third*, legislative privilege also does not justify Mitchell's refusal to answer deposition questions about "how" he drew the Proposition 50 map and "why" he drew the map the way he did. A non-party's "invocation of legislative privilege is without merit" where a plaintiff seeks evidence of how a "map was redrawn" and whether the legislature "had the specific intent to dilute the votes" of a specific group. *Benisek v. Lamone*, 263 F.Supp.3d 551 (D. MD. 2017); *see also S. Car. State Conf. of NAACP v. McMaster*, 584 F. Supp. 3d 152, 166 (D.S.C. 2022) (rejecting claims of legislative privilege in a racial-gerrymander case and ordering production of "[a]ll documents which relate in any manner to the intent behind any proposed design" of a map).

His objections were so broad it became impossible to determine when the

legislative privilege began and where it ended. He wielded his privilege claims like a sword to prevent any questioning of his maps and his process. Considering that his maps essentially became AB 604, this tactic prohibited any meaningful discovery.

### III.    Any Applicable Legislative Privilege Must Yield to the Compelling Interests in Disclosure

Even if the legislative privilege could apply, the requisite balancing of the relevant interests nonetheless counsels in favor of compelling Mitchell's testimony and the disclosure of the requested documents. In *United States v. Gillock*, 445 U.S. 360, 373 (1980), the Supreme Court "balanced" the effect of "denial of a privilege to a state legislature" against "the need of enforcing federal criminal statutes." The Court declined to "recogni[ze] … an evidentiary privilege for state legislators for their legislative acts" because doing so "would impair the legitimate interest of the Federal Government in enforcing its criminal statutes with only speculative benefit to the state legislative process." *Id.*

Lower courts, including a court in this District, have extended *Gillock* to civil cases. In *Kay v. City of Rancho Palos Verdes*, 2003 WL 25294710 at *13–14 (C.D. Cal. Oct. 10, 2023), the court noted that *Gillock* "rejected the notion that the common law immunity of state legislators gives rise to a general evidentiary privilege … *Gillock* instructs us that any such privilege must be qualified, not absolute, and must therefore depend on a balancing of the legitimate interests on both sides." Likewise, the Third Circuit has held that the legislative privilege "must be qualified, not absolute, and must therefore depend on a balancing of the legitimate interests on both sides." *In re Grand Jury*, 821 F.2d 946, 957 (3d Cir. 1987) (citing *Gillock*, 445 U.S. 360). Specifically, courts must balance "the importance of the interests that would be served by forcing disclosure of information … against the interference in the legislative process that would follow." *Kay*, 2003 WL 25294710 at *14. This is especially true where, as here, a plaintiff "proceeds against the *State*" rather than

individual legislators and seeks evidence to vindicate important *public* rights guaranteed by federal law. *Bethune-Hill v. Va. State Bd. of Elections*, 114 F. Supp. 3d. 323, 336 (E.D. Va. 2015).

Compelling production of Mitchell's documents would vindicate interests of the highest magnitude. The individual plaintiffs have an overwhelming interest in vindicating their own voting rights, and the United States has a similarly strong interest in protecting the voters of California from the invidious race-based gerrymander that is Proposition 50. No one contests that the right to vote is "a fundamental political right, because [it is] preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). "Other rights, even the most basic, are illusory if the right to vote is undermined." *Williams v. Rhodes*, 393 U.S. 23, 31 (1968). "Racially based gerrymandering" undermines this paramount right of franchise because it impermissibly "result[s] in denying to some citizens their right to vote." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). That is precisely what Plaintiffs seek to prevent.

The United States also has its own powerful interest in ensuring that California does not violate the Voting Rights Act or Equal Protection Clause. When a State discriminates on the basis of race, it harms not only its own citizens but also the United States itself. It is "beyond doubt" that the United States suffers "an injury to … its sovereignty" when a State violates federal law, *Vermont Agency of Nat. Res. v. United States*, 529 U.S. 765, 771 (2000), including the United States Constitution, *see Pasadena City Bd. of Educ. v. Spangler*, 427 U.S. 424, 430-431 (1976).

