JESUS A. OSETE*
Principal Deputy Assistant Attorney General
MATTHEW ZANDI (CA No. 203329)
Chief of Staff & Special Counsel
MAUREEN RIORDAN (NY No. 2058840)
Acting Chief, Voting Section
ANDREW BRANIFF (IN No. 23430-71)
Acting Chief, Appellate Section
DAVID GOLDMAN (VA No. 98922)
JOSHUA R. ZUCKERMAN (DC No. 1724555)
GRETA GIESEKE (TX No. 24132925)
Attorneys
   Civil Rights Division
   United States Department of Justice
   950 Pennsylvania Avenue, NW
   Washington, D.C. 20530
   Telephone: (202) 514-3847
   E-Mail: joshua.zuckerman@usdoj.gov

TODD BLANCHE
Deputy Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
JULIE A. HAMILL (CA No. 272742)
Assistant United States Attorney
   United States Attorney's Office
   300 North Los Angeles Street, Suite 7516
   Los Angeles, California 90012
   Telephone: (213) 894-2464
   E-Mail: julie.hamill@usdoj.gov

Attorneys for Plaintiff-Intervenor
UNITED STATES OF AMERICA

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DAVID TANGIPA, *et al.*,<br>    *Plaintiffs*,<br>and<br><br>UNITED STATES OF AMERICA,<br>    *Plaintiff-Intervenor*,<br>v.<br><br>GAVIN NEWSOM, in his official capacity | Case 2:25-cv-10616-JLS-WLH-KKL<br>Three-Judge Court<br><br>**PLAINTIFF-INTERVENOR'S RENEWED MOTION FOR ADVERSE INFERENCE**<br><br>Hon. Josephine L. Staton<br>Hon. Wesley L. Hsu<br>Hon. Kenneth K. Lee |

---

\* Assistant Attorney General Harmeet K. Dhillon is recused from this matter.

| | |
|---|---|
| as the Governor of California, *et al.*,<br>*Defendants*, | **Hearing Date: December 15, 2025**<br>**Time: 9 a.m.**<br>**Courtroom: One** |

**TABLE OF CONTENTS**

BACKGROUND ................................................................................................... **3**

ARGUMENT ..........................................................................................................7

   I.   Mitchell's Belated Document Productions Prejudiced the United States.......7

   II.  DCCC Controls Mitchell's Documents............................................................9

   III.  Mitchell Has Waived Legislative Privilege ................................................10

CONCLUSION....................................................................................................13

CERTIFICATE OF COMPLIANCE…………………………………………...15

CERTIFICATE OF SERVICE……………………………………………………16

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. S. Car. State Conf. of NAACP*, 602 U.S. 1 (2024) .............................10

*Anheuser-Busch, Inc. v. Nat'l Beverage Distributors*, 69 F.3d 337 (9th Cir. 1995).8

*Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elections*, 2011 WL
    4837508, (N.D. Ill. 2011)......................................................................... 11, 12

*La Union Del Pueblo Entero v. Abbott*, 68 F.4th 228 (5th Cir. 2023) .....................12

*Lee v. City of Los Angeles*, 908 F.3d 1175 (9th Cir. 2018) .....................................10

*Malone v. United States Postal Serv.*, 833 F.2d 128 (9th Cir. 1987) ........................8

*N. Am. Watch Corp. v. Princess Ermine Jewels*, 786 F.2d 1447 (9th Cir. 1986)......8

*Payne v. Exxon Corp.*, 121 F.3d 503 (9th Cir. 1997) .................................................8

*Residential Funding Corp. v. George Fin. Corp.*, 306 F.3d 99 (2d Cir. 2002).........8

*Thompson v. United States*, 2009 WL 10645607 (E.D.N.C. Dec. 7, 2009) ............11

*United States v. Int'l Union of Petroleum and Indus. Workers, AFL-CIO*, 870 F.2d
    1450 (9th Cir. 1989).........................................................................................9

**Rules**

Fed. R. Civ. P. 34 .......................................................................................................9

**Treatises**

C. Wright & A. Miller, 8B Fed. Prac. & Proc. Civ. § 2210 (3d ed.).........................9

Throughout this case, Paul Mitchell and Defendant-Intervenor the Democratic Congressional Campaign Committee ("DCCC") repeatedly have engaged in litigation tactics intended to prevent Plaintiff-Intervenor the United States of America from obtaining the documents and testimony that it is entitled to under Rules 26 and 30 of the Federal Rules of Civil Procedure. Mitchell's affront peaked late last night when he produced documents for the first time—nearly twelve hours after the Court ordered him to "**immediately produce non-privileged and responsive documents on a rolling basis**" yesterday, Ex. 3 at 3 ("Order"), and just 36 hours before Monday's hearing. Hamill Decl. at. ¶ 23.

