1  Lalitha D. Madduri (CA Bar No. 301236)
   lmadduri@elias.law
2  Christopher D. Dodge* (DC Bar No. 90011587)
   cdodge@elias.law
3  Max Accardi* (DC Bar No. 90021259)
4  maccardi@elias.law
5  **ELIAS LAW GROUP LLP**
   250 Massachusetts Ave. NW, Suite 400
6  Washington, DC 20001
7  T: (202) 968-4652
   F: (202) 968-4498
8

9  Abha Khanna* (WA Bar No. 42612)
   akhanna@elias.law
10 Tyler L. Bishop (CA Bar No. 337546)
11 tbishop@elias.law
   **ELIAS LAW GROUP LLP**
12 1700 Seventh Avenue, Suite 2100
13 Seattle, WA 98101
14 T: (206) 656-0177
   F: (206) 656-0180
15

16 Omar Qureshi (CA Bar No. 323493)
   omar@qureshi.law
17 Max Schoening (CA Bar No. 324643)
18 max@qureshi.law
   **QURESHI LAW PC**
19 700 Flower Street, Suite 1000
20 Los Angeles, CA 90017
   T: (213) 600-6096
21 F: (213) 277-8989
22
   *Counsel for Defendant-Intervenor DCCC*
23
24 * *Admitted pro hac vice*
25
26
27
28

1

2

3

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

4

**DAVID TANGIPA,** *et al.*,

5

Plaintiffs,

6

and

7

**UNITED STATES OF AMERICA,**

8

Plaintiff-Intervenor,

9

10

v.

11

**GAVIN NEWSOM, in his official
capacity as the Governor of California,**
*et al.*,

12

13

14

Defendants,

15

**DEMOCRATIC CONGRESSIONAL
CAMPAIGN COMMITTEE,** *et al.*,

16

17

Defendant-Intervenors.

2:25-cv-10616-JLS-WLH-KKL
Three-Judge Court

**DEFENDANT-INTERVENOR
DCCC'S RESPONSE TO
PLAINTIFFS' RENEWED
MOTION FOR ADVERSE
INFERENCE**

18

19

20

21

22

23

24

25

26

27

28

ii

**INTRODUCTION**

Plaintiffs' most recent last-minute discovery motion continues to highlight the weakness of their case. Central to their motion is the claim that DCCC controls mapmaker Paul Mitchell, which Plaintiffs assert by misconstruing a bookkeeping clause in a boilerplate contract for services. DCCC produced this contract to Plaintiffs shortly after midnight on **December 5**—ten days ago. *See* ECF No. 162-1 ¶ 29.[1] Yet only now— on the literal eve of trial and days after their opportunity to depose Mr. Mitchell—do they assert that this contract shows that DCCC controls Mr. Mitchell. Plaintiffs' belated assertion is dead wrong. For one, the contract they point to terminated in August according to its own terms. *See* ECF No. 162-10 § 2. That much is unsurprising; at that point, DCCC had obtained what it wanted from Mr. Mitchell (his map), for the reason it wanted it (Democratic gains), and had paid Mr. Mitchell for it. *See* ECF No. 159-1 at 230:1-10. More absurdly, the provision Plaintiffs rely on has nothing to do with Mr. Mitchell's files or work product—it concerns "books and records," a well-worn common law reference to *bookkeeping and ledgers*, as the Ninth Circuit has held. *See In re MC2 Cap. Partners*, No. 11-14366, 2015 WL 777649, at *5 (B.A.P. 9th Cir. Feb. 25, 2015) (noting this term refers to "ledgers, but also financial statements, records pertaining to receivables and payables, purchase orders, and invoices"). Simply put, Plaintiffs continue to try to slam square pegs into round holes to build up their paper-thin case at the last minute. The Court should look past this desperate effort.

Their remaining arguments are equally flawed. The Supreme Court could not possibly be clearer in holding that the Legislature is entitled to a presumption of good faith. Indeed, just weeks ago it faulted another three-judge district court—armed with evidence that casts a mile-long shadow over the record here—for failing to honor that presumption. *See Abbott v. League of United Latin Am. Citizens* ("*LULAC*"), No.

---

[1] Despite having had this document for nearly ten days, Plaintiffs only sought to add it to their exhibit list on Sunday, December 14.

