UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DAVID TANGIPA, et al.,

                  Plaintiffs,
      and

UNITED STATES OF AMERICA,

                 Plaintiff-Intervenor,
    v.

GAVIN NEWSOM, in his official capacity
as the Governor of California, et al.,

               Defendants,
      and

DCCC,

             Defendant-Intervenor,
      and

LEAGUE UNITED LATIN AM.
CITIZENS,

             Defendant-Intervenor.

CASE NO. 2:25-cv-10616-JLS-WLH-KKL


**ORDER DENYING PLAINTIFFS'
MOTION FOR PRELIMINARY
INJUNCTION (Doc. 15) AND
DENYING PLAINTIFF-
INTERVENOR'S MOTION FOR
PRELIMINARY INJUNCTION (Doc.
29)**

Before:
Hon. Josephine L. Staton
Hon. Wesley L. Hsu
Hon. Kenneth K. Lee

Opinion by Judge Staton
Dissent by Judge Lee

STATON, District Judge:

## I.    INTRODUCTION

On November 4, 2025, California voters overwhelmingly passed Proposition 50, amending the California Constitution and adopting a new map with new congressional district lines that everyone agrees are likely to flip five congressional seats from Republicans to Democrats.  Challengers[1] now seek to enjoin California's use of the Proposition 50 Map, arguing that the predominant reason for its adoption was not politics but rather unconstitutional and unlawful racial gerrymandering.

We have reviewed briefing from all parties, held a 3-day evidentiary hearing with 9 witnesses (including 6 experts), and reviewed a record that includes over 500 exhibits totaling thousands of pages (along with video and audio evidence).  We find that Challengers have failed to show that racial gerrymandering occurred, and we conclude that there is no basis for issuing a preliminary injunction.

Our conclusion probably seems obvious to anyone who followed the news in the summer and fall of 2025.  In the summer of 2025, the Trump administration began pressuring Texas to redistrict for the purpose of picking up five more Republican seats in Congress.  The Texas Legislature obliged.  In August 2025, Governor Gavin Newsom announced that California would "fight back" with its own Election Rigging Response Act ("ERRA").  The stated goal of the ERRA was to counter the actions of Texas and pick up an additional five Democratic seats.  The new map drawn by a private consultant, paid for by the Democratic Congressional Campaign Committee, and incorporated into Proposition 50, met that goal exactly.

In the roughly two and a half months between the California Legislature's initial consideration of the ERRA and the special election on November 4, 2025, Proposition 50

---

[1] We refer to Plaintiffs—comprising individuals and the California Republican Party—and Plaintiff-Intervenor the United States collectively as "Challengers."

and its new map were heavily debated.  No one on either side of that debate characterized the map as a racial gerrymander.  The California Democratic Party told voters that "Proposition 50 proposes new lines for many of California's 52 congressional districts, which would negate the five Republican seats drawn by Texas.  Under the proposed lines, Democrats could gain up to 5 seats in the U.S. House of Representatives."  Plaintiff California Republican Party urged a "no" vote on Proposition 50, telling voters it was a "political power grab to help Democrats retake Congress and impeach Trump."  Attorney General Pamela J. Bondi called it a "redistricting power grab" for political gain.  And Plaintiff California Assembly member David Tangipa publicly described Proposition 50 as "partisan gerrymandering" and a "power grab" that "eliminate[d] five Republican districts & strengthen[ed] Democrat held seats."

Proposition 50 was the single issue on the ballot for the November 4 special election:  the Official Voter Information Guide provided maps to the voters showing both the existing district lines and the proposed new district lines.  And the pros and cons of Proposition 50 were outlined in purely political, partisan terms, with each side claiming the other was engaging in a "power grab."  No one told the voters that the Proposition 50 Map involved racial gerrymandering.  Over 7 million Californians voted "yes" on Proposition 50, it passed by nearly a 2 to 1 margin, and the next day Plaintiffs filed their complaint in this Court.

But the Supreme Court ruled in *Rucho v. Common Cause* that "partisan gerrymandering claims present political questions beyond the reach of the federal courts."[2] So, Challengers have abandoned the argument they made to the voters.  Proposition 50, apparently, is no longer a partisan power grab.  Now, it is a "racial gerrymander."  And Challengers also tell us that, even if the voters intended to adopt the Proposition 50 Map as

---

[2] 588 U.S. 684, 718 (2019).

a partisan counterweight to Texas's redistricting, their intent does not matter, as they were simply dupes of a racially-motivated legislature.

However, we reject the notion that voters' intent does not matter. Instead, we employ well-understood tools to determine the voters' intent in adopting the Proposition 50 Map, and after reviewing the evidence, we conclude that it was exactly as one would think: it was partisan. Indeed, the record contains a mountain of statements reflecting the partisan goals of Proposition 50, from which Challengers have culled a molehill of statements showing race consciousness on the part of the mapmaker and certain legislators. But that is not enough to make the necessary showing that the relevant decisionmakers— here, the electorate—enacted the new map for racial reasons.

Nor have Challengers offered alternative maps that would prove otherwise. Significantly, they provide no alternative map for any congressional district except one: District 13.[3] And as to that district, the alternative maps they do offer are either materially indistinguishable from the Proposition 50 Map or do not meet other redistricting goals.

We explain our findings of fact and conclusions of law below.

## II.    BACKGROUND

### A.    Texas's Redistricting and the California Legislature's Response

On July 9, 2025, following pressure from the White House and the United States Department of Justice ("DOJ") to effectuate congressional redistricting in Texas, Texas Governor Greg Abbott added mid-decade redistricting to the Texas Legislature's agenda. *See League of United Latin Am. Citizens v. Abbott*, 2025 WL 3215715, at *1 (W.D. Tex. Nov. 18, 2025). Reportedly, President Donald Trump commented approvingly on the redistricting effort, stating, "We are entitled to five more seats." (Pres. Trump on Texas,

---

[3] The alternative maps presented for District 13 do show the impact of the proposed changes to District 13 on two neighboring districts, District 5 and District 9.

Ex. 213 at 65, Doc. 189-1.)[4]  In August of 2025, the Texas Legislature passed, and Governor Abbott signed into law, House Bill 4, establishing a new congressional district map for Texas which will be effective starting from the 2026 midterm election.

California politicians swiftly responded.  On August 8, 2025, California Governor Gavin Newsom posted a video of a conference between California and Texas Democrats, at which he announced, "We will nullify what happens in Texas.  We will pick up five seats with the consent of the people."  (Ex. 229 at 370, Doc. 189-1.)  California Assembly Speaker Robert Rivas issued an August 9 press release stating that he and other California Democrats were prepared to "fight back against Trump's redistricting power grab."  (Ex. 18 at 1481, Doc. 188-9.)  On August 11, 2025, Governor Newsom sent a letter to President Trump, writing, "If you will not stand down, I will be forced to lead an effort to redraw the maps in California to offset the rigging of maps in red states."  (Ex. 93 at 3, Doc. 190-1.)

As promised, in an August 14, 2025 press release, Governor Newsom announced a legislative package entitled the Election Rigging Response Act ("ERRA").  (Ex. 102 at 12–19, Doc. 190-1.)  Although California voters had, in 2010, created an independent Citizens Redistricting Commission (the "Commission") to redraw California's congressional maps every 10 years, the ERRA would give California voters the option to replace the congressional map drawn by the Commission in 2021 (the "2021 Map") with a new one.  Specifically, the ERRA contained three bills.  First, Assembly Constitutional Amendment 8 ("ACA 8") would refer to California voters a proposed constitutional amendment which, if approved, would replace the 2021 Map with an updated congressional district map for the 2026, 2028, and 2030 elections.  Assembly Bill 604 ("AB 604") set forth the proposed updated map (the "Proposition 50 Map"), which was prepared by third-party consultant Paul Mitchell.  (Mitchell Depo., Ex. 513 at 32, Doc. 210-2.)  Finally, Senate Bill 280 ("SB 280") would authorize a statewide special election

---

[4] Unless otherwise noted, page numbers refer to those printed by the Court after e-filing, located in a blue line at the top of each page.

on November 4, 2025, in which California voters would vote on ACA 8 as Proposition 50. Governor Newsom declared that the ERRA would "enable California voters the opportunity to fight back against Trump's attempted power grab in Texas." (Ex. 102 at 12, Doc. 190-1.)

The California Legislature's debate surrounding the ERRA included passionate defenses and criticism of its partisan goals.  Assembly member Marc Berman introduced ACA 8 by stating, "ACA 8 is before you today because President Trump and Republicans in Texas and other states across the country are attempting to redraw congressional districts mid-decade in an effort to rig the upcoming election." (CA Assembly Elections Comm. Tr., Ex. 5 at 197, Doc. 188-9.)  Assembly member Robert Garcia similarly characterized ACA 8 as necessary "only because Republicans force partisan maps on voters in other states." (CA Assembly Floor Tr., Ex. 9 at 1180, Doc. 188-9.)  And Senator Sasha Renée Pérez emphasized that ACA 8 would "allow us to neutralize what is happening in Texas so that we can create an additional five Democratic seats to stop this mess and stop this chaos." (CA Senate Tr., Ex. 8 at 925, Doc. 188-9.)  Opponents of the ERRA, however, vilified its naked partisan purpose, with Assembly member Alexandra Macedo criticizing it as "a blatant attempt to gerrymander congressional districts for partisan gain." (CA Assembly Elections Comm. Tr. at 321.)  Plaintiff Assembly member David Tangipa's floor statement against the ERRA similarly characterized it as a partisan gerrymander:

> Californians can look at their districts today, and they know that they were not manipulated for partisan advantage.  And now, in just four days, with two rushed committee hearings and almost no opportunity for real public comment, we are on the verge of throwing all of that away.  Let me remind this body.  During committee hearings, one of our colleagues brazenly admitted that this entire thing was about partisan gerrymandering. Admitted partisan politics. . . .  So how can we stand in this chamber and criticize Texas, Florida or other states for gerrymandering when we've joined them in the same practice?

(CA Assembly Floor Tr. at 1119–20.)  On August 21, 2025, the California

Legislature passed the ERRA, and Governor Newsom signed it into law.

On August 25, four Republican California legislators and four voters, including

Plaintiff in this action Eric Ching, filed a Petition with the California Supreme Court,

arguing that the ERRA violated the California Constitution and seeking a writ of mandate

that ACA 8 not be presented to voters in the special election.  (*Sanchez v. Weber* Petition,

Ex. 234 at 810, Doc. 189-1.)  Like Governor Newsom and the legislators who debated the

ERRA, the plaintiffs highlighted the legislation's unabashedly partisan goals, providing a

declaration by Dr. Sean Trende, who is also Challengers' expert in this case, which stated

that "it seems obvious that the purpose of this map is to favor one party or the other, as

leaders in the state have not been particularly shy that the purpose of the map is to

'neutralize' a Republican gerrymander in Texas."  (Trende Decl. in *Sanchez* ¶ 15, Ex. 129

at 136, Doc. 190-1.)  The California Supreme Court denied the Petition on August 27.

(Ex. 342 at 156, Doc. 190-12.)  California voters would therefore vote on Proposition 50 in

a November 4, 2025 special election.

**B.    The Proposition 50 Campaign**

A fierce campaign ensued.  Proposition 50's proponents called on voters to "fight

back" against Republican redistricting efforts in other states.  The California Democratic

Party's "YES on Prop 50" webpage, for example, informed voters,

> Proposition 50 proposes new lines for many of California's 52
> congressional districts, which would negate the five Republican
> seats drawn by Texas.  Under the proposed lines, Democrats
> could gain up to 5 seats in the U.S. House of Representatives.
> With a majority in the House, Democrats can fight back against
> Trump and Republicans' MAGA Agenda.

(Ex. 89 at 15, Doc. 188-12.)  Democratic politicians from across the country

participated in the campaign.  On September 16, Governor Newsom livestreamed a virtual

"Yes on Prop 50" rally, during which Senator Elizabeth Warren called on voters to "please

7

understand how important these midterms are.  Any accountability for Donald Trump—

any accountability—is going to come because of the midterms." (Ex. 122 at 76, Doc. 190-

1.)  Senator Warren continued:  "Let me tell you the way to do that:  that is, vote 'Yes' on

50." (*Id.*)  Former Vice President Kamala Harris posted to social media on October 30 that

she was voting "yes" on Proposition 50 "because Donald Trump and the Republicans are

trying to rig the system . . . around congressional maps, so we as Californians are standing

up to level the playing field, and we're doing that by voting 'Yes' on Prop. 50." (Ex. 121

at 75, Doc. 190-1.)

Proposition 50's opponents decried its repudiation of the independently drawn 2021

Map and characterized it as entrenching political power.  The California Republican Party

ran video advertisements stating, "They aren't hiding it.  Prop. 50 eliminates five

congressional seats," and describing Proposition 50 as an attempt to "paint California

blue." (Ex. 212 at 62, Doc. 189-1; Ex. 220 at 96, Doc. 189-1.)  Voters also received text

messages from the California Republican Party, warning them that "Gavin Newsom's Prop

50 political power grab is a scheme to gerrymander more congressional seats for

Democrats so they can take control of Congress[.]" (Ex. 332 at 1–48, Doc. 190-12.)

California legislators who originally opposed the ERRA also urged voters to reject

Proposition 50.  Assembly member Carl DeMaio and the organization Reform California

created a "No on Prop 50" website to warn voters that "Prop 50 takes the redistricting

power away from citizens and gives that power to the politicians so they can manipulate

the lines of election districts for their own personal political benefit." (Ex. 134 at 1–3,

Doc. 190-2.)  Plaintiff Assembly member Tangipa also launched a website entitled "Defeat

Prop 50," characterizing Proposition 50 as a "unilateral decision to redraw Congressional

maps, eliminate five Republican districts, & strengthen Democrat held seats." (Ex. 244 at

1302, Doc. 189-1.)  The website warned that Proposition 50 would prevent Republicans

from retaking District 13 or District 21, "two of the best pickup options for Republicans in

the country." (*Id.*)  And on social media, Assembly member Tangipa urged voters to "step

8

up" to vote "NO on Prop 50" because "one of the map's OWN authors admitted: 'this is partisan gerrymandering.' They don't care about communities of interest—only power." (Ex. 242 at 1297, Doc. 189-1.)

    **C.**    **The Special Election**

    The November 4, 2025 special election contained only one ballot measure: Proposition 50. The Special Election's Official Voter Information Guide informed voters that Proposition 50's passage would mean that California "would use new, legislatively drawn congressional district maps starting in 2026." (Voter Information Guide, Ex. 187 at 560, Doc. 190-3.) The Voter Guide then included six pages of images of California's "Current" and "Proposed" congressional districts, providing voters with the entire 2021 Map, the entire Proposition 50 Map, and larger images of the northern and southern congressional districts for both maps. (*Id.* at 565–70.) The Voter Guide also included arguments in favor of and against Proposition 50:

> ARGUMENT IN FAVOR OF PROPOSITION 50
> STOP TRUMP FROM RIGGING THE 2026 ELECTION
> Donald Trump and Texas Republicans are making an unprecedented power grab to steal congressional seats and rig the 2026 election before voting even begins.
> Other Republican states are following suit. They want to steal enough seats to control Congress even if voters overwhelmingly reject their agenda.
> This isn't politics as usual. It's an emergency for our democracy.

> REBUTTAL TO ARGUMENT IN FAVOR OF
> PROPOSITION 50
> Districts do not belong to either party; they belong to the People. But, party bosses want to call the shots—again. . . .
> Vote NO on partisan gerrymandering. Vote NO on Prop. 50.

> ARGUMENT AGAINST PROPOSITION 50
> PROPOSITION 50: A POWER GRAB BY POLITICIANS
> Prop. 50 is not democratic; it gives voters a take-it-or-leave-it decision on the most partisan maps in California's history—a product of politicians' secretive backroom deals with ZERO meaningful public engagement. . . .

> Instead of protecting important programs, they're spending it on
> a political power grab.
> Vote NO on Prop. 50.

(*Id.* at 571–72.)  64.4% of voters voted "yes" on Proposition 50.  (Ex. 201 at 145,
Doc. 190-9.)  As a result, the Proposition 50 Map is set to dictate California's 52
congressional districts for the 2026, 2028, and 2030 elections.  As Proposition 50's
supporters repeatedly promised, the Proposition 50 Map is expected to make "five of the
nine Republican-held seats more likely to elect a Democrat[.]"  (Grofman Report ¶ 7, Ex.
184, Doc. 190-3.)

**D.    The Instant Lawsuit**

The day after the special election, Plaintiffs Assembly member David Tangipa, the
California Republican Party, and several California voters filed the Complaint in this
action against Defendants Governor Gavin Newsom and California Secretary of State
Shirley Weber ("State Defendants"), requesting that this Court enjoin the use of the
Proposition 50 Map.  (Pl. Compl., Doc. 1.)  Following several months of campaigning that
construed Proposition 50 as a political and partisan power grab, Plaintiffs now claim that
State Defendants violated the Fourteenth and Fifteenth Amendments "by using race as a
predominant factor in drawing the boundaries of sixteen congressional districts" because
those districts were drawn to favor Latino voters.  (*Id.* ¶¶ 95–98.)

On November 7, 2025, Plaintiffs filed a Motion for Preliminary Injunction,
requesting that this Court enjoin the use of the Proposition 50 Map, and order the use the
2021 Map during the pendency of this litigation.  (Pl. Mot., Doc. 15; Pl. Mem., Doc. 16-1.)
Plaintiff-Intervenor the United States filed a Motion for Preliminary Injunction, requesting
the same relief, on November 13, 2025.  (U.S. Mot., Doc. 29; U.S. Mem., Doc. 29-1.)

This three-judge panel held a preliminary injunction hearing from December 15,
2025, to December 17, 2025.  At the hearing, Challengers presented evidence of racial
motivations in connection with Proposition 50.  In turn, State Defendants, Defendant-
Intervenor Democratic Congressional Campaign Committee ("DCCC"), and Defendant-

Intervenor League of United Latin American Citizens ("LULAC") (together, "Defendants") presented evidence of partisan motivations. Because we find that the evidence of any racial motivation driving redistricting is exceptionally weak, while the evidence of partisan motivations is overwhelming, Challengers are not entitled to preliminary relief on any of their claims.

## III.    LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy never awarded as a matter of right." *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (quotation omitted). A district court should issue a preliminary injunction only "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "[T]he party seeking the injunction . . . bear[s] the burden of demonstrating the various factors justifying preliminary injunctive relief . . . ." *Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 441 (1974). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. The Ninth Circuit uses a sliding scale to weigh these factors, "such that where there are only 'serious questions got to the merits'" a preliminary injunction may issue "so long as 'the balance of hardships tips *sharply* in plaintiff's favor' and the other two factors are satisfied." *Short v. Brown*, 893 F.3d 671, 676 (9th Cir. 2018) (quoting *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013)). The third and fourth *Winter* factors merge where, like here, the nonmovant is the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Further, we must "tread carefully where preliminary relief would disrupt a state voting system on the eve of an election." *Short*, 893 F.3d at 675. That is because "in

addition to the harms attendant upon issuance or nonissuance of an injunction . . . [c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls." *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006). And, "[a]s an election draws closer, that risk will increase." *Id.* at 5.

## IV.    ANALYSIS

Challengers claim that in enacting the Proposition 50 Map, State Defendants engaged in (1) racial gerrymandering in 16 congressional districts—Districts 13, 18, 21, 22, 25, 29, 31, 33, 34, 35, 38, 39, 41, 44, 46, and 52—in violation of the Fourteenth Amendment, (2) racial gerrymandering in the same 16 districts in violation of the Fifteenth Amendment, and (3) intentional racial discrimination in violation of Section 2 of the Voting Rights Act.[5] (Pl. Compl.; U.S. Compl., Doc. 42.) We first evaluate Challengers' racial gerrymandering claims under the Fourteenth and Fifteenth Amendments before turning to their Voting Rights Act claim.

### A.    Racial Gerrymandering

Challengers assert that 16 congressional districts in the Proposition 50 Map—in particular, the 16 districts where "the Hispanic population makes up more than 50% of the voters"—were racially gerrymandered.[6] (Pl. Mem. at 18.) Defendants, in turn, disagree that racial motivations drove the enactment of the challenged districts.

_____

[5] More specifically, Plaintiffs challenge only racial gerrymandering in the aforementioned 16 congressional districts under the Fourteenth and Fifteenth Amendments. (Pl. Compl.) The United States alone challenges the Proposition 50 Map under the Voting Rights Act (*see* U.S. Compl. at 17, Doc. 42), and additionally challenges racial gerrymandering in only District 13 under the Fourteenth Amendment (*see* Hearing Tr. at 525).

[6] Plaintiffs' Motion incorrectly lists District 42, a district which they do not challenge, as one of these majority-Latino districts, but Plaintiffs' expert report authored by Dr. Tom Brunell states that District 41, rather than District 42, is majority-Latino in the Proposition 50 Map. (Brunell Report at 4, Table 2, Ex. 196, Doc. 190-9.) Accordingly, Plaintiffs challenge all 16 districts with majority-Latino voting populations in the Proposition 50 Map.

A State may not, "without sufficient justification," "separat[e] its citizens into different voting districts on the basis of race." *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 187 (2017) (quotation omitted). Typically, for racial gerrymandering claims, "the plaintiff must prove that 'race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'" *Cooper v. Harris*, 581 U.S. 285, 291 (2017) (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)). Race is the predominant factor in redistricting when a legislature subordinates "race-neutral districting criteria such as compactness, contiguity, and core preservation to 'racial considerations.'" *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 7 (2024) (quoting *Miller*, 515 U.S. at 916). Importantly, the plaintiff must make the distinction between the legislature "being aware of racial considerations and being motivated by them." *Miller*, 515 U.S. at 916. The plaintiff must show that other considerations were subordinate, meaning that race was "the criterion that, in the State's view, could not be compromised." *Shaw v. Hunt (Shaw II)*, 517 U.S. 899, 907 (1996). Because of the "sensitive nature of redistricting and the presumption of good faith that must be accorded legislative enactments," courts must "exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race." *Miller*, 515 U.S. at 916.

Typically, a plaintiff may make a showing of racial predominance through "'direct evidence' of legislative intent, 'circumstantial evidence of a district's shape and demographics,' or a mix of both." *Cooper*, 581 U.S. at 291 (quoting *Miller*, 515 U.S. at 916). Direct evidence "often comes in the form of a relevant state actor's express acknowledgment that race played a role in the drawing of district lines," or may be "smoked out over the course of litigation." *Alexander*, 602 U.S. at 8. Circumstantial evidence involves examining a district's design to argue that it "rationally cannot be understood as anything other than an effort to separate voters into different districts on the basis of race." *Shaw v. Reno (Shaw I)*, 509 U.S. 630, 649 (1993).

13

Here, because the circumstances under which the challenged districts have been enacted are unique, we begin with a threshold inquiry into whose motivations are relevant, before turning to the evidence.  First, because the voters enacted the Proposition 50 Map, we hold that the relevant inquiry is whether race predominated in the minds of the voters.  Next, looking to the record, we find virtually no evidence that race predominated in the voters' enactment of the Proposition 50 Map.

