Lalitha D. Madduri (CA Bar No. 301236)
lmadduri@elias.law
Christopher D. Dodge* (DC Bar No. 90011587)
cdodge@elias.law
Max Accardi* (DC Bar No. 90021259)
maccardi@elias.law
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652
F: (202) 968-4498

Abha Khanna* (WA Bar No. 42612)
akhanna@elias.law
Tyler L. Bishop (CA Bar No. 337546)
tbishop@elias.law
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
T: (206) 656-0177
F: (206) 656-0180

Omar Qureshi (CA Bar No. 323493)
omar@qureshi.law
Max Schoening (CA Bar No. 324643)
max@qureshi.law
**QURESHI LAW PC**
700 Flower Street, Suite 1000
Los Angeles, CA 90017
T: (213) 600-6096
F: (213) 277-8989

*Counsel for Defendant-Intervenor DCCC*

*\* Admitted pro hac vice*

1
2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

3

4   **DAVID TANGIPA,** *et al.*,

5                                          Plaintiffs,

6       and

7

8   **UNITED STATES OF AMERICA,**

9                                 Plaintiff-Intervenor,

10      **v.**

11  **GAVIN NEWSOM, in his official**
12  **capacity as the Governor of California,**
    *et al.*,

13                                          Defendants,

14

15      and

16  **DCCC,**

17                                 Defendant-Intervenor,

18      and

19

20  **LEAGUE UNITED LATIN AM.**
    **CITIZENS,**

21                                 Defendant-Intervenor.

22

2:25-cv-10616-JLS-WLH-KKL
Three-Judge Court

**DEFENDANT-INTERVENOR**
**DCCC'S MOTION TO DISMISS**

Hearing date: April 10, 2026

Time: 10:30 a.m.

Courtroom: 8A

23
24
25
26
27
28

## **DEFENDANT-INTERVENOR DCCC'S MOTION TO DISMISS**

Defendant-Intervenor DCCC hereby moves the Court to dismiss Plaintiffs' complaint and Plaintiff-Intervenor's complaint-in-intervention, ECF Nos. 1, 42. In support of its motion, DCCC submits and incorporates the attached Memorandum of Points and Authorities. Pursuant to Local Rule 7-3, counsel for DCCC conferred with counsel for Plaintiffs and Plaintiff-Intervenor on February 7, 2026. Plaintiffs and Plaintiff-Intervenor informed DCCC that they oppose DCCC's motion.

1

Dated: February 11, 2026

Respectfully submitted,

2

*/s/ Lalitha D. Madduri*
Lalitha D. Madduri (CA Bar No. 301236)
Christopher D. Dodge* (DC Bar No. 90011587)
Max Accardi* (DC Bar No. 90021259)
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652
F: (202) 968-4498
lmadduri@elias.law
cdodge@elias.law
maccardi@elias.law

Abha Khanna* (WA Bar No. 42612)
Tyler L. Bishop (CA Bar No. 337546)
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
T: (206) 656-0177
akhanna@elias.law
tbishop@elias.law

Omar Qureshi (CA Bar No. 323493)
Max Schoening (CA Bar No. 324643)
**QURESHI LAW PC**
700 Flower Street, Suite 1000
Los Angeles, CA 90017
T: (213) 600-6096
omar@qureshi.law
max@qureshi.law

*Counsel for Defendant-Intervenor DCCC*

* *Admitted pro hac vice*

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..........................................................................iv

MEMORANDUM OF POINTS AND AUTHORITIES...............................1

BACKGROUND .........................................................................................3

LEGAL STANDARD...................................................................................6

ARGUMENT................................................................................................6

I.  Plaintiffs' racial gerrymandering claims directed to the entire Prop
50 map must be dismissed as a matter of law...............................6

A.  Both complaints impermissibly plead racial gerrymandering
claims against the Prop 50 map as an undifferentiated whole..........7

B.  Neither complaint advances *any* allegations about the intent
of the California electorate. ........................................................9

C.  The complaints do not plausibly allege any direct evidence of
discriminatory intent attributable to any state actor. ..................10

D.  The complaints also fail to plausibly allege any circumstantial
evidence of racial predominance as to fifteen challenged
districts. ......................................................................................12

II.  The claims directed at CD-13 should be dismissed because they do
not allege facts permitting an inference of racial predominance...............12

A.  The complaints fail to plausibly allege direct evidence of
racial predominance in the adoption of CD-13. ...........................13

B.  The circumstantial evidence alleged as to CD-13 fails to
support a plausible inference of racial predominance. .................15

III.  The United States' VRA claim should be also dismissed. .......................20

CONCLUSION............................................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Abbott v. Perez,*
    585 U.S. 579 (2018) ................................................................. 7, 13

*Alexander v. S.C. State Conf. of the NAACP,*
    602 U.S. 1 (2024) .................................................................... *passim*

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ......................................................... 6, 19, 20

*Baidan v. Shull,*
    No. 24-CV-03171-VKD, 2025 WL 267348 (N.D. Cal. Jan. 22, 2025) .............. 15

*City of Baton Rouge/E. Baton Rouge Par. v. Bank of Am., N.A.,*
    No. 19-CV-725-SDD-RLB, 2021 WL 1201664 (M.D. La. Mar. 30, 2021) ........ 15

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ................................................................ *passim*

*Bethune-Hill v. Va. State Bd. of Elections,*
    580 U.S. 178 (2017) ................................................................ *passim*

*Ala. Legis. Black Caucus v. Alabama,*
    575 U.S. 254 (2015) ......................................................... 1, 7, 14, 19

*Bravo v. Neff,*
    No. 5:24-CV-2458-PA-RAO, 2025 WL 2005483 (C.D. Cal. July 3, 2025) ......... 5

*Cooke v. Corp. of the President of the Church of Jesus Christ of Latter Day
    Saints,*
    395 F. App'x 367 (9th Cir. 2010) .................................................. 10

*Cooper v. Harris,*
    581 U.S. 285 (2017) ...................................................................... 13

*Coto Settlement v. Eisenberg,*
    593 F.3d 1031 (9th Cir. 2010) ........................................................ 3

*Cox v. Ass'n of Or. Corr. Emps., Inc.,*
    No. 24-2763, 2025 WL 1077133 (9th Cir. Apr. 10, 2025) ..................... 11

*Cubanos Pa 'lante v. Fla. House of Representatives,*
    766 F. Supp. 3d 1204 (S.D. Fla. 2025) ........................................ *passim*

iv

*Darling v. Eddy,*
No. 9:21-CV-00147-DLC, 2023 WL 157712 (D. Mont. Jan. 11, 2023) ............ 14

*Easley v. Cromartie,*
532 U.S. 234 (2001) ...................................................................... 11

*Fisher v. Ramirez-Palmer,*
219 F. Supp. 2d 1076 (E.D. Cal. 2002) ................................................ 5

*Gill v. Whitford,*
585 U.S. 48 (2018) .................................................................*passim*

*Hollingsworth v. Perry,*
570 U.S. 693 (2013) ...................................................................... 9

