1   Rob Bonta
    Attorney General of California
2   Anya M. Binsacca
    Lara Haddad
3   Supervising Deputy Attorneys General
    David Green
4   Ryan Eason
    Jennifer E. Rosenberg
5   S. Clinton Woods
    Iram Hasan
6    Deputy Attorneys General
     State Bar No. 320802
7    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
8    Telephone:  (415) 510-3793
     Fax:  (415) 703-5480
9    E-mail:  Iram.Hasan@doj.ca.gov
    *Attorneys for Defendants California Governor*
10  *Gavin Newsom and Secretary of State Shirley*
    *Weber*

11              IN THE UNITED STATES DISTRICT COURT

12            FOR THE CENTRAL DISTRICT OF CALIFORNIA

13                      WESTERN DIVISION

14

15

16  | **DAVID TANGIPA, *et al.*,** | 2:25-cv-10616-JLS-WLH-KKL |
    | | Three-Judge Court |

17  Plaintiffs,

18  and                                    **MEMORANDUM OF POINTS
                                           AND AUTHORITIES**
19  **UNITED STATES OF AMERICA,**          **SUPPORTING DEFENDANTS'
                                           MOTION TO DISMISS**
20                Plaintiff-Intervenor     **CHALLENGERS'
                                           COMPLAINTS**
21  v.
                                           Date:        April 10, 2026
22  **GAVIN NEWSOM, in his official        Time:        10:30 a.m.
    capacity as the Governor of California,** Courtroom:  1
23  ***et al.*,**                          Judges:      Hon. Josephine L.
                                                        Staton, Hon. Kenneth
24                         Defendants,                  K. Lee, and Hon.
                                                        Wesley L. Hsu
25  and                                    Trial Date:  None Designated
                                           Action Filed: Nov. 5, 2025
26  **DEMOCRATIC CONGRESSIONAL
    CAMPAIGN COMMITTEE, *et al.*,**

27                Defendant-Intervenors.

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................... 1

BACKGROUND ............................................................................................. 2

    I.    California Moves to Redistrict to Counteract Texas ........................... 2

    II.   California Voters Approve Proposition 50 ......................................... 3

    III.  Procedural History ............................................................................ 4

LEGAL STANDARD ..................................................................................... 5

ARGUMENT .................................................................................................. 6

    I.    Challengers Fail to State a Racial Gerrymandering Claim Under
the Fourteenth Amendment ............................................................... 6

        A.    Challengers Fail to Plead That Race Was the Predominant
Factor Motivating the Relevant State Actors: the Voters........... 6

        B.    Challengers Fail to Plead Any Facts Regarding Voter
Intent ......................................................................................... 9

        C.    Challengers Fail to Plead Sufficient Facts for Any of
California's Fifty-Two Districts ............................................... 13

    II.   Plaintiffs Fail to State a Claim Under the Fifteenth Amendment....... 14

    III.  Plaintiff-Intervenor Fails to State a Claim Under the Voting
Rights Act ......................................................................................... 17

    IV.  Sovereign Immunity Bars Challengers' Claims Against
Governor Newsom .......................................................................... 20

CONCLUSION.............................................................................................. 21

# TABLE OF AUTHORITIES

**Page**

CASES

*Abbott v. League of United Latin Am. Citizens*
607 U.S. ___ (2025) ............................................................... 2, 3, 11

*Abbott v. Perez*
585 U.S. 579 (2018) ...................................................................... 15

*Adarand Constructors v. Pena*
515 U.S. 200 (1995) ...................................................................... 17

*Alabama Legislative Black Caucus v. Alabama*
575 U.S. 254 (2015) ...................................................................... 14

*Alexander v. S.C. State Conf. of the NAACP*
602 U.S. 1 (2024) ........................................................... 1, 8, 12, 17

*Allen v. Milligan*
599 U.S. 1 (2023) .......................................................................... 17

*Ashcroft v. Iqbal*
556 U.S. 662 (2009) ........................................................ 5, 6, 14, 19

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*
729 F.3d 937 (9th Cir. 2013) ................................................. 2, 20, 21

*Associated Home Builders etc., Inc. v. City of Livermore*
557 P.3d 473 (Cal. 1976) .................................................................. 7

*Backus v. South Carolina*
857 F.Supp.2d 553 (D.S.C. 2012) .................................................... 16

*Bell Atlantic Corp. v. Twombly*
550 U.S. 544 (2007) .................................................................. 5, 18

*Bethune-Hill v. Virginia State Bd. of Elections*
580 U.S. 178 (2017) ...................................................................... 12

*Brnovich v. Democratic Nat'l Comm.*
594 U.S. 647 (2021) ........................................................................ 9

1
2

# TABLE OF AUTHORITIES
## (continued)

Page

3
4
*City of L.A. v. Cnty. of Kern*
    462 F. Supp. 2d 1105 (C.D. Cal. 2006)............................................................. 10

5
6
*City of Mobile v. Bolden*
    446 U.S. 55 (1980) (plurality opinion)................................................. 16

7
8
*Cooper v. Harris*
    581 U.S. 285 (2017) ............................................................. 6, 15

9
*Cooper v. Pickett*
    137 F.3d 616 (9th Cir. 1997) ............................................................. 6

10
11
*Democratic Nat'l Comm. v. Reagan*
    904 F.3d 686 (9th Cir. 2018) ............................................. 17, 18, 19

12
13
*Easley v. Cromartie*
    532 U.S. 234 (2001) ............................................................. 15

14
15
*Garza v. County of Los Angeles*
    918 F.2d 763 (9th Cir. 1990) ............................................... 19

16
17
*Gomillion v. Lightfoot*
    364 U.S. 339 (1960) ............................................................. 16

18
19
*Hunter by Brandt v. Regents of the Univ. of Cal.*
    971 F.Supp. 1316 (C.D. Cal. 1997)................................................. 17

20
21
*Los Angeles Cnty. Bar Ass'n v. Eu*
    979 F.2d 697 (9th Cir. 1992)........................................... 20, 21

22
*Miller v. Johnson*
    515 U.S. 900 (1995) ............................................................. 8, 15

23
24
*Navarro v. Block*
    250 F.3d 729 (9th Cir. 2001) ............................................. 13

25
26
*Papasan v. Allain*
    478 U.S. 265 (1986) ............................................................. 20

27
28
*Pennhurst State Sch. & Hosp. v. Halderman*
    465 U.S. 89 (1984) ............................................................. 20

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*People v. Rizo*

4
    996 P.2d 27 (Cal. 2000)........................................................................... 10

