MICHAEL A. COLUMBO (SBN: 271283)
mcolumbo@dhillonlaw.com
SHAWN COWLES (SBN: 163826)
scowles@dhillonlaw.com
DOMENIC P. AULISI*
daulisi@dhillonlaw.com
AMBER R. HULSE*
ahulse@dhillonlaw.com
**DHILLON LAW GROUP INC.**
4675 MacArthur Court, Suite 1410
Newport Beach, CA 92660
Telephone: (415) 433-1700

    * Admitted *Pro Hac Vice*

*Attorneys for Plaintiffs David Tangipa, Eric Ching,
Saul Ayon, Peter Hernandez, Roxanne Hoge,
Joel Guiterrez Campos, Solomon Verduzco,
Paul Ramirez, Jayne Ortiz-Wilson, Vernon Costa,
Rachel Gunther, Doug Buchanan, Sayrs Morris,
Mike Netter, Christina Raughton, Kristi Hays,
James Reid, Michael Tardif, Alex Galicia, and
California Republican Party*

BRADLEY A. BENBROOK (SBN: 177786)
brad@benbrooklawgroup.com
STEPHEN M. DUVERNAY (SBN: 250957)
steve@benbrooklawgroup.com
**BENBROOK LAW GROUP, PC**
1301 Dove Street, 5th Floor
Newport Beach, CA 92660
Telephone: (703) 745-5870

J. CHRISTIAN ADAMS*
adams@publicinterestlegal.org
KAYLAN PHILLIPS*
kphillips@publicinterestlegal.org
JOSEPH M. NIXON*
jnixon@publicinterestlegal.org

Consolidated Complaint                          Case No. 2:25-cv-10616

JEWEL M. LIGHTFOOT*
jlightfoot@publicinterestlegal.org
CAROLYN C. VALDES*
cvaldes@publicinterestlegal.org
**PUBLIC INTEREST LEGAL FOUNDATION**
107 S. West Street
Alexandria, VA 22314
Telephone: (703) 745-5870

   * Admitted *Pro Hac Vice*

*Attorneys for Plaintiffs Mitch Noyes,*
*Holden Lomeli, and Anthony McBroom*

JESUS A. OSETE*
  Principal Deputy Assistant Attorney General
MATTHEW ZANDI (SBN: 203329)
  Chief of Staff & Special Counsel
ANDREW BRANIFF (IN No. 23430-71)
  Acting Chief, Appellate Section
DAVID GOLDMAN (VA No. 98922)
JOSHUA R. ZUCKERMAN (DC No. 1724555)
GRETA GIESEKE (TX No. 24132925)
  Attorneys
    Civil Rights Division
    United States Department of Justice
    950 Pennsylvania Avenue, NW
    Washington, D.C. 20530
    Telephone: (202) 514-3847
    Email: greta.gieseke@usdoj.gov

TODD BLANCHE
  Deputy Attorney General
BILAL A. ESSAYLI
  First Assistant United States Attorney
JULIE A. HAMILL (SBN 272742)
  Assistant United States Attorney
    United States Attorney's Office
    300 North Los Angeles Street, Suite 7516

Consolidated Complaint                                    Case No. 2:25-cv-10616

Los Angeles, California 90012
Telephone: (213) 894-2464
Email: julie.hamill@usdoj.gov

* Assistant Attorney General Harmeet K. Dhillon
is recused from this matter

*Attorneys for Plaintiff-Intervenor
United States of America*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DAVID TANGIPA, ERIC CHING, SAUL AYON, PETER HERNANDEZ, ROXANNE HOGE, JOEL GUITERREZ CAMPOS, SOLOMON VERDUZCO, PAUL RAMIREZ, JAYNE ORTIZ-WILSON, VERNON COSTA, RACHEL GUNTHER, DOUG BUCHANAN, SAYRS MORRIS, MIKE NETTER, CHRISTINA RAUGHTON, KRISTI HAYS, JAMES REID, MICHAEL TARDIF, ALEX GALICIA, AND CALIFORNIA REPUBLICAN PARTY | Case Nos. 2:25-cv-10616-JLS-WLH-KKL (Lead); 2:25-cv-11480-JLS-WLH-KKL |

Plaintiffs,

and

MITCH NOYES, HOLDEN LOMELI, and ANTHONY MCBROOM,

Plaintiffs,

and

UNITED STATES OF AMERICA,

Plaintiff-Intervenor,

vs.

**CONSOLIDATED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Hon. Josephine L. Staton
Hon. Kenneth K. Lee
Hon. Wesley L. Hsu

Action Filed: November 5, 2025

---

Consolidated Complaint                                    Case No. 2:25-cv-10616

GAVIN NEWSOM, in his official capacity as the Governor of California; SHIRLEY WEBER, in her official capacity as California Secretary of State,

Defendants,

and

DEMOCRATIC CONGRESSIONAL CAMPAIGN COMMITTEE,

Defendant-Intervenor,

and

LEAGUE OF UNITED LATIN AMERICAN CITIZENS,

Defendant-Intervenor.

Consolidated Complaint                                    Case No. 2:25-cv-10616

**INTRODUCTION**

1.     This consolidated action challenges the constitutionality and lawfulness of a new California congressional district map implemented following the passage of Proposition 50 (the "Proposition 50 map"). The California Legislature violated the Fourteenth[1] and Fifteenth[2] Amendments to the United States Constitution, and Section 2 of the Voting Rights Act of 1965[3] ("VRA"), 52 U.S.C. § 10301, when it drew new congressional district lines using race as the predominant factor—specifically to protect or enhance Hispanic or black voting power—without a compelling justification backed by evidence that the VRA required such action.

2.     The Equal Protection Clause of the Fourteenth Amendment guarantees every citizen the equal protection of the laws, and the U.S. Supreme Court has held that the Clause's central mandate is racial neutrality in governmental decision-making. *Miller v. Johnson*, 515 U.S. 900, 904 (1995). While the Constitution entrusts states with designing congressional districts, states may not, absent a compelling, evidence-based reason, separate citizens into different voting districts based on race. *Cooper v. Harris*, 581 U.S. 285, 291 (2017).

3.     The Fifteenth Amendment provides an absolute prohibition against the denial or abridgement of the right to vote on account of race or color. U.S. Const. amend. XV, § 1. A racial gerrymander—the deliberate and arbitrary distortion of district boundaries for racial purposes—circumvents the Fifteenth Amendment. *Shaw v. Reno*, 509 U.S. 630, 640 (1993) ("*Shaw I*"). Unlike the Fourteenth Amendment, the Fifteenth

---

[1] Only the Tangipa Plaintiffs (defined *infra*) and the United States challenge the constitutionality of the Proposition 50 Map under the Fourteenth Amendment.

[2] Only the Noyes Plaintiffs (defined *infra*) challenge the constitutionality of the Proposition 50 Map under the Fifteenth Amendment.

[3] Only the Noyes Plaintiffs and the United States challenge the lawfulness of the Proposition 50 Map under Section 2 of the VRA.

1

Consolidated Complaint                                    Case No. 2:25-cv-10616

Amendment's prohibition is absolute and admits no compelling-interest defense. *Prejean v. Foster*, 227 F.3d 504, 519 (5th Cir. 2000).

4. Section 2 of the VRA prohibits states from implementing any "practice[] or procedure . . . which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). A violation of this prohibition "is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State … are not equally open to participation by members of a class of citizens protected by [52 U.S.C. § 10301(a)] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b).

5. The Noyes Plaintiffs allege that by intentionally distorting district boundaries along racial lines to preserve a specific number of Hispanic-majority districts and two black-influence districts, California violated the Fifteenth Amendment and Voting Rights Act. *See* U.S. Const., amend. XV, § 1; 52 U.S.C. § 10101(a); *see also Shaw I*, 509 U.S. at 657 ("[r]acial gerrymandering … may balkanize us into competing racial factions; it threatens to carry us further from the goal of a political system in which race no longer matters").

6. Although frequently marketed to the public as a lawful partisan gerrymander intended to counter redistricting efforts in Texas, the "first thing" that Paul Mitchell, the architect of the Proposition 50 map "did in drawing the new map"—the "number one thing that [he] first started thinking about"—was to create a new "majority/minority Latino district." And while legislators discussed the purported dilution of Democratic representation elsewhere across the country, they also alleged that the voting power of racial groups in other states was being diluted and California must respond. They feared that a "Latino voice in Texas is worth one third of the representation as a white voice." That Texas would "slid[e] back" to the days of "black codes, and Jim Crow." And that Texas legislators would "silence the voices of Latino voters." The

2

Proposition 50 map would therefore serve as a "shield" against "racist maps" elsewhere so that minorities in California could "stand up and be counted." The end result was a new congressional district map that manipulates district lines in the name of bolstering or safeguarding the voting power of certain Californians on the basis of their race.

