Lalitha D. Madduri (CA Bar No. 301236)
lmadduri@elias.law
Christopher D. Dodge* (DC Bar No. 90011587)
cdodge@elias.law
Max Accardi* (DC Bar No. 90021259)
maccardi@elias.law
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652
F: (202) 968-4498

Abha Khanna* (WA Bar No. 42612)
akhanna@elias.law
Tyler L. Bishop (CA Bar No. 337546)
tbishop@elias.law
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
T: (206) 656-0177
F: (206) 656-0180

Omar Qureshi (CA Bar No. 323493)
omar@qureshi.law
Max Schoening (CA Bar No. 324643)
max@qureshi.law
**QURESHI LAW PC**
700 Flower Street, Suite 1000
Los Angeles, CA 90017
T: (213) 600-6096
F: (213) 277-8989

*Counsel for Defendant-Intervenor DCCC*

*\* Admitted pro hac vice*

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION**

| | |
|---|---|
| **DAVID TANGIPA,** *et al.*,<br><br>                              Plaintiffs,<br><br>   and<br><br>**UNITED STATES OF AMERICA,**<br><br>                         Plaintiff-Intervenor,<br><br>        v.<br><br>**GAVIN NEWSOM, in his official capacity as the Governor of California,** *et al.*,<br><br>                              Defendants,<br><br>**DEMOCRATIC CONGRESSIONAL CAMPAIGN COMMITTEE,** *et al.*,<br><br>                     Defendant-Intervenors. | Case Nos. 2:25-cv-10616-JLS-WLH-KKL (Lead); 2:25-cv-11480-JLS-WLH-KKL<br><br><br>**DEFENDANT-INTERVENOR DCCC'S MOTION TO DISMISS THE CONSOLIDATED COMPLAINT**<br><br><br>Hon. Josephine L. Staton<br>Hon. Kenneth K. Lee<br>Hon. Wesley L. Hsu<br><br>Hearing date: June 26, 2026<br><br>Time: 10:30 a.m.<br><br>Courtroom: 1 |

## DEFENDANT-INTERVENOR DCCC'S MOTION TO DISMISS

Defendant-Intervenor the Democratic Congressional Campaign Committee ("DCCC") hereby moves the Court to dismiss Plaintiffs' and Plaintiff-Intervenor's Consolidated Complaint, ECF No. 240. In support of its motion, DCCC submits and incorporates the attached Memorandum of Points and Authorities. Pursuant to Local Rule 7-3, counsel for DCCC conferred with counsel for Plaintiffs and Plaintiff-Intervenor on April 22, 2026. Plaintiffs and Plaintiff-Intervenor informed DCCC that they oppose DCCC's motion.

Dated: April 24, 2026

Respectfully submitted,

*/s/ Lalitha D. Madduri*
Lalitha D. Madduri (CA Bar No. 301236)
Christopher D. Dodge* (DC Bar No. 90011587)
Max Accardi* (DC Bar No. 90021259)
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652
F: (202) 968-4498
lmadduri@elias.law
cdodge@elias.law
maccardi@elias.law

Abha Khanna* (WA Bar No. 42612)
Tyler L. Bishop (CA Bar No. 337546)
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
T: (206) 656-0177
akhanna@elias.law
tbishop@elias.law

Omar Qureshi (CA Bar No. 323493)
Max Schoening (CA Bar No. 324643)
**QURESHI LAW PC**
700 Flower Street, Suite 1000
Los Angeles, CA 90017
T: (213) 600-6096
omar@qureshi.law
max@qureshi.law

*Counsel for Defendant-Intervenor DCCC*

* *Admitted pro hac vice*

ii

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................ v

MEMORANDUM OF POINTS AND AUTHORITIES ........................................... 1

BACKGROUND ...................................................................................................... 2

LEGAL STANDARDS ............................................................................................ 5

ARGUMENT ........................................................................................................... 6

I.     Plaintiffs' overbroad racial gerrymandering claims directed to the entire Prop 50 map must be dismissed as a matter of law .................................... 6

    A.     The Tangipa Plaintiffs' and United States's Fourteenth Amendment claims impermissibly attack the Prop 50 map as an undifferentiated whole. ........................................................................... 7

    B.     The Noyes Plaintiffs have failed to allege standing to bring their Fifteenth Amendment and VRA claims. ............................................ 8

    C.     The United States's participation in this case cannot broaden the substantive scope of Plaintiffs' challenges. ................................... 10

II.    The Noyes Plaintiffs have not alleged a cognizable vote-dilution claim under the Fifteenth Amendment or the VRA. ....................................... 11

III.   The Consolidated Complaint does not plausibly allege direct evidence of race discrimination as to any district. ................................................... 14

    A.     The Consolidated Complaint offers no discussion of the intent of the California electorate. ................................................................ 15

    B.     Plaintiffs' cherrypicked statements from California legislators do not establish discriminatory intent. ................................................. 16

    C.     The allegations about Paul Mitchell do not establish discriminatory intent attributable to any state actor. ...................... 17

IV.    Plaintiffs have not plausibly alleged racial predominance as to any of the specific districts they discuss. ........................................................... 19

    A.     The allegations concerning CD-13 do not plausibly show racial predominance. .................................................................................. 20

B.      Plaintiffs' allegations about HCVAP percentages do not plausibly
        show racial predominance...................................................................................24

C.      The allegations directed to CD-38, CD-41, and CD-42 do not
        plausibly show racial predominance. ...............................................................26

D.      Plaintiffs' allegation that Prop 50 preserves existing VRA and
        Black-influence districts does not establish racial predominance. .............27

CONCLUSION......................................................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. League of United Latin Am. Citizens,*
146 S. Ct. 418 (2025) ................................................................................................. 13

*Abbott v. Perez,*
585 U.S. 579 (2018) ............................................................................................. 18, 29

*Alabama Legislative Black Caucus v. Alabama,*
575 U.S. 254 (2015) ..........................................................................................*passim*

*Alexander v. S.C. State Conf. of the NAACP,*
602 U.S. 1 (2024) ...............................................................................................*passim*

*Am. Mfrs. Mut. Ins. Co. v. Sullivan,*
526 U.S. 40 (1999) ..................................................................................................... 18

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ..................................................................................................... 5

*Baidan v. Shull,*
No. 24-CV-03171-VKD, 2025 WL 267348 (N.D. Cal. Jan. 22, 2025) ................. 21

*City of Baton Rouge/E. Baton Rouge Par. v. Bank of Am., N.A.,*
No. 19-CV-725-SDD-RLB, 2021 WL 1201664
(M.D. La. Mar. 30, 2021) ........................................................................................... 21

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ................................................................................ 5, 11, 20, 23

*Bethune-Hill v. Va. State Bd. of Elections,*
580 U.S. 178 (2017) ..........................................................................................*passim*

*Bravo v. Neff,*
No. 5:24-CV-2458-PA-RAO, 2025 WL 2005483 (C.D. Cal. July 3, 2025) ........... 3

*Brnovich v. Democratic Nat'l Comm.,*
594 U.S. 647 (2021) ................................................................................................... 18

*Bush v. Vera,*
517 U.S. 952 (1996) ................................................................................................... 27

*Christian Ministerial All. v. Thurston*,
714 F. Supp. 3d 1093 (E.D. Ark. 2024) ........................................................... 11

*Cooke v. Corp. of the President of the Church of Jesus Christ of Latter Day Saints*,
395 F. App'x 367 (9th Cir. 2010) ................................................................... 19

*Cooper v. Harris*,
581 U.S. 285 (2017) ....................................................................................... 13

*Coto Settlement v. Eisenberg*,
593 F.3d 1031 (9th Cir. 2010) ......................................................................... 2

*Cox v. Ass'n of Or. Corr. Emps., Inc.*,
No. 24-2763, 2025 WL 1077133 (9th Cir. Apr. 10, 2025) .............................. 19

*Cubanos Pa 'lante v. Fla. House of Representatives*,
766 F. Supp. 3d 1204 (S.D. Fla. 2025) ................................................... *passim*

*Darling v. Eddy*,
No. 9:21-CV-00147-DLC, 2023 WL 157712 (D. Mont. Jan. 11, 2023) .......... 21

*Dutta v. State Farm Mut. Auto. Ins. Co.*,
895 F.3d 1166 (9th Cir. 2018) ......................................................................... 9

*Easley v. Cromartie*,
532 U.S. 234 (2001) ....................................................................................... 17

*Fisher v. Ramirez-Palmer*,
219 F. Supp. 2d 1076 (E.D. Cal. 2002) ............................................................ 3

*Garza v. Cnty. of Los Angeles*,
918 F.2d 763 (9th Cir. 1990) ......................................................................... 11

*Gill v. Whitford*,
585 U.S. 48 (2018) ............................................................................. 7, 8, 9, 11

*Hall v. Virginia*,
385 F.3d 421 (4th Cir. 2004) ......................................................................... 25

*Hollingsworth v. Perry*,
570 U.S. 693 (2013) ....................................................................................... 15

*Hunter v. Underwood*,
471 U.S. 222 (1985) ....................................................................................... 14

*In re Century Aluminum Co. Sec. Litig.*,
    729 F.3d 1104 (9th Cir. 2013) ........................................................................23, 24

*Jackson v. Tarrant County*,
    158 F.4th 571 (5th Cir. 2025) .................................................................................23

*Johnson-Lee v. City of Minneapolis*,
    No. 02-1139(JRT/FLN), 2004 WL 2212044 (D. Minn. Sept. 30, 2004)...............13

