ROB BONTA
Attorney General of California
ANYA M. BINSACCA
LARA HADDAD
Supervising Deputy Attorneys General
RYAN EASON
DAVID GREEN
KIANA HEROLD
JENNIFER E. ROSENBERG
IRAM HASAN
 Deputy Attorneys General
 State Bar No. 320802
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 510-3793
 Fax:  (415) 703-5480
 E-mail:  Iram.Hasan@doj.ca.gov
*Attorneys for Defendants California Governor
Gavin Newsom and Secretary of State Shirley
Weber*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| **DAVID TANGIPA, *et al.*,**<br><br>Plaintiffs,<br><br>and<br><br>**UNITED STATES OF AMERICA,**<br><br>Plaintiff-Intervenor<br><br>v.<br><br>**GAVIN NEWSOM, in his official capacity as the Governor of California, *et al.*,**<br><br>Defendants,<br><br>and<br><br>**DEMOCRATIC CONGRESSIONAL CAMPAIGN COMMITTEE, *et al.*,**<br><br>Defendant-Intervenors. | 2:25-cv-10616-JLS-WLH-KKL<br>Three-Judge Court<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES SUPPORTING DEFENDANTS' MOTION TO DISMISS CONSOLIDATED COMPLAINT (ECF NO. 240)**<br><br>Date:　　　　June 26, 2026<br>Time:　　　　10:30 a.m.<br>Courtroom:　1<br>Judges:　　　Hon. Josephine L. Staton, Hon. Kenneth K. Lee, and Hon. Wesley L. Hsu<br><br>Trial Date:　None Designated<br>Action Filed: Nov. 5, 2025 |

# TABLE OF CONTENTS

**Page**

Introduction ...................................................................................................1

Background.....................................................................................................3

    I.     California Moves to Redistrict to Counteract Texas...........................3

    II.    California Voters Approve Proposition 50 ...........................................5

    III.   Procedural History .............................................................................6

Legal Standard...............................................................................................7

Argument.......................................................................................................8

    I.     Tangipa Plaintiffs and Plaintiff-Intervenor Fail to State a Racial Gerrymandering Claim Under the Fourteenth Amendment.................8

         A.    Plaintiffs Bringing a Racial Gerrymandering Claim Face an "Especially Stringent" Burden ...............................................9

             1.    Plaintiffs here must plead that race was the predominant factor motivating the voters.......................9

             2.    Plaintiffs must also overcome a presumption that the voters acted in good faith .........................................10

         B.    Tangipa Plaintiffs and Plaintiff-Intervenor Fail to Plead Any Facts Regarding Voter Intent...............................................11

         C.    Even if Legislative Intent Were Relevant, Tangipa Plaintiffs and Plaintiff-Intervenor Fail to Plausibly Allege that Race was the Legislature's Predominant Motivation .........13

         D.    Challengers Fail to Plead Sufficient Facts for Any of California's Fifty-Two Districts ...............................................15

    II.    Noyes Plaintiffs Fail to Allege Facts Supporting Standing to Bring Either of Their Claims.......................................................17

         A.    Noyes Plaintiffs Lack Standing to Bring Their Fifteenth Amendment Claim ...............................................................19

         B.    Noyes Plaintiffs Lack Standing to Bring Their Voting Rights Act Claim.....................................................................20

    III.   Noyes Plaintiffs Fail to State a Claim Under the Fifteenth Amendment .....................................................................................21

    IV.   Noyes Plaintiffs and Plaintiff-Intervenor Fail to State a Claim Under the Voting Rights Act.............................................................24

         A.    The Complaint Fails to Allege that Voters Approved the Map with a Racially Discriminatory Motivation ......................25

         B.    Facts Regarding the *Arlington Heights* Factors Are Absent from the Complaint ..............................................................27

          C.    The Complaint Fails to Allege an Adverse Effect on Any Group.................................................................................28

# TABLE OF CONTENTS
## (continued)

**Page**

V.    Sovereign Immunity Bars Challengers' Claims Against
      Governor Newsom.................................................................................29

Conclusion.................................................................................................................31

# TABLE OF AUTHORITIES

**Page**

CASES

*Abbott v. League of United Latin Am. Citizens*
146 S.Ct. 418 (2025)......................................................................................1, 3, 13

*Abbott v. Perez*
585 U.S. 579 (2018) ....................................................................... 15, 21, 28

*Adarand Constructors v. Pena*
515 U.S. 200 (1995)......................................................................................25

*Alabama Legislative Black Caucus v. Alabama*
575 U.S. 254 (2015)..................................................................................15, 18

*Alexander v. S.C. State Conf. of the NAACP*
602 U.S. 1 (2024)..................................................................................*passim*

*Allen v. Milligan*
599 U.S. 1 (2023)......................................................................................24

*Ashcroft v. Iqbal*
556 U.S. 662 (2009)...................................................................... 8, 17, 26

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*
729 F.3d 937 (9th Cir. 2013)....................................................................3, 30

*Associated Home Builders etc., Inc. v. City of Livermore*
557 P.3d 473 (Cal. 1976) .................................................................................9

*Backus v. South Carolina*
857 F.Supp.2d 553 (D.S.C. 2012) .................................................................23

*Bell Atlantic Corp. v. Twombly¸*
550 U.S. 544 (2007)...........................................................................................8

*Bethune-Hill v. Virginia State Bd. of Elections*
580 U.S. 178 (2017)...................................................................................13

*Brnovich v. Democratic Nat'l Comm.*
594 U.S. 647 (2021)...................................................................................11

**TABLE OF AUTHORITIES**
**(continued)**

Page

*City of L.A. v. Cnty. of Kern*
462 F. Supp. 2d 1105 (C.D. Cal. 2006) ............................................................12

*City of Mobile, Ala. v. Bolden*
446 U.S. 55 (1980) ..........................................................................................22, 24

*Clapper v. Amnesty Int'l USA*
568 U.S. 398 (2013) ..............................................................................................19

*Cooper v. Harris*
581 U.S. 285 (2017) ...................................................................................9, 10, 22

*Cooper v. Pickett*
137 F.3d 616 (9th Cir. 1997) .................................................................................8

*Ctr. For Biological Diversity v. Bernhardt*
946 F.3d 533 (9th Cir. 2019) ...............................................................................18

*DaimlerChrysler Corp. v. Cuno*
547 U.S. 332 (2006) ........................................................................................7, 19

*Democratic Nat'l Comm. v. Reagan*
904 F.3d 686 (9th Cir. 2018) .........................................................................24, 26

*Easley v. Cromartie*
532 U.S. 234 (2001) ..............................................................................................21

*Ex parte Young*
209 U.S. 123 (1908) ..............................................................................................30

*Fed. Election Comm'n v. Akins*
524 U.S. 11 (1998) ................................................................................................20

*Garza v. Cty. of Los Angeles*
918 F.2d 763 (9th Cir. 1990) .........................................................................20, 28

*Gill v. Whitford*
585 U.S. 48 (2018) ..........................................................................................18, 21

*Gomillion v. Lightfoot*
364 U.S. 339 (1960) ..............................................................................................22

## TABLE OF AUTHORITIES
### (continued)

Page

*Gonzalez v. Planned Parenthood of L.A.*
759 F.3d 1112 (9th Cir. 2014) ................................................................14

*Hunter by Brandt v. Regents of the Univ. of Cal.*
971 F.Supp. 1316 (C.D. Cal. 1997).........................................................24

*Leite v. Crane Co.*
749 F.3d 1117 (9th Cir. 2014)...................................................................8

*Los Angeles Cnty. Bar Ass'n v. Eu*
979 F.2d 697 (9th Cir. 1992)...................................................................30

*Lujan v. Defenders of Wildlife*
504 U.S. 555 (1992)..................................................................................18

*Maya v. Centex Corp.*
658 F.3d 1060 (9th Cir. 2011)...................................................................7

*Miller v. Johnson*
515 U.S. 900 (1995)................................................... 9, 11, 14, 15, 21

*Navarro v. Block*
250 F.3d 729 (9th Cir. 2001)...................................................................15

*Noyes v. Newsom*
No. 2:25-cv-11480-JLS-WLH-KKL (C.D. Cal. Dec. 2, 2025) ......................6, 7

*Papasan v. Allain*
478 U.S. 265 (1986)..................................................................................29

*Pennhurst State Sch. & Hosp. v. Halderman*
465 U.S. 89 (1984)..............................................................................29, 30

*People v. Rizo*
996 P.2d 27 (Cal. 2000) ...........................................................................12

*Perry-Bey v. City of Norfolk, Va.*
678 F. Supp. 2d 348 (E.D. Va. 2009) ......................................................21

*Prejean v. Foster*
227 F.3d 504 (5th Cir. 2000)....................................................................22

v

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Rice v. Cayetano*
528 U.S. 495 (2000)......................................................................................22

*Robert L. v. Superior Ct.*
30 Cal. 4th 894 (2003) ................................................................................12

