Benbrook Law Group, PC
Bradley A. Benbrook (SBN 177786)
Stephen M. Duvernay (SBN 250957)
1301 Dove Street, 5th Floor
Newport Beach, CA 92660
Telephone: (916) 447-4900
brad@benbrooklawgroup.com

Public Interest Legal Foundation
J. Christian Adams*
Kaylan Phillips*
Joseph M. Nixon*
Jewel M. Lightfoot*
Carolyn C. Valdes*
107 S. West Street, Suite 700
Alexandria, VA 22314
Telephone: (703) 745-5870

*Pro hac vice

Attorneys for Noyes Plaintiffs

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID TANGIPA, *et al.*,<br><br>Plaintiffs,<br>and<br><br>UNITED STATES OF AMERICA,<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>GAVIN NEWSOM, in his official capacity as Governor of California; and SHIRLEY WEBER in her official capacity as California Secretary of State,<br><br>Defendants,<br><br>DEMOCRATIC CONGRESSIONAL CAMPAIGN COMMITTEE, *et al.*,<br><br>and<br><br>LEAGUE OF UNITED LATIN AMERICAN CITIZENS,<br><br>Defendant-Intervenors. | Case No.: 2:25-cv-10616-JLS-WLH-KKL<br><br>**MEMORANDUM IN RESPONSE TO DEFENSE PARTIES' MOTIONS TO DISMISS**<br><br><br><br>Hon. Josephine L. Staton<br>Hon. Kenneth K. Lee<br>Hon. Wesley L. Hsu<br><br>Hearing Date: June 26, 2026<br><br>Time: 10:30 a.m.<br><br>Courtroom: 1 |

## INTRODUCTION

Partisanship may have been the impetus, but race drew legislative districts with deliberate racial outcomes. If the Defense Parties had doubts about the legality of the use of race, *Louisiana v. Callais* has since resolved the questions before this Court. In *Callais*, the Supreme Court affirmed, "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Louisiana v. Callais*, Nos. 24-109, 24-110, 2026 U.S. LEXIS 1950, at *29 (Apr. 29, 2026) (quoting *Rice v. Cayetano*, 528 U.S. 495, 517 (2000)).

California Defendants and their affiliates admit they drew the congressional lines based on race to "retain and expand Voting Rights Act districts that empower Latino voters" and to protect two "historic Black Districts." ECF No. 240 ¶¶84-86. They admit much more, as pleaded by Noyes Plaintiffs.

"In such a situation…the Fifteenth Amendment permits the imposition of liability without demanding the Courts engage in the fraught enterprise of attempting to determine whether the state legislature as an institution…was motivated by race." *Callais*, 2026 U.S. LEXIS 1950, at *37.

California Defendants cannot enjoy absolution for their unconstitutional racial means and motivations by way of a referendum. Constitutional rights are not left to the whims of the masses. *See Lucas v. Forty-Fourth Gen. Assembly*, 377 U.S. 713, 736-37 (1964).

Proposition 50 ("Prop. 50") violated the Fifteenth Amendment rights of all Californians by separating and sorting the entire population by race and producing maps with deliberate racial targets and outcomes. After *Callais*, the right to vote cannot depend on immutable characteristics. The Defendants are accountable and the Prop. 50 Map violates the Fifteenth Amendment. The motions should be denied.

NOYES PLAINTIFFS' RESPONSE TO MOTIONS TO DISMISS

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................i

TABLE OF CONTENTS........................................................................... ii

TABLE OF AUTHORITIES ................................................................. iii

FACTUAL AND PROCEDURAL BACKGROUND ...............................................1

STANDARD OF REVIEW .......................................................................4

SUMMARY OF THE ARGUMENT ......................................................5

ARGUMENT .........................................................................................6

I.    *Louisiana v. Callais* Cripples Defense Parties' Arguments…………………..6

II.    Noyes Plaintiffs Have Standing Because They Each Are California Voters Living in Racially-Drawn Districts………………………………………………10

A.    Fifteenth Amendment Standing Is Also Not Limited by Geography............11

B.    Fifteenth Amendment Standing Is Not Limited to Members of a Protected Class...........................................................................................................12

III.    Noyes Plaintiffs' Fifteenth Amendment and VRA Section 2(a) Claims are Facially Plausible…………………………………………………………14

A.    Noyes Plaintiffs Pleaded a Fifteenth Amendment Claim.............................14

1. Fifteenth Amendment Claims Are Analytically Distinct from Fourteenth Amendment Claims..........................................................................14

2. Noyes Plaintiffs Alleged Facts Sufficient to Support the Fifteenth Amendment Claim. ...............................................................................18

B. Noyes Plaintiffs Pleaded a Section 2 Claim. ...............................................25

C. A Referendum Cannot Absolve a Constitutional Violation .........................26

IV.    The Eleventh Amendment Does Not Bar the Claims Against Governor Newsom…………………………………………………………………...29

CONCLUSION...................................................................................30

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*238 Serrano Props. LLC v. State*,
No. 2:24-cv-08443-SSS-SSCx, 2025 U.S. Dist. LEXIS 186200 (C.D. Cal.
Sep. 22, 2025)……………………………………………………….……4

*Abbott v. League of United Latin Am. Citizens*,
607 U.S.    , 146 S. Ct. 418 (2025)…………………………………………18

*Adarand Constructors v. Pena*,
515 U.S. 200 (1995)…………………………………………………..11

*Alexander v. S.C. State Conf. of the NAACP*,
602 U.S. 1 (2024)………………………………………..…..9, 22, 24

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)……………………………………..…………4, 24

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)…………………………………………………4

*Bethune-Hill v. Va. State Bd. of Elections*,
580 U.S. 178 (2017)……………………………………………..…18

*Cath. League for Religious & C.R. v. City & Cnty. of San Francisco*,
624 F.3d 1043 (9th Cir. 2010)………………………………………...11

*City of Los Angeles v. Cnty. of Kern*,
462 F. Supp. 2d 1105 (C.D. Ca. 2006)………………………..……29

*Cooper v. Harris*,
581 U.S. 285 (2017)…………………………………………………..17

*Davis v. Guam*,
932 F.3d 822 (9th Cir. 2019)………………………………...10, 12-15, 17

*Ex parte Yarbrough*,
110 U.S. 651 (1884)…………………………………….....…......……13-14

*Ex parte Young*,
209 U.S. 123 (1908)………………………………………………….29-30

*Gill v. Whitford*,
585 U.S. 48 (2018)…………………………………………………11

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023)……………………………………..…24

*Gomillion v. Lightfoot*,
364 U.S. 339 (1960)………………………………………..5, 11, 16, 28

NOYES PLAINTIFFS' RESPONSE TO MOTIONS TO DISMISS

*Guinn v. United States*,
238 U.S. 347 (1915)……………………………………………………..28

*Hunter v. Erickson*,
393 U.S. 385 (1969)…………………………………………………..27

*Kirksey v. Jackson*,
663 F.2d 659 (5th Cir. 1981)…………………………………………28

*Leite v. Crane Co.*,
749 F.3d 1117 (9th Cir. 2014)…………………………………………..4

*Los Angeles Cnty. Bar Ass'n v. March Fong Eu*,
979 F.2d 697 (9th Cir. 1992)…………………………………………30

*Louisiana v. Callais*,
Nos. 24-109, 24-110, 2026 U.S. LEXIS 1950 (Apr. 29, 2026)…….........i, 2,
4-10, 16-18, 21, 24-26

*Lucas v. Forty-Fourth Gen. Assembly*,
377 U.S. 713 (1964) …………………………………………, 26-27, 29

*Miller v. Johnson*,
515 U.S. 900 (1995)……………………………………………..……10

*Myers v. Anderson*,
238 U.S. 368 (1915)…………………………………………………..28

*North Carolina v. Covington*,
585 U.S. 969 (2018)……………………………………………..…10

*Palmore v. Sidoti*,
466 U.S. 429 (1984)…………………………………………………..27

*Prejean v. Foster*,
227 F.3d 504 (5th Cir. 2000)…………………………………………17

*Rice v. Cayetano*,
528 U.S. 495 (2000)……………………………………………..…….i, 17

*R.W. v. Columbia Basin Coll.*,
77 F.4th 1214 (9th Cir. 2023)……………………………………..…..30

