MICHAEL A. COLUMBO (SBN: 271283)
mcolumbo@dhillonlaw.com
SHAWN COWLES (SBN: 163826)
scowles@dhillonlaw.com
DOMENIC P. AULISI (Admitted PHV)
daulisi@dhillonlaw.com
AMBER R. HULSE (Admitted PHV)
ahulse@dhillonlaw.com
**DHILLON LAW GROUP INC.**
4675 MacArthur Court, Suite 1410
Newport Beach, CA 92660
Telephone: (415) 433-1700
Fax: (415) 520-6593

*Attorneys for the Tangipa Plaintiffs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **DAVID TANGIPA**, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>**GAVIN NEWSOM**, in his official capacity as the Governor of California, *et al.*,<br><br>Defendants. | Case No. 2:25-cv-10616-JLS-WLH-KKL<br><br>**PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANTS' AND DEFENDANT-INTERVENORS' MOTIONS TO DISMISS**<br><br>Hon. Josephine L. Staton<br>Hon. Kenneth K. Lee<br>Hon. Wesley L. Hsu<br><br>Action Filed: November 5, 2025 |



Pls.' Opp. to Mots. to Dismiss                    Case No. 2:25-cv-10616

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION .................................................................................................... 1

FACTUAL BACKGROUND ................................................................................... 3

    I.     The Commission Map and the HOPE Letter ................................................ 3

    II.    Paul Mitchell's Engagement and Racial Design Methodology ....................... 4

    III.   The DCCC Submission and Racial Data .......................................... 6

    IV.   Legislative Statements Advertising Racial Objectives ................................. 7

    V.    Statistical Evidence of Racial Gerrymandering ................................................. 8

    VI.   The Legislative Process and Voter Approval ........................................... 9

LEGAL STANDARD ............................................................................................ 10

ARGUMENT .......................................................................................................... 12

    I.     The Racial-Predominance Inquiry Focuses on the Map's
         Design, Not an Impossible or Arbitrary Assessment
         of the Electorate's Reasons for Approving it .................................................. 12

        A.    The Constitutional Injury Is the Racial Sorting ........................................ 13

        B.    Defendants' Framework Creates an Untenable
             Avenue for Racial Gerrymandering .......................................................... 17

    II.    Parallel Partisan Objectives Do Not Render the
         Racial Gerrymandering Claim Implausible ................................................. 18

    III.   The Complaint Plausibly Alleges That Race Was
         the Predominant Factor in Drawing the Challenged Districts ...................... 21

        A.    Mitchell's Statements Are Direct Evidence of
             Racial Predominance ................................................................................. 22

        B.    Legislative Statements Corroborate Racial Intent ................................... 24

i



C.    The Statistical Evidence Disentangles Race from Politics ........................25

IV.    Even Under the Voter-Intent Framework this Court
Adopted at the Preliminary Injunction Stage, the
Complaint Plausibly States a Claim ................................................................26

V.    Defendants' Remaining Arguments Do Not
Warrant Dismissal ................................................................................................29

A.    LULAC's "Judicial Admissions" Argument Fails .....................................29

B.    The Complaint Pleads Sufficient District-Specific Facts ..........................30

C.    The Complaint Adequately Addresses Traditional
Redistricting Principles ......................................................................................31

**CONCLUSION** ........................................................................................................32



Pls.' Opp. to Mots. to Dismiss                                    Case No. 2:25-cv-10616

**TABLE OF AUTHORITIES**

<u>**Cases**</u>

*Abbott v. Perez*,
585 U.S. 579 (2018) ..................................................................................... 13, 14, 15

*Alabama Legislative Black Caucus v. Alabama*,
575 U.S. 254 (2015) .......................................................................................... 30, 31

*Alexander v. South Carolina State Conference of the NAACP*,
602 U.S. 1 (2024) ..............................................................................................*passim*

*Am. Title Ins. Co. v. Lacelaw Corp.*,
861 F.2d 224 (9th Cir. 1988) ....................................................................................29

*American Manufacturers Mutual Insurance Co. v. Sullivan*,
526 U.S. 40 (1999) ...................................................................................................23

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..................................................................................... 10, 11, 18

*AT & T v. Compagnie Bruxelles Lambert*,
94 F.3d 586 (9th Cir. 1996) ..................................................................................... 11

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ......................................................................................... 10, 18

*Bethune-Hill v. Virginia State Board of Elections*,
580 U.S. 178 (2017) .......................................................................................22, 24, 32

*Brnovich v. Democratic Nat'l Comm.*,
594 U.S. 647 (2021) ................................................................................................. 17

*City of Cathedral City v. Fantasy Balloon Fights*,
No. 5:25-cv-1490-SSS-DTBx, 2026 WL 325505 (C.D. Cal. Feb. 2, 2026)................24

*City of Los Angeles v. County of Kern*,
462 F. Supp. 2d 1105 (C.D. Cal. 2006) ........................................................ 14, 26, 28

*Cooper v. Harris*,
581 U.S. 285 (2017) .............................................................................................*passim*

*Cubanos Pa'lante v. Florida House of Representatives*,
766 F. Supp. 3d 1204 (S.D. Fla. 2025) .......................................................................19



Pls.' Opp. to Mots. to Dismiss                          Case No. 2:25-cv-10616

*Daniels-Hall v. Nat'l Educ. Ass'n*,
   629 F.3d 992 (9th Cir. 2010)..................................................................................... 10

*Easley v. Cromartie*,
   532 U.S. 234 (2001) .................................................................................................. 20

*Ehrlich v. BMW of N. Am., LLC*,
   801 F. Supp. 2d 908 (C.D. Cal. 2010) ..................................................................... 24

*Gant v. Wallingford Bd. of Educ.*,
   69 F.3d 669 (2d Cir. 1995).......................................................................................29

*Gomez v. Toledo*,
   446 U.S. 635 (1980)..................................................................................................28

*Harrison v. Institutional Gang of Investigations*,
   No. C 07-3824 SI (pr), 2009 WL 1277749 (N.D. Cal. May 6, 2009) ........................29

*Hunter v. Underwood*,
   471 U.S. 222 (1985) .................................................................................................. 16

*Louisiana v. Callais*,
   146 S. Ct. 1131 (2026) ....................................................................................4, 14, 24

*Lucas v. Forty-Fourth General Assembly of State of Colorado*,
   377 U.S. 713 (1964)...................................................................................................16

*Miller v. Johnson*,
   515 U.S. 900 (1995).............................................................................................12, 13

*Romer v. Evans*,
   517 U.S. 620 (1996)...................................................................................................16

*Scarff v. Intuit, Inc.*,
   318 Fed. App'x 483 (9th Cir. 2008).........................................................................29

*Shaw v. Hunt*,
   517 U.S. 899 (1996).............................................................................................19, 30

*Shaw v. Reno*,
   509 U.S. 630 (1993)...................................................................................................13

*Starr v. Baca*,
   652 F.3d 1202 (9th Cir. 2011)...................................................................................18

*Tangipa v. Newsom*,
   816 F. Supp. 3d 1081 (C.D. Cal. 2026) .........................................................13, 15, 26

iv



Pls.' Opp. to Mots. to Dismiss                                    Case No. 2:25-cv-10616

*Tennessee State Conference of the NAACP v. Lee*,
  746 F. Supp. 3d 473 (M.D. Tenn. 2024)..................................................................19

*Thornburg v. Gingles*,
  478 U.S. 30 (1986).....................................................................................................30

*United States v. Ritchie*,
  342 F.3d 903 (9th Cir. 2003)....................................................................................11

*Usher v. City of L.A.*,
  828 F.2d 556 (9th Cir. 1987)....................................................................................10

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977)...................................................................................................24

*Washington v. Seattle School District No. 1*,
  458 U.S. 457 (1982)...................................................................................................14

*West Virginia State Board of Education v. Barnette*,
  319 U.S. 624 (1943)...................................................................................................16

*Wilkins v Lowe*,
  No. CV 19-9159-VAP(E), 2020 WL 3065119 (C.D. Cal. Apr. 21, 2020)..................29

*Winter v. Nat'l Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ......................................................................................................11

**Rules**

Federal Rule of Civil Procedure 8(a)(2) ........................................................................19



Pls.' Opp. to Mots. to Dismiss                                    Case No. 2:25-cv-10616

## INTRODUCTION

Courts considering racial gerrymandering claims have rarely, if ever, been presented with a record like this one at the pleading stage, and no court has ever dismissed such a claim on comparable allegations. The Consolidated Complaint does not rest on statistical inference alone, nor on the kind of circumstantial puzzle that courts must painstakingly assemble from the shape of a map's district lines and the silence of the legislative record. Here, Paul Mitchell, the consultant who drew every line in the Proposition 50 map, told a public audience that creating a "majority/minority Latino district" was the "number one thing" he "first started thinking about." He confirmed that a private advocacy organization's racial blueprint informed "the first thing [he] did in drawing the new map." And he described the finished product as one that would "be great for the Latino community" because the "Latino districts that are the VRA seats are bolstered." The presiding officers of both state legislative chambers then advertised these racial objectives to the public in official press releases, listed under independent headings separate from any partisan discussion.