The requested discovery is necessary for Plaintiffs to vindicate their interests. Mitchell is likely to have in his possession, custody, or control documents that indicate whether and the extent to which he considered race in drawing the Proposition 50 map. *Supra* at pp. 3, 5-7. As the Supreme Court has recognized, the "legislative or administrative history" of governmental decisionmaking "may be highly relevant … in determining whether racially discriminatory intent existed." *Arlington Heights*, 429 U.S.

9

252, 268 (1977).  Such is the case here.

Other factors frequently considered by courts in considering assertions of legislative privilege also support compelling disclosure here.  The "relevance of the evidence sought weighs in favor of disclosure" because Mitchell's documents and testimony are highly relevant for the reasons discussed above.  *Newport Pac. Inc. v. Cty. of San Diego*, 200 F.R.D. 628, 639 (S.D. Cal. 2001); *see supra* at 6, 7.  The documents are not easily "[a]vailab[le] … from [o]ther [s]ources."  *Newport Pac.*, 200 F.R.D. at 628, 638 (boldface omitted).  They will promote "[a]ccurate [j]udicial [f]act [f]inding" because more information always facilitates the search for truth.  *Newport Pac.*, 200 F.R.D. at 638 (boldface omitted).  The "[s]eriousness of the [l]itigation [and] [a]llegations of [g]overnmental [m]isconduct" also weigh in favor of disclosure.  *Id.* (boldface omitted).  California's discrimination against non-Latino voters is extremely serious insofar as the Legislature adopted a map designed to empower its favored racial group at the expense of all others, including minorities that have historically been subjected to discrimination.  The United States accordingly has an overwhelming "[f]ederal [i]nterest in [the] [e]nforcement of [f]ederal [l]aw," another factor supporting disclosure.  *Id.* (boldface omitted).

Further, "courts have indicated that communications with technical employees who provide information to legislators collectively, but who do not advise a particular legislator as his or her personal staff, at best deserve weak deference in the balancing of competing interests."  *Favors v. Cuomo*, 285 F.R.D. 187, 212 (E.D.N.Y. 2012).  Mitchell was not an agent or employee of an individual legislator and acknowledged at his deposition that he spoke with several legislators while drawing the Proposition 50 map, including Speaker of the Assembly Robert Rivas's Chief of Staff, Senator Sabrina Cervantes (Chair of the Senate Election Committee) and Assemblymember Alexandra Macedo (Vice Chair of the House Election Committee).  Hamill Decl., ¶ 12, Ex. 3 at 23:20-22, 76:2-14, 158:14-19.  His communications with high-ranking legislators and their staff, over which he asserted

legislative privilege, belie any assertions that he worked for "a particular legislator" and suggest that he worked for the Legislature as a whole.

In contrast to Plaintiffs' strong interest in compelling disclosure, Mitchell and the California Legislature have minimal interests in preventing disclosure. They have no interest in "the maintenance of confidentiality," which "is not the fundamental concern of the legislative privilege." *Pulte Home Corp. v. Montgomery Cnty., Md.*, 2017 WL 2361167, at *8 (D. Md. May 31, 2017). "[B]ecause confidentiality is not the legislative privilege's animating concern, the privilege would not prevent Plaintiffs from asking the third parties with which the Legislators communicated about those communications." *League of Women Voters of Florida, Inc. v. Lee*, 340 F.R.D. 446, 454 n.2 (N.D. Fla. 2021). That is precisely what Plaintiffs have done here: requested from Mitchell his correspondence—with the Legislature and anyone else—about the Proposition 50 map, as well as any related documents.