The 3.4 GB of documents that Mitchell dumped on the United States late last night presumably are only a fraction of the responsive documents in his "collection of 45,000 files for collection and review for privilege and responsiveness." Dkt. 160 at 4. Nonetheless, these documents already preliminarily prove what the United States continuously has alleged: Mitchell prioritized racial considerations when drawing the Proposition 50 map. Consistent with Mitchell's public statements that he intended to increase Latino political power when drawing the Proposition 50 map, a slide deck he created before the California Legislature enacted AB 604 advertised that the new map "improves the opportunity for Latino voters to elect candidates of choice in more districts" and "increases … opportunities for Latinos." Ex. 6 at 8. This evidence is consistent with Mitchell's publicly announced goal of delivering a new Latino-controlled seat. *See, e.g.*, Dkt. 140 at 1-2, 12.

The United States previously requested that this Court draw an adverse inference from Mitchell's refusal to produce documents and his repeated, meritless invocation of legislative privilege during his deposition. *See* Dkt. 147. In opposing the request for an adverse inference, State Defendants represented that they "did not assert any privilege during Mitchell's deposition," Dkt. 155 at 2, yet that is belied by the certified transcript. *See, e.g.*, Dkt. 159 at 92:21-93:4 (joining objections, including on the basis of legislative

privilege). DCCC also opposed an adverse inference, in part, because Mitchell is "a non-party who is not controlled by any party to this case." Dkt. 157 at 1. But according to DCCC's contract with Mitchell, DCCC can demand that Mitchell "open" records to DCCC for "inspection and copying." Specifically, Mitchell must maintain all "books and records … for up to thirty-six (36) months after expiration or termination of this Agreement **and open [them] to inspection and copying by Client**." Ex. 9 at ¶ 14 (emphasis added); *see also* Dkt. 147 at 17-18 (asserting DCCC had "control" over Mitchell); Dkt. 159-1 at 54:7-10 ("DCCC paid me for the map[.]"). DCCC has control over the very documents that the United States seeks. And it has had control since day one of this litigation.

Because DCCC has, and has always had, the right of full access to all of Mitchell's records, DCCC had an independent obligation to produce these documents to the United States. Indeed, before DCCC's response was filed on Friday, the Court ordered DCCC to "be prepared to produce documents … should the Court so order." Dkt. 153. To the extent the Court relied on DCCC's representation that it had no control over Mitchell's documents in issuing its Order on Saturday, that has only further prejudiced the United States. Further, Mitchell has also now produced documents over which he had previously asserted legislative privilege, but only after he escaped the scrutiny of a deposition under oath.

Worse yet, Mitchell apparently *waived* any applicable legislative privilege over the data he considered and the methodology he used when drawing the map, which the United States discovered only after last night's voluminous document dump. Yet he asserted the privilege anyway. His meritless assertions of privilege, combined with his belated discovery, undoubtedly has deprived the United States of additional documents and testimony beneficial to prove its claims, resulting in extreme prejudice.

The United States regrets having to file this motion on the eve of the hearing, but it has exhausted every avenue—to no avail. Accordingly, the United States, per the Court's

2

Order, respectfully renews its request for an adverse inference that Mitchell considered race as either a predominating or motivating factor when drawing the Proposition 50 map. This inference, along with the evidence that has been and will be submitted, warrants the United States' requested preliminary injunction.

## BACKGROUND

As the Court has correctly recognized, "[t]he parties agree that Paul Mitchell was hired by [DCCC] and drafted the maps in question." Ex. 3 at 1.

DCCC produced a heavily redacted version of its contract with Mitchell. The contract contains a provision called "MAINTENANCE OF RECORDS":

> Consultant shall maintain adequate books and records in a manner consistent with the accounting and professional standards ordinarily followed within Consultant's industry, except as Consultant may be otherwise directed by Client. All books and records shall be maintained for up to thirty-six (36) months after expiration or termination of this Agreement and open to inspection and copying by Client. . . .