1   25A608, 2025 WL 3484863, at *1 (U.S. Dec. 4, 2025) (noting that failure to presume

2   good faith amounts to "serious error[]"). Plaintiffs now ask this Court to turn that

3   standard on its head by simply erasing Plaintiffs' twin burdens to make a "clear showing"

4   of entitlement to relief at this preliminary stage *and* to rebut the presumption of legislative

5   good faith. Plaintiffs are hardly subtle in their attempt at overreach: Their proposed order

6   asks that this Court simply assume the ultimate merits question in dispute and "find[],

7   for purposes of a preliminary injunction, that race predominated in the drawing of the

8   Proposition 50 map." ECF No. 162-12. But *LULAC* makes plain this Court cannot

9   properly grant such a windfall, particularly given that Plaintiffs failed to raise even

10   rudimentary allegations against nearly every challenged district. Further still, Plaintiffs'

11   request for an adverse inference continues to become more attenuated and confused. On

12   their reasoning (apparently), this Court should draw an adverse inference as to why *the*

13   *Legislature and voters* adopted Proposition 50 because DCCC did not collect documents

14   from a third-party mapmaker based on the belated and wrong assertions of Plaintiffs

15   about the meaning of a contract they've had in their possession for ten days.

16          Plaintiffs' waiver argument is equally confused. For one, neither Paul Mitchell

17   (nor DCCC) can waive *the Legislature's* privilege. *See Puente Ariz. v. Arpaio*, 314

18   F.R.D. 664, 671 (D. Ariz. 2016) (citing *Marylanders for Fair Representation, Inc. v.*

19   *Schaefer*, 144 F.R.D. 292, 298 (D. Md. 1992); *Gravel v. United States*, 408 U.S. 606,

20   616 (1972)). Legislators alone can make that call. *See id.* Furthermore, it is hardly clear

21   why Mitchell's production of 3.4GB of *non-privileged documents*—previously withheld

22   under a *burden* objection—constitutes any kind of waiver. Those are precisely the

23   category of documents this Court ordered him to produce on Saturday. And Plaintiffs'

24   suggestion that Mr. Mitchell is slow walking his production—made just hours after the

25   Court ordered it—is remarkable given that they themselves have made *two separate*

26   *productions* on the night before the hearing in response to document requests served prior

27   to Thanksgiving. The Court should deny the motion in all respects.

28

2

**ARGUMENT**

**I.    DCCC does not control Mitchell's documents.**

Plaintiffs' renewed motion hinges on the notion that DCCC has control over Paul Mitchell or his documents. This argument is based on a flawed reading of a single provision in the standard-form independent contractor agreement between DCCC and Mitchell, which, read in context, refers to accounting and actuarial documents—not the sort of documents Plaintiffs believe they are entitled to.   Plaintiffs hang their hopes on Paragraph 14 in DCCC's contract with Mitchell, titled "Maintenance of Records." The Paragraph reads, in full:

> Consultant shall maintain adequate books and records in a manner consistent with the accounting and professional standards ordinarily followed within Consultant's industry, except as Consultant be otherwise directed by Client. All books and records shall be maintained for up to thirty-six (36) months after expiration or termination of this Agreement and open to inspection and copying by Client. Consultant shall reimburse Client for any additional costs incurred by Client in reviewing, updating, supplementing or otherwise correcting the books and records of Consultant in connection with any breach of its obligation under this Section 14, if, after demand by Client, Consultant shall fail to promptly correct the breach. Consultant shall maintain a complete record of all contracts or other agreements for the work relating to the Services.

Ex. A ¶ 14.

Plaintiffs argue that under this provision, "DCCC [c]ontrols Mitchell's [d]ocuments," Mot.8, because it "has a contractual right to access and copy any documents in Mitchel's possession that relate to the drawing of the Proposition 50 map that he was paid to create." Mot.9. But that is a gross misreading of Paragraph 14. The Paragraph provides only that DCCC has the right to inspect Mitchell's "books and records" that are "maintaine[d] . . . in a manner consistent with the accounting and professional standards ordinarily followed within [Mitchell's] industry." Ex. A ¶ 14.