### 1.    The Voters' Intent Is the Relevant Inquiry

The Proposition 50 Map and its new congressional district lines went into effect only because California voters enacted it.  In a press conference announcing the package of bills that would eventually become Proposition 50, Governor Newsom emphasized this fact when he said to the press:  "We will pick up five seats with the consent of the people.  And that is the difference between the approach we're taking and the approach they're taking. . . . [W]e're doing it by asking the people of the state of California for their consent and support."  (Newsom Press Conference Tr., Ex. 90 at 48, Doc. 188-12.)  This voter-driven process is unique.  Generally, "[r]edistricting constitutes a traditional domain of state legislative authority."  *Alexander*, 602 U.S. at 7.  And in all of the case law cited by the parties, the legislature holds the final decision-making authority as to whether a challenged map goes into effect.  *See id.* at 8 (looking for direct evidence of intent from "a relevant state actor[]").  Where the legislature is the relevant state actor, redistricting case law directs us to analyze whether there is direct evidence that the legislature subordinated non-racial criteria in the drawing of a new map.  *Miller*, 515 U.S. at 916.  But the centrality of voters here distinguishes this case from nearly all precedent on racial gerrymandering.  In fact, it appears to the Court that the question of how to consider discriminatory intent in the context of a redistricting ballot measure is an issue of first impression.  (*Accord* Hasen Amicus at 5, Doc. 122-1.)

Challengers urge us to ignore entirely the intent of the voters who overwhelmingly supported Proposition 50, arguing that the intent of the map drawer, Paul Mitchell, and by

extension the California Legislature, is dispositive. (*See* U.S. Reply to Defs. at 11–15, Doc. 140.) The Court disagrees. Instead, for at least three reasons, in deciding whether "the State has used race as a basis for separating voters into districts," we conclude that the voters are the most relevant state actors and their intent is paramount. First, California law subordinates the legislature to the electorate when amending the constitution. Second, this particular constitutional amendment did not simply authorize the legislature to engage in partisan gerrymandering as the legislature saw fit; it was an amendment in which the voters enacted a particularly-drawn map that everyone had the opportunity to review, debate, and critique. And third, the very nature of the injury, "that the State has used race as a basis for separating voters into districts," *Miller*, 515 U.S. at 911, demands that we focus not on preliminary or peripheral comments, but on why the relevant decisionmaker chose to enact these congressional district maps.

By way of background, California's Constitution provides that the Citizens Redistricting Commission will conduct redistricting in the year following the national census. Cal. Const. art. XXI, §§ 1–2. Accordingly, mid-cycle, partisan redistricting required a constitutional amendment. The California Constitution requires that a proposed amendment be "submitted to the electors" and "approved by a majority of votes cast thereon." Cal. Const. art. XVIII, § 4. The Legislature's power to amend the state constitution is limited to "proposals," which it may submit to the voters after a two-thirds vote of each house. *Id.* § 1.

Here, three bills formed the legislative package that later became Proposition 50. ACA 8 provided for a constitutional amendment putting in place new congressional districts to be used in elections through 2030. (ACA 8, Ex. 1, Doc. 188.) AB 604 proposed the exact boundaries of the districts put in place in ACA 8. (Ex. 3, Docs. 188-1–188-8.) SB 280 called for a special election in November 2025 to vote on the proposed amendment. (Ex. 2, Doc. 188.) Through these bills, the constitutional amendment

provided in ACA 8, and by extension the map drawn by AB 604, was submitted to voters as Proposition 50.

The first Constitution of California, enacted in 1849, reserved the final power of constitutional amendment to the people. *See* Cal. Const. 1849 art. X § 1 ("if the people shall approve and ratify such amendment . . . by a majority of the electors . . . [the amendment] shall become part of the Constitution."). This provision has changed strikingly little since the state Constitution's earliest days, affirming the persistent constitutional underpinning that that "[a]ll political power is inherent in the people. Government is instituted for their protection, security, and benefit, and they have the right to alter or reform it when the public good may require." Cal. Const. art. II § 1; *accord* Cal. Const. 1849 art. I § 2 (same). From its earliest days until now, California's Constitution has facially subordinated the power of government officials to the electorate. *See also Californians for an Open Primary v. McPherson*, 134 P.3d 299, 317 (Cal. 2006) (holding that certain 1879 amendments limited the power of the legislature to design the manner in which proposed amendments were submitted to the electorate).

And further changes to the state's Constitution have since confirmed that California's constitutional design places the ultimate political decision-making responsibility with the electorate. For example, in 1911, the California voters approved Proposition 7, which empowered voters to directly propose statutory initiatives and constitutional amendments. *See Perry v. Brown*, 265 P.3d 1002, 1016 (Cal. 2011) (summarizing the history of the 1911 changes). This power grew out of the Progressive movement and was designed to be a check on the legislature. *Id.* (quoting the original ballot materials, which described the proposition as allowing the people to initiate measures "*which the legislature either viciously or negligently fails or refuses to enact*" (emphasis in original)). Dissatisfaction with the then-government motivated the voters to retake "lost control of the political process," reclaiming their place in California's constitutional structure as the ultimate source of political authority. *Id.* The initiative

16

process shows that under California's constitutional system, where there is a clash between the legislature and the people, it is the will of the electorate that takes precedence.

And, as the ultimate source of political authority, the electorate is also subject to constitutional limitations.  The California Supreme Court has confirmed that, in the context of redistricting through statutory initiative, the voters' power is "coextensive with the power of the Legislature."  *Legislature v. Deukmejian*, 669 P.2d 17, 26 (Cal. 1983).  In that case, the California Supreme Court prevented voters from calling a referendum to redistrict by statutory initiative after the congressional lines had already taken effect because it would have violated the once-a-decade redistricting limitation contained in the state Constitution.  669 P.2d at 30.  In other words, the voters and the legislature are not subject to different constitutional standards:  under California law, the two possess the same legislative capacity, which is equally limited.

But again, this is because "all power of government ultimately resides in the people" so the power of Californians to propose statutory initiatives and constitutional amendments is not "a right granted the people, but . . . a power reserved by them." *Associated Home Builders etc., Inc. v. City of Livermore*, 557 P.2d 473, 477 (Cal. 1976).  Thus, while the voters' power to propose and adopt initiatives is subject to limitation, they are "precious few." *Cal. Cannabis Coal. v. City of Upland*, 401 P.3d 49, 56 (Cal. 2017). Accordingly, the voters' legislative power through statutory initiative remains "*at least* as broad as the legislative power wielded by the Legislature and local governments." *Id.* (emphasis added).  When the voters speak, we should consider it to be with the utmost legislative authority.

In the case of Proposition 50, this means that the requirement that the legislature submit the map to the voters was not merely symbolic or a procedural formality.  The need for the voters to enact the map through constitutional amendment stems from California's constitutional design, which intentionally subordinates the power of the legislature to the

electorate.  Accordingly, when we search for racial gerrymandering in a map enacted by the electorate, we must look to the intent of the voters, rather than the legislature.

This conclusion does not mean that legislative statements are irrelevant to our intent analysis.  Statements made while debating proposals to be submitted to the electorate often speak directly to voters.  Therefore, we may look to statements made during a bill's passage to determine the voters' intent.  In doing so, however, we must be careful to avoid the "cat's paw" theory[7] of intent which the Supreme Court has directed us to reject.  *See Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 689 (2021).  In *Brnovich*, the Democratic National Committee challenged Arizona's limitations on ballot collection in part on the grounds that the enactment of the law was racially motivated.  The Ninth Circuit had determined that evidence of the racial motivation of the bill's sponsor, along with a widely distributed "racially-tinged" video, demonstrated that "well meaning legislators were used as 'cat's paws.'  Convinced by the false and race-based allegations of fraud, they were used to serve the discriminatory purposes of" others.  *Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989, 1041 (9th Cir. 2020), *rev'd and remanded sub nom. Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647 (2021).  The Supreme Court rejected this "cat's paw" theory, writing that "legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents.  Under our form of government, legislators have a duty to exercise their judgment and to represent their constituents.  It is insulting to suggest that they are mere dupes or tools."  *Brnovich*, 594 U.S. at 689–90.

Challengers essentially urge us to apply the "cat's paw" theory to the voters here. (*See, e.g.*, Pl. Reply at 11, Doc. 143; U.S. Reply to Defs. at 12 (arguing that the legislature "laundered" its equal protection violations through the voters).)  Echoing the rejected

---

[7] According to the Ninth Circuit opinion, "the doctrine is based on the fable, often attributed to Aesop, in which a clever monkey induces a cat to use its paws to take chestnuts off of hot coals for the benefit of the monkey."  *Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989, 1040 (9th Cir. 2020).

argument in *Brnovich*, Challengers argue that even if the voters passed the measure intending to put in place a partisan gerrymander, if the legislature surreptitiously drew those lines to separate voters based on race, then the referendum may not "cleanse" this intent. (U.S. Reply to Defs. at 12.)  This argument, however, is completely antithetical to the position of voters in California's constitutional system.  As described, it is the legislature's power that is *subordinated* to the power of the voters.  And therefore this is simply a reiteration of the cat's paw:  that although the voters have the real power, they are mere dupes of the legislature's impermissible will.

Not only does that argument run afoul of *Brnovich*, it ignores a litany of case law treating voters as discerning, which is a core precept of our electoral system.  For example, in the First Amendment context, political candidates are given broad latitude to make their views known "so that the electorate may intelligently evaluate" them.  *Buckley v. Valeo*, 424 U.S. 1, 52–53 (1976).  That is because "where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential."  *Id.* at 14–15.  To that end, courts are directed to reject limits on political speech out of a concern that voters would be persuaded by distorting campaign messages.  *See, e.g.*, *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 351–56 (2010) (rejecting the "antidistortion rationale" for limitations on corporate campaign expenditures because "[t]he First Amendment confirms the freedom to think for ourselves"); *Brown v. Hartlage*, 456 U.S. 45, 61 (1982) (protecting the ability of candidates to make false statements because "a candidate's factual blunder is unlikely to escape the notice of, and correction by, the erring candidate's political opponent").  This precedent bolsters our conclusion that the potential for falsies and subterfuge by the legislature should not impact our reliance on voter intent.  Rather, we trust that voters are discerning and that the campaign and electoral process will out the truth.

Nor do we find Challengers' remaining arguments against consideration of voter intent convincing.  For the first time in their replies, Challengers suggest that the narrow

19

bill they challenge is not ACA 8, the constitutional amendment putting the new congressional districts into effect, but AB 604, which outlined the district boundaries. (U.S. Reply to Defs. at 11–12; Pl. Reply at 12.)  This is a distinction without a difference. The voters did, in fact, choose "the actual Proposition 50 map." (U.S. Reply to Defs. at 11–12.)  The text of the amended state constitution now provides that the state will temporarily use "the single-member districts for Congress reflected in Assembly Bill 604 of the 2025-26 Regular Session." Cal. Const. art. XXI § 4.  Furthermore, the voter guide includes the exact boundaries of the proposed districts, as it must, given that the voters were not merely lifting a procedural bar but doing so *for a specific map*. (Voter Information Guide at 565–70.)  The voters were free to reject the constitutional amendment based either on disagreement with the partisan premise for redrawing put forth by ACA 8, or on disagreement with the specific lines created by AB 604, which were meaningless without enactment of the constitutional amendment.  As Challengers acknowledge, "the Official Voter Information Guide . . . could not have been created until after AB 604 passed." (U.S. Reply to LULAC at 8, Doc. 141.)  Nothing about the legislature's passage of AB 604 diminishes the fact that the map was presented to the voters to accept or reject after an extensive campaign presenting arguments both in favor and against.

Challengers next argue that reliance on voter intent will allow Equal Protection violations to flourish unchecked. (Pl. Reply at 11; U.S. Reply to Defs. at 12.)  But the cases they cite, *Romer v. Evans*, 517 U.S. 620 (1996) and *Perry v. Brown*, 671 F.3d 1052 (9th Cir. 2012), both of which invalidated discriminatory voter-approved referendums or ballot propositions, stand for the opposite proposition:  when voters' discriminatory intent is clear, the courts will strike down laws as violative of the Equal Protection Clause. *See Romer*, 517 U.S. at 623–24 (concluding that state constitutional amendment following statewide referendum "classifies homosexuals not to further a proper legislative end but to make them unequal to everyone else"); *Perry*, 671 F.3d at 1090 (rejecting one proffered

legitimate state interest after looking to the voter information guide because it was not "the reason the voters adopted the measure"). If anything, *Romer* and *Perry* underscore our conclusion that the voters' will is not passive, but a very real power that requires a constitutional check.

We therefore reject the suggestion that looking for evidence of voter intent has any "disturbing implication." (Pl. Reply at 11.) Plaintiffs argue that "the majority of voters in a state could lawfully vote to enact a racial gerrymander that obliterates the voting power of a vulnerable minority so long as the measure's authors were clever enough to conceal their design." (*Id.*) But this ignores a few obvious problems. The measure's authors would need first to conceal their design from the measure's opponents, lest they point to the discriminatory intent in "vote no" advertisements. They would also need to obfuscate their intent on the face of the map, lest it spark opposition or reveal circumstantial evidence. And then they must police any public presentations to voters on the campaign trail, lest some uninitiated proponents reveal the true design. Such subterfuge is highly implausible, and there is no evidence it is present in the case before us. For these reasons, we reject Challengers' contentions, and center voters' intent as the dispositive inquiry.

Accordingly, like in cases where a legislature has enacted a challenged map, Challengers here must prove that race was the predominant factor motivating the relevant state actors: the voters. Like a legislature, the populace will consider a "complex interplay of forces" in making redistricting decisions. *Miller*, 515 U.S. at 915–16; *see Cal. Cannabis Coal.*, 401 P.3d at 56 (legislative power of voters acting through statutory initiative is at least as broad as the legislature's). As we discuss below, voters look to a litany of materials to determine whether to vote for or against an initiative. And because voters considering redistricting may certainly be "aware of racial considerations" without "being motivated by them," the "extraordinary caution" a court must exercise is no lower here than in legislative redistricting cases. *Miller*, 515 U.S. at 916. Finally, voters, like the legislature, are entitled to a presumption of good faith. *See Alexander*, 602 U.S. at 10–11.

21

If courts "should not be quick to hurl such accusations" at the legislature, they should certainly exercise at least as much restraint toward the electorate. *Id.* at 11. Just as in other racial gerrymandering cases, a presumption of good faith is justified because "we must be wary of plaintiffs who seek to transform federal courts into 'weapons of political warfare' that will deliver victories that eluded them 'in the political arena.'" *Id.* (quoting *Cooper*, 581 U.S. at 335 (Alito, J., concurring in judgment in part and dissenting in part)). As such, "the plaintiff's evidentiary burden" in cases accusing the voters of racial gerrymandering must be, like in cases accusing the legislature of a racial gerrymandering, "especially stringent." *Id.*

### 2.    Evidence of the Voters' Purpose in Enacting Proposition 50

Challengers must put forth evidence that the voters predominantly intended the challenged districts to be racial, rather than partisan, gerrymanders. Unlike referendums in *Romer* or *Perry*, where the effect of the law (to discriminate against a particular population) revealed the intent behind it (to discriminate against a particular population), here Challengers must show that the effect of Proposition 50, gaining five additional Democratic seats, obfuscates the intent behind it—to sort voters based on race. One way of doing that is with evidence that the voters subordinated "race-neutral considerations" in the redistricting process. *Miller*, 515 U.S. at 916. These race-neutral considerations include partisanship. *See Cooper*, 581 U.S. at 308 (holding that the district court must make a "sensitive inquiry" into the direct evidence of intent to prove that race rather than politics drove the creation of district lines) (quotation omitted). Therefore, after sorting through all the evidence presented by Challengers and Defendants, and assuming the electorate's good faith, the Court must be satisfied that the evidence unambiguously indicates that race predominated over partisanship in the minds of the voters.

We conclude that determining intent in the context of redistricting is not fundamentally different from determining such intent in other related contexts. Thus, to determine the voters' predominant motivation in enacting the challenged districts within

the Proposition 50 Map, we are armed with California and federal case law assessing

voters' intent for the purposes of, for example:  showing racial discrimination, showing

discrimination against out-of-state businesses in the context of the dormant commerce

clause, and interpreting ambiguous language in statutes passed by initiative.  Those sources

suggest that in assessing the voters' intent we may look to evidence like (1) the

amendment or statutory text; (2) statements of a Proposition's proponents and sponsors;

(3) statements by opponents; (4) the ballot materials, especially the Voter Information

Guide; and (5) the historical circumstances of enactment.[8]  *See Washington v. Seattle Sch.*

*Dist. No. 1*, 458 U.S. 457, 471 (1982) (finding discriminatory intent in a ballot measure

because proponents "candidly" represented that the measure only impacted busing for

desegregation, and "assured" the electorate that there would be no impacts outside that

context); *N. Am. Meat Institute v. Becerra*, 420 F.Supp.3d 1014, 1025 (C.D. Cal. 2019)

("[C]ampaign statements made to friendly in-state audiences are among some of the most

fruitful sources of protectionist purpose evidence."); *City of Los Angeles v. County of*

*Kern*, 462 F.Supp.2d 1105, 1114 (C.D. Cal. 2006) (In the case of a ballot measure, "the

Court may look to the nature of the initiative campaign to determine the intent of the

drafters and voters in enacting it."); *People v. Rizo*, 996 P.2d 27, 30 (Cal. 2000)

(determining that "analyses and arguments contained in the official ballot pamphlet" are

particularly important evidence of voter intent (quotation omitted)); *Horwich v. Superior*

*Court*, 21 Cal. 4th 272, 277 & n.4 (Cal. 1999) (looking to the "legislative history" of a

---

[8] For the legislature, we look for "direct evidence" of legislative intent, generally meaning statements of legislators going to legislative purpose.  *See, e.g.*, *Cooper*, 581 U.S. at 291, 299–300. By contrast, the sources we identify here constitute relevant, but not direct, evidence of voter intent.  This is not to say that one could never adduce direct evidence of voter intent, for example by pointing to promotional statements of voter organizations, but this kind of evidence is not present here.  *See, e.g.*, *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 937 (N.D. Cal. 2010) (considering the testimony of a proponent of Proposition 8, which defined marriage as between one man and one woman, in which he stated that he conducted voter outreach in support of the proposition because he believed homosexual people were more likely to commit various sex crimes).

ballot proposition, but writing that legislative materials "not directly presented to the voters" were irrelevant to interpreting ambiguous language).[9]

Challengers particularly emphasize a few, small portions of District 13, where they argue the lines were drawn exclusively with race in mind.  (*See, e.g.*, Pl. Reply at 13–14.)  This raises a question, then, of whether the tools we outline above are sufficient to reveal evidence that race predominated in enacting a map for a particular district.  *See Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 262 (2015) (reasoning that the analysis of racial predominance in the redistricting context is "district-by-district").  We conclude that the tools are sufficient to reveal evidence of voter intent.

First, as discussed below, a plaintiff may introduce evidence of the district's shape and demographics, as Challengers did here, to adduce the voters' intent as to that district.  Second, even when looking at legislative intent, a plaintiff will often "rel[y] heavily upon statewide evidence to prove that race predominated in the drawing of individual district lines."  *Id*. at 266.  Thus, messaging to voters about statewide redistricting goals remains probative of voter intent as to any particular district.  The corollary is that local leaders will typically opine on a statewide measure with arguments that resonate particularly with their community, as many did here.  (*See e.g.*, Tangipa Press Release, Ex. 333 at 49–50, Doc. 190-12 (inviting voters to a joint rally for Voter ID laws and Proposition 50 because "Central California is leading the fight for fairness and transparency").)

Thus, the voters' intent as to a specific district may be particularly apparent in the campaign messaging to voters within that particular district.  Voters are subjected to local advertising, attend community debates, and hear tailored messaging from their own

---

[9] While we are not necessarily searching for discriminatory intent, as such, but only the intent to sort voters based on race, these evidentiary sources are consistent with the kinds of sources we look to in evaluating a legislature's "invidious" discriminatory intent in the context of facially race-neutral laws. *Cf. Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–68 (1977) (looking to the historical background of a redistricting measure, the sequence of events leading to the challenged map, departures from normal procedure, public statements by members of the legislature, and whether there is a disparate impact on a minority group).

representatives, which may focus on how a map will affect their district, racially or otherwise.  Accordingly, if race had predominated in the minds of the voters of a specific district, one would expect Challengers to adduce some evidence of voter intent by pointing to messaging within that district.

Importantly, however, any evidence that California voters racially gerrymandered a particular district would not be limited to evidence of the motivations of voters within that one district.  The dissent contends that the voters who are not in a racially gerrymandered district will not have any knowledge or intent about that district's boundaries.  But we see no basis for the assumption that the electorate will care about a statewide redistricting effort only insofar as it impacts their home districts; indeed, state legislators are not subjected to the same assumption.  Challengers point to nothing to support the notion that voters, unlike legislators, would be fixated only on their own neighborhoods; rather, voters have agency and agendas they wish to see implemented state- and nationwide.  It is therefore possible for ample evidence to exist to support a finding that racial considerations predominated as to certain districts in the minds of voters.

But this is not such a case.  Challengers' evidence is insufficient to show that race predominated in passage of Proposition 50 for voters as to *any* district, District 13 or otherwise.  (*See* Hearing Tr. at 492, 494, 497.)  The closest Challengers come to offering such evidence are the legislative debates and press releases by legislators, which were publicly available for voters to see.  (*Id.*)

But Challengers' cited legislative statements provide little support for the idea that the legislature presented the Proposition 50 Map to voters in racial, rather than partisan, terms.  Nearly all of Challengers' quotes from legislators discuss the implications of the partisan redistricting wars on various racial minorities.  For example, Assembly member Isaac Bryan accused Republican-led states like Indiana and Florida of redrawing congressional districts "with the explicit aim of diluting Black and Brown representation and power."  (CA Assembly Appropriations Comm. Tr., Ex. 7 at 681, Doc. 188-9.)

Assembly member Mark González presented the bill as "[a] shield against racist maps," referring to the maps created by Republican-led state legislatures. (CA Assembly Floor Tr. at 1062.)[10] Statements like these did not sell voters on the idea that they should vote for district boundaries that were drawn to enhance Latino voting power, or the voting power of any racial minority, specifically. Instead, they present the argument that a Democratic *partisan* gerrymander will broadly counteract the racially discriminatory efforts of Republican-led states.