*Hunter v. Underwood,*
471 U.S. 222 (1985) .................................................................... 20

*In re Century Aluminum Co. Sec. Litig.,*
729 F.3d 1104 (9th Cir. 2013) ................................................... 18, 19

*Jackson v. Tarrant County,*
No. 25-11055, 2025 WL 3019284 (5th Cir. Oct. 29, 2025) ..................... 18

*Karcher v. Daggett,*
462 U.S. 725 (1983) .................................................................... 11

*Miller v. Johnson,*
515 U.S. 900 (1995) ..............................................................2, 7, 11

*N.C. State Conf. of NAACP v. McCrory,*
831 F.3d 204 (4th Cir. 2016) ......................................................... 20

*Navarro v. Block,*
250 F.3d 729 (9th Cir. 2001) ........................................................... 6

*Old Person v. Cooney,*
230 F.3d 1113 (9th Cir. 2000) ....................................................... 20

*Puma SE v. Forever 21, Inc.,*
No. CV17-2523 PSG EX, 2017 WL 4771004 (C.D. Cal. June 29, 2017) ........... 17

*Redlands Country Club Inc. v. Cont'l Cas. Co.,*
No. 10-CV-1905-GAF-DTBX, 2011 WL 13224843 (C.D. Cal. Jan. 28, 2011) ............................................................................ 18

*Rivera v. Patel*,
  No. 16-CV-00304-PJH, 2016 WL 3566949 (N.D. Cal. July 1, 2016) ................ 17

*Rodriguez v. Ford Motor Co.*,
  722 F. Supp. 3d 1104 (S.D. Cal. 2024) .................................................... 4

*Singh v. City of New York*,
  No. 19-CV-5030 (PKC) (RER), 2020 WL 5752157 (E.D.N.Y. Sep. 24,
  2020) ......................................................................................................... 15

*U.S. Bank, N.A. v. Queen Victoria #1720-104 NV W. Servicing LLC*,
  No. 2:13-CV-01679-GMN-NJK, 2015 WL 419836 (D. Nev. Jan. 5, 2015) ....... 17

*United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*,
  707 F.3d 451 (4th Cir. 2013) ................................................................... 17

*Watson v. Crumbl LLC*,
  736 F. Supp. 3d 827 (E.D. Cal. 2024) ...................................................... 4

**State Constitution**

Cal. Const. art. II, § 1 ............................................................................ 9

**Federal Rules**

Fed. R. Civ. P. 12(b)(6) ........................................................................... 6

**Other Authorities**

Assemb. B. 604, 2025-26 Reg. Sess. (Cal. 2025) .......................................... 14

*Bill Votes: AB-604 Redistricting: congressional districts*, Cal. Legis. Info (last
  updated Aug. 21, 2025), https://perma.cc/3FT9-X5A8 ........................... 4

*Bill Votes: ACA-8 Congressional Redistricting*, Cal. Legis. Info. (last updated
  Aug. 21, 2025), https://perma.cc/9ZH4-3LET ...................................... 4

*Bill Votes: SB-280 Elections*, Cal Legis. Info. (last updated Aug. 21, 2025),
  https://perma.cc/G5AR-ALJR ................................................................ 4

Brief for the United States, *Tangipa v. Newsom*, No. 25A839 (U.S. Jan. 22, 2026) ....... 9

Cal Poly Pomona & CalTech, *Proposition 50: Projected Impacts on Latino
  Voting Power* (Oct. 2025), https://perma.cc/N779-E7C5 ...................... 16

*Game Rules*, State of Cal. Dep't of Just. (last visited Feb. 11, 2026),
  https://perma.cc/K3G5-2MQJ ............................................................... 14

*Official Declaration of the Vote Results on State Ballot Measure*, Cal. Sec'y of
    State (last visited Feb. 11, 2026), https://perma.cc/H5D4-ZLZ3 .......................... 5

Order Denying Application for Writ of Injunction Pending Appeal, *Tangipa v.
    Newsom*, No. 25A839 (U.S. Feb. 4, 2026) ............................................................ 6

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

This Court has already spotted the many deficiencies that plague the racial gerrymandering claims in this case. *See generally* Prelim. Inj. Order, ECF No. 216 ("PI Order"). But those deficiencies are not mere failures of proof—they are fundamental shortcomings with the legal and factual scaffolding upon which the Plaintiffs have pled their claims. Accordingly, DCCC respectfully moves to dismiss both complaints in full. *See* Compl., ECF No. 1 ("CAGOP Compl."); United States' Compl. in Intervention, ECF No. 42 ("U.S. Compl.").[1]

To start, both CAGOP and the United States have challenged California's new congressional map as a whole. *See, e.g.*, CAGOP Compl. at 24 (seeking relief against the "Proposition 50 maps"); U.S. Compl. at 16 (similar). But the Supreme Court has repeatedly made clear that racial gerrymandering plaintiffs cannot challenge a legislative map as "an undifferentiated whole," but instead must proceed "district-by-district." *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 262, 264 (2015). Simply put, Plaintiffs "cannot sue to invalidate the whole State's . . . districting map." *Gill v. Whitford*, 585 U.S. 48, 66 (2018). And while CAGOP half-heartedly attempts to identify sixteen challenged districts, *see* CAGOP Compl. ¶ 70, it fails to allege *anything* about fifteen of those districts. Accordingly, the Court should dismiss all of Plaintiffs' claims to the extent they do not challenge a specific district—which is to say every single claim excepting CAGOP's Count III. *See* CAGOP Compl. ¶¶ 120–26.

Plaintiffs' overbroad assault on California's congressional map fails for other reasons too. This Court has already held that, as a matter of law, "whether race predominated in the minds of the voters" is a critical aspect of whether California's new map is a racial gerrymander. PI Order at 14. Yet neither complaint makes a single allegation about the intent of the California electorate or alleges that the Prop 50

---

[1] For purposes of this motion, "CAGOP" refers collectively to the original plaintiffs in this case. *See* CAGOP Compl. ¶¶ 6–25. The term "Plaintiffs" refers collectively to the CAGOP Plaintiffs, as well as the United States.

1

referendum was somehow tainted by racial considerations. Accordingly, allegations about a critical source of direct evidence are totally absent from the complaints, which alone warrants dismissal. That shortcoming is made all the more glaring because Plaintiffs' allegations about the next most relevant state actors—California's legislators—are paltry. The isolated soundbites collected in the complaints reflect boilerplate puffery, or irrelevant observations about actions taken in *other states*. None supply a plausible inference that "race for its own sake,"—rather than partisan gain or other redistricting principles—"was the legislature's dominant and controlling rationale in drawing its district lines." *Miller v. Johnson*, 515 U.S. 900, 913 (1995). That is particularly so given the "starting presumption that the legislature acted in good faith." *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 10 (2024). Plaintiffs cannot overcome this failure to plead facts supplying direct evidence of racial intent by shoehorning in statements from mapmaker Paul Mitchell—neither complaint offers *any* basis for treating him as a "relevant state actor." *Id.* at 8. In fact, CAGOP alleges the exact opposite. *See* CAGOP Compl. ¶ 50 ("The map codified by the Legislative Package was not drawn by legislators or paid for by the state of California."). Plaintiffs cannot alter this theory midstream—Rule 12 demands their allegations be well-pled in the operative pleading. And even if Mitchell's statements had any conceivable relevance, the statements cited in the complaints simply do not offer a plausible inference of racial motivation as to any specific district.