5

*Prejean v. Foster*

6
    227 F.3d 504 (5th Cir. 2000) .................................................................. 15

7

*Robert L. v. Superior Ct.*

8
    30 Cal. 4th 894 (Cal. 2003) .................................................................... 10

9

*Romero v. City of Pomona*
    665 F.Supp. 853 (C.D. Cal. 1987)......................................................... 16

10

*Rucho v. Common Cause*

11
    588 U.S. 684 (2019) ................................................................................. 1

12

*Schreiber Distributing Co. v. Serv-Well Furniture Co., Inc.*

13
    806 F.2d 1393 ......................................................................................... 17

14

*Shaw v. Hunt (Shaw II)*

15
    517 U.S. 899 (1996) ................................................................................. 8

16

*Shaw v. Reno*

17
    509 U.S. 630 (1993) (*Shaw I*)................................................................ 15

18

*Skorepa v. City of Chula Vista*

19
    723 F.Supp. 1384 (S.D. Cal. 1989) ...................................................... 16

20

*Tangipa v. Newsom*
    No. 2:25-cv-10616-JLS-WLH-KKL, 2026 WL 110585 (C.D. Cal.

21
    Jan. 14, 2026)..................................................................................*passim*

22

*Tangipa v. Newsom*

23
    No. 25A839, 2026 WL 291659 (U.S. Feb. 4, 2026) (Supreme Court
    Order)........................................................................................................ 2

24

25

*U.S. v. Hays*
    515 U.S. 737 (1995) .............................................................................. 16

26

*United States v. Ritchie*

27
    342 F.3d 903 (9th Cir. 2003) ................................................................... 6

28

# TABLE OF AUTHORITIES
### (continued)

Page

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*
  429 U.S. 252 (1977) ................................................................... 19

*Virginia Off. For Prot. & Advoc. v. Stewart*
  563 U.S. 247 (2011) ................................................................... 20

*Voinovich v. Quilter*
  507 U.S. 146 (1993) ................................................................... 15

*Washington v. Seattle Sch. Dist. No. 1*
  458 U.S. 457 (1982) ..................................................................... 9

*Whole Woman's Health v. Jackson*
  595 U.S. 30 (2021) .................................................................... 21

*Ex parte Young*
  209 U.S. 123 (1908) ............................................................ 20, 21

STATUTES

52 U.S.C. § 10301 ........................................................................ 17, 19

52 U.S.C. § 10301(b) .......................................................................... 18

Assembly Bill 604, 2025 Cal. Stat., ch. 96 ................................................ 3

Assembly Constitutional Amendment 8, 2025 Cal. Stat., ch. 156 .......................... 3

Election Rigging Response Act ............................................................... 3

Voting Rights Act ..................................................................... *passim*

CONSTITUTIONAL PROVISIONS

California Constitution, Article XVIII
  § 1 ............................................................................... 3, 7, 9
  § 4 .................................................................................. 3, 7

United States Constitution
  Eleventh Amendment .......................................................... 2, 20, 21
  Fourteenth Amendment ........................................................ *passim*
  Fifteenth Amendment ......................................................... *passim*

v

# TABLE OF AUTHORITIES
### (continued)

Page

**COURT RULES**

Federal Rule of Civil Procedure 12(b)(6)................................................................5, 6

**OTHER AUTHORITIES**

89th Leg., 2nd Special Sess. (Tex. 2025) ................................................................3

St. *Official Voter Information Guide*,
    https://vig.cdn.sos.ca.gov/2025/special/pdf/complete-vig.pdf (last
    visited Jan. 28, 2026)............................................................................................10

# INTRODUCTION

Proposition 50 is "exactly what it was billed as: a political gerrymander designed to flip five Republican-held seats to the Democrats." *Tangipa v. Newsom*, No. 2:25-cv-10616-JLS-WLH-KKL, 2026 WL 110585, *30 (C.D. Cal. Jan. 14, 2026).[1] "[T]he 'impetus for adoption' of the Proposition 50 Map was 'partisan advantage, pure and simple.'" *Id*. at *30 (quoting *Abbott v. League of United Latin Am. Citizens*, 607 U.S. ___, 2025 WL 3484863 (2025) (slip op. at 2-3) (Alito, J., concurring)). Having failed to convince voters to reject Proposition 50 at the ballot box—and because partisan gerrymandering claims are nonjusticiable, *Rucho v. Common Cause*, 588 U.S. 684 (2019)—Plaintiffs and Plaintiff-Intervenors (together, "Challengers") now try to reframe an obvious partisan gerrymander as an illegal racial gerrymander by citing certain statements of individual legislators and a private consultant. But courts "must be wary of plaintiffs who seek" such a drastic subversion of the voters' will, and must afford voters "a presumption of good faith[.]" *Tangipa¸* 2026 WL 110585, at *11. Rather than plead facts to overcome this presumption, the complaints do not mention the intent of the voters at all—a fatal omission since voters are the "most relevant state actors," *id.* at *8, at all.

Challengers fail to meet their "especially stringent" burden to sustain a claim under the Fourteenth Amendment: aside from failing to plead a single fact about voter intent, they plead no facts to support their claim that race *predominated* over *all* other factors in the drawing of the new map, nor any facts specific to fifty-one out of the fifty-two districts in the Proposition 50 map. *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 7, 11 (2024). Each Challenger also proposes meritless claims under other authorities. Plaintiffs allege a standalone racial

---

[1] Only Plaintiffs filed a notice of appeal (ECF No. 217) of this Court's order denying their preliminary injunction motion (ECF No. 216) on January 15, 2026. This Court denied Plaintiffs' application for an injunction pending appeal on January 16, 2026 (ECF No. 220), and the Supreme Court likewise denied Plaintiffs' emergency application for a writ of injunction pending appeal on February 4, 2026 (ECF No. 224).

gerrymandering claim under the Fifteenth Amendment, but no such claim exists under governing precedent. And Plaintiff-Intervenor offers no relevant allegations that could support its claim of intentional racial discrimination under the Voting Rights Act (VRA).

This Court has already rejected Challengers' efforts to persuade it "to ignore entirely the intent of the voters who overwhelmingly supported Proposition 50[.]" *Tangipa*, 2026 WL 110585 at *8. It has likewise rejected the proposition "that the intent of the map drawer and, by extension, the California Legislature, is dispositive." *Id*. And the Supreme Court has declined to upset this Court's prior ruling. *Tangipa v. Newsom*, No. 25A839, 2026 WL 291659, at *1 (U.S. Feb. 4, 2026) (Supreme Court Order). Consistent with that ruling, this Court should find that Challengers' failure to include a single allegation regarding the voters' intent, coupled with their failure to meet their burden with respect to any of their claims, warrants dismissal of their complaints in their entirety. At the very least, Plaintiffs' Fifteenth Amendment claim and Plaintiff-Intervenor's Voting Rights Act claim should be dismissed, and the scope of Challengers' Fourteenth Amendment claim should be narrowed to District 13 only.