7.     Some of the newly enacted districts mirror or resemble race-based districts previously adopted by the California Redistricting Commission, which it justified using the VRA (but which the California Legislature did not identify or justify as so-called "VRA districts"). "When a State invokes the VRA to justify race-based districting, it must show (to meet the 'narrow tailoring' requirement) that it had a 'strong basis in evidence' for concluding that the statute required its action." *Cooper*, 581 U.S. at 292 (quoting *Alabama Legis. Black Caucus v. Alabama*, 575 U.S. 254, 278 (2015)). In other words, "the State must establish that it had 'good reasons' to think that it would transgress the [VRA] if it did *not* draw race-based district lines." *Id.* at 293 (citation omitted). In prior filings to date in this matter, Defendants have never sought to justify the Proposition 50 map as required by the VRA.[4]

8.     As respectively alleged herein by the Tangipa Plaintiffs (defined *infra*), the Noyes Plaintiffs (defined *infra*), and the United States, Proposition 50 created a congressional map that is unconstitutional and unlawful because it violates the Fourteenth Amendment's guarantee of equal protection by sorting voters into districts on the basis of their race, denies or abridges the right to vote in violation of the Fifteenth Amendment, and denies or abridges the right to vote in violation of Section 2 of the VRA.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1345 because Plaintiffs and Plaintiff-Intervenor assert claims under the federal constitution, 42 U.S.C. § 1983, and the VRA.

10.     Declaratory relief is authorized by 28 U.S.C. §§ 2201–2202.

---

[4] The United States does not join this paragraph. The United States also does not join the use of the term "VRA districts" in this Complaint.

Consolidated Complaint                                        Case No. 2:25-cv-10616

11.    Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to these claims occurred in this District, including the administration and conduct of elections using the challenged congressional map in Los Angeles, Orange, Riverside, San Bernardino, Ventura, Santa Barbara, and San Luis Obispo Counties, where Plaintiffs reside and vote.

12.    Plaintiffs and Plaintiff-Intervenor request a three-judge court under 28 U.S.C. § 2284 because this case challenges the constitutionality of the apportionment of congressional districts in California.

## PARTIES

### A.    The Tangipa Plaintiffs

13.    Plaintiff David Tangipa is a registered voter and Assemblyman residing in Congressional District 21 in Fresno County. He is the first Legislator in California's history to be of Polynesian descent, the smallest and least-represented minority group in the State, and was elected from a majority-white district. He sits on the Assembly Elections Committee. He plans to vote in the 2026, 2028, and 2030 congressional elections. Proposition 50 assigns him to a district drawn with race as the predominant factor, causing stigmatic and representational injury.

14.    Plaintiff Eric Ching is an Asian voter and Congressional candidate who resides in Congressional District 31 in Los Angeles County, where he has resided for about forty-two years. He was formerly a city councilman, and he plans to run for election and vote in the 2026, 2028, and 2030 District 31 Congressional elections. Before Proposition 50, Mr. Ching had intended to run for Congress in Congressional District 38, his congressional district at that time and the district in which he had previously run for Congress twice. But, because of the changes to his district, he now lives in Congressional District 31. Proposition 50 assigns him to a district drawn with race as the predominant factor, causing stigmatic and representational injury.

15.    Plaintiff Saul Ayon is a Hispanic voter who resides in Congressional District 22 in Kern County, where he has resided for forty-nine years. He was formerly a city

4

councilman. He plans to vote in the 2026, 2028, and 2030 congressional elections. Proposition 50 assigns him to a district drawn with race as the predominant factor, causing stigmatic and representational injury.

16. Plaintiff Peter Hernandez is a Hispanic voter who resides in Congressional District 18 in San Benito County, where he has resided for fifty-one years. He formerly served as a school board member and as a member of the board of supervisors. He plans to vote in the 2026, 2028, and 2030 congressional elections. Proposition 50 assigns him to a district drawn with race as the predominant factor, causing stigmatic and representational injury.

17. Plaintiff Roxanne Hoge is an immigrant from Jamaica who is a registered voter who resides in Congressional District 29 in Los Angeles County, where she has resided since 1988. She plans to vote in the 2026, 2028, and 2030 congressional elections. Proposition 50 assigns her to a district drawn with race as the predominant factor, causing stigmatic and representational injury.

18. Plaintiff Joel Guiterrez Campos is a Hispanic voter who resides in Congressional District 13 in Stanislaus County, where he has resided for roughly thirty-four years. He plans to vote in the 2026, 2028, and 2030 congressional elections. Proposition 50 assigns him to a district drawn with race as the predominant factor, causing stigmatic and representational injury.

19. Plaintiff Solomon Verduzco is a Hispanic voter who resides in Congressional District 21 in Fresno County, where he has resided for his entire life. He plans to vote in the 2026, 2028, and 2030 congressional elections. Proposition 50 assigns him to a district drawn with race as the predominant factor, causing stigmatic and representational injury.

20. Plaintiff Paul Ramirez is a Hispanic voter who resides in Congressional District 41 in Los Angeles County, where he has resided since 1962. He plans to vote in the 2026, 2028, and 2030 congressional elections. Proposition 50 assigns him to a district drawn with race as the predominant factor, causing stigmatic and representational injury.

Consolidated Complaint                                          Case No. 2:25-cv-10616

21. Plaintiff Jayne Ortiz-Wilson is a Hispanic voter who resides in Congressional District 9 in San Joaquin County, where she has resided for fifteen years. She plans to vote in the 2026, 2028, and 2030 congressional elections. Proposition 50 assigns her to a district drawn with race as the predominant factor, causing stigmatic and representational injury.

22. Plaintiff Vernon Costa is a Portuguese voter who resides in Congressional District 22 in Kings County, where he has resided for sixty-eight years. He plans to vote in the 2026, 2028, and 2030 congressional elections. Proposition 50 assigns him to a district drawn with race as the predominant factor, causing stigmatic and representational injury.

23. Plaintiff Rachel Gunther is a Filipino voter who resides in Congressional District 41 in Los Angeles County, where she has lived since 1971. She plans to vote in the 2026, 2028, and 2030 congressional elections. Proposition 50 assigns her to a district drawn with race as the predominant factor, causing stigmatic and representational injury.

24. Plaintiff Doug Buchanan is a white voter who resides in Congressional District 13 in Stanislaus County, where he has lived for forty-six years. He plans to vote in the 2026, 2028, and 2030 congressional elections. Proposition 50 assigns him to a district drawn with race as the predominant factor, causing stigmatic and representational injury.

25. Plaintiff Sayrs Morris is a white voter who resides in Congressional District 25 in Imperial County, where she has resided for fourteen years. She plans to vote in the 2026, 2028, and 2030 congressional elections. Proposition 50 assigns her to a district drawn with race as the predominant factor, causing stigmatic and representational injury.

26. Plaintiff Mike Netter is a white voter who resides in Congressional District 31 in Los Angeles County, where he has resided for six years. He plans to vote in the 2026, 2028, and 2030 congressional elections. Proposition 50 assigns him to a district drawn with race as the predominant factor, causing stigmatic and representational injury.

Consolidated Complaint                    Case No. 2:25-cv-10616

27.     Plaintiff Christina Raughton is a white voter who resides in Congressional District 33 in San Bernardino County, where she has been a resident since 2005. She plans to vote in the 2026, 2028, and 2030 congressional elections. Proposition 50 assigns her to a district drawn with race as the predominant factor, causing stigmatic and representational injury.

28.     Plaintiff Kristi Hays is a white voter who resides in Congressional District 35 in Riverside County, where she has been a resident for fourteen years. She plans to vote in the 2026, 2028, and 2030 congressional elections. Proposition 50 assigns her to a district drawn with race as the predominant factor, causing stigmatic and representational injury.

29.     Plaintiff James Reid is a white voter who resides in Congressional District 35 in San Bernardino County, where he has lived for roughly forty years. He plans to vote in the 2026, 2028, and 2030 congressional elections. Proposition 50 assigns him to a district drawn with race as the predominant factor, causing stigmatic and representational injury.

30.     Plaintiff Michael Tardif is a white voter who resides in Congressional District 46 in Orange County, where he has lived for over seventy years. He plans to vote in the 2026, 2028, and 2030 congressional elections. Proposition 50 assigns him to a district drawn with race as the predominant factor, causing stigmatic and representational injury.

31.     Plaintiff Alex Galicia is a Hispanic voter who resides in Congressional District 52 in San Diego County, where he has lived for over 19 years. He plans to vote in the 2026, 2028, and 2030 congressional elections. Proposition 50 assigns him to a district drawn with race as the predominant factor, causing stigmatic and representational injury.

32.     Plaintiff California Republican Party ("CAGOP") is a political party in California with its principal place of business in Sacramento. The CAGOP exercises its "federal and state constitutional rights, as set forth in the First and Fourteenth

7

Amendments to the United States Constitution, and Article IV, Section 5 . . . to represent and speak for its members [and] to endorse and to nominate candidates for all partisan elective offices." Section 1.04.01 of the CAGOP Bylaws. The CAGOP represents over 5.8 million registered Republican voters in California as of October 20, 2025. The CAGOP has a vital interest in protecting the ability of Republican voters to vote in elections in which the districts are not unconstitutional racial gerrymanders, and brings this suit to vindicate its own rights and, in a representational capacity, the rights of its member voters and candidates.

### B.    The Noyes Plaintiffs

33.    Plaintiff Mitch Noyes is a California resident and is registered to vote in California. Under the challenged map, he is assigned to a district drawn with racial intent.

34.    Plaintiff Holden Lomeli is a California resident and is registered to vote in California. Under the challenged map, he is assigned to a district drawn with racial intent.

35.    Plaintiff Anthony McBroom is a California resident and is registered to vote in California. Under the challenged map, he is assigned to a district drawn with racial intent.