*Karcher v. Daggett*,
    462 U.S. 725 (1983) ..........................................................................17, 28, 29

*League of United Latin Am. Citizens v. Abbott*,
    809 F. Supp. 3d 502 (W.D. Tex. 2025) ...................................................................12

*Miller v. Johnson*,
    515 U.S. 900 (1995) ................................................................................*passim*

*N.C. State Conf. of NAACP v. McCrory*,
    831 F.3d 204 (4th Cir. 2016)...................................................................................14

*Navarro v. Block*,
    250 F.3d 729 (9th Cir. 2001).......................................................................5, 11, 12

*Old Person v. Cooney*,
    230 F.3d 1113 (9th Cir. 2000) .................................................................................14

*Page v. Bartels*,
    248 F.3d 175 (3d Cir. 2001)...............................................................................13, 14

*Prejean v. Foster*,
    83 F. App'x 5 (5th Cir. 2003) ..................................................................................13

*Redlands Country Club Inc. v. Cont'l Cas. Co.*,
    No. 10-CV-1905-GAF-DTBX, 2011 WL 13224843
    (C.D. Cal. Jan. 28, 2011)...................................................................................23, 29

*Rice v. Cayetano*,
    528 U.S. 495 (2000) .................................................................................................11

*Robertson v. Bartels*,
    148 F. Supp. 2d 443 (D.N.J. 2001).........................................................................13

*Rodriguez v. Ford Motor Co.*,
    722 F. Supp. 3d 1104 (S.D. Cal. 2024) ....................................................................2

*Searle v. Allen*,
148 F.4th 1121 (9th Cir. 2025) ............................................................................... 6, 9, 12

*Shaw v. Reno*,
509 U.S. 630 (1993) ............................................................................................ 17, 27

*United States v. Hays*,
515 U.S. 737 (1995) ...................................................................................................... 9

*Vallejo v. Keller Indep. Sch. Dist.*,
No. 4:25-CV-00138-O, 2026 WL 112050 (N.D. Tex. Jan. 15, 2026) .................... 12

*Walls v. Sanders*,
760 F. Supp. 3d 766 (E.D. Ark. 2024) ...................................................................... 14

*Washington v. Finlay*,
664 F.2d 913 (4th Cir. 1981) ..................................................................................... 13

*Watson v. Crumbl LLC*,
736 F. Supp. 3d 827 (E.D. Cal. 2024) ......................................................................... 2

*Wood v. Raffensperger*,
981 F.3d 1307 (11th Cir. 2020) ................................................................................. 12

**Constitutional Provisions**

Cal. Const. art. II, § 1 ....................................................................................................... 15

**Rules**

Fed. R. Civ. P. 12(b) ................................................................................................... 5, 8, 9

**Other Authorities**

Assemb. B. 604, 2025–26 Reg. Sess. (Cal. 2025) ........................................................... 20

*Bill Votes: ACA-8 Congressional Redistricting*, Cal. Legis. Info. (last updated
Aug. 21, 2025), https://perma.cc/9ZH4-3LET ......................................................... 2

*Bill Votes: AB-604 Redistricting: Congressional Districts*, Cal. Legis. Info (last
updated Aug. 21, 2025), https://perma.cc/3FT9-X5A8 ............................................. 2

*Bill Votes: SB-280 Elections*, Cal Legis. Info. (last updated Aug. 21, 2025),
https://perma.cc/G5AR-ALJR ................................................................................... 2

Brief for the United States, *Tangipa v. Newsom*, No. 25A839 (U.S. Jan. 22, 2026) ........................................................................................................... 15

*Game Rules*, State of Cal. Dep't of Just. (last visited Feb. 11, 2026), https://perma.cc/K3G5-2MQJ ........................................................... 20

*Official Declaration of the Vote Results on State Ballot Measure*, Cal. Sec'y of State (last visited Feb. 11, 2026), https://perma.cc/H5D4-ZLZ3 ...................... 4

Order Denying Application for Writ of Injunction Pending Appeal, *Tangipa. v. Newsom*, No. 25A839 (U.S. Feb. 4, 2026) .......................................... 4

**MEMORANDUM OF POINTS AND AUTHORITIES**

This Court has already spotted this case for what it is: a political disagreement about partisan gerrymandering, masquerading as a racial gerrymandering challenge. *See generally* Prelim. Inj. Order, ECF No. 216 ("PI Order"). In the Consolidated Complaint, ECF No. 240 ("Consol. Compl."), three groups of Plaintiffs regurgitate flawed challenges to California's new congressional map (the "Prop 50 map"), which was overwhelmingly endorsed by California voters at the ballot box. The first group, the "Tangipa Plaintiffs," advances a racial gerrymandering claim under the Fourteenth Amendment. The Consolidated Complaint, however, does not address the numerous pleading deficiencies with this claim that DCCC has already identified, *see* ECF No. 225, and which the Court already recognized, *cf.* PI Order at 67 (concluding Tangipa Plaintiffs "fail[ed] to establish serious questions going to the merits of racial gerrymandering"). Among other pitfalls, the Tangipa Plaintiffs impermissibly challenge the Prop 50 map as an undifferentiated whole, *but see Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 264 (2015); fail to allege direct evidence of discriminatory intent attributable to any state actor, *but see Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 8 (2024); and fail to allege any circumstantial evidence permitting an inference of racial predominance, *but see Miller v. Johnson*, 515 U.S. 900, 913 (1995). The second group, the "Noyes Plaintiffs," advance a similar racial gerrymandering claim under the Fifteenth Amendment—though they fail to set out a coherent legal theory for any standalone Fifteenth Amendment claim—as well as a claim under Section 2 of the Voting Rights Act ("VRA"). Not only have the Noyes Plaintiffs failed to adequately allege standing as to nearly all the districts they challenge, but as a matter of law their allegations about Hispanic and Black voting districts do not plausibly allege intentional race discrimination. Finally, the United States advances tag-along Fourteenth Amendment and VRA claims, but these copycat claims fall short for the same reasons as the claims brought by the first two groups. These pleading shortcomings are terminal and the Consolidated Complaint should be dismissed in its entirety or, at minimum, severely curtailed in scope.

1

## BACKGROUND[1]

This case arises out of California's mid-decade redistricting effort, which began in response to events in Texas. Consol. Compl. ¶ 6. Specifically, in August 2025, Governor Newsom and other Democratic legislative leaders in California announced that they would "not allow [President] Trump's Republican Party to rig the system and take permanent control of the U.S. House of Representatives" through mid-decade redistricting efforts undertaken in Texas at the President's behest. Ex. 18. Vowing to "fight fire with fire," *id.*, these legislators introduced a three-bill legislative package to replace California's existing congressional map, *see* Consol. Compl. ¶ 57. The stated purpose of this package was avowedly partisan. Assembly Constitutional Amendment No. 8, which amended the California Constitution to permit mid-decade redistricting, asserted that "[t]he 2026 United States midterm elections for Congress must be conducted on a level playing field without an extreme and unfair advantage for Republicans." Assemb. Const. Amend. 8, 2025–26 Reg. Sess. (Cal. 2025). Accordingly, the legislative package was crafted for the proclaimed purpose of "neutraliz[ing] the partisan gerrymandering being threatened by Republican-led states." *Id.* And it was further designed to require voter approval before going into effect. *See* Consol. Compl. ¶ 57. After a contentious partisan debate, the Legislature approved the package along a party line vote, with nearly every Democratic legislator voting in favor and all Republican legislators voting against.[2]

---

[1] The Court is well familiar with the background and posture of this case. *See* PI Order at 4–12; *see also id.* at 74–77. DCCC therefore offers a brief summation based on the pleadings, the materials incorporated therein, and other public records. All citations to exhibits throughout this motion refer to the parties' Second Am. Joint Ex. List, ECF No. 176. DCCC relies exclusively upon exhibits that are public records or that can be fairly construed as incorporated into the complaints. *See Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010).

[2] The Court may take notice of the legislative debate and vote history on the legislative package. *See, e.g.*, *Watson v. Crumbl LLC*, 736 F. Supp. 3d 827, 838 (E.D. Cal. 2024);

As the Consolidated Complaint concedes, the proposed congressional map included in the legislative package—the Prop 50 map—was not drawn by legislators or even paid for by the Legislature. *See* Consol. Compl. ¶ 56. Instead, the Consolidated Complaint alleges that the Prop 50 map was drawn by Paul Mitchell, an independent consultant paid by DCCC. Consol. Compl. ¶¶ 6, 56, 74. Plaintiffs do not allege that Mitchell was a state actor or that he acted at the direction of any state actor. Instead, they claim that DCCC—an organization with an indisputably partisan mission—paid for the Prop 50 map and submitted it to the Legislature. *See id.* ¶¶ 56, 73–74.[3]

Like the original pleadings, the Consolidated Complaint neglects to discuss the three-month long public campaign and debate that followed Prop 50's passage by the Legislature. As the Court observed in its preliminary injunction order, that absence is conspicuous. *Cf.* PI Order at 37. Public records reflect the overwhelmingly partisan nature of the debate over Prop 50. For example, the Voter Information Guide published by the Secretary of State echoed the legislative purpose contained in ACA 8, while also providing arguments for and against Prop 50 that focused on its partisan motivations and consequences. *See* Ex. 444 at 5.[4] Nothing in the Voter Information Guide suggested to voters that it would favor particular racial groups. Rather, the Guide's only mention of

---

*Rodriguez v. Ford Motor Co.*, 722 F. Supp. 3d 1104, 1111 (S.D. Cal. 2024); *see also* PI Order at 6–7 (discussing excerpts of the debate); *Bill Votes: ACA-8 Congressional Redistricting*, Cal. Legis. Info. (last updated Aug. 21, 2025), https://perma.cc/9ZH4-3LET; *Bill Votes: AB-604 Redistricting: Congressional Districts*, Cal. Legis. Info (last updated Aug. 21, 2025), https://perma.cc/3FT9-X5A8; *Bill Votes: SB-280 Elections*, Cal Legis. Info. (last updated Aug. 21, 2025), https://perma.cc/G5AR-ALJR.