*Romero v. City of Pomona*
665 F.Supp. 853 (C.D. Cal. 1987)...............................................................23

*Rucho v. Common Cause*
588 U.S. 684 (2019)........................................................................................1

*Schreiber Distributing Co. v. Serv-Well Furniture Co., Inc.*
806 F.2d 1393 (9th Cir. 1986)......................................................................23

*Shaw v. Hunt (Shaw II)*
517 U.S. 899 (1996)........................................................................................9

*Shaw v. Reno*
509 U.S. 630 (1993) (*Shaw I*) ....................................................................22

*Skorepa v. City of Chula Vista*
723 F.Supp. 1384 (S.D. Cal. 1989) .............................................................23

*Spokeo, Inc. v. Robins*
578 U.S. 330 (2016)............................................................................18, 19, 20

*Tangipa v. Newsom*
No. 2:25-cv-10616-JLS-WLH-KKL, 2026 WL 110585 (C.D. Cal.
Jan. 14, 2026)..........................................................................................*passim*

*Tangipa v. Newsom*
No. 25A839, 2026 WL 291659 (U.S. Feb. 4, 2026) ....................................2, 7

*TransUnion LLC v. Ramirez*
594 U.S. 413 (2021)......................................................................................18

*United States v. Hays*
515 U.S. 737 (1995)......................................................................................19

**TABLE OF AUTHORITIES**
**(continued)**

Page

*United States v. Ritchie*
  342 F.3d 903 (9th Cir. 2003)................................................................8

*Vaughan v. Lewisville Indep. Sch. Dist.*
  475 F. Supp. 3d 589 (E.D. Tex. 2020)................................................21

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*
  429 U.S. 252 (1977)..........................................................26, 27, 28

*Virginia Off. For Prot. & Advoc. v. Stewart*
  563 U.S. 247 (2011)..........................................................................30

*Voinovich v. Quilter*
  507 U.S. 146 (1993)..........................................................................21

*Walls v. Sanders*
  760 F.Supp.3d 766 (E.D. Ark. 2024)................................................28

*Washington v. Seattle Sch. Dist. No. 1*
  458 U.S. 457 (1982)..........................................................................12

*Whole Woman's Health v. Jackson*
  595 U.S. 30 (2021)............................................................................30

**STATUTES**

52 U.S.C.
  § 10301 ..............................................................................................24
  § 10301(b) .........................................................................................20

2025 Cal. Stat., ch. 156.........................................................................3

2025 Cal. Stat., ch. 96 (Assembly Bill 604) ........................................4

2025 Cal. Stat., ch. 97 (Senate Bill 280) .............................................4

**CONSTITUTIONAL PROVISIONS**

California Constitution, Article XVIII
  § 1............................................................................................4, 9, 11
  § 4..................................................................................................4, 9

## TABLE OF AUTHORITIES
### (continued)

**Page**

California Constitution, Article XXI
§§ 1–2 ..................................................................................................4

Election Rigging Response Act..............................................................3, 4

Equal Protection Clause ..........................................................................22

United States Constitution
Eleventh Amendment..................................................................3, 29, 30
Fourteenth Amendment ..................................................................*passim*
Fifteenth Amendment .....................................................................*passim*

Voting Rights Act ..................................................................................*passim*

Voting Rights Act
§ 2.................................................................................................*passim*

**COURT RULES**

Federal Rule of Civil Procedure 12(b)(6) ...............................................8

Federal Rules of Civil Procedure
Rule 12(b)(1) ......................................................................................7
Rule 12(b)(6) ......................................................................................7

**OTHER AUTHORITIES**

89th Leg., 2nd Special Sess. (Tex. 2025) ...............................................3

United States Census Bureau, *About the Hispanic Population and its Origin*, https://www.census.gov/topics/population/ hispanic-origin/about.html (last visited April 24, 2026) ...................................1

**INTRODUCTION**

As this Court has already recognized, Proposition 50 is "exactly what it was billed as: a political gerrymander designed to flip five Republican-held seats to the Democrats." *Tangipa v. Newsom*, No. 2:25-cv-10616-JLS-WLH-KKL, 2026 WL 110585, *30 (C.D. Cal. Jan. 14, 2026). "[T]he 'impetus for adoption' of the Proposition 50 Map was 'partisan advantage, pure and simple.'" *Id*. at *30 (quoting *Abbott v. League of United Latin Am. Citizens*, 146 S.Ct. 418, 420 (2025) (Alito, J., concurring)). The Legislature proposed Proposition 50 to favor Democrats and the California electorate elected to adopt those new congressional district lines by an overwhelming majority. *Id.* at *7-*8.

Having failed to convince voters to reject Proposition 50 at the ballot box—and because partisan gerrymandering claims are nonjusticiable, *Rucho v. Common Cause*, 588 U.S. 684 (2019)—Tangipa Plaintiffs, Noyes Plaintiffs, and Plaintiff-Intervenor (together, "Challengers") attempt to reframe an obvious, voter-approved partisan gerrymander as an illegal racial gerrymander and intentional race discrimination in five separately pleaded but overlapping counts brought under the Fourteenth and Fifteenth Amendments and Section 2 of the Voting Rights Act (VRA). To support their claims, Challengers allege that the predominant purpose of Proposition 50 was to benefit Latinos[1] and rely primarily upon scattered statements of individual legislators and a private consultant who drafted an early version of the map but do not allege even a single fact regarding the intent of the voters.

This failure is fatal to Challengers' claims and reflects Challengers' refusal to acknowledge the legal framework this Court has already determined applies to their

---

[1] The federal government defines a "Hispanic or Latino" person as one of "Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin regardless of race." United States Census Bureau, *About the Hispanic Population and its Origin*, https://www.census.gov/topics/population/hispanic-origin/about.html (last visited April 24, 2026). The terms are often used interchangeably.

1

claims.  In denying Tangipa Plaintiffs' and Plaintiff-Intervenors' motions for preliminary injunction, this Court rejected Challengers' efforts to persuade it "to ignore entirely the intent of the voters who overwhelmingly supported Proposition 50[.]" *Tangipa*, 2026 WL 110585 at *8.  Indeed, this Court already concluded that it is the voters who are the "most relevant state actors" for purposes of assessing the intent behind adoption of the Prop 50 map lines.  *Id.* at *8.  It likewise rejected the proposition "that the intent of the map drawer and, by extension, the California Legislature, is dispositive." *Id*.  The Supreme Court declined to upset those statements of the applicable legal tests.  *Tangipa v. Newsom*, No. 25A839, 2026 WL 291659, at *1 (U.S. Feb. 4, 2026) (Supreme Court Order).

With respect to their Fourteenth Amendment claim, Tangipa Plaintiffs and Plaintiff-Intervenor fail to meet their "especially stringent" burden to sustain that claim, *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 7, 11 (2024), or to overcome the presumption of good faith to which the voters are entitled.  Aside from failing to plead a single fact about voter intent, they plead no facts that could support their claim that race *predominated* over *all* other factors in the voters' approval of the new map.  And even if legislative intent was more important to the analysis, Plaintiffs have not sufficiently alleged that the Legislature was predominantly motivated by race.

The remaining claims are also meritless.  Noyes Plaintiffs purport to allege a standalone racial gerrymandering claim under the Fifteenth Amendment, but no such claim exists under governing precedent.  And Noyes Plaintiffs and Plaintiff-Intervenor offer no relevant factual allegations that could support their claims of intentional racial discrimination under the VRA.  At bottom, the Complaint fails to trace any purportedly unconstitutional actions to the Governor or Secretary of State.

Moreover, Noyes Plaintiffs have not pleaded any cognizable injury in fact relevant to their claims: they fail to identify the districts in which they reside, plead

2

that their right to vote was abridged or denied, or include any facts establishing that they are members of any protected class unable to equally access the political process.  They therefore lack standing to bring their Fifteenth Amendment and Voting Rights Act claims.

Finally, Governor Newsom "is entitled to Eleventh Amendment immunity because his only connection to [Proposition 50] is his general duty to enforce California law," which cannot subject him to suit.  *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 943 (9th Cir. 2013), *cert. denied*, 574 U.S. 932 (2014).  Accordingly, he must be dismissed as a Defendant.

In short, Challengers' claims fail as a matter of law.  This Court should find that Challengers' failure to include a single allegation regarding the voters' intent, coupled with their failure to meet their burden with respect to any of their claims, warrants dismissal of their Complaint in its entirety.

## BACKGROUND

## I.   CALIFORNIA MOVES TO REDISTRICT TO COUNTERACT TEXAS

"With an eye on the upcoming 2026 midterm elections, several States have in recent months redrawn their congressional districts in ways that are predicted to favor the State's dominant political party."  *Abbott*, 146 S.Ct. at 419.  "Texas adopted the first new map," *id.*, that would likely result in a Republican advantage, *see* H.B. 4, 89th Leg., 2nd Special Sess. (Tex. 2025).  "California responded with its own map for the stated purpose of counteracting what Texas had done."  *Abbott*, 146 S.Ct. at 419.