*S. Alameda Spanish Speaking Org. v. Union City*,
424 F.2d 291 (9th Cir. 1970)…………………………………………28

*Searle v. Allen*,
148 F.4th 1121 (9th Cir. 2020)………………………………………….4

*Sinkfield v. Kelley*,
531 U.S. 28 (2000)…………………………………………………11

*Shaw v. Hunt*,
517 U.S. 899 (1996)……………………………………………..…9, 11

NOYES PLAINTIFFS' RESPONSE TO MOTIONS TO DISMISS

*Shaw v. Reno,*
    509 U.S. 630 (1993)……………………………………………………..5, 10, 14, 18

*Shroyer v. New Cingular Wireless Servs.*
    622 F.3d 1035 (9th Cir. 2010)……………………………………………….4

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)…………………………………………………………4

*United Jewish Orgs. of Williamsburgh v. Carey,*
    430 U.S. 144 (1977)…………………………………………....10, 12

*United States v. Brown,*
    561 F.3d 420 (5th Cir. 2009)…………………………………………13

*United States v. Brown,*
    494 F. Supp. 2d 440 (S.D. Miss. 2007)……………………………12-13

*United States v. Hays,*
    515 U.S. 737 (1995)…………………………………………………......11

*United States v. Mississippi,*
    380 U.S. 128 (1965)…………………………………………………..28

*United States v. Reese,*
    92 U.S. 214 (1875)……………………………………………………13

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
    429 U.S. 252 (1977)…………………………………………………..26

*Washington v. Seattle Sch. Dist. No. 1.,*
    458 U.S. 457 (1982)……………………………………………………..29

**Rules**

Fed. R. Civ. P. 12(b)(1)…………………………………………………………….4

Fed. R. Civ. P. 12(b)(6)…………………………………………………………….4

**Constitution and Statutes**

52 U.S.C. § 10301(a)…………………………………………………………….6

Cal. Const. Art V, § 1…………………………………………..…………………...30

U.S. Const. amend. XV, § 1…………………………………………………..…5

**Other Authorities**

CONG. GLOBE, 40th Cong. 2d Sess. 769 (Jan. 1868)…………………...............13

CONG. GLOBE, 40th Cong. 2d Sess. S.p. 725 (Jan. 1868)………………………..16

NOYES PLAINTIFFS' RESPONSE TO MOTIONS TO DISMISS

JOHN MABRY MATTHEWS, LEGISLATIVE AND JUDICIAL HISTORY OF THE FIFTEENTH AMENDMENT (The Johns Hopkins Press 1909)………………………………..15

## FACTUAL AND PROCEDURAL BACKGROUND

Governor Newsom proposed a statewide congressional map that could add five non-competitive Democrat congressional districts, subject to voter approval at a special election. *See Governor Gavin Newsom, Governor Newsom launches statewide response to Trump rigging Texas' elections* (Aug. 14, 2025), https://www.gov.ca.gov/2025/08/14/governor-newsom-launches-statewide-response-to-trump-rigging-texas-elections/ (last visited May 20, 2026). The proposed statewide congressional map was drawn using racial tools to create racial outcomes in these Congressional districts.

Paul Mitchell, the founder of Redistricting Partners and Prop. 50's Map drawer, admitted to drawing the map based on race. When asked about his decision to place new districts in Los Angeles despite net population loss in the city, Mapmaker Mitchell exposed the intent: "[w]e've actually gained Latino population, so why would you remove districts from a Latino community that has been historic and has a lot of community of interest arguments in that district. Why take that out when you can just leave it there and let all of the districts in LA push out over the county area?" *Mapmaker Paul Mitchell on California's Emergency Redistricting Proposal*, CAPITOL WEEKLY (Aug. 15, 2025), https://capitolweekly.net/mapmaker-paul-mitchell-on-californias-emergency-redistricting-proposal/ (last visited May 20, 2026).

Legislators who enacted Prop. 50 also admitted the racial purpose. This Court cited numerous admissions, legislative debate statements, and legislative press releases describing Prop. 50's racial motivations. ECF No. 240 ¶¶78-87. But a sample:

- The Prop. 50 Map "retains both historic Black districts and Latino-majority districts." Speaker of the Assembly Robert Rivas, ECF No. 216 at 28 (citing Preliminary Injunction Ex. 20, at 1488).

NOYES PLAINTIFFS' RESPONSE TO MOTIONS TO DISMISS

• The Voting Rights Act ("VRA") "mandat[es] that voters of color be placed in districts with more opportunity to select their preferred candidates." Senate Floor Debate, Aug. 21, 2025 (Statement of Senator Aisha Wahab), *id.* at 92 (Lee, J. dissenting) (citing Preliminary Injunction Ex. 8 at 172)).

To make good on these race-centric aims, the Legislature distributed to each senator and assembly member a document starkly describing racial demographics, and *only the racial demographics*, of each newly proposed congressional district. *See* Noyes Exhibit ("Ex.") 1, "AB 604 Atlas." The racial demographics included Latino, Black, Asian, and "other." The official seal of both the Senate and General Assembly were proudly placed on each page. No political data was provided.

Despite the Defense Parties' insistence that the maps were about politics, the data produced for legislators told a very different tale. The documents and data told the truth. Racial data drew the lines. Racial outcomes were the goal in each Congressional district.

While the AB 604 Atlas prominently displays the racial breakdown of every district, political data is not to be found. While the DCCC submitted a modicum of political information along with race data for each proposed district to the Legislature, Noyes Ex. 2, "DCCC Draft Map," (ECF No. 188-16), the political data was not transferred onto the document distributed to the entire Legislature. The singular official State of California document distributed to the Legislature to consider when voting on Prop. 50 was all about race, not politics. Noyes Ex. 1.

The Legislature only focused on the racial composition of the new Prop. 50 districts, but even this Court, in its pre-*Callais* denial of the Tangipa Plaintiffs' Motion for Preliminary Injunction (ECF No. 216), acknowledged Mapmaker Mitchell's statements of racial intent. Repeatedly, Mapmaker Mitchell expressed an

intent to sort populations to maximize the power of racial groups like Latino Californians. This Court credits this evidence:

- "The Prop. 50 Maps I think will be great for the Latino community" as "they ensure that the Latino districts" are "bolstered in order to make them most effective, particularly in the Central Valley." ECF No. 216 at 41 (citing Hispanas Organized for Political Equality (HOPE) Presentation, Preliminary Injunction Ex. 11 at 1383, Doc. 188-9).

- The "number one thing" he "started thinking about" was creating a "[replacement] Latino majority" district in Los Angeles. *Id.* at 42 n. 17 (citing HOPE Presentation, Preliminary Injunction Ex. 11 at 1376-77).

- Mapmaker Mitchell identified "Latino-influenced" districts and highlighted the importance of "support[ing] and do[ing] turnout there for Latinos to protect a Latino member of Congress in a district that is still a Latino-influenced district, but is no longer a majority/minority district." *Id.* at 84 (Lee, J. dissenting) (citing Mapmaker Mitchell's statement on HOPE Zoom meeting, Preliminary Injunction Ex. 11 at 25-26, 29).

- The "proposed Proposition 50 map will further increase Latino voting power" and "adds one more Latino influence district." *Id.* at 71 (Lee, J., dissenting) (citing Preliminary Injunction Ex. 14).

It gets worse. There is strong evidence, cited by the Noyes Plaintiffs in the Complaint, that the Prop. 50 Map could not have been drawn without race deliberately playing a central role in the new districts. Noyes Plaintiffs' Expert Report, Supplemental Report, and Illustrative Map show in detail how California Defendants used specific racial strategies, tactics, and aims to sort the population by race and draw new congressional districts. ECF No. 240-11.

NOYES PLAINTIFFS' RESPONSE TO MOTIONS TO DISMISS

California Defendants' use of race to draw the Prop. 50 Map violates the civil rights of Californians. The practice of using race to allocate power is not only corrosive to civil society, but also unconstitutional. *Callais*, 2026 U.S. LEXIS 1950, at \*\*28-29. The Noyes Plaintiffs properly pleaded both a Fifteenth Amendment and VRA Section 2 claim in the Consolidated Complaint (ECF No. 240).