Statistical evidence reinforces what Mitchell's own words reveal. The Proposition 50 map preserves exactly sixteen majority-Hispanic districts, fourteen of which cluster within an implausibly narrow 52–55% Hispanic CVAP band, mirroring the racial thresholds that the HOPE letter prescribed and which Mitchell expressly adopted. Nine of those sixteen have a Hispanic CVAP within two percentage points of their Commission-map counterpart, despite having entirely redrawn boundary lines. And a deliberate pattern of passing Hispanic-majority census blocks from one adjacent district to another confirms that the map's resulting racial composition is no accident.

This evidence is precisely what the Supreme Court has identified as the hallmark of a meritorious racial gerrymandering claim. Instead of ambiguous evidence or circumstantial arguments, the statements of Mitchell and the Legislature constitute direct evidence of a racial target and the method to achieve that target, and the statistical evidence disentangles race from politics in the manner *Alexander v. South Carolina State*

1



| Pls.' Opp. to Mots. to Dismiss | Case No. 2:25-cv-10616 |
|---|---|

*Conference of the NAACP*, 602 U.S. 1, 8 (2024), and *Cooper v. Harris*, 581 U.S. 285, 299–300, 321–22 (2017), require. Defendants[1] identify no decision from the Supreme Court or any other tribunal in which a complaint alleging this combination of evidence has been dismissed for failure to state a claim.

The constitutional injury in a racial gerrymandering case is the assignment of voters to districts on the basis of race. Defendants' motions to dismiss rest on two principal contentions, neither of which warrants dismissal.

*First*, Defendants contend that because the Proposition 50 map was given legal effect through a voter-approved constitutional amendment, the predominance inquiry must center on voter intent. But the assignment of voters based on their race in the challenged districts was made by Paul Mitchell, not by the electorate. The voters who approved Proposition 50 did not draw a single line, review a single table of voter data, or make judgments about the potential movement of voters between districts. Those actions, which are subject to Constitutional safeguards, were taken by Paul Mitchell and approved by the Legislature. Significantly, the document presented to the legislators when they were asked to vote on Proposition 50 listed each new district and provided its racial composition, not its partisan composition, establishing that the Legislature was focused predominantly on race. Each voter, a resident of only a single district, was presented with a 235-page document of census-tract assignments across all 52 districts and asked to vote yes or no. The startling theory that, under a standard that accepts well pleaded facts as true, voters can somehow launder the expressly acknowledged racial gerrymander of a mapmaker and the Legislature is novel, alarming, and contrary to the fundamental right of voters to not be sorted by race into districts designed by their author to favor one race over others.

*Second*, Defendants argue that partisanship constitutes an "obvious alternative explanation" for the map's design, rendering the racial gerrymandering claim

---

[1]As used herein, "Defendants" refers to both Defendants and Defendant-Intervenors, unless otherwise specified.

2



implausible. But the Supreme Court has squarely and consistently held that a mapmaker who uses race to sort voters engages in unconstitutional racial gerrymandering "even if race is meant to function as a proxy for other (including political) characteristics." *Cooper*, 581 U.S. at 308 n.7. The Complaint does not merely allege that the map has a racial <u>effect</u> of debatable cause. It plausibly alleges, based on the plain meaning of public statements by the mapmaker and Legislature, that Proposition 50 is the product of deliberate racial targets, built on and deliberately enhancing a racially-drawn Citizens Redistricting Commission map that set aside congressional districts based on race in reliance on a recently rejected Voting Rights Act theory. Moreover, it identifies specific features of the map for which no alternative explanation can account.

This is not like those cases where an accusation was made about the motives of the mapmaker who never boasted of his racial design and who denied the claims and defended their work. In this case, both Paul Mitchell and the Legislature, including the leaders of both chambers at the time, have refused to explain their work. The evidence of their intentions and actions is thus neither circumstantial, ambiguous, nor conflicting.

This Court's preliminary injunction order does not control here. At that stage, the Tangipa Plaintiffs bore the burden of demonstrating a likelihood of success on the merits of their claim, and the Court, after weighing competing testimony, evidence, and argument over the course of a three-day hearing, determined that the Tangipa Plaintiffs were not entitled to preliminary relief. That conclusion was in part based on the Court's supposition of an alternative explanation for Mitchell's and the Legislature's statements (that they were not true). However, a motion to dismiss poses the categorically different question of whether the Complaint's well-pleaded allegations, accepted as true, state a plausible claim. They do. Thus, the motions to dismiss should be denied.

## FACTUAL BACKGROUND

### I.    The Commission Map and the HOPE Letter

In 2021, California's Citizens Redistricting Commission (the "Commission") drew a congressional map following the 2020 Census. The Commission map contained

3



Pls.' Opp. to Mots. to Dismiss                                    Case No. 2:25-cv-10616

sixteen majority-Hispanic CVAP districts, including fourteen districts the Commission designed to favor Hispanic voters "to address VRA obligations": Districts 13, 18, 21, 22, 25, 31, 33, 35, 38, 39, 42, 44, 46, and 52. Compl. ¶¶ 55, 71. As discussed further below, the Supreme Court's recent decision in *Louisiana v. Callais*, 146 S. Ct. 1131 (2026), significantly narrowed the circumstances under which the VRA can justify race-based redistricting, calling into question whether the Commission's VRA rationale could survive strict scrutiny today. Mitchell expressly acknowledged that Proposition 50 incorporated the Commission's VRA rationale as a starting point and that Proposition 50 preserved or enhanced Hispanic Voting power even further.

One exception to the Commission's racial gerrymander would become important for this case: Before the Commission formally adopted its map, Hispanas Organized for Political Equality ("HOPE") sent the Commission a letter voicing concern about "the elimination of a majority-minority Latino district within the area of Los Angeles' Gateway cities." Compl. ¶ 64, Ex. C at 1.[2] The letter attached a report that identified specific racial demographic thresholds as ideal, asserting that districts with a Hispanic CVAP "between 52% and 54%" would "still be very likely to elect Latino candidates of choice." Ex. C at 5. And the report declared that "the protection of voters of color is a higher priority than preserving county boundaries or other lower-order criteria." *Id.*

Despite HOPE's urging otherwise, the Commission ultimately abolished that district. Compl. ¶ 63.

## II.   Paul Mitchell's Engagement and Racial Design Methodology

In the summer of 2025, following Texas's mid-decade redistricting, California's legislative leadership announced the Election Rigging Response Act ("ERRA"), a three-part legislative package that involved (1) Assembly Bill 604 ("AB 604"), a 235-page bill that identified a new slate of congressional districts by census tract; (2) Assembly Constitutional Amendment 8 ("ACA 8" or "Proposition 50"), a proposed constitutional

---

[2]Unless otherwise specified, all references to exhibits refer to exhibits attached to the Consolidated Complaint.

4



Pls.' Opp. to Mots. to Dismiss

Case No. 2:25-cv-10616

amendment operationalizing those districts; and (3) Senate Bill 280 ("SB 280"), a bill calling for a statewide special election on ACA 8. Compl. ¶ 57. The congressional map component was drawn by Paul Mitchell, a private consultant at Sacramento-based Redistricting Partners. *Id.* ¶ 56.

Mitchell was not a detached individual who submitted a proposed map of his own accord. On July 2, 2025, he "met with Speaker of the California Assembly Robert Rivas's Chief of Staff, Steve Omara, and began conversations with the California Legislature about drawing the new congressional districts that would become the Proposition 50 map." *Id.* Defendant-Intervenor DCCC paid Mitchell for the map and submitted it to the Legislature on August 15, 2025. *Id.*

When pressed during his deposition to explain his public statements about the map's racial design, Mitchell invoked legislative privilege and declined to provide any testimony suggesting those statements were inaccurate. *Id.* ¶ 77. And when the Tangipa Plaintiffs attempted to depose the Speaker of the Assembly, Robert Rivas, and the President pro Tempore of the Senate, Mike McGuire, their counsel indicated that the legislators intended to invoke legislative privilege to avoid answering questions about their discussions with Mitchell. *Id.* ¶ 87. In other words, both Mitchell and members of the California Legislature viewed Mitchell and his work as indispensable to the redistricting process.

Mitchell's own description of his process reveals the extent to which race drove his work. At an October 17, 2025, presentation to HOPE—two weeks before the November 4 special election—he recounted that upon learning the project might happen, his very first communication to his staff was a text message listing "this concept of drawing a replacement Latino majority/minority district in the middle of Los Angeles." Ex. B at 23–24. He went on: "That was the number one thing that I first started thinking about because it was something that I worked with HOPE on in the last redistricting process." *Id.* at 24. In his own version of events, racial objectives occupied his mind before he drew a single line.