Any other interests Mitchell and the California Legislature might assert in defense of the legislative privilege are unavailing. Although "[t]he role of the government in the litigation itself" can be a factor in assessing the claim of privilege, *United States v. Irvin*, 127 F.R.D. 169, 173 (C.D. Cal. 1989), here "the very nature of the allegations and the role of the government in the litigation … tip the scales in favor of disclosure," *Newport Pac.*, 200 F.R.D. at 640. Likewise, there is little concern that disclosure will chill the legitimate and necessary exercise of legislative power or otherwise result in "[p]ossible [f]uture [t]imidity by [g]overnment [e]mployees." *Id.* (boldface omitted). Mitchell (and individual legislators, *see* Dkt. 29-1 at 4–5) already have discussed publicly the role of race in the mapmaking process, at least at a high level. Plaintiffs merely ask Mitchell to produce documents and provide deposition testimony that prove these public claims.

Perhaps disclosure will be embarrassing for Mitchell or the legislature and will chill any future attempts to racially discriminate. That is a good thing. "[I]f because of this case, members of government agencies acting on behalf of the public at large are reminded

11

that they are subject to scrutiny, a useful purpose will have been served." *Newport Pac.*, 200 F.R.D. at 640.  California's citizens do not "have the interest or time to endure the litigation tactics being used by public officials or their private counsel in what has quickly become a poorly disguised attempt to cover up a process that should have been public from the outset." *Baldus v. Members of the Wis. Gov. Accountability Bd.*, 843 F. Supp. 2d 955, 960-61 (E.D. Wis. 2012).  If California did not discriminate on the basis of race, Mitchell should say so.

Applying the proper balancing tests, other courts have denied assertions of legislative privilege in Voting Rights Act cases.  In *Cano v. Davis*, a three-judge court in this District held that the "legislative privilege does not bar … a third party non-legislator[] from testifying to conversations with legislators and their staffs."  193 F. Supp. 2d 1177, 1179 (C.D. Cal. 2002) (per curiam).  In a separate opinion, Judge Reinhardt further explained that "courts hearing redistricting matters have frequently considered testimony by legislators and staff members regarding legislative acts and statements designed to show the presence or absence of discriminatory motivation."  *Id.* at 1181-82 (Reinhardt, J., concurring in part and dissenting in part).[1]  And in *Turtle Mountain Band of Chippewa Indians v. Jaeger*, 344 F.R.D. 89, 101 (D.N.D. 2022), the court considered whether Native Americans were the victims of an illegal racial gerrymander and held that because "voting-rights litigation is especially serious," state legislators could not assert legislative privilege at their depositions.

*Page v. Virginia State Board of Elections*, 15 F. Supp. 3d 657 (E.D. Va. 2014), is particularly instructive.  Plaintiffs alleged that Virginia's redistricting process resulted in a "racial gerrymander."  *Id.* at 659.  They sought documents and deposition testimony

---

[1] Judge Reinhardt dissented from the court's holding as to the nature and scope of legislative privilege afforded state legislators.  *Cano*, 193 F. Supp. 2d at 1181 (Reinhardt, J., concurring in part and dissenting in part).  The court was in full agreement about the ability to compel testimony from a "third party non-legislator."  *Id.* at 1179 (per curiam); *id.* at 1181 (Reinhardt, J., concurring in part and dissenting in part).

from "an independent contractor" who "participated in crafting redistricting legislation [and] coordinat[ed] and gather[ed] analysis of data and information from which redistricting legislation was introduced." *Id.* at 660.  The court rejected the consultant's assertion of legislative privilege.  The court noted that the "right to vote and the rights conferred by the Equal Protection Clause are of cardinal importance." *Id.* at 667.  Any "purely factual material" the consultant had, such as raw data, "can shed light on what factors and considerations were foremost in the legislature's mind while the legislation was pending." *Id.* at 666.  And although there was some risk of chilling future legislative activity, that risk at most could justify withholding "documents concerning the actual deliberations of the Legislature *once the redistricting legislation had been formally introduced.*" *Id.* at 668 (emphasis added).  *Page* counsels in favor of compelling disclosure here, especially to the extent that Plaintiffs seek documents that predate the introduction of A.B. 604.  But the version of A.B. 604 containing Mitchell's map was not introduced until August 18, over a month after Mitchell first spoke to any legislator.  The case that legislative privilege shields documents produced before August 18 accordingly is weak.