Ex. 9 ¶ 14. DCCC, as Mitchell's client, therefore has full authority to access Mitchell's records.

The United States' discovery requests to DCCC and its subpoena to Mitchell sought information relating to Mitchell's drawing of the Proposition 50 map. Request for Production No. 5 to DCCC sought "Any Documents input into or generated by the computer software program(s) used to draw the new map that Relate to the Proposition 50 Map or any other Map drawn by You or produced and sent to You by Your agents, employees, consultants, contractors, or any other Person from July 1, 2025, through and including August 24, 2025."[1] Ex. 1 at 5. DCCC responded that "after a reasonable search

---

[1] The instructions to Plaintiffs' Requests for Production provided that the "requests encompass documents in Responding Parties' possession or in the possession of Responding Parties' staff, agents, employees, representatives, and, unless privileged,

3

it ha[d] located only privileged documents." Ex. 2 at viii.  The only documents on the privilege log that concern Mitchell are two spreadsheets and a handful of emails.  Ex. 10 at 2–3.

The United States sought to depose Mitchell.  After multiple attempts, the United States successfully served Mitchell on December 1 with a subpoena instructing him to appear and produce documents at a December 5 deposition.  Dkt. 147-1 ¶ 6.  On December 2, Mitchell's counsel, Kimon Manolius, informed the United States that Mitchell was unavailable on December 5.  At his request, the United States agreed to accommodate Mitchell's schedule and postpone the deposition to December 10.  *Id.* ¶ 7.

The United States' sole request for production to Mitchell was similar to its aforementioned request to DCCC.  The United States sought his "files, including, without limitation, all correspondence, memoranda, analyses, reports, tables, figures, charts, invoices, slide decks, talking points, electronic maps and data files, and other documents, relating to your conception, drafting, revision, analysis, or presentation of the California congressional map placed on the November 2025 ballot as Proposition 50."  Dkt. 147-3 at 5.

At 1:16 a.m. Pacific Time on the day of Mitchell's deposition, Manolius informed the United States via email that, notwithstanding a subpoena issued nine days earlier, Mitchell would be unable to produce relevant non-privileged documents "before the December 15 hearing concludes."  Dkt. 147-3 at 2.  Stated differently, even though Mitchell was served on December 1, he would be unable to produce a single non-privileged document in the *seventeen days* between the service of his subpoena and the conclusion of the hearing.

---

attorneys, or any other person who has possession, custody, or control of Responding Parties' documents." Ex. 1 at 1.

Manolius's 1:16 a.m. email also included formal responses and objections to the United States' subpoena. As relevant here, counsel asserted legislative privilege, deliberative-process privilege, and First Amendment privilege. Dkt. 147-3 at 5–6. Manolius was retained to represent Mitchell on December 1. Dkt. 160-1 ¶ 3. Yet he waited nine days, until what he acknowledged was a "late hour" to assert these privileges for the very first time.

At Mitchell's deposition, his counsel asserted legislative privilege approximately 122 times. Dkt. 147-1 at ¶ 10; *see also* Dkt. 147 at 3–4 (describing the privilege objections). Due to Mitchell's refusal to produce *even a single nonprivileged document*, the United States moved to compel the production of documents and to reopen Mitchell's deposition testimony. Dkt. 147. It also requested that the Court draw an adverse inference in the United States' favor. *Id.*

On December 13, the Court granted partial relief. The Court questioned "why Mr. Manolius waited until the morning of the deposition to inform Plaintiffs that Mr. Mitchell would be asserting the legislative privilege." Order at 2. The Court rejected Mitchell's baseless assertion of the First Amendment and deliberative-process privileges. *Id.* at 3. And crucially, the Court rejected Manolius's claim that it "take[s] weeks to produce responsive documents." *Id.* at 3. The Court ordered Mitchell to "immediately" begin producing responsive and non-privileged documents. *Id.* It also denied without prejudice the request for an adverse inference, to be "renewed" at a later date. *Id.* The Court's Order was silent as to the request to reopen Mitchell's deposition.