3

1    In context, the term "books and records" clearly refers to accounting and financial

2    records—not the entirety of Mitchell's documents that might conceivably relate to

3    DCCC. This is so for several reasons. For one, multiple courts have interpreted the

4    contractual term "books and records" as limited to businesses' bookkeeping obligations

5    for tax and accounting purposes. The Ninth Circuit's bankruptcy panel, for example,

6    observed that "the term 'books and records' . . . at common law included not only ledgers,

7    but also financial statements, records pertaining to receivables and payables, purchase

8    orders, and invoices." *In re MC2 Cap. Partners*, No. 11-14366, 2015 WL 777649, at *5

9    (B.A.P. 9th Cir. Feb. 25, 2015); *see also Garner v. Authenticity.ai Invs., LLC*, 334 A.3d

10   1108, 1127 (Del. Ch. 2025) (rejecting the use of a "books and records" proceeding to

11   investigate "broad" allegations about a company's misconduct); *Hous. Works, Inc. v.*

12   *Turner*, No. 00CIV.1122(LAK)(JCF), 2004 WL 2101900, at *17 (S.D.N.Y. Sep. 15,

13   2004) (noting testimony that the term "restated books and records" is understood to mean

14   "records . . . focused on the general ledger, which is the fundamental focal document in

15   all *accounting records*" (emphasis added; quotation omitted)); *Int'l Bhd. of Elec.*

16   *Workers v. Internet Const., Inc.*, No. 03 C 1082, 2004 WL 2931301, at *2 (N.D. Ill. Dec.

17   15, 2004) (noting that the plaintiff "engaged a certified public accounting firm to conduct

18   an audit" of the defendant's "books and records"); *Deutsche Bank Nat'l Tr. Co. v. Fed.*

19   *Deposit Ins. Corp.*, 109 F. Supp. 3d 179, 199 (D.D.C. 2015) (the contract term "reflected

20   on the Books and Records" was "unambiguous" in that it referred to only liabilities

21   "stated . . . on [the party's] accounting records").[2]

22   This limited definition of "books and records" is also consistent with widespread

23   usage. The Internal Revenue Service, for example, maintains a webpage advising

24   business owners that, for tax purposes, they "must keep a complete and separate set of

25

26   ───────────────────────────

[2] The Agreement contains a choice-of-law provision indicating that it "shall be governed

27   by the laws of the District of Columbia." Ex. A. ¶ 16. Plaintiffs have cited no authority

     from the District of Columbia or elsewhere supporting their interpretation of Paragraph

28   14 of the Agreement.

*books and records* for each business"—indicating that the term refers to financial and tax information.[3] The Code of Federal Regulations also harmonizes with an understanding of "books and records" as referring to financial documents. For instance, 17 C.F.R. § 275.204-2(a) details the "books and records" that investment advisers must maintain, and "cash receipts and disbursements," "ledgers," and records of purchase orders. By contrast, Plaintiffs' motion includes not a shred of authority—legal or otherwise—to support their claim that "books and records" should be interpreted broadly to include all of Paul Mitchell's documents.

Plaintiffs' expansive interpretation of Paragraph 14 is also inconsistent with the paragraph as a whole. The first clause of the paragraph, for example, requires Mitchell to maintain "books and records in a manner consistent with the *accounting* and professional standards ordinarily followed within [his] industry." Ex. A ¶ 14. There are, of course, generally accepted accounting and professional standards for how small business owners should maintain financial records, as just discussed. But there are no such standards—or at least, Plaintiffs cite no such standards—for how redistricting consultants should maintain the sum total of their documents.

Finally, Plaintiffs' interpretation of "books and records" to encompass every document related to Mitchell's work for clients would render much of the rest of the contract language superfluous. The final clause of Paragraph 14 requires Mitchell to "maintain a complete record of all contracts or other agreements for the work relating to [his] Services," Ex.A ¶ 14—a provision which would be surplusage if "books and records" already encompassed all documents that relate in a broad sense to Mitchell's redistricting work. Plaintiffs' interpretation is thus inconsistent with basic principles of contract interpretation. *D.C. v. D.C. Pub. Serv. Comm'n*, 963 A.2d 1144, 1157 (D.C.

---

[3] Internal Revenue Service, "Publication 583 (12/2024), Starting a Business and Keeping Records," available at https://www.irs.gov/publications/p583 (last visited Dec. 15, 2025).

2009) (noting that "we must avoid" an "interpretation which . . . would render [contractual] language surplusage").

Thus, Plaintiffs have failed to show that DCCC had possession, custody, or control of the documents belonging to Paul Mitchell that form the basis for their motion. They are therefore entitled to none of the relief they request.

## II.    The adverse inference Plaintiffs seek is foreclosed by precedent.

Plaintiffs' request for an "adverse inference" flies in the face of the Supreme Court's recent and repeated admonition that federal courts commit "serious error[]" when they "fail to honor the presumption of legislative good faith by construing ambiguous direct and circumstantial evidence against the legislature." *LULAC*, 2025 WL 3484863, at *1; *see also, e.g.*, *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018); *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999); *Miller v. Johnson*, 515 U.S. 900, 915 (1995). Even in cases involving "serious claims" of "racial gerrymandering," the Court has been clear that "good faith of the legislative body must be presumed, and the burden of proof rests with the challenger to demonstrate that race predominated the districting process." *Lee v. City of Los Angeles*, 908 F.3d 1175, 1183 (9th Cir. 2018) (citations omitted). In contrast, Plaintiffs cannot cite even a *single example* of a Court drawing an adverse inference against a legislature in a redistricting case based on the invocation of legislative privilege.