Challengers also lean on various statements from legislators that allude to the Voting Rights Act ("VRA").[11] For example, Challengers reference Assembly member Marc Berman, who stated that: "A big distinction between these maps that were drawn in California and the maps that are currently being passed by the State of Texas, for example, are California's maps strictly abide by the federal Voting Rights Act, which the Texas maps don't. And so we've actually put ourselves in a very good position to defend the maps that have been drawn because the Voting Rights Act and the principles of the Voting

---

[10] Challengers also cite the following similar statements: Assembly member Mark González: "And as our Texas Democratic colleagues said yesterday, they [Trump and his allies] shield their racism with their party line." (CA Assembly Floor Tr. at 1060); Assembly member González: "This is about whether a Latino child in Texas, a black family in Florida, or an immigrant community in California has a voice in their own democracy members [sic]." (*Id.* at 1062); Assembly member González: "If Florida wants to silence voters of color, we will not sit quietly." (*Id.* at 1061); Assembly member Isaac Bryan: "A Latino voice in Texas is worth one third of the representation as a white voice. A black voter in Texas is worth one fifth of the representation of a white voter in Texas." (*Id.* at 1071.); Assembly member Mike Gibson: "It's about the next generation that we may not even have any black people serving in office to have representation. It's about 10 African American members of Congress that could be wiped away in Congress if we don't stand up and be counted." (*Id.* at 1075); State Senator Sabrina Cervantes: "They want to silence the voices of Latino voters, Black voters, API voters, and LGBTQ voters." (CA Assembly Elections Comm. Tr., Ex. 5 at 341, Doc. 188-9); State Senator Lola Smallwood-Cuevas: "In Texas, what this looks like is that black Texans will lose much of their power, being reduced to about a fifth of what their power was before this gross attack." (CA Senate Tr. at 909); Senator Smallwood-Cuevas: "Texas once saw black political power rise during reconstruction, as it had across much of the country, only to be stripped away by the black codes, and Jim Crow, and racial terror, poll taxes, white-only primaries that cut black voter rolls in Texas from over 100,000 to just a few thousand." (*Id.* at 910–11.)

[11] *See* 52 U.S.C. § 10301 (VRA § 2).

26

Rights Act were taken into very high consideration when those maps were drawn." (CA Assembly Elections Comm. Tr. at 303.) But this statement, along with other references to maintaining the VRA protections from the 2021 Map, appear to communicate merely that the Proposition 50 Map complies with the law. In fact, Assembly member Berman's statement came in response to a question from Assembly member Tangipa about the potential fiscal liability of defending the Proposition 50 Map against lawsuits. (*Id.* at 302–03.)

Furthermore, the various press releases Challengers put forward confirm that legislators represented the Proposition 50 Map to voters as one that remained compliant with the law and with other redistricting principles while enacting a partisan gerrymander. Challengers cite language from a press release disseminated by Senate President pro tempore Mike McGuire, stating that lawmakers "pushed for key provisions in the legislation to ensure fidelity to independent commissions, protections for the Voting Rights Act, and preservation of California cities and communities," and that "[t]he new map makes no changes to historic Black districts in Oakland and the Los Angeles area, and retains and expands Voting Rights Act districts that empower Latino voters to elect their candidates of choice." (McGuire Press Release from August 19, 2025, Ex. 21 at 1491–92, Doc. 188-9.)

While press releases can be probative of how the legislature sought to frame a particular measure for voters, these quotations are again removed from key context presenting the Proposition 50 Map to voters as having limited negative impacts beyond its obvious, partisan results. For example, Challengers' cited passage from the McGuire Press Release informs voters that "Republican redistricting efforts in Texas and other states are dividing communities, undermining voter freedom." But by contrast, "[i]n California, lawmakers in the Assembly and Senate pushed for [the] key provisions" to which Challengers cite. (*Id.* at 1491–92.) Thus, the press release goes on to reassure voters that the *partisan* gerrymander will do things like "keep the Independent Citizens Redistricting

27

Commission," "[p]rotect[] communities of color and historically marginalized voters," and "[k]eep[] cities and communities together." (*Id.*)

Similarly, press releases from the Office of the Speaker of the Assembly, Robert Rivas, included statements like: "The new map retains the voting rights protections enacted by the independent commission" (Rivas Press Release from August 15, 2025, Ex. 19 at 1485, Doc. 188-9), and that "[t]he new map . . . retains both historic Black districts and Latino-majority districts" (Rivas Press Release from August 19, 2025, Ex. 20 at 1488, Doc. 188-9).[12]  Challengers isolate these bullet points from a list of reasons the Democrat-designed districts, unlike their Republican counterparts in other states, will "ensure fidelity to independent commissions, protections for the Voting Rights Act and preservation of California cities and communities." (Rivas Press Release from August 15, 2025 at 1485; Rivas Press Release from August 19, 2025 at 1488.)  In doing so, Challengers seek to repurpose these statements as evidence of racially-motivated goals.  But like the language in Senator McGuire's press release, the proffered quotes amount only to a reassurance to voters that a gerrymander based on politics will not have negative impacts on racial minorities or other undesirable consequences.  Beyond these tangentially-related statements in press releases and publicly-accessible legislative debates, Challengers adduce no evidence that the voting public considered race when casting votes in favor of Proposition 50.  Accordingly, we find that the evidence adduced indicates that legislators sought to market Proposition 50 to voters as a partisan gerrymander.

---

[12] Challengers also cite the following quote from Assembly member Avelino Valencia in a press release from Assembly Speaker Rivas's office:  "Redistricting should be about making sure every voice counts.  President Trump and Texas Republicans are using it to drown out the voices they do not want to hear, especially communities of color and working families.  Their manipulation of our democracy is wrong and we will not sit on the sidelines.  We will call out the injustice, protect representation, and make sure our democracy reflects communities like mine." (Rivas Press Release from August 9, 2025, Ex. 18 at 1482, Doc. 188-9.)  For the same reasons as the legislative statements cited above, this quotation does little more than advocate for the ameliorative effects of a Democratic partisan gerrymander.

Challengers' argument that Paul Mitchell, the mapmaker, drew the Proposition 50 Map with the goal of enhancing Latino voting power is even further attenuated.  (*See, e.g.*, U.S. Mem. at 15–16; Pl. Mem. at 17–20.)  In the case before us, whether race predominated in Mitchell's mind is relevant only to the extent that it points to the intent of the voters.  As we discuss later, in some cases the mapmaker's intent provides relevant evidence going to the *legislature's* intent when legislators have given the mapmaker instructions.  *See Cooper*, 581 U.S. at 299–300 (legislators directed mapmaker to draw districts with at least 50% African-American voters); *Alexander*, 602 U.S. at 22–23.  Here, these cases provide little guidance because the voters did not engage or direct Mitchell, a private consultant.  Furthermore, Challengers make no showing that the voters knew why Mitchell decided to draw the lines of individual districts in the way that he did.  Significantly, at the hearing, Challengers acknowledged that if race predominated in a mapmaker's drawing, but the legislature knew nothing of that intent, the mapmaker's private intentions could not be imputed to the legislature.  (*See* Hearing Tr. at 520.)  The same is true of the voters here:  Challengers have not linked Mitchell's statements to the electorate.  Without a connection between the mapmaker's statements and the voters' intent, Challengers cannot rely on Mitchell to show that race predominated in the enactment of Proposition 50.

Challengers' limited evidentiary showing stands in stark contrast to the mountain of evidence produced by Defendants that the voters intended to enact a partisan gerrymander.  And this evidence spans all five of the categories we previously identified.  First, the enacted text of ACA 8, which was also presented to voters in the Voter Information Guide, provides:  "President Trump and Republicans are attempting to gain enough seats through redistricting to rig the outcome of the 2026 United States midterm elections," and that "it is the intent of the people that California's temporary maps be designed to neutralize the partisan gerrymandering being threatened by Republican-led states."  (ACA 8 at 2; Voter Information Guide at 573.)  Accordingly, Proposition 50 added amended language to the

state Constitution that expressly stated the mid-cycle redistricting was "[i]n response to the congressional redistricting in Texas in 2025." Cal. Const. art. XXI § 4. Thus, the text of the initiative is clear and unambiguous as to the voters' intent: to respond to *partisan* redistricting in Texas.

Second, Proposition 50's proponents vocally campaigned to the electorate on the idea that the initiative was a partisan measure. For example, a press release from the Governor's office announcing the legislation described the effort as one that "will enable Californians to fight back against President Trump's attempts to rig Texas' elections next year." (Ex. 102 at 12–13, Doc. 190-1.) Governor Newsom also made a letter he sent to President Trump publicly available to voters, asking him to stop redistricting efforts by "the governor of Texas and other red states." (Ex. 93, Doc. 190-1.) In fact, there are dozens of social media posts by Governor Newsom and other members of the California Legislature supporting the measure, all of which present the map to voters as a partisan gerrymander. (*See, e.g.*, Newsom Tik Tok Video, Ex. 96, Doc. 190-1 ("We've had enough of red states and Trump changing the rules"); Newsom Facebook Post, Ex. 101, Doc. 190-1 ("Buckle up, Donald Trump. California is about to get a whole lot bluer, thanks to you."); Post on X by Senator Sabrina Cervantes, Exs. 104–05, Doc. 190-1 (describing Proposition 50 as a response to "an effort to silence Democrats in Texas and in Republican-led states across our country"); Exs. 106–08, 121, Doc. 190-1 (similar posts from Senate President pro tempore Mike McGuire, Senator Lena M. Gonzalez, Assembly member Cecila Aguiar-Curry, and former Vice President Kamala Harris).) This is only a subset of the available evidence in the record, which overwhelmingly demonstrates that proponents of Proposition 50 emphasized to voters that it was a partisan gerrymander.

Third, there is abundant evidence in the record that Proposition 50's opponents, including the United States and many of the Plaintiffs in this case, vocally criticized the measure as a partisan gerrymander. For example, the California Republican Party inundated its voter lists with messaging to that effect. In the record alone there are

approximately 374 pages of mass emails sent by the California Republican Party urging voters to "vote no" on Proposition 50 as a Democratic Party measure by writing, for example, that: "this special election is about one thing and one thing only: Democrats want to GUARANTEE a Democrat House majority" and "Gavin Newsom HAS OFFICIALLY called for a special election to RIG our Congressional districts for Democrats." (CAGOP "Vote No" Emails, Ex. 331, Docs. 190-10, 190-11; *see also* 48 pages of CAGOP "Vote No" Text messages, Ex. 332, Doc. 190-12 (same); Four CAGOP Video Advertisements, Exs. 212, 220–22, Doc. 189-1.) None of these mass communications mention that Proposition 50 impermissibly classifies based on race.

Plaintiff Assembly member David Tangipa sent the same kinds of messages to his voters via press releases, interviews, and social media. (*See, e.g.*, Tangipa Press Release (describing Proposition 50 as a "misleading measure that threatens accountability and transparency in California elections"); Tangipa Social Media Posts, Exs. 237–42, Doc. 189-1 ("One of the map's OWN authors admitted: 'this is partisan gerrymandering.' They don't care about communities of interest—only power.").)[13] And while their voter communications are not in the record, Republican Congressional Representatives Ken Calvert, Darrell Issa, and Kevin Kiley, whose districts were redrawn in the process, publicly spoke of Proposition 50 in the same terms. (*See* Calvert X Posts, Exs. 149–50, Doc. 192-2 ("Prop 50 isn't about saving democracy. It's about pure political power"); Issa X Post, Ex. 151, Doc. 192-2 ("It was difficult to watch as Gavin Newsom and Sacramento's special interests . . . deliver[ed] what they know is an undeserved advantage to democrats"); Kiley Interview on Fox Business, Ex. 152, Doc. 190-2 (stating that Gavin Newsom's goal with Proposition 50 was to make an "explicitly political gerrymander" and

---

[13] When testifying, Assembly member Tangipa stated that his definition of "partisan" is "prejudice with a cause," and that his repeated references to "partisan gerrymandering" leading up to and throughout the Proposition 50 campaign should be interpreted as a reference to all sorts of gerrymandering, including racial. (Hearing Tr. at 193.) We found his testimony on this point entirely lacking in credibility.

"make California a whole lot bluer and to pick up five seats.").)  And even upon joining this lawsuit, Attorney General Bondi posted that Governor Newsom "should be more concerned about keeping Californians safe and shutting down Antifa violence, not rigging his state *for political gain*."  (Bondi X Post, Ex. 131, Doc. 190-1 (emphasis added).) Again, this is but a small snapshot of evidence to this effect that has been entered into the record.  (*See also* "No on Prop 50" and "Vote No on Prop 50" Websites, Exs. 143–146, Doc. 190-2.)  Accordingly, the evidence of opponents' statements in this case shows a concerted effort to present Proposition 50 as a partisan, political gerrymander.

Significant to the issue of voter intent on a district-by-district basis, the record indicates that opponents of Proposition 50 like state Assembly member Tangipa contested the boundaries of individual districts, including District 13—the only district for which alternative maps were proffered—but did so on a purely partisan basis.  (*See* "Help Assemblyman David Tangipa Defeat Prop 50" Webpage, Ex. 244, Doc. 189-1 (shown below, printing an image of District 13 before and after Proposition 50, and showing the shift from "purple" to "blue").)



Fourth, the ballot materials presented to voters present the measure as a partisan gerrymander.  The Ballot Label described the measure as "AUTHORIZ[ING] TEMPORARY CHANGES TO CONGRESSIONAL DISTRICT MAPS IN RESPONSE TO TEXAS' PARTISAN REDISTRICTING."  (Ballot Label, Ex. 186, Doc. 190-3.)  The information guide shows the current and proposed congressional districts not only statewide but magnified to show northern and southern California in detail (pictured below).



Figure 2

**Proposed Congressional Districts**

Note: See northern and southern congressional district maps for district numbers for the Bay Area and Los Angeles regions. Map reflects data posted to the California Legislature elections committees' (Assembly Elections Committee and Senate Elections and Constitutional Amendments Committee) websites.



Figure 4

**Proposed Northern Congressional Districts**

Note: Map reflects data posted to the California Legislature elections committees' (Assembly Elections Committee and Senate Elections and Constitutional Amendments Committee) websites.



Figure 6

**Proposed Southern Congressional Districts**

Note: Map reflects data posted to the California Legislature elections committees' (Assembly Elections Committee and Senate Elections and Constitutional Amendments Committee) websites.

(Voter Information Guide at 565–70.)  The "Argument in Favor of Proposition 50" makes no mention of race, but it argues that "if Californians don't act now, Donald Trump will seize total power for two more years."  (*Id.* at 571.)  The "Argument Against Proposition 50" begins by stating "Prop. 50 was written by politicians, for politicians" and goes on to state that "[Proposition 50] gives voters a take-it-or-leave-it decision on the most partisan maps in California's history."  (*Id.* at 572.)  The only passing references to

race in the Voter Information Guide come in *opposition* to Proposition 50.  The "Argument Against" includes the quote:  "When politicians gerrymander, they divide our neighborhoods and weaken the voice of communities of color . . . —Reverend Mac Shorty, Civil Rights Leader."  (*Id.*)  And the "Rebuttal to the Argument in Favor of Proposition 50" (i.e., Proposition 50 opponents) argues that after the Commission began drawing maps, "Women in the Legislature doubled, Asian representation tripled, Black representation nearly doubled, and Latino seats grew by 8%."  (*Id.* at 571.)  Again, the ballot materials provide strong evidence that voters cast their votes in favor Proposition 50 as a purely partisan gerrymander.

And lastly, we briefly acknowledge the historical circumstances of this enactment, which require little review here.  Governor Newsom announced the ERRA following President Trump's call for midcycle redistricting in Texas.  (*See, e.g.*, Pres. Trump on Texas; Newsom Press Conference Tr.)  The resulting five-seat pickup was purportedly designed, and presented to voters as, a deliberate counterbalance to Texas's redistricting.  (Newsom Press Conference Tr. at 47–48; Voter Information Guide at 563.)  Without belaboring the partisan redistricting war that has led to the passage of Proposition 50, it suffices to say that the circumstances of the measure's enactment evidence the voters' intent to engage in a partisan gerrymander.

In sum, there is voluminous and overwhelming evidence in the record indicating that the voters intended the Proposition 50 Map to be a partisan gerrymander.  Challengers, who bear the burden of showing that race predominated in the minds of voters, have put forth almost no evidence of racial predominance for any of the five factors, either as to the Map as a whole or as to any particular district.

### 3.    The Intent of Paul Mitchell and the Legislature

Our dissenting colleague gives no weight to the role of the voters in this case, and instead searches for evidence of the intent of the mapmaker, Paul Mitchell, and the intent of the legislature.  To be clear, we center the voters' intent in this case because they are the

relevant decisionmakers.  But even when Challengers' claims are evaluated using the traditional approach—focusing on legislative intent—Challengers' evidence remains insufficient to warrant a preliminary injunction.

The dissent focuses on the mapmaker's intent as the most relevant, if not the sole, inquiry, pondering, "[w]ho else but the author of the map is the best source of the motivation behind the map?"  But we are not directed to look at the motivation behind a *map*, we are directed to look at the motivation of the enacting *legislature*.  *Miller*, 515 U.S. at 916; *see also Abbott v. Perez*, 585 U.S. 579, 603–05 (2018) (holding that an enacting legislature's discriminatory intent could not infect a map with racial gerrymandering in the manner of "original sin" (quotation omitted)).  Therefore, while a mapmaker's approach can often be indicative of the messaging the mapmaker received about a map's objectives, not even Challengers in this case have argued that a mapmaker's private intentions are relevant.  (Hearing Tr. at 520.)

To the extent Mitchell's intent is relevant, the evidence supports a finding that politics predominated in his map drawing, including for District 13.  While Mitchell did not testify at the hearing, there is substantial evidence in the record reflecting Mitchell's process in drawing the Proposition 50 Map, including his deposition testimony[14] and the

---

[14] The dissent emphasizes that Mitchell repeatedly invoked legislative privilege at his deposition, concludes that such behavior "borders on bad faith," and appears to draw an adverse inference against Defendants as a result.  We respectfully disagree with drawing such a game-changing, adverse inference from Mitchell's counsel's invocation of privilege.  First, it is premature to draw an adverse inference against Defendants when the Court has not ruled on the merits of the legislative privilege; once the contours of any privilege can be established by the Court, more discovery may be obtained.  Second, legislative privilege is frequently invoked in redistricting cases.  *See, e.g.*, *League of United Latin Am. Citizens v. Abbott*, 708 F. Supp. 3d 870, 876, 879–80 (W.D. Tex. 2023).  We have yet to decide the availability or scope of any privilege in this case, but we note that it was not frivolous for Mitchell—or the California Legislature (who also seek application of the privilege)—to invoke legislative privilege under these circumstances.  *See Vota v. Noble*, 2024 WL 4371943, at *3 (D. Ariz. Oct. 2, 2024) (allowing legislators to invoke legislative privilege as to documents shared between the legislators and third parties, even where the third parties were being subpoenaed); *La Union del Pueblo Entero v. Abbott*, 93 F.4th 310, 323 (5th Cir. 2024) (holding that a third party's "documents shared, and communications made" with
(footnote continued)

documents he produced.  (*See* Mitchell Depo.; Redistricting Partners Presentation, Ex. 523, Doc. 188-20.)

In his deposition, Mitchell stated that he drew the Proposition 50 Map as a "partisan redistricting" effort, asserting, "I agreed to do it only because of what Texas did." (Mitchell Depo. at 310.)  Mitchell confirmed that for certain districts, he "sought to increase the partisanship of a district so that we could get a Democrat elected in order to combat what Trump is doing."  (*Id.* at 317; ABC10 Article, Ex. 123 at 78, Doc. 190-1.) Presentation charts created by Redistricting Partners, Mitchell's firm, affirms that "[t]he goal was flipping five of these districts," circling 10 districts including District 13, and continues, "[w]hile also bolstering Dems in these," again circling 10 districts including District 13:



---

legislators are protected when the third party has been "brought into the legislative process").  We do not infer nefarious motives based on invocation of the privilege.



(Redistricting Partners Presentation at 9–10; Mitchell Depo. at 25.)

Mitchell's materials also explain that "[n]o changes were made to the map that were not consistent with the goals set forward by the delegation – pushing back on the mid-decade redistricting plans from Texas and other states." (Redistricting Partners Presentation at 5.)

Perhaps the best evidence of Mitchell's intent comes from an unlikely source: Challengers' own expert witness, Dr. Sean Trende. In a separate case challenging Proposition 50 in the California Supreme Court, Dr. Trende analyzed the Proposition 50 Map. (Trende Decl. in *Sanchez*.) He had before him the entirety of the Map and its district boundaries, just as he has before him in this case. His conclusion? The Proposition 50 Map "*was drawn* with partisan objectives in mind; in particular *it was drawn to improve Democratic prospects* in congressional elections in the state, and to increase the share of seats that they would expect to win in an election." (*Id.* ¶ 27 (emphasis added); Hearing Tr. at 95.) This is not a generalized statement as to voter intent or political messaging; this is an expert who reviewed the Proposition 50 Map and

determined, without caveat,[15] that the person who drew it did so with partisan intent.  We agree.

The dissent accords great weight to a statement made by Mitchell in a presentation given to HOPE weeks before the special election.  In the HOPE Presentation, Mitchell stated that "[t]he Prop. 50 maps I think will be great for the Latino community" as "they ensure that the Latino districts" are "bolstered in order to make them most effective, particularly in the Central Valley."[16]  (HOPE Presentation, Ex. 11 at 1383, Doc. 188-9.) But this statement, especially when read in the context of other statements made by Mitchell, is not, as characterized by the dissent, "smoking gun" evidence of racial predominance; if anything, it shows Mitchell's truly partisan endeavor.

At most, the statement communicates that certain Central Valley districts which are majority-Latino, like District 13, have been "bolstered" to be "most effective" in some unspecified way.  Significantly, at the time Mitchell made that statement he had already broadcast to the public exactly how the Central Valley districts had been bolstered and for what specific purpose.  In an interview given to ABC10 in August 2025, Mitchell said:

> "We have these five Democratic pickups, but we also have about five seats where we have Democrats who, you know, maybe won by a couple-hundred votes in the last election, and we can't afford for a Republican to pick that seat up and eat into these potential gains . . . .  So we did a lot to *bolster Democratic candidates* up and down the state that are potentially in tough races *like Adam Gray in the Central Valley*."

(ABC10 Article at 78 (emphasis added); *see* Mitchell Depo. at 318.)  Given the context of this previous, public statement and the undisputed fact that Proposition 50 Map increased Democratic performance in District 13 by about three percentage points (*see*

---

[15] To be sure, in the context of this case, Dr. Trende now offers qualifications and caveats to his prior unqualified declaration, namely, that he now sees racial gerrymandering in one part of one district.  We address that below.

[16] The dissent references this same statement six times.

Grofman Report ¶ 12, Ex. 184), it is apparent that, when speaking to HOPE, Mitchell was referring to bolstering the *political* effectiveness of District 13, where Adam Gray is the incumbent Democrat.  That Mitchell did not explicitly spell out to HOPE that Latino districts would be bolstered "politically" is immaterial; indeed, he was instructed by the moderator, immediately before giving the statement in question, to identify "what . . . Latino voters [should] pay the most attention to" about the Proposition 50 Map, "*trying as much as we can to keep it nonpartisan*[.]"  (HOPE Presentation at 1381 (emphasis added).)