Finally, CAGOP's Count III must also be dismissed, along with any other claim construed as being directed towards CD-13 specifically. While the complaints each make fleeting reference to CD-13, those allegations are not well-pled simply because they exceed the anemic allegations made towards every other district. Plaintiffs' challenge to CD-13 suffers many of the same deficiencies as their broader claims. Most notably, neither complaint contains *any* allegations of racial motive from voters or legislators as to CD-13. Nor do they even allege that *Mitchell's* statements concern CD-13 specifically. At most, they offer half-hearted allegations about slivers of CD-13's boundaries, but

make no effort to "take account of the districtwide context" in CD-13, or explain "the design of the district as a whole." *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 192 (2017). That falls short not only of the legal requirements for stating a racial gerrymandering claim, but also basic pleading requirements, which demand well-pled facts that "nudge[] [Plaintiffs'] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). But even generously construed, Plaintiffs' complaints at most allege circumstantial evidence that is "merely consistent with" with both racial and partisan explanation explanations for the small areas in focus. *Id.* at 557. Accordingly, Plaintiffs' "complaint[s] must be dismissed." *Id.* at 570.

## **BACKGROUND**[2]

This case arises out of California's mid-decade redistricting effort, which began in response to events in Texas. *See* CAGOP Compl. ¶ 38; U.S. Compl. ¶ 42. Specifically, in August 2025, California Governor Newsom and other Democratic legislative leaders in California announced that they would "not allow [President] Trump's Republican Party to rig the system and take permanent control of the U.S. House of Representatives" through mid-decade redistricting efforts undertaken in Texas at the President's command.[3] Vowing to "fight fire with fire,"[4] these legislators introduced a three-bill legislative package to replace California's existing congressional map. *See* CAGOP Compl. ¶ 39. The stated purpose of this package was avowedly partisan. Assembly

---

[2] The Court is well familiar with the background and posture of this case. *See* PI Order at 4–12; *see also id.* at 74–77. DCCC therefore offers a brief summation based on the pleadings, the materials incorporated therein, and other public records. *See Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010) (explaining district courts "may consider materials incorporated into the complaint or matters of public record" on a Rule 12(b)(6) motion without converting the motion into one for summary judgment).

[3] Ex. 18; *see also* CAGOP Compl. ¶ 67 (incorporating this press release into the complaint). All citations to exhibits throughout this motion refer to the parties' Second Am. Joint Ex. List, ECF No. 176. DCCC relies exclusively upon exhibits that are public records or that can be fairly construed as incorporated into the complaints.

[4] Ex. 18.

3

Constitutional Amendment No. 8, which amended the California Constitution to permit mid-decade redistricting, proclaimed that "[t]he 2026 United States midterm elections for Congress must be conducted on a level playing field without an extreme and unfair advantage for Republicans." Assemb. Const. Amend. 8, 2025–26 Reg. Sess. (Cal. 2025). Accordingly, the legislative package was crafted "to neutralize the partisan gerrymandering being threatened by Republican-led states." *Id.* And it was further designed to require voter approval before going into effect. *See* CAGOP Compl. ¶ 39(c) (describing SB 280). After a contentious partisan debate, the Legislature approved the package along a party line vote, with nearly every Democratic legislator voting in favor and all Republican legislators voting against.[5]

As CAGOP's complaint concedes, the proposed congressional map included in the legislative package—the Prop 50 map—"was not drawn by legislators or paid for by the state of California." CAGOP Compl. ¶ 50. Rather, it "was drafted by Paul Mitchell of Redistricting Partners." *Id.* CAGOP's complaint does not allege that Mitchell was a state actor or that he acted at the direction of any state actor.[6] Instead, CAGOP alleges that DCCC—an organization with an indisputably partisan mission—paid for the Prop 50 map. *See id.* ¶ 51.[7] CAGOP's pleadings also quote Mitchell as saying he was

---

[5] The Court may take notice of the legislative debate and vote history on the legislative package. *See, e.g.*, *Watson v. Crumbl LLC*, 736 F. Supp. 3d 827, 838 (E.D. Cal. 2024); *Rodriguez v. Ford Motor Co.*, 722 F. Supp. 3d 1104, 1111 (S.D. Cal. 2024); *see also* PI Order at 6–7 (discussing excerpts of the debate); *Bill Votes: ACA-8 Congressional Redistricting*, Cal. Legis. Info. (last updated Aug. 21, 2025), https://perma.cc/9ZH4-3LET; *Bill Votes: AB-604 Redistricting: congressional districts*, Cal. Legis. Info (last updated Aug. 21, 2025), https://perma.cc/3FT9-X5A8; *Bill Votes: SB-280 Elections*, Cal Legis. Info. (last updated Aug. 21, 2025), https://perma.cc/G5AR-ALJR.

[6] The United States inchoately alleges that "Paul Mitchell was retained to draft new congressional maps for California" but fails to allege by whom. U.S. Compl. ¶ 41.

[7] DCCC disputes Plaintiffs' characterization of this arrangement, *see* Decl. of Julie Merz ¶ 5, ECF No. 20-1 ¶ 5, but for purposes of the present motion does not dispute that DCCC ultimately submitted a proposed map to the Legislature.

4

motivated to create "a five-district pick-up map" for Democrats, confirming the existence of an alternative partisan explanation for his choices. *Id.* ¶ 59. And there is no real dispute that Prop 50 will, in fact, add "up to 5 [Democrat] [sic] seats in the U.S. House of Representatives." U.S. Compl. ¶ 42. In contrast, CAGOP merely alleges "on information and belief" that sixteen districts within the Prop 50 map are "racial gerrymanders." CAGOP Compl. ¶ 70.

Both complaints omit any allegations regarding the public campaign that followed Prop 50's passage by the Legislature. As the Court observed in its preliminary injunction order, that absence is conspicuous. *Cf.* PI Order at 37. In any event, public records reflect the overwhelmingly partisan nature of the debate over Prop 50. For example, the Voter Information Guide published by the Secretary of State echoed the legislative purpose contained in ACA 8, while also providing arguments for and against Prop 50 that focused on its partisan motivations and implications. *See* Ex. 444 at 5.[8] Neither the arguments for or against Prop 50 suggested to voters that it would favor particular racial groups. Rather, the Guide's only mention of race—from Prop 50's *opponents*—argued that Prop 50 would *diminish*, rather than favor, representation for Latinos. *Id.* at 17.