Finally, Governor Newsom "is entitled to Eleventh Amendment immunity because his only connection to [Proposition 50] is his general duty to enforce California law," and that is not enough to overcome the immunity. *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris,* 729 F.3d 937, 943 (9th Cir. 2013), *cert denied*, 574 U.S. 932 (2014). Accordingly, he should be dismissed as a Defendant from this suit.

## BACKGROUND

### I.   CALIFORNIA MOVES TO REDISTRICT TO COUNTERACT TEXAS

"With an eye on the upcoming 2026 midterm elections, several States have in recent months redrawn their congressional districts in ways that are predicted to favor the State's dominant political party." *Abbott*, 607 U.S. ___, 2025 WL

3484863, at *1.  "Texas adopted the first new map," *id.*, that would likely result in a Republican advantage, *see* H.B. 4, 89th Leg., 2nd Special Sess. (Tex. 2025). "California responded with its own map for the stated purpose of counteracting what Texas had done." *Abbott*, 607 U.S. at ___, 2025 WL 3484863, at *1.

To counter Texas, the California Legislature approved a three-part legislative package called the Election Rigging Response Act ("ERRA").  One part, Assembly Constitutional Amendment 8 ("ACA 8"), 2025 Cal. Stat., ch. 156, referred to California voters a proposed state constitutional amendment that, if approved, would authorize use of a new congressional district map for the next three congressional elections.  Defendants' Request for Judicial Notice ("RJN"), Ex. 1. In doing so, the Legislature acted consistent with state law providing that the Legislature may propose constitutional amendments, Cal. Const., art. XVIII, § 1, that will become effective if approved by a majority of votes cast, *id.* § 4.  The measure asking voters to consider ACA 8 was called Proposition 50.

The Legislature's express statements and the legislative history make clear that partisan considerations motivated the ERRA.  The Legislature's statement of findings described ACA 8 as an attempt "to neutralize the partisan gerrymandering being threatened by Republican-led states without eroding fair representation for all communities" to ensure that the "2026 United States midterm elections for Congress" are "conducted on a level playing field without an extreme and unfair advantage for Republicans."  RJN, Ex. 1, Findings (*l*), (n).  Committee hearing materials for ACA 8 and Assembly Bill 604, 2025 Cal. Stat., ch. 96, emphasized the same point.  *See*, *e.g.*, ECF No. 42-5 at 385 (the ERRA "neutraliz[es] partisan gerrymandering" by other states).

## II.   CALIFORNIA VOTERS APPROVE PROPOSITION 50

Before the election, all voters received an Official Voter Information Guide that included the text of ACA 8, the official summary for Proposition 50, and arguments submitted by proponents and opponents of Proposition 50.  ECF No. 42

3

(U.S. Compl.) ¶ 42; RJN, Ex. 2.  The text of ACA 8 explained that "[i]t is the intent of the people that California's temporary maps be designed to neutralize the partisan gerrymandering being threatened by Republican-led states without eroding fair representation for all communities."  RJN, Ex. 1, Findings (n).  The official summary similarly stated that "[i]n response to Texas' mid-decade partisan congressional redistricting, this measure temporarily requires new congressional district maps, as passed by the Legislature in August 2025, to be used in California's congressional elections through 2030."  RJN, Ex. 2 at 8.

The official arguments for and against likewise had a partisan focus.  The former asserted that it "makes sure the 2026 mid-term elections are conducted on a level playing field without an unfair advantage for Republicans" and "ensure[s] our voices aren't silenced by partisan gerrymandering in other states[.]"  RJN, Ex. 2 at 16.  The official argument against Proposition 50, in turn, called it a "political power grab" that "draw[s] partisan seats without transparency or citizen input, solely to protect incumbents," argued the measure would create "the most partisan maps in California's history," and encouraged voters to "[v]ote NO on partisan gerrymandering."  *Id.* (italics removed).

The ballot label on voters' ballots also emphasized the partisan focus, asking voters to choose whether to vote for redistricting "in response to Texas' partisan redistricting."  RJN, Ex. 3.  On November 4, 2025 California voters—presented with this partisan framing for Proposition 50—approved the measure, with over 64% of votes cast in favor.  RJN, Ex. 4 at 13.

## III.  PROCEDURAL HISTORY

Plaintiffs filed their complaint on November 5, 2025, bringing three racial gerrymandering claims:  (1) The Legislature violated the Fourteenth Amendment when it drew sixteen congressional district lines allegedly on the basis of race; (2) the Legislature violated the Fifteenth Amendment when it drew the same sixteen congressional district lines allegedly on the basis of race; and (3) the Legislature

4

violated the Fourteenth and Fifteenth Amendments when it drew District 13, one of the sixteen districts Plaintiffs attack in their first two claims, allegedly on the basis of race.  *See* ECF No. 1 (Pl. Compl.) ¶¶ 94-126.

After the Court granted its request to intervene, Plaintiff-Intervenor filed its complaint-in-intervention.  ECF No. 38; U.S. Compl.  Plaintiff-Intervenor raised two claims:  (1) A racial gerrymandering claim alleging that the Legislature relied on race when drawing "at least" one district in violation of the Fourteenth Amendment; and (2) a statutory claim alleging that the Legislature adopted the Proposition 50 map with the purpose of denying or abridging the right to vote based on race or color in violation of Section 2 of the VRA.  U.S. Compl. ¶¶ 67, 70.

Challengers later moved to preliminarily enjoin the State from implementing the new voter-approved map, raising arguments under Fourteenth Amendment, Fifteenth Amendment, and VRA.  ECF No. 16-1 at 35, 29-1 at 8.  This Court denied both motions on all grounds following a multi-day evidentiary hearing. *Tangipa*, 2026 WL 110585, at *1.  Plaintiffs afterward appealed to the Supreme Court, ECF No. 217, unsuccessfully sought a stay in this Court, ECF No. 220, and unsuccessfully sought a writ of injunction pending appeal in the Supreme Court, Supreme Court Order at *1.