### C.    Plaintiff-Intervenor

36.    Plaintiff-Intervenor is the United States of America.[5] The United States is authorized to intervene pursuant to 42 U.S.C. § 2000h-2 to enforce the Equal Protection Clause of the Fourteenth Amendment, as the Attorney General of the United States has certified that this case is one of general public importance. *See* Ex. A.

37.    The United States is also authorized to institute an action for preventative relief whenever "there are reasonable grounds to believe that any person is about to engage in any act or practice prohibited by" Section 2 of the VRA. 52 U.S.C. § 10308(d).

---

[5] Given the unusual nature of a consolidated complaint, the United States reserves the right to unjoin any portion of this Consolidated Complaint that is inconsistent with its original Complaint in Intervention (Dkt. 42).

8

Consolidated Complaint                                        Case No. 2:25-cv-10616

**D.    Defendants**

38.    Defendant Gavin Newsom is a party to this action in his official capacity as Governor of California. *See generally Ex Parte Young*, 209 U.S. 123 (1908). The California Constitution vests the "supreme executive power of th[e] State" in the Governor, who "shall see that the law is faithfully executed." Cal. Const. art. V, § 1. Governor Newsom signed the laws that enabled Proposition 50 to be placed on the ballot.

39.    Defendant Shirley Weber is a party to this action in her official capacity as the Secretary of State of California. *See generally Young*, 209 U.S. 123. The California Secretary of State is the chief elections officer and is responsible for implementing the Proposition 50 map.

## STANDING

40.    Plaintiffs are registered voters who have a right to vote and plan to vote in future congressional elections in California, including 2026, 2028, and 2030. Plaintiffs have standing to challenge Proposition 50 because the law classifies and segregates them into distinct districts drawn based on their races for purposes of voting. *See North Carolina v. Covington*, 585 U.S. 969, 978 (2018) (per curiam); *Miller*, 515 U.S. at 911; *Shaw I*, 509 U.S. at 650.

41.    Plaintiffs also have standing because they suffered unlawful, intentional discrimination based on race when the State used racial criteria to create and maintain sixteen Latino districts and two black-influence districts. *See generally Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181 (2023); *Adarand Constructors v. Pena*, 515 U.S. 200 (1995); *Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989).

42.    Because Proposition 50 draws congressional district lines with racial intent, Plaintiffs have suffered a constitutional injury. *See Catholic League for Religious and Civ. Rts. v. City & Cnty. of San Francisco*, 624 F.3d 1043, 1052 (9th Cir. 2010) (en banc). The Fifteenth Amendment "applies with equal force regardless of the particular racial group targeted by the challenged law." *Davis v. Guam*, 932 F.3d 822, 832 (9th Cir. 2019).

9

Consolidated Complaint                                          Case No. 2:25-cv-10616

43.    The Noyes Plaintiffs also have standing because they have suffered an abridgment of their rights to vote. *Shaw v. Hunt*, 517 U.S. 899, 917 (1996) ("*Shaw II*"); *Gomillion v. Lightfoot*, 364 U.S. 339 (1960).

44.    These injuries are fairly traceable to Defendants' conduct, which directly and intentionally caused them, and are redressable by this Court. Plaintiffs are personally subjected to the racial sorting embodied in the Proposition 50 map, suffer representational harms, and face imminent electoral injuries absent relief.

45.    Plaintiff CAGOP has standing to represent its members in each of the challenged congressional districts who have been harmed. CAGOP works to elect Republican candidates to Congress, and the passage of Proposition 50 will result in CAGOP diverting resources and spending significant amounts of money to educate voters about the new lines and their congressional representation.

46.    The United States, as sovereign, suffers a legal injury when a State violates federal law. *See Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771–72 (2000); *Pasadena City Bd. of Educ. v. Spangler*, 427 U.S. 424, 430–31 (1976) (standing under 42 U.S.C. § 2000h-2 to enforce the Equal Protection Clause). The United States may also sue as *parens patriae* to protect the federal rights of its citizens. *Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923); *see United States v. Raines*, 362 U.S. 17, 27 (1960) (standing to enforce voting rights).

## FACTUAL BACKGROUND

### A. Background on California Elections and Demographics

47.    According to the most recent decennial census, performed in 2020, California has a population of 39,538,223. California: 2020 Census Population and Housing Map, U.S. Census Bureau, https://www.census.gov/library/stories/state-by-state/california.html#race-ethnicity (last visited Mar. 20, 2026). Hispanic individuals constitute a plurality, making up 39.4% of California's population. Non-Hispanic white individuals are 34.7% of that population. Non-Hispanic Asian individuals are about

10

Consolidated Complaint                                    Case No. 2:25-cv-10616

15.1% of that population. And Non-Hispanic black individuals make up about 5.4% of that population. In other words, there is no ethnic majority group in California.

48. "Latino[6] communities are not a uniform constituency; they differ significantly across urban, suburban, and rural regions in terms of socioeconomic status, citizenship rates, linguistic backgrounds, and political participation." Dr. Raquel Centeno & Dr. Jarred Cuellar, *Latino Voters and the November 2025 Special Election: Redistricting and Representation* 2, https://www.politico.com/f/?id=0000019a-0e13-dc69-abda-fed37ace0000 (last visited Mar. 20, 2026) (the "Centeno & Cuellar Report").

49. Recent elections demonstrate that Hispanics have not struggled to elect politicians of their choice in California. Results in California are largely driven by partisan bloc voting rather than racial bloc voting. In 2022, Democrat Alex Padilla, a Hispanic candidate, won 61.1% of the statewide vote for U.S. Senate against Republican Mark Meuser, a white candidate, who won 38.9%. November 8, 2022, General Election: Statement of Vote Summary Pages 6, Cal. Sec'y of State, https://elections.cdn.sos.ca.gov/sov/2022-general/sov/06-summary.pdf (last visited Mar. 20, 2026). The result mirrored the Governor's race between Gavin Newsom, a white Democrat, and Brian Dahle, a white Republican. *Id.* Padilla, the Hispanic candidate, received more votes and a larger margin of victory than Newsom—the opposite of what one would expect if white voters voted as a bloc against Hispanic candidates. *Id.*

50. In the 2018 general election, Hispanic Democratic candidates also defeated white Republican candidates by comfortable margins in statewide races. November 6,

---

[6] "The terms [Hispanic and Latino] are often used interchangeably, though the words can convey slightly different connotations." Britannica, *What's the Difference Between Hispanic and Latino?*, Britannica, https://www.britannica.com/story/whats-the-difference-between-hispanic-and-latino (last visited Mar. 20, 2026). "Latino" "refers to (almost) anyone born in or with ancestors from Latin America and living in the U.S., including Brazilians." *Id.* "'Hispanic' is generally accepted as a narrower term that includes people only from Spanish-speaking Latin America, including those countries/territories of the Caribbean or from Spain itself." *Id.* Plaintiffs and Plaintiff-Intervenor will use these terms interchangeably.

11

Consolidated Complaint                                              Case No. 2:25-cv-10616

2018, General Election: Statement of Vote Summary Pages 7, https://elections.cdn.sos.ca.gov/sov/2018-general/sov/07-summary.pdf (last visited Mar. 20, 2026). In the 2020 presidential election, Joseph R. Biden defeated Donald J. Trump in California by a similar margin to other statewide races. November 3, 2020, General Election: Statement of Vote Summary Pages 8, https://elections.cdn.sos.ca.gov/sov/2020-general/sov/08-sov-summary.pdf (last visited Mar. 20, 2026). Across elections, votes received by candidates of the same party in the same year are stable, indicating high levels of partisan straight-ticket voting regardless of race.

51.    In other words, division amongst California voters is attributable primarily to partisan differences, not race.

52.    At least 27 of California's 52 Congressional representatives are of an ethnic minority. Of those, at least 15 are Hispanic. At least 20 of California's 40 state senators are of an ethnic minority, including at least 15 who are Hispanic. At least 45 of California's 80 state assemblymen are of an ethnic minority, including at least 27 who are Hispanic. California also has a racially diverse set of statewide elected officials.

**B. Historical Background of Redistricting in California**

53.    The United States Constitution requires the states to periodically redistrict. Article I, § 2, mandates that congressional representation be recalculated every ten years. *Reynolds v. Sims*, 377 U.S. 533, 562 (1964); *Wesberry v. Sanders*, 376 U.S. 1, 8 (1964).

54.    California's Constitution implements this principle through its once-per-decade limitation on redistricting. Article XXI, § 1, provides that the Citizens Redistricting Commission ("CRC" or the "Commission") shall adjust congressional boundary lines in the year following the national census. Cal. Const. art. XXI, § 1. Prior to Proposition 50, the California Constitution only permitted the redistricting of congressional districts after the Commission has published its maps in two scenarios: (1) when a new map is authorized through a voter referendum, or (2) when a new map must be drawn to comply with a court order. *Id.* art. XXI, §§ 2(i), 3(b)(3).

12

Consolidated Complaint                                      Case No. 2:25-cv-10616

55. The CRC last drew a congressional map for California in 2021 following the 2020 Census (the "Commission map").

### C. The Three-Bill Legislative Package and Enactment of Proposition 50

56. On July 2, 2025, Paul Mitchell, from Sacramento-based Redistricting Partners, met with Speaker of the California Assembly Robert Rivas's Chief of Staff, Steve Omara, and began conversations with the California Legislature about drawing the new congressional districts that would become the Proposition 50 map. Defendant-Intervenor Democratic Congressional Campaign Committee ("DCCC") paid Mr. Mitchell for the new congressional map and submitted it to the California Legislature on August 15, 2025.