[3] DCCC disputes Plaintiffs' characterization of this arrangement, *see* Decl. of Julie Merz ¶ 5, ECF No. 20-1 ¶ 5, but for purposes of the present motion does not dispute that DCCC ultimately submitted a proposed map to the Legislature.

[4] The Court may take notice of public records, like those published by the Secretary of State, in this posture. *See, e.g.*, *Bravo v. Neff*, No. 5:24-CV-2458-PA-RAO, 2025 WL 2005483, at *4 (C.D. Cal. July 3, 2025); *Fisher v. Ramirez-Palmer*, 219 F. Supp. 2d 1076, 1078 n.2 (E.D. Cal. 2002).

race—from Prop 50's *opponents*, no less—argued that Prop 50 would *harm*, rather than bolster, representation of minority voters. *Id.* at 17.

On November 4, 2025, California voters overwhelmingly approved Prop 50 by a two-to-one margin. *See* Consol. Compl. ¶ 61; *see also Official Declaration of the Vote Results on State Ballot Measure*, Cal. Sec'y of State (last visited Feb. 11, 2026), https://perma.cc/H5D4-ZLZ3. The Tangipa Plaintiffs sued the very next day, *see* ECF No. 1, and the United States filed a motion to intervene, along with a complaint in intervention, shortly thereafter, *see* ECF No. 28. The Noyes Plaintiffs brought a separate case about a month later, filing their initial complaint on December 2, 2025. *See* Case No. 2:25-cv-11480, ECF No. 1.

Both the Tangipa Plaintiffs and the United States moved for preliminary injunctions. *See* ECF Nos. 15, 29. This Court held a three-day hearing where it heard testimony from nine witnesses (including six experts) and received over 500 exhibits into evidence. *See* PI Order at 2. The Court concluded that the Tangipa Plaintiffs and the United States "failed to show that racial gerrymandering occurred." *Id.* This "conclusion," the Court noted, "probably seems obvious to anyone who followed the news in the summer and fall of 2025." PI Order at 2. Nonetheless, the Tangipa Plaintiffs appealed to the Supreme Court, and subsequently sought an injunction pending appeal. *See Tangipa v. Newsom*, No. 25A839 (U.S. Jan. 20, 2026). After briefing, the Supreme Court denied that request in a brief order without any noted dissent. Order Denying Application for Writ of Injunction Pending Appeal, *Tangipa. v. Newsom*, No. 25A839 (U.S. Feb. 4, 2026). The Tangipa Plaintiffs later voluntarily dismissed their appeal. *See* ECF Nos. 237, 239.

After the Supreme Court denied the request for an injunction pending appeal, this Court ordered all parties to show cause why the Tangipa and Noyes cases should not be consolidated. *See* ECF No. 230. All parties except for the Noyes Plaintiffs agreed to consolidation, *see* ECF Nos. 231, 232, 233, 234, 235 & Case No. 2:25-cv-11480, ECF

No. 53, and on March 17, the Court consolidated the cases and ordered all three groups of Plaintiffs to file a single complaint. ECF No. 238 at 6.

Plaintiffs filed the Consolidated Complaint on March 27, 2026. *See* ECF No. 240. The Consolidated Complaint advances five claims, each associated with a different Plaintiff group. The Tangipa Plaintiffs, in Count I, assert a racial gerrymandering claim under the Fourteenth Amendment. *See* Consol. Compl. ¶¶ 124–33. The Noyes Plaintiffs, in Counts II and III, assert racial gerrymandering claims under the Fifteenth Amendment and Section 2 of the VRA, respectively. *See id*. ¶¶ 134–52. The United States, in Counts IV and V asserts racial gerrymandering claims under the Fourteenth Amendment and Section 2 of the VRA, respectively. *See id*. ¶¶ 153–66. Thus, the Consolidated Complaint essentially combines the three previously operative pleadings and retains essentially the same division of parties and claims as those pleadings.

## **LEGAL STANDARDS**

A complaint must be dismissed where it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). At the motion-to-dismiss stage, the Court "must accept as true all of the allegations contained in a complaint" but need not accept the complaint's "legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[W]here the well pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. at 678. Dismissal is also required when a complaint contains "no cognizable legal theory" or fails to allege "sufficient facts . . . to support a cognizable legal theory," *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). In addition to the allegations in the complaint, the Court can consider materials incorporated into the complaint or in the public record. *Coto Settlement*, 593 F.2d at 1038.

A similar standard governs a facial challenge to subject matter jurisdiction under Rule 12(b)(1): the Court must "[a]ccept[] all factual allegations in the operative complaint as true" and draw "reasonable inferences in the plaintiff's favor," then "determine whether the plaintiff's allegations are sufficient to invoke the court's jurisdiction." *Searle v. Allen*, 148 F.4th 1121, 1128 (9th Cir. 2025).

## ARGUMENT

Plaintiffs' claims fail for a host of reasons. First, each group impermissibly attacks the Prop 50 Map as a whole, rather than on a district-specific basis, notwithstanding extensive Supreme Court authority precluding such an approach. Plaintiffs' error requires dismissal or, at minimum, severe curtailment of Plaintiffs' claims. *See infra* § I. The Noyes Plaintiffs, in turn, assert a confused Fifteenth Amendment claim which is either not pled at all, or not supported by plausible allegations. *See infra* § II. Next, even assuming the Consolidated Complaint sufficiently raises cognizable district-specific challenges, the pleadings fail to allege *any* sort of direct evidence of racial predominance. *See infra* § III. That failure presents a substantial challenge for Plaintiffs, *see Alexander*, 602 U.S. at 8, but their fate is sealed by the failure to plausibly allege even circumstantial evidence of impermissible racial predominance in the drawing of any district in the Prop 50 Map. *See infra* § IV. Taken together, these shortcomings require dismissal of the entire Consolidated Complaint.

## I. Plaintiffs' overbroad racial gerrymandering claims directed to the entire Prop 50 map must be dismissed as a matter of law.

Although the Consolidated Complaint advances several categories of racial gerrymandering claims, each category suffers from a common fatal flaw: they impermissibly attack California's statewide map as "an undifferentiated whole," *Alabama*, 575 U.S. at 264 (emphasis omitted). This flaw manifests in ways applicable to both Rule 12(b)(1) and Rule 12(b)(6). For example, the Tangipa Plaintiffs and United States fail to allege racial predominance on a district-by-district basis, as required to plausibly allege their Fourteenth Amendment claims. The Noyes Plaintiffs, in turn, have

not adequately alleged standing to bring *any* of their claims—and they too have failed to advance specific allegations as to most of the districts they challenge. Nor does the participation of the United States permit Plaintiffs to broaden the scope of their attack on the Prop 50 map. These threshold deficiencies require dismissing several claims entirely and severely curtailing others (which fail, in turn, for reasons set forth *infra* §§ III, IV).

> **A.    The Tangipa Plaintiffs' and United States's Fourteenth Amendment claims impermissibly attack the Prop 50 map as an undifferentiated whole.**

In their Fourteenth Amendment claims, the Tangipa Plaintiffs and United States advance a broadside attack on 16 of the 52 congressional districts in the Prop 50 map. *See* Consol. Compl. ¶¶ 125, 157. But, with the exception of CD-13, the Consolidated Complaint says almost nothing about *any* of these districts, and instead attacks the Prop 50 map writ large. This is a fatal defect. Even setting aside for now the "especially stringent" racial predominance standard Plaintiffs must meet, *Alexander*, 602 U.S. at 11, Plaintiffs must allege facts showing racial predominance on a "district-by-district" basis, *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 191 (2017); *see* PI Order at 24 (noting that plaintiffs must show "race predominated in enacting a map for a particular district"). As the Supreme Court has repeatedly admonished, "the basic unit of analysis for racial gerrymandering claims in general, and for the racial predominance inquiry in particular, is the district." *Bethune-Hill*, 580 U.S. at 191. Thus, a racial gerrymandering claim cannot target a map as "an undifferentiated whole," *Alabama*, 575 U.S. at 264 (emphasis omitted), or seek "to invalidate the whole State's . . . districting map," *Gill v. Whitford*, 585 U.S. 48, 66 (2018).

The Consolidated Complaint, however, says nothing about most of the districts challenged by the Tangipa Plaintiffs and the United States in their Fourteenth Amendment claims. These claims are based on a theory that Paul Mitchell drew certain districts to benefit Latino voters over other racial groups, and that the 16 districts targeted by this theory are all Latino-majority districts in the Prop 50 map. *See* Consol. Compl.