To counter Texas, the California Legislature approved a three-part legislative package called the Election Rigging Response Act ("ERRA").  One part, Assembly Constitutional Amendment 8 ("ACA 8"), 2025 Cal. Stat., ch. 156, referred to California voters a proposed state constitutional amendment that, if approved, would authorize use of a new congressional district map for the next three

congressional elections instead of those maps prepared by the Citizens Redistricting Commission following each decennial census.[2] Defendants' Request for Judicial Notice ("RJN"), Ex. 1; *see* Cal. Const. art. XXI, §§ 1–2. In proposing a constitutional amendment to the voters, the Legislature acted consistently with state law providing that the Legislature may propose constitutional amendments, Cal. Const., art. XVIII, § 1, that will become effective only if approved by a majority of votes cast by California voters, *id.* § 4. The measure asking voters to consider ACA 8 was called Proposition 50.

The Legislature's express statements and the legislative history make clear that partisan considerations motivated the ERRA. The Legislature's statement of findings described ACA 8 as an attempt "to neutralize the partisan gerrymandering being threatened by Republican-led states without eroding fair representation for all communities" to ensure that the "2026 United States midterm elections for Congress" are "conducted on a level playing field without an extreme and unfair advantage for Republicans." RJN, Ex. 1 at 6, Findings (*l*), (n). Committee hearing materials for ACA 8 and Assembly Bill 604, 2025 Cal. Stat., ch. 96, which are exhibits to the Complaint, emphasized the same point. *See, e.g.*, Compl., Ex. F at 14 ("We're here today because President Trump and Republicans in Texas and other states are attempting to redraw Congressional districts mid decade in an effort to rig the upcoming election."); *id.* at 77 ("We must take decisive action to stand up to Donald Trump's unprecedented call for Republican led states like Texas and Florida to redraw the Congressional lines and unfairly rig the 2026 midterm elections for Republican politicians to benefit."); Ex. G at 2 ("We will not allow red states to strip seats in Congress . . . ."); *id.* at 10 ("California cannot stand down if other states are attempting to cheat and rig the election in 20[2]6 to maintain

---

[2] The other two parts, Assembly Bill 604 (2025 Cal. Stat., ch. 96) and Senate Bill 280 (2025 Cal. Stat., ch. 97), respectively set forth the details regarding the new proposed congressional district map and procedures and timelines for conducting subsequent elections.

4

Republican control of Congress."); Ex. H at 18 (AB 604 is a "reasonable and rational response to the anti-[d]emocratic actions of the Republican party as they attempt to rig our congressional elections.").

## II.   CALIFORNIA VOTERS APPROVE PROPOSITION 50

Before the election, all voters received an Official Voter Information Guide that included the text of ACA 8, the official summary for Proposition 50, and arguments submitted by proponents and opponents of Proposition 50.  RJN, Ex. 2. The text of ACA 8 explained that "[i]t is the intent of the people that California's temporary maps be designed to neutralize the partisan gerrymandering being threatened by Republican-led states without eroding fair representation for all communities."  RJN, Ex. 1 at 6, Findings (n).  The official summary similarly stated that "[i]n response to Texas' mid-decade partisan congressional redistricting, this measure temporarily requires new congressional district maps, as passed by the Legislature in August 2025, to be used in California's congressional elections through 2030."  RJN, Ex. 2 at 8.

The official arguments for and against the initiative likewise had a partisan focus.  The former asserted that it "makes sure the 2026 mid-term elections are conducted on a level playing field without an unfair advantage for Republicans" and "ensure[s] our voices aren't silenced by partisan gerrymandering in other states[.]"  RJN, Ex. 2 at 16.  The official argument against Proposition 50, in turn, called it a "political power grab" that "draw[s] partisan seats without transparency or citizen input, solely to protect incumbents," argued the measure would create "the most partisan maps in California's history," and encouraged voters to "[v]ote NO on partisan gerrymandering."  *Id.* (italics removed).  The ballot label on voters' ballots also emphasized the partisan focus, asking voters to choose whether to adopt a new proposed Congressional district map "in response to Texas' partisan redistricting."  RJN, Ex. 3; *see* Compl. ¶ 61.

On November 4, 2025, California voters—presented with this partisan framing for Proposition 50—overwhelmingly approved the measure, with over 64% of votes (7,453,339 votes) cast in favor.  RJN, Ex. 4 at 13; Compl. ¶ 61.

**III.  PROCEDURAL HISTORY**

Tangipa Plaintiffs filed their complaint on November 5, 2025, alleging three racial gerrymandering claims with respect to sixteen congressional districts, premised on violations of the Fourteenth and Fifteenth Amendments.  *See* ECF No. 1 ¶¶ 94-126.  After the Court granted leave to intervene, Plaintiff-Intervenor, the United States, filed its complaint-in-intervention, alleging a similar Fourteenth Amendment racial gerrymandering claim and that California engaged in intentional racial discrimination in violation of the VRA.  ECF No. 42 ¶¶ 67, 70.  On December 2, 2025, Noyes Plaintiffs filed a separate action challenging the Proposition 50 map as a racial gerrymander in violation of the Fifteenth Amendment and the VRA.  *See* Complaint, ECF No. 1, *Noyes v. Newsom*, No. 2:25-cv-11480-JLS-WLH-KKL (C.D. Cal. Dec. 2, 2025).

Before this Court consolidated these various challenges, Tangipa Plaintiffs and Plaintiff-Intervenor moved to preliminarily enjoin the State from implementing the new voter-approved map.  ECF No. 16-1 at 35, 29-1 at 8.  This Court denied both motions on all grounds.  *Tangipa*, 2026 WL 110585, at *1; *see* ECF No. 216. Starting with the Fourteenth and Fifteenth Amendment claims, the Court explained "that the relevant inquiry is whether race predominated in the minds of the voters" and found "virtually no evidence" making that showing here.[3]  *Tangipa*, 2026 WL 110585, at *7.  Turning to the VRA claim, the Court found the claim failed for two reasons:  Plaintiff-Intervenor "fail[ed] to show that the voters acted with discriminatory intent," *id.* at *31, and "fail[ed] to show that Proposition 50 has had

---

[3] The Court conducted an alternative analysis based on the intent of the mapmaker and Legislature and found that Tangipa Plaintiffs' claims failed even "using the traditional approach—focusing on legislative intent." *Id.* at *17.

6

any adverse effect," *id.* at \*31 n.35.  Tangipa Plaintiffs appealed that ruling to the Supreme Court, ECF No. 217, and unsuccessfully sought an injunction pending appeal in this Court, ECF No. 220, and in the Supreme Court, Supreme Court Order at \*1.  This Court dismissed Tangipa Plaintiffs' Notice of Appeal pursuant to the parties' stipulation.  ECF Nos. 237, 239.

On March 17, 2026, this Court consolidated the *Tangipa* and *Noyes* matters and directed Challengers to file a single consolidated complaint.  ECF No. 238.  Challengers jointly filed a complaint on March 27, 2026, but chose not to consolidate their claims.  ECF No. 240 (Compl.).  The new complaint contains duplicative claims:  Tangipa Plaintiffs and Plaintiff-Intervenor separately allege that California engaged in racial gerrymandering in violation of the Fourteenth Amendment (Counts I and IV); Noyes Plaintiffs allege that California engaged in racial gerrymandering in violation of the Fifteenth Amendment (Count II); and Noyes Plaintiffs and Plaintiff-Intervenor separately allege that California engaged in intentional racial discrimination in violation of the VRA (Counts III and V).  Compl. at ¶¶ 124-166.  Tangipa Plaintiffs abandoned their Fifteenth Amendment claim.  *Compare* Compl. *with* ECF No. 1 ¶¶ 1-3, 112-121, 124.

## LEGAL STANDARD

A complaint must be dismissed for lack of subject matter jurisdiction if a plaintiff lacks standing to sue.  Fed. R. Civ. P. 12(b)(1); *see Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011).  The plaintiff bears the burden of demonstrating standing "for each claim" and "each form of relief" that it seeks.  *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006) (internal citations and quotations omitted).  A court resolves a facial jurisdictional attack "as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's

7

jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (citation omitted).