## STANDARD OF REVIEW

### I.    Rule 12(b)(1)

To evaluate a plaintiff's standing under Rule 12(b)(1), courts must draw all reasonable inferences in the plaintiff's favor and accept all factual allegations as true. *Searle v. Allen*, 148 F.4th 1121, 1128 (9th Cir. 2020). The court then evaluates if pleadings are jurisdictionally (facial attack) or factually (factual attack) sufficient to establish subject-matter jurisdiction. *See Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014); Fed. R. Civ. P. 12(b)(1), (h)(3).

### II.    Rule 12(b)(6)

To survive a Rule 12(b)(6) motion, a plaintiff need only plead facts sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When evaluating a Rule 12(b)(6) motion, "a court must consider the complaint in its entirety and any attached documents, documents incorporated by reference, or matters of which a court may take judicial notice." *238 Serrano Props. LLC v. State*, No. 2:24-cv-08443-SSS-SSCx2025, U.S. Dist. LEXIS 186200, at \*9 (C.D. Cal. Sep. 22, 2025) (*citing Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)). "Dismissal for failure to state a claim 'is proper only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory.'" *Shroyer v. New Cingular Wireless Servs.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (internal citations omitted).

## SUMMARY OF THE ARGUMENT

Noyes Plaintiffs pleaded that the Prop. 50 Map used racial means to achieve racial outcomes. The Noyes Plaintiffs pleaded that the maps deliberately designed Congressional districts to maximize the performance of Latino and Black candidates across California in violation of the Fifteenth Amendment and VRA Section 2. Racial sorting violates the Fifteenth Amendment's promise that the right to vote will never again be tainted by race. U.S. Const. amend. XV, § 1; *Callais*, 2026 U.S. LEXIS, at *47 ("the Fifteenth Amendment prohibits[] present-day intentional racial discrimination regarding voting.").

Defense Parties' (California Defendants, Defendant-Intervenor DCCC, Defendant-Intervenor LULAC) motions to dismiss (ECF Nos. 250, 251, 253) should be denied.

The motions attack the merits of Noyes Plaintiffs' claims, confusing Noyes Plaintiffs' Fifteenth Amendment cause of action with Fourteenth Amendment elements. Defense Parties ask the Court to draw negative inferences against Noyes Plaintiffs' allegations—turning the standards under Rules 12(b)(1) and 12(b)(6) on their heads.

Noyes Plaintiffs allege a legally independent and analytically distinct violation of the Fifteenth Amendment. The Fifteenth Amendment, unlike the Fourteenth Amendment, does not require a plaintiff to plead that district boundaries were drawn predominately by race. Instead, the Fifteenth Amendment prohibits any racial purpose or means in the allocation of electoral power. *See Shaw v. Reno*, 509 U.S. 630, 652 (1993); *Gomillion v. Lightfoot*, 364 U.S. 339, 347-48 (1960). When California Defendants used racial designs to deliberately create political districts for one racial group, others were harmed.

Noyes Plaintiffs have pleaded an actionable claim under Section 2 of the VRA and Fifteenth Amendment. *See Callais*, 2026 U.S. LEXIS 1950, at *9 ("Section 2 of

5

the Voting Rights Act of 1965, 52 U. S. C. §10301 *et seq.*, was designed to enforce the Constitution—not collide with it."). Section 2 forbids enforcing election procedures enacted with a racial intent or that result in a denial, or abridgment, of the right of any citizen to vote on account of race. 52 U.S.C. § 10301(a). Defendants violated Section 2 by using race to sort the electorate into the new race-based districts.

Under the Fifteenth Amendment and Section 2, any state action motivated by any racially discriminatory purpose is illegal—including using race to achieve a partisan political advantage with racially engineered districts. *Callais*, 2026 U.S. LEXIS 1950, at *47.

## ARGUMENT

**I.    *Louisiana v. Callais* Cripples Defense Parties' Arguments.**

*Louisiana v. Callais* altered the landscape since the last time this Court visited these issues. Everything is different now. A deliberately engineered racial outcome violates the Constitution. Race may not play the role it played in the Prop. 50 story.

*Callais* was a tectonic shift in the jurisprudence at issue in Defense Parties' motions. The Supreme Court evaluated race-based redistricting beginning with "the general rule that the Constitution almost never permits the Federal Government or a State to discriminate on the basis of race" and concluding that Louisiana's use of race to create two majority Black districts was unconstitutional. *Callais*, 2026 U.S. LEXIS 1950, at **28, 53.

Racial engineering may not be the means a map drawer chooses to achieve partisan ends. *Callais* provides the guide star for this Court to revisit and correctly decide whether racially engineered outcomes are constitutional in legislative map drawing.

Racial outcomes were a goal of the Prop. 50 Congressional map. Racial tools were used to draw the Prop. 50 Congressional districts. The map drawers, sponsors,

6

NOYES PLAINTIFFS' RESPONSE TO MOTIONS TO DISMISS

and advocates said so. The evidence, which of course must be taken as pled at this stage, confirms it. The illustrative map, statements by California legislators, and Mapmaker Mitchell establish the elements of an unconstitutional intention to sort the electorate by race and produce racially designed results. *Callais* forecloses granting Defense Parties' motions.

The singular instance where race may play any role at all and not offend the Fifteenth Amendment is the narrow creation of a remedial district under the VRA– a circumstance not present here.  Defense Parties do not attempt that next-to-impossible defense.

The tectonic shifts in *Callais* ripple through this case.

The Fifteenth Amendment considers "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Callais*, 2026 U.S. LEXIS 1950, at *29. In redistricting, "where the State assumes from a group of voters' race that they 'think alike, share the same political interests, and will prefer the same candidates at the polls, it engages in racial stereotyping at odds with equal protection mandates.'" *Id.* (internal citations omitted). And "present day intentional racial discrimination regarding voting" is unconstitutional. *Id.* at *47.

The Complaint pleads Constitutional violations of the sort detailed in *Callais*.

First, and perhaps most important, the Court in *Callais* affirmed any use of race, under the VRA or otherwise, is no excuse for discriminatory racial sorting. *Callais*, 2026 U.S. LEXIS 1950, at *47 (stating "the Fifteenth Amendment prohibits[] present-day intentional racial discrimination regarding voting."). Noyes Plaintiffs pleaded a parade of evidence in the Complaint that California used race to redistrict. ECF No. 240 ¶¶78-87. Just like the Louisiana legislators in *Callais*, the California legislators openly stated that race was used to sort the voters and draw the map. Indeed, the Complaint alleges that the documents they received detailing the

NOYES PLAINTIFFS' RESPONSE TO MOTIONS TO DISMISS

maps plainly said so. Race data was used to educate the legislature about each district, not political data.

The racial intent was there for all to see, as alleged in the Complaint. California legislators explained the Prop. 50 Map "retains both historic Black districts and Latino-majority districts," and that it "retains and expands [VRA] districts that empower Latino voters to elect their candidates of choice." ECF No. 240 ¶¶84-85. Defendant-Intervenor DCCC admits the statements Noyes Plaintiffs pleaded show California legislators "advocate[d] for Prop. 50 in part because it preserves existing majority-minority or [VRA] districts in the previous map." ECF No. 250 at 16.

Under *Callais*, this is well pleaded evidence of unconstitutionality. "When the vast majority of voters, regardless of race, favors the same political party, a map that is disadvantageous for members of one racial group cannot be explained on the ground that it was drawn to favor a political party." 2026 U.S. LEXIS 1950, at *43. Noyes Plaintiffs allege that the voting patterns in California fit that description. ECF No. 240 ¶¶49-50.

Noyes Plaintiffs even pleaded that California Defendants' twisted interpretation of the VRA, which they described as "mandating that voters of color be placed in districts with more opportunity to select their preferred candidates" is indicative of a racial purpose. ECF No. 240 ¶86. The VRA does not require creation of racial opportunity districts, particularly after *Callais*. The tectonic shift in *Callais* foreclosed this defense of the Prop. 50 Map. The VRA does not "mandate" that anyone has "more" opportunity. In fact, the VRA does not entitle anyone to anything more or less than the "opportunity" of "members of the electorate" to contribute their votes to a winning cause because of the "application of the State's combination of permissible criteria." *Callais*, 2026 U.S. LEXIS 1950, at *35.