5



Pls.' Opp. to Mots. to Dismiss                    Case No. 2:25-cv-10616

Mitchell then connected his methodology directly to the HOPE letter's racial recommendations. He read the letter's demands aloud during his presentation and confirmed that the HOPE letter's two key recommendations—the creation of an additional majority-Hispanic district and the creation of a new Hispanic-influence district—were "the first thing we did in drawing the new map." Compl. ¶ 65, Ex. B at 24–25. He described recreating "the old Ed Roybal district, Lucille Roybal-Allard district, the first Latino majority/minority district in the country, the first Latino member of Congress in the country. We put that district back." Ex. B at 25. This framing centered entirely on the district's racial heritage, not its present-day partisan performance.

Mitchell also stated that a VRA analysis was performed to measure Latino electoral performance, that the Proposition 50 map "improves the opportunity for Latino voters to elect candidates of choice in two more districts than the existing plan," and that the result would "be great for the Latino community" because the "Latino districts that are the VRA seats are bolstered in order to make them most effective, particularly in the Central Valley." Compl. ¶¶ 66–67, Ex. B at 26, 30. Notably, he acknowledged that the VRA analysis found the prior Commission map already "compliant with Section 2." *Id.* ¶ 66, Ex. B at 26.

Despite this, the Proposition 50 map created additional Hispanic districts that no VRA obligation required, and he proudly announced he created "Latino districts that are the VRA seats are bolstered." *Id.* ¶ 66.

### III.    The DCCC Submission and Racial Data

Defendant-Intervenor DCCC submitted Mitchell's completed map to the Legislature, along with a cover letter and census population tables that broke down CVAP data by race for each proposed district. Compl. ¶¶ 73–74, Ex. D. The cover letter described the map as "created using traditional redistricting criteria." Ex. D at 1. But the accompanying data broke down each district's CVAP by race and included bar graphs illustrating the racial composition of each proposed district, presenting racial

6

Pls.' Opp. to Mots. to Dismiss    Case No. 2:25-cv-10616

demographics with a degree of granularity that suggests their centrality to the overall design process. Compl. ¶ 73.

The summary tables of the 59-page document, presented on pages two through seven, contain no statements regarding partisan affiliation whatsoever and focus exclusively on the CVAP of each proposed district, broken down by race. *Id.* Ex. D at 3–8. The prominence of racial data and the complete absence of any analysis explaining how traditional redistricting criteria informed specific line-drawing decisions suggest that racial demographics were a primary metric driving the map's design. And in the cover letter accompanying the proposed map, DCCC candidly acknowledged that the new districts were designed to "push back" against perceived racial gerrymandering in other states. *Id.* at 1.

## IV.    Legislative Statements Advertising Racial Objectives

The Legislature's leadership publicly advertised the map's racial design as a feature independent of its partisan objectives. President pro Tempore McGuire issued a press release listing five "key provisions" of the Proposition 50 map. Ex. I at 2. One—listed under its own heading, "Protecting communities of color and historically marginalized voters"—unambiguously stated that the map "retains and expands Voting Rights Act districts that empower Latino voters to elect their candidates of choice[]." *Id.* That is, that despite any competing partisan objective, or unlawfully in support of it, the Proposition 50 map deliberately took what the Legislature understood were the Redistricting Commission's racially gerrymandered districts favoring Hispanic voters, and it expanded them. This heading stood apart from the provision addressing the partisan response to Texas.

Speaker Rivas similarly described the map's racial objectives: Notwithstanding the extensive marketing of Proposition 50 as a partisan gerrymander, "The new map retains the voting rights protections enacted by the independent commission, and retains both historic Black districts and Latino-majority districts." Ex. J at 1. Even under this

7

reading, the allegedly partisan redistricting effort was subordinated to race with respect to historic Black and Latino-majority districts.

During legislative floor debates over the legislative package, Assemblyman Isaac Bryan stated that Republican-led states were redrawing their districts "with the explicit aim of diluting Black and Brown representation and power." Ex. E at 6. Assemblyman Mark Gonzalez promoted Proposition 50 as a "shield against racist maps." Ex. F at 40. Senator Sabrina Cervantes stated: "They want to silence the voices of Latino voters, Black voters, API voters, LGBTQ voters[.]" Ex. G at 75. And Senator Aisha Wahab described the VRA as "mandating that voters of color be placed in districts with more opportunity to select their preferred candidates." Ex. H at 170. These statements unequivocally demonstrate the degree to which offsetting the perceived racial effects of Texas's map was of significant concern to members of the Legislature as well as the now-disproven and discredited theory that the VRA could be used by states to justify placing voters in districts based only on their race with the specific goal of creating "more opportunity" for those voters, as voters of a favored race, to control the outcome of elections.

## V.    Statistical Evidence of Racial Gerrymandering

Despite a supposed superior partisan objective, the Proposition 50 map preserves exactly sixteen majority-Hispanic districts—the same number as the Commission map. Compl. ¶ 89. Fourteen of the sixteen fall within a narrow 52–55% Hispanic CVAP band. *Id.* Nine of the sixteen have a Hispanic CVAP within two percentage points of their Commission map counterpart, despite having entirely redrawn boundaries. *Id.* ¶ 90. Not one dropped below roughly 52% Hispanic CVAP. *Id.* This is further clear evidence, sufficient at least for the pleading phase, corroborating the allegation that Proposition 50 included racial targets and that the state set aside a number of districts to preserve the dominance of voters of one race over others.

The data reveal a deliberate pattern of passing Hispanic-majority census blocks from one adjacent district to another to preserve racial outcomes. Compl. ¶¶ 89, 91.



Pls.' Opp. to Mots. to Dismiss                                    Case No. 2:25-cv-10616

District 18, for example, lost territory with 57.5% Hispanic CVAP to Districts 16 and 17, and yet it preserved its majority-Hispanic status (shifting from 52.4% to 52.5% Hispanic CVAP) through carefully selected population transfers from adjacent Districts 13 and 22. *Id.* ¶ 91. When District 42 transitioned from a Hispanic-majority district to a non-Hispanic-majority district, District 41 was drawn to replace it and preserve the racial outcome. *Id.* ¶ 92.

Nowhere is this intentional objective clearer than in how Mitchell configured District 13. There, the Proposition 50 map redraws the district across parts of five counties, yet it maintains a Hispanic CVAP that falls squarely within the 52–55% band that characterizes the map as a whole. *Id.* ¶ 117.

The VRA did not compel this race-based redesign. *Id.* ¶ 119. And the specific contours of the new district confirm that race, not partisanship, shaped its lines. Near Ceres and Modesto in Stanislaus County, the boundary bulges outward to split Modesto while keeping the heavily Hispanic city of Ceres intact, omitting a significant white Democratic population in Modesto, while capturing a heavily Hispanic Republican population in and around Ceres. *Id.* ¶¶ 120–21. If partisanship had been the motivating criterion, the district would have dropped the Republican areas in Ceres and picked up the Democratic areas in Modesto. *Id.* ¶ 122. The same pattern repeats at the district's northern boundary near Stockton, where the district extends a northern appendage into heavily Hispanic areas while bypassing white Democratic neighborhoods to the west. *Id.* ¶ 123. That configuration makes little sense from the perspective of a mapmaker seeking to maximize partisan performance, but it aligns precisely with the objectives of one seeking to maintain a racial target. *Id.*

## VI.   The Legislative Process and Voter Approval

The ERRA was introduced and passed on a highly compressed timeline. The map was published on Friday, August 15, 2025, just days before the Legislature returned from recess. Compl. ¶ 58. The Legislature stripped language from three pre-existing bills and inserted entirely new language to bypass the California Constitution's 30-day waiting



Pls.' Opp. to Mots. to Dismiss                                   Case No. 2:25-cv-10616

period for new legislation. *Id.* ¶ 57. The California Supreme Court quickly declined to even consider an immediate challenge to this controversial "gut and amend" circumvention of Article IV, § 8(a) of the California Constitution. *See* Order, *Strickland v. Weber*, No. S292490 (Cal. Aug. 20, 2025).

The package moved from its first reading on August 18 to a final vote on August 21, a span of four days. Compl. ¶ 58. No district-by-district VRA analysis or memorandum illustrating a strong basis in evidence was provided to legislators before they cast their votes. *Id.* ¶ 60. The California Supreme Court again quickly declined to consider an immediate challenge to the legislation on the grounds that it, *inter alia*, authorized an unconstitutional ballot measure; violated the "separate-vote" requirement of Article XVIII, § 1 of the California Constitution; and constituted an *ultra vires* legislative act. *See* Order, *Sanchez v. Weber*, No. S292592 (Cal. Aug. 27, 2025).

On November 4, 2025, California voters approved Proposition 50 by a vote of approximately 64% to 36%. Compl. ¶ 61. This affirmative vote amended the state constitution, retroactively condoning the Legislature's redistricting and rendering the map enacted through AB 604 operational. *Id.*

## LEGAL STANDARD

A complaint survives a Rule 12(b)(6) motion when it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The court accepts well-pleaded factual allegations as true and draws all reasonable inferences in the plaintiff's favor. *Id.*; *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). At this stage, "[t]he issue is not whether the plaintiff ultimately will prevail, but whether he is entitled to offer evidence to support his claim." *Usher v. City of L.A.*, 828 F.2d 556, 561 (9th Cir. 1987).