This Court should reject Mitchell's assertion of legislative privilege.

## IV.    The First Amendment Privilege Does Not Apply

The "First Amendment privilege is rarely invoked." *Perry v. Schwarzenegger*, 591 F.3d 1147, 1156 (9th Cir. 2010).  The privilege seeks to protect "the freedom to associate" from the "compelled disclosure of political associations" or "political affiliations and activities." *Id.* at 1159–60.  As such, it generally, if not exclusively, is asserted by organizations seeking to vindicate "the free exercise of the constitutionally protected right of association." *Apple v. Match Grp., Inc.*, 2021 WL 3727067, at *7 (N.D. Cal. Aug. 19, 2021).

A "claim of First Amendment privilege is subject to a two-part framework." *Perry*, 591 F.3d at 1160.  First, the "party asserting the privilege must demonstrate ... a prima

13

facie showing of arguable First Amendment infringement. This *prima facie* showing requires [the party claiming the privilege] to demonstrate that enforcement of the discovery requests will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or chilling of, the members' associational rights." *Id.* (internal quotation marks, citations, and brackets omitted; ellipses in original). Mitchell cannot make this *prima facie* showing. He is an individual, not an organization, and disclosure of his personal records relating to the actions that he personally took in drawing the Proposition 50 map do not harass or discourage any "members" and do not chill any "members' associational rights." Further, Request No. 1 does not seek information about anyone's identity, associations with California legislators or political parties, or viewpoints.

Even if Mitchell could make the requisite *prima facie* showing that Request No. 1 chills associational rights, First Amendment privilege remains inapplicable. Once the party opposing discovery makes "the necessary *prima facie* showing, the evidentiary burden then shifts to the requesting party to demonstrate that the information sought through the discovery is rationally related to a compelling government interest and is the least restrictive means of obtaining the desired information." *Apple v. Match Grp. Inc.*, 2021 WL 3727067, at *7 (N.D. Cal. Aug. 19, 2021).

As discussed above, *supra* at III, Plaintiffs have a compelling interest in obtaining the requested discovery from Mitchell. Additionally, Request No. 1 is the "least restrictive means of obtaining the desired information." Mitchell is the author or recipient of the requested documents, so they are likely to be in his possession, custody, or control—if not in his *exclusive* possession, custody, or control. The preliminary-injunction hearing is only four days from now, so there is not time for Plaintiffs to serve additional subpoenas on any other (presently unidentified) third party that might have these documents.

## V.    The Deliberative-Process Privilege Does Not Apply

The deliberative-process privilege does not apply here because it is not a legislative

14

privilege. Rather, it is "an *executive* privilege rendering executive agencies immune from normal disclosure or discovery in civil litigation." *Doe v. Horne*, 737 F. Supp.3d 758, 766 (D. Ariz. 2024) (emphasis added). Mitchell is not—and does not claim to be—a member or agent of California's executive branch.

In any event, the deliberative-process privilege, like the legislative privilege, "is a qualified rather than an absolute privilege." *Irvin*, 127 F.R.D. at 173. The deliberative-process privilege therefore is subject to the same balancing test discussed above. And, as above, that test counsels in favor of compelling production. "[T]he federal interest in enforcement of the Voting Rights Act weighs heavily in favor of disclosure" and against the deliberative-process privilege. *Id.* at 174. "[C]ourts have overridden local officials' privileges found to be in conflict with the enforcement of federal civil rights laws," especially where, as here, those laws "requir[e] vigorous and searching enforcement." *Id.* Any assertion of the "deliberative process privilege must yield in this instance to the need for disclosure" and robust enforcement of the Voting Rights Act and Equal Protection Clause. *Id.*