Shortly after the Court issued its order, the United States asked Manolius if Mitchell would sit for a deposition on December 14. Ex. 4 at 5. The United States explained that it had a "court reporter in Sacramento on standby" and asked whether Mitchell would "continue to stand on legislative privilege objections and instructions not to answer, or will he provide the United States with answers to any of the approximately 122 questions he was instructed not to answer on Wednesday." *Id.* The United States also asked at what

5

time it could expect Mitchell's document production and requested that counsel "respond by noon PST today." *Id.* Counsel did not respond by noon. Hamill Decl. ¶ 19. When he did respond, counsel declined to reopen the deposition because the Order "does not provide for an additional deposition of Mr. Mitchell." Ex. 4 at 4. Counsel provided no answer as to when Mitchell would begin producing documents. *Id.*

Without an estimated production time, the United States' East Coast litigation support staff waited on standby all afternoon and evening but logged off shortly before midnight in Washington, D.C., when the United States still had not received an update from Manolius. Hamill Decl. ¶ 22. At 8:57 p.m. Pacific Time, Mitchell finally made his initial production. Ex. 5. **As of the filing of this motion, Plaintiffs have not received any additional documents.**

Due to Mitchell's delayed production and initial difficulties accessing the documents, it was nearly 11 p.m.—36 hours before Monday's hearing is scheduled to commence—when counsel for the United States finally could begin reviewing the 3.4 GB of documents. Hamill Decl. ¶ 24. Many of the files were produced in formats, such as .shx, .shp, .prj, .dbf, and .qmd files, that counsel for the United States was unable to review without assistance from their then-offline litigation-support team. *Id.*

Upon the United States' initial review, some of the documents produced by Mitchell indicate that he considered race in drawing the Proposition 50 Map or took his marching orders from nonprofits that advocate on behalf of certain racial, religious, or ethnic groups. For example, one folder of documents is entitled "Asian Law Caucus." Hamill Decl. ¶ 24. This folder includes subfolders entitled "AAAJ_Venice_JA," "CAIR_Masjid Badr," "HIP_Hmong_FIRM," and "ThaiCDC_ThaiTown."[2] *Id.* Additionally, a slide deck boasts

---

[2] The United States believes that "AAAJ" refers to Asian Americans Advancing Justice, "CAIR" refers to Council on American-Islamic Relations, "HIP" refers to Hmong Innovating Politics, and "ThaiCDC" refers to "Thai Community Development Center." Hamill Decl. ¶ 24.

6

that Mitchell's new map "improves the opportunity for Latino voters to elect candidates of choice in more districts" and "increases … opportunities for Latinos." Ex. 6 at 8.

# ARGUMENT

The United States renews its request for an adverse inference. An adverse inference is warranted because Mitchell and DCCC have stymied the discovery process at every turn. Mitchell has withheld documents from the United States, using a baseless assertion of legislative privilege as a sword, not a shield. State Defendants and DCCC may object to the issuance of an adverse inference. But at least at one point in the deposition, the State Defendants joined the baseless assertion of legislative privilege, and DCCC has apparently had access to all of Mitchell's records but has failed to conduct a reasonable search for responsive documents. State Defendants, DCCC, and Mitchell's combined conduct prejudicially has deprived the United States of documents highly relevant to its case. For these reasons, and those that follow, an adverse inference is warranted in these unusual circumstances.

## I. Mitchell's Belated Document Productions Prejudiced the United States

The Court has acknowledged the "importance of mapmakers' testimony in these cases," Order at 2, and accordingly ordered the "immediate" production of Mitchell's records.

Rather than produce these relevant records in a timely fashion, Mitchell did not produce a *single* document until the Court ordered him to do so. He did produce some documents almost twelve hours after the Court's Order, suggesting that he could have made a production at any time after December 3—the date when Manoulis claims he began "gathering and arranging for the gathering of documents," Dkt. 160-1 ¶ 6—but simply chose not to.

Mitchell and DCCC seemingly hoped to avoid producing documents relating to "drafting, revision, analysis, or presentation" of the Proposition 50 map until after "the December 15 hearing concludes," Dkt. 147-3 at 2, 5, and would have done so but for this

7

Court's Order. This lackadaisical approach to document production is unacceptable. Regardless of Mitchell's and DCCC's motives, the Court "should not countenance [their] purposeful sluggishness in discovery." *Residential Funding Corp. v. George Fin. Corp.*, 306 F.3d 99, 113 (2d Cir. 2002) (quotation marks omitted).