Plaintiffs' own proposed order illustrates how egregious such legal error would be. It asks the Court to "find[], for purposes of a preliminary injunction, that race predominated in the drawing of the Proposition 50 map" and also "that race was a motivating factor in the drawing of the Proposition 50 map." ECF No. 162-12 at 1. To simply assume those things—with no record no less—would make an utter mockery of the presumption of legislative good faith. Plaintiffs' attempt to dupe the Court into not only violating Supreme Court precedent but also deciding the ultimate issue of this case on that basis only demonstrates their own bad-faith efforts to skirt the law.

Even if Plaintiffs' theory had merit, their request for an immediate sanction from this Court in these preliminary emergency proceedings is a nonstarter. In view of the

1    "onerous" consequences of an adverse evidentiary inference, courts routinely deny such

2    requests where the issue has not yet been fully developed. *See, e.g.*, *Vega v. Delaware N.*

3    *Cos.*, No. 1:19-CV-00484, 2023 WL 6940198, at *5 (E.D. Cal. Oct. 20, 2023) (denying

4    motion for adverse inference as premature where discovery issue not yet fully litigated

5    by the parties and resolved by the court) (collecting cases); *see also, e.g.*, *United States*

6    *v. Veeraswamy*, No. 23-CV-9379, 2025 WL 2740374, at *21 (E.D.N.Y. Sep. 26, 2025),

7    *decision affirmed on reconsideration*, 2025 WL 3187284 (E.D.N.Y. Nov. 14, 2025).

8    Plaintiffs, again, cite no authority whatsoever supporting the notion that an adverse

9    inference can be drawn at the preliminary injunction stage merely because the parties

10   remain locked in a privilege dispute—an evergreen feature of redistricting litigation.

11   And, as explained in DCCC's opposition to Plaintiffs' first *ex parte* request, courts have

12   routinely refused to draw an adverse inference based on assertions of legislative

13   privilege, which would be "tantamount to punishing a party for asserting a privilege—

14   especially one that as of yet has not been determined to be unavailable." *N.C. State Conf.*

15   *of NAACP v. McCrory*, 997 F. Supp. 2d 322, 361 n.47 (M.D.N.C. 2014); *see* ECF No.

16   157 at 9–10.

17   **III.    Plaintiffs have failed to show that Mitchell waived the legislative**
18          **privilege.**

19          Plaintiffs' final argument is that Mitchell has somehow "waived" the right to assert

20   legislative privilege. This argument fails for several reasons. <u>First</u>, the United States

21   asserts no authority that Mitchell, a third party, *can* waive the legislative privilege.

22   Although the privilege protects some of his communications with legislators and their

23   staff, the "underlying right"—i.e., the privilege itself—belongs to "individual

24   legislators" or the legislature, not Mitchell. *Arnold v. Barbers Hill Indep. Sch. Dist.*, 157

25   F.4th 749, 756 (5th Cir. 2025).  Accordingly, "only the state actor who holds the privilege

26   can waive the privilege." *Arpaio*, 314 F.R.D. at 67. Mitchell thus cannot waive the

27   privilege as a matter of law. Nor is there anything unusual about Mitchell's conduct. By

28   invoking the privilege, Mitchell—again, a non-party haled into this litigation via a

1   subpoena—was simply trying to protect the legislature's rights. There is nothing

2   untoward about "a party taking the usual course of defending its privilege," *see ABN*

3   *Corp. v. Groupe PELM Int'l Corp.*, No. 23-CV-00004-RFL (LJC), 2025 WL 660194, at

4   *11 n.7 (N.D. Cal. Feb. 28, 2025)—much less exercising appropriate diligence in

5   protecting another party's privileged information.