The dissent also relies on a 2021 letter from HOPE to the Commission, which asserts, "[i]f these districts were between 52% and 54% Latino CVAP, for instance, they would still be very likely to elect Latino candidates of choice" (HOPE 2021 Letter, Ex. 12 at 1452, Doc. 188-9).  But while there is evidence that Mitchell had read the letter, Mitchell did not write it, nor was he the recipient, nor has he stated that he relied on it in creating the Proposition 50 Map.  (*See* HOPE Presentation at 1377.)  Indeed, when asked about the letter in his deposition, Mitchell responded, "I don't know why the analysis reads like this or what he was trying to say," and later stated, "you'd be best served talking to the author of this document."  (Mitchell Depo. at 154, 157.)  And more specifically, when asked about the "sweet spot of 52 to 55 percent that's expressed in this letter," Mitchell stated that it was "the first time I have ever heard anybody say sweet spot with regards to a CVAP target."  (*Id.* at 162–63.)  Mitchell then expressly disclaimed the use of any racial target.  (*See id.* at 163 ("Q:  So there's no target?  A:  No.").)[17]  The evidence that Mitchell

---

[17] The dissent also places improper weight on Mitchell's statement to HOPE that the "number one thing" that he "started thinking about" was creating a "[replacement] Latino majority" district in Los Angeles.  (HOPE Presentation at 1376–77.)  This statement does not speak to the redistricting of District 13; it concerns the creation of a wholly unchallenged district.  The Supreme Court explained that a racial gerrymander claim "applies to the boundaries of individual districts" at a "district-by-district" level.  *Ala. Legis. Black Caucus*, 575 U.S. at 262.  As Mitchell explained at his deposition, his statement acknowledged to HOPE that he was aware of the existence of a previous map drafted in 2021 that had been advocated by various groups, including HOPE, and using it would be an "easy" way to "pick up a democratic seat."  (Mitchell Depo. at 122-23.)  Mitchell's assurance to HOPE members that the goals they previously expressed would
(footnote continued)

was predominantly motivated by race is therefore exceptionally weak.  Rather, substantial evidence indicates that Mitchell prioritized partisan considerations in drawing district lines for the Proposition 50 Map, including and especially District 13.

Where Mitchell did consider non-partisan redistricting principles, it appears these other principles were also race-neutral.  For example, Challengers (as well as the dissent) ignore the fact that the Proposition 50 Map was drawn as a temporary measure to respond to Texas and also fail to consider "core district retention," i.e., "the proportion of districts that remain when a State transitions from one districting plan to another," as a relevant factor to explain map design.  *Alexander*, 602 U.S. at 27.  In creating these districts, Mitchell consistently emphasized his fidelity to the Commission's 2021 Map (a process to which California will revert in 2031) and stated that:

> [We] took the Commission map.  We kept about 80 percent of it the same, but in certain areas we made small, modest changes to create a push back to what Texas was doing, an opportunity for Democrats to pick up five seats, and to counterbalance the five republican seats in Texas.  And in doing so, we were able to keep a large number of communities of interest together.  We were able to reduce the numbers of cities that were split.  We were able to protect the Voting Rights Act.

(Capitol Weekly Podcast, Ex. 10 at 1379, Doc. 188-9.)  As the Supreme Court explained in *Alexander*, "[l]awmakers do not typically start with a blank slate; rather, they usually begin with the existing map and make alterations to fit various districting goals.  Core retention recognizes this reality."  602 U.S. at 27.  Bearing in mind the temporary nature of Proposition 50 and the principle of core district retention, we conclude that Mitchell's statements demonstrate that the temporary changes to the 2021 Map were

---

be achieved in a map that adds a Democratic seat hardly amounts to evidence of racial predominance.  Indeed, pointing to this statement does nothing to "disentangle race and politics."  *See Alexander*, 602 U.S. at 6.

(1) motivated predominately by politics and (2) designed to minimize disruption to the 2021 Map consistent with partisan goals and traditional redistricting principles.

The legislative statements cited by the dissent are no more persuasive. For the same reasons that the legislative statements invoking race are weak evidence of racial predominance in the minds of voters, they are also weak evidence of racial predominance in the minds of legislators. First, as discussed above, there is ample evidence that legislators discussed Proposition 50 as a purely partisan effort. (*See, e.g.*, CA Assembly Floor Tr. at 1119 ("During committee hearings, one of our colleagues brazenly admitted that this entire thing was about partisan gerrymandering. Admitted partisan politics.").) Moreover, the dissent's cited statements characterizing Proposition 50 as beneficial to racial groups are intertwined with discussion of Proposition 50's partisan goals. (*See, e.g.*, CA Assembly Elections Comm. Tr. at 341 ("They want to silence the voices of Latino voters, Black voters, API voters, and LGBTQ voters. Trump wants to change the rules of the game in the fifth inning so that Republicans get four strikes while Democrats get three. . . . But if Trump decides to move forward with his plan to steal Democratic seats, then California will be the firewall."); CA Assembly Floor Tr. at 1062 ("[Proposition 50] is about whether . . . an immigrant community in California has a voice in their own democracy members. . . . Democrats fight to survive. Republicans fight to dominate. And when you fight to dominate, you stop at nothing. You cheat, you rig. You kill democracy in the process.").) So again, rather than reveal any desire for the Proposition 50 Map to enhance Latino voting power, the statements highlight legislators' assumptions that the Proposition 50 Map's Democratic gains would lead to fair representation for certain racial groups. And to the extent legislators reference the VRA, such statements appear to communicate, at best, that they are "aware of" racial considerations, as legislatures "almost always" are, in ensuring that Proposition 50 would be legally compliant. *Miller*, 515 U.S. at 916. But statements confirming that the Proposition 50 Map "respect[s] the Voting Rights Act" (Senate Elections Comm. Tr., Ex. 6 at 628, Doc. 188-9), for example, do not

show any racial motivation, let alone a predominant one, for the legislature's decision "to place a significant number of voters within or without a particular district." *Miller*, 515 U.S. at 916.  Thus, the proffered evidence is insufficient to show that the legislature predominantly considered race, rather than partisanship, in proposing to the voters the map of any district.

Again, we maintain that the voters' intent is the relevant inquiry.  However, we do not shy away from examining the intent of Paul Mitchell and the legislature, because taking either path leads to the same destination:  a partisan gerrymander.

We now turn to a final consideration, which is relevant both to the inquiry into voter intent, and to the inquiry into legislative intent:  the districts' shape and demographics.

### 4.    The Shape and Demographics of the Proposition 50 Map

Challengers argue that evidence of the "shape and demographics" of districts within the Proposition 50 Map supports their racial gerrymandering claim.  *Bethune-Hill*, 580 U.S. at 187 (quoting *Miller*, 515 U.S. at 916).  We agree that, just as a district's "shape and demographics" can provide evidence of legislative intent, they can also provide evidence of voter intent.  Such evidence alone may, "at least in theory," support a finding of racial predominance, if redistricting has produced a district that is "'so bizarre on its face that it discloses a racial design' absent any alternative explanation."  *Alexander*, 602 U.S. at 8 (quoting *Miller*, 515 U.S. at 914).  But such cases will be "rare."  *Id.*  Accordingly, with little other accompanying evidence of racial predominance, Challengers face an uphill battle.  Moreover, a case based solely on the shape and demographics of a district is "especially difficult when the State raises a partisan-gerrymandering defense," because "[w]hen partisanship and race correlate, it naturally follows that a map that has been gerrymandered to achieve a partisan end can look very similar to a racially gerrymandered map."  *Id.* at 9.  In such cases, "a plaintiff must 'disentangle race from politics' by proving 'that the former *drove* a district's lines.'"  *Id.* (quoting *Cooper*, 581 U.S. at 308) (emphasis in original).  "That means, among other things, ruling out the competing explanation that

political considerations dominated the [State's] redistricting efforts. If either politics or race could explain a district's contours, the plaintiff has not cleared its bar." *Id.* at 9–10.

Here, Challengers submit an expert report from Dr. Tom Brunell, asserting that the Proposition 50 Map contains 16 majority-Latino districts, and an expert report from Dr. Sean Trende, analyzing the boundaries of District 13 and concluding that race predominated. (Brunell Report, Ex. 196, Doc. 190-9; Trende Report, Ex. 194, Doc. 190-9.) Four experts—Dr. Bernard Grofman, Dr. Jonathan Rodden, Dr. Maxwell Palmer, and Anthony Fairfax—submit reports to counter Challengers' shape and demographics evidence. (Grofman Report, Ex. 184; Rodden Report, Ex. 207, Doc. 189-1; Palmer Report, Ex. 208, Doc. 189-1; Fairfax Report, Ex. 250.) We find Defendants' experts convincing and therefore conclude that Challengers have failed to show serious questions going to whether "race for its own sake, and not other districting principles," explains the districts' shapes and demographics. *Miller*, 515 U.S. at 913.

### (1)    Districts 18, 21, 22, 25, 29, 31, 33, 34, 35, 38, 39, 41, 44, 46, and 52

Because Dr. Trende analyzes primarily District 13, Challengers' map-focused evidence of racial predominance for the other 15 challenged congressional districts is particularly weak. Challengers' expert Dr. Brunell shows that in the Proposition 50 Map, these 15 districts have a Hispanic Citizen Voting Age Population ("HCVAP") percentage of over 50%. (Brunell Report at 4, Table 2, Ex. 196.)[18] But these HCVAP percentages are, on the whole, not new: in the 2021 Map, 14 of those districts also had HCVAP percentages of over 50%. (Grofman Report, Table 2A, Ex. 184.) Only one challenged district, District 41, became a majority-Latino district under the Proposition 50 Map, while

---

[18] All citations to page numbers within Dr. Brunell's report refer to the numbers at the bottom of the pages of the report.

another district that is not challenged, District 42, is no longer a majority-Latino district under the Proposition 50 Map.  (*Id.*)

Challengers do not dispute that most of the majority-Latino districts within the Proposition 50 Map were also majority-Latino within the 2021 Map.  Rather, they posit that the fact that the Proposition 50 Map "somehow [has] the exact same number of majority-Latino districts as the Commission's 2021 map" is "unlikely in the absence of a racial motive."  (Pl. Reply at 8.)  And more specifically, Challengers point out that within 13 of these 15 districts, the HCVAP percentage stayed within a "tight band" of "51 to 55 percent."[19]  (Hearing Tr. at 106.)  Challengers contend that this evidence reveals the existence of a "racial target" as to those districts.  (*Id.* at 484.)

However, the mere fact that a district was previously majority-minority and is still majority-minority carries little-to-no weight, especially because any other evidence of racial predominance is scant.  *See Alexander*, 602 U.S. at 20 (concluding that "the mere fact that District 1's BVAP stayed more or less constant proves very little," even where the challengers presented four expert reports analyzing District 1).  Despite retaining Dr. Trende as an expert, Challengers present no expert report analyzing these 15 districts, nor any alternative race-neutral but equally partisan map for these districts.  *See Abbott v. League of United Latin Am. Citizens*, 607 U.S. ___ (2025) (slip op. at 3) (Alito, J., concurring) ("Although respondents' experts could have easily produced such a map if that were possible, they did not, giving rise to a strong inference that the State's map was indeed based on partisanship, not race.").

Furthermore, Defendants counter with substantial map-focused evidence of partisan intent.  Dr. Palmer posits in his report that for two out of these 15 districts—Districts 22 and 41—Democratic candidates would experience greater success under the Proposition 50

---

[19] We are skeptical that this argument is properly before us because it was raised for the first time in reply.  Nevertheless, we will assume *arguendo* Challengers can properly bring this argument.

Map, and for the remaining 13 districts, Democratic success would remain constant.  (*See* Palmer Report ¶ 10, Table 2, Ex. 208.)  Dr. Grofman similarly determined that the Proposition 50 Map turned formerly Republican Districts 22 and 41 into districts where Democrats would at least have a "reasonable chance of success," and additionally concluded that another two of the challenged districts—Districts 21 and 25—were competitive Democratic seats that "registered an improvement in their chances of success in electing a Democrat in 2026."  (Grofman Report ¶¶ 1, 4, Ex. 184.)  And importantly, the Proposition 50 Map as a whole achieved a successful partisan result, including making "five of the nine Republican-held seats more likely to elect a Democrat."  (*Id.* ¶ 7); *see Bethune-Hill*, 580 U.S. at 192 (reasoning that "a common redistricting policy toward multiple districts" can be evidence of district-specific motivations).

In sum, we find that the absence of any alternative maps is reflective of the dearth of evidence that these 15 districts were enacted for any reason other than a partisan gerrymander.  Accordingly, Challengers far short of establishing "serious questions going to the merits" that race predominated in the minds of the voters for these 15 districts.  *Shell Offshore*, 709 F.3d at 1291 (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).  We therefore turn to the congressional district at the core of the parties' dispute:  District 13.

### (2)     District 13

Dr. Trende's expert report focuses on District 13 and argues broadly that it was enacted to favor Latino voters.  (Trende Report, Ex. 194.)  District 13 is a "competitive district in the Central Valley" which borders, among other districts, Districts 5 and 9.  (*Id.* at 5.)[20]  Districts 9 and 13 have Democratic incumbents as congressional representatives. (Grofman Report ¶¶ 15, 17, Ex. 184; Trende Report at 6, Ex. 194.)  The parties characterize District 5 as a safe Republican district.  (*See* Grofman Report ¶¶ 16, 18, Ex.

---

[20] All citations to page numbers within Dr. Trende's report refer to the numbers in the top right corners of the pages of the report.

48

184; *see* Hearing Tr. at 98.)  The borders of Districts 5, 9, and 13 in the Proposition 50

Map are below:



Figure 1: California District 13



© OpenStreetMap contributors

(Trende Report at 5, Figure 1, Ex. 194.)  Dr. Trende's report notes that District 13

"has relatively unremarkable boundaries, with three exceptions: [1] Madera in the

southeast, [2] the area near Ceres and Modest[o] in the northern part of the district, and [3]

the large protrusion near Stockton off the far northern tip."  (*Id.*)  Dr. Trende states that

although the Madera boundary "does not appear to be motivated by race," the

Modesto/Ceres boundary and the Stockton boundary appear crafted to enhance the number

of Latino voters in District 13, in ways that "cannot be explained by traditional

redistricting principles, nor can they be explained by politics."  (*Id.* at 6, 11, 16, 27.)  Dr.

Trende also provides three alternative maps to prove that "it is possible to achieve the

political goals of the map with a more regular configuration that does not target race."[21]

(*Id.* at 22–26.)

---

[21] As discussed more fully below, Dr. Trende offered conflicting testimony on the question of
whether he believed there was racial targeting in District 13.

As a threshold issue, Defendants critique Dr. Trende's "piecemeal" focus on only "very small subparts of District 13": the Modesto/Ceres boundary and the Stockton boundary. (Defs. Opp. at 38–39, Doc. 113.) Although Defendants are correct that courts "should not divorce any portion of the lines . . . from the rest of the district," this does not mean that specific portions of a district's boundaries are not relevant. *Bethune-Hill*, 580 U.S. at 191–92. Rather, the Supreme Court has stated,

> [R]ace-based decisionmaking may be evident in a notable way in a particular part of a district. It follows that a court may consider evidence regarding certain portions of a district's lines, including portions that conflict with traditional redistricting principles.

*Id.* at 192. The Supreme Court further cautioned,

> The ultimate object of the inquiry, however, is the [State's] predominant motive for the design of the district as a whole. A court faced with a racial gerrymandering claim therefore must consider all of the lines of the district at issue; any explanation for a particular portion of the lines, moreover, must take account of the districtwide context. Concentrating on particular portions in isolation may obscure the significance of relevant districtwide evidence, such as stark splits in the racial composition of populations moved into and out of disparate parts of the district, or the use of an express racial target. A holistic analysis is necessary to give that kind of evidence its proper weight.

*Id.* Accordingly, we first evaluate the two challenged subparts of District 13's boundary for "conflict with [race-neutral] redistricting principles." *Id.* Next, we "take account of the districtwide context" and perform a "holistic analysis" of District 13. *Id.*

### (a)    The Modesto/Ceres Boundary

Dr. Trende provides visualizations of the eastern Modesto/Ceres boundary between Districts 13 and 5 to show that race predominated in the drawing of the boundary:

Figure 7: California District 13, Modesto/Ceres Area



(Trende Report at 11, Figure 7, Ex. 194.)  Dr. Trende first provides a visualization of the partisan leanings of the Modesto/Ceres area.  Dr. Trende argues that the boundary leaves Democrats, shaded in blue, to the north of the boundary in Modesto, "on the table"; *i.e.*, placing them out of District 13 and into District 5.  (*Id.* at 11.)

Figure 9: Modesto/Ceres Area, By Politics and Precinct



(*Id.* at 13.)  He further provides a visualization of the racial makeup of the
Modesto/Ceres area.  Dr. Trende argues that the district lines capture areas with higher
HCVAP percentages around Ceres—the easternmost portion of District 13 shown below—
and leave areas with lower HCVAP percentages to the north of Modesto outside of the
district (*id.* at 11, 13):

Figure 10:  Modesto/Ceres Area, By HCVAP and Block Group



(*Id.* at 14, Figure 10.)  Dr. Trende therefore argues that District 13 (1) leaves out
Democratic areas with lower HCVAP percentages in Modesto, and (2) in turn, captures
Republican territory around Ceres with higher HCVAP percentages.  (*Id.* at 13.)  Thus,
Dr. Trende concludes that "[i]f partisanship were really the motivating factor for this
division, the district would drop some of the Republican areas in Ceres and pick up
Democratic areas in Modesto."  (*Id.*)

Dr. Trende's analysis, however, is far from sufficient to prove that "race-neutral
districting principles," including partisanship, were "subordinated to race."  *Miller*, 515
U.S. at 916.  Dr. Rodden persuasively contests Dr. Trende's conclusions with regard to the

Modesto boundary as driven by "measurement error." (Rodden Report at 13, Ex. 207.)[22]
Specifically, Dr. Rodden explains that Dr. Trende's use of choropleth maps, with colors
assigned to precincts, does not show political data on either side of the Modesto boundary
with the requisite specificity. (*Id.* at 12–13.) Dr. Rodden demonstrates that District 13's
Modesto boundary splits precincts, meaning that the choropleth map assigning colors to
precincts will *always* show the same color on either side of the boundary. (*Id.* at 12–14.)
Thus, Dr. Trende's conclusion that "Democrats are left on the table" because blue appears
both above and below the Modesto boundary is an inevitable result of his precinct-level
map, rather than an indication that partisan considerations were subordinated. Indeed,
Dr. Rodden calculates that the Proposition 50 Map's changes to the boundary between
Districts 5 and 13, which includes the Modesto/Ceres boundary, moved 51.8% Democratic
vote share census blocks into District 13, while they moved 39.1% Democratic vote share
census blocks out of District 13. (*Id.* at 18.) Democratic votes therefore appear to have
been swept into District 13, rather than "left on the table."

Dr. Trende has also not shown that racial considerations predominated over
partisan ones in Ceres. First, Dr. Trende categorizes Ceres as "heavily Hispanic," and
therefore connects its inclusion in District 13 to racial motivations. (Trende Report at 13,
Ex. 194.) But Dr. Trende's own map shows that this area has an HCVAP percentage of at
most 35% (*id.* at 14, Figure 10), and as Dr. Rodden testified, "the Hispanic voting age
population is relatively similar on both sides of the boundary." (Hearing Tr. at 371.)
Furthermore, even if the Ceres area had a higher HCVAP percentage, it is sparsely
populated and therefore has relatively few Latino voters, meaning that there would be little
racial incentive to include Ceres in District 13. (*See* Rodden Report at 15, Ex. 207.)

Second, Dr. Trende categorizes Ceres as "Republican territory," implying that its
inclusion shows that partisan considerations were subordinated. (Trende Report at 13, Ex.

---

[22] All citations to page numbers within Dr. Rodden's report refer to the numbers in the bottom
right corners of the pages of the report.

194.)  But both Dr. Grofman and Dr. Rodden take issue with this characterization. Dr. Grofman notes that although Ceres voted for Donald Trump in 2024, it has "consistently voted for [Democratic Congressman] Adam Gray in all seven general elections."  (Grofman Report ¶ 15, Ex. 184.)  Meanwhile, Dr. Rodden states that "using the full set of statewide races from 2016 to 2024, I calculate that Ceres had a Democratic vote share of 54.6 percent[.]"  (Rodden Report at 15, Ex. 207.)

During his testimony, even Dr. Trende recognized that the Modesto/Ceres boundary is a weaker example of racial predominance and acknowledged that this Court may "disagree with [him] about the Modesto/Ceres area."  (Hearing Tr. at 28, 43.)  At best, then, Dr. Trende's analysis could "plausibly support multiple conclusions," and Challengers have not met their burden to overcome the presumption of good faith. *Alexander*, 602 U.S. at 10.  We therefore conclude that Challengers have failed to show that race subordinated partisanship, along with other redistricting principles, in the Modesto/Ceres portion of the District 13 boundary.

### (b)    The Stockton Boundary

Dr. Trende then turns to the northern Stockton boundary between Districts 13 and 9. While acknowledging that any Democratic partisan gerrymander would require an appendage that reaches into heavily Democratic, urban Stockton, he nonetheless argues that the Stockton area provides "one of the more egregious examples" of racial gerrymandering.  (Trende Report at 16, Ex. 194.)

Figure 13: District 9/13 Boundary, Stockton Area



© OpenStreetMap contributors

(*Id.* at 17, Figure 13.) Dr. Trende first provides a visualization of the partisan leanings of the Stockton area; he argues that "areas to the west of the District are heavily Democratic" but left out of District 13. (*Id.* at 16.)

Figure 15: District 9/13 Boundary, Stockton Area, By Politics and Precinct



(*Id.* at 19, Figure 15.)  Dr. Trende additionally provides a visualization of the racial makeup of the Stockton area.  Dr. Trende argues that the district lines capture areas with higher HCVAP percentages to the north (*see id.* at 19):

Figure 16: District 9/13 Boundary, Stockton Area, By HCVAP and Block Group



(*Id.* at 20, Figure 16.)  In sum, Dr. Trende asserts that the Stockton boundary "bypass[es] heavily Democratic areas" to the west, which have lower HCVAP

percentages, "to get into some politically marginal territory" to the north, which has a

higher HCVAP percentage, in pursuit of a racial goal.[23]  (Hearing Tr. at 49.)

But Defendants provide several alternate race-neutral explanations for the Stockton

area's boundaries.  First, by excluding certain heavily Democratic areas from District 13,

they remain in District 9, another "competitive seat." (Grofman Report ¶¶ 16–17, Ex. 184;

Rodden Report at 23, Ex. 207.)  Accordingly, the intent to "shore up" Democratic votes in

District 9 could explain why District 13 bypasses those same votes.[24]  (Grofman Report

¶ 16, Ex. 184.)