On November 4, 2025, California voters overwhelmingly approved Prop 50. *See* CAGOP Compl. ¶ 76; U.S. Compl. ¶ 60; *see also Official Declaration of the Vote Results on State Ballot Measure*, Cal. Sec'y of State (last visited Feb. 11, 2026), https://perma.cc/H5D4-ZLZ3. CAGOP Plaintiffs filed this suit the very next day. *See* Compl. at 24. The United States filed a motion to intervene, along with a complaint in intervention, on November 13, 2025. *See* ECF No. 28.

Both CAGOP and the United States moved for preliminary injunctions. *See* ECF Nos. 15, 29. This Court held a three-day hearing where it heard testimony from nine

---

[8] The Court may take notice of public records, like those published by the Secretary of State, in this posture. *See, e.g.*, *Bravo v. Neff*, No. 5:24-CV-2458-PA-RAO, 2025 WL 2005483, at *4 (C.D. Cal. July 3, 2025); *Fisher v. Ramirez-Palmer*, 219 F. Supp. 2d 1076, 1078 n.2 (E.D. Cal. 2002).

witnesses (including six experts) and received over 500 exhibits into evidence. *See* PI Order at 2. The Court concluded that the CAGOP Plaintiffs and the United States "failed to show that racial gerrymandering occurred." *Id.* Plaintiffs, with the support of the United States, subsequently sought an injunction pending appeal from the Supreme Court. *See Tangipa v. Newsom*, No. 25A839 (U.S. Jan. 20, 2026). After briefing, the Supreme Court denied that request in a brief order without any noted dissent or concurrence. Order Denying Application for Writ of Injunction Pending Appeal, *Tangipa. v. Newsom*, No. 25A839 (U.S. Feb. 4, 2026).

## LEGAL STANDARD

A complaint must be dismissed where it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). At the motion-to-dismiss stage, the Court "must accept as true all of the allegations contained in a complaint" but need not accept the complaint's "legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. Dismissal is also required when a complaint contains "no cognizable legal theory" or fails to allege "sufficient facts . . . to support a cognizable legal theory," *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

## ARGUMENT

I.    **Plaintiffs' racial gerrymandering claims directed to the entire Prop 50 map must be dismissed as a matter of law.**

Both complaints fall far short of alleging theories or facts that would permit a plausible inference of racial gerrymandering—a claim subject to an "especially stringent" legal standard. *Alexander*, 602 U.S. at 11. To meet it, Plaintiffs must plausibly allege that California "subordinated traditional race-neutral districting principles,

6

including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations." *Miller*, 515 U.S. at 916. Plaintiffs face an uphill battle in plausibly alleging such a violation, which requires them to plead facts capable of overcoming the "presumption of legislative good faith" and the ironclad requirement to "draw the inference that cuts in the legislature's favor" when confronted with ambiguity. *Alexander*, 602 U.S. at 10. Plaintiffs must also allege facts showing racial predominance on a "district-by-district" basis, *Bethune-Hill*, 580 U.S. at 191 (quotation omitted), and allege that it was the state actors responsible for enacting specific challenged districts who had "discriminatory intent." *Abbott v. Perez*, 585 U.S. 579, 609 (2018). Plaintiffs' allegations fail at each step, and in doing so fail to offer a "cognizable legal theory" as to nearly all their claims. *See also infra* § II (addressing claims directed specifically to CD-13).

### A. Both complaints impermissibly plead racial gerrymandering claims against the Prop 50 map as an undifferentiated whole.

Plaintiffs' complaints say almost nothing about any specific district, and instead attack the Prop 50 map writ large. This is a fatal defect. As the Supreme Court has repeatedly admonished, "the basic unit of analysis for racial gerrymandering claims in general, and for the racial predominance inquiry in particular, is the district." *Bethune-Hill*, 580 U.S. at 191. Thus, a racial gerrymandering claim cannot target a map as "an undifferentiated whole," *Alabama*, 575 U.S. at 264 (emphasis omitted), or seek "to invalidate the whole State's . . . districting map," *Gill*, 585 U.S. at 66. "Racial gerrymandering claims" must "proceed 'district-by-district.'" *Bethune-Hill*, 580 U.S. at 191 (quoting *Alabama*, 575 U.S. at 262).

Plaintiffs seek to invalidate the *entire* Prop 50 map, yet neither offers any district-by-district allegations or analysis. Instead, both complaints contain scattershot allegations about the Prop 50 map as a whole but fail to map it onto specific districts. *See, e.g.*, CAGOP Compl. ¶ 8 ("Defendants engaged in unconstitutional racial gerrymandering when they created the Proposition 50 congressional district map."); *id.* ¶ 109 ("[I]n the Proposition 50 map adopted by the Defendants, race predominated.");

7

*id.* ¶ 115 ("[T]he government has drawn the district lines" to "reflect the preferences of Hispanic voters."); U.S. Compl. ¶ 64 ("California's Congressional redistricting plan, Proposition 50, is racially gerrymandered."); *id.* ¶ 70 ("Proposition 50 was adopted with the purpose of denying or abridging the right to vote on account of race."). And the "direct evidence" of discriminatory intent that Plaintiffs allege, such as it is, similarly has no connection to any particular district. *See, e.g.*, CAGOP Compl. ¶ 52 ("Public statements by Paul Mitchell . . . confirm that race and Latino demographics were . . . [used] in designing the Proposition 50 map."); *id.* ¶ 61 ("[R]ace and Latino population data were consciously used to draw district lines in the Proposition 50 map."); U.S. Compl. ¶¶ 41–47 (quoting Mitchell statements that do not specify any particular district of the Prop 50 map as evidence of racial predominance). And their Prayers for Relief are even more candid; neither bothers to identify a *single* specific district for purposes of relief, targeting the "Proposition 50 maps" wholesale instead. CAGOP Compl. at 24; *see also* U.S. Compl. at 16. (same).

While CAGOP's complaint at least alleges—albeit based solely "on information and belief"—that sixteen specific districts were "racial gerrymanders," *see* CAGOP Compl. ¶ 70, the complaint makes no factual allegations *whatsoever* about *fifteen* of those districts, much less allege direct evidence of racial predominance sufficient to overcome the presumption of legislative good faith. *Alexander*, 602 U.S. at 10. This is a fundamental pleading deficiency that sinks both complaints as a matter of law: "Plaintiffs who complain of racial gerrymandering in their State *cannot sue* to invalidate the whole State's legislative districting map." *Gill*, 585 U.S. at 66 (emphasis added). In short, Plaintiffs' "state-wide" allegations about "the [Prop 50 map] as a whole" have "no probative force with respect to their racial-gerrymandering claim[s]," *Alexander*, 602 U.S. at 33, meaning that each of their claims directed towards the Prop 50 map writ large fail as a matter of law.