## LEGAL STANDARD

Challengers' complaints can only survive dismissal under Federal Rule of Civil Procedure 12(b)(6) if they "state a claim to relief that is plausible on its face[.]"  *Bell Atlantic Corp. v. Twombly¸* 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the pleaded factual content allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (citing *Twombly*, 550 U.S. at 556). And "whether a particular complaint sufficiently alleges" such a violation "cannot be decided in isolation from the facts pleaded."  *Id*. at 673.

In ruling on a Rule 12(b)(6) motion, a court may consider the complaint, documents attached to and incorporated by reference in it, and matters subject to judicial notice "without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). A court may also "consider the full texts of documents which the complaint quotes only in part." *Cooper v. Pickett*, 137 F.3d 616, 623 (9th Cir. 1997) (citations omitted). Courts need not "credit a complaint's conclusory statements without reference to its factual context[,]" *id.*, and "pleadings that . . . are no more than conclusions[] are not entitled to the assumption of truth[,]" *Iqbal*, 556 U.S. at 679.

# ARGUMENT

## I. CHALLENGERS FAIL TO STATE A RACIAL GERRYMANDERING CLAIM UNDER THE FOURTEENTH AMENDMENT

Challengers' burden for their Fourteenth Amendment claims is to "plead sufficient factual matter to show," *Iqbal*, 566 U.S. at 677, that "race was the predominant factor motivating the relevant state actors," *Tangipa*, 2026 WL 110585 at *11. Challengers do not "state a claim to relief that is plausible on its face," *Iqbal*, 566 U.S. at 570, and thus wholly fail to meet this burden.

### A. Challengers Fail to Plead That Race Was the Predominant Factor Motivating the Relevant State Actors: the Voters

In Count I of their complaints, Challengers claim that the Proposition 50 map is an illegal racial gerrymander in violation of the Fourteenth Amendment. Pl. Compl. ¶¶ 94-111; U.S. Compl. ¶¶ 63-68. But they fail to raise a single allegation concerning the key state actor here: the voters. "Where the legislature is the relevant state actor," *Tangipa*, 2026 WL 110585 at *7, plaintiffs bringing racial gerrymandering claims typically "must prove that 'race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district[,]'" *Cooper v. Harris*, 581 U.S. 285, 291 (2017) (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)).

But this case does not involve a circumstance in which "the legislature holds the final decision-making authority as to whether a challenged map goes into effect." *Tangipa*, 2026 WL 110585 at *7. The "Proposition 50 map and its new congressional district lines went into effect only because California voters enacted it." *Id*. Indeed, "all power of government ultimately resides in the people." *Associated Home Builders etc., Inc. v. City of Livermore*, 557 P.3d 473, 477 (Cal. 1976); *see* Cal. Const., art. XVIII, §§ 1,4. And "[w]hen the voters speak, we should consider it to be with the utmost legislative authority." *Tangipa*, 2026 WL 110585 at *9.

In the specific context of the passage of Proposition 50, this Court explained that there are at least three relevant considerations. First, "California law subordinates the legislature to the electorate when amending the constitution"; second, ACA 8 "did not simply authorize the legislature to engage in partisan gerrymandering as the legislature saw fit[,]" but rather "it was an amendment" that voters approved, as a result of which they "enacted a particularly-drawn map that everyone had the opportunity to review, debate, and critique[;]" and third, in evaluating racial gerrymandering claims, courts must consider "why the relevant decisionmaker chose to enact these congressional district maps." *Id*. at *8. Accordingly, this Court concluded, in determining whether the Proposition 50 map was the product of an illegal racial gerrymander, that "voters are the most relevant state actors." *Id*. at *8. This Court clarified that this conclusion "does not mean that legislative statements are irrelevant to [the] intent analysis." *Id*. at *9. Statements made by legislators, *id*., and other state actors, *id*. at *17-21, are also relevant to the extent that they inform the court's understanding of voter intent, *id*. at *9. In sum, "like in cases where a legislature has enacted a challenged map, Challengers here must prove that race was the predominant factor motivating the relevant state actors: the voters." *Id*. at *11.

1    A "plaintiff's evidentiary burden in cases accusing the voters of racial

2  gerrymandering must be, like in cases accusing the legislature of a racial

3  gerrymandering, especially stringent." *Id.* (citing *Alexander*, 602 U.S. at 11)

4  (quotation marks omitted).  The plaintiff must show that "other considerations were

5  subordinate" to race.  *Tangipa*, 2026 WL 110585 at *7.  In other words, the

6  plaintiff must show that race was "the criterion that . . . could not be compromised."

7  *Shaw v. Hunt (Shaw II)*, 517 U.S. 899, 907 (1996).  "[T]he plaintiff must make the

8  distinction between" the relevant state actor "'being *aware* of racial considerations

9  and being *motivated* by them.'"  *Tangipa*, 2026 WL 110585 at *7 (quoting *Miller*,

10  515 U.S. at 916) (emphasis added).  If "*either* politics *or* race could explain a

11  district's contours, the plaintiff has not cleared its bar."  *Alexander*, 602 U.S. at 10

12  (emphasis added).

13    A plaintiff must also overcome "a presumption that the legislature acted in

14  good faith.  *Id.* at 11 (citing *Cooper*, 581 U.S. at 291).  This presumption requires

15  "courts to draw the inference that cuts in the legislature's favor when confronted

16  with evidence that could plausibly support multiple conclusions" to ensure that

17  "race for its own sake, and not other districting principles, was the legislature's

18  dominant and controlling rationale in drawing its district lines."  *Alexander*, 602

19  U.S. at 10 (citations and quotation marks omitted); *see id.* at 10-11.  And "voters,

20  like the legislature, are entitled to a presumption of good faith."  *Tangipa*, 2026 WL

21  110585 at *11 (citing *Alexander*, 602 U.S. at 10-11).  Federal courts "must exercise

22  extraordinary caution in adjudicating a claim that a State has drawn district lines on

23  the basis of race.  *Miller*, 515 U.S. at 915-16.  Particularly here, where, despite the

24  "paramount" importance of voters' intent, *Tangipa*, 2026 WL 110585, at *8, facts

25  regarding the voters' intent are entirely absent from Challengers' complaints.  Pl.