57. In August 2025, Governor Newsom and state legislative leadership announced a coordinated package to replace the congressional map adopted by the Commission with a new map for use in 2026, 2028, and 2030, subject to voter approval at a special election. The package consisted of: (a) Assembly Constitutional Amendment No. 8 ("ACA 8") (Rivas & McGuire), a legislatively referred constitutional amendment authorizing temporary use of legislature-enacted congressional map through 2030 that would require voter approval to take effect; (b) Assembly Bill No. 604 ("AB 604") (Aguiar-Curry & Gonzalez), the statute specifying the new congressional district boundaries; and (c) Senate Bill No. 280 ("SB 280") (Cervantes & Pellerin), a bill calling for the special election, appropriating funds, and making conforming calendar changes (collectively, the "Legislative Package"). The Legislature stripped language from three pre-existing unrelated bills and inserted entirely new language to bypass the California Constitution's 30-day waiting period for new legislation. Cal. Const. art. IV, § 8(a).

58. The map was published on Friday, August 15, 2025, just days before the Legislature returned from summer recess. The Legislative Package moved from first reading on August 18, 2025, to a vote in less than four days. On August 21, 2025, the Assembly and Senate approved the Legislative Package. On that same day, to bypass safeguards on the legislative process and facilitate rapid referral from committee, the

13

Consolidated Complaint                    Case No. 2:25-cv-10616

Senate suspended Joint Rule 10.5 and Senate Rule 19 by a recorded vote of Ayes 30, Noes 9, and the Assembly suspended Assembly Rule 63 and Assembly Rule 69(b)(1).

59.    Because of the Legislature's skirting of the California Constitution's waiting period, rule suspensions, and the compressed timeline, the Legislative Package proceeded with limited public transparency. Legislators and stakeholders had little, if any, time to review changing versions of the bills.

60.    During this accelerated process, no district-by-district analysis under Section 2 of the VRA or memorandum illustrating a strong basis in evidence showing the need for additional VRA districts was provided to legislators before their votes. Public bill materials and committee analyses contained no district-specific assessment of minority citizen voting-age population ("CVAP"), racial cohesion, crossover or white-bloc voting, or functional performance for any proposed district. Multiple sitting legislators, including Assemblyman Tangipa and Senator Ochoa-Bogh, were not provided any evidence to determine if the State was required to draw VRA districts. Due to the compressed timeline, Assemblyman Tangipa noted in his opposition to ACA 8's passage that he did not have the opportunity to read the bill. In response, the bill's co-author, Assemblymember Marc Berman, stated that he knew the general content and trusted the people who drafted ACA 8.

61.    On November 4, 2025, Proposition 50 was passed in a special election by California voters, receiving 7,453,339 affirmative votes. November 4, 2025, Statewide Special Election: Statement of Vote Summary Pages 6, https://elections.cdn.sos.ca.gov/sov/2025-special/sov/06-sov-summary.pdf (last visited Mar. 20, 2026). Proposition 50 asked voters to approve the constitutional amendment proposed by the Legislature in ACA 8, to use the newly drawn congressional map adopted by the Legislature in AB 604.

**D. The Use of Race in Drawing the Proposition 50 Map**

62.    Paul Mitchell's public statements confirm that he intentionally and directly used race and Hispanic demographics as criteria in designing the map.

14

Consolidated Complaint                                    Case No. 2:25-cv-10616

63.    Mr. Mitchell acknowledged during a public presentation that his work on the Legislature's plan was guided by racial considerations and **that the "number one thing that [he] first started thinking about" was "drawing a replacement Latino majority/minority district in the middle of Los Angeles."** Ex. B at 23–24 (emphasis added). He stated that the "first thing" he and his team did in "drawing the new map" was to "reverse[]" the CRC's earlier elimination of a "Latino district from LA" and "put that district back." *Id.* at 25.

64.    Mr. Mitchell further explained that he relied on a 2021 letter sent by Hispanas Organized for Political Equality ("HOPE") to the CRC, in which HOPE expressed concern about "the elimination of a majority/minority Latino district within the area of Los Angeles gateway cities." *Id.* at 24. He stated that the letter "illustrated what HOPE wanted to see done . . . allowing for the creation of five Latino majority/minority districts in an area where there are currently four." *Id.* The HOPE letter argued that districts drawn with a Hispanic CVAP "between 52% and 54%" would "still be very likely to elect Latino candidates of choice," and stated that "the protection of voters of color is a higher priority than preserving county boundaries or other lower-order criteria." Ex. C at 5.

65.    Mr. Mitchell admitted that those racial goals dictated his line-drawing decisions. *See* Ex. B at 24–25 (citing Ex. C at 2). He stated: "That [*sic*] two bullet points was the first thing we did in drawing the new map. We essentially reversed the Redistricting Commission's decision to eliminate a Latino district from LA, the old Ed Roybal district . . . We put that district back . . . eliminating the Ken Calvert district in Riverside . . . in order to fill in." *Id.* at 25.

66.    Mr. Mitchell further confirmed that a formal "Voting Rights Act analysis" was conducted to measure Latino electoral performance while simultaneously asserting that the existing CRC map was "compliant with Section 2" of the VRA. *Id.* at 26. Nevertheless, the Proposition 50 map he created "improves the opportunity for Latino voters to elect candidates of choice in two more districts than the existing plan." *Id.* He

Consolidated Complaint                                    Case No. 2:25-cv-10616

also expressly admitted that he drew the map to satisfy HOPE's request for a "Latino-influenced district at 35 percent Latino by voting age population." *Id.* at 25.

67.    Mr. Mitchell stated that the Public Policy Institute of California conducted an analysis confirming the Proposition 50 map "maintained the status quo in terms of the Voting Rights Act," and yet the Proposition 50 map "added one more Latino-influenced district." *Id.* at 26. **He stated the map** "will be great for the Latino community in . . . that they **ensure that the Latino districts that are the VRA seats are bolstered in order to make them most effective**, particularly in the Central Valley." *Id.* at 30 (emphasis added).

68.    Mr. Mitchell identified "Latino-influenced" districts and highlighted the importance of "support[ing] and do[ing] turnout there for Latinos to protect a Latino member of Congress in a district that is still a Latino-influenced district but is no longer a majority-minority district." *Id.* at 29.

69.    On October 23, 2025, Mr. Mitchell posted on X that **the "proposed Proposition 50 map will further increase Latino voting power over the current Commission map"** and that the "proposed plan matches the current one almost exactly: it adds one more Latino influence district but otherwise replicates the status quo." Paul Mitchell (@paulmitche11), X (Oct. 23, 2025, 9:45 AM), https://perma.cc/W73P-X7QU (emphasis added).

70.    Mr. Mitchell also expressly confirmed that, when drawing the Proposition 50 map, he set out to retain the boundaries of the Commission map, "keep[ing] about 80 percent of it the same," but "in certain areas," "ma[king] small, modest changes in order to create a push back to what Texas was doing." Ex. B at 26.

71.    In drawing the Commission map, the CRC explicitly acknowledged that the boundaries of **fourteen congressional districts**—13, 18, 21, 22, 25, 31, 33, 35, 38, 39, 42, 44, 46, and 52—**were drawn "to address VRA obligations**." *See* Report on Final Maps 45, 2020 Cal. Citizens Redistricting Comm'n (Dec. 26, 2021),

16

Consolidated Complaint                                        Case No. 2:25-cv-10616

https://wedrawthelines.ca.gov/wp-content/uploads/sites/64/2023/01/Final-Maps-Report-with-Appendices-12.26.21-230-PM-1.pdf (emphasis added).

72.    Mr. Mitchell's decision to incorporate district boundaries that were concededly race-based into the Proposition 50 map, without making any independent or current determination that such boundaries were required to comply with the VRA, means that the boundaries of at least some districts contained in the resulting Proposition 50 map were based predominantly on race.

73.    Redistricting Partners provided a draft map to the Defendant-Intervenor DCCC in a document that included census population tables and CVAP in each district, broken down by race, as well as bar graphs of each district's racial composition. This document did not include any data showing the political affiliations of the citizens assigned to each proposed district.

74.    DCCC then sent this document to the California Legislature, noting that the map was drawn expressly to "push back against the corrupt scheme in Texas," where legislators were "considering adopting a clearly racially gerrymandered, partisan map at the expense of their voters." Ex. D at 1.

75.    Thirteen districts in this draft map had Hispanic CVAP rates within the optimal 52–55% range identified by HOPE in its letter to the CRC and highlighted by Mr. Mitchell in his presentation to HOPE. One district fell slightly short of that range, containing a Hispanic CVAP percentage of 51.8%. Mr. Mitchell's decision to draw these districts with a Hispanic CVAP percentage close to or within that range was deliberately designed to ensure that Hispanic voting power would not be negatively impacted by the contours of the Proposition 50 districts.

76.    These statements constitute direct evidence that race predominated in the drawing of the Proposition 50 map. *See Alexander v. S. Carolina State Conf. of the NAACP*, 602 U.S. 1, 8 (2024) ("Direct evidence often comes in the form of a relevant state actor's express acknowledgment that race played a role in the drawing of district lines. Such concessions are not uncommon because States often admit to considering

17

Consolidated Complaint                                           Case No. 2:25-cv-10616

race for the purpose of satisfying our precedent interpreting the Voting Rights Act of 1965.").