¶¶ 41, 89, 125, 157.[5] But Plaintiffs do not allege *anything* about most of these districts, and even where they mention one of the districts in passing, they fail to connect the allegation to their legal theory. Indeed, although the Noyes Plaintiffs direct allegations to a handful of these districts, *see, e.g.*, Consol. Compl. ¶¶ 99, 106, the Consolidated Complaint states that the Tangipa Plaintiffs "do not join" these allegations, *id*. ¶ 93 n.7. And the "direct evidence" of discriminatory intent that Plaintiffs allege, such as it is, similarly has no connection to any particular district. *See, e.g.*, Consol. Compl. ¶¶ 62 (alleging that Paul Mitchell "used race and Hispanic demographics as criteria *in designing the map*" (emphasis added)); 78 (alleging that legislators "identified explicitly racial . . . motivations behind their support *for the new map*" (emphasis added)). Plaintiffs' prayer for relief is even more candid: they do not even bother to identify a *single* specific district for purposes of relief, instead targeting the "proposition 50 map" wholesale. *See* Consol. Compl. at 39–40.

This is a fundamental pleading deficiency that sinks Plaintiffs' Fourteenth Amendment claims a matter of law. "Plaintiffs who complain of racial gerrymandering in their State *cannot sue* to invalidate the whole State's legislative districting map." *Gill*, 585 U.S. at 66 (emphasis added). Plaintiffs' "state-wide" allegations about "the [Prop 50 map] as a whole" have "no probative force with respect to their racial-gerrymandering claim[s]," *Alexander*, 602 U.S. at 33, meaning that for this reason alone each of their Fourteenth Amendment claims must be dismissed under Rule 12(b)(6) or, at minimum, restricted to CD-13.

### B. The Noyes Plaintiffs have failed to allege standing to bring their Fifteenth Amendment and VRA claims.

The Noyes Plaintiffs' Fifteenth Amendment and VRA claims suffer from an even more fundamental pleading deficiency: standing. "[A] plaintiff who alleges that he is the object of a racial gerrymander—a drawing of district lines on the basis of race—has

---

[5] Specifically, the Fourteenth Amendment claims challenge Districts 13, 18, 21, 22, 25, 29, 31, 33, 34, 35, 38, 39, 41, 44, 46, and 52.

8

standing to assert only that his own district has been so gerrymandered." *Gill*, 585 U.S. at 66–67. Absent a person who actually lives in a challenged district, and has thus "personally been subjected to a racial classification," a racial gerrymandering claim asserts only a "generalized grievance against governmental conduct." *United States v. Hays*, 515 U.S. 737, 745 (1995). Therefore, "Plaintiffs who complain of racial gerrymandering in their State cannot sue to invalidate the whole State's legislative districting map"; they are limited to challenging the districts which they themselves inhabit. *Gill*, 585 U.S. at 66.

The Consolidated Complaint does not identify the districts in which the Noyes Plaintiffs reside, and thus fails to allege the information needed to "invoke the court's jurisdiction." *Searle,* 148 F.4th at 1128; *see Dutta v. State Farm Mut. Auto. Ins. Co.*, 895 F.3d 1166, 1173 (9th Cir. 2018) (noting that plaintiffs must plead the elements of standing). All three paragraphs discussing the Noyes Plaintiffs allege only that they are "California resident[s]" who are "registered to vote in California" and "assigned to a district drawn with racial intent." Consol. Compl. ¶¶ 33–35. But their pleadings otherwise fail to identify what district the Noyes Plaintiffs reside in, or to even confirm that they live in districts challenged by the Noyes Plaintiffs' claims. They have thus failed to allege that any of them has "personally been subjected to a racial classification," an essential element of standing for a redistricting claim. *Hays*, 515 U.S. at 745. Rule 12(b)(1) therefore requires outright dismissal or narrowing of their claims to the districts in which the Noyes Plaintiffs actually live—a maximum of three districts.

Relatedly, Rule 12(b)(6) also requires dismissing or narrowing the Noyes Plaintiffs' claims. The number of districts the Noyes Plaintiffs *purport* to challenge under their Fifteenth Amendment and VRA claims is ambiguous, but read generously, the Consolidated Complaint appears to include all sixteen Latino-majority districts and two "black influence districts." *See* Consol. Compl. ¶ 151. But their claims suffer from at least two fatal threshold deficiencies: The Noyes Plaintiffs have not alleged that they live in *any* of those districts, nor have they advanced district-specific allegations as to about

9

half of them. The Consolidated Complaint references by name only 9 districts that were alleged to have been drawn with race in mind: Districts 13, 18, 37, 38, 41, 42, 43, 44, and 52. *See* Consol. Compl. ¶¶ 91–93, 97–99, 100, 103, 107, 109, 117. Setting aside whether Plaintiffs have adequately alleged discriminatory intent with respect to these districts—they have not, as explained below—Plaintiffs' failure to even try to conduct the required "district-by-district" analysis, *Bethune-Hill*, 580 U.S. at 191, further warrants dismissal or narrowing of their claims. Simply put, as a matter of law, the Noyes Plaintiffs' claims can extend no further than those districts within which they actually reside *and* for which they supply meaningful, district-specific allegations that satisfy the Rule 12(b)(6) plausibility standard.

### C. The United States's participation in this case cannot broaden the substantive scope of Plaintiffs' challenges.

The involvement of the United States does not permit the Tangipa or Noyes Plaintiffs to broaden the scope of their attack on the Prop 50 map. The United States pursues two claims—a Fourteenth Amendment claim and a VRA Section 2 claim. *See* Consol. Compl. ¶¶ 36–37. As to the former, the United States's claim does not include concrete allegations about specific districts other than CD-13, so its Fourteenth Amendment claim must likewise be dismissed entirely or, at minimum, restricted to CD-13 alone. *See* Consol. Compl. ¶¶ 153–58; *see also supra* Argument § I.A.

As to its VRA claim, the United States again supplies no greater factual allegations than those supplied by the Noyes Plaintiffs. Accordingly, at its absolute outer bounds, the United States's VRA claim can only be understood to challenge the 9 districts purportedly drawn with race in mind, *see supra* Argument § I.B., as it otherwise fails to allege "that race was improperly used in the drawing of the boundaries of [additional] specific electoral districts." *Alabama*, 575 U.S. at 263 (emphasis omitted).

\*    \*    \*

As in their original pleadings, the Plaintiffs each once more seek "to invalidate the whole State's legislative districting map," *Gill*, 585 U.S. at 66, notwithstanding both the

10

limited scope of their claims and, as to the Noyes Plaintiffs, the narrow geographic reach of their inadequately pled injuries. Accordingly, at the outset, the Court must dismiss or narrow the claims set forth in the Consolidated Complaint. Moreover, for the reasons below, Plaintiffs fail to plausibly allege racial gerrymandering claims, even as the small handful of districts actually discussed within the Consolidated Complaint.

## II.    The Noyes Plaintiffs have not alleged a cognizable vote-dilution claim under the Fifteenth Amendment or the VRA.

In addition to the fundamental overbreadth of their claims, the Noyes Plaintiffs' standalone Fifteenth Amendment claim suffers from at least two facial deficiencies. *See* Consol. Compl. ¶¶ 134–47 (Count II). As an initial matter, their pleadings fail to set forth a coherent framework for adjudicating this claim, citing instead to a grab bag of cases that bear no resemblance to this one. *See id.* ¶ 136. *Rice v. Cayetano*, for example, concerned a race-based qualification for voting in certain statewide elections, *see* 528 U.S. 495, 499 (2000), while *Garza v. County of Los Angeles* does not even reference the Fifteenth Amendment at all, *see generally* 918 F.2d 763 (9th Cir. 1990). Simply put, by failing to lay out the basic contours of their Fifteenth Amendment claim, the Noyes Plaintiffs do not meet their "obligation to provide the grounds of [their] entitlement to relief." *Twombly*, 550 U.S. at 555 (cleaned up); *see also Navarro*, 250 F.3d at 732 (explaining dismissal is proper "where there is no cognizable legal theory" asserted in the complaint).

To be sure, cognizable Fifteenth Amendment claims do exist, even though the Noyes Plaintiffs fail to intelligibly set forth the claim they are asserting. But the Noyes Plaintiffs' Fifteenth Amendment claim fails twice over because they fail to adequately plead such a claim. A redistricting plaintiff can advance one of two "analytically distinct" types of claims under the Fifteenth Amendment. *Christian Ministerial All. v. Thurston*, 714 F. Supp. 3d 1093, 1096 (E.D. Ark. 2024) (quoting *Miller*, 515 U.S. at 915). *First*, a plaintiff can advance a "vote dilution" theory, which requires showing that a state "has enacted a particular voting scheme as a purposeful device to minimize or cancel out the

11

voting potential" of specific racial groups. *Miller*, 515 U.S. at 911. To plead a vote dilution claim, a plaintiff must plausibly allege both "that the purpose and operative effect" of the challenged scheme is "to dilute the voting strength of minority citizens," *and* that "there is an actual discriminatory effect on that group." *Vallejo v. Keller Indep. Sch. Dist.*, No. 4:25-CV-00138-O, 2026 WL 112050, at *5 (N.D. Tex. Jan. 15, 2026) (citations omitted, alterations incorporated).