But even if a court has subject matter jurisdiction to hear a case, a complaint must "state a claim to relief that is plausible on its face[,]" or otherwise face dismissal under Federal Rule of Civil Procedure 12(b)(6). *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A court may consider the complaint, documents attached to and incorporated by reference in it, and matters subject to judicial notice "without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). A court may also "consider the full texts of documents which the complaint quotes only in part." *Cooper v. Pickett*, 137 F.3d 616, 623 (9th Cir. 1997) (citations omitted). Courts need not "credit a complaint's conclusory statements without reference to its factual context[,]" *id.*, and "pleadings that . . . are no more than conclusions[] are not entitled to the assumption of truth[,]" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

## ARGUMENT

### I. TANGIPA PLAINTIFFS AND PLAINTIFF-INTERVENOR FAIL TO STATE A RACIAL GERRYMANDERING CLAIM UNDER THE FOURTEENTH AMENDMENT

In Counts I and IV of the Complaint, Tangipa Plaintiffs and Plaintiff-Intervenor claim that the Proposition 50 map is an illegal racial gerrymander in violation of the Fourteenth Amendment. Compl. ¶¶ 124-133, 153-158. A plaintiff's burden for such claims is to "plead sufficient factual matter to show," *Iqbal*, 566 U.S. at 677, that "race was the predominant factor motivating the relevant state actors," *Tangipa*, 2026 WL 110585, at *11. Tangipa Plaintiffs and Plaintiff-Intervenor do not "state a claim to relief that is plausible on its face," *Iqbal*, 566 U.S. at 570, because they fail to make a single allegation concerning the key actors here—the voters. Nor do they plead facts showing that race was the Legislature's predominant motivation. Thus, they wholly fail to meet their burden

8

to sustain their Fourteenth Amendment claims.

### A. Plaintiffs Bringing a Racial Gerrymandering Claim Face an "Especially Stringent" Burden

Plaintiffs bringing Fourteenth Amendment racial gerrymandering claims must show that "other considerations were subordinate" to race for the relevant state actors. *Tangipa*, 2026 WL 110585, at *7. In other words, the plaintiff must show that race was "the criterion that . . . could not be compromised." *Shaw v. Hunt (Shaw II)*, 517 U.S. 899, 907 (1996). "[T]he plaintiff must make the distinction between" the relevant state actors "'being *aware* of racial considerations and being *motivated* by them.'" *Tangipa*, 2026 WL 110585, at *7 (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)) (emphases added). If "*either* politics *or* race could explain a district's contours, the plaintiff has not cleared its bar." *Alexander*, 602 U.S. at 10 (emphases added).

### 1. Plaintiffs here must plead that race was the predominant factor motivating the voters

"Where the legislature is the relevant state actor," *Tangipa*, 2026 WL 110585, at *7, plaintiffs bringing racial gerrymandering claims typically "must prove that 'race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district[,]'" *Cooper v. Harris*, 581 U.S. 285, 291 (2017) (quoting *Miller*, 515 U.S. at 916). But this case does not involve a circumstance in which "the legislature holds the final decision-making authority as to whether a challenged map goes into effect." *Tangipa*, 2026 WL 110585 at *7. The "Proposition 50 map and its new congressional district lines went into effect only because California voters enacted it." *Id*. Indeed, "all power of government ultimately resides in the people." *Associated Home Builders etc., Inc. v. City of Livermore*, 557 P.3d 473, 477 (Cal. 1976); *see* Cal. Const., art.

XVIII, §§ 1,4.  And "[w]hen the voters speak, we should consider it to be with the utmost legislative authority."  *Tangipa*, 2026 WL 110585 at *9.

In the specific context of the passage of Proposition 50, this Court explained that there are at least three relevant considerations.  First, "California law subordinates the legislature to the electorate when amending the constitution"; second, ACA 8 "did not simply authorize the legislature to engage in partisan gerrymandering as the legislature saw fit[,]" but rather "it was an amendment" that voters approved, as a result of which they "enacted a particularly-drawn map that everyone had the opportunity to review, debate, and critique"; and third, in evaluating racial gerrymandering claims, courts must consider "why the relevant decisionmaker chose to enact these congressional district maps."  *Id*. at *8.  Accordingly, in determining whether the Proposition 50 map was the product of an illegal racial gerrymander, "voters are the most relevant state actors."  *Id*. at *8.  This Court clarified that this conclusion "does not mean that legislative statements are irrelevant to [the] intent analysis."  *Id*. at *9.  Statements made by legislators, *id*., and other state actors, *id*. at *17-21, are also relevant to the extent that they inform the court's understanding of voter intent, *id*. at *9.

In sum, "like in cases where a legislature has enacted a challenged map, Challengers here must prove that race was the predominant factor motivating the relevant state actors:  the voters."  *Id*. at *11.

**2.    Plaintiffs must also overcome a presumption that the voters acted in good faith**

Plaintiffs in traditional congressional redistricting cases must also overcome "a presumption" that the legislature acted in "good faith."  *Tangipa*, 2026 WL 110585  at 11 (citing *Cooper*, 581 U.S. at 335).  This presumption requires "courts to draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions" to ensure that "race for

10

its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines." *Alexander*, 602 U.S. at 10 (citations and quotation marks omitted); *see id.* at 10-11. And "voters, like the legislature, are entitled to a presumption of good faith." *Tangipa*, 2026 WL 110585 at \*11 (citing *Alexander*, 602 U.S. at 10-11).

A "plaintiff's evidentiary burden in cases accusing the voters of racial gerrymandering must be, like in cases accusing the legislature of a racial gerrymandering, especially stringent." *Id*. (citing *Alexander*, 602 U.S. at 11) (quotation marks omitted). Federal courts "must exercise extraordinary caution in adjudicating a claim that a State has drawn district lines on the basis of race. *Miller*, 515 U.S. at 915-16.

### B. Tangipa Plaintiffs and Plaintiff-Intervenor Fail to Plead Any Facts Regarding Voter Intent

Tangipa Plaintiffs' and Plaintiff-Intervenor's decision to plead no facts regarding voter intent dooms their claims here. As Tangipa Plaintiffs and Plaintiff-Intervenor themselves concede, it was the voters who chose to enact the challenged congressional district map. Compl. ¶ 61. And it was the voters who had the sole authority to approve the constitutional amendment that made possible the adoption of the new map. *See* Cal. Const. art. XVIII, § 1; ACA 8.

This Court has squarely rejected the idea that "the intent of the voters who overwhelmingly supported Proposition 50" "does not matter[.]" *Tangipa*, 2026 WL 110585, at \*2, \*8. It explained that ignoring voter intent here would "essentially . . . apply the 'cat's paw' theory"—a theory that the Supreme Court has prohibited courts from adopting—"to the voters[.]" *Id*. at \*9-\*10 (citing *Brnovich v. Democratic Nat'l Comm*., 594 U.S. 647, 689-90 (2021)).[4] Treating the voters as

---

[4] "A 'cat's paw' is a dupe who is used by another to accomplish his purposes. A plaintiff in a 'cat's paw' case typically seeks to hold the plaintiff's employer liable for the 'animus of the supervisor who was not charged with making the ultimate adverse employment decision.'" *Brnovich*, 594 U.S. at 689-90.

"dupes" of the Legislature, this Court found, "is completely antithetical to the position of voters in California's constitutional system." *Id*. at *10. "[I]t is the legislature's power that is *subordinated* to the power of the voters." *Id*. Tangipa Plaintiffs and Plaintiff-Intervenor were given the opportunity to amend their prior allegations, yet they chose to remove all reference to what the voters might have considered in deciding to vote in favor of Proposition 50 and to address only the intent of a private consultant, a handful of individual members of the Legislature, and other unidentified actors. This choice demonstrates an unwillingness or inability to litigate within the framework laid out by this Court and prior precedent.

It also ignores that courts have long considered voter intent in the context of voter-approved initiatives. For example, in *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 464-65, 471 (1982), the Supreme Court examined the motivation of voters in supporting an initiative regarding the use of mandatory busing in the context of a Fourteenth Amendment Equal Protection claim. And this District has held that courts "may look to the nature of the initiative campaign to determine the intent of the drafters and voters in enacting it" in cases assessing equal protection and other constitutional claims challenging voter-approved initiatives. *City of L.A. v. Cnty. of Kern*, 462 F. Supp. 2d 1105, 1114 (C.D. Cal. 2006) (citing *Washington*, 458 U.S. at 471). California state law further clarifies that "analyses and arguments contained in the official ballot pamphlet" are particularly important "indicia of the voters' intent[.]" *People v. Rizo*, 996 P.2d 27, 30 (Cal. 2000); *see Robert L. v. Superior Ct.*, 30 Cal. 4th 894, 896-97 (2003) (courts may look to contents of a ballot pamphlet to determine voters' intent).

Tellingly, Tangipa Plaintiffs and Plaintiff-Intervenor do not allege that any publicly available information led voters to believe that the map was drawn with a predominantly racial intent. Nor could they. Here, the Voter Information Guide for the November 4, 2025 Special Election was distributed to voters across California

12

and included arguments for and against Proposition 50 that framed it in purely partisan terms and as a response to the recent redistricting in Texas at President Trump's direction.  *See* RJN, Ex. 2; *see also* ECF No. 42 ¶ 42.  Challengers plead nothing to suggest that the voters' "impetus for the adoption" of the Proposition 50 map was anything other than "partisan advantage pure and simple."  *Abbott*, 146 S.Ct. at 420 (Alito, J., concurring).  And they come nowhere close to pleading that a different motivation altogether—racial gerrymandering—was, in fact, the *predominant* purpose.  *See Alexander*, 602 U.S. at 7 ("a party challenging a map's constitutionality must disentangle race and politics").