NOYES PLAINTIFFS' RESPONSE TO MOTIONS TO DISMISS

*Callais* foreclosed other defenses, including that sorting voters by race is excusable if it is to ameliorate the use of race elsewhere. Noyes Plaintiffs pleaded that Governor Newsom's and various legislators' statements sought to justify the map's use of race because of Texas' redistricting. ECF No. 240 ¶¶78-83. *Callais* foreclosed this unconstitutional justification. "The States and Federal Government have no compelling interest in generally remediating 'past discrimination in a particular industry or region' or the 'effects of societal discrimination.'" *Callais*, 2026 U.S. LEXIS 1950, at *29 (quoting *Shaw v. Hunt*, 517 U.S. 899, 909-10 (1996) (*Shaw II*)). California Defendants may not invoke race as a reason to check whatever happened in Texas redistricting. Once legislators invoke race to justify legislative action, they act with impermissible racial intent. Noyes Plaintiffs have pleaded as much. *See* ECF No. 240 ¶¶5, 136.

Next, the Supreme Court said plaintiffs have the burden of "disentangl[ing] race from politics," which means "offering an alternative map that achieves all the State's objectives—including partisan advantage and any of the State's other political goals—at least as well as the State's map." *Callais*, 2026 U.S. LEXIS 1950, at **39-40. The Noyes Plaintiffs did exactly that.

Noyes Plaintiffs put forth an Illustrative Map that *added five* non-competitive Democrat districts *without using race*. ECF No. 240-11 at 223-336.

Because the Illustrative Map was drawn without using race, and by taking into consideration traditional districting principles, it demonstrates that the California Defendants could have achieved their political goals without resorting to unconstitutional racial sorting. According to the Supreme Court, this Illustrative Map means Noyes Plaintiffs carried their pleading burden of disentangling race from politics. *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 10, 34-35 (2024); *Callais*, 2026 U.S. LEXIS 1950, at *40.

*\*\*\**

9

Noyes Plaintiffs have pleaded that race may not be used whatsoever as a legitimate purpose except in very limited circumstances to remedy a finding of discrimination. There is no finding of discrimination in California's Congressional maps justifying the use of race or racial outcome. Race was unconstitutionally used to sort Californians in direct contravention of the Constitution and Section 2, and Defense Parties' motions should be denied.

**II.    Noyes Plaintiffs Have Standing Because They Each Are California Voters Living in Racially-Drawn Districts.**

Any voter in a state that unconstitutionally uses race to draw a Congressional district map may bring a Fifteenth Amendment challenge to the implementation of the map. *See North Carolina v. Covington*, 585 U.S. 969, 978 (2018) (plaintiffs can establish a cognizable injury if they have "been placed in their legislative districts on the basis of race" and the district court's remedy is to ensure plaintiffs are "relieved of the burden of voting" in a racially gerrymandered district); *see also Shaw v. Reno*, 509 U.S. at 650; *Miller v. Johnson*, 515 U.S. 900, 911 (1995) (explaining that just as the state may not "segregate citizens on the basis of race" in public parks, buses, golf courses, beaches, and schools, "it may not separate its citizens into different voting districts on the basis of race").

Standing is also not confined to members of favored racial groups or "protected classes." *Davis v. Guam*, 932 F.3d 822, 832 (9th Cir. 2019) ("[T]he Fifteenth Amendment applies with equal force regardless of the particular racial group targeted by the challenged law."); *United Jewish Orgs. of Williamsburgh v. Carey*, 430 U.S. 144 (1977) (recognizing that white voters can bring claims under the VRA).

Because Noyes Plaintiffs are voters in a state that unconstitutionally used race to draw its 52 districts to maximize Hispanic and Black electoral power, they each have standing to challenge California's Prop. 50 Map. *See Cath. League for*

NOYES PLAINTIFFS' RESPONSE TO MOTIONS TO DISMISS

*Religious & C.R. v. City & Cnty. of San Francisco*, 624 F.3d 1043, 1052 (9th Cir. 2010) (en banc) ("The cause of the plaintiffs' injury here is not speculative: it is the resolution itself."); *Adarand Constructors v. Pena*, 515 U.S. 200, 211 (1995) (explaining there is injury when "a discriminatory classification prevents the plaintiff from competing on an equal footing. The aggrieved party need not allege that he would have obtained the benefit but for the barrier in order to establish standing") (internal citations omitted).

**A. Fifteenth Amendment Standing Is Also Not Limited by Geography.**

Noyes Plaintiffs have standing because they are California voters who have a right to vote in California's Congressional elections free from the implementation of an unconstitutionally drawn map.

Because *every district* is challenged for being drawn unconstitutionally, Noyes Plaintiffs need not have a residence in any specific individual district to bring their Fifteenth Amendment claim. Defense Parties miss the mark.

Defense Parties exclusively cite cases challenging Congressional maps based on the Fourteenth Amendment for the argument that Noyes Plaintiffs do not have standing. *United States v. Hays*, 515 U.S. 737, 744 (1995); *Shaw II*, 517 U.S. at 904; *Sinkfield v. Kelley*, 531 U.S. 28, 31 (2000); *Gill v. Whitford*, 585 U.S. 48, 65-72 (2018). This ignores the fundamental difference between the Fourteenth and Fifteenth Amendments—the Fourteenth is an equal protection claim, and the Fifteenth is a denial or abridgment of the right to vote.

Defense Parties' position would deprive the *Gomillion v. Lightfoot* plaintiffs of standing to bring their Fifteenth Amendment challenge. *Gomillion*, 364 U.S. at 340-41 (plaintiffs resided outside the new, challenged city boundaries).

The Defense Parties' construction of standing would create absurd and judicially inefficient barriers to challenge an unconstitutional statewide map. The

NOYES PLAINTIFFS' RESPONSE TO MOTIONS TO DISMISS

caption above would require at least 52 different plaintiffs—one from each of California's districts.

Defendants misunderstand why Noyes Plaintiffs pleaded facts about the tight 52-55% Latino CVAP and the two Black influence districts in the Complaint as *evidence* of the unconstitutional line drawing. Noyes Plaintiffs do not suggest that these were the *only* districts drawn using race. Every district was drawn by race. The map benefited "Latino" and "Black" voters, thereby disadvantaging all "others." Again, Noyes Plaintiffs challenge *every district* as being drawn with racial intent.

Simply put, Noyes Plaintiffs have standing because they were unconstitutionally sorted by race when California implemented the Prop. 50 Map.

**B.      Fifteenth Amendment Standing Is Not Limited to Members of a Protected Class.**

California Defendants' argument that Noyes Plaintiffs do not have standing because they failed to allege they belong to a "protected class" is based on the corrosive notion that not all races are protected by voting rights laws. *See* ECF No. 253-1 at 20-21. Both the Supreme Court and Ninth Circuit have blocked this foul defense.

The Fifteenth Amendment does not require Noyes Plaintiffs to fall within an enumerated "protected class of citizens" to have standing. *Davis*, 932 F.3d at 832; *United Jewish Orgs.*, 430 U.S. at 166 (holding a "plan [that] did not minimize or unfairly cancel out white voting strength" complied with the Fifteenth Amendment). The Ninth Circuit resolved this question in Noyes Plaintiffs' favor. "Moreover, the Fifteenth Amendment applies with equal force regardless of the particular racial group targeted by the challenged law." *Davis*, 932 F.3d at 832; *see United States v. Brown*, 494 F. Supp. 2d 440, 449 (S.D. Miss. 2007) (holding defendants violated Section 2 of the VRA when they "engaged in racially motivated manipulation of the

12

NOYES PLAINTIFFS' RESPONSE TO MOTIONS TO DISMISS

electoral process in Noxubee County to the detriment of white voters"), aff'd *United States v. Brown*, 561 F.3d 420 (5th Cir. 2009).

The California Defendants' argument that the Noyes Plaintiffs must identify themselves by race and that only certain races have standing is not only wrong, but also quite telling. The California Legislature classified its non-Black, non-Latino, and non-Asian constituents as "other" on legislative materials analyzing each district. *See* Noyes Ex. 1. Noyes Plaintiffs need not plead their race. Blacks, Hispanics, Asians and "Other" have standing to bring a Fifteenth Amendment claim.