Pls.' Opp. to Mots. to Dismiss　　　　　　　　　　　　　Case No. 2:25-cv-10616

Courts may consider documents incorporated by reference in the complaint and materials subject to judicial notice without converting the motion to one for summary judgment. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). But where Defendants rely on exhibit language that they contend contradicts the Complaint, the Court must still draw all reasonable inferences from documentary evidence in Plaintiffs' favor, including inferences about the meaning of that language. *See AT & T v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996).

This standard differs categorically from the standard governing preliminary injunctions. A preliminary injunction is "an extraordinary remedy never awarded as of right," *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and requires the movant to demonstrate a "likelihood of success on the merits" based on actual evidence, *id.* at 20. The court weighs evidence, makes credibility determinations, and chooses between competing inferences, each of which is an exercise within its authority at that stage but forbidden on a motion to dismiss. *See Iqbal*, 556 U.S. at 678.

Defendants repeatedly invoke the preliminary injunction order as though its findings control this motion. State Mem. 1–2, 6, 9–11; LULAC Mem. 5, 9. They do not. The preliminary injunction order's conclusion—based on severely constrained discovery and a truncated timeframe—that the Tangipa Plaintiffs had not established a "likelihood of success" on the evidentiary record says nothing about whether the Complaint, with its detailed factual allegations and exhibits, states a plausible claim that is entitled to a fuller development of the factual record, including re-addressing the matter of Mitchell's 11th-hour wholesale refusal to answer questions in his deposition or to timely produce documents in response to lawful requests (six months later, he is still in the process of producing documents and claiming privileges).

Defendants' reliance on the order effectively asks this Court to apply the wrong legal standard. The Court should decline to do so.

Defendants also invoke the presumption of legislative good faith recognized in *Alexander*, 602 U.S. at 6, 10. State Mem. 2, 10–11, 16; DCCC Mem. 16, 19, 29; LULAC

11

Mem. 6, 12, 25. But that presumption is an evidentiary principle, not a pleading standard. It "directs district courts to draw the inference that cuts in the legislature's favor when confronted with <u>evidence</u> that could plausibly support multiple conclusions." *Alexander*, 602 U.S. at 10 (emphasis added). At the pleading stage, the Court accepts well-pleaded allegations as true and draws all reasonable inferences in the plaintiff's favor.

LULAC cites *Miller v. Johnson*, 515 U.S. 900, 916–17 (1995), for the proposition that "constitutional principles" in racial gerrymandering cases apply at "various stages" of litigation, including under Rule 12(b). LULAC Mem. 17. But the "principles" *Miller* references concern what a plaintiff must, as a necessary condition, establish to succeed in a racial gerrymandering claim—*i.e.*, racial predominance. *See Miller*, 515 U.S. at 916–17 (noting that it is the "plaintiff's burden . . . to show, either through circumstantial evidence of a district's shape and demographics <u>or more direct evidence</u> going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district" (emphasis added)). They are not evidentiary burdens of proof. The presumption of good faith is a burden-allocation device that instructs courts how to weigh competing evidence. At the pleading stage, there is no "evidence" to weigh. The Court accepts allegations as true. The presumption thus has no role to play in evaluating a motion brought under Rule 12(b)(6).

## ARGUMENT

### I. The Racial-Predominance Inquiry Focuses on the Map's Design, Not an Impossible or Arbitrary Assessment of the Electorate's Reasons for Approving it

Defendants contend that because Proposition 50 was enacted through a voter-approved constitutional amendment, the racial-predominance inquiry must center on voter intent as revealed through the text of ACA 8, the Voter Information Guide, and campaign materials. State Mem. 9–13; LULAC Mem. 9–12; DCCC Mem. 15–16. This Court adopted a version of that framework at the preliminary injunction stage,

Pls.' Opp. to Mots. to Dismiss                                    Case No. 2:25-cv-10616

determining that "voters are the most relevant state actors." *Tangipa v. Newsom*, 816 F. Supp. 3d 1081, 1099 (C.D. Cal. 2026).

The Tangipa Plaintiffs respectfully maintain that this framework is legally incorrect. Every Supreme Court case addressing the issue has focused on the decisions of the individuals responsible for drafting the challenged map. And to hold otherwise would create an untenable loophole that would authorize the most extreme forms of racial gerrymandering while affording no means of effective redress to injured voters.

### A.    The Constitutional Injury Is the Racial Sorting

The constitutional harm in a racial gerrymandering case is that the State or its agents designed district lines with race as the predominant factor in deciding "to place a significant number of voters within or without a particular district." *Miller*, 515 U.S. at 916. The injury, in other words, is the racial sorting itself. *Shaw v. Reno*, 509 U.S. 630, 647–49 (1993) ("*Shaw I*"). That sorting occurs when a mapmaker decides to place members of a particular racial group in a particular district. The extent to which any number of legislators or voters were aware of the racial sorting is irrelevant to the violation inherent in the racial sorting. A doctrine that permits the racial sorting of voters if legislators or voters are ignorant of and ratify it is not consistent with the Constitutional prohibition against racial discrimination, creates perverse incentives, and sets up an impossible or arbitrary task (measuring the intent of voters acting on inevitably personal and distinct motivations and unequal information) that would shield egregious violations.

Every racial gerrymandering case to reach the Supreme Court has examined the intent and methodology of the actors who drew the lines. In *Cooper*, the Court asked whether "race was the predominant factor motivating the legislature's decision." 581 U.S. at 291. In *Abbott v. Perez*, the Court examined the intent of the legislature that adopted the challenged plan. 585 U.S. 579, 607–10 (2018). In *Alexander*, the Court looked to "a relevant state actor's express acknowledgment that race played a role in the <u>drawing</u> of district lines" and identified both legislators and mapmakers as being among the relevant actors. 602 U.S. at 8 (emphasis added). And in *Callais*, the Court examined

Pls.' Opp. to Mots. to Dismiss                          Case No. 2:25-cv-10616

whether race predominated in the "State's decisionmaking process," scrutinizing the circumstances of the legislative process. 146 S. Ct. at 1143. In none of these cases did the Court look beyond the map-drawing function to the intent of any downstream actor and treat that actor's intent as dispositive, even though, in each, the maps were given legal effect by a subsequent act of the legislative body as a whole, a governor's signature, or both.

Here, the voters' role in ratifying Proposition 50 did not alter the identity of the person who decided which census blocks to place in which district. That person was Paul Mitchell. A voter who casts a "yes" vote on an amendment that would give effect to a 235-page document of census-tract assignments does not, thereby, make the granular racial sorting decisions that constitute a racial gerrymander in any of those districts, particularly when each voter resides in only one of those districts and has no individual stake in the line-drawing decisions affecting the other fifty-one. Holding otherwise would impute to millions of individual voters a set of line-drawing choices that belong solely to the individual who actually selected each line.

Defendants rely on *Washington v. Seattle School District No. 1*, 458 U.S. 457 (1982), and *City of Los Angeles v. County of Kern*, 462 F. Supp. 2d 1105 (C.D. Cal. 2006), for the proposition that voter intent must be assessed whenever voters enact a law through referendum. State Mem. 12. But both cases involved measures that voters or their agents designed from the ground up. In *Seattle*, Initiative 350 was a citizen-initiated ballot measure, and the Court examined the nature of the campaign because the campaign itself reflected the drafters'—*i.e.*, the voters'—purpose. 458 U.S. at 461–63, 471. In *Kern*, the story was the same. *See* 462 F. Supp. 2d at 1114 (assessing "the nature of the initiative campaign" in the context of a voter-initiated measure). Here, voters did not design, initiate, or shape the Proposition 50 map. The analogy to *Seattle* and *Kern* thus fails.

The State's reliance on *Perez*, 585 U.S. at 603–05, is similarly unavailing. *Perez* addressed whether one legislature's discriminatory intent could be imputed to a different,

14



Pls.' Opp. to Mots. to Dismiss                                Case No. 2:25-cv-10616

later legislature that adopted the same district lines. As this Court has stated, the Court in *Perez* held that an "enacting legislature's discriminatory intent could not infect a map with racial gerrymandering in the manner of 'original sin.'" *Tangipa*, 816 F. Supp. 3d at 1114 (quoting *Perez*, 585 U.S. at 603). But *Perez* involved an institutional gap between the enacting body and the body whose intent the plaintiffs sought to attribute. Here, there is no such gap. The same legislature that worked with Mitchell enacted the very map Mitchell produced, in a compressed process spanning four days. Mitchell's intent did not travel across legislative sessions or between different governmental bodies. It accompanied the map from its creation to its enactment by the very body that initially sought it. Mitchell and the Legislature built on what they understood was a racially gerrymandered Commission map, at least preserving or enhancing its supposedly VRA-justified racial gerrymander while understanding it as such. Thus, the alleged racial gerrymander in this case is that of Mitchell and the Legislature that enacted the Proposition 50 map, not some silently imputed intent of a prior body to them.