## VI.   The Proper Remedy Is to Compel Immediate Disclosure or Draw an Adverse Inference

Despite their professed concerns about "delays in ongoing and upcoming election processes" resulting from this litigation, Dkt. 113-2 at 6, Defendants and Defendant-Intervenors repeatedly have sought to prolong this litigation—no doubt to thwart this Court's efforts to issue a prompt decision; Defendants believe that *Purcell v. Gonzalez*, 549 U.S. 1 (2006), bars injunctive relief after candidates may begin collecting signatures on December 19. Dkt. 113 at 46. A "mere six days after they stipulated to" "the preliminary injunction and hearing schedule," Defendants "filed an eleventh-hour ex parte application" to postpone the hearing, even though there was not "anything [that] ha[d] occurred in those six days that justifies [their] sudden change of heart." Dkt. 81 at 1. Defendants and Defendant-Intervenors later filed an ex parte application inviting time-

15

consuming post-hearing briefing.  Dkt. 134.

Mitchell's flawed assertions of sweeping legislative privilege represent Defendants' and their allies' latest efforts to run out the *Purcell* clock.  Despite having been served with a deposition notice a week earlier, Mitchell waited until the morning of his deposition to assert legislative privilege.  He simultaneously offered to confer about producing, but not to actually produce, "relevant non-privileged documents," *after* "the December 15 hearing concludes."  Ex. 2.  And at his deposition, he continued to invoke the privilege, and his counsel was unable or unwilling to offer any case law supporting invocation of the privilege.  Hamill Decl., ¶ 12, Ex. 3 at 21:21-22:2.

Mitchell's tactics mirror those of Defendants and Defendant-Intervenors:  delay, delay, delay.  His strategy is a naked display of bad faith.  Based on dubious assertions of legislative privilege, as well as plainly inapplicable privileges such as the First Amendment and deliberative-process privileges, Mitchell is necessitating time-consuming motions practice while also seeking to withhold production of the most important documents in this case until after the evidentiary hearing concludes.

This Court should not countenance Mitchell's gamesmanship and attempt to thwart effective judicial review of Plaintiffs' claims.  His counsel's insistence that Mitchell cannot "produce relevant non privileged documents … before the December 15 hearing concludes" strains credulity.   Ex. 2.  Mitchell drew the Proposition 50 map.  Mitchell publicly has spoken about the map.  Presumably at least *some* documents relating to the map are saved on his computer or in his physical files.  It should not be difficult to immediately begin productions on a rolling basis.

Plaintiffs therefore respectfully request that this Court order that (1) Mitchell immediately produce, on a rolling basis, all non-privileged and responsive documents to Plaintiffs and all assertedly privileged documents to this Court for *in camera* review, and (2) allow Plaintiffs to reopen Mitchell's deposition, to be taken no later than December 14, "for the limited purpose of obtaining information that was previously withheld on …

privilege grounds." *Alliance Atlantis Releasing Ltd. v. Bob Yari Prods.*, 2009 WL 10672591, at *4 (C.D. Cal. May 14, 2009).

If Mitchell fails to timely produce documents and sit for a reopened deposition, this Court should draw appropriate adverse inferences against Mitchell because his flawed assertions of privilege and his dilatory tactics deprived Plaintiffs of the opportunity to meaningfully depose him prior to the beginning of the preliminary-injunction hearing.

An adverse inference is permissible because of the relationship between Mitchell and Defendant-Intervenor DCCC. There is a "venerable rule that a factfinder may draw an adverse inference when a party fails to produce highly probative evidence that it could readily obtain if in fact such evidence exists." *Alexander v. S. Car. State Conf. of NAACP*, 602 U.S. 1, 36 (2024). "According to the missing witness rule, when a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the [issue], but chooses not to call them, an inference arises that the testimony, if produced, would be unfavorable." *Chi. Coll. of Osteopathic Med. v. George A. Fuller Co.*, 719 F.2d 1335, 1353 (7th Cir. 1983).