Mitchell's "suppressing information that was clearly relevant" has severely prejudiced Plaintiffs. *Anheuser-Busch, Inc. v. Nat'l Beverage Distributors*, 69 F.3d 337, 354 (9th Cir. 1995). A party can be "prejudiced by the concealment of the documents" that should have been produced. *Id.* That is especially true where obstructionist discovery tactics have harmed the party's "ability to prepare for trial." *Malone v. United States Postal Serv.*, 833 F.2d 128, 131 (9th Cir. 1987). Such is the case here. Mitchell did not produce a single document until two days before the hearing. As of 48 hours before the hearing, Mitchell had produced zero documents. As of the filing of this motion, Mitchell had produced only a fraction of the 45,000 files in his possession. Dkt. 160 at 4. Mitchell has produced *zero* documents since his initial document dump late last night.

Mitchell's "[l]ast-minute tender of documents does not cure the prejudice" to the United States. *N. Am. Watch Corp. v. Princess Ermine Jewels*, 786 F.2d 1447, 1451 (9th Cir. 1986). "[G]iven the imminence of the trial date," the United States simply has had no time to conduct a meaningful and thorough review of the documents. *Malone*, 833 F.2d at 131. Mitchell also has not explained why these documents were produced first and whether the to-be-produced documents may be more relevant to the United States' claims or more damaging to State Defendants' and Defendant-Intervenors' defenses. Mitchell's "failure to provide documents and information in a timely fashion" therefore "prejudiced the ability of [the United States] to prepare its case for" tomorrow's preliminary injunction hearing. *Payne v. Exxon Corp.*, 121 F.3d 503, 508 (9th Cir. 1997).

## II. DCCC Controls Mitchell's Documents

The United States previously has discussed the degree of control DCCC asserted over Mitchell, which is a relevant factor in the adverse-inference analysis. Dkt. 147 at 18.

1  Further, Rule 34 allows a party to request another party to produce documents within that
2  party's "possession, custody, or control." Fed. R. Civ. P. 34(a)(1). "Control is defined as
3  the legal right to obtain documents upon demand." *United States v. Int'l Union of*
4  *Petroleum and Indus. Workers, AFL-CIO*, 870 F.2d 1450, 1452 (9th Cir. 1989). A party
5  that has the contractual right to obtain documents therefore has control over the documents
6  and must produce relevant, nonprivileged documents upon request. *See* C. Wright & A.
7  Miller, 8B Fed. Prac. & Proc. Civ. § 2210 n.5 (3d ed.) (collecting cases).

8      DCCC has violated its discovery obligations. It controls Mitchell's documents
9  because it has a contractual right to access and copy any documents in Mitchell's
10 possession that relate to the drawing of the Proposition 50 map he was paid to create.
11 Ex. 9 ¶ 14. Yet DCCC claimed in a filing that Mitchell is "not controlled by any party to
12 this case." Dkt. 157 at 1. Both of these things cannot be true.

13     DCCC should have produced by December 1 "[a]ll documents input into or
14 generated by the computer software program(s) used to draw the new map that Relate to
15 the Proposition 50 Map." Ex. 1 at 5. Mitchell presumably has possession of these
16 documents; he has a contractual obligation to retain them and allow DCCC to access them
17 for 36 months after the contract terminates. Ex. 9 ¶ 14. If nothing else, one would expect
18 a professional mapmaker with a financial interest in making maps to retain files that might
19 help him in any future mapmaking. But Mitchell's counsel did not start "gathering and
20 arranging for the gathering of documents" until December 3, after *Mitchell* received a
21 document request from the United States, notwithstanding the United States' earlier
22 request to DCCC for the same documents and DCCC's contractual right to the documents
23 in Mitchell's possession. Dkt. 160-1 ¶ 6. It thus appears that *DCCC did not even request*
24 *these documents from Mitchell or his counsel.* Yet DCCC represented that it conducted
25 "a reasonable search" for these documents. Ex. 2 at viii.

26     DCCC has failed to produce responsive and crucially important documents it had
27 the contractual right to obtain. An adverse inference is thus warranted under the
28

9

"venerable rule that a factfinder may draw an adverse inference when a party fails to produce highly probative evidence that it could readily obtain if in fact such evidence exists." *Alexander v. S. Car. State Conf. of NAACP*, 602 U.S. 1, 36 (2024). Mitchell's documents indisputably are "highly probative." As the Court has noted, "[t]his turns on whether California's congressional redistricting map reflects political—or racial—gerrymandering." Order at 1. The documents that DCCC should have produced, which it contractually could have accessed at the time of its production, are likely to demonstrate whether and to what extent Mitchell considered race and/or whether race was featured in the documents "input into or generated by the computer software program(s) used to draw the new map." Ex. 2 at viii.