6         Second, Plaintiffs' waiver argument is simply unintelligible—it is nearly

7   impossible to understand from their frantic motion what trove of documents they believe

8   Mr. Mitchell has waived legislative privilege over, even if he *could* lawfully do so. To

9   the extent they are referring to documents like those Mr. Mitchell has recently produced,

10  they ignore that those are *non-privileged documents* previously withheld on the basis of

11  burden objections; Mr. Mitchell has indicated that he remains in the process of producing

12  such materials. If, instead, they mean to refer to documents solely within Mr. Mitchell's

13  custody—but to which Plaintiffs wrongly believe the DCCC has some contractual

14  entitlement—they simply misread the relevant contract. *See supra* § I. And if they mean

15  to refer documents Mr. Mitchell did in fact share with DCCC, they neglect that DCCC

16  has either already produced such documents or identified them on a privilege log. Simply

17  put, while Plaintiffs' motion is long on rhetoric, it is nearly impossible to parse the scope

18  of their waiver argument. That is because Plaintiffs are grasping at straws.

19        Plaintiffs also appear to assert that Mitchell waived the privilege "by sharing his

20  documents, methodologies, and factors considered when drafting the map with third

21  parties, including DCCC." Mot.11. Again, Plaintiffs cite no authority for this position,

22  and it is inconsistent with caselaw on the scope of the privilege. The legislative privilege,

23  as the Ninth Circuit has held, covers anything "pertinent to potential legislation or

24  investigation," or otherwise "concerning matters within the legitimate legislative

25  sphere." *Miller v. Transamerican Press, Inc.*, 709 F.2d 524, 530 (9th Cir. 1983). There

26  is no allegation that "the legislators [sent] privileged documents to third parties *outside*

27  the legislative process; instead they brought third parties *into* the process." *La Union Del*

28

8

1    *Pueblo Entero v. Abbott*, 68 F.4th 228, 237 (5th Cir. 2023). Thus, Plaintiffs' waiver

2    argument is wrong as a matter of law.

3       <u>Third</u>, Plaintiffs appear to suggest that Mitchell waived the privilege because his

4    production was "untimely." Mot.10–11. Plaintiffs do not explain why Mitchell's

5    production was untimely or how this relates to their waiver argument. Mitchell's initial

6    responses to Plaintiffs' subpoena include broad objections to the scope and undue burden

7    of Plaintiffs' requests. *See United States v. Acad. Mortg. Corp.*, 968 F.3d 996, 1006 (9th

8    Cir. 2020) (noting "the important interest in ensuring that non-parties are not subjected

9    to burdensome discovery requests"). Nonetheless, Mitchell moved promptly to respond

10    to Plaintiffs' requests and appeared for a deposition—and, when the Court ordered him

11    to accelerate his production of documents, he swiftly complied. *See* ECF No. 153.

12    Nothing about Mitchell's conduct suggests bad faith or dilatory tactics. To the contrary,

13    Plaintiffs—who have been in receipt of Defendants' requests for weeks—nonetheless

14    chose to produce several troves of documents that are clearly responsive to those requests

15    *on the literal eve of trial*.

16                               **CONCLUSION**

17       The Court should deny Plaintiffs' renewed motion for an adverse inference.

18

19       Dated: December 15, 2025            Respectfully submitted,

20

                                          <u>*/s/ Lalitha D. Madduri*</u>

21                                          Lalitha D. Madduri (CA Bar No. 301236)

                                         Christopher D. Dodge* (DC Bar No.

22                                          90011587)

23                                          Max Accardi* (DC Bar No. 90021259)

                                         **ELIAS LAW GROUP LLP**

24                                          250 Massachusetts Ave. NW, Suite 400

25                                          Washington, DC 20001

                                         T: (202) 968-4652

26                                          F: (202) 968-4498

27                                          lmadduri@elias.law

                                         cdodge@elias.law

28                                          maccardi@elias.law

1

2                              Abha Khanna* (WA Bar No. 42612)

3                              Tyler L. Bishop (CA Bar No. 337546)
**ELIAS LAW GROUP LLP**

4                              1700 Seventh Avenue, Suite 2100
Seattle, WA 98101

5                              T: (206) 656-0177
akhanna@elias.law

6                              tbishop@elias.law

7

8                              Omar Qureshi (CA Bar No. 323493)
Max Schoening (CA Bar No. 324643)

9                              **QURESHI LAW PC**
700 Flower Street, Suite 1000

10                            Los Angeles, CA 90017
T: (213) 600-6096

11                            omar@qureshi.law

12                            max@qureshi.law

13

14                            *Counsel for Intervenor-Defendant DCCC*

15                            *\* Admitted pro hac vice*

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 15, 2025, I electronically served the foregoing document via electronic mail on all counsel of record.

*/s/ Lalitha D. Madduri*
Lalitha D. Madduri (CA Bar No. 301236)

11