Dr. Trende disagrees that such a justification can explain the boundary.  He points

out that the Proposition 50 Map transformed District 9 from "leaning Democrat" to being

"solid Democrat," while District 13 stayed a "toss up," meaning that District 9 has

Democratic "votes to spare" for District 13.  (Hearing Tr. at 50–52; Trende Rebuttal

Report at 16, Ex. 511 at 344, Doc. 188-19.)  However, while in Dr. Trende's opinion,

Democrats are ultimately harmed by the exclusion of heavily Democratic areas from

District 13 and their inclusion in District 9, Dr. Trende's opinion is by no means the only

reasonable one.  As Dr. Grofman explained, there is no "optimal" partisan gerrymander,

because "it entirely depends on your preference for risk." (Hearing Tr. at 301.)  That is not

to say that a court may never question a gerrymander that appears inconsistent with

partisan goals.  But here, because District 9 voted Republican in the 2024 presidential

election (*see* Grofman Report ¶ 17, Ex. 184), the increased Democratic vote share in

---

[23] Dr. Rodden contests Dr. Trende's characterization of the northern areas of District 13 as "politically marginal."  (Hearing Tr. at 368–69.)  In particular, he testified that the two subdivisions to which District 13 extends, Garden Acres and August, are around 58.5% and 61% Democratic, and we credit that testimony.  (*Id.* at 369.)  However, he concedes that the area left out of District 13 to the west, Weston Ranch, leans more Democratic than the areas included in the north.  (*Id.*)

[24] Indeed, Dr. Trende's premise that District 13 of the Proposition 50 Map should have, but failed to, maximize Democratic performance is itself a strawman; there is no evidence that maximizing Democratic performance *in District 13* was a reason for the Proposition 50 Map. Protecting Democratic Congressman Adam Gray, yes; *maximizing* Democratic performance, no.

District 9, even at the expense of District 13, could reflect a strategic partisan decision. We therefore cannot "rul[e] out the competing explanation that political considerations" drove the inclusion of Democratic voters in District 9. *Alexander*, 602 U.S. at 9.

This competing partisan explanation alone could end this inquiry. However, Defendants further provide an alternate explanation for the Stockton area's boundaries: respect for communities with shared interests. *See Miller*, 515 U.S. at 916 (reasoning that a plaintiff must prove that "traditional race-neutral districting principles," including "communities defined by actual shared interests," were subordinated "to racial considerations"). Dr. Ines Ruiz-Houston testified as a very credible fact witness with an in-depth knowledge of the community, that the western areas excluded from District 13— including the neighborhoods of Brookside and Weston Ranch—are separated from the areas of south Stockton within District 13 by Interstate-5. (Hearing Tr. at 420–21.) She explained that Brookside and Weston Ranch are more suburban, more educated, and wealthier than south Stockton. (*Id.*) By contrast, Dr. Ruiz-Houston testified that the northern areas included within District 13—including the neighborhoods of Garden Acres and August[25]—are similar to south Stockton, as they contain working-class families who share resources with and are otherwise connected to south Stockton. (*Id.* at 416–19.)

Dr. Rodden corroborated Dr. Ruiz-Houston's testimony. He emphasized that August and Garden Acres are similar in population density and income level to neighboring areas of District 13, while Weston Ranch, which has been excluded from the district, has a higher income level. (Hearing Tr. at 362, 366; Ex. 604, Doc. 189-5.) Keeping August and Garden Acres within District 13, and out of neighboring District 9, is also reasonable, Dr. Rodden explained, as they are much more densely populated than the neighboring areas of District 9, and are separated from these areas by a canal. (Hearing Tr.

---

[25] The dissent characterizes the Proposition 50 Map as splitting August and Garden Acres. But Dr. Trende confirmed that "the vast majority of both those cities are included in CD13" and that District 13's border "largely tracks the border of those two cities." (Hearing Tr. at 75.)

at 363–65.)  This "communities-of-interest" testimony went unrebutted, as Dr. Trende acknowledged that he performed no analysis of any communities-of-interest factors in the Stockton area.[26]  (Hearing Tr. at 81–82.)

Thus, while we find that partisan considerations sufficiently explain the Stockton area's boundaries, a desire to keep communities of interest together does as well.  Because multiple considerations could explain the contours of the Stockton boundary, Challengers have fallen far short of their burden to "'disclose[] a racial design' absent any alternative explanation."  *Alexander*, 602 U.S. at 8 (quoting *Miller*, 515 U.S. at 914).

### (c)    Dr. Trende's Alternative Maps

Finally, Dr. Trende provides three alternative maps of District 13 to show that it would be possible for District 13 to have better or equal Democratic outcomes while including fewer Latino voters.  (*See* Trende Report at 22–27, Ex. 194.)  The maps make changes only to the district's Modesto/Ceres and Stockton boundaries:

---

[26] The dissent is skeptical that respect for communities of interest may justify the Stockton boundary.  But to the extent Mitchell's intent is relevant, there is evidence that he considered communities of interest:  Mitchell discussed in his deposition how he takes into account communities of interest, like neighborhoods, in redistricting, and the Redistricting Partners presentation lists communities of interest as a consideration.  (Mitchell Depo. at 82–84; Redistricting Partners Presentation at 2.)

**Figure 14: Boundary of District 13 in AB 604 and 3 Demonstration Maps, Modesto Area**



**Figure 13: Boundary of District 13 in AB 604 and 3 Demonstration Maps, Stockton Area**



(Rodden Report at 27, Figure 13, 29, Figure 14, Ex. 207.)  Alternative maps are important to show "that a rational [decisionmaker] sincerely driven by its professed partisan goals would have drawn a different map with greater racial balance."[27] *Alexander*, 602 U.S. at 10.  The failure to provide a viable alternative map should result in a "dispositive or near-dispositive adverse inference" against Challengers.  *Abbott v. League of United Latin Am. Citizens*, 607 U.S. ___ (2025) (slip op. at 1).

While the alternative maps achieve roughly the same partisan outcomes for District 13 as the Proposition 50 Map, Defendants' experts convincingly explain problems with each of Dr. Trende's alternative maps.[28]

Alternative Map A, for instance, keeps the Proposition 50 Map's Modesto/Ceres boundary intact, removes the neighborhoods of Garden Acres and August out of District 13 and into District 9, and includes Weston Ranch in District 13.  (Rodden Report at 26, Ex. 207.)  For the reasons described above, removing Garden Acres and August from District 13, while including Weston Ranch, splits communities of interest.  Moreover, in Alternative Map A, the HCVAP percentage of District 13 is 51.3%—only a marginal decrease from around 53% in the Proposition 50 Map.  (Trende Report at 23, Ex. 194.)  Because Challengers assert that the challenged districts, including District 13, were

---

[27] Where decisionmakers are the voters, an alternative map may be less capable "of distinguishing between racial and political motivations."  *Alexander*, 602 U.S. at 34.  Voters will usually be presented with one map to approve or reject.  Unlike some legislators, voters will not have had the opportunity to consider, yet reject for racial reasons, any alternatives.  Thus, while the existence of an alternative map that was not enacted may indicate that legislators made a race-based decision, it is less indicative that the voters approved any one map with racial intent.

[28] First, we hesitate to give any weight to these alternative maps because we lack confidence that they avoid a population deviation that would create "one person – one vote" problems.  Specifically, Mr. Fairfax's report shows that the Alternative Maps have an overall population deviation of 923 persons.  (Fairfax Report at 31.)  A map with that population deviation is not a viable alternative.  While Dr. Trende's rebuttal report offers a competing analysis, no one really engaged with this discrepancy at the hearing.  Challengers did acknowledge, however, that substituting one of Dr. Trende's Alternative Maps for Districts 13, 5, and 9 would have a "domino effect."  (Hearing Tr. at 529.)  Such an effect seems akin to an admission that Dr. Trende's Alternative Maps may have unknown, broader consequences.  Because we find other issues with the alternative maps, we do not resolve the population deviation issue at this time.

enacted to meet a "racial target" of between 51 to 55 percent HCVAP[29] (*see* Hearing Tr. at 484–85), it is unclear why Alternative Map A, which also falls within that same range, is a materially different alternative.  Rather, that Dr. Trende created Alternative Map A without race in mind casts doubt on Challengers' claim that racial motivation is the only explanation as to why the HCVAP percentage of District 13 would fall within this "tight band."

Alternative Maps B and C, on the other hand, both suffer from a significant flaw:[30] they split the city of Tracy, which is in District 9 under the Proposition 50 Map, by taking areas of Tracy out of District 9 and placing them in District 13.  (Rodden Report at 28, Ex. 207.)  Such a split could be undesirable as a partisan gerrymander:  District 9's current incumbent, Democratic Representative Josh Harder, lives in Tracy.  (*Id.*)  As such, Democrats may rely on Representative Harder's local constituency for re-election in District 9, which voted Republican in the 2024 Presidential election.[31]  While the dissent asserts that "preserving Tracy in its entirety weakens the primary express goal of a partisan gerrymander" because District 9 is a "safer Democratic seat" under the Proposition 50 Map than District 13, we are not so quick to assume expertise over which redistricting decisions will maximize Democratic success in various future elections.  A court may not

---

[29] The dissent references a 52 to 54 percent HCVAP range, but Challengers consistently maintain that the "tight band of HCVAP" to which districts were tailored was "51 to 55 percent." (*See, e.g.*, Hearing Tr. at 106; 484–85.)

[30] Alternative Maps B and C also suffer from the same flaw as Alternative Map A:  they remove the neighborhoods of Garden Acres and August from District 13 and place them in District 9.

[31] Challengers claim that Mitchell would not hesitate to split Tracy because Mitchell stated that he did not create an "incumbent preference" gerrymander.  (Hearing Tr. at 485–86; Ex. 528 at 102, Doc. 188-20.)  But even if a partisan gerrymander does not prioritize protecting incumbents in general, protecting Democratic Representative Harder specifically, who won the 2024 election in a district that also voted for President Trump and therefore has a track record of success in a competitive district, would be consistent with Mitchell's stated goal of bolstering Democratic performance in District 9.  (Redistricting Partners Presentation at 10.)  Further, it is the voters' intent, not Mitchell's, that is relevant here.

merely dispose of a map when the court feels it is not the best possible partisan gerrymander. *See Miller*, 515 U.S. at 915 ("Federal-court review of districting legislation represents a serious intrusion on the most vital of local functions."). Rather, we find that because both Districts 9 and 13 were vulnerable Democratic districts under the 2021 Map, sweeping areas of Tracy, home to District 9's Representative Harder, into District 13 could quite possibly undermine Democrats' overall success in future elections.

In sum, Dr. Trende's alternative maps, like his analyses of the Modesto/Ceres boundary and the Stockton boundary, fail to show that "race for its own sake, and not other districting principles," dominated in the two challenged sub-parts of District 13. *Alexander*, 602 U.S. at 10 (internal quotation marks omitted) (quoting *Miller*, 515 U.S. at 913). We find his testimony and the evidence he offers significantly less persuasive than the contrary testimony of the other experts, particularly that of Dr. Grofman, who stated that "the evidence for racial preponderance is weak to nonexistent." (Hearing Tr. at 293.)

### (a)    District 13 as a Whole

Not only do Challengers fail to show that race predominated in the Modesto/Ceres and Stockton areas, but a "holistic analysis" of District 13 also shows that partisanship, rather than race, was the "predominant motive for the design of the district as a whole." *Bethune-Hill*, 580 U.S. at 192. District 13's overall demographic and partisan changes are not contested. The parties agree that the Proposition 50 Map did not meaningfully change District 13's HCVAP percentage; in fact, District 13's HCVAP percentage marginally decreased from 54% under the 2021 Map, to 53.8% under the Proposition 50 Map. (Grofman Report ¶ 12, Table 1B, Ex. 184; Hearing Tr. at 35.) The parties further agree that under the 2021 Map, District 13 was a politically competitive district, and that the Proposition 50 Map improved District 13's expected Democratic performance. (*See* Trende Report at 6, Ex. 194; Hearing Tr. at 58.) Dr. Rodden's report shows that the Proposition 50 Map made significant changes to District 13's boundaries to produce this partisan result:



(Rodden Report at 1, Figure 1, Ex. 207.)  As Dr. Rodden shows, the large southern portion of District 13 in the 2021 Map, which the Proposition 50 Map removed, is largely rural and largely Republican.  (*Id.* at 5–6.)  Meanwhile, the small northern "plume" added near Stockton is a largely Democratic area.  (*Id.* at 6.)  As a result, the Proposition 50 Map increased Democratic vote share in District 13 by at least 3 percentage points.  (Grofman Report ¶ 12, Ex. 184; *see also* Rodden Report at 10, Ex. 207 (same); Fairfax Report at 11, Ex. 250 ("Democratic performance increases by almost four percentage points.").)[32]

That District 13's percentage of Latino voters remained constant while its percentage of Democratic voters increased does not deter Challengers from asserting that racial considerations still predominated.  Challengers, pointing to the district's unchanged HCVAP percentage, contend that District 13 was enacted to meet a "racial target" as a district with between 51% and 55% Latino voters.  (Pl. Reply at 9–10; *see* Hearing Tr. at 37–38.)  Challengers argue that "having a racial target in drawing congressional lines

---

[32] All citations to page numbers within Mr. Fairfax's report refer to the numbers at the bottom of the pages of the report.

would establish" or at least be "strong evidence" of racial predominance.  (Hearing Tr. at 481–82.)

This argument fails on multiple counts.  First, there is far too little evidence to support the existence of any racial target.  Challengers rely heavily on Dr. Trende's stated conclusion at the hearing that District 13 "was plainly drawn with a racial target in mind." (Hearing Tr. at 55.)  But Dr. Trende's conclusion relies on his analyses about racial predominance as to the Modesto/Ceres and Stockton boundaries, which, for the reasons discussed above, are unpersuasive.  Additionally, even Dr. Trende fails to definitively conclude that any racial target existed.  At that same hearing, Dr. Trende later testified as follows:

Q. You are not offering an opinion that CD13 was drawn with a racial target in mind, right?

A. Right.

Q. You are not offering an opinion that any district in Prop 50 was drawn with a racial target in mind, right?

A. Correct.

(Hearing Tr. at 92.)  And nowhere in Dr. Trende's Report does he identify any racial target.  Rather, his report offers reasons as to why he thinks certain portions of the boundaries of District 13 were "crafted to enhance the Hispanic Voting Age Population and Hispanic Citizen Voting Age Population."  (Trende Decl. ¶ 9, Ex. 194, Doc. 190-9.) Further, as discussed above, Dr. Trende acknowledges that one of his own alternative maps, which was assertedly drawn with no racial targets and solely as an exercise in political gerrymandering, still results in an HCVAP percentage that is within the same 51% to 55% range as the Proposition 50 Map's District 13.

Second, a holistic analysis of District 13 includes the three-percentage point increase in its Democratic vote share, which indicates a countervailing predominant motivation:  partisanship.  *See Allen v. Milligan*, 599 U.S. 1, 32 (2023) (plurality opinion)

("'[T]he use of an express racial target' [is] just one factor among others that the court would have to consider as part of '[a] holistic analysis.'") (quoting *Bethune-Hill*, 580 U.S. at 192). Partisan predominance seems especially likely when examining the magnitude of changes made to District 13: if the predominant consideration were to maintain District 13's racial makeup, one might expect its borders to remain the same or very similar. But the removal of District 13's large southern portion, and the addition of its northern portion, directly correspond to its improved Democratic performance. As Dr. Grofman testified, given the political makeup of the areas within and surrounding District 13, the changes made by the Proposition 50 Map were some of the most natural changes available to improve District 13's Democratic performance. (*See* Hearing Tr. at 321–23.) Indeed, an "appendage" or "plume" into the Stockton area in the north is replicated in each of Dr. Trende's partisan, alternative maps (*see* Trende Report at 23–27, Ex. 194), and Challengers acknowledged at the hearing that one would expect to see an "appendage" or tentacle" reaching into Stockton in any partisan gerrymander. (Hearing Tr. at 516.) Finally, the partisan changes within District 13 are consistent with partisan changes across the rest of the Proposition 50 Map, which made "five of the nine Republican-held seats more likely to elect a Democrat" and improved Democrats' projected performance in all eight competitive districts with Democratic incumbents, including District 13. (Grofman Report ¶¶ 4, 7, Ex. 184); *see Ala. Legis. Black Caucus*, 575 U.S. at 263 (reasoning that statewide evidence can be relevant to a district-specific racial gerrymandering claim). Accordingly, the district's boundaries suggest that partisanship, not race, was the "predominant motive for the design of the district as a whole." *Bethune-Hill*, 580 U.S. at 192.

### (b)    Conclusion as to District 13

Because Challengers present little-to-no other evidence of voters' racial motivations, their evidence of the shape and demographics of District 13 must meet a high bar to show racial gerrymandering. *Cf. Alexander*, 602 U.S. at 8 ("[W]e have never

invalidated an electoral map in a case in which the plaintiff failed to adduce any direct evidence[.]").  Challengers fall far short.  Challengers therefore fail to establish "serious questions going to the merits" of racial predominance as to District 13.[33]  *Shell Offshore*, 709 F.3d at 1291 (quoting *All. for the Wild Rockies*, 632 F.3d at 1135).

### 5.    Conclusion as to Racial Gerrymandering

Having carefully reviewed and weighed the relevant evidence, we find that the evidence presented reflects that Proposition 50 was exactly what it was billed as:  a political gerrymander designed to flip five Republican-held seats to the Democrats.  In other words, the "impetus for the adoption" of the Proposition 50 Map was "partisan advantage pure and simple."  *Abbott v. League of United Latin Am. Citizens*, 607 U.S. ___ (2025) (slip op. at 2–3) (Alito, J., concurring).  For all the challenged districts, and for the reasons stated above, we concluded that Challengers fail to establish serious questions going to the merits of racial gerrymandering in violation of the Fourteenth and Fifteenth Amendments.

### B.    Section 2 of the Voting Rights Act

The United States additionally brings a claim for "Intentional Racial Discrimination" under § 2 of the Voting Rights Act ("VRA"), 52 U.S.C. § 10301.  (U.S. Compl. at 17.)  Its Complaint states "Proposition 50 was adopted with the purpose of denying or abridging the right to vote on account of race or color in violation of Section 2 of the VRA, 52 U.S.C. § 10301."  (*Id.* ¶ 70.)  Its Motion for Preliminary Injunction is equally succinct; the only argument the United States makes as to a § 2 violation is that "the same showing of intentional racial discrimination that is sufficient to constitute a

---

[33] The dissent theorizes that District 13 was racially gerrymandered to curry favor with Latino voters who are drifting away from the Democratic party, as part of a racially-based spoils system.  There is nothing in the record that reflects this theory.  Moreover, it is unclear to us what racial spoils Latino voters ultimately received with regard to District 13, which saw a marginal decrease in its HCVAP percentage, and how such a decrease would enable Democrats to curry favor with Latino voters.

violation of the fourteenth amendment is sufficient to constitute a violation of section 2." (U.S. Mem. at 14 (internal quotation marks and citation omitted).)[34]

"To the extent that a redistricting plan deliberately minimizes minority political power, it may violate both the Voting Rights Act and the Equal Protection Clause of the fourteenth amendment." *Garza v. County of Los Angeles*, 918 F.2d 763, 766 (9th Cir. 1990). To prevail on a § 2 claim, Challengers must show both a *purpose* and an *effect*. *See Alexander*, 602 U.S. at 38–39 (citing *Shaw I*, 509 U.S. at 649). First, they must show that the State acted with a "'racially discriminatory motivation' or an 'invidious purpose' to discriminate." *Allen*, 599 U.S. at 11 (quoting *City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 61–65 (1980)). Further, they must show an effect that is cognizable under the VRA, namely, that members of the protected class "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b); *see also Garza*, 918 F.2d at 771.

The United States fails to show that the voters acted with discriminatory intent. In examining discriminatory intent, "*Arlington Heights* provided a non-exhaustive list of factors that a court should consider." *Hobbs*, 948 F.3d at 1038 (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977)). Here, neither the "historical background" of Proposition 50 nor "[t]he specific sequence of events leading up to" Proposition 50 shows that the decisionmakers acted with a racially-motivated purpose, *see*

---

[34] In general, a claim under "§ 2 turns on the presence of discriminatory effects, not discriminatory intent." *Allen*, 599 U.S. at 25. That is because the 1982 Amendments to the VRA were a "hard-fought compromise" reflecting a Congressional desire to overturn the prior rule that a § 2 challenger must show discriminatory intent. *Id.* at 10–14, 25 (recounting the history in depth). Accordingly, most § 2 claims now center on the effects-based test outlined in *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986). However, while a challenger is not required prove discriminatory intent for a § 2 claim, the revised language did not foreclose claims on that basis. *See Chisom v. Roemer*, 501 U.S. 380, 394 n.21 (1991). Here, the United States argues that Proposition 50 violates § 2 only because it was passed with a discriminatory intent. (U.S. Compl. ¶ 70; U.S. Mem. at 14.)

*Arlington Heights*, 429 U.S. at 267; indeed, we have already examined the substantial partisan-oriented messaging preceding Proposition 50's passage. Although the mid-decade redistricting effort represented a "[d]eparture[] from the normal procedural sequence," as well as a "[s]ubstantive departure" from Commission-drawn congressional maps, *see id.*, the evidence indicates that such departures were a result of overwhelming political, rather than racial, motivations. (*See, e.g.*, Voter Information Guide at 571 ("This isn't politics as usual. It's an emergency for our democracy.").) The United States has presented no evidence of "contemporary statements by members of the decisionmaking body"—here, the voters—which are probative of any racially discriminatory intent. *Arlington Heights*, 429 U.S. at 268. And finally, we have already discussed in-depth why Challengers' analysis of the "[t]he impact of the official action" on the configuration of District 13, which, in rare cases, could show "a clear pattern, unexplainable on grounds other than race," is insufficient to establish any racial motivation here. *Id.* at 266. In sum, for fundamentally the same reasons that Challengers' racial gerrymandering claims fall short, the United States fails to show that the voters acted with racially discriminatory intent.[35] The United States has therefore failed to establish serious questions going to the merits of its VRA § 2 claim.[36]

_____

[35] Furthermore, the United States fails to show that Proposition 50 has had any adverse effect. It claims that "[t]he racial classification itself is the relevant harm." (U.S. Reply to LULAC at 7 (quoting *Alexander*, 602 U.S. at 38); *see also* Hearing Tr. at 513–14.) But the Supreme Court has clarified that the classification-based harm referenced by the United States is specific to the context of racial gerrymandering claims under the Equal Protection Clause. *See Alexander*, 602 U.S. at 38. By contrast, in the context of § 2 of the VRA, the United States must show that there are "members of a [protected] class" who are unable to equally access the political process. *Garza*, 918 F.2d at 771; 52 U.S.C. § 10301(b). It makes no attempt to do so here.

[36] This Court therefore need not analyze the remaining *Winter* factors. *See All. for the Wild Rockies*, 632 F.3d at 1135 (holding that the *Winter* test "requires the plaintiff to make a showing on all four prongs").

## V.    CONCLUSION

For the foregoing reasons, the Court DENIES Challengers' Motions for Preliminary Injunction.

LEE, Circuit Judge, dissenting:

"It is a sordid business, this divvying us up by race." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 511 (2006) (Roberts, C.J., concurring in part).  But California sullied its hands with this sordid business when it engaged in racial gerrymandering as part of its mid-decade congressional redistricting plan to add five more Democratic House seats.  We know race likely played a predominant role in drawing at least one district because the smoking gun is in the hands of Paul Mitchell, the mapmaker who drew the congressional redistricting map adopted by the California state legislature.