**B.    Neither complaint advances *any* allegations about the intent of the California electorate.**

As this Court observed in its order denying Plaintiffs' motions for a preliminary injunction, Prop 50 is different from other redistricting efforts because it was put before the electorate as a ballot measure, rather than enacted by legislative fiat. *See* PI Order at 17; *see also* Cal. Const. art. II, § 1 (the California voters have the final power over amendments to the state constitution); *Hollingsworth v. Perry*, 570 U.S. 693, 707 (2013) (recognizing that, in California, ballot proposals "bec[o]me 'a duly enacted constitutional amendment or statute'" only once "approved by the voters" (quoting *Perry v. Brown*, 265 P.3d 1002, 1021 (Cal. 2011)). Accordingly, the Court "must look to the intent of the voters, rather than the legislature" alone to determine whether race predominated in drawing the Prop 50 map. PI Order at 18. The United States apparently agrees with this framework: in its brief supporting CAGOP's request for an injunction pending appeal before the Supreme Court, the United States argued it was "appropriate . . . to treat the voters as the ultimate legislature for purposes of th[e] Court's racial-gerrymandering precedents." Brief for the United States at 20, *Tangipa v. Newsom*, No. 25A839 (U.S. Jan. 22, 2026).

Even so, neither complaint includes a *single* allegation about whether voters intended to enact a racial gerrymander or whether the campaign itself was tainted by appeals to race. CAGOP's complaint says only that "Proposition 50 was passed by the voters," with nary a mention of the contentious and highly partisan ballot campaign that preceded the vote. CAGOP Compl. ¶ 76. The United States' complaint is similarly sparse, alleging only that "[o]n November 4, 2025, the voters of California approved Proposition 50." U.S. Compl. ¶ 60. And while both complaints discuss statements by Paul Mitchell and California legislators about Prop 50—which might conceivably "speak directly to voters," and therefore provide indirect evidence of "the voters' intent," PI Order at 18—neither complaint alleges that any of Mitchell's or the legislators' statements informed, influenced, or reflected the motives of the California electorate. *See generally* U.S. Compl.; CAGOP Compl. On its own, the total absence of *any* allegations

9

1   about the intent of "the most relevant state actors," PI Order at 15, warrants dismissing

2   Plaintiffs' claims, *see also Alexander*, 602 U.S. at 8.

### C.  The complaints do not plausibly allege any direct evidence of discriminatory intent attributable to any state actor.

5   Even if the Court were to consider Plaintiffs' "direct evidence" allegations—

6   despite the disconnect between that evidence and any of the districts they challenge—the

7   allegations fail on their own terms. Plaintiffs' allegations of "direct evidence" fall into

8   two categories: (1) statements by Paul Mitchell and (2) statements by California

9   legislators. Yet neither supplies any plausible inference of racial predominance.

10  As for Paul Mitchell, Plaintiffs do not allege that he is a state actor, nor plead any

11  facts that might warrant attributing his statements to the California legislators or

12  electorate. To the contrary: CAGOP Plaintiffs allege that the Prop 50 map "was *not*

13  drawn by legislators or paid for by the state of California," but was instead "drafted by

14  Paul Mitchell"—a "consultant"—and paid for and submitted to the California legislature

15  by DCCC. CAGOP Compl. ¶¶ 50–52 & § E (emphasis added). The United States alleges

16  that Mitchell "was retained" to draw the Prop 50 map, U.S. Compl. ¶ 41, but does not

17  even say by whom or allege any other contacts between Mitchell and the state of

18  California that would permit an inference that he was acting at the behest of the state. *See

19  id.* ¶¶ 41–47. Accordingly, both complaints contain a canyon-wide gap in alleging that

20  Mitchell's views can be attributed to a relevant state actor. Absent well-pled facts

21  suggesting Mitchell is a state actor or that his statements are attributable to one, Plaintiffs'

22  allegations about Mitchell simply reflect the personal opinions of a third party.[9] *See

23  Cooke v. Corp. of the President of the Church of Jesus Christ of Latter Day Saints*, 395

24  F. App'x 367 (9th Cir. 2010) (affirming dismissal of complaint where plaintiff failed to

---

27  [9] As DCCC has explained elsewhere, when placed in context, Mitchell's

28  statements reveal that his predominant motivation was partisan. *See, e.g.*, DCCC's Opp'n to Mot. for Prelim. Inj., ECF No. 112.

10

1    allege defendants were state actors); *Cox v. Ass'n of Or. Corr. Emps., Inc.*, No. 24-2763,

2    2025 WL 1077133, at *1 (9th Cir. Apr. 10, 2025) (similar).

3    As for California's legislators, every legislator statement alleged in the complaints

4    either (1) accuses *other* states of engaging in racial gerrymandering to *disfavor* minorities

5    or (2) advocates for Proposition 50 in part because it preserves existing majority-minority

6    or Voting Rights Act districts in the previous map (which Plaintiffs purportedly wish to

7    restore). *See* CAGOP Compl. ¶¶ 62–69; U.S. Compl. ¶¶ 56–59. The former statements

8    do not, on their face, say anything about the Prop 50 map at all—instead, they indict

9    alleged racial gerrymandering in *other* states, and it is unclear what inference CAGOP

10   expects the Court to draw from these statements. The latter statements are simply

11   boilerplate puffery about Prop 50's preservation of existing minority voting rights. These

12   statements at most suggest that some legislators may have "considered race, along with

13   other partisan and geographic considerations," in voting for Prop 50, *Easley v.*

14   *Cromartie*, 532 U.S. 234, 253 (2001), which is not enough to allege predominance, *see*

15   *Cubanos Pa'lante v. Fla. House of Representatives*, 766 F. Supp. 3d 1204, 1212–13

16   (S.D. Fla. 2025) ("generalized language" employed by legislators to refer to "protected[]

17   majority-minority Hispanic districts" failed to "sustain the inference that race

18   predominated in the Legislature's discussions" at the motion-to-dismiss stage). Indeed,

19   the more plausible interpretation of the statements is that some legislators wished to

20   preserve aspects of the prior map, which the Supreme Court has recognized as a

21   legitimate legislative consideration. *Karcher v. Daggett*, 462 U.S. 725, 740 (1983)

22   (recognizing "preserving the cores of prior districts" as a valid criterion); *Miller*, 515

23   U.S. at 916 (similar); *see Alexander*, 602 U.S. at 11 (the Court must draw all reasonable

24   inferences in the legislature's favor).

25   In short, the Plaintiffs' allegations of "direct evidence" of discriminatory intent are

26   either not attributable to the state or fail to plausibly suggest that race played a

27   predominant role in the California legislature's evaluation of Prop 50.

28

11

**D.    The complaints also fail to plausibly allege any circumstantial evidence of racial predominance as to fifteen challenged districts.**

The inchoate legal framework of Plaintiffs' claims, coupled with their failure to plausibly allege *any* relevant direct evidence of racial predominance, is enough to dismiss their claims. *See Alexander*, 602 U.S. at 11; *Cubanos Pa'lante*, 766 F. Supp. 3d at 1212–13. But dismissal becomes all the more warranted because both complaints fail to allege *any* circumstantial evidence about *any* specific district in the Prop 50 map save one (*but see infra* § II), much less plead facts sufficient to defeat the presumption of legislative good faith. CAGOP, as noted, purports to identify sixteen districts as racial gerrymanders, CAGOP Compl. ¶ 95, but their only allegations about the specific borders of any district focus on CD-13. *See, e.g., id.* ¶ 99. The United States's complaint does not even *mention* any district other than CD-13. *See* U.S. Compl. ¶¶ 49–55. Plaintiffs' failure to advance any allegations about all but one of the districts they challenge warrants dismissing their claims, particularly when coupled with their paucity of direct evidence allegations. *See Cubanos Pa'lante*, 766 F. Supp. 3d at 1216 (dismissing allegations as to two challenged districts where plaintiffs offered "only conclusory allegations in place of . . . more specific circumstantial evidence").