26  Compl; U.S. Compl.

27

28

### B.    Challengers Fail to Plead Any Facts Regarding Voter Intent

Challengers' decision to plead facts only addressing the intent of the Legislature and a private consultant dooms their claim where, as here, the voters' "intent is paramount" "in the context of a redistricting ballot measure[.]" *Tangipa*, 2026 WL 110585 at *7-*8.  Indeed, it was the voters who chose to enact the challenged congressional district map, and the voters who had the sole authority to approve the constitutional amendment that made possible the adoption of the new map.  *See* Cal. Const. art. XVIII, § 1; ACA 8.  And this Court has squarely rejected the idea that "the intent of the voters who overwhelmingly supported Proposition 50" "does not matter[.]" *Tangipa*, 2026 WL 110585, at *2, *8.  This Court explained that ignoring voter intent here would "essentially . . . apply the 'cat's paw' theory"—a theory that the Supreme Court has prohibited courts from adopting—"to the voters[.]" *Id*. at *9-*10 (citing *Brnovich v. Democratic Nat'l Comm*., 594 U.S. 647, 689-90 (2021)).[2]  Treating the voters as "dupes" of the legislature, this Court found, "is completely antithetical to the position of voters in California's constitutional system—"it is the legislature's power that is *subordinated* to the power of the voters." *Id*. at *10.

In neglecting the role of voters, Challengers ignore that courts have long considered voter intent in the context of voter-approved initiatives.  For example, in *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 464-65, 471 (1982), the Supreme Court examined the motivation of voters in supporting an initiative regarding the use of mandatory busing in the context of a Fourteenth Amendment Equal Protection claim.  And this Court later held in another case that courts "may look to the nature of the initiative campaign to determine the intent of the drafters and voters in enacting it" in cases assessing equal protection and other

---

[2] "A 'cat's paw' is a dupe who is used by another to accomplish his purposes. A plaintiff in a 'cat's paw' case typically seeks to hold the plaintiff's employer liable for the 'animus of the supervisor who was not charged with making the ultimate adverse employment decision." *Brnovich*, 549 U.S. at 689-90.

constitutional claims challenging voter-approved initiatives. *City of L.A. v. Cnty. of Kern*, 462 F. Supp. 2d 1105, 1114 (C.D. Cal. 2006) (citing *Washington*, 458 U.S. at 471). California state law further clarifies that "analyses and arguments contained in the official ballot pamphlet" are particularly important "indicia of the voters' intent[.]" *People v. Rizo*, 996 P.2d 27, 30 (Cal. 2000); *see Robert L. v. Superior Ct.*, 30 Cal. 4th 894, 896-97 (Cal. 2003) (courts may look to contents of a ballot pamphlet to determine voters' intent). State law also explains the relationship between the intent of a statute's drafters and that of the electorate that must vote to adopt it. *See id.* at 904 ("the motive or purpose of the drafters of a statute is not relevant to its construction, absent reason to conclude that the body which adopted the statute was aware of that purpose and believed the language of the proposal would accomplish it" (citations omitted)). Accordingly, courts considering the intent of the actor responsible for adopting legislation and how and when to consider the intent of the drafting body is not new.

As evidenced by Plaintiff-Intervenor's complaint, materials ordinarily available to voters, like the Official Voter Information Guide and its contents and partisan campaigns encouraging a vote in favor of the measure, were also available to Challengers. *See* U.S. Compl. ¶ 42 (citing a link to the Voter Guide and *Yes on Prop 50*).[3] Tellingly, Challengers do not claim that any of these materials even hinted at a racial gerrymander. They also do not allege that any official materials would lead voters to believe that the maps were drawn with a predominantly racial intent. Nor could they. As discussed below, the cited materials speak for themselves.

---

[3] The link to the Voter Information Guide provided in Plaintiff-Intervenor's complaint is no longer valid. The guide may be accessed via the following active link: Cal. Sec'y. of St. *Official Voter Information Guide*, https://vig.cdn.sos.ca.gov/2025/special/pdf/complete-vig.pdf (last visited Jan. 28, 2026).

Quoting from the *Yes on 50* website cited in its complaint, Plaintiff-Intervenor itself points out that "[t]he professed purpose for the new map was to 'negate the five Republican seats drawn by Texas by adding up to 5 Democrat seats in the U.S. House of Representatives." U.S. Compl. ¶ 42.  And the Voter Guide—which includes "particularly important evidence of voter intent," *Tangipa*, 2026 WL 110585, at *12 (citing *Rizo*, 996 P.2d at 30)—was distributed to voters across California.  *See* U.S. Compl. ¶ 42; RJN, Ex. 2.[4]  It included arguments for and against Proposition 50 that each frame the initiative in purely partisan terms and as a response to the recent redistricting in Texas at President Trump's direction.

For example, the Argument in Favor of Proposition 50 starts with "STOP TRUMP FROM RIGGING THE 2026 ELECTION" and explains that "Prop. 50 makes sure the 2026 mid-term elections are conducted on a level playing field without an unfair advantage from Republicans."  RJN, Ex. 2 at 16.  The Rebuttal to the Argument in Favor of Proposition 50 frames the measure in similar terms: "Districts do not belong to either party; they belong to the People.  But, party bosses want to call the shots—again[.]"  *Id*.  And the Argument Against Proposition 50 includes its title, "A Power Grab by Politicians[,]" and states that "Prop. 50" is "the most partisan map[] in California's history[.]"  *Id*. at 17.

In other words, the messaging in the Voter Guide was purely partisan. Challengers plead nothing to suggest that the voters' "impetus for the adoption" of the Proposition 50 map was anything other "partisan advantage pure and simple." *Abbott*, 607 U.S. at ___, 2025 WL 3484863, at *1 (Alito, J., concurring).  And they come nowhere close to pleading that a different motivation altogether—racial gerrymandering—was, in fact, the *predominant* purpose.

---

[4] Because Plaintiffs do not reference the Voter Guide in their complaint (*see* Pl. Compl.), Defendants request judicial notice of it in addition to citing the website in Plaintiff-Intervenor's complaint.

The Voter Guide also included six pages of images of both the Commission's district lines and the proposed lines that would be implemented if voters approved Proposition 50, for each of California's 52 congressional districts, *id.* at 10-15, "as it must, given that the voters[,]" in authorizing ACA 8, "were not merely lifting a procedural bar but doing so *for a specific map*[,]" *Tangipa*, 2026 WL 110585, at *10 (emphasis in original). "[V]oters look to a litany of materials to determine whether to vote for or against an initiative." *Id.* at *11. And armed with this information, they overwhelmingly approved Proposition 50 by a margin of millions of votes. RJN, Ex. 4 at 13.