77.    When pressed during his deposition to explain whether these statements accurately characterized his approach to designing the Proposition 50 map, Mr. Mitchell invoked legislative privilege repeatedly and refused to provide any evidence suggesting otherwise.

**E. Legislators' Own Statements Framed the Effort in Racial Terms**

78.    During the Legislature's consideration of and debate over Proposition 50, several legislators identified explicitly racial, as opposed to political, motivations behind their support for the new map. They described other states' redistricting efforts as efforts intended to suppress minority voters and viewed Proposition 50 as a way to offset those perceived efforts.

79.    Assemblyman Isaac Bryan stated that Republican-led states were redrawing their congressional districts "with the explicit aim of diluting Black and Brown representation and power." Ex. E at 6. He also said, "A Latino voice in Texas is worth one third of the representation as a white voice. A black voter in Texas is worth one fifth of the representation of a white voter in Texas. I didn't say three fifths. There was no compromise. I said one fifth. That is the kind of gerrymandering, that is the kind of theft that they are perpetuating. And we can't just sit by and let it happen." Ex. F at 49.

80.    Assemblyman Mark Gonzalez promoted Proposition 50 as a "shield against racist maps" created by Republican states. *Id.* at 40. He stated: "This is about whether a Latino child in Texas, a black family in Florida, or an immigrant community in California has a voice in their own democracy." *Id.*

81.    Assemblyman Mike Gibson stated: "[I]t's about the next generation that we may not even have any black people serving in office to have representation. It's about 10 African American members of Congress that could be wiped away in Congress if we don't stand up and be counted." *Id.* at 53.

18

Consolidated Complaint                                    Case No. 2:25-cv-10616

82. Senator Sabrina Cervantes, the author of Senate Bill 280, stated: "They want to silence the voices of Latino voters, Black voters, API voters, LGBTQ voters[.]" Ex. G at 75.

83. Senator Lola Smallwood-Cuevas stated: "In Texas, what this looks like is that black Texans will lose much of their power, being reduced to about a fifth of what their power was before this gross attack." Ex. H at 149–50. She also said: "Texas once saw black political power rise during reconstruction, as it had across much of the country, only to be stripped away by the black codes, and Jim Crow, and racial terror, poll taxes, white-only primaries that cut black voter rolls in Texas from over 100,000 to just a few thousand." *Id.* at 150.

84. In a press release, Senate President pro Tempore Mike McGuire said that Proposition 50 "makes no changes to historic Black districts in Oakland and the Los Angeles area, and **retains and expands Voting Rights Act districts that empower Latino voters to elect their candidates of choice**[]." Ex. I at 2 (emphasis added).

85. Speaker of the Assembly Robert Rivas issued a press release asserting that **the Proposition 50 map "retains both historic Black districts and Latino-majority districts."** Ex. J at 1 (emphasis added).

86. Senator Aisha Wahab **described the Voting Rights Act as "mandating that voters of color be placed in districts with more opportunity to select their preferred candidates**." Ex. H at 172 (emphasis added).

87. These statements demonstrate that Proposition 50's map was understood by members of the California Legislature as having been engineered to increase or, at a minimum, safeguard Latino voting power in certain districts to counteract the perceived effects of redistricting in other states on the political power of their minority ethnic citizens or somehow compelled by federal law. When the Tangipa Plaintiffs attempted to schedule the depositions of Speaker Rivas and President pro Tempore McGuire to develop their understanding of these statements, counsel for the legislators stated their

19

Consolidated Complaint                                                Case No. 2:25-cv-10616

intent to assert the legislative privilege with regard to their legislative acts, including with respect to any communications with Paul Mitchell regarding those acts.

**F.      Statistical Evidence of Racial Engineering**

88.    Statistical analysis confirms that the Proposition 50 map's lines were deliberately drawn to produce racially engineered outcomes.

89.    In California's effort to produce a map with sixteen Hispanic-majority districts, the State engaged in a deliberate practice of passing Hispanic-majority census blocks from one adjacent district to another. This was achieved by reducing the Hispanic population in many districts with precision, while carefully and deliberately maintaining a floor of roughly 52% Hispanic CVAP. This resulted in fourteen Hispanic-majority districts falling in an implausibly narrow band of roughly 52–55% Hispanic CVAP in the Proposition 50 map. The demographics of the resulting districts indicate a deliberate, racially motivated approach, and align with the HOPE Letter's recommendations to unpack and redistribute Hispanic voters. *See* Ex. C at 5.

90.    The Proposition 50 map's Hispanic VRA districts were drawn to replicate the racial composition of the Commission map's districts. Of the sixteen majority-Hispanic CVAP districts in the Proposition 50 map, nine have a Hispanic CVAP within two percentage points of their Commission map counterpart, despite entirely redrawn boundary lines. Two more change by less than four percentage points, two by less than one, and one—District 44—increased to 62% Hispanic CVAP. Not a single one of these districts saw its Hispanic CVAP drop below roughly 52%. That the fourteen VRA districts of the Commission map were so faithfully reproduced—and expanded to sixteen—through facially different district lines is the product of deliberate racial engineering.

91.    For example, majority-Hispanic District 18 lost 57.5% Hispanic CVAP territory to District 16 and 57.5% Hispanic CVAP territory to District 17, but was able to preserve its majority-Hispanic status (changing from 52.4% to 52.5% Hispanic CVAP) through carefully selected population transfers from adjacent Districts 13 and 22. District

20

Consolidated Complaint                                    Case No. 2:25-cv-10616

18 absorbed 51.4% Hispanic CVAP territory from District 13 and 70.8% Hispanic CVAP territory from District 22, offsetting its receipt of lower-Hispanic territories. Otherwise, District 18 might not have remained a majority-Hispanic district under Proposition 50.

92.    Similarly, when District 42 transitioned from a Hispanic-majority district to a non-Hispanic-majority district, District 41 was drawn deliberately to replace it and preserve the racial outcome. The former District 42 discarded a heavily Hispanic area to the north, and that population was split between District 38 and the new District 41, allowing District 41's Hispanic CVAP to fall within the narrow 51–55% range.

93.    While Proposition 50 will likely reduce California's Republican delegation from nine to four members, these new district lines were drawn with racial goals and using racial means. The map deliberately preserved California's sixteen Hispanic-majority districts by narrowing the margin of Hispanic population in all but District 44. *See* Ex. K at Ex. 1 at 3-4, ¶ 10. [7]

94.    The Proposition 50 map also intentionally maintained two black-influence districts. *See* Ex. K at Ex. 1 at 3-4, ¶ 10. This enabled racial groups to maintain a narrow majority in these two districts. *See* Ex. K at Ex. 1 at 4, ¶ 11.

*I. Evidence of Racial Intent: Passing the Hispanic Population Between Districts*

95.    In California's effort to preserve sixteen Hispanic-majority Districts, the State engaged in a deliberate practice of passing Hispanic-majority census blocks from one adjacent district to another to preserve the number of Hispanic-majority congressional districts. This was achieved by reducing Hispanic population with precision in many districts, but at a level that very carefully and deliberately maintained a floor of 52% Hispanic population. This "pass the population" tactic achieved the racially motivated outcome of preserving 16 majority Hispanic citizen voting-age population (CVAP) Districts but narrowing this majority to a tight range between 52-

---

[7] The Tangipa Plaintiffs do not join from ¶ 93 through ¶ 116.

Consolidated Complaint                                          Case No. 2:25-cv-10616

55% Hispanic population in these districts. *See* Ex. K at Ex. 1 at 58-59, ¶ 147 and Table 1 below. This is implausible without a deliberate racially motivated draw using explicit racial means.

Table 1 – Distribution of majority Hispanic CVAP districts:

| 2025 Newsom Plan | | | | 2024 Enacted Plan | | |
|---|---|---|---|---|---|---|
| Hispanic CVAP | Number of Districts | Districts | | Hispanic CVAP | Number of Districts | Districts |
| Over 61% | 2 | 22, 44 | | Over 61% | 1 | 22 |
| 58% to 61% | 0 | | | 58% to 61% | 1 | 35 |
| 55% to 58% | 0 | - | | 55% to 58% | 7 | 42, 33, 31, 29, 38, 25, 21 |
| 52% to 55% | 13 | 41, 34, 33, 39, 31, 13, 29, 35, 38, 18, 46, 25, 21 | | 52% to 55% | 7 | 44, 34, 39, 13, 18, 46, 52 |
| Under 52% | 1 | 52 | | Under 52% | 0 | - |

96.     As Judge Lee noted, this racial breakdown can be explained by the 2021 letter from HOPE to the redistricting commission warning against "overpacked" districts with too highly concentrated Latino populations. Dkt. 216 at 83 (Lee, J. dissenting) (citing HOPE Letter, Ex. C at 4). The letter advocated, for maximum electoral effect, drawing districts "between 52% and 54% Latino CVAP" which would "still be very likely to elect Latino candidates of choice." Ex. C at 5. It also stated that "the protection of voters of color is a higher priority than preserving county boundaries or other lower-order criteria" and that "it is also acceptable for [map drawers] to value providing influence to voters of color in [their] districting plans, so long as it is not the sole criteria used." *Id.*

97.     As already discussed, majority-Hispanic District 18 lost 57.5% Hispanic CVAP territory to District 16 and 57.5% Hispanic CVAP territory to District 17. *See* Ex.