But to the extent the Noyes Plaintiffs intend to advance a vote dilution theory, they have failed to advance any allegations about vote dilution, much less allegations plausibly suggesting that *their* votes have been diluted. Neither the word "dilute" nor any of its variants appears in the Noyes' Plaintiffs' Fifteenth Amendment claim, Consol. Compl. ¶¶ 148–52, and where the word appears elsewhere in the Consolidated Complaint, it refers to racial gerrymandering in *other states*, *e.g.*, *id*. ¶ 6 (alleging that California legislators feared "that the voting power of racial groups in other states was being diluted"). The Noyes Plaintiffs thus have not plausibly alleged that *any* California voters experienced vote dilution on racial grounds—meaning they have not alleged "sufficient facts . . . to support a cognizable legal theory." *Navarro*, 250 F.3d at 732. And, by extension, they necessarily have not alleged standing as required for a vote-dilution claim. "[I]n the racial gerrymandering . . . context[], vote dilution occurs when voters are harmed compared to irrationally favored voters from other districts." *Wood v. Raffensperger*, 981 F.3d 1307, 1314 (11th Cir. 2020). The Noyes Plaintiffs have not even alleged what districts they inhabit, much less facts sufficient to plausibly suggest that the value of their votes has been diluted compared to voters in other districts. Absent a cognizable harm, the Consolidated Complaint's allegations are not "sufficient to invoke the court's jurisdiction." *Searle*, 148 F.4th at 1128. The requirements to plead a vote-dilution claim under the VRA are the same as to plead a vote-dilution claim under the Fifteenth Amendment. *See League of United Latin Am. Citizens v. Abbott*, 809 F. Supp. 3d 502, 515 (W.D. Tex. 2025). Thus, to the extent the Noyes Plaintiffs intended their VRA claim to assert a vote-dilution theory, it fails for the same reasons.

*Second*, a plaintiff can advance a traditional racial gerrymandering theory under the Fifteenth Amendment, though typically in combination with a Fourteenth Amendment claim. *Cf. Abbott v. League of United Latin Am. Citizens*, 146 S. Ct. 418, 422 (2025) (Kagan, J., dissenting) (observing that plaintiffs alleged a racial gerrymander "in violation of the Fourteenth and Fifteenth Amendments"). As explained below, however, pleading this traditional racial gerrymandering theory requires plausibly alleging that "race was the predominant factor motivating the legislature's decision" to draw particular lines. *Cooper v. Harris*, 581 U.S. 285, 291 (2017) (citation omitted). The Noyes Plaintiffs at times hint at the notion that they are advancing a racial gerrymandering claim that is somehow subject to a lower standard than Plaintiffs' Fourteenth Amendment claims. *See, e.g.*, Consol. Compl. ¶ 136. But the Supreme Court has never recognized a lower-bar racial gerrymandering claim under the Fifteenth Amendment; courts instead uniformly subject racial gerrymandering claims to the same high standard, whether they are brought under the Fourteenth or Fifteenth Amendments.[6] To the extent the Noyes Plaintiffs intend to advance a racial gerrymandering theory under the Fifteenth Amendment—as the title to Count II suggests—that claim is subject to the same standards as the Tangipa Plaintiffs' Fourteenth Amendment claim—and falls short for the reasons explained below. *See infra*, Argument §§ III–IV.

---

[6] *See, e.g.*, *Abbott*, 146 S. Ct. at 422 (Kagan, J., dissenting) (explaining the standard for "racial-gerrymander claim[s]" under the "Fourteenth and Fifteenth Amendments" involves "show[ing] that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district"); *Page v. Bartels*, 248 F.3d 175, 192 (3d Cir. 2001) (applying the "predominant factor" test to Fifteenth Amendment claims); *Prejean v. Foster*, 83 F. App'x 5, 11 (5th Cir. 2003) (same); *Robertson v. Bartels*, 148 F. Supp. 2d 443, 453–54 (D.N.J. 2001) (applying the same standard to Fourteenth and Fifteenth Amendment racial gerrymandering claims), *aff'd*, 534 U.S. 1110 (2002); *Johnson-Lee v. City of Minneapolis*, No. 02-1139(JRT/FLN), 2004 WL 2212044, at *13 (D. Minn. Sept. 30, 2004) (same), *aff'd*, 170 F. App'x 15 (8th Cir. 2006); *cf. Washington v. Finlay*, 664 F.2d 913, 919 (4th Cir. 1981) (characterizing, prior to *Shaw*, Fourteenth and Fifteenth Amendment claims in this realm as "essentially congruent").

### III. The Consolidated Complaint does not plausibly allege direct evidence of race discrimination as to any district.

The Supreme Court has indicated that direct evidence of racial predominance is an all-but-essential requirement for plausibly alleging a racial gerrymandering claim. *See Alexander*, 602 U.S. at 8. Such evidence typically takes "the form of a relevant state actor's express acknowledgment that race played a role in the drawing of district lines." *Id*. This "state actor" requirement is further reflected in the substantive standards for each of the claims asserted in the Consolidated Complaint. For example, Plaintiffs' Fourteenth and Fifteenth Amendment claims require them to allege that relevant state actors "subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations." *Miller*, 515 U.S. at 916; *see also Page*, 248 F.3d at 192 (applying the "predominant factor" test to Fifteenth Amendment claims); *Prejean*, 83 F. App'x at 11 (same). As for their VRA § 2 claim, Plaintiffs must allege that "racial discrimination [was] . . . a 'substantial' or 'motivating' factor behind enactment of" the Prop 50 map, *Hunter v. Underwood*, 471 U.S. 222, 228 (1985), and the Court must consider any "*actual* non-racial motivations" held by the relevant state actors, *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 221 (4th Cir. 2016).[7]

Plaintiffs have not plausibly alleged discriminatory intent on the part of *any* state actor—a gaping omission that undermines the plausibility of their claims. For example,

---

[7] The Ninth Circuit has also held that to advance a claim under § 2 of the VRA, a plaintiff must allege facts sufficient to permit an inference of discriminatory intent under the *Arlington Heights* framework. *See Old Person v. Cooney*, 230 F.3d 1113, 1130–31 (9th Cir. 2000). That standard requires considering numerous factors, including contemporaneous statements by state actors, procedural or substantive deviations, and the degree of burden on majority and minority voters. The Consolidated Complaint says nothing about these factors—which is yet another pleading deficiency for Plaintiffs' VRA claims. *Walls v. Sanders*, 760 F. Supp. 3d 766, 797 (E.D. Ark. 2024) ("To survive a motion to dismiss under *Arlington Heights*, a plaintiff must allege facts sufficient to allow the Court to draw a reasonable inference that lawmakers acted with a discriminatory intent or purpose when they enacted the law at issue.").

14

Plaintiffs say nothing about the intent of the California electorate, which was the final arbiter as to Prop 50's enactment and which this Court has already held to be the most relevant state actor. And the supposed direct evidence they *do* discuss consists of cherrypicked statements from Paul Mitchell (whom they fail to plausibly allege is a state actor) and California legislators, all of which ultimately confirm Prop 50's overwhelmingly partisan motivations.

### A.    The Consolidated Complaint offers no discussion of the intent of the California electorate.

As this Court has already observed, Prop 50 is different from other redistricting efforts because it was placed before the electorate as a ballot measure, rather than enacted via legislation alone. *See* PI Order at 17; *see also* Cal. Const. art. II, § 1 (the California voters have the final power over amendments to the state constitution); *Hollingsworth v. Perry*, 570 U.S. 693, 707 (2013) (recognizing that, in California, ballot proposals "bec[o]me 'a duly enacted constitutional amendment or statute'" only once "approved by the voters" (quoting *Perry v. Brown*, 265 P.3d 1002, 1021 (Cal. 2011)). Accordingly, the Court "must look to the intent of the voters, rather than the legislature" alone to determine whether race predominated in drawing the Prop 50 map. PI Order at 18. The United States apparently agrees with this framework: in its brief supporting the Tangipa Plaintiffs' request for an injunction pending appeal before the Supreme Court, the United States argued it was "appropriate . . . to treat the voters as the ultimate legislature for purposes of th[e] Court's racial-gerrymandering precedents." Brief for the United States at 20, *Tangipa v. Newsom*, No. 25A839 (U.S. Jan. 22, 2026).

Even so, the Consolidated Complaint does not advance a *single* allegation about whether voters intended to enact a racial gerrymander or whether the campaign itself was tainted by racial appeals. Plaintiffs allege only that "Proposition 50 was passed in a special election by California voters," Consol. Compl. ¶ 61, with nary a mention of the openly partisan ballot campaign that preceded the vote. And while the Consolidated Complaint discusses statements by Paul Mitchell and California legislators about Prop

50—which might conceivably "speak directly to voters," and therefore provide indirect evidence of "the voters' intent," PI Order at 18—the Consolidated Complaint does not bridge that gap by alleging that any of Mitchell's or the legislators' statements informed, influenced, or reflected the motives of the California electorate. *See generally* Consol. Compl. On its own, the total absence of *any* allegations about the intent of "the most relevant state actors," PI Order at 15, warrants dismissing Plaintiffs' claims, *see also Alexander*, 602 U.S. at 8, or at minimum demands particularly compelling allegations of circumstantial evidence, *see id.*, which Plaintiffs likewise fail to supply.

**B.     Plaintiffs' cherrypicked statements from California legislators do not establish discriminatory intent.**

The Consolidated Complaint also references a handful of stray statements by California legislators about the Prop 50 map as evidence of racial predominance. But every statement identified in the Complaint either (1) accuses *other* states of engaging in racial gerrymandering to *disfavor* minorities or (2) advocates for Prop 50 in part because it preserves existing majority-minority or Voting Rights Act districts in the previous map. *See* Consol. Compl. ¶¶ 78–87. Even in the out of-context manner in which Plaintiffs present these statements, they do not plausibly show that the Prop 50 map was enacted to favor or disfavor any racial group, much less that race predominated in the drawing of any specific district.