### C.    Even if Legislative Intent Were Relevant, Tangipa Plaintiffs and Plaintiff-Intervenor Fail to Plausibly Allege that Race was the Legislature's Predominant Motivation

Even setting aside voter intent—an implausible course here, where the voters approved the Proposition 50 map—Tangipa Plaintiffs and Plaintiff-Intervenor do not allege facts sufficient to show that "race was the predominant factor" motivating the Legislature in adopting Proposition 50.  *Alexander*, 602 U.S. at 7. Instead, they rely on out-of-context statements by individual legislators and an independent consultant and a years-old letter from a private organization to the Citizens Redistricting Commission.  In doing so, they fall far short of meeting their burden to plead that race was the Legislature's predominant motivation.

To begin with, Tangipa Plaintiffs' and Plaintiff-Intervenor's selective quotes from individual legislators and a non-state actor at most suggest a permissible and inevitable "aware[ness] of race."  *Bethune-Hill*, 580 U.S. at 187.  For example, they quote a press release from Senate President pro tempore Mike McGuire noting that Proposition 50 "retains and expands Voting Rights Act districts that empower Latino voters."  Compl., ¶ 84.  Read in context, however, the release conveys McGuire's understanding that partisanship—specifically, "stop[ping] Texas and Trump from rigging the election," Compl., Ex. I, ECF No. 240-9 at 2—was the

13

predominant motivation for the measure.  That McGuire also understood and referred to Proposition 50's effects on certain minority communities is unexceptional.  Legislators will "almost always be aware of racial demographics," *Alexander*, 602 U.S. at 22 (quoting *Miller*, 515 U.S. at 916), and the Constitution does not require them to conceal that knowledge.  *Id.*

Tangipa Plaintiffs' and Plaintiff-Intervenor's reliance on a letter that a private organization sent to the Citizens Redistricting Commission for the claim that the Legislature later sought to meet a racial target is likewise misplaced.  *See, e.g.*, Compl. ¶¶ 64, 75, 89, 96.  First, they mischaracterize the letter's contents, *see, e.g.*, Compl., Ex. C at 4 ("Simply looking at the Latino [Citizen Voting Age Population] in a district is not sufficient for determining if a district is likely to elect a Latino candidate of choice.").  And second, they do not allege that a single legislator saw this letter, let alone that it was the motivating consideration for the Legislature as a whole.  While Tangipa Plaintiffs and Plaintiff-Intervenor allege that a private consultant relied on a racial target described in this letter, they cite in support an attached exhibit that does not support their claim.  *See, e.g.*, Compl., ¶ 65 (citing Ex. B at 24-25), Ex. B at 26:1-8 (private consultant stating, "We kept about 80 percent of [the Commission map] the same" and "made small, modest changes in order to create a push back to what Texas was doing, an opportunity for Democrats to pick up five seats, and to counterbalance the five Republican seats in Texas."); *id.* at 27:1-8 (noting "[we kept] the same values that the Commission and Californians have, doing modest changes, and, you know, doing the minimum we had to in order to achieve the political goal while protecting communities of interest").  The Court need not consider allegations that are contradicted by the very exhibit the Complaint relies on.  *See Gonzalez v. Planned Parenthood of L.A.*, 759 F.3d 1112, 1115 (9th Cir. 2014) ("Although we normally treat all of plaintiff's factual allegations in a complaint as true, we 'need not . . . accept as true allegations

14

that contradict matters properly subject to judicial notice or by exhibit.'").

Allegations suggesting that the map itself harbors another actor's discriminatory intent, Compl. ¶ 6, also do not satisfy the plausibility standard because courts "are not directed to look at the motivation behind a *map* but rather "the motivation of the enacting *legislature*." *Tangipa*, 2026 WL 110585, at *17 (citing *Miller*, 515 U.S. at 916) (emphasis in original). The Supreme Court has made clear that "an enacting legislature's discriminatory intent could not infect a map [adopted by a later legislature] with racial gerrymandering in the manner of 'original sin[.]'" *Tangipa*, 2026 WL 110585, at *17 (quoting *Abbott v. Perez*, 585 U.S. 579, 603-05 (2018)).

Regardless of the role legislative intent may play in an analysis of a voter-adopted map like Proposition 50's, Plaintiffs' claims fail because Plaintiffs have not alleged facts sufficient to show that anyone—the Legislature or voters—was predominantly motivated by race. When there is "an absence of sufficient facts alleged to support a cognizable legal theory[,]" as there is here, "the court must dismiss the claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Accordingly, Counts I and IV should be dismissed in full.

### D. Challengers Fail to Plead Sufficient Facts for Any of California's Fifty-Two Districts

If the Court declines to dismiss Counts I and IV in full for the reasons discussed above, it should, in the alternative, limit the scope of those claims to only those districts, if any, for which the Challengers sufficiently plead that race predominated in the drawing of those district lines. That is appropriate since "[a] racial gerrymandering claim . . . applies district-by-district. It does not apply to a State considered as an undifferentiated 'whole.'" *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 262 (2015). Challengers here seek the extraordinary remedy of enjoining the entire fifty-two-district Proposition 50 map,

15

but fail to plead that race predominated in the drawing of all 52 districts. Challengers only include district-specific allegations for a handful of districts, and even for those, the allegations are insufficient to state a racial gerrymandering claim.

For example, in a section that Plaintiff-Intervenor declines to join, Compl. at 30 n.8, the Complaint alleges that "[t]he boundaries of District 13 under the Proposition 50 map were drawn predominantly to improve Hispanic performance in the district," *id.* ¶ 120. But the Complaint acknowledges that the Hispanic population in District 13 actually *decreased* in the Proposition 50 map, *id.* ¶¶ 117-118, without explaining how decreasing the size of that population somehow improves its performance. As to the other challenged districts, the Complaint alleges that the Hispanic Citizen Voting Age Population (CVAP) remained almost exactly the same in District 18, *id.* ¶ 97 ("changing from 52.4% to 52.5%"); that the "Hispanic-majority area" of prior District 42 "was left intact and formed the core of a new Hispanic-majority District 41," which "effectively replace[d] District 42[,] *id.* ¶¶ 100-101; and that "the number of majority Hispanic CVAP districts [was preserved] at sixteen[,]" *id.* ¶ 101. And while the documents attached to the Complaint as Exhibit K appear to make statements regarding each congressional district, they only assert that "race was *a* motivating factor in the drawing of" the Proposition 50 map, not the *predominant* factor. Compl., Ex. K, ECF No. 240-11 p. 2 ¶ 3, p. 6 ¶ p. 67 ¶ 165, pp. 258-259 ¶ 111.[5]

"[T]he mere fact that" a voting age population remains "roughly the same . . . proves very little." *Alexander* 602 U.S. at 3. And entirely absent from the Complaint are allegations that any of Challengers' claims could overcome the presumption of good faith for the relevant state actors. *See id.* at 6. Nor does any

---

[5] Because Exhibit K to the Complaint, the Morgan declaration and reports, is hundreds of pages long and contains several different documents, the citation to this Exhibit uses the ECF number and the PDF page numbers at the top of the page, in addition to the paragraph being discussed, for ease of reference.

16

Challenger allege how the "high priority" given to the "partisan aim" of Proposition 50, as is clear from judicially noticed materials and attachments to the Complaint, could support a claim that race *predominated* in the voters' decision to approve Proposition 50. *Id*. at 3.

Moreover, the Supreme Court has "consistently described a claim of racial gerrymandering as a claim that race was improperly used in the drawing of the boundaries of one or more *specific electoral districts*." *Id*. (emphasis in original) (collecting cases). Here, Challengers do not plead sufficient facts regarding any of the 52 districts and consequently fail to give Defendants fair notice of the facts forming the basis of their claims. *See Iqbal*, 556 U.S. at 570. Their Complaint also wholly fails to explain the mismatch between the allegations they raise and the relief they seek—an injunction of the *entire* fifty-two-district Proposition 50 map. Compl. at 39. Challengers are not "entitled to relief" as to any district where, as here, their factual allegations "do not permit the Court to infer more than the mere possibility of misconduct" in any of the fifty-two districts. *Iqbal*, 556 U.S. at 679.

Accordingly, the Court should reject Challengers' threadbare racial gerrymandering claims as to all of the districts, but should the Court permit either of the Fourteenth Amendment claims to proceed, the scope of those claims should be narrowed to only the districts for which the Court finds the Complaint sufficiently pleads that race predominated in the drawing of those districts.

## II.   NOYES PLAINTIFFS FAIL TO ALLEGE FACTS SUPPORTING STANDING TO BRING EITHER OF THEIR CLAIMS.[6]

Noyes Plaintiffs purport to bring a racial gerrymandering claim under the Fifteenth Amendment and a claim of intentional racial discrimination under Section 2 of the VRA. *See* Compl. ¶¶ 134-147 (Count II), ¶¶ 148-152 (Count III). But they

---

[6] Defendants reserve the right to challenge the standing of the remaining plaintiffs should the case proceed to the discovery and merits briefing stages.