The legislative history of the enactment of the Fifteenth Amendment offers no quarter to the California Defendants' standing argument. "If there be a man in the United States who needs the ballot for the protection of his manhood, his rights, and privileges as an American citizen, that man is the poor landless working man. It matters not whether he be a white man or a black man, the possession of the ballot increases his sense of self-respect, augments his power, and wins the consideration of others." CONG. GLOBE, 40th Cong. 2d Sess. 769 (Jan. 1868) (Statement of Congressman Wilson).

The fact that the Fifteenth Amendment protects all races as possible plaintiffs has been the law of the land since Reconstruction and is only reinforced every time courts have confronted the question. The Supreme Court first confronted the reach of the Fifteenth Amendment in 1876 when it said, "[i]f citizens of one race having certain qualifications are permitted by law to vote, those of another having the same qualifications must be. Previously to this amendment, there was no constitutional guaranty against this discrimination: now there is." *United States v. Reese*, 92 U.S. 214, 218 (1875); *see also Ex parte Yarbrough*, 110 U.S. 651, 665 (1884) (explaining that although the Fifteenth Amendment "was mainly designed for citizens of African descent,"… the protection of the exercise of the right is "as necessary to the right of

NOYES PLAINTIFFS' RESPONSE TO MOTIONS TO DISMISS

other citizens to vote as to the colored citizen, and to the right to vote in general as to the right to be protected against discrimination.").

The Fifteenth Amendment protects everyone, not just members of a favored racial group. California Defendants have harmed every Californian who wants to participate in a political process free from racial sorting. Using race to allocate power "reinforces racial stereotypes and threatens to undermine our system of representative democracy by signaling to elected officials that they represent a particular racial group rather than their constituency as a whole." *Shaw*, 509 U.S. at 650. For standing, Noyes Plaintiffs need only plead they are citizens who are subject to power being allocated using race.

**III. Noyes Plaintiffs' Fifteenth Amendment and VRA Section 2(a) Claims are Facially Plausible.**

Noyes Plaintiffs pleaded that California Defendants denied their right to vote in violation of the Fifteenth Amendment and Section 2 by using race to sort all Californians. Defense Parties' motions must be denied because the practice of using race to allocate power is unconstitutional under the Fifteenth Amendment.

**A.    Noyes Plaintiffs Pleaded a Fifteenth Amendment Claim.**

**1. Fifteenth Amendment Claims Are Analytically Distinct from Fourteenth Amendment Claims.**

Defense Parties invite confusion by conflating the Fifteenth and Fourteenth Amendments and subjecting the Fifteenth Amendment to Fourteenth Amendment analysis. *See* ECF No. 250 at 11-13; 251-1 at 23-25; 253-1 at 21-22. This is flawed. The Ninth Circuit understands what the Defense Parties do not. The Fifteenth Amendment provides a distinct, independent, and quite different Constitutional check than does the Fourteenth Amendment. *Davis*, 932 F.3d at 824, n.1("Because we affirm the district court on Fifteenth Amendment grounds, we do not address Davis's arguments that the 2000 Plebiscite Law violates the Fourteenth Amendment, the Voting Rights Act, and the Organic Act of Guam.")

NOYES PLAINTIFFS' RESPONSE TO MOTIONS TO DISMISS

Noyes Plaintiffs properly pleaded a distinct Fifteenth Amendment claim challenging the California Defendants' unconstitutional use of race in drawing the Prop. 50 Map.

Defense Parties' assertions that the Fifteenth Amendment offers no independent relief or that a Fifteenth Amendment claim must be bootstrapped to a Fourteenth Amendment claim is quite confused. The Fifteenth Amendment asks only one question: Did race drive the construction of the map? In this case, the answer is "yes." The Fourteenth Amendment asks more, different, and evidentiarily harder questions. "Any suggestion that the Fifteenth Amendment be read restrictively should be viewed with skepticism. The right to vote is foundational in our democratic system." *Davis*, 932 F.3d at 830.

The Fifteenth Amendment is a distinct cause of action to challenge race-based redistricting, not a sidecar to the Fourteenth Amendment. The history of the Reconstruction Amendments as well as how courts treat claims under each Amendment help resolve the confusion.

First, the Fourteenth and Fifteenth Amendments were passed to serve different purposes. The Fourteenth Amendment was passed by Congress in June 1866, and the Fifteenth Amendment was passed by a different Congress in February 1869. The Fifteenth Amendment's enactment was centered on the need and desire for universal suffrage. *See* JOHN MABRY MATTHEWS, LEGISLATIVE AND JUDICIAL HISTORY OF THE FIFTEENTH AMENDMENT 21-22 (The Johns Hopkins Press 1909). Between 1866 and 1869, unionist White citizens in the South–sometimes derisively called "carpetbaggers"—experienced lawlessness and murder. Congressman Morton explained the situation as such:

> Congress had attempted the work of reconstruction through the constitutional amendment by leaving the suffrage with the white men, and by leaving with the white people of the South the question as to when the colored people should exercise the right of suffrage, if ever; but when it was found that those white men were as rebellious as ever, that they hated this Government more bitterly than ever; when it was

found that they persecuted the loyal men, both white and black, in their midst…then it became apparent to all men of intelligence that reconstruction could not take place upon the basis of the white population, and something else must be done.

CONG. GLOBE, 40th Cong. Sess. S.p. 725 (Jan. 1868) (Statement of Congressman Morton).

The history of Reconstruction is not the only evidence that the Fourteenth and Fifteenth Amendments are independent and analytically distinct. Courts consistently treat the Amendments differently. Defense Parties argue that challenges to legislative maps drawn for racial purposes are not justiciable under the Fifteenth Amendment alone and, instead, are either only cognizable as Fourteenth Amendment challenges or when the claim is brought under both the Fourteenth and Fifteenth Amendments. ECF Nos. 250 at 13; 251-1 at 23-25; 253-1 at 21-24. This defense is flat wrong.

First, California Defendants' argument that a Fifteenth Amendment claim alleging unconstitutional redistricting does not exist, ECF No. 253-1 at 21-22, is directly contracted by both *Callais* and *Gomillion*. In both cases, the Supreme Court addressed the unconstitutional use of race in redistricting in the Fifteenth Amendment context. *Callais*, 2026 U.S. LEXIS 1950, at **50-55; *Gomillion*, 364 U.S. at 347-48.

Next, Defense Parties' argument that Noyes Plaintiffs did not plead a "traditional" racial gerrymandering claim that is subject to the same standards as claims under the Fourteenth Amendment, ECF Nos. 250 at 13; 251-1 at 23-24, 253-1 at 21-22, wrongly assumes that claims alleging unconstitutional redistricting are only cognizable in the equal protection context. Redistricting can be challenged under either the Fourteenth or Fifteenth Amendment, and each claim is subject to a quite different analysis.

NOYES PLAINTIFFS' RESPONSE TO MOTIONS TO DISMISS

The Equal Protection Clause of the Fourteenth Amendment "prevents a State, in the absence of 'sufficient justification,' from 'separating its citizens into different voting districts on the basis of race.'" *Cooper v. Harris*, 581 U.S. 285, 291 (2017) (internal citations omitted).

The Fifteenth Amendment, on the other hand, prohibits "intentional racial discrimination." *Callais*, 2026 U.S. LEXIS 1950, at *36. The Supreme Court reaffirmed "what the Fifteenth Amendment prohibits: present-day intentional racial discrimination regarding voting." *Callais*, 2026 U.S. LEXIS 1950, at *47. The Supreme Court emphasized the importance and breadth of the Fifteenth Amendment when it said, "In light of the text and the unique importance of the Fifteenth Amendment, where there is any doubt about the Fifteenth Amendment's boundaries we err on the side of inclusiveness." *Davis*, 932 F.3d at 830.