To the extent Defendants argue that if one legislature's intent cannot infect a later legislature's map, then a consultant's intent cannot infect the voters' enactment, the analogy fails. In *Perez*, the later legislature independently exercised judgment with respect to where to draw district lines. *See* 585 U.S. at 604 (noting that "[t]he 2013 Texas Legislature did not reenact the plan previously passed by its 2011 predecessor" and that, importantly, *Perez* is not "a case in which a law originally enacted with discriminatory intent is later reenacted by a different legislature"). Here, the voters exercised no independent line-drawing judgment whatsoever. Each voter, a resident of just one district, made a binary choice about whether to approve or disapprove of the already-drawn statewide set of 52 maps. The voters' role was ratification, not design, and there is no "institutional gap" because the voters did not make any independent design decisions.

Other precedents reinforce the point. In *Hunter v. Underwood*, the Court struck down a voter-ratified provision of Alabama's Constitution because the provision was

15



designed with a racially discriminatory intent, without performing a granular analysis of the voters' idiosyncratic reasons for ratifying the broader constitution. 471 U.S. 222, 229, 233 (1985). In *Romer v. Evans*, the Court invalidated a voter-approved constitutional amendment under the Equal Protection Clause while avoiding the same inquiry. 517 U.S. 620, 631–32 (1996). The constitutional defect inhered in the law's design and effect, not in the subjective reasons voters subsequently may have had for casting each of their ballots.

The principle is not new. More than sixty years ago, in *Lucas v. Forty-Fourth General Assembly of State of Colorado*, the Court struck down a voter-approved apportionment scheme on equal protection grounds notwithstanding popular support at the ballot box. 377 U.S. 713, 736–37 (1964). The Court unequivocally stated: "An individual's constitutionally protected right to cast an equally weighted vote cannot be denied even by a vote of a majority of a State's electorate, if the apportionment scheme adopted by the voters fails to measure up to the requirements of the Equal Protection Clause." *Id.* at 736. "A citizen's constitutional rights can hardly be infringed simply because a majority of the people choose that it be." *Id.* at 736–37. Quoting *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 638 (1943), the Court emphasized that "[o]ne's right to life, liberty, and property . . . and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections." *Lucas*, 377 U.S. at 736. The right to be free from racial classification in the assignment of voters to districts is no less fundamental. If voter approval cannot immunize a malapportioned plan, it equally cannot immunize a racially gerrymandered one.

For the foregoing reasons, the predominance inquiry should focus on the evidence-backed allegations of Mitchell's design methodology rather than attempting to surmise, or requiring Plaintiffs to allege and prove, the subjective motivations of millions of individual voters.



Pls.' Opp. to Mots. to Dismiss                                    Case No. 2:25-cv-10616

**B.    Defendants' Framework Creates an Untenable Avenue for Racial Gerrymandering**

Taken to its logical conclusion, Defendants' framework would mean that no voter-approved redistricting map could ever be realistically challenged as a racial gerrymander. Voter intent, assessed through objective ballot materials, will almost never reflect racial line-drawing methodology. Voters do not vote on census-block assignments and, other than this case, a mapmaker rarely, if ever, would publicly announce their use of race in drawing the maps before the vote. Under Defendants' theory, a legislature could hire a consultant to draw racially gerrymandered lines, bury the racial engineering in technical details, present voters with a ballot measure framed entirely around partisan messaging, and thereby insulate the racial design from constitutional review. That result would be unprecedented and have shocking implications for voting rights nationwide, and Defendants cite no case supporting it.

Instead, Defendants invoke *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647 (2021), for the proposition that "legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents." DCCC Mem. 18 (quoting *Brnovich*, 594 U.S. at 689–90). But *Brnovich* addressed the relationship between a bill's sponsor and the legislators who voted for it. 594 U.S. at 689–90. It does not address the distinct question of whether a legislative consultant's design methodology is attributable to the legislature that enacted his product without meaningful alteration.

Where, as here, the Legislature contacted a consultant through its own staff to prepare its map, adopted the consultant's subsequent work product, announced and promoted its racial dimensions consistent with the consultant's own published acknowledgments, and then invoked legislative privilege to shield the details of that collaboration from discovery, Compl. ¶¶ 56, 77, 87, the reasonable inference at the pleading stage is that the Legislature adopted the consultant's racial methodology along with his map.

17

## II.   Parallel Partisan Objectives Do Not Render the Racial Gerrymandering Claim Implausible

All three sets of Defendants argue that Proposition 50's partisan motivation constitutes an "obvious alternative explanation" under *Twombly*, 550 U.S. at 567, and *Iqbal*, 556 U.S. at 682, rendering the racial gerrymandering claim implausible as a matter of law. LULAC Mem. 12–13; *see* State Mem. 1, 13–14; DCCC Mem. 23–24, 29. The argument misapprehends both the plausibility standard and the Supreme Court's racial gerrymandering jurisprudence.

*Twombly*'s "obvious alternative explanation" principle originated in the antitrust context, where the complaint alleged parallel conduct—behavior equally consistent with lawful independent action and unlawful conspiracy—without any specific facts suggesting the latter. 550 U.S. at 566–67. Dismissal is warranted under that principle only when the complaint alleges nothing beyond conduct equally consistent with both lawful and unlawful behavior. It has no application where, as here, the complaint alleges specific facts, including the plain and consistent admissions of the map drawer and the Legislature, that go well beyond what the alternative explanation can account for.

A mere factual dispute based on competing explanations does not require dismissal. Even if the partisan motivations behind Proposition 50 provide an alternative explanation, dismissal under Rule 12(b)(6) is only warranted where a plaintiff's explanation is implausible. *See Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)."). Accepted as true, the Complaint's allegations support a reasonable inference of racial predominance that an exclusively partisan motivation alone cannot explain.

More fundamentally, the Supreme Court has rejected the premise that a plausible partisan explanation necessarily renders a racial explanation implausible. *Cooper* held that "the sorting of voters on the grounds of their race remains suspect even if race is

18



Pls.' Opp. to Mots. to Dismiss                                    Case No. 2:25-cv-10616

meant to function as a proxy for other (including political) characteristics." 581 U.S. at 308 n.7. Thus, a mapmaker who uses race to sort voters engages in racial gerrymandering even when the ultimate objective includes partisan advantage.

LULAC's reliance on *Tennessee State Conference of the NAACP v. Lee*, 746 F. Supp. 3d 473 (M.D. Tenn. 2024), is misplaced. LULAC Mem. 13. As a threshold matter, *Lee* is a district court decision from another circuit with no binding authority over this Court. But in any case, *Lee* is readily distinguishable. There, the complaint contained no statements from the mapmaker describing racial objectives. *See Lee*, 746 F. Supp. 3d at 483. Instead, it relied on general allegations about the map's racial effects. *Id.* Here, by contrast, the Complaint rests on direct evidence from the mapmaker himself describing racial objectives as his first priority.

DCCC's citation to *Cubanos Pa'lante v. Florida House of Representatives*, 766 F. Supp. 3d 1204 (S.D. Fla. 2025), actually supports Plaintiffs' position. That court *denied* dismissal where the complaint alleged sufficient district-specific evidence supporting an inference of racial predominance. *Id.* at 1215. In short, the existence of a plausible partisan motivation does not render implausible the Complaint's well-supported allegations that race was the predominant factor in the map's design. At the pleading stage, where the Court must accept the Complaint's factual allegations as true and draw all reasonable inferences in the Tangipa Plaintiffs' favor, the Complaint more than adequately alleges that race, not politics, was "the criterion that . . . could not be compromised," *Shaw v. Hunt*, 517 U.S. 899, 907 (1996) ("*Shaw II*"), with respect to the challenged districts.

Federal Rule of Civil Procedure 8(a)(2) demands only a "short and plain statement of the claim showing that the pleader is entitled to relief." The Complaint meets that standard. To the extent that Defendants suggest an alternative map or some other demonstrative illustrating that the State could have flipped five seats without offending the Equal Protection Clause is required at this stage, that argument is without merit. No court has ever required an alternative map to survive a motion to dismiss. The alternative-



Pls.' Opp. to Mots. to Dismiss

Case No. 2:25-cv-10616

map inquiry is a merits-stage device for disentangling race from politics, not a pleading requirement.