When assessing whether the invocation of a privilege justifies an adverse inference, the "overarching concern … is fundamentally whether the adverse inference is trustworthy under all of the circumstances." *Coquina Investments v. T.D. Bank, N.A.*, 760 F.3d 1300, 1311 (11th Cir. 2014). "[F]our non-exclusive factors" guide this inquiry: "(1) the nature of the relevant relationships; (2) the degree of control of the party over the nonparty witness; (3) the compatibility of the interests of the party and non-party witness in the outcome of the litigation; and (4) the role of the non-party witness in the litigation." *Id.* (quotation marks omitted).

Each of these factors supports drawing an adverse inference here. First, the "nature of the relevant relationship," as "examined … from the perspective of a non-party witness' loyalty to the [party]" reveals a "close[] … bond … by reason of … business" between Mitchel and DCCC. *LiButti v. United States*, 107 F.3d 110, 123 (2d Cir. 1997). DCCC

17

paid Mitchell $108,000 to draw the Proposition 50 map.  Hamill Decl., ¶ 12, Ex. 3 at 46:13-47:4.  Although Mitchell is not "employed by" DCCC, "there is reason to believe [he] still retain[s] some loyalty to" DCCC.  *Coquina Investments*, 760 F.3d at 1311.  Second, at all relevant times, DCCC had a high degree of control over Mitchell.  He was a contractor for DCCC and was paid a large sum of money for his work.  "It is immaterial that [he] no longer work[s]" for DCCC.  *United States v. Mallory*, 989 F.3d 730, 740 (4th Cir. 2021) (affirming an adverse inference from a former contractor's invocation of privilege).  What matters is that Mitchell was the "former" contractor of "a party to litigation."  *Id.*  Third, Mitchell and DCCC have highly compatible—if not the same— interests.  DCCC paid Mitchell to do the work at issue in this case.  Both want this Court to uphold the Proposition 50 map.  Mitchell's "assertion of the privilege" therefore "advances the interests of both the non-party witness and the affected party in the outcome of the litigation."  *Libutti*, 107 F.3d at 123.  Fourth, Mitchell plays a paramount role in this litigation.  As the mapmaker, he is the "key figure in the activities at issue in this case."  *Cerro Gordo Charity v. Fireman's Fund Am. Life Ins. Co.*, 819 F.2d 1471, 1481 (8th Cir. 1987) (affirming an adverse inference).

The *LULAC* case that DCCC heavily relies on, Dkt. 112 at 17, supports drawing an adverse inference from Mitchell's use of legislative privilege to shield his connection to "the intent of the Prop 50 map."  In *LULAC*, a state senator "insisted that she was not considering race at all in her redistricting decisions."  *LULAC v. Abbott*, 601 F. Supp. 3d 147, 155 (W.D. Tex. 2022).  Plaintiffs "put forth substantial evidence that [she] was particularly less than forthright" and attempted to ask the senator about her motives, but she asserted legislative privilege and "declined to answer questions about her motivation."  *Id.* at 180.  The court then drew an adverse inference, explaining that, "[t]hough courts may not draw negative inferences from a criminal defendant's assertion of his Fifth Amendment rights, no similar constraint binds our assessment of a civil witness's assertion of legislative privilege."  *Id.*  The court accordingly "interpret[ed] [her] reticence

as strengthening the inference that her previously stated reasons for redrawing [the map] were, at best, highly incomplete, and, at worst, disingenuous." *Id.* This Court should draw the same inference here. Like the senator in *LULAC*, Mitchell is a "main legislative antagonist" who has refused to answer questions about his motives despite considerable evidence of improper race-based decisionmaking. *Id.* at 174.