### III. Mitchell Has Waived Legislative Privilege

The United States incorporates by reference its prior arguments that Mitchell has improperly asserted legislative privilege during his deposition and that legislative privilege cannot justify Mitchell's nonproduction of documents. *See generally* Dkt. 147; *see also* Order at 3 ("[W]e question whether Mr. Mitchell can invoke a blanket legislative privilege for his actions, knowledge, and communications before July 2, 2025, which is the first time he communicated with California state legislators about redistricting."). Contrary to the Legislature's assertion, Dkt. 157 at 6, *Lee v. City of Los Angeles*, 908 F.3d 1175 (9th Cir. 2018), does not rescue Mitchell's claims of privilege. There, the Ninth Circuit held only that "legislative privilege protects local officials from being deposed" about their decisions to adopt new maps. *Id.* at 1178. *Lee* does not support Mitchell's contention that documents are shielded by legislative privilege simply because a consultant hired by a private organization considered them when creating a map that ultimately was sent to and adopted by the Legislature.

Mitchell's untimely production of admittedly nonprivileged documents reinforces the United States' prior arguments against the assertion of legislative privilege. DCCC has argued that any documents produced after July 2, the date when Mitchell first

10

communicated with a legislator, are privileged. Dkt. 157 at 4. But Mitchell produced documents created in July and August 2025—the very timeframe that DCCC claims that Mitchell "was consulting with state legislators and staff." *Id.* (emphasis omitted). For example, he produced a slide deck entitled "California Congressional Mid-Decade Redistricting," which described his methodology in drawing the Proposition 50 map. Ex. 6. The slide deck's metadata show that Mitchell created the deck on July 28 and last modified it on August 13, Hamill Decl. ¶ 26, thus negating any claims that documents created after July 2 are per se privileged.

Regardless of whether the privilege ever applied to Mitchell's documents, Mitchell has waived it by sharing his documents, methodologies, and factors considered when drafting the map with third parties, including DCCC.[3] "As with any privilege, the legislative privilege can be waived when the parties holding the privilege share their communications with an outsider." *Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elections*, 2011 WL 4837508, *10 (N.D. Ill. 2011).

This is not the first time that legislative privilege has been waived in a redistricting case because of communications with DCCC. In *Committee for a Fair and Balanced Map*, plaintiffs sought "information concerning the motives, objectives, plans, reports, and/or procedures used by lawmakers to draw" a new congressional map. *Id.* at 2. The lawmakers asserted legislative privilege, but the court held that they waived privilege as to any communications with "outsiders to the legislative process" such as "lobbyists, members of Congress and *the Democratic Congressional Campaign Committee*." *Id.* at 10 (emphasis added). "Although these groups may have a heightened interest in the

---

[3] DCCC is not within the bubble of legislative privilege simply because it paid Mitchell to create a map for the Legislature. *Cf. Thompson v. United States*, 2009 WL 10645607 at *3 n.6 (E.D.N.C. Dec. 7, 2009) ("In fact, an attorney is prohibited from engaging in such communications with persons who pay her client's legal fees; she is prohibited by the attorney-client privilege from disclosing to third parties' communications between herself and her client.").

11

outcome of the redistricting process, they could not vote for or against the Redistricting Act, nor did they work for someone who could. As such, the legislative privilege [did] not apply." *Id.* The same result follows here, especially because Mitchell signed a contract granting DCCC access to all of his records relating to his drawing the Proposition 50 map. Accordingly, few, if any, of those documents are protected by legislative privilege.

Mitchell's disclosures of purportedly privileged information are not limited to DCCC. He also produced documents proving that he shared his mapmaking insights with several advocacy groups. In a presentation to the LGBT-rights group EQCA, he shared a "Draft Plan" for the "Sac Metro" area. Ex. 7 at 15. But at his deposition, Mitchell asserted legislative privilege when asked whether he "use[d] election results when drafting the Proposition 50 maps" and "[w]hich election results" he considered. Dkt. 159-1 at 295:10–21. And in a presentation to the organization Courage Campaign, he explained that his map considered "electoral performance" and used "Polsby Popper as a metric for compactness." Ex. 8 at 4, 7. But at his deposition, he asserted legislative privilege when asked about his "methodology that [he] used to draw the Proposition 50 maps." Dkt. 159-1 at 32:20–25.