Mitchell refused to appear before our court to explain how he drew the map and invoked legislative privilege for staying silent.  But before this lawsuit was filed, he publicly boasted to his political allies that he drew the map to "ensure that the Latino districts . . . are bolstered in order to make them most effective, particularly in the Central Valley."  Ex. 11 at 30.  He also bragged on X/Twitter that the "proposed Proposition 50 map will further increase Latino voting power" and "adds one more Latino influence district."  Ex. 14.  True to his word, Congressional District 13 (CD 13) in the Central Valley has the hallmarks of a racially gerrymandered district: It is a majority Latino district that oddly juts out in the north to capture Latino areas—to the exclusion of more Democratic but more White areas nearby.  This was no accident.  Dr. Sean Trende has offered multiple alternative maps for this district that are more Democratic but less Latino—which presumably would be more favorable if this were just a case of political gerrymandering.

Why did California create this Latino-majority district?  It is not because Latinos lack political power and must be given special protection.  California today is not like the Deep South of yesteryears. Far from it. Latinos are the largest racial/ethnic group in the state, have won statewide races, and hold dozens of seats in federal and state districts in California.  In fact, their political potency is likely the reason California's Democratic state

legislature created a racially gerrymandered district—as part of a racial spoils system to award a key constituency that may be drifting away from the Democratic party.

But the Fourteenth Amendment to the U.S. Constitution generally bars the government from separating the people by race. Our government must be neutral on race—or else we risk balkanizing our country into competing racial factions and breeding resentment. To be sure, California's main goal was to add more Democratic congressional seats. But that larger political gerrymandering plan does not allow California to smuggle in racially gerrymandered seats. In other words, a state can create a map with the larger goal of political gerrymandering but still run afoul of the Fourteenth Amendment if it relies on race as a predominant factor in drawing certain districts.

The majority largely waves off Mitchell's damning admissions and says that we should only look at the voters' intent—not the state legislature's—because the voters approved Proposition 50. That proposition amended the state constitution to jettison the independent redistricting commission's map and implemented the new districts approved by the state legislature under AB604. But we cannot categorically look only at the so-called "voters' intent"—to the exclusion of other more probative evidence—in assessing racial gerrymandering claims. The reason is obvious: We cannot discern the intent of 11 million Californians for redrawing a single congressional district when they voted on a statewide referendum that changed all 52 congressional districts.

In trying to determine what the state had in mind in drawing the districts, the most relevant evidence is the intent of the mapmaker, as the Supreme Court has repeatedly emphasized. The majority's position that a state referendum can cleanse the sins of the state creates perverse incentives for the governor and the state legislature to shroud their unlawful racial designs and package their actions in more popular terms for the public. And that is exactly what they did—they spoke little of racially gerrymandering CD 13

72

(which implicates only two percent of the state population) and instead sold Proposition 50 as an anti-President Trump initiative (which has wide appeal in a blue state like California).

I would preliminarily enjoin California's new congressional redistricting map because it is infected with racial gerrymandering. I respectfully dissent.

## Background

California has long been a melting pot of people of all races and ethnicities. At UCLA, scores of students—three-quarters of whom are racial minorities—study and mingle together. Fifteen miles east at Chavez Ravine, Latino Dodgers fans sport Shohei Ohtani or Mookie Betts jerseys, much like white fans donned Fernando Valenzuela jerseys decades earlier. In 2022, Californians elected a Latino U.S. Senator and an Asian-American as the State Attorney General. Indeed, the Latino Senate candidate (Alex Padilla) earned more votes than the white governor (Gavin Newsom) that year. And in other recent elections, Californians have elected a Black U.S. Senator (in 2016), a Latino State Attorney General (in 2018), a Black State Attorney General (in 2010 and 2014), a Latino Secretary of State (in 2014 and 2018), a Black Secretary of State (in 2022), an Asian State Treasurer (in 2014, 2018 and 2022), an Asian State Controller (in 2010, 2014, and 2018), a Black State Controller (2022), a Latino Insurance Commissioner (in 2018 and 2022), and an Afro-Latino Superintendent of Public Instruction (in 2018 and 2022).

Yet in embarking on a mid-decade redistricting plan to create more Democrat-friendly districts, California relied on race to create at least one Latino-majority congressional district. To be clear, as the majority explains, California began its mid-cycle redistricting attempt after Texas initiated its own redistricting in favor of Republicans. Ex. 19. But that larger partisan goal does not negate that California's Democratic state legislature sought to maintain and expand a racial spoils system.

## I.    Latinos, the largest racial group in California, wield political power.

It is no surprise why the California state legislature engaged in a racial spoils system if we look at population and political power in the Golden State.  In the 2020 census, Latinos[1] were 39.4% of California's population, the largest ethnic or racial group.  Doc. 16-7 at 28; Ex. 14 at 3.  Other racial groups consisted of Non-Hispanic White at 34.7%, Asian at about 15.1%, and Non-Hispanic Black at 5.4%.  *Id.*  Latinos are also the second largest voting population and the fastest growing demographic in the state.  Ex. 14 at 3–4.

Naturally, Latinos have substantial political clout.  Latino candidates have won and continue to win state and federal races.  Today, Latino officials hold the statewide elected offices of U.S. Senator, California Insurance Commissioner, and California Superintendent of Public Instruction.  In 2023, California sent fifteen Latino members to the U.S. House of Representatives.[2]  Thirteen California state senators and twenty-two State Assembly members are members of the California Latino Legislative Caucus.[3]  In short, Latinos often run for and win elections in California.

## II.    California's Democratic state legislature engages in a racial spoils system of establishing Latino districts.

Importantly though, Latinos are not politically monolithic.  Traditionally, Latinos voted for Democratic candidates.  From 2008 to 2020, about 70 percent of Latinos voted

---

[1] The words Hispanic and Latino appear throughout this opinion to describe essentially the same individuals or groups.  While the U.S. Census Bureau uses Hispanic, modern parlance has shifted to prefer the term Latino to describe those in the United States with racial or ethnic origins in Latin America.  U.S. Census Bureau, *Hispanic Origin*, https://www.census.gov/topics/population/hispanic-origin.html (last visited Jan. 2, 2026).

[2] Hispanas Organized for Pol. Equal., *Latina Representation in California Government* (2023).

[3] Cal. Latino Legis. Caucus, *Member Directory*, https://latinocaucus.legislature.ca.gov/member-directory (last visited Jan. 2, 2026).

for the Democratic presidential candidate.[4]   While the majority still votes reliably for Democratic Party candidates, an ongoing political realignment shows a change in voting behavior, as widely reported in the press.[5]   In the 2024 presidential election, as few as 51% of Latinos nationwide may have voted for Vice President Harris and up to 46% for President Trump.[6]   While numbers specific to California voters are limited, data suggest a surge in Latino support for Republicans and a corresponding decrease in support for Democrats.[7]

This change would likely be a major concern for the California state legislature, which is controlled by a Democratic supermajority.   Latinos do not just make up the largest racial/ethnic group in the state, their associated community organizations engage in outreach and get-out-the-vote efforts.    And many of the leading Latino groups have significant sway among California's Democratic elected officials and leaders.[8]   We need to look no further than this case. Paul Mitchell—whose Proposition 50 map work was funded in part by the Democratic Congressional Campaign Committee (DCCC)—met

---

[4] *See* Alan I. Abramowitz, *Are Latinos Deserting the Democratic Party? Evidence from the Exit Polls*, Ctr. for Pol. Sabato's Crystal Ball, March 24, 2022, https://centerforpolitics.org/crystalball/are-latinos-deserting-the-democratic-party-evidence-from-the-exit-polls/.

[5] *See* Bruno Vega Hubner & F. Javier Pueyo Mena, *The Hispanic Vote in the 2024 U.S. Presidential Elections* (2025).

[6] *Id.* at 11.

[7] Eric McGhee & Jennifer Paluch, *Who is Switching Political Parties in California*, Public Policy Institute of California, Oct. 9, 2014, https://www.ppic.org/blog/who-is-switching-political-parties-in-california/.

California's political dynamic is starkly different from, say, that of South Carolina, where it is much more difficult to disentangle race from politics because of the extreme political polarization.  In South Carolina, about 90% of the Black voters support Democrats at the ballot box, while a supermajority of Whites vote Republican. *See Alexander v. S.C. State Conference of the NAACP*, 602 U.S. 1, 9 (2024).  In contrast, all ethnic/racial groups vote Democratic in California, albeit to somewhat varying degrees.  *See* Brunell Report, Ex. 196 at 16–19.

[8] *See generally* Gene M. Grossman & Elhanan Helpman, *Special Interest Politics* (2002).

75

repeatedly with Latino groups (such as Hispanas Organized for Political Equality (HOPE)) about expanding their political power. Paul Mitchell statement on HOPE Zoom meeting, Ex. 11 at 23–24, 33–34. And the League of United Latin American Citizens (LULAC) intervened here on the side of California and the DCCC.

As Latinos continue to grow in population and exert more influence in state politics (Ex. 14 at 3–4), it would surprise no one that the Democratic supermajority in the California state legislature does not want Latinos to stray from the party. One strategy is to deliver policy results to community organizations and Latino communities. Another is to ensure that Latino officials are elected to represent Latino areas and can lock in districts to the party and its incumbents.[9]

### III. Paul Mitchell creates racially gerrymandered districts while creating a Democratic-friendly redistricting map.

We saw this racial politics in play during California's mid-cycle redistricting plan. Redistricting requires a mapmaker. Enter Paul Mitchell, a California redistricting expert paid hundreds of thousands of dollars by Congressman Hakeem Jeffries, House Majority PAC, and the DCCC to draw a redistricting map for California. Doc. 159-1 at 228–29. As he publicly acknowledged, he did not just politically gerrymander, though that was the larger goal in mind. Race-based interest groups wanted certain racial outcomes out of the process. *See* Ex. 11 at 23–29. He happily delivered. *See* Ex. 11 at 30–35. As explained in detail later, Mitchell, in a meeting with a Latino interest group, said that the "number one thing that I started thinking about" when drafting the Proposition 50 map was creating a "Latino majority/minority district" in Los Angeles. Ex. 11 at 23–24. He also bragged that "[t]he Prop. 50 maps I think will be great for the Latino community" as "they ensure

---

[9] *See* Daryl Levinson & Benjamin I. Sachs, *Political Entrenchment and Public Law*, 125 Yale L.J. 400, 415 (2015) (discussing gerrymandering as a means of political entrenchment).

that the Latino districts" are "bolstered in order to make them most effective, particularly in the Central Valley." *Id.* at 30.

California's state legislature adopted Mitchell's map in the legislative vehicles that would become Prop. 50. The resulting map advanced Democratic Party interests by creating five additional safe Democratic seats after Texas redistricted to try to gain five more Republican seats. Statement of Senator Gonzalez, Ex. 5 at 275. The California state legislature adopted the legislative package containing the map mere days after it was submitted for their consideration. The package proposed a state constitutional amendment requiring voter approval for adoption. That amendment was necessary because the California state constitution mandates that an independent commission create non-partisan congressional districts.

Around 11 million Californians voted in the November 2025 special election and approved the map and associated state constitutional amendment.

### Discussion

We address this case at the preliminary injunction phase. A plaintiff merits a preliminary injunction if he can show "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). When, as here, "the nonmovant is the government, the last two *Winter* factors 'merge.'" *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). All factors must be satisfied, but the Ninth Circuit applies a "sliding-scale approach" by which "a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Yet, "[l]ikelihood of success on the merits is a threshold inquiry and is the most important factor." *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020). I address each factor in turn.

I.    **Plaintiffs are likely to succeed on the merits because California's mapmaker admitted that he created racially gerrymandered districts.**

The Fourteenth Amendment generally bars racial gerrymandering.  *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 7 (2024) ("The Fourteenth Amendment introduces one constraint by prohibiting a State from engaging in a racial gerrymander unless it can satisfy strict scrutiny.").   As the Supreme Court explained, "Racial classifications with respect to voting carry particular dangers" because it "threatens to carry us further from the goal of a political system in which race no longer matters—a goal that the Fourteenth and Fifteenth Amendments embody, and to which the Nation continues to aspire."  *Shaw v. Reno*, 509 U.S. 630, 657 (1993).   And in analyzing redistricting challenges, we do so on a district-by-district basis—not a state map as a whole.  *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 191 (2017) ("[T]he basic unit of analysis for racial gerrymandering claims . . . is the district").

David Tangipa and other plaintiffs allege that California drew several racially gerrymandered districts in favor of Latinos.   But proving a state engaged in racial gerrymandering requires a strong showing.  At this stage, I believe that Plaintiffs have met this burden for at least one congressional district—CD 13 in the Central Valley—by showing that race was a predominant factor in its drawing.   They, however, have not provided sufficient evidence for other districts at the preliminary injunction stage. Plaintiffs' Reply ISO PI, Doc. 143 at 9–10; U.S. Reply ISO PI, Doc. 140 at 11–12.  But for CD 13, direct and indirect evidence show that it was racially gerrymandered.

A. **We should presume legislative good faith, though the lack of any direct evidence of the state's intent raises questions.**

My colleagues correctly assert that courts must tread carefully when wading into redistricting, a "traditional domain of state legislative authority."  *Alexander*, 602 U.S. at 7.  Accordingly, "courts must exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race" as "federal-court review of districting

legislation represents a serious intrusion on the most vital of local functions." *Id.* (quoting *Miller v. Johnson*, 515 U.S. 900, 915–16 (1995)) (cleaned up).

We thus begin by presuming that the redistricting "legislature acted in good faith." *Id.* at 6. This presumption is based in "due respect" for state legislatures and avoiding unfounded accusations of "'offensive and demeaning' conduct." *Id.* at 11 (quoting *Miller*, 515 U.S. at 912). We also "must be wary of plaintiffs who seek to transform federal courts into weapons of political warfare that will deliver victories that eluded them in the political arena." *Id.* (internal quotation marks omitted).

But this presumption is not insurmountable. *See id.* It can be rebutted by both direct and indirect evidence of racial gerrymandering. The evidence here is plentiful. As explained more later, Mitchell and many legislators spoke publicly and to Latino interest groups declaring that race was a priority in developing several congressional districts for the Proposition 50 map.

I take Mitchell's statements at face value and conclude they reflect his true motivations behind the Proposition 50 map. We have nothing else to go on. Mitchell refused to appear before our court to testify at the preliminary injunction hearing in Los Angeles, even though he acknowledged that he had no other pressing plans and lives in California. Doc. 178-5 at 184–85 (Mitchell Depo Designations pgs. 184–85). According to his lawyer, he would not appear before us because "the burden on him has been enough." *Id*.

Because Mitchell's own words show that he relied on race in drawing certain districts, Plaintiffs have rebutted the presumption of legislative good faith that we give to California. But I highlight Mitchell's behavior because the contours of the presumption of good faith may require further explanation by the Supreme Court. The Court has typically presumed good faith when the mapmaker testifies about his (non-racial) intent in drawing the map but other evidence suggests racial motives. *See, e.g., Alexander*, 600 U.S. at 10

(The "presumption of legislative good faith directs district courts to draw the inference that cuts in the legislature's favor *when confronted with evidence that could possibly support multiple conclusions*.") (emphasis added); *Abbott v. Perez*, 585 U.S. 579, 610–12 (2018); *Miller v. Johnson*, 515 U.S. 900, 915 (1995) ("*until a claimant makes a showing sufficient to support the allegation* the good faith of a state legislature must be presumed") (emphasis added). In the face of such conflicting evidence, the Court held that we must presume the state acted in good faith. *See Alexander*, 600 U.S. at 10. But here, there is *no* direct evidence that the mapmaker or any state official had non-racial motives in drawing CD 13. On the contrary, the only direct evidence—from the mouth of Mitchell in public statements—shows that race was a predominant factor in drawing that district.

Mitchell went to great lengths to avoid testifying under oath about how he drew the California map—even though he publicly talked about it to the press and interest groups before this lawsuit. He first delayed his deposition until just a few short days before the preliminary injunction hearing. Doc. 147-1 at 3. On the morning of his deposition, his counsel—for the first time—claimed that he would be invoking legislative privilege in response to questions related to how he drew the redistricting map. Doc. 178-5 at 26–27 (Mitchell Depo Designations pgs. 26–27). Notably, he cited legislative privilege, even though California and DCCC had recently submitted briefs claiming that Mitchell was merely a private person, and not a state actor. Then at his deposition, he invoked legislative privilege over one hundred times. *See generally* Doc. 178-5. He declined to answer how he drew the map, whether race played any role, and even the most basic questions. For example, he even refused to answer whether he drew the Proposition 50 Map. *Id.* at 26 ("Q: So is it fair to say that you drew the Prop 50 maps? Mr. Manolius: Objection, calls for information that's privileged under legislative privilege. I instruct you not to answer."). Mitchell also did not produce any documents until explicitly ordered to do so by the court and then only started to produce a small fraction of the relevant documents by the time of

the hearing. Doc. 147-1 at 3; Doc. 167. And any potential challenge to these privilege claims faced veiled threats of interlocutory appeal under the collateral order doctrine, which would have delayed our proceedings by potentially months. Doc. 157 at 9.

When the mapmaker's behavior borders on bad faith and the state has failed to produce any direct evidence that race was not a predominant factor in drawing a particular district, I question whether the presumption of good faith even applies. We, however, need not resolve it and can proceed with presumption of good faith but recognize that it has been rebutted here.[10]

### B. Direct evidence—Mr. Mitchell's own words—shows that race was a predominant factor in drawing CD 13.

To prove a Fourteenth Amendment racial redistricting claim, the plaintiff can offer both direct and circumstantial evidence. *Alexander*, 602 U.S. at 8 (citing *Cooper v. Harris*, 581 U.S. 285, 291 (2017)). Direct evidence is often "a relevant state actor's express acknowledgement that race played a role in the drawing of district lines." *Id.* Such concessions may be guised in the language of Voting Rights Act compliance. *Id.* Other direct evidence might include admissions like "e-mails from state officials instructing their mapmaker" to racially gerrymander. *Id.* Absent a compelling state interest to racially gerrymander, "direct evidence of this sort amounts to a confession of error." *Id.* A state can justify the racially gerrymandered district only by showing a compelling interest under strict scrutiny. *Id.* at 7 ("The Fourteenth Amendment introduces one constraint by

---

[10] The majority suggests that I am drawing an adverse inference due to Mitchell's invocation of legislative privilege. I am not. Nor am I advocating that the court apply one. I merely raise an unresolved question about the contours of the presumption of legislative good faith that would benefit from Supreme Court review.

prohibiting a State from engaging in a racial gerrymander unless it can satisfy strict scrutiny.").[11]

California does not argue that the Proposition 50 map satisfies strict scrutiny. Defendants' Opp. to PI, Doc. 113 at 40.  Rather, California insists that strict scrutiny does not apply because it did not rely on race as a predominant factor in drawing the districts. *Id.*  So the only question is whether race was a predominant factor in drawing the lines of CD 13.  If it were not, then strict scrutiny does not apply, and Plaintiffs' claim will likely fail.  But if it were, then strict scrutiny does apply, and Plaintiffs are likely to succeed on the merits.

We turn first to the statements of the person who drew California's redistricting map, Paul Mitchell.  The Supreme Court has repeatedly relied on statements from the mapmaker in assessing whether the state improperly relied on race in drawing district lines. *See, e.g., Alexander*, 602 U.S. at 13–15, 19, 22–23; *Cooper v. Harris*, 581 U.S. 285, 288–89 (2017); *Rucho v. Common Cause*, 588 U.S. 684, 725–26 (2019); *Bethune-Hill*, 580 U.S. at 194–95.  We have smoking-gun evidence that CD 13 is a racial gerrymander.  In a video-call presentation for Hispanas Organized for Political Equality (HOPE), he openly said he wanted more Latino districts when he began drawing the Proposition 50 map.  Paul Mitchell statement on HOPE Zoom meeting, Ex. 11 at 23–24.  For example, he admitted that the "number one thing" that he "started thinking about" in creating the Proposition 50 map was creating a "Latino majority" district in Los Angeles.  *Id.*  Creating Latino majority districts was a longtime goal of his: Dating back over a decade, he had worked with Latino

---

[11] Often, states that create racially gerrymandered districts justify them by invoking the Voting Rights Act (VRA).  But Supreme Court precedent indicates that merely mentioning the VRA is not an elixir that wards off constitutional concerns.  Rather, it often reveals an unconstitutional "racial target." *Cooper*, 581 U.S. at 299–300.  California does not try to justify CD 13 as a VRA district. And for good reason: Latinos wield substantial political power in California and likely have the power to elect their preferred representatives without the VRA.

groups like HOPE that sought to maximize Latino congressional representation in Latino areas. *Id.* at 23–24, 33–34. In the 2021 Commission redistricting process, Mitchell helped HOPE advocate for more "majority/minority Latino districts." *Id.* at 24. In discussing his current work on the Proposition 50 map, Mr. Mitchell cited that earlier work as front-of-mind in his redistricting process and quoted a 2021 letter addressing that effort's goals. *Id.*

That 2021 letter expressly encouraged the use of race in drawing congressional districts. Ex. 12. It states that "the protection of voters of color is a higher priority than preserving county boundaries or other lower-order criteria." *Id.* at 4. It also instructs that "it is also acceptable for [redistricters] to value providing influence to voters of color in [their] districting plans, so long as it is not the sole criterion used." *Id.* It then warns of "overpacked" districts in which the Latino population has been too highly concentrated for maximum electoral effect, providing a target percentage for Latino-majority districts "between 52% and 54% Latino CVAP [Citizen Voting Age Population]." *Id.* Such districts, it claims, "would still be very likely to elect Latino candidates of choice." *Id.* Mitchell cited this 2021 letter years after its publication as a roadmap for his 2025 redistricting goals. Paul Mitchell statement on HOPE Zoom meeting, Ex. 11 at 24. It is little surprise that he followed its instructions.

He then made a damning confession about CD 13: He said that "[t]he Prop. 50 maps I think will be great for the Latino community" as "they ensure that the *Latino districts* are "*bolstered in order to make them most effective, particularly in the Central Valley*." *Id.* at 30 (emphasis added). Congressional District 13 is in the Central Valley. The message was not lost at HOPE, the Latino advocacy group. The presentation's host summarized Mitchell's remarks as answering "what this map means for long-term political – Latino political power in the state." *Id.* at 33. In parting, the HOPE host referred to Paul Mitchell as "St. Paul"—as if he were an evangelist of racial gerrymandering. *Id.* at 35–36. This praise is well deserved. Mitchell bragged on social media that the "proposed

83

Proposition 50 map will further increase Latino voting power" and "adds one more Latino influence district."  Ex. 14.[12]

Mitchell was fully aware of the racial makeup of congressional districts when he spoke publicly.  Again, in the HOPE presentation, Mitchell cited several districts as "Latino-influenced."  Paul Mitchell statement on HOPE Zoom meeting, Ex. 11 at 25, 26, 29.  In one instance, he cited a specific district's demographics "at 35 percent Latino by voting age population."  *Id.* at 25.  In another instance, he highlighted the importance of "support[ing] and do[ing] turnout there for Latinos to protect a Latino member of Congress in a district that is still a Latino-influenced district, but is no longer a majority/minority district."  *Id.* at 29.  When asked at his deposition to identify which district this was (or what a Latino-influenced district means to him), Mitchell declined to explain, relying in part on, you guessed it, legislative privilege.  Mitchell Deposition, Ex. 434 at 282–86.