**II.    The claims directed at CD-13 should be dismissed because they do not allege facts permitting an inference of racial predominance.**

Both complaints single out CD-13 for special attention—as least relative to their anemic allegations as to every other congressional district—but even then their allegations fail to state a plausible claim. *E.g.*, CAGOP Compl. ¶¶ 99, 122–24; U.S. Compl. ¶¶ 49–54, 67. Most obviously, many of the same pleading deficiencies discussed above apply with equal force as to Plaintiffs' CD-13 claims. *See supra* §§ I.B, I.C. Glaringly, Plaintiffs fail to allege *any* facts that could supply direct evidence that voters or legislators held racialized motives as to the adoption of CD-13. And their critiques of isolated portions of CD-13's boundaries in the Prop 50 map fail to nudge their claims over the line from speculative to plausible, because they do not even try "rul[e] out the

12

competing explanation that political considerations dominated" the redrawing of CD-13. *Alexander*, 602 U.S. at 9; *accord Twombly*, 550 U.S. at 557.

### A. The complaints fail to plausibly allege direct evidence of racial predominance in the adoption of CD-13.

As a matter of law, "whether race predominated in the minds of the voters" is a key aspect of whether the Prop 50 map is a racial gerrymander. PI Order at 14. Yet the complaints are each silent when it comes to alleging that *voters* enacted CD-13's boundaries to achieve a racial gerrymander. *See generally* CAGOP Compl.; U.S. Compl. (failing to make any allegations as to intent of voters). Thus, there is a gaping hole in Plaintiffs' allegations of racial predominance in the drawing of CD-13. *See supra* § I.B.

Legislators are the next best focus of inquiry, as they approved the Prop 50 legislation and are typically the "relevant state actor[s]" in racial gerrymandering claims. *Alexander*, 602 U.S. at 8 (citing *Cooper v. Harris*, 581 U.S. 285, 291 (2017)). Yet once more the complaints each fail to allege any facts suggesting that legislators intended race to predominate in CD-13 specifically. *See* CAGOP Compl. ¶¶ 62–73 (discussing legislator statements but failing to map any of them onto specific districts, including CD-13); U.S. Compl. ¶¶ 56–60 (similar). Indeed, CAGOP's complaint even concedes that it is not quite sure which districts the Legislature intended to racially gerrymander, but that "upon information and belief" they include CD-13. *See* CAGOP Compl. ¶ 70. Plaintiffs' allegations of direct evidence as to CD-13 are therefore either non-existent or pure boilerplate, and thus fail to offer any plausible inference that race predominated in drawing CD-13. *See Cubanos Pa'lante*, 766 F. Supp. 3d at 1216 (finding even more substantial legislative statements "too generalized to support the inference that race motivated" redistricting efforts for two congressional districts and granting Rule 12(b)(6) motion); *see also supra* § I.B. (explaining why lack of voter intent allegations requires dismissal).

Plaintiffs' allegations about Paul Mitchell fail to remedy this pleading deficiency. As explained, his commentary cannot be imputed to the relevant state actors—California's voters and legislators—as a matter of law. *See supra* § I.C; *see also Abbott*,

13

585 U.S. at 605. Even if they could, none of the comments attributed to him in the complaints are specific to CD-13, and thus fail to plausibly allege any of the district-specific evidence needed to state a claim. *See supra* § I.A; *see also Alabama*, 575 U.S. at 262–63; *Bethune-Hill*, 580 U.S. at 191; *Gill*, 585 U.S. at 66.

The closest either complaint comes to making a cogent allegation that Mitchell intended for race to predominate in CD-13 specifically is where they assert that, during his presentation to HOPE, he said the Prop 50 map would make the Latino vote more "effective, particularly in the Central Valley." CAGOP Compl. ¶ 58; U.S. Compl. ¶ 46. But there are at least two flaws with relying upon this remark to state a claim. *First*, neither CAGOP nor the United States ever actually alleges that Mitchell was referring to CD-13 when he made this statement. And the Court cannot simply assume that he was— the Central Valley includes at least *eight* congressional districts in whole or part,[10] and there is no dispute that Prop 50 significantly altered many of them. Mitchell's bare reference to the "Central Valley" therefore fails to supply the necessary district-specific allegations for Plaintiffs' CD-13 claims. *See Alabama*, 575 U.S. at 262–63. *Second*, and just as importantly, Mitchell was expressly told prior to making this remark to "keep it nonpartisan" when explaining what "Latino voters [should] pay the most attention to when it comes to . . . the[] Prop 50 maps[.]" U.S. Compl., Ex. B at 28:8–11.[11] Simply

_____

[10] The precise contours of the Central Valley are variable, but the Court can take judicial notice of the fact that the California Department of Justice defines the Central Valley as including at least the following ten counties: Fresno, Kern, Kings, Madera, Mariposa, Merced, San Joaquin, Stanislaus, Tulare, Tuolumne. *See Game Rules*, State of Cal. Dep't of Just. (last visited Feb. 11, 2026), https://perma.cc/K3G5-2MQJ . Under the Prop 50 map, these counties are located partially or entirely within congressional districts 5, 9, 13, 18, 20, 21, 22, 23. *See generally* Assemb. B. 604, 2025-26 Reg. Sess. (Cal. 2025) (identifying county census blocks by congressional district). Regardless of any quibbles about the precise boundaries of the Central Valley, the point remains the same: the Court cannot simply assume an offhand reference to the region refers to CD-13 specifically.

[11] Both complaints conveniently fail to quote the actual question that Mitchell was asked when giving his response. Even so, that portion of the transcript is plainly incorporated into each complaint. *See* CAGOP Compl. ¶¶ 54–55; U.S. Compl. ¶ 46.

14

put, it is impossible to infer *anything* about the relative predominance of race versus partisanship from this particular remark given that the materials in Plaintiffs' own complaints show that Mitchell was asked to avoid speaking about the latter. *See, e.g.*, *Baidan v. Shull*, No. 24-CV-03171-VKD, 2025 WL 267348, at *4 (N.D. Cal. Jan. 22, 2025) (dismissing complaint where transcript incorporated into the pleadings failed to permit inference sought by complainant); *City of Baton Rouge/E. Baton Rouge Par. v. Bank of Am., N.A.*, No. 19-CV-725-SDD-RLB, 2021 WL 1201664, at *4 (M.D. La. Mar. 30, 2021) (dismissing Sherman Act claim where chat room transcript incorporated into complaint "scarcely evidences an understanding regarding price whatsoever, let alone an explicit one," and therefore failed to support a plausible inference of conspiracy); *Singh v. City of New York*, No. 19-CV-5030 (PKC) (RER), 2020 WL 5752157, at *13 (E.D.N.Y. Sep. 24, 2020) (dismissing equal protection claim where transcript incorporated into complaint contradicted plaintiffs' allegation that he could not follow proceedings without an interpreter). Drawing an inference that race predominated over partisanship from such an exchange would be like asking a man to blindfold himself and then faulting him for not candidly describing the scenery. The Court should reject such pleading-by-soundbite.