In ignoring voter intent in their complaints and instead focusing on a few stray, out-of-context statements of individual legislators and a private consultant who prepared an initial draft of the map, Challengers appear to extend the "cat's paw" theory to voters, suggesting that "although the voters have the real power, they are mere dupes of the legislature's impermissible will"—an argument that this Court has already rejected. *Id.* at *10. The cherry-picked statements of those actors do not substitute for facts speaking to voter intent because "the voters are the *most* relevant state actors" here. *Id.* at *8. This conclusion would be the same even if the voters were not the "paramount" state actor. *Tangipa*, 2026 WL 110585, at *8. At a minimum, voter intent is highly relevant to whether Proposition 50 was a racial gerrymander, and the absence of any allegation that race predominated for California voters is fatal to Challengers' claims. And even setting aside voter intent—an implausible course here, where the voters approved the Proposition 50 map—Challengers also do not allege facts sufficient to show that "race was the predominant factor" motivating the Legislature in adopting Proposition 50. *Alexander*, 602 U.S. at 7. Instead, their selective quotes from Mr. Mitchell and individual legislators at most suggest a permissible and inevitable "aware[ness] of race." *Bethune-Hill*, 580 U.S. at 187.

Allegations that that the map itself harbors another actor's discriminatory intent, Pl. Compl. ¶ 107-109; U.S. Compl. at 1:17-18, also do not satisfy the plausibility standard for pleadings because courts "are not directed to look at the motivation behind a *map*," rather, they "are directed to look at the motivation of the enacting *legislature*." *Tangipa*, 2026 WL 110585, at *17 (citing *Miller*, 515 U.S. at 916) (emphasis in original). And the Supreme Court has already addressed this theory: "an enacting legislature's discriminatory intent could not infect a map with racial gerrymandering in the manner of 'original sin[.]'" *Tangipa*, 2026 WL 110585, at *17 (quoting *Abbott v. Perez*, 585 U.S. 579, 603-05 (2018)).

Because Challengers fail to sufficiently plead a Fourteenth Amendment racial gerrymandering claim by failing to state any facts regarding voter intent. *See id*. at 678 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). When there is "an absence of sufficient facts alleged to support a cognizable legal theory[,]" as there is here, "the court must dismiss the claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Accordingly, Count I in both complaints should be dismissed.

## C. Challengers Fail to Plead Sufficient Facts for Any of California's Fifty-Two Districts

As discussed, Challengers fail to allege sufficient facts supporting a Fourteenth Amendment claim. But in the alternative, if the Court declines to dismiss Count I in either complaint in full, it should find that the scope of the claims is limited to District 13. Challengers here seek the extraordinary remedy of enjoining the entire fifty-two-district Proposition 50 map, but claim that in enacting the Proposition 50 map, Defendants engaged in racial gerrymandering in only sixteen of the fifty-two congressional districts. Pl. Compl. ¶¶ 70, 95; U.S. Compl. ¶ 47. And of those sixteen, Challengers allege facts specific to only one district, District 13. Pl. Compl. ¶¶ 99, 120-126; U.S. Compl. ¶¶ 49-55. But even the facts alleged with respect to District 13 are insufficient to state a racial gerrymandering claim.

"A racial gerrymandering claim . . . applies to the boundaries of individual districts. It applies district-by-district. It does not apply to a State considered as an undifferentiated 'whole.'" *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 262 (2015). The Supreme Court has "consistently described a claim of racial gerrymandering as a claim that race was improperly used in the drawing of the boundaries of one or more *specific electoral districts*." *Id*. (emphasis in original) (collecting cases). Here, Challengers fail to plead sufficient facts regarding *any* district as a whole (including District 13), and consequently fail to give Defendants fair notice of the facts forming the basis of their claims as to any district, much less the sixteen they challenge. *See Iqbal*, 556 U.S. at 570. Their also complaints wholly fail to explain the mismatch between the allegations they raise and the relief they seek—an injunction of the *entire* fifty-two-district Proposition 50 map. Pl. Compl. at 24; U.S. Compl. at 16. On these pleadings, Challengers at best could have sought injunctive relief for only District 13. But Challengers are not "entitled to relief" as to any district where, as here, their factual allegations "do not permit the Court to infer more than the mere possibility of misconduct" in one out of fifty-two districts. *Iqbal*, 556 U.S. at 679. However, should the Court permit Challengers' Fourteenth Amendment claims to proceed, the scope of those claims should be narrowed to District 13 only.

## II. PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE FIFTEENTH AMENDMENT

In addition to their claim for racial gerrymandering under the Equal Protection Clause of the Fourteenth Amendment, Plaintiffs' Count Two purports to plead a standalone racial gerrymandering claim under the Fifteenth Amendment.[5] *See* Pl. Compl. ¶¶ 112-119. The Fifteenth Amendment prohibits states from "den[ying] or abridg[ing]" the "right of citizens of the United States to vote . . . on account of

---

[5] Plaintiff-Intervenor chose not to include a similar separate Fifteenth Amendment claim. *See* U.S. Compl.

race, color, or previous condition of servitude." U.S. Const. amend. XV.  There is no legal basis for such a claim, but even if there was, Plaintiffs fail to allege facts sufficient to support it.

The Supreme Court's racial gerrymandering case law has developed under the Equal Protection Clause of the Fourteenth Amendment.  *See*, *e.g.*, *Miller*, 515 U.S. at 904; *Abbott v. Perez*, 585 U.S. 579, 585 (2018); *Easley v. Cromartie*, 532 U.S. 234, 237 (2001); *Cooper*, 581 U.S. at 285; *accord Voinovich v. Quilter*, 507 U.S. 146, 159 (1993) ("[W]e never have held any legislative apportionment inconsistent with the Fifteenth Amendment").  Though the Supreme Court has referenced the Fifteenth Amendment in racial gerrymandering cases, *see, e.g., Shaw v. Reno*, 509 U.S. 630 (1993) (*Shaw I*), no governing precedent applies a separate test for racial gerrymandering other than the one developed under the Equal Protection Clause.  Therefore, to the extent there is a racial gerrymandering cause of action under the Fifteenth Amendment, it is coextensive with the test under the Equal Protection Clause.[6]  And, as discussed extensively above in Argument § I, Plaintiffs fail to plead a plausible claim under the Equal Protection Clause, including because they do not allege facts sufficient to show that race predominated in the voters' adoption of the Proposition 50 map.[7]  *See Tangipa*, 2026 WL 110585, at *11 (voters' intent is the relevant inquiry).

---

[6] The Court's majority and dissenting opinions applied the test under the Fourteenth Amendment's Equal Protection Clause in the order denying Challengers' motions for preliminary injunction, not any separate test under the Fifteenth Amendment.  *See Tangipa*, 2026 WL 110585, at *13, *78.