22

Consolidated Complaint                                    Case No. 2:25-cv-10616

K at Ex. 1 at 10, ¶ 28. California was able to preserve District 18 as a majority-Hispanic CVAP district (changing from 52.4% to 52.5%) through carefully selected population transfers from the adjacent Districts 13 and 22 (also Majority-Hispanic districts in both maps). *See* Ex. K at Ex. 1 at 8-9, ¶ 25.

98.    District 18 was able to achieve this consistency by absorbing a 51.4% Hispanic CVAP territory from District 13 and a 70.8% Hispanic CVAP from District 22. *See* Ex. K at Ex. 1 at 8-9, ¶ 25. This contributed to offsetting District 18's receipt of 25.4% Hispanic CVAP territory from District 16 and 14.6% Hispanic CVAP territory from District 17. *See* Ex. K at Ex. 1 at 9, ¶ 26.

99.    These deliberate swaps of racial population enabled District 18 to remain within the deliberately tight band of 52-55% Hispanic CVAP range. *See* Ex. K at Ex. 1 at 11, ¶ 30. Despite substantial changes in territory, District 18's Hispanic CVAP population remained consistent between 2024 and 2025. California moved high concentrations of Hispanic CVAP territory into District 18 to offset its losses of high Hispanic CVAP territory. Otherwise, District 18 might not have remained majority Hispanic in 2025. *See* Ex. K at Ex. 1 at 11, ¶ 31.

*II. Evidence of Racial Intent: Replacing District 42 with District 41*

100.    Districts 42 and 41 demonstrate the intent of the map drawer to preserve districts to maintain racial outcomes. Though District 42 transitioned from a Hispanic-majority district to a non-Hispanic-majority district, District 41 was drawn deliberately to preserve a racial outcome and replace this Hispanic-majority district. The new District 42 is effectively dismantled (rendering it no longer a majority Hispanic CVAP district) and was replaced in the same geographic area by a new District 41, which is now within the 52-55% Hispanic CVAP range. *See* Ex. K at Ex. 1 at 24-25, ¶ 68-69. District 42 changed its racial composition by discarding a heavily Hispanic area to the north. That population was divided between District 38 and the new District 41. *See* Ex. K at Ex. 1 at 24-25, ¶ 69. This change enabled District 41 to effectively replace District 42.

23

Consolidated Complaint    Case No. 2:25-cv-10616

101.    Despite District 42 losing a substantial portion of its Hispanic population, this Hispanic-majority area was left intact and formed the core of a new Hispanic-majority District 41, preserving the number of majority Hispanic CVAP districts at sixteen.

102.    Under the Proposition 50 map, Districts 41 and 42 were completely relocated. Despite being moved elsewhere in the State with a new constituent population, those districts were drawn to deliberately maintain the same proportion of Hispanic population. *See* Ex. K at Ex. 1 at 24-30.

103.    Similarly, Republican District 48 lost territory to three Democrat districts. District 52 (a Hispanic-majority district) only absorbed just enough territory from District 48 to have its Hispanic CVAP population change from 52.0% to 51.7%, preserving its narrow Hispanic majority. *See* Ex. K at Ex. 1 at 18-19, ¶ 50.

104.    When evaluating the Hispanic CVAP majority districts in Proposition 50's new map, most of the districts not only retain their Hispanic-majority status but maintain similar racial compositions as they had under the previous map.

105.    The racial population in the new map demonstrates a carefully and intentionally crafted racial outcome.  Despite having altogether new lines, nine of the sixteen majority Hispanic CVAP districts are precisely within 2% of their 2024 percentages, and all but one remained above 52% Hispanic CVAP despite substantial changes to the congressional boundaries' location. *See* Ex. K at Ex. 1 at 20, ¶ 55. Two districts' Hispanic CVAP changed within 4%, two changed within 6%, and one changed by 9% (District 44 increased to 62% Hispanic CVAP), however, none of the districts that changed by 4% or 6% had their Hispanic CVAP drop below 52%. *See* Ex. K at Ex. 1 at 20, ¶ 55. This is not a coincidence. It is a deliberately racially engineered outcome.

106.    The new District 38 remained majority-Hispanic (52.5%) despite being moved west because it absorbed part of the former Districts 42 and 31. If these components had not been merged into District 38, it likely would not have remained majority-Hispanic. *See* Ex. K at Ex. 1 at 42, ¶ 109.

24

Consolidated Complaint                                    Case No. 2:25-cv-10616

107.    Despite substantial geographic changes between the 2024 and 2025 maps, two majority-Hispanic Districts (38 and 42) were effectively reconfigured into the new Districts 38 and 41 to retain their majority Hispanic status. *See* Ex. K at Ex. 1 at 24-44. Proposition 50 not only replaced District 42 with 41 but retained almost the exact same Hispanic CVAP percentage in each district. *See* Ex. K at Ex. 1 at 31, ¶ 85.

### *III. Evidence of Racial Intent: Deliberately Preserving Two Black Influence Districts*

108.    In addition to the deliberate maintenance of sixteen Hispanic-majority districts, Proposition 50 deliberately preserved two performing black-influence districts. These two districts avoided absorbing too much Hispanic population to not jeopardize their status as black-performing districts.

109.    Districts 37 and 43 lie side-by-side, have the highest portion of black population in any district in California, and are not majority-Hispanic. *See* Ex. K at Ex. 1 at 48-49, ¶ 129. Rather than making a new majority-black or majority-Hispanic district, California deliberately preserved the black populations' proportion in both districts and did not mix them with the surrounding Hispanic population. *See* Ex. K at Ex. 1 at 49-50, ¶ 133. Districts 37 and 43 were deliberately drawn in such a way as to preserve the proportion of the black population and its ability to elect candidates based on race. *See* Ex. K at Ex. 1 at 50, ¶ 134-35. As Map 1 shows, District 44 was drawn to avoid taking any Hispanic population from District 43 that would upset the ability to elect black-preferred candidates.

25

Consolidated Complaint                                          Case No. 2:25-cv-10616

Map 1 – Black Influence Districts 37 and 43

110. No racial groups' CVAP populations in Districts 43 and 37 changed. Neighboring Hispanic-majority Districts 33, 38, 44 and white-majority District 40 all experienced demographic changes. *See* Ex. K at Ex. 1 at 59, ¶ 148. Maintaining Districts 43 and 37 is evidence of California's racial intent in drawing the map.

111. Maps 2 and 3 show that the black and Hispanic populations are divided in such a way that neither group is the majority of the citizen voting-age population in either district. However, the voter registration data in the census block groups show that the higher concentration of Hispanic population has lower registration as a percentage of voting-age population. *See* Ex. K at Ex. 1 at 57, ¶ 144. This demonstrates that the black population has an increased voting strength relative to the Hispanic population in both districts, providing the black population with an advantage. *See* Ex. K at Ex. 1 at 57, ¶ 144.

112. Maintaining black racial targets in Districts 43 and 37 enables the black population to maintain black influence districts. *See* Ex. K at Ex. 1 at 50, ¶ 135. As Map 2 demonstrates, the Hispanic population in this area has lower registration as a percentage of VAP. This supports the fact that the Hispanic population in California has a lower

26

Consolidated Complaint                                    Case No. 2:25-cv-10616

citizenship rate than the black population. This enables the black populations in Districts 43 and 37 to effectively politically control the districts despite lacking any majority or plurality in the census data. *See* Ex. K at Ex. 1 at 57, ¶ 145. By intentionally walling off surrounding Hispanic and white racial populations, California deliberately and illegally created two black-influence districts. *See* Ex. K at Ex. 1 at 50, ¶ 135. The consequence of blocking Hispanic populations from voting in these two districts was shown in the increase of Hispanic population in neighboring District 44. *See* Ex. K at Ex. 1 at 61, ¶ 155.

27

Map 2 – Illustrative community map with Districts 37 and 43 (NH black and Hispanic VAP)



28

113. Map 2 shows the Hispanic and non-Hispanic black voting-age population (VAP) and uses triangles to represent the Hispanic population and circles for the black population.

114. The larger circles indicate 50% or more non-Hispanic black VAP, and the smaller circles indicate between 40% and 50% black VAP. *See* Ex. K at Ex. 1 at 55, ¶ 142.

115. The triangles show the strength of the Hispanic community with the larger triangles indicating over 50% Hispanic VAP and the smaller triangles indicating between 40% and 50% Hispanic VAP. *See* Ex. K at Ex. 1 at 55, ¶ 143.

Map 3 – Illustrative community map with Districts 37 and 43 (Registration as % of VAP)



29

Consolidated Complaint                                                    Case No. 2:25-cv-10616

116.    By deliberately concentrating the black population in two districts with low Hispanic registration percentages, while walling off the Hispanic and white populations to the surrounding districts, California preserved two influence districts for the black population. California intentionally drew district lines to advance political control of one racial group over another to the detriment of the Fifteenth Amendment and the Voting Rights Act.

### G. District 13 Is an Exemplar of Racial Gerrymandering[8]

117.    District 13 is made up of parts of five counties: part of San Joaquin County, southwestern Stanislaus County, all of Merced County, western Madera County, and part of Fresno County. As drawn, District 13 is 64.8% Hispanic by total population and has a Hispanic CVAP that accounts for 53.8% of the district's total CVAP.