The first set of statements, on their face, do not say anything about the Prop 50 map at all—instead, they indict alleged racial gerrymandering in *other* states, and it is unclear what inference Plaintiffs expect the Court to draw from these statements. Generously construed, Plaintiffs appear to be alleging that these statements somehow reflect a *reciprocal* desire on the part of some California legislators to engage in racial gerrymandering of the sort alleged to be taking place elsewhere. But Plaintiffs do not even muster a bare allegation to this effect, never mind sufficient allegations to overcome the presumption of legislative good faith. *Alexander*, 602 U.S. at 11.

16

The second category of statements are simply boilerplate puffery about Prop 50's preservation of existing minority voting rights. These statements at most suggest that some legislators may have "considered race, along with other partisan and geographic considerations," in voting for Prop 50, *Easley v. Cromartie*, 532 U.S. 234, 253 (2001), which is not enough to allege predominance, *see Cubanos Pa 'lante v. Fla. House of Representatives*, 766 F. Supp. 3d 1204, 1212–13 (S.D. Fla. 2025) (dismissing complaint because "generalized language" employed by legislators to refer to "protected[] majority-minority Hispanic districts" failed to "sustain the inference that race predominated in the Legislature's discussions"). Indeed, the more plausible interpretation of the statements is that some legislators wished to preserve aspects of the prior map, which the Supreme Court has recognized as a legitimate legislative consideration. *See Karcher v. Daggett*, 462 U.S. 725, 740 (1983) (recognizing "preserving the cores of prior districts" as a valid criterion); *Miller*, 515 U.S. at 916 (similar); *see also Alexander*, 602 U.S. at 10 (explaining the Court must draw all reasonable inferences in the legislature's favor). Thus, none of these alleged statements provide a plausible inference that race played a predominant role in the California Legislature's evaluation of Prop 50.[8]

### C.    The allegations about Paul Mitchell do not establish discriminatory intent attributable to any state actor.

In contrast to their allegations concerning California's voters and legislators, Plaintiffs focus substantial portions of their pleadings on Paul Mitchell, the independent consultant who allegedly prepared a draft map for DCCC. But the Consolidated Complaint alleges no facts to suggest that he is a state actor or that his statements are

---

[8] The Consolidated Complaint also suggests that Mitchell's company, Redistricting Partners, provided DCCC with a draft map that "included census population tables and CVAP in each district, broken down by race," and that "DCCC then sent this document to the California Legislature." Consol. Compl. ¶¶ 73–74. It is unclear whether Plaintiffs intend to suggest that this constitutes direct evidence of racial intent, but if so, it plainly does not: at most, it indicates "consciousness" of racial statistics, which is not enough to show predominance. *Shaw v. Reno*, 509 U.S. 630, 646 (1993).

attributable to California legislators or the California electorate. According to the Consolidated Complaint, Paul Mitchell is a private consultant at "Sacramento-based Redistricting Partners." Consol. Compl. ¶ 56. After Mitchell drafted a map, DCCC, an indisputably partisan organization, "paid Mr. Mitchell for the new congressional map and submitted it to the California legislature." *Id*. ¶¶ 56, 73–74. The closest Plaintiffs come to alleging Mitchell's relevance is a one-sentence allegation that Mitchell "met with Speaker of the California Assembly Robert Rivas's Chief of Staff, Steve Omara, and began conversations with the California Legislature about drawing the new congressional districts that would become the Proposition 50 map." *Id*. ¶ 56. But the mere suggestion that Mitchell had a conversation with legislative staff about Prop 50—even if true—falls far short of demonstrating that he is a relevant state actor who can speak for the Legislature or the electorate. *See Abbott v. Perez*, 585 U.S. 579, 608–10 (2018) (racial gerrymandering plaintiffs must show it was the state actors responsible for enacting specific challenged districts who had "discriminatory intent"); *Alexander*, 602 U.S. at 8 (focusing on the intent of a "relevant state actor[]"); *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999) ("Action taken by private entities with the mere approval or acquiescence of the State is not state action."); *cf. Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 689–90 (2021) (explaining "legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents").

Thus, there is a mile-wide gap between the Consolidated Complaint's paltry allegations and any permissible inference that Mitchell's views or statements can be attributed to a relevant state actor. Absent well-pled facts suggesting Mitchell is a state actor or that his statements can be imputed to one, Plaintiffs' allegations about Mitchell reflect nothing more than snippets of a third party's personal opinions.[9] *See Cooke v. Corp. of the President of the Church of Jesus Christ of Latter Day Saints*, 395 F. App'x

---

[9] As DCCC has explained elsewhere, when placed in context, Mitchell's statements make crystal clear that his predominant motivation was partisan gain for Democratic Party candidates. *See* DCCC's Opp'n to Mot. for Prelim. Inj., ECF No. 112.

367 (9th Cir. 2010) (affirming dismissal of complaint where plaintiff failed to allege defendants were state actors); *Cox v. Ass'n of Or. Corr. Emps., Inc.*, No. 24-2763, 2025 WL 1077133, at *1 (9th Cir. Apr. 10, 2025) (similar). Accordingly, even setting aside how Plaintiffs mischaracterize the substance of his remarks, *see infra*, Argument § IV.A, there is no basis to begin with for treating Mitchell's comments as direct evidence of any kind.

## IV.    Plaintiffs have not plausibly alleged racial predominance as to any of the specific districts they discuss.

The inchoate legal framework of Plaintiffs' claims, coupled with their failure to plausibly allege *any* relevant direct evidence of racial predominance whatsoever, is enough to dismiss their claims. *See Alexander*, 602 U.S. at 11; *Cubanos Pa 'lante*, 766 F. Supp. 3d at 1212–13. But even were the Court to consider their remaining circumstantial allegations directed towards specific congressional districts, these allegations do not plausibly show racial predominance, and certainly do not overcome the strong presumption of legislative good faith. *See Cubanos Pa 'lante*, 766 F. Supp. 3d at 1216 (dismissing allegations as to two challenged districts where plaintiffs offered "only conclusory allegations in place of . . . more specific circumstantial evidence"). Most obviously, the supposed district-specific evidence Plaintiffs allege suffers from the same pleading deficiencies discussed above—Plaintiffs glaringly fail to allege *any* facts that could supply direct evidence that voters or legislators held racialized motives as to the adoption of any of the districts they discuss. *See supra*, Argument § III. And Plaintiffs' critiques of isolated portions of a handful of challenged districts fail to nudge their claims over the line from speculative to plausible, because they do not even try "rul[e] out the competing explanation that political considerations dominated" the redrawing of these districts. *Alexander*, 602 U.S. at 9–10; *accord Twombly*, 550 U.S. at 557.

### A.    The allegations concerning CD-13 do not plausibly show racial predominance.

Like the Tangipa Plaintiffs' original complaint, the Consolidated Complaint focuses significantly on CD-13, a congressional district in the San Joaquin Valley. *See* Consol. Compl. ¶¶ 117–23. Plaintiffs do not even attempt to allege that the California electorate or California's legislators held racialized motives in adopting CD-13's boundaries, *see id*., meaning they have not plausibly alleged that race predominated in the drawing of CD-13's boundaries. *See Cubanos Pa 'lante*, 766 F. Supp. 3d at 1216 (finding even more substantial legislative statements "too generalized to support the inference that race motivated" redistricting efforts for two congressional districts and granting Rule 12(b)(6) motion); *supra* Argument § III (explaining why lack of voter or legislator statements suggesting racial motivation warrants dismissal).

The closest the Consolidated Complaint comes to alleging direct evidence of discrimination as to CD-13 is its recitation of Paul Mitchell's statement during his presentation to a Hispanic advocacy organization, Hispanas Organized for Political Equality (HOPE), that the Prop 50 map would make the Latino vote more "effective, particularly in the Central Valley." Consol. Compl. ¶ 67. But there are at least three problems with relying on this remark as circumstantial evidence regarding CD-13. *First*, Plaintiffs never allege that Mitchell was referring to CD-13 when he made this statement. And the Court cannot simply assume that he was—the Central Valley includes at least *eight* congressional districts in whole or part,[10] and there is no dispute that Prop 50

---

[10] The precise contours of the Central Valley are variable, but the Court can take judicial notice of the fact that the California Department of Justice defines the Central Valley as including at least the following ten counties: Fresno, Kern, Kings, Madera, Mariposa, Merced, San Joaquin, Stanislaus, Tulare, Tuolumne. *See Game Rules*, State of Cal. Dep't of Just. (last visited Feb. 11, 2026), https://perma.cc/K3G5-2MQJ. Under the Prop 50 map, these counties are located partially or entirely within congressional districts 5, 9, 13, 18, 20, 21, 22, 23. *See generally* Assemb. B. 604, 2025–26 Reg. Sess. (Cal. 2025) (identifying county census blocks by congressional district). Regardless of any quibbles

significantly altered many of them. Mitchell's bare reference to the "Central Valley" therefore fails to supply the necessary district-specific allegations for Plaintiffs' CD-13 claims. *See Alabama*, 575 U.S. at 262–63. *Second*, and just as importantly, Mitchell was expressly told prior to making this remark to "keep it nonpartisan" when explaining what "Latino voters [should] pay the most attention to when it comes to . . . the[] Prop 50 maps[.]" Consol. Compl. Ex. B at 28:8–11.[11] Simply put, it is impossible to infer *anything* about the relative predominance of race versus partisanship from this particular remark given that the materials in the Consolidated Complaint show that Mitchell was asked to avoid speaking about the latter. *See, e.g.*, *Baidan v. Shull*, No. 24-CV-03171-VKD, 2025 WL 267348, at *4 (N.D. Cal. Jan. 22, 2025) (dismissing complaint where transcript incorporated into the pleadings failed to permit inference sought by complainant); *cf. City of Baton Rouge/E. Baton Rouge Par. v. Bank of Am., N.A.*, No. 19-CV-725-SDD-RLB, 2021 WL 1201664, at *4 (M.D. La. Mar. 30, 2021) (dismissing Sherman Act claim where chat room transcript incorporated into complaint "scarcely evidences an understanding regarding price whatsoever, let alone an explicit one," and therefore failed to support a plausible inference of conspiracy). *Third*, Mitchell's statement on its face concerned the *effects* of the Prop 50 map, not the intent underlying

about the precise boundaries of the Central Valley, the point remains the same: the Court cannot simply assume an offhand reference to the region refers to CD-13 specifically.