17

do not identify the districts they reside in or the protected class they belong to. These omissions doom their claims by undermining their standing.

Standing is "not [a] mere pleading requirement[], but rather an indispensable part of the plaintiffs' case[.]" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "[A] plaintiff seeking relief in federal court must first demonstrate that he has standing to do so, including that he has a personal stake in the outcome, distinct from a generally available grievance about government." *Gill v. Whitford*, 585 U.S. 48, 54 (2018) (citations and quotation marks omitted). A plaintiff has standing if it has suffered an "injury in fact," that injury is fairly traceable to the challenged conduct, and the injury will "likely" be "redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61 (citations and quotation marks omitted). Relevant here, an injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.'" *Id.* at 560 (citations and quotation marks omitted). At "the pleading stage, the plaintiff must clearly allege facts demonstrating each element [of standing]." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation, quotation marks, and ellipses omitted); *see id*. at 330, 339-40 (defining requisite injury); *see Lujan*, 504 U.S. at 560 (same). The plaintiff must do so for "each claim" it brings and "for each form of relief" it seeks. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021); *see Ctr. For Biological Diversity v. Bernhardt*, 946 F.3d 533, 560 (9th Cir. 2019).

For both the Fifteenth Amendment and VRA claims, the alleged harm to any voter stems from the boundaries and composition of the specific district in which the voter resides. A plaintiff who alleges that he was injured by a racial gerrymander must plead that his own district has been gerrymandered. *See Gill*, 585 U.S. at 66 (citation omitted); *see Ala. Legislative Black Caucus*, 575 U.S. at 262. Noyes Plaintiffs do not identify the districts in which they reside, alleging only that they are "assigned to a district drawn with racial intent." Compl. ¶¶ 33-

18

35.  These allegations are insufficient to establish standing for either claim as they assert "only a generalized grievance against governmental conduct of which [they] do[] not approve."  *See United States v. Hays*, 515 U.S. 737, 745 (1995).[7]

### A.    Noyes Plaintiffs Lack Standing to Bring Their Fifteenth Amendment Claim

Noyes Plaintiffs fail to allege an injury-in-fact sufficient to sustain their Fifteenth Amendment claim because they do not allege their right to vote was denied or abridged in a non-conclusory fashion.  The Complaint contains conclusory allegations that Noyes Plaintiffs "have suffered an abridgment of their rights to vote," and that the State "abridged and/or denied" their right to vote because the State "sought to separate voters by race."  Compl. ¶¶ 43, 146.  The general allegation that the State "sought to separate voters by race" is not a personal, concrete injury suffered by any of the Noyes Plaintiffs specifically— especially as they have not even identified the districts in which they reside, much less alleged how those particular districts were racially gerrymandered.  *See DaimlerChrysler Corp.*, 547 U.S. at 333 ("A plaintiff must allege personal injury"); Compl. ¶ 146.  An injury is "particularized" when it impacts a plaintiff in a personal and individual way; "concrete" when it is real and not abstract; and "imminent" when it is certainly impending.  *See Spokeo, Inc.*, 578 U.S. at 339-340; *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  Noyes Plaintiffs' allegations fail to satisfy any of these requirements.  The absence of factual allegations suggesting that any Noyes Plaintiff's personal right to vote was abridged or denied necessitates the dismissal of their Fifteenth Amendment claim for lack of standing.

///

///

---

[7] If the Court allows Noyes Plaintiffs to amend their claims, Noyes Plaintiffs would only have standing as to the individual districts in which they reside.

19

### B.    Noyes Plaintiffs Lack Standing to Bring Their Voting Rights Act Claim

Noyes Plaintiffs' VRA claim must be dismissed because, in addition to failing to allege an Article III injury, they have also failed to allege that they come within the zone of interests protected by the VRA sufficient for prudential standing. *See Spokeo, Inc.*, 578 U.S. at 339-40 (outlining the injury in fact requirement); *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 20 (1998) ("[P]rudential standing is satisfied when the injury asserted by a plaintiff arguably [falls] within the zone of interests to be protected or regulated by the statute . . . in question.'" (quotation omitted, alterations in original)). While these are distinct pleading failures, they are largely coextensive.

To bring a claim under Section 2 of the VRA, Noyes Plaintiffs must allege that they are members of a protected class who are unable to equally access the political process. *See Garza v. Cty. of Los Angeles*, 918 F.2d 763, 765 (9th Cir. 1990); 52 U.S.C. § 10301(b). Therefore, to avoid dismissal, Noyes Plaintiffs must allege in a non-conclusory manner that they personally are unable to equally access the political process. Their barebones allegations fail to do so. Nor do they allege any other concrete, particularized injury they have suffered or will suffer. Noyes Plaintiffs instead allege that they "suffer representation harms, and face imminent electoral injuries absent relief." Compl. ¶ 44. But there are no factual allegations that illuminate what representation harms or electoral injuries Noyes Plaintiffs personally claim to suffer.

Noyes Plaintiffs also allege that the drawing of eighteen congressional districts kept the "non-Hispanic population" an "ineffective minority." Compl. ¶ 151. Setting aside the abstract nature of these allegations, Noyes Plaintiffs do not allege that any of them individually suffered this harm because they do not allege that they are members of the "non-Hispanic population." *See id*. Accordingly, Noyes

20

Plaintiffs fail to allege a concrete, particularized injury sufficient for Article III standing, and also fail to allege that they are unable to equally access the political process on account of their race, as required for prudential standing. *See, e.g.*, *Vaughan v. Lewisville Indep. Sch. Dist.*, 475 F. Supp. 3d 589, 595 (E.D. Tex. 2020) ("Because [the plaintiff] fails to invoke any legally protected interest under the VRA that is personal to him and concrete, he cannot meet the injury-in-fact requirement and lacks standing."); *Perry-Bey v. City of Norfolk, Va.*, 678 F. Supp. 2d 348, 363 (E.D. Va. 2009) (complaint dismissed for "failure to allege an actual and concrete invasion of a protected interest" because plaintiff failed to "allege that she is a member of a minority group and that her right to vote has been abridged on account of her race or color, thus suffering a constitutional injury in fact").

Ultimately, only "voters who allege facts showing disadvantage to themselves as individuals have standing to sue to remedy that disadvantage." *Gill*, 585 U.S. at 65–66. Because Noyes Plaintiffs allege no such facts, their claims should be dismissed for lack of standing.

## III. NOYES PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE FIFTEENTH AMENDMENT

Noyes Plaintiffs' Count II purports to plead a standalone racial gerrymandering claim under the Fifteenth Amendment.[8] *See* Compl. ¶¶ 134-147. But there is no legal basis for a standalone racial gerrymandering claim under the Fifteenth Amendment. Even if there were, Noyes Plaintiffs fail to allege facts sufficient to support such a claim.

The Supreme Court's racial gerrymandering case law has developed under the Equal Protection Clause of the Fourteenth Amendment. *See, e.g.*, *Miller*, 515 U.S. at 904; *Abbott v. Perez*, 585 U.S. at 585; *Easley v. Cromartie*, 532 U.S. 234, 237

---

[8] Plaintiff-Intervenor and Tangipa Plaintiffs do not join in Count II. Tangipa Plaintiffs have abandoned the Fifteenth Amendment claim raised in their initial complaint. *See* ECF No. 1 ¶¶ 112-119.

(2001); *Cooper*, 581 U.S. at 285; *accord Voinovich v. Quilter*, 507 U.S. 146, 159 (1993) ("[W]e never have held any legislative apportionment inconsistent with the Fifteenth Amendment").  Though the Supreme Court has referenced the Fifteenth Amendment's guarantees in racial gerrymandering cases, *see*, *e.g., Shaw v. Reno*, 509 U.S. 630 (1993) (*Shaw I*), no governing precedent applies a separate test for racial gerrymandering under that Amendment.[9]  Indeed, this Court's majority and dissenting opinions denying Tangipa Plaintiffs' and Plaintiff-Intervenor's motions for preliminary injunction applied solely the test under the Equal Protection Clause, not any separate test under the Fifteenth Amendment.  *See Tangipa*, 2026 WL 110585, at *13, *78.  But Noyes Plaintiffs do not bring a cause of action under the Equal Protection Clause.  *See* Compl.