Under the Fifteenth Amendment, "all citizens, regardless of race, have an interest in selecting officials who make policies on their behalf." *Rice*, 528 U.S. at 523 (holding that, "[u]nder the Fifteenth Amendment, voters are treated not as members of a distinct race but as members of the whole citizenry"). The Fifteenth Amendment's "prohibition on race-based voting restrictions is both fundamental and absolute." *Davis*, 932 F.3d at 832. "Unlike the Fourteenth Amendment[], there is *no room* for a compelling state interest defense, as the Fifteenth Amendment's prohibition is *absolute*." *Prejean v. Foster*, 227 F.3d 504, 519 (5th Cir. 2000) (emphasis added). Defendant-Intervenor LULAC attempts to minimize the value of how the *Prejean* court distinguished the Fourteenth and Fifteenth Amendments, ECF No. 251-1 at 24-25, but the Fifth Circuit was clear: "Redistricting legislation must still pass Fifteenth Amendment muster." *Id.*

The Supreme Court recognized the difference between Fourteenth and Fifteenth Amendment claims in its request for supplemental briefing in *Callais*. The Court asked the parties to address the question: "Whether the State's intentional

17

creation of a second majority-minority congressional district violates the Fourteenth **or** Fifteenth Amendments to the U.S. Constitution." *Callais*, 2026 U.S. LEXIS 1950, at \*\*27-28 (emphasis added). The Supreme Court did not treat the two Amendments in the redistricting context as equals, and neither should this Court.

### 2. Noyes Plaintiffs Alleged Facts Sufficient to Support the Fifteenth Amendment Claim.

Prop. 50 violates the Fifteenth Amendment because race was used to allocate power and produce Congressional maps drawn deliberately on account of race. Regardless of whether partisanship was the "impetus," *Abbott v. League of United Latin Am. Citizens*, 607 U.S.   , 146 S. Ct. 418, 420 (2025) (Alito, J., concurring), the Prop. 50 Map is unconstitutional because every district line was drawn by sorting the electorate based on their race.  California has "refused to take no for an answer and continued to circumvent the Fifteenth Amendment's prohibition." *Shaw*, 509 U.S. at 639.

The allegations in the Noyes Plaintiffs' Complaint state a cause of action under the Fifteenth Amendment that aligns with the Supreme Court's analysis in *Callais*. Noyes Plaintiffs pleaded facts that support a Fifteenth Amendment violation.

First, Noyes Plaintiffs alleged Prop. 50 was drawn with racial intent with direct evidence including admissions by Mapmaker Mitchell and the legislators who passed Prop. 50. ECF No. 240 ¶¶62-73, 78-87. *See Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 191 (2017) (ruling that a Plaintiff can establish racial redistricting with "direct evidence of the legislative purpose and intent or other compelling circumstantial evidence.").

Before this case was filed, Mapmaker Mitchell was forthcoming about his racial goals when drawing the map that would become the Prop. 50 Map. Mapmaker Mitchell said the "number one thing that [he] first started thinking about" was

18

"drawing a replacement Latino majority/minority district in the middle of Los Angeles." ECF No. 240 ¶63. That is direct evidence of a racial purpose.

Mapmaker Mitchell incorporated the concerns of HOPE about any "elimination of a majority/minority Latino district within the area of Los Angeles gateway cities." ECF No. 240 ¶64.

Mapmaker Mitchell confirmed a formal "analysis" was conducted and that the Prop. 50 Map "improves the opportunity for Latino voters to elect candidates of choice in two more districts than the existing plan." ECF No. 240 ¶66.

These pieces of direct evidence alone are constitutionally fatal, but Mapmaker Mitchell went further.

The Complaint also contains Mapmaker Mitchell's statements that the map "will be great for the Latino community in…that they ensure that the Latino districts that are the VRA seats are bolstered in order to make them most effective, particularly in the Central Valley." ECF No. 240 ¶67. Mapmaker Mitchell's expressions of racial intent are direct evidence of unconstitutional racial sorting. *See also* ECF No. 240 ¶¶65, 68-77.

Defendant-Intervenor DCCC claims the statements of Mapmaker Mitchell cannot be imputed to the Legislature and therefore Noyes Plaintiffs have not met their burden of alleging discriminatory intent. ECF No. 250 at 17-19. Not so. Noyes Plaintiffs' Complaint connects Mapmaker Mitchell to the Legislature by alleging he spoke with the Chief of Staff to the Speaker of the General Assembly and then submitting the map that would become the Prop. 50 Map to the Legislature. ECF No. 240 ¶56; *See also* Noyes Exs. 1, 2. The fact that Defendant-Intervenor DCCC acted as an intermediary between Mapmaker Mitchell and the Legislature does not negate the connection.

Even if Mapmaker Mitchell's statements of racial intent cannot be imputed to the Legislature, Noyes Plaintiffs pleaded in the Complaint a parade of statements

made by California legislators evidencing that racial purpose saturated the passage of Prop. 50. ECF No. 240 ¶¶78-87; *see also supra,* Argument § I.

- Republican-led states are redrawing their congressional districts "with the explicit aim of diluting Black and Brown representation and power." ECF No. 240 ¶79.

- "A Latino voice in Texas is worth one third of the representation as a white voice. A Black voter in Texas is worth one fifth of the representation of a white voter in Texas. I didn't say three fifths. There was no compromise. I said one fifth. That is the kind of gerrymandering, that is the kind of theft that they are perpetuating. And we can't just sit by and let it happen." ECF No. 240 ¶79.

- "This is about whether a Latino child in Texas, a Black family in Florida, or an immigration community in California has a voice in their own democracy." ECF No. 240 ¶80.

- "We may not even have any Black people serving in office to have representation. It's about ten African American members of Congress that could be wiped away in Congress if we don't stand up and be counted." ECF No. 240 ¶81.

- "They want to silence the voices of Latino voters, Black voters, API voters, and LGBTQ voters." ECF No. 240 ¶82.

- "Black Texans will lose much of their power, being reduced to about a fifth of what their power was before this gross attack." ECF No. 240 ¶83.

- "Texas once saw Black political power rise during reconstruction, as it had across much of the country, only to be stripped away by the Black codes, and Jim Crow, and racial terror, poll taxes, white-only primaries

NOYES PLAINTIFFS' RESPONSE TO MOTIONS TO DISMISS

that cut Black voter rolls in Texas from over 10,000 to just a few thousand." ECF No. 240 ¶83.

• Prop. 50 "makes no changes to historic Black districts in Oakland and the Los Angeles area and retains and expands Voting Rights Act districts that empower Latino voters to elect their candidates of choice." ECF No. 240 ¶84.

Defendant-Intervenor LULAC's defense that Plaintiff Tangipa's statements about the partisan nature of Prop. 50 "conclusively establishes partisan intent on behalf of the legislators," ECF No. 251-1 at 12, seems ridiculous in light of this parade of racially saturated legislative statements. The Supreme Court said where, as here, the inference of racial motivation is strong, "§2 of the Fifteenth Amendment permits the imposition of liability without demanding that the courts engage in the fraught enterprise of attempting to determine whether the state legislature as an institution, as opposed to certain individual members or the State's hired mapmaker, was motivated by race." *Callais*, 2026 U.S. LEXIS 1950, \*37.

Noyes Plaintiffs alleged district-specific statistical facts, statements by legislators, and statements by the mapmaker himself—including *direct evidence* of Mapmaker Mitchell's racial intent in drawing the Prop. 50 Map and the California Legislature's racial intent in enacting the Prop. 50 Map. Even LULAC admits: "Plaintiffs allege direct evidence of a racial gerrymander." ECF No. 251-1 at 21.

The facts pleaded in the Complaint get worse for the Defense Parties.

Noyes Plaintiffs have also alleged expert quantitative evidence that the Latino majority districts were carefully engineered to meet an intentional 52-55% band, while preserving two Black influence districts. *See* ECF No. 240-11 at 62-63, ¶147. This uniform percentage in an identical number of Hispanic-majority districts as the prior Congressional district map, despite massive demographic shifts and walling off two racially engineered districts are in the Complaint. Worse for all Defendants,

Mapmaker Mitchell made it plain that he did it all intentionally. *See* ECF No. 251-1 at 19.

The Complaint alleges that California ensured an outsized electoral impact for specific racial groups at the expense of every other Californian. ECF No. 240 ¶¶141, 146-47.

Defendant-Intervenor LULAC claims that the result of five additional, reliably Democrat districts, is an admission by Noyes Plaintiffs of a partisan effect—believing that this evidences a failure to disentangle race from politics. *See* ECF No. 251-1 at 13.