This case, based on the direct evidence of the mapmaker and Legislature's statements and further discovery that lies ahead, may ultimately be the exception to the virtual requirement of alternate maps—but that is a question for another day. Even after the pleading stage, for a decision on the merits, the Supreme Court's precedents confirm that an alternative map is not a prerequisite to a racial gerrymandering claim, particularly where there is direct evidence of racial intent. In *Cooper*, the Court expressly rejected North Carolina's argument that *Easley v. Cromartie*, 532 U.S. 234 (2001) ("*Cromartie II*"), established an inflexible counter-map requirement, determining that "the entire thrust of the *Cromartie II* opinion runs counter to an inflexible counter-map requirement." 581 U.S. at 321. *Cromartie II*'s discussion of alternative maps, the Court explained, had "a different and narrower point, arising from and reflecting the evidence offered in that case." *Id.* In *Cromartie II*, "[t]he direct evidence of a racial gerrymander . . . was extremely weak" and "sa[id] little or nothing about whether race played a predominant role in drawing district lines." *Id.* (internal quotation marks omitted). Where, by contrast, the case "turned not on the possibility of creating more optimally constructed districts, but on direct evidence of the [relevant state actor's] intent," "including many hours of trial testimony subject to credibility determinations," no alternative map is required. *Id.* at 322.

*Alexander*, in its review of a district court's issuance of a permanent injunction, found that the lower court had erred in failing to draw an adverse inference from the plaintiffs' failure to submit an alternative map, but the Court's reasoning was tied expressly to the weakness of the plaintiffs' case. The challengers "provided no direct evidence of a racial gerrymander, and their circumstantial evidence [was] very weak." 602 U.S. at 18. In that context, the absence of an alternative map was significant. The converse is equally clear. Where a plaintiff's case rests on direct evidence of racial intent, an alternative map provides little additional utility to the Court in adjudicating the merits

20



Pls.' Opp. to Mots. to Dismiss                    Case No. 2:25-cv-10616

of a plaintiff's claim. Indeed, where, as here, the mapmaker has acknowledged his use of race in his districting design, it would be peculiar to nonetheless conclude the Plaintiffs failed to meet their burden as a matter of law, particularly at the pleading stage, because they did not also submit an alternate map.

This case falls on the *Cooper* side of the line. The Complaint does not depend on circumstantial inferences to establish racial predominance. It alleges that the mapmaker himself described racial objectives as his "number one" priority and identified a racial blueprint as "the first thing [h]e did." Compl. ¶¶ 63–65, Ex. B at 23–25. The evidence-based allegations include an acknowledgment that the starting point for Proposition 50 was a Redistricting Commission map that was itself racially gerrymandered in reliance on a VRA justification and that the Proposition 50 map retained or expanded the Commission's racial sorting. Compl. ¶¶ 70–71, 84. This is the kind of direct evidence that *Cooper* held sufficient without an alternative map, and it is far stronger than anything at issue in *Cromartie II* or *Alexander*, neither of which involved unequivocal statements of racial intent from the mapmaker.

In any event, the Complaint's statistical allegations themselves perform the disentangling function that an alternative map would serve. Partisan objectives cannot explain why fourteen majority-Hispanic districts converge within a narrow Hispanic CVAP range despite extensively redrawn boundary lines, or why Hispanic-majority census blocks were systematically passed between adjacent districts to preserve racial outcomes. Compl. ¶¶ 89–92. These patterns disentangle race from politics in the precise manner *Alexander* and *Cooper* contemplate. At the pleading stage, this demonstration is more than adequate.

**III.   The Complaint Plausibly Alleges That Race Was the Predominant Factor in Drawing the Challenged Districts**

Defendants argue that the Complaint fails to plausibly allege that race predominated in the drawing of the challenged districts. This argument requires the Court

21

Pls.' Opp. to Mots. to Dismiss                                    Case No. 2:25-cv-10616

to disregard the Complaint's extensive direct and circumstantial evidence, all of which must be accepted as true at this stage.

### A.    Mitchell's Statements Are Direct Evidence of Racial Predominance

Under *Alexander*, direct evidence of racial gerrymandering "often comes in the form of a relevant state actor's express acknowledgment that race <u>played a role</u> in the drawing of district lines. Such concessions are not uncommon because States often admit to considering race for the purpose of satisfying . . . the Voting Rights Act of 1965." 602 U.S. at 8 (emphasis added). In *Cooper*, the Court affirmed a finding of racial predominance based in part on the testimony of the legislator who drew the challenged districts, who "candidly admitted" <u>using a racial target</u>. 581 U.S. at 300. And in *Bethune-Hill v. Virginia State Board of Elections*, the Court held that racial predominance was established where the legislature had used a 55% Black <u>voting-age population floor</u> as a racial target in a particular district. 580 U.S. 178, 193–94 (2017).

Mitchell's statements easily qualify as statements of this kind. He established that race played a role when he described creating a "Latino majority/minority district" as the "number one thing" he "first started thinking about." Compl. ¶ 63, Ex. B at 23–24. He confirmed that the HOPE letter's racial recommendations were "the first thing we did in drawing the new map." Compl. ¶ 65, Ex. B at 24–25. He touted the map as "great for the Latino community" because the "Latino districts that are the VRA seats are bolstered," despite simultaneously acknowledging that the Commission map already complied with the VRA. Compl. ¶¶ 66–67, Ex. B at 30. And he stated that the map "improves the opportunity for Latino voters to elect candidates of choice in two more districts than the existing plan." Compl. ¶ 66, Ex. B at 26. Read together, these statements describe a systematic racial methodology that begins with the identification of racial targets, moves to consultation with a racial blueprint, then to an analysis of racial performance, and finally to the implementation of racial objectives.

Defendants raise two principal objections.

22



Pls.' Opp. to Mots. to Dismiss                    Case No. 2:25-cv-10616

*First*, DCCC and LULAC argue that Mitchell is not a "state actor" whose intent can be attributed to the State. DCCC Mem. 17–19; LULAC Mem. 19. But *Alexander* does not limit direct evidence to formal state employees, only to "relevant state actors." 602 U.S. at 8. When a State retains a consultant to draw its maps, works directly with that consultant through legislative staff, and adopts the consultant's work without meaningful alteration, the consultant's statements are probative of the purpose behind the enacted map. The Legislature also distributed to its members a summary of the maps that exclusively displayed their racial voting-age population, not their partisan breakdown.

The Complaint alleges that Mitchell coordinated directly with Speaker Rivas's Chief of Staff, Compl. ¶ 56, and the Legislature enacted his map without significant changes. Both Mitchell and the legislative members evaded testifying about the motivations behind specific line-drawing decisions by invoking legislative privilege. *Id.* ¶¶ 77, 87. The reasonable inference at the pleading stage is that the Legislature adopted Mitchell's racial methodology along with his product. DCCC's citation to *American Manufacturers Mutual Insurance Co. v. Sullivan*, 526 U.S. 40, 52 (1999), is inapposite. DCCC Mem. 18. That case concerned whether a private insurer could be held liable under the Fourteenth Amendment for its own coverage decisions, not whether a consultant's statements bear on legislative purpose. *Sullivan*, 526 U.S. at 52–53. Thus, it addressed circumstances wholly different from those presented here.

*Second*, DCCC argues that Mitchell's racial statements during the HOPE presentation were merely a product of being asked to "keep it nonpartisan." DCCC Mem. 21 & n.11. This argument undermines Defendants' own position. The instruction asked Mitchell to set aside the partisan dimension and describe what else the map accomplished. That he responded with a fluent and detailed account of his racial methodology, focusing on HOPE's racial recommendations, the recreation of a historic Latino district, and the bolstering of VRA seats, confirms that race operated as a separate, independent line-drawing criterion, not a byproduct of partisanship. If partisanship had

23

been the sole motivation, Mitchell would have had nothing to say once asked to set it aside. Instead, he described racial objectives that stand entirely on their own.

Defendants also contend that Mitchell's statements, viewed in context, are "contradicted" by other portions of the transcript in which he discussed partisan goals. State Mem. 14–15. But resolving competing characterizations of an exhibit is precisely the kind of factual dispute impermissible on a motion to dismiss. *See Ehrlich v. BMW of N. Am., LLC*, 801 F. Supp. 2d 908, 920 (C.D. Cal. 2010) (refusing to make determination where it "rest[ed] on the parties' conflicting interpretations of Plaintiff's allegations"); *City of Cathedral City v. Fantasy Balloon Fights*, No. 5:25-cv-1490-SSS-DTBx, 2026 WL 325505, at *2 (C.D. Cal. Feb. 2, 2026) ("[F]actual disputes are not properly resolved on a motion to dismiss."). That Mitchell also discussed partisan goals does not negate his racial ones. It simply introduces the central question in every racial gerrymandering case of the modern era: whether race or politics predominated. That question cannot be resolved on the pleadings.

## B.    Legislative Statements Corroborate Racial Intent

Beyond Mitchell's admissions, the Complaint alleges that the Legislature's presiding officers described the map in explicitly racial terms. In *Cooper*, two statements by two legislators constituted sufficient evidence of racial predominance. 581 U.S. at 299. In *Callais*, the Court considered the issue of racial predominance all but conceded, in light of the Legislature's candid acknowledgment that it used race to configure its districts to comply with a court order. *See* 146 S. Ct. at 1161 (noting that "[t]he State never hid the ball"). The relevance of such statements is well established: "contemporary statements by members of the decisionmaking body" are probative of discriminatory purpose. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977).