Finally, if Mitchell fails to timely produce responsive and nonprivileged documents, this Court should order that Defendants and Defendant-Intervenors may not introduce at the hearing any responsive documents that were not timely produced to Plaintiffs. "[C]ourts have been loath to allow a legislator to invoke the privilege at the discovery stage, only to selectively waive it thereafter in order to offer evidence to support the legislator's claims or defenses … Accordingly, once the privilege is invoked, the Court should not later allow the proponent of the privilege to strategically waive it to the prejudice of other parties." *Favors*, 285 F.R.D. at 212.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion to compel should be granted.

DATED: December 11, 2025                Respectfully submitted:

19

| | |
|---|---|
| TODD BLANCHE | JESUS A. OSETE* |
| Deputy Attorney General | Principal Deputy Assistant Attorney General |
| BILAL A. ESSAYLI | *s/ Matthew Zandi* |
| First Assistant United States Attorney | MATTHEW ZANDI |
| *s/ Julie A. Hamill* | Chief of Staff & Special Counsel |
| JULIE A. HAMILL | |
| Assistant United States Attorney | MAUREEN RIORDAN |
| United States Attorney's Office | Acting Chief, Voting Section |
| | |
| | ANDREW BRANIFF |
| | Acting Chief, Appellate Section |
| | |
| | DAVID GOLDMAN |
| | JOSHUA R. ZUCKERMAN |
| | GRETA GIESEKE |
| | Attorneys |
| | |
| | Civil Rights Division |
| | United States Department of Justice |
| | |
| | Attorneys for Plaintiff-Intervenor |
| | UNITED STATES OF AMERICA |

Dated: December 11, 2025          DHILLON LAW GROUP INC.

By: _/s Mark P. Meuser_____

Mark P. Meuser

Attorney for Plaintiffs

Attestation: All signatories listed have concurred with the ex parte application's content and have authorized the filing.

---

\* Assistant Attorney General Harmeet K. Dhillon is recused from this matter.

TODD BLANCHE
Deputy Attorney General
BILAL A. ESSAYLI
First Assistant United States
Attorney
*s/ Julie A. Hamill*
JULIE A. HAMILL
Assistant United States Attorney
United States Attorney's Office

JESUS A. OSETE[*]
Principal Deputy Assistant Attorney General
*s/ Matthew Zandi*
MATTHEW ZANDI
Chief of Staff & Special Counsel

MAUREEN RIORDAN
Acting Chief, Voting Section

ANDREW BRANIFF
Acting Chief, Appellate Section

DAVID GOLDMAN
JOSHUA R. ZUCKERMAN
GRETA GIESEKE
Attorneys

Civil Rights Division
United States Department of Justice

Attorneys for Plaintiff-Intervenor
UNITED STATES OF AMERICA

---

[*] Assistant Attorney General Harmeet K. Dhillon is recused from this matter.

21

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiff Intervenor United States of America, certifies that this brief contains 6,251 words, which complies with the word limit of L.R. 11-6.1.

December 11, 2025

_s/ Julie A. Hamill_
JULIE A. HAMILL
Assistant United States Attorney

United States Attorney's Office

## CERTIFICATE OF SERVICE

**Case Name: Tangipa et al v. Newsom et al No. 2:25-cv-10616-JLS-WLH-KKL**

I hereby certify that on December 11, 2025, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**Plaintiffs' and Plaintiff Intervenor's Ex Parte Application for an Order to Compel Testimony of Paul Mitchell**

I certify that all parties in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

In addition, I served non-party deponent under subpoena, Paul Mitchell, by sending an electronic e-mail to his attorney, Kimon Manolius, at the email address below:

kmanolius@hansonbridgett.com

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on December 11, 2025, in Los Angeles, California.

/s/ *Julie A. Hamill*
JULIE A. HAMILL
Assistant United States Attorney

United States Attorney's Office