At least in the Fifth Circuit, some *legislators'* "communications with third parties, such as private communications with advocacy groups, are protected by legislative privilege." *La Union Del Pueblo Entero v. Abbott*, 68 F.4th 228, 236 (5th Cir. 2023). However, the Fifth Circuit's case concerned "correspondence that [legislators] solicited from constituents." *Id.* at 237. Here, a private consultant hired by an arm of the Democrat Party—not a legislator—discussed his methodology with at least two interest groups. Mitchell and DCCC apparently take the "incredible positions," Dkt. 157 at 1, that legislative privilege applies to communications between two private parties simply because one of those parties discussed facts contained within those communications with legislators. Mitchell has waived any privilege as to the factors he considered and the

12

1  methods he used when drawing the Proposition 50 map.

2      The implications of Mitchell's waiver are astonishing. Mitchell hid behind
3  legislative privilege at his deposition, refusing to answer any questions about his
4  methodology and objectives when drawing the Proposition 50 map. The United States
5  disagreed with his assertion of privilege but was unable to probe further because Mitchell
6  refused to produce any documents before his deposition and because DCCC refused to
7  conduct a reasonable search for and produce the documents that Mitchell possessed and it
8  controlled. Now that the United States has been able to preliminarily review a small
9  fraction of Mitchell's documents, the truth is clear: Mitchell asserted legislative privilege
10 to prevent any inquiry into his methodology and objectives at his deposition despite the
11 fact that he waived the privilege by discussing his methodology and objectives with at
12 least two interest groups. And unless and until Mitchell makes his promised additional
13 productions, it impossible to know how many additional groups Mitchell spoke with, or
14 what those conversations entailed.

15     Mitchell's first production contains evidence that he considered race. As a result
16 of Mitchell's meritless privilege objections, and Mitchell's and DCCC's malfeasance,
17 Plaintiffs have been deprived of untold amounts of evidence as to whether and to what
18 extent Mitchell considered race when drawing the Proposition 50 map. That necessitates
19 an adverse inference at the preliminary-injunction stage.

## CONCLUSION

21     For the foregoing reasons, and those advanced in the prior motion to compel, Dkt.
22 147, the United States respectfully asks this Court to draw an adverse inference that race
23 was a predominating factor in the drawing of the Proposition 50 map.

25 DATED: December 14, 2025         Respectfully submitted:

| | |
|---|---|
| TODD BLANCHE<br>Deputy Attorney General<br>BILAL A. ESSAYLI<br>First Assistant United States Attorney<br>JULIE A. HAMILL<br>Assistant United States Attorney<br>United States Attorney's Office | JESUS A. OSETE[*]<br>Principal Deputy Assistant Attorney General<br>MATTHEW ZANDI<br>Chief of Staff & Special Counsel<br><br>MAUREEN RIORDAN<br>Acting Chief, Voting Section<br><br>ANDREW BRANIFF<br>Acting Chief, Appellate Section<br><br>*/s/Joshua R. Zuckerman*<br>JOSHUA R. ZUCKERMAN<br>DAVID GOLDMAN<br>GRETA GIESEKE<br>Attorneys<br><br>Civil Rights Division<br>United States Department of Justice<br><br>Attorneys for Plaintiff-Intervenor<br>UNITED STATES OF AMERICA |

---

[*] Assistant Attorney General Harmeet K. Dhillon is recused from this matter.

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiff Intervenor United States of America, certifies that this brief contains 4,254 words, which complies with the word limit of L.R. 11-6.1.

December 14, 2025              */s/Joshua R. Zuckerman*
                               JOSHUA R. ZUCKERMAN
                               Attorney
                               Civil Rights Division
                               United States Department of Justice

# CERTIFICATE OF SERVICE

**Case Name:** *Tangipa et al v. Newsom et al*, No. 2:25-cv-10616-JLS-WLH-KKL

I certify that on December 14, 2025, I electronically filed the following document with the Clerk of the Court by using the CM/ECF system:

**Plaintiff-Intervenor's Renewed Motion for Adverse Inference**

I certify that all parties in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

In addition, I served non-party deponent under subpoena, Paul Mitchell, by sending an e-mail to his attorneys, Kimon Manolius, at kmanolius@hansonbridgett.com.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on December 15, 2025, in Los Angeles, California.

December 14, 2025  /s/Joshua R. Zuckerman
JOSHUA R. ZUCKERMAN
Attorney
Civil Rights Division
United States Department of Justice