None of Mitchell's admissions should be surprising.  His constant advocacy of Latino districts aligns perfectly with the California state legislature's long-term political goal of attracting and retaining Latino voters.  The Democratic supermajority in the California state legislature, through its mapmaker, wanted to reward Latino groups and voters with several Latino majority and Latino-influenced seats—in effect, a racial spoils system.  The need to court Latinos through racially gerrymandering is especially

---

[12] The majority downplays Mitchell's admission to HOPE that he tried to "bolster" "Latino districts" in the Central Valley by referring to a different interview in which he says, "We did a lot to bolster Democratic candidates up and down the state that are potentially in tough races like Adam Gray in the Central Valley."  Ex. 123 at 2.  The majority contends that this later interview shows that Mitchell was likely referring to "political effectiveness" when he spoke to HOPE. But we do not know that because he did not show up to court to give his side of the story.  So I take at face value his multiple admissions in which he explicitly referred to strengthening "Latino districts."  And as noted before, it is possible for a state to pursue the larger goal of a more partisan map but still violate the 14th Amendment if it relies on race as a predominant factor in drawing a particular district.  *Bethune-Hill*, 580 U.S. at 191–92.

compelling because Latinos have started drifting away from the Democratic Party in recent years.[13]

Perhaps some may dismiss all this as mere politics. After all, politicians and parties appeal to different interest groups and routinely dispense favors to them. The Democratic party relies on, for example, public labor unions and environmental groups, while the Republican party receives support from business groups and the oil-and-gas industry. Democratic and Republican administrations also often enact policies favoring their interest groups and appoint people in those fields to positions in federal agencies and commissions. So why not allow a spoils system based on race if political parties do so based on other factors?

Race is different because "racial classifications are simply too pernicious." *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003). Our country did not shed the blood of a half-million Americans over corporate tax loopholes or public pensions. We must tread very carefully when it comes to race: When our government divides the people into competing racial camps, it inevitably invites resentment. Electoral performance is "zero-sum," "[a] benefit provided to some [racial groups] but not to others necessarily advantages the former group at the expense of the latter." *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 218–19 (2023). Racial gerrymandering favoring the plurality Latino population disadvantages other citizens based on their race. And racial gerrymandering also "engages in the offensive and demeaning assumption that voters of a particular race, because of their race, 'think alike, share the same political interests, and will prefer the same candidates at the polls.'" *Miller*, 515 U.S. at 911–12 (quoting *Reno*, 509 U.S. at 647). As the Supreme Court warned, "Racial classifications with respect to voting carry particular dangers" because "[r]acial gerrymandering, even for remedial

---

[13] *See* Hubner & Mena, *supra*.

purposes, may balkanize us into competing racial factions." *Reno,* 509 U.S. at 657. Simply put, we play with fire when we treat people differently based on race—and racial politics can be a tinder that engulfs our nation.

Yet Mitchell relied on race in creating CD 13 because he said so himself. My colleagues, however, contend we cannot rely on Mitchell's own words. They claim that (1) Mitchell's intent does not reflect that of the California voters who adopted Proposition 50; (2) in any event, Mitchell is not a state actor; and (3) his statements are not enough to overcome the presumption of legislative good faith. I address each argument in turn.

        1. We need to consider Mitchell's views in discerning state intent.

Despite Mitchell's fatal admissions that he considered race in drawing certain congressional districts, the majority says that we should ignore Mitchell's own words. Rather, because the voters themselves ratified Proposition 50, the majority argues that we need to figure out what 11 million voters thought about CD 13 when they voted on Proposition 50's statewide redistricting map. The majority adopts a categorical rule that the state legislature's intent in enacting a redistricting map—even if the map is infected with unlawful racial considerations—must be cast aside if there was a statewide voter referendum that ultimately approved it. I respectfully disagree.

      The inherent difficulty of assessing a state's intent arises from the fact that the state legislature "is a they, not an it." *See generally* Kenneth A. Shepsle, *Congress Is A "They," Not an "It": Legislative Intent As Oxymoron,* 12 Int'l Rev. L. & Econ. 239 (1992). "[D]ozens if not hundreds of legislators have their own subjective views on the minutiae of bills they are voting on—or perhaps no views at all because they are wholly unaware of their minutiae. . . . Each member voting for the bill has a slightly different reason for doing so. There is no single set of intentions shared by all. The state of the assembly's collective psychology is a hopeless stew of intentions." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts,* 391–96 (2012). That statement is even more true

86

when applied to millions of California voters whose understandings of and motivations for adopting a state-wide redistricting package are legion.

Given these difficulties of assessing legislative or voter intent, the Supreme Court has often looked at the mapmaker as the most natural and perhaps only viable way to discern the state's intent in drafting a congressional redistricting map. *See, e.g., Alexander*, 602 U.S. at 19 (citing mapmaker's testimony as "direct evidence"). After all, the mapmaker is the person who drew the map for the state. Who else but the author of the map is the best source of the motivation behind drafting the map? Much of the Supreme Court's *Alexander* opinion is dedicated to addressing the mapmaker's knowledge and intent. 602 U.S. at 13–15, 19, 22–23. The Court there held that the testimony of the person "who drew the Enacted Map" was "direct evidence" of the state legislature's intent.[14] *Id.* at 19. And so it should be here.

The majority deems irrelevant the intent of the mapmaker who drew the map as well as of the state legislators who drafted and voted for the bill enacting the map. What we need to look at are the 11 million Californians who voted on Proposition 50, according to my colleagues. To do otherwise would be to commit the "cat's paw" fallacy in which we attribute a single state legislator's view to the entire state legislature. *See Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 689–90 (2021) ("A 'cat's paw' is a dupe who is used by another to accomplish his purposes. A plaintiff in a 'cat's paw' case typically seeks to hold the plaintiff's employer liable for 'the animus of a supervisor who was not charged with making the ultimate adverse employment decision." (cleaned up)). In this case, the majority reasons that we would be incorrectly attributing the state legislature's views to

---

[14] Defendants argue *Alexander* does not apply because there the mapmaker was a non-partisan legislative employee rather than an outside contractor paid by a third party. While that distinction is true, it makes little difference. To accept otherwise would lead to absurd results. States could export their redistricting drafting to disreputable third-party groups and shield themselves from any judicial review.

the voters if we consider the mapmaker's intent. But the majority's reliance on 11 million "voters' intent" suffers from the same "cat's paw" fallacy—except that we would now face 11 million cat paws scratching in myriad directions in trying to figure out an abstract "voters' intent."

How do we discern the intent of 11 million voters for a specific congressional district when they voted on a statewide package of redistricting all 52 congressional districts? Perhaps it may be theoretically possible to figure out the voters' intent in a simple but hot-button initiative. *Cf. Romer v. Evans*, 517 U.S. 620, 624 (1996) (statewide referendum denying "claim of discrimination" based on "homosexual, lesbian, or bisexual orientation"). But Proposition 50 was no simple ballot initiative. And in addressing whether districts are racially gerrymandered, we must examine each district individually— we cannot look at a statewide map as a whole. *Bethune-Hill*, 580 U.S. at 191 ("[T]he basic unit of analysis for racial gerrymandering claims . . . is the district"). That means we will have to figure out what 11 million Californians who voted on a package involving all 52 congressional districts thought about a particular single district (CD 13 in this case). But 98% of the voters who are *not* in that racially gerrymandered district will not know about, care about, or have any intent about a single congressional district in the Central Valley.

The majority says that we can look at public statements or social media posts made by proponents or opponents of Proposition 50. As a practical matter, there will be very few public statements from politicians about a single district in a statewide ballot addressing all 52 districts. (More on that later—there are statements from legislators about racial gerrymandering here). One does not succeed in a statewide ballot initiative by focusing on 2 percent of the population residing in that single district. Naturally, most statements focused on the overall map, not a particular district.

Even if we looked at Proposition 50 more generally (and not CD 13 specifically), the "cat's paw" fallacy becomes magnified because we will be attributing a particular

88

statement from an individual to all 11 million Californians who voted on Proposition 50. Should we look at statements from politicians about Proposition 50 as reflecting the "voters' intent"? (But many voters may view politicians dimly, so elected officials' public statements may not reflect the voters' intent). Or should we examine social media posts about Proposition 50? (But which ones? How do we know if that person voted or is even eligible to vote? Should we also look at "likes" or "views" to give weight to each post?) What about articles in the Los Angeles Times or the San Francisco Chronicle? (But how many people read newspapers these days, anyway?) It is a hopeless task to divine the intent of millions of Californians if we have to resort to reading Reddit posts or watching cringey TikTok videos about Proposition 50 (some of which did make their way into the record). Exs. 96–100.

Nor does looking at indirect evidence of oddly shaped districts solve the problem here, as suggested by the majority. As the Supreme Court noted in *Miller v. Johnson*, "parties may rely on evidence other than bizarreness to establish race-based redistricting." 515 U.S. at 913. Yet the majority is effectively saying the only way to show racial gerrymandering is by the bizarreness of the district shape.

Finally, the majority's position will create perverse incentives for California politicians to bury their unlawful conduct by packaging them in politically palatable terms—in other words, lie to the public. So long as politicians can hoodwink the voters, they can cleanse themselves of their sins and avoid judicial review of their conduct. That cannot be the way.

2. Mitchell is a state actor.

Contrary to California's and DCCC's assertions, Mitchell must be treated as a state actor. He drafted the Proposition 50 maps. Ex. 527. Mitchell asserted legislative privilege over one hundred times in his deposition, underscoring he was acting on behalf of the state. Ex. 434. His privilege claim was so prolific it covered his feelings on the Prop. 50 map,

89

*Id.* at 259–60, what he knew during the redistricting process, *Id.* at 263–67, explanations of his past public statements, *see, e.g., Id.* at 276–77, 285–86, 288–89**,** and potential conversations with persons who are not members of the California Legislature, like Governor Gavin Newsom's office, *Id.* at 266, U.S. Congressional staff or members, *Id.*, and outside advocacy groups, Ex. 434 at 51–52.  The California Legislature came prepared to defend that privilege assertion when Plaintiffs challenged it.  California Legislature's Opp. to Mtn. to Compel Testimony of Paul Mitchell, Doc. 158.

We do know, however, that Mitchell began speaking with the California legislature staff on July 2, 2025 at the latest and was contracted by the DCCC on July 15, 2025 to draw the map.  Ex. 434 at 232–234.  At his deposition, Mitchell testified that he spoke to several legislators and their staff about the map.  *Id.* at 50.  We can safely conclude that Mitchell conveyed to the state legislature similar thoughts about the Proposition 50 map that he told advocacy groups, the press, and others.

Yet now California and the DCCC contend that Mitchell's actions are not attributable to the state legislature.  They cannot have it both ways.  They cannot shield Mitchell from revealing his internal deliberations on the basis that he is working for the state legislature but then at the same time say that he is not a state actor.  The Supreme Court has repeatedly looked at mapmakers to divine state intent, and we should do so here. *Alexander*, 602 U.S. at 13–15, 19, 22–23; *see Rucho*, 588 U.S. at 728–29, 736.

### 3.  Other direct evidence from the legislators themselves rebuts the presumption of good faith.

My colleagues claim Mitchell's statements alone cannot overcome the presumption of legislative good faith.  I disagree.  But Mitchell's statements are not the only evidence, as damning as they are.  We also can look at statements made by the legislators themselves. While each statement alone would not prove racial intent and must be viewed cautiously, they confirm Mitchell's admissions that race was a predominant factor in drawing CD 13

90

and potentially other districts, especially given that Mitchell spoke with many legislators and their staff.

California legislators emphasized their racial priority in their public statements. The office of the Speaker of the California Assembly issued a press release heralding that the Prop. 50 map "retains both historic Black districts and Latino-majority districts." Ex. 20 at 1. Legislative leadership lauded that the Prop. 50 map "retains the voting rights protections enacted by the independent commission"—a clear reference to the Voting Rights Act's racial protections. Ex. 19 at 1.

Often in legislative debates, discussion of countering Texas's redistricting slid into the language of race. For example, Senator Sabrina Cervantes, an author of Senate Bill 280, said that "Republican politicians . . . want to silence the voices of Latino voters, Black voters, API voters, and LGBTQ voters." Assembly Elections Comm. Meeting Tr., Au 19, 2025, Ex. 5 at 158. Senator Cervantes repeated those sentiments to the Senate Committee on Elections that same day. Ex. 6 at 75.

In the floor debate, California Senate Majority Leader Lena Gonzalez veiled her gerrymandering language in metaphor when she asked her opposition colleagues about redistricting, "Why have you remained silent during this egregious overreach when Latino communities across California have been kidnapped?" Senate Floor Debate, Aug. 21, 2025, Ex. 8 at 99. Similarly, Assembly Majority Whip Mark Gonzalez said that this redistricting debate is "about whether . . . an immigrant community in California has a voice in their own democracy members." Assembly Floor Debate, Aug. 21, 2025, Ex. 9 at 40. And Assemblymember Isaac Bryan said in floor debate that, a "Latino voice in Texas is worth one third of the representation as a white voice. A black voter in Texas is worth one fifth of the representation of a white voter in Texas. I didn't say three fifths. There was no compromise. I said one fifth. That is the kind of gerrymandering, that is the kind

of theft that they are perpetuating.  And we can't just sit by and let it happen."  Assembly Floor Debate, Aug. 21, 2025, Ex. 9 at 49.

Legislators too guised their racial priorities as VRA compliance.  Senator Mike McGuire, then President pro tempore of the California State Senate, said that "the Voting Rights Act in all districts in every corner of California is upheld.  Full stop."  Senate Floor Debate, Aug. 18, 2025, Ex. 4 at 112.  Senator Gonzalez said, "what we do here in California is we respect the Voting Rights Act."  Senate Comm. on Elections Meeting Tr., Aug. 19, 2025, Ex. 6 at 110.  That was unlike in Texas, he alleged, which "has, every single year since 1965, violated the Voting Rights Act, every single time."  Senate Floor Debate, Aug. 21, 2025, Ex. 8 at 32–33.  Speaking again of Texas legislators, he said, "[t]hey don't have the purview to violate the Voting Rights Act and disenfranchise their voters, but that is what they're doing."  *Id.* at 80.  He went on decrying "the egregious actions by Texas legislators to disenfranchise voters, to additionally split counties and cities, to continue to violate the Voting Rights Act, to just completely ignore communities of interest."  *Id.* at 98.

Senator Lola Smallwood-Cuevas said legislators "must honor the Voting Rights Act, not just with memory but with action.  And we must protect the right to vote and ensure that we are strengthening all communities of interest."  *Id.* at 149.  She explained this was especially important to respond to Texas's allegedly racially harmful redistricting.  *Id.* at 150–51.  She said that "today's gerrymandering in Texas, the voter suppression, shows that Texas is now sliding back" to the era of "black codes, and Jim Crow, and racial terror, poll taxes, [and] white-only primaries."  *Id.*

Senator Aisha Wahab summarized the VRA as "mandating that voters of color be placed in districts with more opportunity to select their preferred candidates."  Senate Floor Debate, Aug. 21, 2025, Ex. 8 at 172.  Assemblymember Marc Berman told the Assembly Elections Committee, "California's maps strictly abide by the Federal Voting Rights Act,

which the Texas maps don't. . . . [T]he Voting Rights Act and the principles of the Voting Rights Act were taken into very high consideration when those maps were drawn." Assembly Elections Comm. Meeting, Aug. 19, 2025, Ex. 5 at 120.  As Senator Jerry McNerney put it, Democratic legislators felt it was their "duty to fight fire with fire and approve new congressional districts that [they thought] satisfy the Voting Rights Act." Senate Floor Debate, Aug. 21, 2025, Ex. 8 at 187.

Even the materials relied on by the legislators to learn about the Prop. 50 maps showed that race was a predominant consideration.  *See Alexander*, 602 U.S. at 6. Mitchell's group, Redistricting Partners, provided an atlas of district maps to introduce the proposed Proposition 50 map to California legislators.  Ex. 190 at 1.   The first five pages after the cover page provide tables of the census population and the Citizen Voting Age Population (CVAP) of each new district, both broken down by race.  *Id.* at 2–7.  Not stopping there, the next 52 pages give a closer look at each individual district's map alongside two bar graphs of that district's racial composition and a table outlining the same racial information.  *Id.* at 8–60.  Political party affiliation of voters in a district is nowhere to be seen on this atlas:

93



*E.g.,* Ex. 190 at 20.

This is a different universe than *Alexander* where "several legislative staffers, including [the mapmaker], viewed racial data at some point during the redistricting process." 602 U.S. at 22. It is even beyond *Miller*'s assertion that "[r]edistricting legislatures will . . . almost always be aware of racial demographics." *Miller*, 515 U.S. at 916. Here, the official atlas from the mapmaker to the legislators provides no numerical data besides race. It is a strong indication that rather than merely considering racial data "only after" drawing the enacted map, *Alexander*, 602 U.S. at 22, Mitchell was conscious of race all along and considered it among the most important factors in the new map.

It also shows what information was available to the legislature before it voted. The legislators would not know the political party breakdown of any district based on the official atlas. Ex. 190. But on every page but the cover of the official atlas of the proposed maps included racial data. *Id.*

### C. Indirect Evidence—Dr. Trende's analysis and alternative maps—confirms that race was a predominant factor for CD 13.

Indirect evidence also supports Plaintiffs' claim. Indirect evidence of racial motivation may come from the "impact of the official action[—]whether it 'bears more heavily on one race than another.'" *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)). Expert analysis highlights the impact the redistricting had on Latino voters.

Expert testimony by Dr. Sean Trende confirms the legislators' and Mitchell's admissions. In analyzing the boundaries of Congressional Districts 5, 9, and 13, he determined their "twisted shapes cannot be explained by traditional redistricting principles, nor can they be explained by politics." Trende Report, Ex. 30 at 1. He concluded that "race predominated in drawing these lines." *Id.*

95

Figure 1: California District 13



© OpenStreetMap contributors

His analysis focuses specifically on the large northern protrusion of CD 13 into CD 9 and to a lesser extent a smaller protrusion of CD 13 into CD 5 around the cities of Modesto and Ceres. *Id.* at 5. In both instances, it appears Mitchell used racial rather than political indicators to determine the district boundaries.

First, the racial predominance in CD 13's boundaries becomes most apparent when we examine the Stockton-area northern protrusion into CD 9. The protrusion resembles an oddly shaped head with a forehead, nose, and chin. The protruding 'forehead-hat' area culminating in a straight line moving from the Northwest to the Southeast encompasses two census designated places called August and Garden Acres. The 'nose' protrusion

loosely follows some of the Stockton city limits to the East. The 'chin' extends to the Southwest to encompass Stockton Metropolitan Airport.



© OpenStreetMap contributors

The primary focus of Dr. Trende's analysis of this protrusion is around the included 'forehead-hat' areas of August and Garden Acres contrasted against the area on the West side of the protrusion containing the neighborhood of Weston Ranch that represents the nape of the figure's neck. Trende Testimony, Hearing Tr. at 19–22.

As the below map shows, the areas in August and Garden Acres that compose the 'forehead-hat' as well as the Stockton area that makes the 'nose' are either marginally Democratic or toss-up areas (as reflected by the light blue coloring in the

eastern/northeastern areas within the CD 13 border).  Trende Report, Ex. 30 at 19; Trende
Testimony, Hearing Tr. at 21.  On the other hand, the western areas excluded from CD 13
around the back of the 'head' and 'nape of the neck' are much more strongly Democratic
areas (as shown by the darker blue areas outside the CD 13 district).  Trende Report, Ex.
30 at 19; Trende Testimony, Hearing Tr. at 21.



This seems to be an unusual choice for a politically gerrymandered district as CD
13 and 9 could both be more compact and the lines simpler if the protrusion were cut shorter
to include the *more Democratic* areas on the southern side of Stockton in CD 13 rather than

branching the district out to the North and East.  Dr. Trende said of this choice, "if you are trying to draw an efficient [political] gerrymander, this is just not a natural choice to make." Trende Testimony, Hearing Tr. at 22.  In other words, Mitchell oddly included the less Democratic areas in the eastern/northeastern area but excluded the more Democratic areas in the western area in drawing CD 13.

This apparent oddity becomes clear when race is considered.  Trende Report, Ex. 30 at 19; Trende Testimony, Hearing Tr. at 21–22.  The map below shows the relevant Hispanic Citizen Voting Age Population (HCVAP), a common redistricting metric.[15] Trende Report, Ex. 30 at 20.  It shows that there are heavily Hispanic areas included in the marginally Democratic 'forehead-hat' while the heavily Democratic area to the West of the 'head-neck' is one of the least Hispanic areas of Stockton.  Trende Testimony, Hearing Tr. at 21–22.  Put another way, CD 13 includes the less Democratic but more Latino areas in the east/northeast but excludes the less Latino but more Democratic area in the west.  These district lines would not be ideal if political gerrymandering were the goal, but they neatly reflect racial gerrymandering to create a Latino district in the 52 to 54 percent HCVAP range to ensure a Latino-preferred congressional representative as advocated for in the HOPE letter which Mitchell cited.  Paul Mitchell statement on HOPE Zoom meeting, Ex. 11 at 24; Letter, Ex 12 at 4.

---

[15] In the Ninth Circuit, the relevant metric for determining minority population in redistricting cases is citizen voting age population (CVAP) rather than mere voting age population (VAP).  *Romero v. City of Pomona*, 883 F.2d 1418, 1425–26 (9th Cir. 1989), *abrogated on other grounds by Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1363 (9th Cir. 1990) (en banc).



© OpenStreetMap contributors

The same result can be seen when considering Hispanic Voting Age Population (HVAP) rather than HCVAP as the below map shows.  Trende Report, Ex. 30 at 21.



© OpenStreetMap contributors

Rather than drawing lines to capture the most Democratic areas nearest to CD 13, the Prop. 50 map veers deep into and past the City of Stockton to capture the most Hispanic areas, even though those areas are politically marginal. *Id.* Describing this odd decision, Dr. Trende told the Court, "the low areas of Hispanic Citizen voting age population here get bypassed, the overwhelmingly Hispanic areas . . . get included." Trende Testimony, Hearing Tr. at 23. He said that this odd configuration "looks like an X-Acto knife job to me." *Id.* at 24.

We see a similar (though less pronounced) emphasis on race over partisan considerations when we look at the Modesto and Ceres areas where CD 13 protrudes into

CD 5 in a shape that again resembles a face with a forehead, nose, and chin.  Trende Report, Ex. 30 at 11.