## B.    The circumstantial evidence alleged as to CD-13 fails to support a plausible inference of racial predominance.

Bereft of any allegations of direct evidence as to CD-13, both complaints are forced to place loadbearing weight on circumstantial allegations of racial predominance. Such evidence takes the form (notionally) of allegations that discrete portions of CD-13 are "so bizarre on [their] face that it discloses a racial design" without any plausible

---

Indeed, the United States attaches the relevant portion of the transcript to its complaint. U.S. Compl. Ex. B. The "policy concern underlying this [incorporation] rule is to prevent plaintiffs from surviving a motion to dismiss by deliberately omitting references to, or portions of, documents that weaken or doom their claims." *Darling v. Eddy*, No. 9:21-CV-00147-DLC, 2023 WL 157712, at *2 (D. Mont. Jan. 11, 2023). That is precisely the case here, where Plaintiffs omit the very question Mitchell was asked, and the critical context it supplies, yet seize upon his response in isolation in a vain effort to state a claim.

alternative explanation. *Alexander*, 602 U.S. at 8 (quoting *Miller*, 515 U.S. at 914). Tellingly though, in making these allegations, both complaints fail to discuss "the design of the district as a whole"—which on its face largely traded rural, conservative voters for more urban and suburban liberal ones—or to "take account of the districtwide context," as required to present a coherent claim. *Bethune-Hill*, 580 U.S. at 192.

CAGOP's complaint briefly alludes to a so-called "bulge[]" in the Modesto-Ceres portion of CD-13, CAGOP Compl. ¶ 99, but otherwise makes no allegations regarding the shape or boundaries of CD-13. This fleeting allusion—which asserts in conclusory fashion that this bulge "appear[s]" to have been drawn "predominantly to improve Hispanic performance in the district," *id.*—hardly forecloses the prospect "that political considerations dominated" in the broader drawing of CD-13, *Alexander*, 602 U.S. at 10. That is particularly so given the undisputed fact—established by materials incorporated into CAGOP's complaint—that Prop 50 converted CD-13 from a razor-sharp toss-up district into a solid Democratic seat.[12] Moreover, CAGOP's complaint categorically fails to allege that CD-13, as drawn, abandons traditional redistricting criteria, such as compactness. As a result, its offhanded criticism about a "bulge" in one small area of the district fails to supply an inference that race, rather than politics, "dominated" the drawing of CD-13 as a whole. *Alexander*, 602 U.S. at 10. "Factual allegations founded on describing the minutiae of a district's boundaries without connecting those boundaries' shapes to the impermissible use of race cannot survive a motion to dismiss." *Cubanos Pa 'lante*, 766 F. Supp. 3d at 1216 (dismissing claims with more substantial critiques of district boundaries).

At the preliminary injunction stage, CAGOP relied upon additional circumstantial evidence focused on the Stockton area of CD-13. Even if well-pled, those allegations

---

[12] Specifically, CAGOP's Complaint cites a study by Cal Poly Pomona and CalTech, which explains that Prop 50 significantly improves the electoral chances of Adam Gray, CD-13's current Democratic incumbent. *See* Cal Poly Pomona & CalTech, *Proposition 50: Projected Impacts on Latino Voting Power* (Oct. 2025), https://perma.cc/N779-E7C5; CAGOP Compl. ¶ 60 & n. 1 (incorporating the study).

16

would not make Plaintiffs' claims of racial predominance plausible as to CD-13. *See infra* at 17–18. But it bears emphasis that CAGOP's complaint *nowhere* alleges that the drawing of CD-13 around Stockton reflects a racial gerrymander—indeed the term "Stockton" does not appear in its complaint—so CAGOP cannot rely upon such contentions to support the adequacy of its pleadings. The fact that CAGOP later advanced this argument through an expert report does not change this: CAGOP "cannot cure pleading deficiencies by inserting the missing allegations in a document that is not either a complaint or an amendment." *Puma SE v. Forever 21, Inc.*, No. CV17-2523 PSG EX, 2017 WL 4771004, at *7 (C.D. Cal. June 29, 2017) (citation omitted) (collecting authority and rejecting plaintiff's effort to "alleg[e] new facts . . . by pointing the Court to exhibits attached to a declaration submitted in support of its motion for a preliminary injunction"); *see also United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 458 n.8 (4th Cir. 2013) (plaintiffs "cannot cure pleading deficiencies . . . with later-filed supporting documentation"); *U.S. Bank, N.A. v. Queen Victoria #1720-104 NV W. Servicing LLC*, No. 2:13-CV-01679-GMN-NJK, 2015 WL 419836, at *2 (D. Nev. Jan. 5, 2015) ("Pleading deficiencies cannot be cured through later presentation of evidence to the Court."). CAGOP "is not permitted to rehabilitate the insufficiency of [its] pleading by relying on documents to support allegations that were not actually made in the complaint," *Rivera v. Patel*, No. 16-CV-00304-PJH, 2016 WL 3566949, at *4 (N.D. Cal. July 1, 2016), and its offhanded reference to the "bulge" around Modesto-Ceres alone falls far short of plausibly stating a claim for CD-13.

The United States' allegations only marginally expand upon CAGOP's barebones pleadings on this score. It, too, notes the so-called "bulge" around the Modesto-Ceres area, *see* U.S. Compl. ¶ 53, while adding a brief allegation about "the 'northern split' of District 13, near Stockton," *id.* ¶ 54. This additional allegation hardly moves the needle. It amounts solely to the allegation that CD-13 "leaves a lot of Democrats on the table" in the Stockton area. *Id.* But this myopic focus continues to ignore "the design of the district as a whole" and fails to "take account of the districtwide context." *Bethune-Hill*, 580 U.S.

17

at 192. Most critically, the United States' complaint fails to offer any allegations that foreclose the more plausible and obvious alternative explanation for why Democrats were left "on the table" near CD-13, namely, that there are "tradeoff[s] . . . inherent in every redistricting: some voters are shifted out of one district and into another." *Jackson v. Tarrant County*, No. 25-11055, 2025 WL 3019284, at *4 (5th Cir. Oct. 29, 2025). The United States' complaint offers no allegations explaining why a reasonable mapdrawer—motivated solely by partisanship—would not leave some Democrats "on the table" near CD-13 in order to deploy them in neighboring districts. That fundamentally fails to comply with their pleading obligations under *Twombly* and *Iqbal*, which require the complainant to supply allegations that "plausibly suggest[]," and are "not merely consistent with," a legal violation. *Twombly*, 550 U.S. at 557; *see also In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) ("To render their explanation plausible, plaintiffs must do more than allege facts that are merely consistent with both their explanation and defendants' competing explanation."); *Redlands Country Club Inc. v. Cont'l Cas. Co.*, No. 10-CV-1905-GAF-DTBX, 2011 WL 13224843, at *3 (C.D. Cal. Jan. 28, 2011) ("Allegations that are equally consistent with lawful and unlawful conduct are insufficient under *Twombly*.").