[7] Plaintiffs also cite a case they suggest eliminates the compelling interest defense to racial gerrymandering claims, seemingly inviting the Court to create a loophole in the existing test for racial gerrymandering claims.  *See* Pl. Compl. ¶ 113 (citing *Prejean v. Foster*, 227 F.3d 504, 519 (5th Cir. 2000)).  However, *Prejean* does not hold that a State cannot assert a compelling interest as a defense to a racial gerrymandering claim.  In fact, it says the opposite.  The plaintiffs there challenged a Louisiana judicial district as a racial gerrymander, and the court's analysis of that claim proceeded exclusively under the Fourteenth Amendment, *Prejean*, 227 F.3d at 509, including reviewing Louisiana's proposed compelling interest, *id.* at 515. The language Plaintiffs cite suggesting that there is no compelling interest defense

If Plaintiffs instead intend to encourage the Court to recognize a new cause of action that allows an analytically distinct claim for racial gerrymandering under the Fifteenth Amendment, their allegations still fail.  Claims brought under the Fifteenth Amendment are reserved for government actions that "den[y]" or "abridge[]" the right to vote on account of race. *See City of Mobile v. Bolden*, 446 U.S. 55, 65 (1980) (plurality opinion), *superseded by statute on other grounds*; *accord Gomillion v. Lightfoot*, 364 U.S. 339, 345 (1960) (striking down municipal boundaries under Fifteenth Amendment on the grounds that boundaries wholly and discriminatorily denied Black voters the right to vote in municipal elections).  For example, courts have held that redistricting plans do not violate the Fifteenth Amendment absent a showing that a minority voter was *denied the ability* to vote. *See, e.g.*, *Romero v. City of Pomona*, 665 F.Supp. 853, 869 (C.D. Cal. 1987) ("the 15th Amendment is not relevant to a question of ethnic vote dilution unless the claim concerns the purposeful denial of minority rights to register to vote and cast ballots"), *affirmed* 883 F.2d 1418 (9th Cir. 1989); *Skorepa v. City of Chula Vista*, 723 F.Supp. 1384, 1393 (S.D. Cal. 1989) (same); *Backus v. South Carolina*, 857 F.Supp.2d 553, 569 (D.S.C. 2012), *affirmed* 568 U.S. 801 (2012).  Here, Plaintiffs allege that the State intended to "empower" or "favor" Latinos, Pl. Compl. ¶ 96, but do not allege that the voters or anyone else intended to deny or abridge any group's right to vote.  Nor do they allege that the State actually denied any group's right to vote.  Instead, they allege only "stigmatic and representational" harms that are insufficient to support a Fifteenth Amendment claim. *See id*. ¶¶ 6-24, 32-33, 36; s*ee also U.S. v. Hays*, 515 U.S. 737, 744 (1995) (describing abstract racial classifications as "stigma[tic]" and "representational" harms) (citing *Shaw I*, 509 U.S. at 643, 648).

---

to a Fifteenth Amendment claim actually concerns disenfranchisement claims, not racial gerrymandering claims. *Id.* at 519.

Plaintiffs cannot cure what ails their claim, which is that no standalone cause of action for racial gerrymandering exists under the Fifteenth Amendment. Moreover, they do not allege that the State intended to deny or abridge any group's right to vote based on race, nor identify any group that was harmed by Proposition 50. Courts may dismiss a claim without leave to amend when "the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distributing Co. v. Serv-Well Furniture Co., Inc.*, 806 F.2d 1393, 1401 (citing *Bonanno v. Thomas*, 309 F.2d 320, 322 (9th Cir. 1962)).  That is the case here.  Accordingly, the Court should dismiss Plaintiffs' meritless Fifteenth Amendment claim with prejudice.

## III. PLAINTIFF-INTERVENOR FAILS TO STATE A CLAIM UNDER THE VOTING RIGHTS ACT

Plaintiff-Intervenor alleges that "Proposition 50 was adopted with the purpose of denying or abridging the right to vote on account of race or color in violation of Section 2 of the VRA, 52 U.S.C. § 10301."[8]  U.S. Compl. ¶ 70.  But because Plaintiff-Intervenor does not allege any plausible facts supporting that claim, it fails as a matter of law.

To show that a State had a discriminatory intent in adopting a voting scheme, Challengers must allege that the State acted with a "'racially discriminatory motivation' or an 'invidious purpose,'" *Allen v. Milligan*, 599 U.S. 1, 11 (2023) (quoting *City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 61–65 (1980)), to impose "adverse effects upon an identifiable group," *see Democratic Nat'l Comm. v. Reagan*, 904 F.3d 686, 717 (9th Cir. 2018) (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).  Intentional discrimination claims under Section 2 are "analytically distinct" from racial gerrymandering claims under the Fourteenth Amendment, which provide a remedy regardless of whether a legislature intended to harm any identifiable group. *See Alexander*, 602 U.S. at 38; *Hunter by*

---

[8] Plaintiffs do not bring a claim under the VRA.  *See* Pl. Compl.

17

*Brandt v. Regents of the Univ. of Cal.*, 971 F.Supp. 1316, 1322 (C.D. Cal. 1997);
*Adarand Constructors v. Pena*, 515 U.S. 200, 227-28 (1995).

Here, Plaintiff-Intervenor fails to identify the racial group or groups whose right to vote has allegedly been denied or abridged.  U.S. Compl.  Its VRA claim can be dismissed for this reason alone.  *See Reagan*, 904 F.3d at 717; *see also* 52 U.S.C. § 10301(b).  This omission also fails to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," falling short of the minimum pleading standard.  *Twombly*, 550 U.S. at 555 (citation and quotation marks omitted).

Plaintiff-Intervenor also fails to allege a single fact to show that the State bore a racially discriminatory motivation toward any identifiable minority group.  To begin, it fails to allege anything with respect to the intent of the voters who adopted the map, *see supra* Argument § I, much less that they adopted the Proposition 50 map with a racially discriminatory motivation, U.S. Compl.  Because the voters are the most relevant actors, that omission is also fatal to its claim.  *See Tangipa*, 2026 WL 110585, at *7-8.