118.    Under the Commission map, District 13 was already 65.9% Hispanic and only 22.5% white.

119.    The VRA did not compel the race-based redesign of this district.

120.    The boundaries of District 13 under the Proposition 50 map were drawn predominantly to improve Hispanic performance in the district, not to improve the prospects of Democratic congressional candidates. Near Ceres and Modesto—two cities in Stanislaus County—the district's boundary bulges out to split Modesto while keeping Ceres intact and capturing areas outside of Ceres.

121.    This configuration omits a significant white Democratic population in Modesto while capturing a heavily Hispanic Republican population in and around Ceres.

122.    If partisanship were the motivating factor, the district would drop some of the Republican areas in Ceres and pick up Democratic areas in Modesto.

123.    Similarly, the northern split of District 13, near Stockton, leaves heavily Democratic areas to the west of the district but includes a northern appendage. What differentiates these areas is that the northern appendage is heavily Hispanic, while the omitted areas to the west are more heavily white. The appendage bypasses white

---

[8] The United States does not join this section.

30

Consolidated Complaint                                        Case No. 2:25-cv-10616

Democrats, making the district less compact, to gain Hispanic areas. This decision makes little sense from the perspective of a mapmaker intending to maximize partisan performance.

## CLAIMS FOR RELIEF

## COUNT I (Tangipa Plaintiffs)

### Racial Gerrymandering in Violation of the Equal Protection Clause of the Fourteenth Amendment

### (42 U.S.C. § 1983)

124.   The Tangipa Plaintiffs reallege and incorporate by reference the foregoing allegations, except as otherwise stated, as if fully set forth herein.

125.   Defendants violated the Equal Protection Clause of the Fourteenth Amendment by using race as a predominant factor in drawing the boundaries of sixteen congressional districts: Districts 13, 18, 21, 22, 25, 29, 31, 33, 34, 35, 38, 39, 41, 44, 46, and 52.

126.   As alleged above, members of the California Legislature issued a press release announcing that they had created districts to "empower Latino voters to elect their candidates of choice," expanding the number of such districts from fourteen to sixteen. Paul Mitchell explained that the first thing he did when drawing the map was to add a "Latino District" that the Commission had previously eliminated. The Hispanic CVAP of the challenged districts predominantly falls within a narrow range to optimize Hispanic voting power, that is, to meet a racial target. Race thus predominated over traditional, race-neutral districting principles such as compactness, contiguity, respect for political subdivisions, and communities of interest.

127.   Because Plaintiffs have shown direct evidence indicating that race predominated in the drawing of the Proposition 50 map, Defendants must show that they had a strong basis in evidence to justify their race-based districting—*i.e.*, that it was narrowly tailored to achieve a compelling state interest. *Cooper*, 581 U.S. at 292.

Consolidated Complaint                                         Case No. 2:25-cv-10616

128.   While compliance with the VRA may justify race-based districting under current law, Paul Mitchell admitted that one VRA analysis concluded the prior Commission-drawn map did not violate the VRA.

129.   Thus, the inclusion of VRA districts in the Proposition 50 map was not required by federal law.

130.   Moreover, members of the California Legislature were not provided with a VRA analysis showing the need for additional VRA districts. Indeed, upon information and belief, there existed no data, findings, or analyses demonstrating the need for additional VRA districts at the time the Proposition 50 map was drawn. Accordingly, the California Legislature cannot claim that it had a sound basis in evidence from which to conclude that race-based redistricting was necessary.

131.   The Tangipa Plaintiffs will suffer irreparable injury if Defendants are allowed to implement and run congressional elections under the Proposition 50 map.

132.   No adequate remedy at law exists to compensate the Tangipa Plaintiffs for this injury.

133.   The balance of hardships and the public interest strongly favor the implementation and use of a congressional district map that complies with the Equal Protection Clause of the Fourteenth Amendment.

### COUNT II (Noyes Plaintiffs)

### Racial Gerrymandering in Violation of the Fifteenth Amendment

### (42 U.S.C. § 1983)

134.   The Noyes Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

135.   Noyes Plaintiffs bring this complaint against the California Governor and Secretary of State in their official capacities and seek declaratory and injunctive relief. Noyes Plaintiffs rely on John Morgan's Expert Report (Ex. K-1); John Morgan's Supplemental Report (Ex. K-2); John Morgan's Illustrative Map (Ex. K-3); and John Morgan's Supplemental Report Annex (Ex. K-4).

32

Consolidated Complaint                                    Case No. 2:25-cv-10616

136. California's racially motivated and racially drawn districts violate the Fifteenth Amendment's prohibition of state action for which **any** racially discriminatory intent or racial means are used, even to gain political or partisan advantage. *See* U.S. Const. amend. XV. The intent standard of the Fifteenth Amendment is violated by actions taken with the intent of effectuating a racial outcome or using race as a tool to accomplish a particular aim. *See e.g., Garza v. Cnty. of Los Angeles*, 918 F.2d 763, 778 (9th Cir. 1990) (Kozinski, J., concurring and dissenting in part). Under the Fifteenth Amendment, "all citizens, regardless of race, have an interest in selecting officials who make policies on their behalf." *Rice v. Cayetano*, 528 U.S. 495, 523 (2000) (holding that, under the Fifteenth Amendment, "voters are treated not as members of a distinct race but as members of the whole citizenry").

137. Defendants are constitutionally prohibited from intentionally racially discriminating against "voters in elections to determine public governmental policies or to select public officials, national, state, or local." *Terry v. Adams*, 345 U.S. 461, 467 (1953); *see also Rice*, 528 U.S. 495 at 512 (the Fifteenth Amendment "grants protection to all persons, not just members of a particular race"). This "prohibition on race-based voting restrictions is both fundamental and absolute." *Davis v. Guam*, 932 F.3d 822, 832 (9th Cir. 2019).

138. Even facially neutral election procedures violate the Fifteenth Amendment if they are adopted with a racially discriminatory purpose. *See Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 481 (1997). "Racial discrimination need only be one purpose, and not even a primary purpose, of an official act" to violate the prohibition on election procedures enacted with racially discriminatory intent. *Velasquez v. City of Abilene*, 725 F.2d 1017, 1022 (5th Cir. 1984) (citing *Village of Arlington Heights v. Metro. Dev. Hous. Corp.*, 429 U.S. 252, 265 (1977)).

139. The Fifteenth Amendment's race-neutrality requirement restrains California's authority to draw its congressional districts. *Rice*, 528 U.S. at 522; *see also Gomillion*, 364 U.S. at 345 (declining to sanction "the achievement by a State of any

33

impairment of voting rights [] so long as it was cloaked in the garb of the realignment of political subdivisions"). A claim under the Fifteenth Amendment is distinct from claims brought under the Fourteenth Amendment. "Unlike the Fourteenth Amendment[], there is no room for a compelling state interest defense, as the Fifteenth Amendment's prohibition is absolute." *Prejean v. Foster*, 227 F.3d 504, 519 (5th Cir. 2000).

140. Racial gerrymandering—deliberately drawing district boundaries for racial purposes and with racial means —circumvents the Fifteenth Amendment. *Shaw I*, 509 U.S. at 640.

141. California's map violates the Fifteenth Amendment by packing Hispanic and black voters into districts in order to preserve the number of Hispanic-majority districts at a precise set number, as well as maintaining two black influence districts— maximizing the voting strength of these racial minorities. *See* Ex. K at Ex. 1 at 59, ¶ 150. This achieved the intended racially motivated outcome of preserving 16 majority Hispanic citizen voting-age population (CVAP) Districts but narrowing this majority to a tight range between 52-55% Hispanic population in these districts. *See* Ex. K at Ex. 1 at 58-59, ¶ 147 and Table 1 above. The map also violates the Fifteenth Amendment by maintaining two black influence districts by deliberately steering Hispanic populations away from these two districts and placing it in non-compact, adjacent, Hispanic-majority districts. *See* Ex. K at Ex. 1 at 59, ¶ 148.

142. Defendants acted under color of state law to deprive the Noyes Plaintiffs of rights secured by the Fifteenth Amendment, the Voting Rights Act, and 42 U.S.C. § 1983.

143. The Fifteenth Amendment prohibits drawing congressional maps with any racial intent, goal, or purpose.

144. Map drawers in California intentionally used race to draw district lines in contravention of the Fifteenth Amendment. This is evidenced, in part, by:

- The intentional preservation of Hispanic-majorities in precisely sixteen districts (despite carefully lowering the percentage);

Consolidated Complaint                                   Case No. 2:25-cv-10616

- The implausibly tight range (roughly 52–55%) of Hispanic population in the resulting districts; and

- The deliberate allocation of black population in Districts 37 and 43 and careful avoidance of adding white and Hispanic population to preserve these two racial influence districts to guarantee electoral outcomes based on race.

145. California's intentional distortion of district boundaries for racial purposes violates the Noyes Plaintiffs' Fifteenth Amendment rights.

146. The use of race abridged and/or denied the Noyes Plaintiffs' rights to vote because Defendants intentionally sought to separate voters by race.

147. The effect of Defendants' districting plan was to intentionally give greater value to the votes of some racial groups, thereby discounting the value of the votes of those groups not benefited.

### COUNT III (Noyes Plaintiffs)

### Intentional Racial Discrimination in Violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301

148. The Noyes Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

149. Section 2(a) of the Voting Rights Act provides that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a).

150. A violation of Section 2(a) of the Voting Rights Act may be based upon the finding of a discriminatory purpose alone, which can be established by proof that race was a motivating factor in the decision to draw California's congressional map. *See generally Rice* 528 U.S. 495. California cannot enforce any voting qualification or prerequisite to voting or any standard, practice, or procedure that has any purpose of

35

Consolidated Complaint                                    Case No. 2:25-cv-10616

denying or abridging the right to vote on account of race, color, or membership in a language minority group. The Proposition 50 maps were drawn with this intent.