[11] Plaintiffs conveniently fail to quote the actual question that Mitchell was asked when giving his response, which was: "[T]rying as much as we can to keep it nonpartisan, from your perspective, what should Latino voters pay the most attention to when it comes to this -- to these Prop. 50 maps?" *See* Consol. Compl. Ex. B at 28:8–11. Even so, that portion of the transcript is plainly incorporated into the Consolidated Complaint. *See* Consol. Compl. Ex. B; Consol. Compl. ¶ 63 (introducing Mitchell's HOPE presentation as an exhibit). The "policy concern underlying this [incorporation] rule is to prevent plaintiffs from surviving a motion to dismiss by deliberately omitting references to, or portions of, documents that weaken or doom their claims." *Darling v. Eddy*, No. 9:21-CV-00147-DLC, 2023 WL 157712, at *2 (D. Mont. Jan. 11, 2023). That is precisely the case here, where Plaintiffs omit the very question Mitchell was asked, and the critical context it supplies, yet seize upon his response in isolation in a vain effort to state a claim.

the map. "[R]ace and partisan preference are [often] highly correlated," *Alexander*, 602 U.S. at 6, meaning a map *intended* to make a district more Democratic might have the *effect* of making it more effective for Latino voters. The Consolidated Complaint's allegations entirely fail to "disentangle race and politics," *id.*, and thus do not state a claim for racial predominance.

Bereft of any allegations of direct evidence as to CD-13, Plaintiffs are forced to place loadbearing weight on circumstantial allegations of racial predominance. Such evidence takes the form (notionally) of allegations that discrete portions of CD-13 are "so bizarre on [their] face that it discloses a racial design" without any plausible alternative explanation. *Id.* at 8 (quoting *Miller*, 515 U.S. at 914). Tellingly though, in making these allegations, Plaintiffs fail to discuss "the design of the district as a whole"— which on its face largely traded rural, conservative voters for more urban and suburban liberal ones—or to "take account of the districtwide context," as required to present a coherent claim. *Bethune-Hill*, 580 U.S. at 192.

The Consolidated Complaint briefly mentions two geographic features of CD-13: (1) a "bulge[]" which "omits a significant white Democratic population in Modesto while capturing a heavily Hispanic Republican population," and (2) a "split . . . near Stockton" which "leaves heavily Democratic areas to the west of the district but includes a northern appendage." Consol. Compl. ¶¶ 120–23. These fleeting allusions, which assert in conclusory fashion that CD-13's design "makes little sense from the perspective of a mapmaker intending to maximize partisan performance," *id.* ¶ 123, hardly foreclose the prospect that "political considerations dominated" in the broader drawing of CD-13, *Alexander*, 602 U.S. at 9–10. This is particularly true given that, according to Plaintiffs' own allegations, Prop 50 *reduced* the overall Latino population of CD-13. Consol. Compl. ¶¶ 117–118 (noting that the "Hispanic" population of CD-13 was 65.9% in the old map, and 64.8% in the new map). As a result, Plaintiffs' offhand criticisms of a "bulge" in one small area of the district and a "split" in another fails to supply an inference that race, rather than politics, "dominated" the drawing of CD-13 as a whole.

22

*Alexander*, 602 U.S. at 9–10. "Factual allegations founded on describing the minutiae of a district's boundaries without connecting those boundaries' shapes to the impermissible use of race cannot survive a motion to dismiss." *Cubanos Pa 'lante*, 766 F. Supp. 3d at 1216 (dismissing claims with more substantial critiques of district boundaries). To the contrary, Plaintiffs' myopic focus on the minutiae of a couple small portions of CD-13's boundaries ignores "the design of the district as a whole" and fails to "take account of the districtwide context." *Bethune-Hill*, 580 U.S. at 192.

Plaintiffs also fail to offer any allegations that foreclose the more plausible and obvious alternative explanation for why certain Democrats were "omit[ted]" from CD-13, namely, that there are "tradeoff[s] . . . inherent in every redistricting: some voters are shifted out of one district and into another." *Jackson v. Tarrant County*, 158 F.4th 571, 582 (5th Cir. 2025). Plaintiffs make no allegations explaining why a reasonable mapdrawer—motivated exclusively by partisanship—would not leave some Democrats on the table just outside CD-13 in order to deploy them in neighboring competitive districts. And, even setting partisanship aside, Plaintiffs offer *no* allegations to suggest that other "traditional redistricting factors," such as "compactness, contiguity of territory, and respect for communities of interest," *Bethune-Hill*, 580 U.S. at 183, did not play a role in drawing CD-13. Thus, Plaintiffs have fundamentally failed to comply with their pleading obligations under *Twombly* and *Iqbal*, which require the complainant to supply allegations that "plausibly suggest[]," and are "not merely consistent with," a legal violation. *Twombly*, 550 U.S. at 557; *see also In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) ("To render their explanation plausible, plaintiffs must do more than allege facts that are merely consistent with both their explanation and defendants' competing explanation."); *Redlands Country Club Inc. v. Cont'l Cas. Co.*, No. 10-CV-1905-GAF-DTBX, 2011 WL 13224843, at *3 (C.D. Cal. Jan. 28, 2011) ("Allegations that are equally consistent with lawful and unlawful conduct are insufficient under *Twombly*.").

23

In *Cubanos Pa 'lante*, for example, the three-judge court dismissed racial gerrymandering claims towards Florida's CD-27 because the complaint failed to offer allegations foreclosing "equally plausible explanation[s] for the district's shape." 766 F. Supp. 3d at 1216. In other words, "equally plausible inferences" of lawful conduct remained even when accepting the facts in the complaint as true. *Id.* That is the case here as well. Plaintiffs have not even tried to plead the most basic counter-explanation as to why partisanship does not explain the choice to leave some Democrats outside of the district—and thus available for neighboring districts like CD-5 and CD-9—when looking at CD-13. That failure is critical given the need to "disentangle race and politics" when pleading a racial gerrymandering claim. *Alexander*, 602 U.S. at 6. As such, Plaintiffs have "not offered allegations" to render their racial gerrymandering theory "plausible," even as to CD-13 specifically. *In re Century Aluminum*, 729 F.3d at 1108; *see also Cubanos Pa 'lante*, 766 F. Supp. 3d at 1216–17.

### B.     Plaintiffs' allegations about HCVAP percentages do not plausibly show racial predominance.

Similar to their allegations about CD-13, Plaintiffs suggest that the Prop 50 map deliberately creates "Hispanic-majority Districts" by "passing Hispanic-majority census blocks from one adjacent district to another." Consol. Compl. ¶ 95. The Prop 50 map achieves this, according to Plaintiffs, by "reducing Hispanic population with precision in many districts, but at a level that very carefully and deliberately maintained a floor of 52% Hispanic population." *Id*. In making these allegations, Plaintiffs rely on statistics about the "Hispanic Citizen Voting-Age Population" (also referred to as "Hispanic CVAP" or "HCVAP") of the districts they discuss.

But those statistics belie this theory. According to Table 1, the previous congressional map had sixteen "Hispanic-majority districts"—the *exact same number* as the Prop 50 map. Consol. Compl. at Table 1. Moreover, the number of "Hispanic-majority" districts in the previous plan with an HCVAP percentage below 52% is zero—whereas the Prop 50 map contains at least one "Hispanic-majority" district, CD-52, with

24

less than 52% HCVAP. *Id*. Thus, Plaintiffs have not plausibly alleged that the Prop 50 map establishes a "floor of 52% Hispanic population"—if anything, the map goes below that "floor" more so than the prior map. *See Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004) (affirming dismissal of racial gerrymandering claim where statistics did not support the plaintiff's theory).

Plaintiffs also suggest that the Prop 50 map intentionally draws districts with between 52% and 55% HVCAP, and that the configuration of these districts was designed, for some reason, to be consistent with an opinion letter sent by HOPE to California's previously operative Redistricting Commission concerning Latino-majority districts. *See* Consol. Compl. ¶¶ 64, 96. [12] But not all districts fall within this band; two districts exhibit over 61% HCVAP, while one falls below 52%, as just discussed. *Id*. at Table 1. And as the Consolidated Complaint shows, the prior map itself contained seven districts with between 52% and 55% HCVAP, and seven more districts with HCVAP between 55% and 58%. *See id*. at Table 1. Plaintiffs do not plausibly allege, based on the mere presence of districts with slightly altered Latino majorities, that the Prop 50 map was drawn with racial goals in mind, especially given the multitude of other redistricting criteria a state may legitimately consider in districting. *See Miller*, 515 U.S. at 916. Simply gesturing toward districts' HCVAP percentages does not amount to a plausible allegation of "racial predominance" in any given district. *Bethune-Hill*, 580 U.S. at 191.