Even if there were an analytically distinct claim for racial gerrymandering under the Fifteenth Amendment, Noyes Plaintiffs' allegations do not support it. The Fifteenth Amendment prohibits government actions that "den[y]" or "abridge[]" the right to vote "on account of race."  U.S. Const. amend. XV; *see City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 65 (1980) (plurality opinion), *superseded by statute on other grounds*.  Courts have relied on the Fifteenth Amendment to invalidate voting structures that prevented entire groups of a certain race or ethnic class from voting altogether.  *See*, *e.g.*, *Gomillion v. Lightfoot*, 364 U.S. 339, 345 (1960) (striking down municipal boundaries under Fifteenth Amendment on the grounds that boundaries wholly and discriminatorily denied Black voters the right to vote in municipal elections); *Rice v. Cayetano*, 528 U.S. 495, 518-524 (2000) (striking down provision of Hawaiian Constitution that excluded persons of certain

---

[9] In addition to attempting to create a new standalone Fifteenth Amendment test for racial gerrymandering, Noyes Plaintiffs further mischaracterize the law by citing *Prejean v. Foster*, 227 F.3d 504, 519 (5th Cir. 2000), for the proposition that "there is no room for a compelling state interest defense" to racial gerrymandering claims.  Compl. ¶ 139.  But *Prejean* explicitly states the opposite.  It involved a *Fourteenth* Amendment analysis, *Prejean*, 227 F.3d at 509, 515, and the cited language concerns disenfranchisement claims, not racial gerrymandering claims, *id.* at 519.

ancestry from voting in elections selecting trustees to state agency).  Accordingly, courts have held that redistricting plans do not violate the Fifteenth Amendment absent a showing that a minority voter was *denied the ability* to vote.  *See, e.g., Romero v. City of Pomona*, 665 F.Supp. 853, 869 (C.D. Cal. 1987) ("the 15th Amendment is not relevant to a question of ethnic vote dilution unless the claim concerns the purposeful denial of minority rights to register to vote and cast ballots"), *affirmed* 883 F.2d 1418 (9th Cir. 1989); *Skorepa v. City of Chula Vista*, 723 F.Supp. 1384, 1393 (S.D. Cal. 1989) (same); *Backus v. South Carolina*, 857 F.Supp.2d 553, 569 (D.S.C. 2012), *affirmed* 568 U.S. 801 (2012).

Here, Noyes Plaintiffs allege that the State "abridged and/or denied" their right to vote because the State "sought to separate voters by race."  Compl. ¶¶ 43, 146. But missing from the Complaint and attached expert reports is a single factual allegation to support a conclusion that any Noyes Plaintiff had their right to vote abridged or denied on account of race, or that the voters intended such an outcome. Instead, Noyes Plaintiffs contend that the Proposition 50 map maintained the same number of Latino-majority districts as the prior map, but with the Latino population falling between a 52-55% range in more districts than in the prior map.  *See id.* ¶ 141; Ex. K, ECF No. 240-11 at 64-65, ¶¶ 153, 157-158.  They also contend that the Proposition 50 map maintained two Black influence districts.  *See id.* ¶ 141; Ex. K, ECF No. 240-11 at 63; ¶¶ 148-150.  Neither of these allegations, even if true, demonstrate that the State denied or abridged Noyes Plaintiffs' right to vote to any extent on account of their race.  Nor do they indicate that the voters intended to do so.  *See supra* Argument § I.

Because Noyes Plaintiffs' Fifteenth Amendment claim fails as a matter of law, no alleged facts can cure the deficiency.  Accordingly, the Court should dismiss Count II without leave to amend.  *See Schreiber Distributing Co. v. Serv-Well Furniture Co., Inc.*, 806 F.2d 1393, 1401 (9th Cir. 1986) (courts may dismiss a

23

claim without leave to amend when "the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency") (citing *Bonanno v. Thomas*, 309 F.2d 320, 322 (9th Cir. 1962)).

## IV. NOYES PLAINTIFFS AND PLAINTIFF-INTERVENOR FAIL TO STATE A CLAIM UNDER THE VOTING RIGHTS ACT

In Count III, Noyes Plaintiffs allege that the State "deliberately ensur[ed] that the Hispanic population maintains a slight majority in all 16 previously Hispanic-majority districts and ensur[ed] the two black influence districts (Districts 37 and 43) were untouched[.]" Compl. ¶ 151. As a result, they claim, "the non-Hispanic population [was dispersed] into districts in which they will remain an ineffective minority," a violation of Section 2 of the VRA. *Id.* In Count V, Plaintiff-Intervenor alleges that "Proposition 50 was . . . enacted with the purpose of denying or abridging the right to vote on account of race or color in violation of Section 2 of the VRA, 52 U.S.C. § 10301." *Id.* ¶ 165. Both claims lack plausible facts in support and therefore fail as a matter of law.

For an intentional discrimination claim under Section 2 to prevail, a plaintiff must plead that the State's action had *both* a discriminatory intent *and* effect. *See Tangipa*, 2026 WL 110585, at *31 (citing *Alexander*, 602 U.S. at 38-39). To show discriminatory intent in adopting a voting scheme, a plaintiff must allege that the State acted with a "'racially discriminatory motivation' or an 'invidious purpose,'" *Allen v. Milligan*, 599 U.S. 1, 11 (2023) (quoting *City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 61–65 (1980)), to impose "adverse effects upon an identifiable group," *see Democratic Nat'l Comm. v. Reagan*, 904 F.3d 686, 717 (9th Cir. 2018) (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)). Intentional discrimination claims under Section 2 are "analytically distinct" from racial gerrymandering claims under the Fourteenth Amendment, which provide a remedy regardless of whether a legislature intended to harm any identifiable group. *See Alexander*, 602 U.S. at 38; *Hunter by Brandt v. Regents of the Univ. of Cal.*, 971

24

F.Supp. 1316, 1322 (C.D. Cal. 1997); *Adarand Constructors v. Pena*, 515 U.S. 200, 227-28 (1995).

### A. The Complaint Fails to Allege that Voters Approved the Map with a Racially Discriminatory Motivation

Noyes Plaintiffs and Plaintiff-Intervenor fail to allege a single fact to show the intent of the voters who approved the Proposition 50 map, *see supra* Argument § I, much less that they approved the map with a racially discriminatory motivation toward any identifiable minority group. That omission is fatal to their claim because the voters are the most relevant actors. *See Tangipa*, 2026 WL 110585, at *7-8.

Noyes Plaintiffs and Plaintiff-Intervenor instead allege that other individuals drew the Proposition 50 map based on race. Regardless of the extent to which the intent of legislators or a private consultant is relevant to the analysis, *see supra* Argument § I.C, the Complaint does not allege that any of those individuals acted with a goal of disadvantaging any identifiable group. Instead, it alleges that legislators said the Proposition 50 map would maintain historic Black districts and retain and expand VRA districts that empower Latino voters to elect their preferred candidates, Compl. ¶¶ 84-85; that Texas and other Republican states redistricted to suppress minority voters in their own states, *id.* ¶¶ 78-83; and that the VRA requires legislatures to draw districts in which racial minority groups can elect their preferred candidates, *id.* ¶ 86. And as to the private consultant, the Complaint alleges that he reversed the prior elimination of a "Latino district from LA[;]" created a district with a 35% Latino voting age population; and described the anticipated effects of the Proposition 50 map, including that one analysis found it would "maintain[] the status quo in terms of the Voting Rights Act and add[] one more Latino-influence district."[10] *Id.* ¶¶ 63-67.

---

[10] Noyes Plaintiffs and Plaintiff-Intervenor do not allege that these referenced

25

Noyes Plaintiffs and Plaintiff-Intervenor further allege that unidentified State actors "pass[ed] the Hispanic population" between districts to preserve the 16 Latino-majority districts from the prior map and drew 13 of the districts to have a Latino CVAP between 52-55%.[11]  *See id.* ¶ 95.  They also allege that the private consultant intended to "preserve districts to maintain racial outcomes" because District 42 became a non-Latino-majority district and District 41 became a Latino-majority district in the same geographic area as the prior District 42.  *Id.* ¶ 100.  And they allege that unidentified state actors "deliberately preserved the black populations' proportion" in Districts 37 and 43, and therefore "intentionally drew district lines to advance political control of one racial group over another" undefined racial group.  *See id.* ¶¶ 109, 116.  Finally, Noyes Plaintiffs (but not Plaintiff-Intervenor) allege that an unidentified actor drew District 13 to improve Latino performance in the district, and "not to improve the prospects of Democratic congressional candidates."  *Id.* ¶ 120.

These allegations are inadequate to support a plausible intentional discrimination claim under Section 2 because they plainly do not show a racially discriminatory motivation to impose "*adverse* effects upon an identifiable group." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) (emphasis added); *Reagan*, 904 F.3d at 717.  The Complaint does not allege that

districts were actually included in the Proposition 50 map or whether they challenge them.  Further, Noyes Plaintiffs and Plaintiff-Intervenor take the private consultant's statements out of context.  *See supra* Argument § I.C; *see also* Ex. B at 26:1-8 (indicating that the private consultant's priorities were to maintain the status quo created by the Independent Redistricting Commission and make minor changes with the goal of partisan gains for Democrats).

[11] Noyes Plaintiffs and Plaintiff-Intervenor allege that it is "implausible" for 13 districts to have Latino populations between 52-55% without a "deliberately racially motivated draw using explicit racial means."  *Id.* ¶ 95.  It is not clear what a "racially motivated draw using explicit racial means" entails.  Regardless, neither the Complaint nor the attached reports of a purported expert attempt to explain why this outcome is "implausible."  The Court should disregard this conclusory statement without any factual allegations in support.  *Iqbal*, 556 U.S. at 679 (courts need not "credit a complaint's conclusory statements without reference to its factual context[,]" and "pleadings that . . . are no more than conclusions[] are not entitled to the assumption of truth.").

any actor, let alone the voters, bore any intent to abridge the ability of any group—much less a group to which Noyes Plaintiffs belong—to vote or elect their candidates of choice.