LULAC misunderstands the law. That Prop. 50 could deliver five new districts to Democrats does not overcome unconstitutional racial intent. Noyes Plaintiffs do not allege that California Defendants cannot enjoy partisan redistricting goals. The Fifteenth Amendment requires that race cannot be the tool to achieve that outcome. Race-based redistricting is exactly what happened here. Race drew the lines.

Noyes Plaintiffs' Illustrative Map showed that California could have achieved its partisan goals *without using race*. ECF 240-11 at 223-336. The Illustrative Map also overcomes any presumption of legislative good faith to which the California Legislature may have otherwise been entitled. *See Alexander*, 602 U.S. at 15.

Defendant-Intervenor DCCC also argues that the Complaint must be dismissed for failing to do a "district-by-district" analysis and, instead, challenging the map "as a whole." ECF No. 250 at 9-10. This argument is factually untrue. California Defendants admit that Noyes Plaintiffs' expert performed a district-by-district analysis to support Noyes Plaintiffs' claim that every district was drawn with racial intent. ECF Nos. 253-1 at 16; 240-11 at 1-64.

22

NOYES PLAINTIFFS' RESPONSE TO MOTIONS TO DISMISS

In the Complaint, in addition to incorporating their expert's district-by-district analysis, Noyes Plaintiffs allege specific facts about several key districts evidencing that race motivated the district lines. ECF No. 240 ¶¶88-123.

As alleged in the Complaint, throughout the Prop. 50 legislative process, legislators were presented with documents describing each new district that *only* provided racial data to inform their decision. Political data was not included. Noyes Ex. 1.

Noyes Plaintiffs alleged specific facts about the sixteen Hispanic-majority districts and how the districts attained a specific HCVAP percentage. ECF No. 240 ¶¶95-99.

Noyes Plaintiffs also alleged specific facts about District 42 and 41 and how in Prop. 50, the old District 42 was replaced with District 41. ECF No. 240 ¶¶100-107.

Noyes Plaintiffs alleged specific facts about how the two Black influence districts were preserved in the Prop. 50 Map where two Democrats districts could have been drawn without creating a racial outcome (ECF No. 240 ¶¶108-16). Partisanship yielded to racial goals in Los Angeles, twice.

Noyes Plaintiffs alleged specifically that District 13 demonstrates the racial purpose of the Prop. 50 Map (ECF No. 240 ¶¶117-123).

Over and over again, the Complaint pleads facts demonstrating that California Defendants used race to draw the Prop. 50 Map in violation of the Fifteenth Amendment.

Defendant-Intervenor DCCC misapplies the standard of review and misconstrues Noyes Plaintiffs' allegations. ECF No. 250 at 19-29. DCCC argues that the allegations about Districts 13, 38, and 42 are insufficient to show the districts were drawn predominately by race, that the HCVAP percentages do not show racial predominance, and that the allegations that Prop. 50 preserves VRA and Black-

influence districts do not establish racial predominance. These are factual quibbles for another day. None of these arguments are sufficient to support dismissal under Rule 12.

The DCCC spends eleven pages attempting to dispute alleged facts. It is as if the DCCC expects Noyes Plaintiffs to have alleged enough facts to blunt every alternative explanation for the allegations of racial intent the DCCC can conjure. Arguing pled facts is not appropriate for a Rule 12 motion.

But this is not a trial, and Noyes Plaintiffs have not yet had the benefit of the discovery process. DCCC asks this Court to apply a heightened pleading standard— one that requires plaintiffs to go far and above the "facial plausibility" standard. *Iqbal*, 556 U.S. at 678. At the motion to dismiss stage, Noyes Plaintiffs must simply put forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 763 (9th Cir. 2023) (citing *Iqbal*, 556 U.S. at 678)). Noyes Plaintiffs meet the appropriate standard and should not be held to anything higher.

Even if DCCC's arguments were appropriate at the motion to dismiss stage, they miss the mark because they ask the Court to analyze every allegation of racial intent in isolation. Courts have required the totality of the circumstances to govern the inquiry of whether voting rights were violated. *Callais*, 2026 U.S. LEXIS 1950, at **47-48. The Complaint alleges facts that show race was used to draw the Prop. 50 Map. Each alleged fact need not stand alone–though some of the statements in the Complaint are so squarely direct evidence of racial intent, they most certainly could. The Supreme Court has acknowledged that a showing of how race was used "can be made through some combination of direct and circumstantial evidence." *Alexander*, 602 U.S. at 12.

NOYES PLAINTIFFS' RESPONSE TO MOTIONS TO DISMISS

Third, Noyes Plaintiffs addressed DCCC's arguments by way of the Illustrative Map. ECF 240-11 at 223-336. Noyes Plaintiffs' Expert, through an Illustrative Map, demonstrated that Mapmaker Mitchell could have achieved the same partisan goals without resorting to the unconstitutional use of race.

Noyes Plaintiffs challenge the *criteria* used to draw every district in the Prop. 50 Map and have put forth allegations that, when viewed as a whole, demonstrate that race was the key criteria used and that race drove the Prop. 50 Map. ECF No. 240 ¶¶62-123.

Thus, the allegations plausibly allege that the Prop. 50 Map was drawn with racial intent in direct violation of the Fifteenth Amendment.

**B. Noyes Plaintiffs Pleaded a Section 2 Claim.**

The Supreme Court reaffirmed that "subsection(a) [of Section 2 of the VRA] means that a districting map may run afoul of §2 if it 'results in a denial or abridgment' of the right to vote 'on account of race or color.'" *Callais*, 2026 U.S. LEXIS 1950, at *31. The focus of Section 2 "must be enforcement of the Fifteenth Amendment's prohibition on *intentional* discrimination." *Id.* at *36 (emphasis added).

Section 2 entitles a voter to "nothing less and nothing more" than the "opportunity" to contribute their vote to a winning cause that results from "the application of the State's combination of permissible criteria." *Callais*, 2026 U.S. LEXIS 1950, at *35. In other words, minority voters are entitled to nothing less and nothing more than the same opportunity as the rest of the electorate to contribute their votes to a winning cause so long as that opportunity was created using permissible criteria. Because California Defendants used race to allocate power, California Defendants violated Section 2.

Noyes Plaintiffs' Complaint aligns directly with the Supreme Court's ruling in *Callais* for Fifteenth Amendment and Section 2 claims. Noyes Plaintiffs met the

disentanglement burden by putting forth an Illustrative Map that demonstrates the same political goals could have been achieved without using race, putting forth evidence that California legislators were motivated by race, and putting forth evidence that Mapmaker Mitchell used race to draw the district lines with preferred racial outcomes. *Callais*, 2026 U.S. LEXIS 1950, *40.

Defense Parties argue that Noyes Plaintiffs have not alleged a proper "vote dilution" claim under the VRA. Noyes Plaintiffs never tried.

Noyes Plaintiffs allege that by allocating power based on race to preferred racial groups, every other racial group's right to vote has been abridged or denied. That is a well pleaded violation of Section 2. A constitutionally compliant map "results from the application of the State's combination of *permissible* criteria"—of which race is not one. *Callais*, 2026 U.S. LEXIS 1950, at *35 (emphasis added).

California Defendants argue Noyes Plaintiffs did not allege any of the *Arlington Heights* factors, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977). Arlington Heights is about evidence—what constitutes relevant circumstantial evidence of racial intent. Plaintiffs do not need circumstantial evidence when so much direct evidence of racial intent exists. Plaintiffs do not need *Arlington Heights* when a long parade of direct evidence is marching through the Complaint.

California Defendants violated Section 2 by drawing a map to maximize the electoral impact of Black and Latino voters and in doing so, denied or abridged the right to vote of millions of Californians.

**C. A Referendum Cannot Absolve a Constitutional Violation**

The effect of a referendum was hardly briefed the last time this issue was before the Court. Thankfully the Supreme Court resolved the matter in 1964. *Lucas v. Forty-Fourth Gen. Assembly* controls the question. 377 U.S. 713 (1964).

NOYES PLAINTIFFS' RESPONSE TO MOTIONS TO DISMISS

Unconstitutional maps cannot be absolved by submitting them to the voters. In *Lucas v. Forty-Fourth Gen. Assembly*, the Supreme Court held, "the fact that an apportionment plan is adopted in a popular referendum is insufficient to sustain its constitutionality or to induce a court of equity to refuse to act. … 'One's right to life, liberty, and property . . . and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.' A citizen's constitutional rights can hardly be infringed simply because a majority of the people choose that it be." *Lucas*, 377 U.S. at 736-37 (internal citations omitted).