Defendants characterize these statements as reflecting mere "awareness" of race, invoking *Bethune-Hill*, 580 U.S. at 187. State Mem. 13–14. But there is a material difference between awareness and purpose. Awareness is a legislator observing that a district has a certain racial composition. Purpose is a presiding officer advertising the

24



map's racial design as an affirmative advantage in an official press release. McGuire's release listed "Protecting communities of color and historically marginalized voters" as an independent feature of the Proposition 50 map. Ex. I at 2. And as discussed above, numerous other legislators viewed Proposition 50 as a direct and tailored response to the anticipated impact of Texas's new map on minority representation. *See supra* Factual Background § IV. These are not offhand observations about a proposed map's racial qualities. They are deliberate communications by the Legislature's leaders describing the map's racial effects as a standalone objective.

### C. The Statistical Evidence Disentangles Race from Politics

*Alexander* instructs that a racial gerrymandering plaintiff must "disentangle race and politics" by "ruling out the competing explanation that political considerations dominated the legislature's redistricting efforts." 602 U.S. at 9–10. One method is to demonstrate that race explains features of the map that partisanship cannot. *See id.* at 10; *Cooper*, 581 U.S. at 308.

The Complaint's statistical allegations supply precisely that showing. If Mitchell had been sorting voters solely by partisan registration, there would be no reason for fourteen of the sixteen majority-Hispanic districts to converge within the same narrow 52–55% Hispanic CVAP band, tracking the optimal racial voting power range identified by HOPE, and no reason for nine of those districts to land within two percentage points of the Commission-map counterparts, despite entirely redrawn boundary lines. Compl. ¶¶ 89–90. Nor would a purely partisan mapmaker engage in the deliberate practice of passing Hispanic-majority census blocks from one adjacent district to another to maintain racial floors. Compl. ¶¶ 89, 91–92. That pattern is the hallmark of racial, not partisan, engineering. *Cf. Cooper*, 581 U.S. at 314–16 (affirming a lower court's finding of racial predominance where partisan motivation could not account for specific line-drawing choices). And at the pleading stage, it is a plausible indicator of deliberate racial targeting, and precisely the kind of statistical circumstantial evidence on which courts have relied. *See id.* at 299–300 (relying on evidence of a racial target).

25



DCCC argues that the Proposition 50 map's racial statistics are unremarkable because the prior Commission map also contained sixteen majority-Hispanic districts with none below 52% Hispanic CVAP. DCCC Mem. 24–25. That argument undercuts Defendants' theory. Mitchell himself acknowledged that he "kept about 80 percent of [the Commission map] the same." Compl. ¶ 70, Ex. B at 26. The Complaint alleges that the Commission drew those districts "to address VRA obligations." Compl. ¶ 71. The Proposition 50 map thus deliberately replicated the Commission map's racial structure, which is itself evidence of racial predominance.

DCCC also suggests a discrepancy between the HOPE letter's thresholds and the map's actual Hispanic CVAP range. DCCC Mem. 25 n.12. But the HOPE letter stated that districts with a Hispanic CVAP "between 52% and 54%" would "still be very likely to elect Latino candidates of choice." Ex. C at 5. The letter identified 52%, not 53%, as its floor. Mitchell read the letter's demands in public and confirmed that they informed his decision-making process. *See* Ex. B. at 24–25. The slight variation between the letter's 52–54% recommendation and the map's 52–55% range is a natural consequence of implementation constraints, not evidence that the letter was disregarded.

**IV.   Even Under the Voter-Intent Framework this Court Adopted at the Preliminary Injunction Stage, the Complaint Plausibly States a Claim**

Even accepting the voter-intent framework for purposes of this opposition, the Complaint plausibly alleges that the map's racial design was communicated to voters through the public discourse surrounding the measure. This Court acknowledged at the preliminary injunction stage that "legislative statements are [not] irrelevant to [the] intent analysis." *Tangipa*, 816 F. Supp. 3d at 1100. They, and the statements of Mitchell, bear on the inquiry "to the extent that [they] point[] to the intent of the voters." *See id.* at 1107. Applying that framework, the Complaint's allegations more than suffice.

Under the *Kern* framework Defendants invoke, voter intent is assessed through "the nature of the . . . campaign." 462 F. Supp. 2d at 1114. The nature of this campaign places race squarely before the electorate in at least three ways.



Pls.' Opp. to Mots. to Dismiss                    Case No. 2:25-cv-10616

*First*, the presiding officers of both legislative chambers publicly advertised the map's racial design as an independent feature of Proposition 50. McGuire's press release listed "Protecting communities of color and historically marginalized voters" under its own heading, entirely separate from the heading identifying Proposition 50 as a partisan response to Texas, and stated that the map "retains and expands Voting Rights Act districts that empower Latino voters to elect their candidates of choice[]." Ex. I at 2. Rivas likewise touted the retention of "both historic Black districts and Latino-majority districts" as an independent benefit of the proposed map. Ex. J at 1. These press releases were official communications by the leaders of the bodies that enacted the measure, published before the election and intended to shape the electorate's understanding of what Proposition 50 would accomplish.

*Second*, Mitchell's HOPE presentation occurred on October 17, 2025—two weeks before the election—and outlined his racial methodology to civic leaders and voters. He described the map as one that would be "great for the Latino community" because "the Latino districts that are the VRA seats are bolstered in order to make them more effective." Ex. B. at 30. This public presentation ensured that the map's racial design was part of the public discourse surrounding the measure before it was submitted to the voters.

*Third*, even the Voter Guide upon which Defendants rely placed racial considerations before every registered voter. The "Argument Against Proposition 50" warned that the map would "divide our neighborhoods and weaken the voice of communities of color." State RJN Ex. 2 at 17. Regardless of whether voters agreed with this characterization or whether it was ultimately accurate, voters were on notice that the measure implicated racial representation and did not concern partisan effects exclusively. ACA 8's own text states the Proposition 50 map would accomplish its partisan goals "without eroding fair representation for all communities," State RJN Ex. 1 at 6, which, read in light of Mitchell's statements and officials' press releases, encompasses the racial design objectives identified in the Complaint.

Pls.' Opp. to Mots. to Dismiss                    Case No. 2:25-cv-10616

Defendants emphasize that ACA 8's findings and declarations are framed in exclusively partisan terms, with no reference to race. LULAC Mem. 8–9. They likewise note that the Voter Guide's "Argument in Favor of Proposition 50," co-authored by Governor Newsom, makes no mention of race. LULAC Mem. 10. But the *Kern* framework does not limit the inquiry to the proponents' ballot argument. It examines the "nature of the . . . campaign" as a whole. 462 F. Supp. 2d at 1114. The campaign here included the official press releases of both presiding officers of the Legislature, a public pre-election presentation by the mapmaker, floor debate statements by numerous legislators, and ballot arguments from opponents, all of which placed the racial dimension of Proposition 50 squarely before the electorate. That statements on the ballot were framed in partisan terms does not erase the racial messaging that pervaded the broader campaign. It simply reflects a strategic choice by sophisticated political actors aware of the legal significance of racial motivation.

Defendants cannot have it both ways. They cannot insist that voter intent is the dispositive inquiry and simultaneously dismiss as irrelevant the explicit racial statements of the measure's proponents. The Complaint thus states a plausible claim whether the Court examines the intent of the map's designer—as the Tangipa Plaintiffs maintain it should—or the intent of the electorate that ratified his work.

Defendants fault the Complaint for containing no specific allegations about voter intent. State Mem. 12–13; LULAC Mem. 9–11; DCCC Mem. 15–16. The Complaint omits specific voter-intent allegations as such because the Tangipa Plaintiffs maintain that voter intent is not the legally relevant inquiry. That omission reflects a legal position about the proper framework, not a concession. But the Complaint's extensive allegations about the public discourse surrounding Proposition 50 are precisely the type of evidence from which voter intent is assessed under the *Kern* framework. A plaintiff is not required to anticipate and plead around every alternative legal framework or defense a defendant might propose. *See Gomez v. Toledo*, 446 U.S. 635, 640 (1980). To the extent the Court applies the voter-intent framework, the Complaint's allegations amply support the

Pls.' Opp. to Mots. to Dismiss                    Case No. 2:25-cv-10616

inference that the map's racial design was communicated to the electorate and formed part of the public understanding of what Proposition 50 would accomplish.

## V. Defendants' Remaining Arguments Do Not Warrant Dismissal

### A. LULAC's "Judicial Admissions" Argument Fails

LULAC contends that two sets of statements in the Consolidated Complaint constitute "judicial admissions" of partisan, rather than racial, intent. LULAC Mem. 4, 11–14. Neither qualifies.