© OpenStreetMap contributors

This protrusion is unusual if the goal were to make a more Democratic CD 13 because the face-shaped protrusion captures Republican-leaning areas in Ceres while the map forgoes Democratic-majority areas in Modesto.  This is best seen again in maps.  In the below figure, the political leaning of areas is shown with blue-purple areas indicating Democratic Party support and red-pink areas reflecting Republican Party support.  *Id.* at 13.

Figure 9: Modesto/Ceres Area, By Politics and Precinct



The odd protrusion appears to better align with racial than political factors. We look first to these areas as distinguished by HCVAP.



This map shows, particularly in the nose and chin areas of the protrusion, an effort to capture Latino residents while avoiding the Democratic but non-Latino areas on the north side of Modesto. *Id.* at 14. This intention becomes even more stark when we examine the areas' Hispanic voting age population (HVAP) rather than the HCVAP. *Id.* at 15.



In sum, race appears to predominate in the choice of these boundaries.

To underscore that race predominated in the drawing of CD 13, Dr. Trende offered three alternative maps that increase Democratic performance in CD 13 but decrease the district's HCVAP.  Trende Report, Ex. 30 at 22–27.  Prop. 50's CD 13 HCVAP is estimated at 53.8%.  *Id.* at 23.  The HCVAP in Demonstration Maps A, B, and C is 51.3%, 48.9%, and 48.1%, respectively.  *Id.* at 23, 25, 27.  While these reductions may seem relatively small, they are crucial because they move CD 13 below the ideal range of 52–54% HCVAP identified in the 2021 HOPE letter that Mitchell cited in his 2025 presentation.  Paul Mitchell statement on HOPE Zoom meeting, Ex. 11 at 24; Letter, Ex. 12 at 4.  Put differently, the reduction in HCVAP below the 52–54% range means it lowers the likelihood that the district would elect a Latino-preferred candidate.

Each alternative map also scores higher on the Polsby-Popper metric of compactness. Trende Report, Ex. 30 at 23, 25, 27. These maps show that Mitchell and the legislature could have "drawn a different map with greater racial balance" if they were "sincerely driven by [their] professed partisan goals." *Alexander*, 602 U.S. at 10.

Defendants' experts dismiss these findings and alternative maps. The majority agrees, arguing first that we must consider each district as a whole and "not divorce any portion of the lines . . . from the rest of the district." *Bethune-Hill*, 580 U.S. at 191–92. The majority correctly notes that racial gerrymandering "may be evident in a notable way in a particular part of a district. It follows that a court may consider evidence regarding certain portions of a district's lines." *Id.* at 192. The majority then cites caselaw that supports rather than counters a finding of racial gerrymandering here. "The ultimate object of the inquiry, however, is the [State's] predominant motive for the design of the district as a whole. . . . [R]elevant districtwide evidence [may include] the use of an express racial target. A holistic analysis is necessary to give that kind of evidence its proper weight." *Id.*

The HOPE Letter specifies a racial target of 52–54% HCVAP to ensure that the district would elect a Latino-preferred candidate. Ex. 12 at 4. Prop. 50's CD 13 meets that target perfectly. Trende Report, Ex. 30 at 23, 25, 27. Dr. Trende's more compact and more Democratic demonstration districts do not meet that target range. *Id.* Mitchell chose to draw the map as if with an "X-Acto knife" to satisfy the ideal 52–54% range that would likely result in a Latino representative. Trende Testimony, Hearing Tr. at 24.

      1.  <u>Keeping more Democratic voters in nearby CD 9 and CD 5 at the expense of CD 13 would not appreciably help the Democratic candidates there.</u>

Defendants' experts concede that more Democratic voters could have been included in CD 13 but respond that Mitchell could have decided to shore up CD 9 as a Democratic seat without harming CD 13. Grofman Report, Ex. 184 at 14; Rodden Report, Ex. 207 at 23. They dispute Trende's conclusion that CD 9 is safely Democratic and argue that taking

away Democratic voters from CD 9 or CD 5 to benefit CD 13 would endanger those two districts.  Grofman Report, Ex. 184 at 14; Rodden Report, Ex.  207 at 23.

In his rebuttal report, Dr. Trende persuasively counters these concerns.  Doc. 143-8 at 16.  He acknowledges that "redistricting is an exercise in robbing Peter to pay Paul."  *Id.* But in the Prop. 50 maps, "District 9 is made substantially more Democratic."  *Id.* So much so that "Cook Political now rates it as 'Solid Democrat'" (from Lean Democrat in the 2021 map).  *Id.*  As Dr. Trende explains, "District 9 doesn't need the heavily Democratic White areas in Stockton to perform well.   But they would help District 13.   In all three Demonstration maps, District 9 remains more Democratic than it was in the Commission Map, it remains more Democratic than District 13 was in the Commission Map, and it remains more Democratic than District 13 in the Assembly Map."  *Id.*

CD 5, on the other hand, is one of the 'packed' Republican districts that becomes even more Republican in this redistricting.   Trende Testimony, Hearing Tr. at 98–99.  A mapmaker would thus have no political incentive to leave Democratic votes in CD 5 when they could be used to shore up CD 13.  *See id.*

Defendants' experts also fall short of persuasively disputing Dr. Trende's alternative maps.  He continues to show that Prop. 50 could have conducted a more efficient partisan gerrymander if it discarded racial priorities in drawing its lines.  Trende Report, Ex. 30 at 22–27.  Citing the Defendants' experts, the majority speculates that moving voters from one district affects the neighboring districts and may reflect a "strategic partisan decision." Majority at 49.  But none of the experts spoke to Mitchell and thus have no clue what motivated him in drawing the district lines.  Perhaps Mitchell could have explained that strategy to us.  But without his testimony, there is little evidence these specific lines were based on anything but race.

2. <u>The Prop 50 map did not consider Communities of Interest in Stockton,
contrary to Defendants' experts' assertions.</u>

Defendants' experts also critique Dr. Trende's Alternative Map A because it splits a supposed community of interest in Stockton. Rodden Testimony, Hearing Tr. at 362, 366; Ruiz-Houston Testimony, Hearing Tr. at 420–21. In doing so, they try to justify the Proposition 50 lines dividing Stockton. Rodden Testimony, Hearing Tr. at 362, 366; Ruiz-Houston Testimony, Hearing Tr. at 420–21. They cite socio-economic, educational, and density differences. Ruiz-Houston Testimony, Hearing Tr. at 420–21.

But there is no evidence that Mitchell considered these communities of interest, and the Proposition 50 lines do not follow cleanly along those community boundaries. *See* Trende Rebuttal, Doc. 143-8 at 21. Dr. Trende found it:

> obvious that the Assembly Map does not, in fact, adhere to the socioeconomic boundaries [Defendants] describe[]. Second, there's no real evidence that the mapmaker would be particularly motivated by the difference between a tract with say 71% high school education and 74% high school education. . . . Third, and most importantly, if these were, in fact, important communities of interest, rather than an attempted post-hoc rationalization, one assumes that they would be included in the map drawn by an independent body laboring under a demand that communities of interest be kept together, and not knitted together via legislation that suspended that requirement.

*Id.*

This speculative and post-hoc justification of communities of interest seems implausible. What's more, Defendants' own case cuts against their communities of interest argument. They claim this was a partisan gerrymander motivated by partisan goals over other redistricting criteria. State Defendants' Opp. to PI, Doc. 113 at 2; DCCC's Opp. to PI, Doc. 112 at 13. But the other considerations the legislators and Mitchell cited often point to race, not vague socio-economic or educational communities of interest. *See* Rivas Press Release, Aug. 15, 2025, Ex. 20 at 1 ("The new map retains . . . both historic Black districts and Latino-majority districts."); Paul Mitchell statement on HOPE Zoom meeting, Ex. 11 at 30 ("[The Prop. 50 maps] ensure that the Latino districts that are the VRA seats

are bolstered in order to make them most effective, particularly in the Central Valley."); Atlas of Prop. 50 Maps, Ex. 190.  Where the legislature and Mitchell do tend to agree is in not splitting cities.  Mitchell Capitol Weekly Podcast Tr., Aug. 15, 2025, Ex. 10 at 23–24 ("We were focused a lot on reducing the city splits."); Senator McGuire Floor Remarks Cal. State Senate, Aug. 18, 2025, Ex. 4 at 112 ("There are fewer city splits in the maps that will be in front of us on Thursday than there are in the [Commission map]."); Rivas Press Release, Aug. 15, 2025, Ex. 20 at 1 ("The proposed Congressional map keeps more cities whole within a single district than the most recent map enacted by the commission.").  But the Prop. 50 map splits not only Stockton, but also August and Garden Acres.  Trende Testimony, Hearing Tr. at 75.  Defendants claim that in favor of actual cities, the map protects vague communities of interest that happen to align perfectly with race.  This contradicts their own criterion and common sense.

     3.   The split of the city of Tracy in Alternative Maps B and C is immaterial, according to Mitchell's own redistricting principles.

Dr. Rodden highlights that Dr. Trende's Alternative Maps B and C split the city of Tracy.[16]  Rodden Report, Ex. 207 at 28.  Defendants and the majority say that this presents complications to a partisan gerrymander as the District 9 incumbent, Democrat Josh Harder, lives in Tracy.  *Id.*  He merits particular protection, they claim, because Harder outperformed Vice President Harris in the 2024 election.  Courage Campaign Presentation, Ex. 523 at 10.

The problem is that Mitchell explicitly disclaimed incumbent protection.  Mitchell Executive Committee Presentation, Ex. 528 at 102 ("this is not an incumbent preference gerrymander").  This also conforms to Mitchell's usual practice.  He told the Capitol Weekly Podcast, "I would say to [clients] beforehand, do not tell me where your

---

[16] This argument also does not address Trende's Alternative Map A which does not split Tracy.

incumbents live.  I will not meet with your incumbents to . . . draw whatever they want in their district."  Ex. 10 at 7–8. Despite Mitchell's double express disclaimer, Defendants oddly insist that this explanation alone undermines Dr. Trende's maps B and C.

In any event, preserving Tracy in its entirety weakens the primary express goal of a partisan gerrymander.  Even if Tracy were split, CD 9 under the new map would be a safer Democratic seat than CD 13 in the new map and safer than its previous composition under the Commission map.  Trende Rebuttal Report, Doc. 143-8 at 16.  It stretches credulity to assume that Mitchell would embrace a priority he disclaims while rejecting a priority he explicitly acknowledged.  Mitchell Statement on Hope Zoom Meeting, Ex. 11 at 30 ("[These maps] ensure that the Latino districts that are the VRA seats are bolstered in order to make them most effective, particularly in the Central Valley.").

### 4.  Mr. Fairfax's error and concession that Dr. Trende's alternative maps are superior to the Prop. 50 map.

The majority relegates to a footnote Mr. Fairfax's allegations that Dr. Trende's alternative maps "exceed the generally accepted overall population deviation" and "are noncontiguous."  Majority at 53 n.21; Fairfax Report, Ex. 250 at 31.  The majority does not substantively address these allegations, but I will briefly as it is apparent they result from a computer error or an honest mistake.

Dr. Trende resolved these concerns both in his rebuttal report and in his hearing testimony.  Trende Rebuttal Report, Doc. 143-8 at 22–25; Trende Testimony, Hearing Tr. at 52–55.  When Dr. Trende examined the areas and data Mr. Fairfax questioned, he found no contiguity failures that would affect the map and no meaningful population deviations.  Doc. 143-8 at 22–25; Trende Testimony, Hearing Tr. at 52–55.  In short, Mr. Fairfax's allegations appear to be the result of a mistake or an error.

Mr. Fairfax also claimed in his report that Dr. Trende's alternative maps were inferior to the Prop. 50 map based on traditional redistricting criteria.  Fairfax Report, Ex. 250.  But when pressed on cross-examination, Fairfax acknowledged that Trende's

Alternative Map A would improve Democratic party performance over the Prop. 50 map, is more compact, and splits fewer communities of interest. Fairfax Testimony, Hearing Tr. at 458–63. In sum, based on traditional redistricting principles, Dr. Trende's Alternative Maps outperform the Prop. 50 map while also delivering a better partisan advantage to the Democrats.

### 5. Dr. Rodden's preference for "dot density" maps misses the point.

Dr. Rodden tried to poke holes by critiquing Dr. Trende's use of choropleth rather than dot density maps as lacking specificity or driven by "measurement error." Rodden Report, Ex. 207 at 2. Trende responds to these concerns in his rebuttal report. Doc. 143-8. As he explains, dot density maps are not without their own "substantial shortcomings" like misrepresenting the actual location of voters using "'empty' space" and can "distort the ratio between groups." *Id.* at 30. These limits are why he is "unaware of anyone drawing maps primarily with dot density maps in front of them" and "[m]ost mapping programs provide choropleth maps." *Id.* Ultimately, Dr. Trende persuasively concludes that the maps are best viewed "as a map drawer might encounter" them to "probe intent." *Id.* Dr. Rodden does not directly counter Dr. Trende's findings outside of Modesto/Ceres, nor does he refute Dr. Trende's finding that politically marginal Latino areas were favored in Prop. 50's CD 13 over more strongly Democratic areas that were not as Latino.

### 6. Dr. Grofman's assertions about a 54% HCVAP target suggest a racial targeting of districts.

Finally, the majority addresses the overall change in CD 13's HCVAP from the Commission map to the Prop. 50 map. The parties acknowledge that the change is small. Grofman Report, Ex. 184 at 12; Trende Testimony, Hearing Tr. at 35. CD 13's HCVAP under the Commission map was 54%, and under the Prop. 50 map, it is estimated at 53.8%. Ex. 184 at 12; Hearing Tr. at 35. The parties also agree that substantial changes were made to CD 13 to make it about 3% more politically advantageous to Democrats. *See* Trende

Report, Ex. 194 at 6; Hearing Tr. at 58.  The experts show that major changes were made to CD 13's boundaries to lead to that result.  Rodden Report, Ex. 207 at 1.

That the district could change so drastically politically and geographically yet by such a small HCVAP is surprising.  Dr. Trende said that this may reveal "a racial target" before walking that back.  Trende Testimony, Hearing Tr. at 37–38, 92.

But these allegations of a racial target are particularly salient when considering that the ultimate result of a 53.8% HCVAP aligns exactly with the recommended HCVAP range in the 2021 HOPE letter from which Mitchell read on the HOPE broadcast discussing Prop. 50's map and its advantages for Latinos.  Ex. 12 at 4 ("If these districts were between 52% and 54% Latino CVAP, for instance, they would still be very likely to elect Latino candidates of choice."); Paul Mitchell statement on HOPE Zoom meeting, Ex. 11 at 24. After such profound change to CD 13, it is remarkable that the HCVAP would only change by two-tenths of a percentage point.  That this small change perfectly aligns with a suggested HCVAP target cited by Mitchell is a bridge too far and suggests an unlawful racial target. *See Bethune-Hill*, 580 U.S. at 183–85.

In sum, the direct and indirect evidence at this juncture is overwhelming.  Plaintiffs are likely to prevail on the merits of their racial gerrymandering claim at least for CD 13.

## II.    The remaining preliminary injunction factors also favor Plaintiffs.

Not only are Plaintiffs likely to prevail on the merits, the remaining factors of irreparable harm, balance of equities, and public interest favor them. *Winter*, 555 U.S. at 20; *Nken*, 556 U.S. at 435.

When a plaintiff alleges a constitutional violation and "shows he is likely to prevail on the merits, that showing usually demonstrates he is suffering irreparable harm no matter how brief the violation." *Baird*, 81 F.4th at 1040; *see Planned Parenthood Ariz., Inc. v. Humble*, 753 F.3d 905, 911 (9th Cir. 2014), *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022).  Here, the Fourteenth Amendment

claim at issue is fundamental to our republic and what it means to be a citizen on equal footing with one's neighbor. Plaintiffs have proven they will be irreparably harmed by the continuation of California's racially gerrymandered district.

And when a plaintiff in a constitutional case proves he is likely to succeed on the merits, it "also tips the public interest sharply in his favor because it is 'always in the public interest to prevent the violation of a party's constitutional rights.'" *Baird*, 81 F.4th at 1040 (quoting *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 731 (9th Cir. 2022)). Further, when "a movant makes a sufficient demonstration of all" the "*Winter* factors . . . a court must not shrink from its obligation to enforce his constitutional rights." *Baird*, 81 F.4th at 1041 (quoting *Porretti v. Dzurenda*, 11 F.4th 1037, 1047 (9th Cir. 2021) (cleaned up)).

Finally, if we consider the *Purcell* principle under the balance of equities prong, I believe that *Purcell* does not foreclose judicial relief. *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006).

The only election-related deadline that has passed is the December 19 date when individuals could begin collecting 1,714 signatures to qualify to appear on primary ballots without having to pay a filing fee of $1,740.[17] That deadline does not shut the door to judicial review. First, candidates can pay the fairly modest filing fee rather than collect signatures. Second, candidates still have until February 4, 2026, to collect and submit 1,714 signatures—not an insurmountable task. Third, Defendants essentially conceded that the December 19 date does not preclude judicial review as they sought a preliminary injunction hearing on January 20, 2026. Doc. 75. Finally, any judicial decision about

---

[17] California Secretary of State, Qualifications for Running for Office in 2026, June 2, 2026 Primary Election, United States Representative in Congress, https://www.sos.ca.gov/elections/upcoming-elections/primary-election-june-2-2026/qualifications (last visited Jan. 5, 2026).

Proposition 50 after December 19 is unlikely to confuse voters or cause any "incentive to remain away from the polls." *Purcell*, 549 U.S. at 5.

The more significant *Purcell* deadline is February 4, 2026, which starts a month-long period when the candidates can begin filing their paperwork declaring their candidacy in the appropriate district. Our decision today allows sufficient time for candidates to select their district and submit their paperwork as well as to seek expedited review from the Supreme Court. In contrast, the Fifth Circuit's opinion in the Texas redistricting case was issued when the candidacy period had begun and was about to close. *See Abbott v. League of United Latin Am. Citizens*, 607 U.S. ___ (2025) (slip op. at 2).

Another factor favoring Plaintiffs is that they are not to blame for the delay. They sued the day after the Proposition 50 election. Plaintiff's Complaint, Doc. 1. Throughout this process, they have sought to expedite where Defendants have wanted delay. Defendants' Application for Relief From P.I. Schedule, Doc. 71; Plaintiff's Opp. to Relief, Doc. 75. Plaintiffs should not be punished when they acted as quickly as possible. *Cf. Benisek v. Lamone*, 585 U.S. 155, 159 (2018) ("In considering the balance of equities . . ., we think that plaintiffs' unnecessary, years-long delay in asking for preliminary injunctive relief weighed against their request.").

**III.    The Supreme Court's order in *Abbott v. LULAC* is distinguishable.**

I also want to address the elephant in the room: The Supreme Court stayed the district court panel's decision preliminarily enjoining Texas' redistricting map that potentially added five more Republican seats. Why does that Supreme Court order not control here?

The Court offered two reasons why the Texas district court panel erred—and those two reasons confirm that California should lose here.

First, the Court held that the district court "failed to honor the presumption of legislative good faith by construing ambiguous direct and circumstantial evidence against

114

the legislature." *Abbott v. LULAC*, 807 U.S. ___ (2025) (slip op. at 1). In Texas, the mapmaker testified that he did *not* consider race in drawing the congressional redistricting map and that he only wanted to create more Republican seats. *LULAC v. Abbott*, 2025 U.S. Dist. LEXIS 227737, at *96–*99 (W.D. Tex. Nov. 18, 2025). But the district court panel majority discounted the mapmaker's testimony and instead credited the statements by the U.S. Department of Justice asserting that Texas' racial "coalition" districts were unlawful. Given this conflicting evidence, the district court erred by taking sides and not honoring the presumption of good faith by Texas.

In contrast here, we do not face "ambiguous" evidence about the intent of the state in devising CD 13. California's mapmaker publicly declared that he wanted to "ensure that the Latino districts . . . are bolstered in order to make them most effective, particularly in the Central Valley." Mitchell Statement on Hope Zoom Meeting, Ex. 11 at 30. California did not offer any witness—whether it be Mitchell or any state legislator—who could say that race was not a predominant factor in crafting CD 13. Given this one-sided record, this court should have held that Plaintiffs rebutted the presumption of good faith and that California had engaged in racial gerrymandering.

Second, the Supreme Court noted that the plaintiffs in Texas had not "produce[d] a viable alternative map that met the State's avowedly partisan goals." *Abbott v. LULAC*, 807 U.S. ___ (slip op. at 1–2). In our case, however, Dr. Trende provided three alternative maps that strengthened the Democratic tilt of CD 13, despite lowering the HCVAP range below the 52–54% band that Mitchell set as a benchmark.

We are defying the rationale of the Supreme Court's order in *Abbott v. LULAC* by refusing to enjoin California's racially gerrymandered map.

## IV.    The proper remedy is to enjoin California's 2025 map.

This court has two potential remedies. It can either adjust the Proposition 50 lines to resolve Plaintiffs' racial gerrymandering complaints, or it can enjoin the entire

Proposition 50 and revert to the 2021 Commission map unless or until the California legislature can enact a constitutionally legitimate map.

I believe the first option is beyond the judicial power of this court. Courts have a limited role in redistricting because it "is an inescapably political enterprise." *Alexander*, 602 U.S. at 6. As discussed above, we would have to consider factors such as political party affiliation, incumbent protection, city limits, compactness, communities of interest, and other inherently political factors in drawing district lines. Courts simply cannot make such highly political decisions.

The jurisprudentially minimalist and more traditional approach is enjoining the Proposition 50 map entirely. True, Plaintiffs at this stage have only shown that only CD 13 is likely constitutionally suspect. And enjoining the map might seem like a blunt remedy. But as Defendants' expert, Mr. Fairfax, explained, one cannot change one district's lines without causing a domino effect requiring changes in almost every other district. Fairfax Testimony, Hearing Tr. at 444. The state of California thus must go back to the drawing board and draw its districts consistent with the Constitution. In the meantime, we should return to the status quo before the Proposition 50 map—the 2021 Commission map.

## Conclusion

The Democratic supermajority in the California state legislature wanted to curry favor with Latino groups and voters—and to prevent Latino voters from drifting away from the party. One way to do that was to accede to Latino organizations' request for Latino-majority congressional districts. Paul Mitchell's public statements confirm that race was a predominant factor in devising Congressional District No. 13. We should accept the state's mapmaker's own words at face value when he said that he wanted to bolster a majority Latino district in the Central Valley.

116

But our Constitution does not allow the government to engage in such a racial spoils system.  Race-based policies "'embody stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts—their very worth as citizens—according to a criterion barred to the Government by history and the Constitution.'"  *Miller*, 515 U.S. at 912 (quoting *Metro Broad. v. FCC*, 497 U.S. 547, 604 (1990) (O'Connor, J., dissenting)).  And if "our society is to continue to progress as a multiracial democracy, it must recognize that the automatic invocation of race stereotypes retards that progress and causes continued hurt and injury."  *Id.* at 927 (quoting *Edmonson v. Leesville Concrete Co.*, 500 U.S.614, 630–31 (1991)).

This court should have acted to prevent California from following an unlawful path that will inevitably sow racial divisions and upset the melting pot that makes California great.  I respectfully dissent.

117