In *Cubanos Pa 'lante*, for example, the three-judge court dismissed racial gerrymandering claims towards Florida's CD-27 because the complaint failed to offer allegations foreclosing "equally plausible explanation[s] for the district's shape." 766 F. Supp. 3d at 1216. That meant that "equally plausible inferences" of lawful conduct remained even when accepting the facts in the complaint as true. *Id.* The same is true here. The United States has not even tried to plead the most basic counter-explanation as to why partisanship does not explain the choice to leave some Democrats on the table when drawing CD-13. That failure is critical given the need to "disentangle race and politics" when pleading a racial gerrymandering claim. *Alexander*, 602 U.S. at 6. As such, the United States "not offered allegations" to render its racial gerrymandering

18

theory "plausible," even as to CD-13 specifically. *In re Century Aluminum*, 729 F.3d at 1108; *see also Cubanos Pa 'lante*, 766 F. Supp. 3d at 1216–17.

*    *    *

In sum, the Court should not lower the pleading threshold for Plaintiffs' claims as to CD-13 merely because their allegations as to that district modestly surpass their skeletal allegations towards the rest of the map. The Supreme Court has been adamant that a racial gerrymandering plaintiff must show—and thus also plausibly allege—a theory that "rule[s] out the competing explanation that political considerations dominated" in the drawing of a district. *Alexander*, 602 U.S. at 9. In doing so, a plaintiff must also "take account of the districtwide context." *Bethune-Hill*, 580 U.S. at 192, and as "a practical matter," make some effort to show—and thus also plausibly allege—"that [an] enacted plan conflicts with traditional redistricting criteria," *id.* at 190. *Twombly* and *Iqbal* superimpose a requirement to *plausibly* allege facts and legal theories that satisfy this demanding framework. *See Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 679. Plaintiffs' pleadings account for none of this. They provide no allegations of direct racialized intent at to CD-13 specifically and seek to paper over that absence with nitpicky allegations about narrow slivers of CD-13, all the while purposefully neglecting to account for the obvious alternative explanation that partisanship "dominated" the drawing of the district's new boundaries. Their claims directed towards CD-13 should thus also be dismissed.[13]

---

[13] If the Court permits Plaintiffs to proceed solely on their claims as to CD-13, it should make clear that the scope of any available relief is limited to that district. A redistricting "plaintiff's remedy must be 'limited to the inadequacy that produced [his] injury in fact.'" *Gill*, 585 U.S. at 66 (alteration in original) (citation omitted). That means "the remedy that is proper and sufficient lies in the revision of the boundaries of the [plaintiff's] own district." *Id.*; *Alabama*, 575 U.S. at 264 (explaining relief can only be granted as "to the individual districts subject to the appellants' racial gerrymandering challenges"). Simply put, Plaintiffs should not be permitted to continue their crusade to invalidate the entire Prop 50 map based on pleadings that, at most, support a claim towards a single district.

### III.   The United States' VRA claim should be also dismissed.

The United States's claim under § 2 of the Voting Rights Act fails for the same reasons as its claim under the Fourteenth Amendment. To state a claim under § 2, the United States must allege that "racial discrimination [was] . . . a 'substantial' or 'motivating' factor behind enactment of" the challenged law, *Hunter v. Underwood*, 471 U.S. 222, 228 (1985), and the Court must consider "the legislature's *actual* non-racial motivations," *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 221 (4th Cir. 2016). The Ninth Circuit has held that to establish a § 2 claim, a plaintiff must allege facts sufficient to permit an inference of discriminatory intent under the *Arlington Heights* framework, which requires considering numerous factors, including contemporaneous statements by state actors, procedural or substantive deviations, and the degree of burden on majority and minority voters. *See Old Person v. Cooney*, 230 F.3d 1113, 1130–31 (9th Cir. 2000).

The United States fails to allege any facts that would support an inference of discriminatory intent. The only concrete allegations in the United States's complaint consist of (1) statements by a third-party mapmaker that are not attributable to the relevant state actors, (2) statements by California legislators which do not suggest racial motivations or reflect racial animus, and (3) vague and conclusory circumstantial evidence that relates only to a narrow portions of a single congressional district. *See supra* §§ I.B–C, II. The scant three paragraphs of the United States's complaint dedicated to its § 2 claim, U.S. Compl. ¶¶ 69–71, are nothing but a "[t]hreadbare recital" of § 2's elements. *Iqbal*, 556 U.S. at 678. Thus, for the same reasons above, the United States's complaint fails to plausibly allege that Prop 50 was motivated by racial considerations, and thus fails to state a claim under § 2.

## **CONCLUSION**

For the foregoing reasons, the Court should dismiss CAGOP's complaint and the United States's complaint-in-intervention.

1    Dated: February 11, 2026              Respectfully submitted,

2                                          */s/ Lalitha D. Madduri*

3                                          Lalitha D. Madduri (CA Bar No. 301236)
                                           Christopher D. Dodge* (DC Bar No.
4                                          90011587)
5                                          Max Accardi* (DC Bar No. 90021259)
                                           **ELIAS LAW GROUP LLP**
6                                          250 Massachusetts Ave. NW, Suite 400
7                                          Washington, DC 20001
                                           T: (202) 968-4652
8                                          F: (202) 968-4498
9                                          lmadduri@elias.law
                                           cdodge@elias.law
10                                         maccardi@elias.law

11
                                           Abha Khanna* (WA Bar No. 42612)
12                                         Tyler L. Bishop (CA Bar No. 337546)
                                           **ELIAS LAW GROUP LLP**
13                                         1700 Seventh Avenue, Suite 2100
14                                         Seattle, WA 98101
                                           T: (206) 656-0177
15                                         akhanna@elias.law
16                                         tbishop@elias.law

17
                                           Omar Qureshi (CA Bar No. 323493)
18                                         Max Schoening (CA Bar No. 324643)
19                                         **QURESHI LAW PC**
                                           700 Flower Street, Suite 1000
20                                         Los Angeles, CA 90017
21                                         T: (213) 600-6096
                                           omar@qureshi.law
22                                         max@qureshi.law
23
                                           *Counsel for Defendant-Intervenor DCCC*
24
25                                         * *Admitted pro hac vice*

26

27

28

21

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for DCCC, certifies that this brief contains 6,382 words, which complies with the word limit of Local Rule 11-6.1.

Dated: February 11, 2026          <u>/s/ Lalitha D. Madduri</u>
                                  Lalitha D. Madduri