Plaintiff-Intervenor instead attempts to plead that other individuals acted predominantly based on race.  But its complaint does not allege that any of those individuals acted with a goal of disadvantaging any identifiable group.  Instead, it alleges that one legislator said the Proposition 50 map would retain and expand VRA districts that empower Latino voters to elect their preferred candidates.  U.S. Compl. ¶ 59.  And further, that several legislators said Texas redistricted to suppress minority voters.  *Id.* ¶ 57.  As to Paul Mitchell, it alleges that he reversed the prior elimination of a "Latino district from LA," created a district with a 35% Latino voting age population, and described the anticipated effects of the Proposition 50 map, including that one analysis found it would "maintain[] the status quo in terms of the Voting Rights Act and add[] one more Latino-influence district. *Id.* ¶¶ 44-46.  Plaintiff-Intervenor also alleges that the State would have

drawn one district, District 13, differently had partisanship been the true motivating factor for the redistricting. *Id.* ¶ 53. Based on these allegations, Plaintiff-Intervenor claims that at least for District 13, the State redistricted predominantly based on race. *Id.* ¶ 67. But these allegations are inadequate to support a plausible intentional discrimination claim under Section 2 because they plainly do not show a racially discriminatory motivation to impose "*adverse* effects upon an identifiable group." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) (emphasis added); *Reagan*, 904 F.3d at 717.

Additionally, to determine whether a State acted with a racially discriminatory motivation, courts look to a non-exhaustive list of factors provided in *Arlington Heights*. The factors include (1) the historical background; (2) the sequence of events leading to enactment, including any substantive or procedural departures from the normal legislative process; (3) the relevant legislative history; and (4) whether the law has a disparate impact on a particular racial group. *Arlington Heights*, 429 U.S. at 266-68. Notably, Plaintiff-Intervenor's complaint does not attempt to show that any of the *Arlington Heights* factors were present in the passage of Proposition 50. Instead, it simply claims that "Proposition 50 was adopted with the purpose of denying or abridging the right to vote on account of race or color in violation of Section 2 of the VRA, 52 U.S.C. § 10301." U.S. Compl. ¶ 70. But this conclusory allegation is insufficient to survive a motion to dismiss, for "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Finally, Plaintiff-Intervenor does not allege that the Proposition 50 map had an adverse *effect* on any group. For a Section 2 claim to prevail, Plaintiff-Intervenor must plead that the State's action had *both* a discriminatory purpose *and* effect. *See Tangipa*, 2026 WL 110585, at *31 (citing *Alexander*, 602 U.S. at 38-39). An effect is cognizable under Section 2 if it is alleged that "members of a [protected] class" are unable to equally access the political process. *Garza v. County of Los Angeles*,

19

918 F.2d 763, 771 (9th Cir. 1990). Plaintiff-Intervenor does not even attempt to plead that the Proposition 50 map has any such effect. *See Tangipa*, 2026 WL 110585, at *31 n.35.

This claim should be dismissed because of Plaintiff-Intervenor's failure to plead any facts relevant to an intentional discrimination claim under Section 2.

## IV.    SOVEREIGN IMMUNITY BARS CHALLENGERS' CLAIMS AGAINST GOVERNOR NEWSOM

Challengers name Governor Newsom as a Defendant in his official capacity as Governor of California. Pl. Compl. ¶ 28; U.S. Compl. ¶ 14. However, the Governor has immunity from Challengers' claims and should be dismissed from this litigation.

The Eleventh Amendment to the United States Constitution prohibits suit against a State or its instrumentalities absent consent by the State or an abrogation of that immunity by Congress. *Papasan v. Allain*, 478 U.S. 265, 276-77 (1986); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100-02 (1984). A third exception, the *Ex parte Young* doctrine, permits actions for prospective relief against state officers sued in their official capacities for "an ongoing violation of federal law." *Virginia Off. For Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255 (2011); *see Ex parte Young*, 209 U.S. 123, 159-60 (1908). The *Ex parte Young* exception applies if the state official sued has direct responsibility for enforcement of an allegedly unconstitutional statute. *Harris,* 729 F.3d at 943. A "generalized duty to enforce state law" is insufficient. *Los Angeles Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992).

None of the three exceptions applies here. First, the State has not consented to suit and, second, Challengers do not allege that Congress has "unequivocal[ly] express[ed]" an "intent to overturn" the State's immunity. *Pennhurst*, 465 U.S. at 106. Third, Challengers allege that the California Constitution vests in the Governor "[t]he supreme executive power" of the State, that he is charged with

"see[ing] that the law is faithfully executed[,]" and that he signed the laws that placed Proposition 50 on the ballot. Pl. Compl. ¶ 28; U.S. Compl. ¶ 14. These allegations state nothing more than the Governor's "general duty to enforce California law." *Harris,* 729 F.3d at 943. The *Ex parte Young* exception does not apply here because the "connection" between the state official and the challenged law "must be fairly direct[,]" *Eu,* 979 F.2d at 704, and Challengers' complaints "do not direct this Court to any enforcement authority the [Governor] possesses in connection with [Proposition 50] that a federal court might enjoin him from exercising[,]" *Whole Woman's Health v. Jackson*, 595 U.S. 30, 43 (2021). Accordingly, the Governor is "entitled to Eleventh Amendment immunity" because "a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision will not subject an official to suit." *Id.* (citation and quotation marks omitted). Governor Newsom should, therefore, be dismissed as a party from this suit because Challengers have not pleaded and could not plead facts establishing his direct role in enforcing Proposition 50.

## CONCLUSION

For the foregoing reasons, Challengers' complaints should be dismissed in their entirety, and the Governor should be dismissed as a Defendant.

1    Dated:  February 11, 2025                    Respectfully submitted,

2                                                 ROB BONTA
                                                  Attorney General of California
3                                                 ANYA M. BINSACCA
                                                  LARA HADDAD
4                                                 Supervising Deputy Attorneys General
                                                  RYAN EASON
5                                                 DAVID GREEN
                                                  JENNIFER E. ROSENBERG
6                                                 S. CLINTON WOODS
                                                  Deputy Attorneys General
7

8                                                 */s/ Iram Hasan*
9                                                 IRAM HASAN
                                                  Deputy Attorney General
10                                                *Attorneys for Defendants California*
                                                  *Governor Gavin Newsom and*
11                                                *Secretary of State Shirley Weber*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

22

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendants California Governor Gavin Newsom and Secretary of State Shirley Weber, certifies that this brief contains 6,880 words, which complies with L.R. 11-6.1.


Dated:  February 11, 2025

Respectfully submitted,

ROB BONTA
Attorney General of California
ANYA M. BINSACCA
LARA HADDAD
Supervising Deputy Attorneys General
RYAN EASON
DAVID GREEN
JENNIFER E. ROSENBERG
S. CLINTON WOODS
Deputy Attorneys General


*/s/ Iram Hasan*
IRAM HASAN
Deputy Attorney General
*Attorneys for Defendants California
Governor Gavin Newsom and Secretary
of State Shirley Weber*