151. By deliberately ensuring that the Hispanic population maintains a slight majority in all 16 previously Hispanic-majority districts and ensuring the two black influence districts (Districts 37 and 43) were untouched, California's boundaries disperse the non-Hispanic population into districts in which they will remain an ineffective minority. In doing this, California intentionally concentrated Hispanic and black populations into districts where they either constitute a slight majority or enjoy an influence district, violating Section 2(a) of the Voting Rights Act.

152. Defendants acted under color of California law to engage in discrimination based on race, color, and/or national origin in violation of: (1) Section 2(a) of the Voting Rights Act; and (2) the Fifteenth Amendment to the United States Constitution, which can be enforced through 42 U.S.C. § 1983.

**COUNT IV (United States)**

**Racial Gerrymandering in Violation of the Equal Protection Clause of the Fourteenth Amendment**

153. The United States realleges and incorporates by reference the allegations in paragraphs 1-123, as if fully set forth herein.

154. The Proposition 50 map was racially gerrymandered, in violation of the Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States.

155. The Supreme Court has reaffirmed that federal courts may remedy two forms of anti-democratic gerrymandering. "In two areas—one-person, one-vote and racial gerrymandering—our cases have held that there is a role for the courts with respect to at least some issues that could arise from a State's drawing of congressional districts." *Rucho v. Common Cause*, 588 U.S. 684, 699 (2019).

156. Racial gerrymandering is unconstitutional when traditional redistricting principles have been subordinated to racial considerations in ways that do not satisfy a

Consolidated Complaint                                    Case No. 2:25-cv-10616

narrowly tailored, compelling state interest. *E.g.*, *Ala. Legis. Black Caucus*, 575 U.S. at 272. "If district lines were drawn for the purpose of separating racial groups, then they are subject to strict scrutiny because 'race-based decisionmaking is inherently suspect.'" *Rucho*, 588 U.S. at 711 (quoting *Miller*, 515 U.S. at 915).

157. Race was a predominant factor in drawing the boundaries of at least sixteen congressional districts: Districts 13, 18, 21, 22, 25, 29, 31, 33, 34, 35, 38, 39, 41, 44, 46, and 52.

158. California cannot satisfy strict scrutiny because it had no "'strong basis in evidence' for concluding that the [VRA] required" as much. *Cooper*, 581 U.S. at 292 (quoting *Ala. Legis. Black Caucus*, 575 U.S. at 278). The Hispanic CVAP in California does not satisfy the test set out in *Thornburgh v. Gingles*, 478 U.S. 30 (1986) for a minority group that can be the subject of a VRA vote-dilution claim. *See Cooper*, 581 U.S. at 302 ("If a State has good reason to think that all the '*Gingles* preconditions' are met, then so too it has good reason to believe that § 2 requires drawing a majority-minority district. But if not, then not.") (citation omitted).

### COUNT V (United States)

### Intentional Racial Discrimination in Violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301

159. The United States realleges and incorporates by reference the allegations in paragraphs 1-123 as if fully set forth herein.

160. Race was an impermissible motivating factor in enacting the Proposition 50 map. *See DNC v. Hobbs*, 948 F.3d 989, 1037-38 (9th Cir. 2020) (en banc), *rev'd on other grounds sub nom. Brnovich v. DNC*, 594 U.S. 647 (2021); *Arlington Heights*, 429 U.S. at 265–68 (explaining that a "motivating factor" need not be either "dominant" or "primary," and listing factors to determine whether discriminatory intent was a motivating factor).

161. The statements of Mitchell and California legislators reveal a series of racially motivated decisions undertaken with discriminatory intent.

Consolidated Complaint                                    Case No. 2:25-cv-10616

162.   "[R]eapportionment legislation that cannot be understood as anything other than an effort to classify and separate voters by race injures voters" even if it does not "dilute[] a racial group's voting strength." *Shaw I*, 509 U.S. at 650. "It reinforces racial stereotypes and threatens to undermine our system of representative democracy by signaling to elected officials that they represent a particular racial group rather than their constituency as a whole." *Id.*; *see also Garza*, 918 F.2d at 771 ("the showing of injury in cases involving discriminatory intent need not be as rigorous as in effects cases"). Just as a map drawn to favor white voters would necessarily harm all other racial groups, a map drawn to favor Latino voters harms all other racial groups.

163.   The enactment of the Proposition 50 map so greatly departed from normal procedures that it required amending California's constitution. Since 2010, California voters have entrusted an independent commission, rather than the State Legislature, to draw the State's congressional district maps every ten years, in "the year following the year in which the national census is taken." Cal. Const. art. XXI, § 1. Yet here, the legislature scrapped the 2021 map after just four years, bypassed the usual mapmakers, and secretly enlisted Mitchell to draw a new map—a map that he has repeatedly and unabashedly attributed to racial favoritism.

164.   The Proposition 50 map achieved the legislators and Mitchell's stated racial goals, as evidenced by the preservation of Hispanic-majorities in precisely sixteen districts (despite carefully lowering the percentage) and the implausibly coincidental tight range (roughly 52–55%) of Hispanic population in the resulting districts.

165.   The Proposition 50 map was therefore enacted with the purpose of denying or abridging the right to vote on account of race or color in violation of Section 2 of the VRA, 52 U.S.C. § 10301.

166.   Unless enjoined by an order of this Court, Defendants will continue to violate Section 2 by administering, implementing, and conducting elections using the Proposition 50 map.

Consolidated Complaint                                                 Case No. 2:25-cv-10616

## PRAYER FOR RELIEF

WHEREFORE, the Tangipa Plaintiffs respectfully request that this Court enter judgment against Defendants as follows:

A.  An order and judgment declaring that the Proposition 50 map constitutes unlawful racial gerrymandering in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution;

B.  A permanent injunction prohibiting Defendants from implementing or using the Proposition 50 map in any future congressional elections;

C.  For attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable law; and

D.  Such other and further relief as the Court deems just and proper.

WHEREFORE, the Noyes Plaintiffs respectfully request that this Court enter judgment against Defendants as follows:

A.  An order and judgment declaring that the Proposition 50 map violates the prohibitions on discriminatory purpose contained in the Fifteenth Amendment to the United States Constitution and Section 2(a) of the Voting Rights Act;

B.  An order and judgment declaring that the Proposition 50 map was adopted with an impermissible racial intent in violation of the guarantee of the Fifteenth Amendment to the United States Constitution and Section 2(a) of the Voting Rights Act;

C.  An order enjoining Defendants from enacting or implementing the map contained in Proposition 50;

D.  For attorneys' fees and costs pursuant to 42 U.S.C. § 1988, 52 U.S.C. § 10310(e), and any other applicable law; and

E.  Such other and further relief as the Court deems just and proper.

WHEREFORE, the United States respectfully requests that this Court enter judgment against Defendants as follows:

39

Consolidated Complaint                                          Case No. 2:25-cv-10616

A.   An order and judgment declaring that the Proposition 50 map constitutes unlawful racial gerrymandering in violation of the Equal Protection Clause of the Fourteenth Amendment;

B.   An order and judgment declaring that the Proposition 50 map was adopted with the purpose of denying or abridging the right to vote on account of race or color, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301;

C.   A preliminary and permanent injunction prohibiting Defendants from implementing or using the Proposition 50 map in any future elections.

Date: March 27, 2026                    Respectfully submitted,

                                        **DHILLON LAW GROUP INC.**

                                        By: *s/ Michael A. Columbo*
                                        Michael A. Columbo
                                        Shawn Cowles
                                        Domenic P. Aulisi
                                        Amber R. Hulse

                                        *Attorneys for Tangipa Plaintiffs*

                                        **BENBROOK LAW GROUP, PC**

                                        By: *s/ Joseph M. Nixon*
                                        Bradley A. Benbrook
                                        Stephen M. Duvernay

                                        PUBLIC INTEREST LEGAL FOUNDATION
                                        J. Christian Adams
                                        Kaylan Phillips
                                        Joseph M. Nixon
                                        Jewel M. Lightfoot
                                        Carolyn C. Valdes

                                        *Attorneys for Noyes Plaintiffs*

40

Consolidated Complaint                                    Case No. 2:25-cv-10616

By: *s/ Greta Gieseke*
JESUS A. OSETE*
  Principal Deputy Assistant Attorney General
MATTHEW ZANDI
  Chief of Staff & Special Counsel
ANDREW BRANIFF
  Acting Chief, Appellate Section
DAVID GOLDMAN
JOSHUA R. ZUCKERMAN
GRETA GIESEKE
  Attorneys
  Civil Rights Division
  United States Department of Justice

By: *s/ Julie A. Hamill*
TODD BLANCHE
  Deputy Attorney General
BILAL A. ESSAYLI
  First Assistant United States Attorney
JULIE A. HAMILL
  Assistant United States Attorney
  United States Attorney's Office

*Attorneys for Plaintiff-Intervenor*
*United States of America*

---

\* Assistant Attorney General Harmeet K. Dhillon is recused from this matter.

41

Consolidated Complaint                    Case No. 2:25-cv-10616