Finally, the Consolidated Complaint does not even discuss the vast majority of the districts with between 52% and 55% HCVAP, and thus their theory that Mitchell somehow passed Hispanic-majority census blocks between districts is not adequately supported by the required "district-by-district" analysis or any specific factual

---

[12] The HOPE letter allegedly suggests creating districts with HCVAP percentages "between 53% and 54%," but Plaintiffs allege that Prop 50 aims for "a tight range between 52-55%." *Compare* Consol. Compl. ¶ 95 *with id*. ¶ 96. This discrepancy further undermines the already implausible hypothesis that the Prop 50 map was designed to comply with the HOPE letter.

25

allegations. *Bethune-Hill*, 580 U.S. at 191 (citation omitted). The only district Plaintiffs *do* discuss as having been kept "within the deliberately tight band of 52-55% Hispanic CVAP range" is CD-18. *See* Consol. Compl. ¶¶ 97–99. But Plaintiffs neglect to mention that CD-18 *also* had a HCVAP percentage of between 52% and 55% in the prior map. *See id*. at Table 1. And Plaintiffs do not, and cannot, explain why a state that wished "to favor Latino voters," Consol. Compl. ¶ 162, would do so by replacing one slightly Latino-majority district with another slightly Latino-majority district, rather than, for example, expanding the actual number of Latino-majority districts. Far from "ruling out" competing explanations, *Alexander*, 602 U.S. at 9, Plaintiffs' allegations—even taken at face value—do not plausibly suggest racial motivation as the predominant factor behind any specific district.

### C. The allegations directed to CD-38, CD-41, and CD-42 do not plausibly show racial predominance.

The Consolidated Complaint also includes a handful of paragraphs concerning CD-41 and CD-42, though the precise implications of these allegations are difficult to parse. *See* Consol. Compl. ¶¶ 100–07. The gist appears to be that Prop 50 converted CD-42 from a Latino-majority district into a non-Latino majority district, and then did the reverse with CD-41, redrawing it from a White-plurality district outside of Los Angeles into a Latino-majority district within Los Angeles County, while maintaining CD-38 as a Latino-majority district by making it absorb components of CD-42. *Id*. In other words, Plaintiffs contend that Prop 50 swaps CD-41 and CD-42 in order to "preserv[e] the number of majority Hispanic CVAP districts at sixteen." *Id.* ¶ 101.

Plaintiffs, however, fail to provide any additional allegations that could supply an inference that these two districts were drawn for an impermissible racial purpose, rather than in service of Prop 50's openly stated goal of electing more Democrats to Congress. *See* PI Order at 2 (Prop 50 adopts "congressional district lines that everyone agrees are likely to flip five congressional seats from Republicans to Democrats"). Nor do they offer allegations suggesting some sort of "trade-off" or "swap" between CD-42 and CD-41.

26

To the contrary, Plaintiffs' own sources in the Consolidated Complaint confirm that that CD-41 was moved into Los Angeles primarily to "eliminat[e] the Ken Calvert district in Riverside," in service of the expressly partisan goal of providing "an opportunity for Democrats to pick up five seats, and to counterbalance the five Republican seats in Texas." Consol. Compl., Ex. B at 25:14–26:8. Moving CD-41 into Los Angeles County—and, in the process, adding a substantial number of Democratic-leaning urban voters to the district—displaced parts of the existing CD-42, pushing it further south and causing it *lose* HCVAP in the process. *See* PI Order at 46–47 ("Only one challenged district, District 41, became a majority-Latino district under the Proposition 50 Map, while another district that is not challenged, District 42, is no longer a majority-Latino district . . . ."). Nothing about that shift supplies an inference of unlawful racial motivation. If anything, "a map drawn to favor Latino voters," Consol. Compl. ¶ 162, would have endeavored to *retain* a Latino-majority district CD-42, rather than swapping one for another (and in the process netting a Democratic-leaning seat).

At most, Plaintiffs' insinuation that Prop 50 deliberately swapped an HCVAP-majority in CD-42 for one in CD-41 reflects "race consciousness," which "does not lead inevitably to impermissible race discrimination." *Shaw*, 509 U.S. at 646. As the Supreme Court has explained, such racial consciousness does "not, in and of itself, convert a political gerrymander into a racial gerrymander, no matter how conscious redistricters were of the correlation between race and party affiliation." *Bush v. Vera*, 517 U.S. 952, 968 (1996); *see also Alexander*, 602 U.S. at 9 (collecting similar authority). Plaintiffs fail to offer pleadings that nudge their meager allegations about CD-41 and CD-42 from (charitably construed) indicative of racial awareness, to evidence of racial discrimination.

### D. Plaintiffs' allegation that Prop 50 preserves existing VRA and Black-influence districts does not establish racial predominance.

Plaintiffs also allege, as circumstantial evidence of discriminatory intent, that the Prop 50 map "deliberately preserved two performing black-influence districts"—CD-37 and CD-43. Consol. Compl. ¶¶ 108–09. Needless to say, these allegations suffer the same

fatal flaws as Plaintiffs' other allegations about specific districts: Plaintiffs say nothing to support a plausible inference that the California Legislature or California electorate were motivated by race in retaining these pre-existing districts. *Supra*, Argument § III. Plaintiffs' allegations about CD-37 and CD-43 are not even thematically consistent with their overall theory of the case. Elsewhere in the Consolidated Complaint, Plaintiffs suggest that Paul Mitchell was motivated to improve Latino voting power, and that he considered "Hispanic demographics as criteria in designing the map" for that purpose. Consol. Compl. ¶¶ 62–77. Yet according to Plaintiffs, in both CD-37 and CD-43, "the [B]lack population has an increased voting strength *relative to the Hispanic population in both districts*." *Id*. ¶ 111 (emphasis added). Plaintiffs do not even attempt to explain why, in a map supposedly drawn to benefit Latino voters, CD-37 and CD-43 were drawn to "wall[] off the Hispanic . . . populations to the surrounding districts." *Id*. ¶ 116. And they certainly have alleged no direct evidence suggesting that an intent to benefit Black voters played *any* role in the design of the Prop 50 map.

Further, Plaintiffs' allegations as to CD-37 and CD-43, even if accepted as true, fail to "rule out [] competing explanation[s]" for the districts' designs. *Alexander*, 602 U.S. at 9. Plaintiffs admit that CD-37 and CD-43 changed little from the previous map. "No racial groups' CVAP populations in Districts 43 and 37 changed," according to the Consolidated Complaint, and the Prop 50 map simply "preserve[s] the [B]lack populations' proportion in both districts." Consol. Compl. ¶¶ 110, 111. Thus, whereas Plaintiffs complain that other districts changed too much, their gripe seems to be that CD-37 and CD-43 did not change *enough*. But the desire not to change a district is *itself* a legitimate redistricting criterion. In *Karcher v. Daggett*, the Supreme Court noted that "preserving the cores of prior districts" was a "legitimate objective." 462 U.S. at 740–41; *see also Miller*, 515 U.S. at 916 (similar). Given the complete absence of any evidence that Paul Mitchell—much less a relevant actor like the Legislature or electorate—intended to unlawfully benefit Black voters, the shapes of CD-37 and CD-

43 are "equally consistent with lawful and unlawful conduct," and thus insufficient to state a claim under Rule 12(b)(6). *Redlands Country Club*, 2011 WL 13224843, at *3.

Nor can Plaintiffs evade these principles by suggesting that the Legislature that *originally* enacted CD-37 and CD-43 possessed discriminatory intent in creating these districts. Even if their creation was discriminatory (a proposition Plaintiffs do not even allege), as the Supreme Court has emphasized in the redistricting context, "[p]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Abbott*, 585 U.S. at 603 (citation omitted). To the contrary, the "presumption of legislative good faith" requires the Court to assume that challenged state action was *not* motivated by invidious discrimination. *Id*. Plaintiffs' allegations about CD-37 and CD-43 require the Court to do the opposite—to assume legislative *bad* faith in the presence of an equally plausible alternative explanation. That inference is legally impermissible, and thus, Plaintiffs have failed to plausibly allege that race predominated in the drawing of CD-37 or CD-43.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Consolidated Complaint.

29

Dated: April 24, 2026

Respectfully submitted,

*/s/ Lalitha D. Madduri*
Lalitha D. Madduri (CA Bar No. 301236)
Christopher D. Dodge* (DC Bar No. 90011587)
Max Accardi* (DC Bar No. 90021259)
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652
F: (202) 968-4498
lmadduri@elias.law
cdodge@elias.law
maccardi@elias.law

Abha Khanna* (WA Bar No. 42612)
Tyler L. Bishop (CA Bar No. 337546)
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
T: (206) 656-0177
akhanna@elias.law
tbishop@elias.law

Omar Qureshi (CA Bar No. 323493)
Max Schoening (CA Bar No. 324643)
**QURESHI LAW PC**
700 Flower Street, Suite 1000
Los Angeles, CA 90017
T: (213) 600-6096
omar@qureshi.law
max@qureshi.law

*Counsel for Defendant-Intervenor DCCC*

* *Admitted pro hac vice*

30

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Proposed Intervenor-Defendant DCCC, certifies that this brief contains 9,142 words, which complies with the word limit of Local Rule 11-6.1 as modified by the Court's order.

Dated: April 24, 2025          /s/ *Lalitha D. Madduri*
                               Lalitha D. Madduri

31