**B.    Facts Regarding the *Arlington Heights* Factors Are Absent from the Complaint**

To determine whether a State acted with racially discriminatory motivation, courts look to a non-exhaustive list of factors provided in *Arlington Heights*. The factors include (1) the historical background; (2) the sequence of events leading to enactment, including any substantive or procedural departures from the normal legislative process; (3) the relevant legislative history; and (4) whether the law has a disparate impact on a particular racial group. *Arlington Heights*, 429 U.S. at 266-68.

Noyes Plaintiffs and Plaintiff-Intervenor do not allege that California has a historical background of "a series of official actions taken for invidious purposes" against non-Latino and non-Black communities, *see id.* at 267, or that the Proposition 50 map has a disparate impact on a particular racial group, *see infra* Argument § IV.C (showing that Noyes Plaintiffs and Plaintiff-Intervenor fail to allege discriminatory effect of Proposition 50 map). They instead rely on unexplained insinuations from the sequence of events leading to enactment of Proposition 50 and the legislative history. They allege that "[t]he Legislature stripped language from three pre-existing bills and inserted entirely new language to bypass the California Constitution's 30-day waiting period for new legislation," Compl., ¶ 57; the Proposition 50 legislative package moved from first reading on August 18, 2025, to a vote on August 21, 2025, *id.* ¶ 58; and the Legislature suspended certain rules to facilitate referral from committee, *id.* This recitation of legislative history ignores the most important part of the sequence of events leading to enactment: the voters' approval of Proposition 50 after a public debate on the measure that overtly focused on the partisan character of the map. *See supra*

27

Background §§ I-II.  Further, these benign facts do not demonstrate a racially discriminatory intent.  *See Walls v. Sanders*, 760 F.Supp.3d 766, 809 (E.D. Ark. 2024) ("The 'brevity of the legislative process' cannot 'give rise to an inference of bad faith' on its own") (quoting *Perez*, 585 U.S. at 610-11).  Without factual allegations to support a single *Arlington Heights* factor showing discriminatory intent, Noyes Plaintiffs and Plaintiff-Intervenor do not plausibly plead a violation of Section 2.

### C.    The Complaint Fails to Allege an Adverse Effect on Any Group

Finally, Noyes Plaintiffs and Plaintiff-Intervenor do not allege that the Proposition 50 map had an adverse *effect* on any group—a necessary element of an intentional discrimination claim.  *See Tangipa*, 2026 WL 110585, at *31 (citing *Alexander*, 602 U.S. at 38-39).  An adverse effect is cognizable under Section 2 if it is alleged that "members of a [protected] class" are unable to equally access the political process.  *Garza v. Cnty. of Los Angeles*, 918 F.2d 763, 771 (9th Cir. 1990).  Here, Noyes Plaintiffs and Plaintiff-Intervenor seem to identify all non-Latino voters in California as the racial group(s) whose right to vote has allegedly been denied or abridged.  But that is not enough to sustain an intentional discrimination claim.  Noyes Plaintiffs allege that "California's boundaries disperse the non-Hispanic population into districts in which they will remain an ineffective minority."[12]  Compl. ¶ 151.  But nothing in their allegations or attached reports allege how non-Latino voters in California will be an "ineffective minority" simply because the Proposition 50 map contains the same number of Latino-majority districts and Black-influence districts as the prior map.  *See* Compl.; *see id*., Ex. K, ECF No. 240-11.  Indeed, Noyes Plaintiffs' claim that non-Latino voters are an "ineffective minority" in California is undermined by Challengers' own data that shows that non-Latino residents are a majority in California and the vast majority of

---

[12] Noyes Plaintiffs do not allege that the Proposition 50 map negatively impacts non-Black voters despite their focus on two Black-influence districts.

districts under the Proposition 50 map are not Latino-majority districts. *See id.* ¶ 47 (alleging that Latino individuals constitute only 39.4% of California's population); Ex. K, ECF No. 240-11, pp. 94-99 (table showing 36 of 52 districts under Proposition 50 map are non-Latino-majority districts).

For its part, Plaintiff-Intervenor relies on a flawed analogy to support its claim that the Proposition 50 map adversely affects non-Latino voters. It states: "Just as a map drawn to favor white voters would necessarily harm all other racial groups, a map drawn to favor Latino voters harms all other racial groups." Compl. ¶ 162. But this is not a factual allegation about how the actual Proposition 50 map has any negative impact on non-Latino voters. The mere fact that a *redrawn* map results in the same majority status in certain districts for some racial groups as the prior map—which, to be clear, Challengers seek through this lawsuit to revert to—does not in any way suggest an *intent* to discriminate against any specific racial group. The allegation that a map "preserv[ing]" the *same* number of Latino-majority districts reveals a discriminatory purpose to disadvantage other groups is not credible. *Id.* ¶ 164.

Counts III and V should be dismissed because Noyes Plaintiffs and Plaintiff-Intervenor fail to plead any facts that could support an intentional discrimination claim under Section 2.

## V. SOVEREIGN IMMUNITY BARS CHALLENGERS' CLAIMS AGAINST GOVERNOR NEWSOM

Challengers name Governor Newsom as a Defendant in his official capacity as Governor of California. Compl. ¶ 38. However, the Governor has immunity from Challengers' claims and should be dismissed from this litigation.

The Eleventh Amendment to the United States Constitution prohibits suit against a State or its instrumentalities absent consent by the State or an abrogation of that immunity by Congress. *Papasan v. Allain*, 478 U.S. 265, 276-77 (1986); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100-02 (1984). A third

29

exception, the *Ex parte Young* doctrine, permits actions for prospective relief against state officers sued in their official capacities for "an ongoing violation of federal law." *Virginia Off. For Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255 (2011); *see Ex parte Young*, 209 U.S. 123, 159-60 (1908).  The *Ex parte Young* exception applies if the state official sued has direct responsibility for enforcement of an allegedly unconstitutional statute.  *Harris*, 729 F.3d at 943.  A "generalized duty to enforce state law" is insufficient.  *Los Angeles Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992).

None of the three exceptions applies here.  First, the State has not consented to suit, and second, Challengers do not allege that Congress has "unequivocal[ly] express[ed]" an "intent to overturn" the State's immunity.  *Pennhurst*, 465 U.S. at 106.  Third, Challengers allege no facts regarding the Governor's direct responsibility to enforce the Proposition 50 map beyond his "general duty to enforce California law."  *Harris*, 729 F.3d at 943.  They merely allege that the California Constitution vests in the Governor "[t]he supreme executive power" of the State, that he is charged with "see[ing] that the law is faithfully executed[,]" and that he signed the laws that placed Proposition 50 on the ballot.  Compl. ¶ 38.  The *Ex parte Young* exception does not apply here because the "connection" between the state official and the challenged law "must be fairly direct[,]" *Eu*, 979 F.2d at 704, and Challengers' Complaint "do[es] not direct this Court to any enforcement authority the [Governor] possesses in connection with [Proposition 50] that a federal court might enjoin him from exercising[,]" *Whole Woman's Health v. Jackson*, 595 U.S. 30, 43 (2021).  Accordingly, the Governor is "entitled to Eleventh Amendment immunity" because "a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision will not subject an official to suit."  *Id*. (citation and quotation marks omitted).  Governor Newsom should be dismissed as a party from this suit

30

because Challengers have not pleaded and could not plead facts establishing his direct role in enforcing Proposition 50.

## CONCLUSION

For the foregoing reasons, Challengers' Complaint should be dismissed in its entirety, and the Governor should be dismissed as a Defendant.

Dated:  April 24, 2026                                  Respectfully submitted,

ROB BONTA
Attorney General of California
ANYA M. BINSACCA
LARA HADDAD
Supervising Deputy Attorneys General
RYAN EASON
DAVID GREEN
KIANA HEROLD
JENNIFER E. ROSENBERG
Deputy Attorneys General


*/s/ Iram Hasan*_____
IRAM HASAN
Deputy Attorney General
*Attorneys for Defendants California
Governor Gavin Newsom and
Secretary of State Shirley Weber*

31

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendants California Governor Gavin Newsom and Secretary of State Shirley Weber, certifies that this brief contains 9,891 words, which complies with this Court's order (ECF No. 249).

Dated:  April 24, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
ANYA M. BINSACCA
LARA HADDAD
Supervising Deputy Attorneys General
RYAN EASON
DAVID GREEN
KIANA HEROLD
JENNIFER E. ROSENBERG
Deputy Attorneys General


*/s/ Iram Hasan*
IRAM HASAN
Deputy Attorney General
*Attorneys for Defendants California Governor Gavin Newsom and Secretary of State Shirley Weber*

32