A referendum provides no sanctuary to a map drawn using racial means and with racial goals. Allocating power using race remains contrary to the Constitution, even if a majority of voters subsequently ratify the legislature's allocation.

Defense Parties squirm against this Constitutional truth. ECF Nos. 250 at 15-16; 251-1 at 9-11; 253-1 at 11-13. The constitutional rights of citizens cannot be left to the electorate and "[t]he sovereignty of the people is itself subject to those constitutional limitations which have been duly adopted and remain unrepealed." *Hunter v. Erickson*, 393 U.S. 385, 392 (1969); *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.").

Noyes Plaintiffs are not required to concoct some novel means of gauging the will of "the voters" who enacted Prop. 50.

The Constitution, not the will of the masses, governs here. Absolving unconstitutional legislation with a referendum creates "perverse incentives for the governor and the state legislature to shroud their unlawful racial designs and package their actions in more popular terms for the public." ECF No. 216 at 72 (Lee, J. dissenting).

NOYES PLAINTIFFS' RESPONSE TO MOTIONS TO DISMISS

Imagine the kinds of racial mischief and discrimination that could follow if legislators can absolve themselves of unconstitutional racial intent by merely holding a referendum.

What if a state legislature intended to discriminate against Black voters so they put a literacy test requirement to a vote? Would *Guinn v. United States*, 238 U.S. 347 (1915) and *United States v. Mississippi*, 380 U.S. 128 (1965) have come out differently in that scenario?

Or what if a state legislature enacted a grandfather clause by putting it to a referendum vote? Would that have changed the outcome of *Myers v. Anderson*, 238 U.S. 368 (1915)?

What if a majority voted to exclude all Black citizens from city limits? Would the outcome of *Gomillion v. Lightfoot*, 364 U.S. 339 (1960) differ?

Glance at our country's history, and you can easily contemplate the civil rights violations and Constitutional abuses if state legislatures could seek absolution from a public vote.

Practical problems arise by making the intent of the public a relevant inquiry. Doing so makes the intent of every single voter in California relevant and presumably in the reach of discovery. So much for the secrecy of the ballot.

The Ninth Circuit recognized the implications on ballot secrecy. "If the true motive is to be ascertained not through speculation but through a probing of the private attitudes of the voters, the inquiry would entail an *intolerable* invasion of the privacy that must protect an exercise of the franchise." *S. Alameda Spanish Speaking Org. v. Union City*, 424 F.2d 291, 295 (9th Cir. 1970) (emphasis added); *see also Kirksey v. Jackson*, 663 F.2d 659, 662 (5th Cir. 1981) (finding that an inquiry "into the motives of voters may very well constitute an unwarranted and unconstitutional undermining of one of the most fundamental rights of the citizens under our constitutional form of government").

NOYES PLAINTIFFS' RESPONSE TO MOTIONS TO DISMISS

Additional practical evidentiary problems plague this novel intent inquiry, including those highlighted in Judge Lee's dissenting opinion. He explained, "[w]e cannot discern the intent of 11 million Californians for redrawing a single congressional district when they voted on a statewide referendum that changed all 52 congressional districts." ECF No. 216 at 72 (Lee, J. dissenting)

This is not to say that evidence of voter intent could *never* be relevant to constitutional questions, rather voter intent cannot be the *determinative* issue. The cases cited by Defense Parties support this understanding by analyzing voter intent as just one factor in a greater analysis to discern discriminatory intent and do not support dismissal of the Complaint. The Court in *Washington v. Seattle Sch. Dist. No. 1.*, 458 U.S. 457 (1982), did not solely look at the intent of the voters to determine whether the initiative had a racial purpose, nor did the case turn on the intent of the voters. 458 U.S. at 471-74. Similarly, in *City of Los Angeles v. Cnty. of Kern*, 462 F. Supp. 2d 1105, 1113-14 (C.D. Cal. 2006), in addition to looking at the ballot campaign for discriminatory intent, the Ninth Circuit looked at the stated purposes of the challenged measure.

Regardless, *Lucas* controls the role of any referendum.

***

Noyes Plaintiffs present a facially plausible claim that both Mapmaker Mitchell and the Legislature drew and enacted Prop. 50 with racial intent in violation of the Fifteenth Amendment and Section 2(a) of the VRA. Defense Parties' motions to dismiss must be denied.

**IV.   The Eleventh Amendment Does Not Bar the Claims Against Governor Newsom.**

Governor Newsom is a proper Defendant, and he is not entitled to Eleventh Amendment protections. *Ex parte Young* provides an exception to sovereign immunity when "an officer of the State [is] a party defendant in a suit to enjoin the

enforcement of an act alleged to be unconstitutional" when such officer has some connection with the enforcement of the act. *Ex parte Young*, 209 U.S. 123, 157 (1908); *Los Angeles Cnty. Bar Ass'n v. March Fong Eu*, 979 F.2d 697, 704 (9th Cir. 1992). "An official-capacity suit for injunctive relief is properly brought against persons who 'would be responsible for implementing any injunctive relief.'" *R.W. v. Columbia Basin Coll.*, 77 F.4th 1214, 1223 (9th Cir. 2023) (internal citations omitted).

Governor Newsom is not protected by the Eleventh Amendment because he was sued in his official capacity for injunctive relief from implementing an unconstitutional Congressional district map and under the California Constitution, "[t]he supreme executive power of this State is vested in the Governor." Cal. Const. Art V, § 1; Ex. 240 ¶¶38, 135.

## CONCLUSION

For the foregoing reasons, Defense Parties' motions to dismiss should be denied. No longer should a government be permitted to unjustly separate its citizens by race. The Fifteenth Amendment rights of every person—no matter their skin color—must be protected. Noyes Plaintiffs further pray for all other relief, at law or in equity, to which they may be justly entitled.

NOYES PLAINTIFFS' RESPONSE TO MOTIONS TO DISMISS

DATE: May 22, 2026

Respectfully submitted,

s/ Joseph Nixon
Joseph M. Nixon*

J. Christian Adams*
Kaylan Phillips*
Jewel M. Lightfoot*
Carolyn Valdes*
PUBLIC INTEREST LEGAL
FOUNDATION
107 S. West Street, Suite 700
Alexandria, VA 22413
Tel: (703) 745-5870
adams@publicinterestlegal.org
kphillips@publicinterestlegal.org
jnixon@publicinterestlegal.org
jlightfoot@publicinterestlegal.org
cvaldes@publicinterestlegal.org
*Admitted *Pro Hac Vice*
*Attorneys for Plaintiffs*

Bradley A. Benbrook
Stephen M. Duvernay
Benbrook Law Group, PC
701 University Ave., Suite 106
Sacramento, CA 95825
(916) 447-4900
brad@benbrooklawgroup.com

NOYES PLAINTIFFS' RESPONSE TO MOTIONS TO DISMISS

## CERTIFICATE OF COMPLIANCE

The undersigned counsel of record for Plaintiff Mitch Noyes, Holden Lomeli, and Anthony McBroom, certifies that this brief contains 8,987 words, which complies with this Court's order (ECF No. 257).

DATED: May 22, 2026                                    For the Plaintiffs:

/s/ Joseph Nixon
Joseph M. Nixon
PUBLIC INTEREST LEGAL
FOUNDATION
107 S. West Street, Suite 700
Alexandria, VA 22413
Tel: (703) 745-5870
jnixon@publicinterestlegal.org

## CERTIFICATE OF SERVICE

I, Joseph Nixon, do hereby certify that service of a true and correct copy of this Response has been forwarded to all counsel of record via electronic notification and sent to non-parties via regular and/or certified mail.

DATED: May 22, 2026                    For the Plaintiffs:

/s/ Joseph Nixon
Joseph M. Nixion
PUBLIC INTEREST LEGAL
FOUNDATION
107 S. West Street, Suite 700
Alexandria, VA 22413
Tel: (703) 745-5870
jnixon@publicinterestlegal.org

- 33 -

*NOYES* PLAINTIFFS' RESPONSE TO MOTIONS TO DISMISS