"Judicial admissions are formal admissions in the pleadings which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988). To qualify as a judicial admission, the admission must be "deliberate, clear, and unequivocal." *Scarff v. Intuit, Inc.*, 318 Fed. App'x 483, 487 (9th Cir. 2008). Assemblyman Tangipa's floor remark that "one of our colleagues brazenly admitted that this entire thing was about partisan gerrymandering," Ex. F at 98, is his characterization of a political opponent's statements during committee hearings. He was criticizing the majority party, not making a deliberate factual concession about map-drawing methodology. Attaching an exhibit containing a legislative debate transcript does not transform every characterization within it into a binding judicial admission. *See Wilkins v Lowe*, No. CV 19-9159-VAP(E), 2020 WL 3065119, at *5 (C.D. Cal. Apr. 21, 2020) ("Plaintiff's attachment of [an] exhibit to his pleading does not necessarily admit the accuracy of all attributions contained in the exhibit."); *Harrison v. Institutional Gang of Investigations*, No. C 07-3824 SI (pr), 2009 WL 1277749, at *2 (N.D. Cal. May 6, 2009) ("[T]he defendants assume that Rule 10(c) requires a plaintiff to adopt as true the full contents of any document attached to a complaint or adopted by reference. This is not a proper reading of the rule." (court's emendation) (quoting *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 674 (2d Cir. 1995))). Moreover, Assemblyman Tangipa's floor statement was made on August 21, 2025, nearly two months before Mitchell's HOPE presentation on October 17, 2025, in which Mitchell publicly disclosed his racial methodology for the first time.

29



Assemblyman Tangipa's characterization reflected what was publicly known at the time, not the full picture that subsequently emerged.

The allegation that California voting is driven by "partisan bloc voting rather than racial bloc voting," Compl. ¶ 49, similarly does not foreclose the Tangipa Plaintiffs' claim. Under *Thornburg v. Gingles*, 478 U.S. 30, 51 (1986), racially polarized voting is a precondition for VRA-justified race-conscious redistricting. The Complaint's allegation that California voters vote along partisan, not racial, lines thus eliminates the very justification Defendants would need to invoke to defend the map's racial design. It cannot simultaneously serve as proof that the map was not racially motivated. But even more fundamentally, this allegation describes voting behavior, not map-drawing methodology. As discussed above, a mapmaker can sort voters by race regardless of whether those voters cast their ballots along partisan lines. *See Cooper*, 581 U.S. at 308 n.7. And even if these were admissions of partisan motivation, they would not require dismissal. An admission that partisanship was one motivation does not preclude a finding that race was the predominant motivation. The relevant question is whether race was the "criterion that . . . could not be compromised." *Shaw II*, 517 U.S. at 907.

## B.    The Complaint Pleads Sufficient District-Specific Facts

Defendants argue that the Complaint fails to allege racial predominance on a district-by-district basis, as required by *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 262 (2015). State Mem. 15–17; LULAC Mem. 17–19; DCCC Mem. 7–8, 19. This argument overstates the specificity required at the pleading stage.

The Complaint contains detailed allegations for several challenged districts. District 13 is alleged to be "an Exemplar of Racial Gerrymandering," with specific allegations about boundary decisions that sacrifice partisan performance to maintain Hispanic demographics. Compl. ¶¶ 117–23. A boundary "bulge" near Ceres "omits a significant white Democratic population in Modesto while capturing a heavily Hispanic Republican population," and a northern split near Stockton "leaves heavily Democratic areas to the west" while including a heavily Hispanic appendage. Compl. ¶¶ 121–23.

30



| Pls.' Opp. to Mots. to Dismiss | Case No. 2:25-cv-10616 |
|---|---|

DCCC argues that Mitchell's reference to making the Latino vote more "effective, particularly in the Central Valley" could refer to any of several Central Valley districts, not District 13 specifically. DCCC Mem. 20–21. But the Complaint identifies District 13 as the "exemplar" based on its own boundary-level allegations, not solely on Mitchell's Central Valley reference. *See* Compl. ¶¶ 120–23. The Complaint has otherwise clearly identified the districts that it is challenging, and why. *Id.* ¶ 125.

Mitchell's statements about his overarching methodology, discussed in detail above, apply across all sixteen challenged districts because they describe the approach he used for the entire map. The Tangipa Plaintiffs' district-specific claims rest on three categories of evidence: (a) the statewide statistical evidence in Paragraphs 88–92 of the Complaint, demonstrating the deliberate use of race to achieve a Hispanic CVAP percentage that fell within an identified range for fourteen identified districts; (b) the District 13-specific evidence described in Paragraphs 117–23 of the Complaint, providing granular boundary-level allegations for one of the challenged districts; and (c) the Legislature's and Mitchell's statements, describing the racial methodology central to the design of the entire map, including the acknowledged expansion of Voting Right Act districts. By their terms, these categories of evidence are not limited to any single district. *See Alabama Legis. Black Caucus*, 575 U.S. at 263 (holding that challengers may rely on statewide evidence to prove predominance in individual districts where the evidence bears on the specific district).

In any event, if the Court concludes that certain districts lack sufficient individualized allegations, the appropriate remedy, as the State acknowledges, is to narrow the claims, not dismiss the entire action. *See* State Mem. 17.

### C.   The Complaint Adequately Addresses Traditional Redistricting Principles

Defendants argue that the Complaint does not allege subordination of traditional redistricting principles. LULAC Mem. 20–21; DCCC Mem. 23. Under *Bethune-Hill*, such a showing is generally required because "legislatures that engage in impermissible



Pls.' Opp. to Mots. to Dismiss

Case No. 2:25-cv-10616

race-based redistricting will find it necessary to depart from traditional principles in order to do so." 580 U.S. at 190. But the Court recognized an exception for cases involving "direct evidence of the legislative purpose and intent or other compelling circumstantial evidence." *Id.* at 191. This case fits squarely within that exception. Mitchell's statements constitute direct evidence that racial considerations were his "number one" priority and that racial goals were the "first thing" implemented. Ex. B at 23–25. And legislative leadership explicitly asserted that the Proposition 50 map "expands Voting Rights Act districts that empower Latino voters to elect their candidates of choice[]." Ex. I at 2.

The Complaint also does allege subordination. It alleges that "[r]ace . . . predominated over traditional, race-neutral districting principles such as compactness, contiguity, respect for political subdivisions, and communities of interest." Compl. ¶ 126. And the District 13 allegations provide concrete examples, including specific boundary decisions that sacrifice both partisan performance and geographic coherence to maintain Hispanic demographics. Compl. ¶¶ 117–23. Therefore, even if not excepted from the requirement due to the direct evidence, the Complaint sufficiently alleges that Mitchell subordinated traditional criteria to his racial objectives.

## CONCLUSION

The Consolidated Complaint alleges far more than what the pleading standard demands. It provides direct evidence from the mapmaker, who described creating a "Latino majority/minority district" as the "number one thing" he "first started thinking about" and confirmed that a private advocacy group's letter's racial recommendations shaped his decision-making process. It provides corroborating statements from the presiding officers of both legislative chambers, who advertised the map's racial design in official press releases. It provides statistical evidence of racial targeting, including fourteen of sixteen majority-Hispanic districts clustered within a 52–55% Hispanic CVAP band. And it alleges the importation of race-based district boundaries without any independent VRA analysis justifying them, which Mitchell and the Legislature acknowledged they were adopting, preserving, and expanding. No court has ever

32

Pls.' Opp. to Mots. to Dismiss                                    Case No. 2:25-cv-10616

dismissed comparable allegations at the pleading stage, and this Court should not be the first. The motions should be denied.

Dated: May 22, 2026                              Respectfully submitted,

                                                 */s/ Michael A. Columbo*
                                                 MICHAEL A. COLUMBO (SBN: 271283)
                                                 mcolumbo@dhillonlaw.com
                                                 **DHILLON LAW GROUP INC.**
                                                 177 Post Street, Suite 700
                                                 San Francisco, California 94108
                                                 Telephone: (415) 944-4996

                                                 SHAWN COWLES (SBN: 163826)
                                                 scowles@dhillonlaw.com
                                                 **DHILLON LAW GROUP INC.**
                                                 4675 MacArthur Court, Suite 1410
                                                 Newport Beach, CA 92660

                                                 DOMENIC P. AULISI (Admitted PHV)
                                                 daulisi@dhillonlaw.com
                                                 AMBER R. HULSE (Admitted PHV)
                                                 ahulse@dhillonlaw.com
                                                 **DHILLON LAW GROUP INC.**
                                                 2121 Eisenhower Avenue, Suite 608
                                                 Alexandria, VA 22314

                                                 *Attorneys for the Tangipa Plaintiffs*



Pls.' Opp. to Mots. to Dismiss                              Case No. 2:25-cv-10616

# **CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for the Tangipa Plaintiffs, certifies that this brief contains 10,894 words, which complies with this Court's order. Dkt. No. 257.

Dated: May 22, 2026                              /s/ *Michael A. Columbo*
                                                 Michael A. Columbo

Pls.' Opp. to Mots. to Dismiss                              Case No. 2:25-cv-10616