JESUS A. OSETE*
Principal Deputy Assistant Attorney General
MATTHEW ZANDI (CA No. 203329)
Chief of Staff & Special Counsel
ANDREW BRANIFF (IN No. 23430-71)
Acting Chief, Appellate Section
DAVID GOLDMAN (VA No. 98922)
JOSHUA R. ZUCKERMAN (DC No. 1724555)
GRETA GIESEKE (TX No. 24132925)
Attorneys
   Civil Rights Division
   United States Department of Justice
   950 Pennsylvania Avenue, NW
   Washington, D.C.  20530
   Telephone: (202) 514-3847
   E-Mail:      greta.gieseke@usdoj.gov

TODD BLANCHE
Acting Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
JULIE A. HAMILL (CA No. 272742)
Assistant United States Attorney
   United States Attorney's Office
   300 North Los Angeles Street, Suite 7516
   Los Angeles, California 90012
   Telephone: (213) 894-2464
   E-Mail:      julie.hamill@usdoj.gov

Attorneys for Plaintiff-Intervenor
UNITED STATES OF AMERICA

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID TANGIPA, *et al.*,<br>*Plaintiffs*,<br>and<br><br>UNITED STATES OF AMERICA,<br>*Plaintiff-Intervenor*,<br>v.<br><br>GAVIN NEWSOM, in his official capacity as the Governor of California, *et al.*,<br>*Defendants*, | Case No.   2:25-cv-10616-JLS-KES<br>Three-Judge Court<br><br>**PLAINTIFF-INTERVENOR'S OPPOSITION TO MOTIONS TO DISMISS**<br><br>**Hon. Josephine L. Staton**<br>**Hon. Wesley L. Hsu**<br>**Hon. Kenneth K. Lee**<br><br>**Hearing Date: June 26, 2026**<br>**Time: 10:30 A.M.**<br>**Courtroom: 1** |

* Assistant Attorney General Harmeet K. Dhillon is recused from this matter.

# TABLE OF CONTENTS

PAGE

INTRODUCTION ..................................................................................................1

BACKGROUND ...................................................................................................2

LEGAL STANDARD............................................................................................5

ARGUMENT .........................................................................................................5

I.   The United States Has Stated an Equal-Protection Claim ...................5

    a.   The Proper Focus in the Predominance Inquiry Is the Intent of the
         Mapmaker and Legislature, Not the Voters ......................................6

    b.   The Complaint Alleges Facts Showing that Race Predominated in the
         Proposition 50 Map .........................................................................12

        1.   The Complaint Alleges Direct Evidence That Race Predominated.........12

        2.   The Complaint Alleges Circumstantial Evidence that Race
             Predominated..........................................................................18

    c.   The Complaint Establishes That Proposition 50 Cannot Survive Strict
         Scrutiny............................................................................................21

    d.   The United States Has Pleaded District-by-District Facts...........................23

II.  The United States Pleaded a Claim of Intentional Discrimination Under
     the Voting Rights Act.........................................................................24

    a.   The United States Has Alleged that Race was a Motivating Factor............25

    b.   The United States Has Established a Resulting Injury ..............................27

## TABLE OF CONTENTS (CONTINUED)

PAGE

III.   Governor Newsom Cannot Assert Sovereign Immunity Against the United States ........................................................................................29

CONCLUSION ..................................................................................................29

# TABLE OF AUTHORITIES

PAGE

**Cases:**

*Abbott v. LULAC,*
146 S. Ct. 418 (2025) ...........................................................................................2

*Ala. Legis. Black Caucus v. Alabama,*
575 U.S. 254 (2015)..........................................................5-6, 14, 16, 23-24

*Alexander v. S.C. Conf. of the NAACP,*
602 U.S. 1 (2024)...................................................................................*passim*

*Arizona v. California,*
460 U.S. 605 (1983) .........................................................................................29

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n,*
576 U.S. 787 (2015)............................................................................................6

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ....................................................................................5, 15

*Barnes v. District of Columbia,*
91 U.S. 540 (1875) .............................................................................................8

*Bethune-Hill v. Virginia State Bd. of Elections,*
580 U.S. 178 (2017) ...........................................................................................5

*Brnovich v. Democratic Nat'l Comm.,*
594 U.S. 647 (2021)............................................................................. 10-11, 25

*Coal. to Defend Affirmative Action v. Regents of Univ. of Mich.,*
539 F. Supp. 2d 924 (E.D. Mich. 2008) .......................................................11

*Cooper v. Harris,*
581 U.S. 285 (2017)................................................................................*passim*

*Democratic Nat'l Comm. v. Hobbs,*
948 F.3d 989 (9th Cir. 2020) (en banc) ..................................................... 25-26

**Cases (continued):**                                                                PAGE

*Garza v. County of Los Angeles*,
    918 F.2d 763 (9th Cir. 1990) ............................................................... 25-27

*Gibson v. City of Portland*,
    165 F.4th 1265 (9th Cir. 2026) ........................................................... 3

*Gomillion v. Lightfoot*,
    364 U.S. 339 (1960) ................................................................................7

*Harper v. Va. State Bd. of Elections*,
    383 U.S. 663 (1966) ..............................................................................20

*Harris v. McCrory*,
    159 F. Supp. 3d 600 (M.D.N.C. 2016) ...............................................24

*Hollingsworth v. Perry*,
    570 U.S. 693 (2013) ..............................................................................10

*Lewis v. Clarke*,
    581 U.S. 155 (2017) ..............................................................................29

*Louisiana v. Callais*,
    146 S. Ct. 1131 (2026) ..................................................................*passim*

*LULAC v. Abbott*,
    809 F. Supp. 3d 502 (W.D. Tex. 2025) ................................................7

*McMillan v. Escambia Cnty.*,
    748 F.2d 1037 (5th Cir. 1984) .............................................................25

*Miller v. Johnson*,
    515 U.S. 900 (1995) ................................................................ 5-6, 17, 25

*PennEast Pipeline Co., LLC v. New Jersey*,
    594 U.S. 482 (2021) ..............................................................................29

*Perry v. Brown*,
    671 F.3d 1052 (9th Cir. 2012) .............................................................10

**Cases (continued):**                                                                                   PAGE

*Romer v. Evans*,
        517 U.S. 620 (1996)..................................................................................................10

*Rucho v. Common Cause*,
        588 U.S. 684, 711 (2019) ...........................................................................................5

*Shaw v. Reno*,
        509 U.S. 630, (1993)................................................................................................27

*Students for Fair Admissions, Inc. v.
President and Fellows of Harvard Coll.*,
        600 U.S. 181 (2023)...................................................................................5, 21, 28

*Thornburg v. Gingles*,
        478 U.S. 30 (1986)............................................................................................ 21-22

*United States v. Mississippi*,
        380 U.S. 128 (1965)................................................................................................29

*United States v. Texas*,
        143 U.S. 621 (1892)................................................................................................29

*Village of Arlington Heights v.
Metropolitan Housing Development Corp.*,
        429 U.S. 252 (1977)....................................................................................... 25-26, 28

**Constitution:**

Eleventh Amendment.....................................................................................................29

Fourteenth Amendment .........................................................................................*passim*

**Statutes:**

Voting Rights Act, Section 5,
        52 U.S.C. § 10301, *et seq.* .......................................................................................25
        52 U.S.C. § 10304....................................................................................................23

**INTRODUCTION**

"[T]he Constitution almost never permits … a State to discriminate on the basis of race." *Louisiana v. Callais*, 146 S. Ct. 1131, 1152 (2026). California nevertheless discriminated on the basis of race "when it drew new congressional district lines using race as the predominant factor" in order to enhance Hispanic voting power. Dkt. 240 ("Compl.") ¶ 1. Specifically, the United States alleges that in violation of the Equal Protection Clause and Section 2 of the Voting Rights Act, "[r]ace was a predominant factor in drawing the boundaries of at least sixteen congressional districts," all of which are Hispanic-majority. *Id.* ¶ 157.

The Complaint alleges extensive direct evidence of race discrimination. The mapmaker Paul Mitchell made several "public statements confirm[ing] that he intentionally and directly used race and Hispanic demographics as criteria in designing the map." Compl. ¶ 62. Most notably, he publicly boasted that the "number one thing that [he] first started thinking about" was "drawing a replacement Latino majority/minority district in the middle of Los Angeles." *Id.* ¶ 63 (emphasis omitted). Several California legislators made similar public comments evincing their desire to empower Hispanic and black voters. *Id.* ¶¶ 66-87.

The Complaint also describes circumstantial evidence of race discrimination. It details how California "engaged in a deliberate practice of passing Hispanic-majority census blocks from one adjacent district to another to preserve the number of Hispanic-majority congressional districts," thereby achieving "the racially motivated outcome of preserving 16 majority Hispanic citizen voting-age population (CVAP) Districts but narrowing this majority to a tight range between 52-55% Hispanic population in these districts." *Id.* ¶ 95. That result was "implausible without a deliberate racially motivated draw using explicit racial means." *Id.*

California Governor Gavin Newsom and Secretary of State Shirley Weber ("State Defendants"), Democratic Congressional Campaign Committee ("DCCC"), and League of United Latin American Citizens ("LULAC") have filed separate motions to dismiss the

1

Complaint.  Dkt. 253-1 ("State Mot."); Dkt. 250 ("DCCC Mot."); Dkt. 251-1 ("LULAC Mot.").  Each Defendant argues that the Complaint should be dismissed because Proposition 50 is a partisan gerrymander and because the Complaint does not allege facts demonstrating that the voters had impermissible racial motives.  Their arguments fall short.

The United States does not dispute and has never disputed that the Proposition 50 map is intended to bolster the performance of the Democratic Party in congressional elections.  However, States may not enact a partisan gerrymander through racially discriminatory means.  As to voter intent, the United States acknowledges that this Court held that "the voters' intent is the relevant inquiry" and that Plaintiffs "bear the burden of showing that race predominated in the minds of voters."  Dkt. 216 ("Order") at 37, 45. Respectfully, this Court should revisit its holding, which would shield all unconstitutional legislative districting from judicial review, so long as it is cleansed by voter approval.  As discussed in greater detail below, the relevant inquiry is whether race predominated when the mapmaker and legislature drew and enacted the map.  Voter intent cannot supersede constitutional prerogatives.  And the United States has sufficiently alleged that race did in fact predominate in violation of the Fourteenth Amendment.

Additionally, under the "updated" framework for interpreting Section 2 of the Voting Rights Act under the Supreme Court's recent *Callais* ruling, the map adopted by the California Legislature and enacted by Proposition 50 cannot withstand strict scrutiny. *Callais*, 146 S. Ct. at 1159-61.  Therefore, California violated Section 2 when creating the Proposition 50 map.

## BACKGROUND

"With an eye on the upcoming 2026 midterm elections, several States have in recent months redrawn their congressional districts in ways that are predicted to favor the State's dominant political party.  Texas adopted the first new map, then California responded with its own map for the stated purpose of counteracting what Texas had done." *Abbott v. LULAC*, 146 S. Ct. 418, 419 (2025).  Since 2010, the California Constitution has required

2

an independent commission to draw the State's congressional maps every ten years, in "the year following the year in which the national census is taken." Compl. ¶ 163. In August 2025, Governor Newsom announced a legislative package "to replace the congressional map adopted by the Commission with a new map"—the Proposition 50 map—"for use in 2026, 2028, and 2030, subject to voter approval at a special election." *Id.* ¶ 57. The legislative package consisted of three items: (1) Assembly Constitutional Amendment No. 8 ("ACA 8"), a constitutional amendment authorizing temporary use of a legislature-enacted congressional map through 2030; (2) Assembly Bill No. 604, a statute specifying the new congressional district boundaries; and (3) Senate Bill No. 280, a statute authorizing a special election to approve the new map. *Id.* Although the Proposition 50 map was often "marketed as a lawful partisan gerrymander intended to counter redistricting efforts in Texas," the California Legislature violated the Fourteenth Amendment and Section 2 of the Voting Rights Act "when it drew new congressional district lines using race as the predominant factor—specifically to protect or enhance Hispanic or black voting power." Compl. ¶ 1.

Paul Mitchell, a consultant at Redistricting Partners, drew the Proposition 50 map. Compl. ¶ 6. In July 2025, Mitchell met with Speaker of the California Assembly Robert Rivas's chief of staff and began to discuss the process of drawing a new map. *Id.* ¶ 56. Defendant-Intervenor DCCC paid Mitchell for his map and submitted it to the Legislature in August 2025. *Id.*

California's voters approved the Proposition 50 map in a November 4, 2025, special election, and the Tangipa Plaintiffs[1] immediately filed suit against the State Defendants. The United States intervened, challenging the map as an illegal racial gerrymander and seeking a preliminary injunction. DCCC and LULAC intervened to defend the map. At a preliminary-injunction hearing, the parties presented evidence and expert testimony, but

---

[1] "Tangipa Plaintiffs" refers to the twenty original plaintiffs in this action, including California Assemblyman David Tangipa, the California Republican Party, and registered voters from various districts in California. *See* Compl. ¶¶ 13-32.

3

Mitchell "refused to appear before [this] court to testify."  Order 79 (Lee, J., dissenting).  Before the hearing, the United States served Mitchell with a deposition subpoena.  While Mitchell sat for the deposition, he "invoked legislative privilege over one hundred times." *Id.* at 80. Mitchell "declined to answer how he drew the map, whether race played any role, and even the most basic questions." *Id.*  Mitchell "even refused to answer whether he drew the Proposition 50 Map," *id.*, despite making public statements acknowledging that he drew the map and despite the State's own evidence recognizing him as the mapmaker, *e.g.*, Order 38.

This Court denied the Tangipa Plaintiffs' and the United States' motions for a preliminary injunction.  It dismissed Mitchell's public statements, Order 29, 37-45, and reasoned that because California law required the Proposition 50 map to be approved by voters, the "voters are the most relevant state actors and their intent is paramount," *id.* at 15.  Accordingly, this Court concluded that it "must look to the intent of the voters, rather than the legislature." *Id.* at 18.  This Court viewed Mitchell's statements as too "attenuated" to establish voter intent because "the voters did not engage or direct Mitchell, a private consultant." *Id.* at 29.  And it concluded that "the voters intended the Proposition 50 Map to be a partisan gerrymander," based on its review of various campaigning materials related to the special election. *Id.* at 37.

On March 17, 2026, this Court consolidated this case with a similar case brought by three California residents and registered voters ("Noyes Plaintiffs"), and ordered the United States, Tangipa Plaintiffs, and Noyes Plaintiffs to file a consolidated complaint.  Dkt. 238.  The United States brings two counts in the consolidated complaint.  First, the United States alleges that the "Proposition 50 map was racially gerrymandered, in violation of the Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States," and that "[r]ace was a predominant factor in drawing the boundaries of at least sixteen congressional districts." Compl. ¶¶ 154, 157.  Second, the United States alleges that the "Proposition 50 map was … enacted with the purpose of denying or abridging the right to vote on account of race or color in violation of Section 2 of the

VRA." *Id.* ¶ 165.  Each Defendant has moved to dismiss.

## LEGAL STANDARD

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), this Court must "accept as true all well-pleaded allegations of material fact, and construe them in the light most favorable to the non-moving party." *Gibson v. City of Portland*, 165 F.4th 1265, 1272 (9th Cir. 2026).  To overcome a Rule 12(b)(6) "motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).  A claim is plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## ARGUMENT

### I.    The United States Has Stated an Equal-Protection Claim

The United States adequately has alleged that at least sixteen congressional districts constitute a racial gerrymander in violation of the Fourteenth Amendment's Equal Protection Clause.  Compl. ¶ 157.  The Equal Protection Clause forbids nearly all "race-based state action."  *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 600 U.S. 181, 208 (2023) ("*SFFA*").  It "prohibits a State, without sufficient justification, from 'separat[ing] its citizens into different voting districts on the basis of race.'"  *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 187 (2017) (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)); *see generally Callais*, 146 S. Ct. 1131.

Gerrymandering is unconstitutional when mapmakers subordinate traditional redistricting principles to racial considerations in ways that do not satisfy a narrowly tailored, compelling state interest.  *E.g.*, *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 272 (2015).  "If district lines were drawn for the purpose of separating racial groups, then they are subject to strict scrutiny because 'race-based decisionmaking is inherently suspect.'"  *Rucho v. Common Cause*, 588 U.S. 684, 711 (2019) (quoting *Miller*, 500 U.S.

5

at 915).  Such suspicion is necessary because "in redistricting, where the State assumes from a group of voters' race that they think alike, share the same political interests, and will prefer the same candidates at the polls, it engages in racial stereotyping at odds with equal protection mandates." *Callais*, 146 S. Ct. at 1153 (quotation marks omitted).

An equal-protection claim that a redistricting map unlawfully uses "race-based lines … call[s] for a two-step analysis." *Cooper v. Harris*, 581 U.S. 285, 291 (2017).  "First, the plaintiff must prove that 'race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'" *Id.* (quoting *Miller*, 515 U.S. at 916); *see also id.* at 308 n.7 (providing that legislators may not "use race as their predominant districting criterion with the end goal of advancing their partisan interests").  "Second, if racial considerations predominated over others," then the burden shifts to the State to satisfy "strict scrutiny." *Id.* at 292.  The Complaint alleges that race predominated in drawing the Proposition 50 map, and California cannot satisfy strict scrutiny, so the United States is likely to prevail on its equal-protection claim.

### a) The Proper Focus in the Predominance Inquiry Is the Intent of the Mapmaker and Legislature, Not the Voters

This Court determined in its order denying a preliminary injunction that "the voters' intent is the relevant inquiry."  Order 14-15 (capitalization altered).  The United States respectfully urges this Court to reconsider that holding.

The Supreme Court has recognized that "[r]edistricting constitutes a traditional domain of state legislative authority," *Alexander v. S.C. Conf. of the NAACP*, 602 U.S. 1, 7 (2024), and has thus described the racial-gerrymandering inquiry as turning on "legislative intent," *Cooper*, 581 U.S. at 291.  And the California Legislature, like those of some other States, generally has outsourced that responsibility to independent commissions or, ultimately, to the voters.  *Cf. Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 798 & n.7 (2015).

But contrary to this Court's analysis, that does not license jettisoning the most probative direct evidence of racial gerrymandering: the mapmaker's own description of

the actual process of "the drawing of district lines." *Alexander*, 602 U.S. at 7. As this case illustrates, the mapmaker is often a private party, not a member of the legislature or legislative staff. *E.g.*, *Cooper*, 581 U.S. at 295; *LULAC v. Abbott*, 809 F. Supp. 3d 502, 568 (W.D. Tex. 2025). And if anything, as Judge Lee pointed out (Order 89), Mitchell's repeated invocations of legislative privilege arguably demonstrate his status as a state actor akin to a legislative staffer, like the one in *Alexander*, 602 U.S. at 13. Either way, the Supreme Court has always treated the mapmaker's statements as direct evidence pertinent to a racial-gerrymandering claim, even though the legislature ultimately votes to adopt the map. *E.g.*, *Cooper*, 581 U.S. at 299-301.

Nothing changes just because the relevant "legislature" includes the State's voters through the referendum process. If a mapmaker "place[s] a significant number of voters within or without a particular district" predominantly based on race, *Cooper*, 581 U.S. at 291, those voters will find themselves in or out of those districts because of their race regardless of whether the legislators are aware of why the district lines were drawn the way they were drawn. It is far-fetched to think that *Cooper* would have come out the other way had North Carolina simply put its redistricting map up for a vote (while hiding the mapmaker's instructions and testimony from the public). Or that the Alabama legislature's redrawing of the City of Tuskegee from a square to "a strangely irregular twenty-eight-sided figure" that removed nearly all black residents from the city's boundaries would have been acceptable had Alabama voters ratified it through a ballot initiative emphasizing non-racial effects of the map. *Gomillion v. Lightfoot*, 364 U.S. 339, 341 (1960).

It thus makes no difference that "the voters did not engage or direct Mitchell" themselves (Order 29), or that most of the campaigning materials that voters saw did not reference race or Mitchell's racial motivations in drawing district boundaries. (Though even that is not entirely true; the official voter information guide included a description of the Proposition 50 map as "divid[ing] our neighborhoods and weaken[ing] the voice of communities of color." Order 37.). Adoption by voters—whether the voters are

legislators or ordinary citizens—does not purge an overt racial gerrymander from an unconstitutional map.

In holding that voter intent could shield the mapmaker's racial gerrymander, this Court mistakenly relied on two false or irrelevant premises.

**First**, this Court explained that it must look to voter intent because "California law subordinates the legislature to the electorate when amending the constitution." Order 15. The State Defendants parrot this argument. State Mot. 9. While it is true that "California's constitutional design places the ultimate political decision-making responsibility with the electorate," Order 16, that is also true in every State. The American people are always "the ultimate source of political authority." *Id.* at 17; *see, e.g.*, *Barnes v. District of Columbia*, 91 U.S. 540, 546 (1875) ("The people are the recognized source of all authority, state and municipal[.]"). In exercising their power, the people of California have chosen to "empower[] voters to directly propose statutory initiatives and constitutional amendments," Order 16. The Supremacy Clause forbids California's voters and legislature from enacting state constitutional amendments or statutes that conflict with the United States Constitution or federal law, regardless of whatever the State's constitution and supreme court have said about popular sovereignty. *See* Order 16-17.

This Court nevertheless held that it must "look to the intent of the voters, rather than the legislature" when it "search[es] for racial gerrymandering." Order 18. Respectfully, this voter-intent test rests on circular reasoning. This Court determined that "the very nature of the injury, 'that the State has used race as a basis for separating voters into districts,' … demands that [this Court] focus not on preliminary or peripheral comments, but on why the relevant decisionmaker chose to enact these congressional district maps." Order 15 (citation omitted). In that "voters are the most relevant state actors" because the motives of the "relevant decisionmaker" are paramount, *id.*, this Court assumed what it set out to argue: that voters are the relevant decisionmakers.

The voter-intent test also might lead to dangerous consequences. State legislatures can immunize themselves from racial gerrymandering claims by outsourcing mapmaking

to a so-called "private consultant," State Mot. 12, and holding a referendum to approve the map. This Court dismissed the possibility of such "subterfuge [as] highly implausible," (Order 21) but mapmakers easily can conceal their intent from the voters. Although Mitchell boasted about his mapmaking approach to the public, Compl. ¶¶ 62-70, he successfully kept the full extent of his decisionmaking from public view by going to "great lengths to avoid testifying under oath" about his racial motivations, Order 80 (Lee, J., dissenting); *see* Compl. ¶¶ 62-77. California's voters would never have learned about his racial motivations had he not made public comments. Future mapmakers, having learned from this litigation, likely will be more careful to hide their racial aims in the first place.

**Second**, this Court emphasized that "this particular constitutional amendment did not simply authorize the legislature to engage in partisan gerrymandering as the legislature saw fit; it was an amendment in which the voters enacted a particularly-drawn map that everyone had the opportunity to review, debate, and critique." Order 15. Respectfully, that is neither relevant nor factually correct. The Court's opinion contemplates two ways in which the Legislature and California voters can work together to create a new congressional map. Under one option, the voters can enact a constitutional amendment via a ballot initiative that gives the legislature unlimited authority "to engage in partisan gerrymandering as the legislature [sees] fit," and then the Legislature can create a map. Order 15. Under the other option, which is how Proposition 50 was enacted (Compl. ¶¶ 56-61), the Legislature can adopt a map, and then the voters can vote to amend the Constitution to use that map. Order 15.

Contrary to the State Defendants' argument (State Mot. 10), it is irrelevant to the constitutional analysis whether the voters send mapmaking instructions to the Legislature or whether the Legislature sends a specific map to the voters as part of a take-it-or-leave-it, all-or-nothing proposal. Either way, the approval of both the Legislature and the voters is necessary to enact a new congressional map. That the voters amended the Constitution to adopt this particular map after the Legislature already approved it does not mean that

this Court "must look to the intent of the voters, rather than the legislature."  Order 18. Just as a politically motivated legislature cannot purify a discriminatory map created by a racially motivated mapmaker, the voters' ratification cannot purify a discriminatory map created by the Legislature.

Unlawful discrimination cannot be laundered through popular referendum and cleansed of its discriminatory purpose.  For example, when voters amended the Colorado constitution to prohibit any state action designed to protect gay and lesbian individuals from discrimination on the basis of their sexual orientation, the Supreme Court held that the amendment violated the Equal Protection Clause and "classifie[d] homosexuals not to further a proper legislative end but to make them unequal to everyone else."  *Romer v. Evans*, 517 U.S. 620, 623-624, 635 (1996); *see also Perry v. Brown*, 671 F.3d 1052, 1063 (9th Cir. 2012) (holding that a ballot initiative that "amended the state constitution to eliminate the right of same-sex couples to marry" violated the Equal Protection Clause), *vacated on other grounds sub nom. Hollingsworth v. Perry*, 570 U.S. 693 (2013), *and dismissed on remand*, 725 F.3d 1140 (9th Cir. 2013) (order).

In holding that voter intent is the relevant inquiry, this Court relied (Order 18-19) on the Supreme Court's admonishment in *Brnovich v. Democratic National Committee*, that a "'cat's paw' theory has no application to legislative bodies."  594 U.S. 647, 689 (2021); *see id.* ("A 'cat's paw' is a 'dupe' who is 'used by another to accomplish his purposes.'" (citation omitted)).  That reliance was misplaced.  *Brnovich* involved a facially race-neutral statute governing who could collect mail-in ballots.  *See id.* at 662 (statute permitted only "a postal worker, an elections official, or a voter's caregiver, family member, or household member" to collect a mail-in ballot).  The plaintiffs nevertheless alleged that the statute "was enacted with a discriminatory purpose."  *Id.* at 687.  In that distinguishable context, the Supreme Court cautioned against treating legislators who indisputably lacked any discriminatory purpose as the mere "dupes or tools" of a few legislators whose purposes might have been questionable, and thereby attributing the intentions of the latter to the former's enactment of a facially race-neutral law.  *Id.* at 689-

690. The Supreme Court emphasized that "legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents" and "have a duty to exercise their judgment and to represent their constituents." *Id.* The Proposition 50 map, in contrast, is not facially neutral; there is extensive statistical evidence of racial engineering based on the boundaries drawn. *See* Compl. ¶¶ 88-116. Additionally, this Court's "reliance on 11 million 'voters' intent' suffers from the same 'cat's paw' fallacy—except that we would now face 11 million cat paws scratching in myriad directions in trying to figure out an abstract 'voters' intent.'" Order 88 (Lee, J., dissenting). And finally, as already discussed, extensive Supreme Court precedent highlights the importance in the redistricting context of the intent of the mapmaker. *Supra*, at 6-8.

This Court should revisit its voter-intent standard for the additional reason that a primary focus on the intent of the voters in a statewide referendum presents an unworkable doctrinal framework, particularly in the context of congressional redistricting. Challenges to redistricting, as Defendants emphasize (State Mot. 15) must proceed district-by-district. As Judge Lee noted in his dissent, it is impossible to "discern the intent of 11 million Californians for redrawing a single congressional district when they voted on a statewide referendum that changed all 52 congressional districts." Order 72; *see also Coal. to Defend Affirmative Action v. Regents of Univ. of Mich.*, 539 F. Supp. 2d 924, 950 (E.D. Mich. 2008) ("Examining intent in the context of a ballot initiative presents a unique problem due to the sheer number of individuals whose intent is relevant.").

The proper inquiry here is whether the relevant state actors—Paul Mitchell and the California Legislature—allowed race to predominate when they drew and enacted the Proposition 50 map. The Complaint adequately alleges that they did, and contrary to Defendants' arguments, Plaintiffs need not "plead any facts regarding voter intent." State Mot. 11-13; DCCC Mot. 15-16; LULAC Mot. 9-11.

11

**b) The Complaint Alleges Facts Showing that Race Predominated in the Proposition 50 Map**

A racial gerrymander exists where "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Cooper*, 581 U.S. at 291; *see also Callais*, 146 S. Ct. at 1147-1148. Race is a predominant factor where "the legislature 'subordinated' other factors—compactness, respect for political subdivisions, partisan advantage, what have you—to 'racial considerations.'" *Cooper*, 581 U.S. at 291. Racial predominance may be shown by "'direct evidence' of legislative intent, 'circumstantial evidence of a district's shape and demographics,' or a mix of both." *Id.* Importantly, a map still reflects a racial gerrymander when race is used as a proxy for political interests or "to advance other goals." *Id.* at 291 n.1. Here, the United States has alleged direct and circumstantial evidence showing that race was a predominant factor in drawing the boundaries of at least sixteen districts and placing voters within or without the districts.

### 1. The Complaint Alleges Direct Evidence That Race Predominated

**Paul Mitchell's Statements.** The Supreme Court has recognized that among the most probative direct evidence of racial gerrymandering is the mapmaker's description of how he drew the map. *See, e.g.*, *Cooper*, 581 U.S. at 299-300. After all, the "plaintiff must prove that 'race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'" *Id.* at 291. The decision to "place" voters "within or without a particular district" is made in the first instance by the person actually engaged "in the drawing of district lines." *Alexander*, 602 U.S. at 8; *see id.* at 13-15, 19, 22-23 (extensively addressing the mapmaker's intent); *Cooper*, 581 U.S. at 299 (focusing on evidence that "the State's mapmakers … established a racial target").

Although Mitchell went to great lengths to avoid testifying at this Court's preliminary-injunction hearing, his public statements reveal that race predominated in his drawing of at least some district lines in the Proposition 50 map. Compl. ¶¶ 62-70.

12

Because Mitchell improperly asserted "prolific" legislative privilege claims "over one hundred times in his deposition" and refused to produce responsive correspondence with legislators or their staff, the extent to which Mitchell considered race is unclear. *See* Order 89-90 (Lee. J., dissenting); *cf. Alexander*, 602 U.S. at 8 (observing that direct evidence "can also be smoked out over the course of litigation," including through e-mails and other evidence).

Particularly relevant is an October 17, 2025, presentation Mitchell gave to the advocacy group Hispanas Organized for Political Equality (HOPE). *See* Compl. ¶¶ 64-66 and Exs. B (transcript of Mitchell's presentation to HOPE) and C (letter from HOPE to Mitchell). In his presentation, Mitchell explained that he had "worked with HOPE" in the "last redistricting process" in 2021, and that his 2025 mapmaking efforts had been guided by a November 2021 letter from HOPE to the independent redistricting commission. Compl. Ex. B at 24. Mitchell characterized that letter as "express[ing] concern about 'the elimination of a majority/minority Latino district within the area of Los Angeles gateway cities.'" Compl. ¶ 64 (quoting Ex. B at 24). He added that the letter "illustrated what HOPE wanted to see done … allowing for the creation of five Latino majority/minority districts in an area where there are currently four." *Id.* (quoting Ex. B at 24). Indeed, the letter explained that because certain "Latino CVAP majority districts ha[d] a very high propensity of electing Latino candidates of choice" with "very high margins of victory," the Redistricting Commission should "unpack some of these districts to provide greater Latino voting strength to surrounding district(s)." Compl. Ex C at 5. The letter proposed a target range of "between 52% and 54% Latino CVAP" for that unpacking, which "would still be very likely to elect Latino candidates of choice." Compl. ¶ 64 (quoting Ex. C at 5).

The Complaint explains that, consistent with HOPE's request, Mitchell expressly assured HOPE that the Proposition 50 map "will be great for the Latino community" because it "ensure[s] that the Latino districts that are the VRA seats are bolstered in order to make them most effective, particularly in the Central Valley." Compl. ¶ 67 (emphasis omitted). This Court understood that statement to be a veiled reference to District 13,

which is located in the Central Valley.  Order 41.  In fact, the projected Hispanic citizen voting-age population ("HCVAP") of District 13 is 53.8% in the Proposition 50 map— precisely in the target range of 52-54%.  *See* Order 105 (Lee, J., dissenting).

Mitchell made additional statements about other districts confirming that race predominated when he drew the Proposition 50 map.  *See Ala. Legis. Black Caucus*, 575 U.S. at 266-267 (explaining that "statewide evidence" that "race predominated in the drawing of individual district lines … is perfectly relevant" to "district-specific claims").  His "own words show that he relied on race in drawing certain districts."  Order 79 (Lee, J., dissenting).  He explained that when asked to draw the Proposition 50 map, he "started listing out this concept of drawing a replacement Latino majority/minority district in the middle of Los Angeles.  That was the number one thing that [he] first started thinking about."  Compl. Ex. B at 23-24; *see also* Compl. ¶¶ 6, 63.  He also admitted that "the first thing [he] did in drawing the new map" was the "creation of five Latino majority/minority districts in an area [centered around Downey] where there are currently four," and "making a Latino-influenced district at 35 percent Latino by voting age population."  Compl. Ex. B at 24-25; Compl. ¶ 64.  Mitchell's creation mirrors the HOPE letter's request for the "creation of FIVE Latino Majority minority districts where there currently are four," and the conversion of an existing district into "a Latino influence seat at 35-40% Latino by voting age population."  Compl. Ex. C at 2; *see also* Compl. ¶ 64.

All of Mitchell's statements are exactly the type of direct evidence of racial predominance in the drawing of district lines that the Supreme Court has found establishes a racial gerrymander.  *E.g., Cooper*, 581 U.S. at 299-301.  The Supreme Court has recognized that direct evidence "in the form of a relevant state actor's express acknowledgment that race played a role in the drawing of district lines" is "not uncommon because States often admit to considering race for the purpose of satisfying our precedent interpreting the Voting Rights Act of 1965."  *Alexander*, 602 U.S. at 8.  So even if Mitchell's statements could charitably be viewed as pursuing nothing more than VRA compliance, they still would constitute direct evidence that race predominated in the

drawing of at least some district lines. This direct evidence of a racial gerrymander is sufficient to overcome the "presumption of legislative good faith." *Id.* at 10. Indeed, where, as here, "the State cannot satisfy strict scrutiny"—and does not even try to—"direct evidence of this sort amounts to a confession of error." *Id.* at 8.

If nothing else, the United States has alleged sufficient facts for this Court to "draw the reasonable inference" that the Proposition 50 map is a racial gerrymander. *Iqbal*, 556 U.S. at 678. More discovery is needed to uncover additional evidence that race predominated when Mitchell drew the map. Thus far, Mitchell has stymied the discovery process at every turn. Mitchell's deposition was postponed at his request, and the morning of the deposition, he asserted legislative privilege for the first time. *See* Dkt. 167 at 1-2. He initially refused to produce "documents or a privilege … before December 15, the day the preliminary injunction hearing [would] begin." *Id.* at 2. On December 13, 2025, this Court rejected Mitchell's argument that it would "take weeks to produce responsive documents" and ordered him to "immediately produce non-privileged and responsive documents on a rolling basis." *Id.* at 3 (emphasis omitted). Mitchell made his first production that night and did not make an additional production until after all parties had presented their cases, dumping 10,000 (mostly data or image files used to create maps) documents on the Tangipa Plaintiffs and the United States in the early hours of December 17—only five hours before closing arguments. *See* Dkt. 177 at 2-3.

Over five months have passed since this Court ordered Mitchell to produce documents and a privilege log, and Mitchell is *still* producing privilege logs on a rolling basis. He continues to assert legislative privilege over his communications with legislators and their staff. Some purportedly privileged communications may contain additional evidence of race discrimination. For example, his privilege log describes several "[c]onfidential communication[s] between DCCC Executive Director, legislative staffers for members of the Latino Caucus, and legislative consultant acting for a legislative purpose facilitating confidential analysis of confidential draft legislation with legislators in the Latino Caucus." Ex. 1 at 1-4 (priv. log 4). Mitchell's invocation of legislative

15

privilege over these communications is dubious at best and ultimately may justify an adverse inference. *See generally* Dkt. 147; Dkt. 167 at 3 (denying the United States' motion for an adverse inference "without prejudice to being renewed later"). In any event, Mitchell's public statements about empowering Latino voters and the possible existence of corroborating, improperly withheld documents signify disputed material facts such that Defendants' motions to dismiss should be denied.

Respectfully, this Court erred at the preliminary-injunction stage in dismissing Mitchell's statements about his racial motivations in drawing the Proposition 50 map. Order 54. This Court focused on how Mitchell used the word "bolster" in an interview, two months before his HOPE presentation, to refer to political considerations: "So we did a lot to bolster Democratic candidates up and down the state that are potentially in tough races like Adam Gray in the Central Valley." Order 41 (emphasis omitted). This Court's reliance on that slim reed was erroneous, especially in light of Mitchell's multiple candid admissions that race predominated in the drawing of the Proposition 50 map—including by being "the number one thing that I first started thinking about." Compl. ¶ 6. This Court observed (Order 42 n.17) that the "number one thing" statement refers to a then-"unchallenged district" (District 41) in Los Angeles. That misses the point: the statement is still relevant, along with Mitchell's many other statements, to establishing that race was front and center when he drew several Proposition 50 districts. *See Ala. Legis. Black Caucus*, 575 U.S. at 266-267. Further, the United States has now challenged District 41 in the Consolidated Complaint. Compl. ¶ 157.

**Legislators' Statements.** The Complaint also alleges that various legislators expressed their support for ABA 8 and the Proposition 50 map in expressly racial terms. The Complaint details how these legislators' "racial, as opposed to political, motives" animated the enactment of the Proposition 50 map. Compl. ¶ 78.

In light of these racially motivated remarks, the Legislature is not entitled to the presumption of legislative good faith. *Contra* State Mot. 10, 16-17. "Because of the 'sensitive nature of redistricting and the presumption of good faith that must be accorded

16

legislative enactments,' courts must 'exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race.'" Order 13 (quoting *Miller*, 515 U.S. at 916). But this presumption is not absolute. Although it instructs courts to "draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions," *Alexander*, 602 U.S. at 10, it does not require courts to blindly defer to legislatures at the pleading stage where, as here, there is a "one-sided record" showing that Mitchell and at least several legislators treated race as a predominating factor. Order 115 (Lee, J., dissenting).

Defendants do not dispute that Mitchell had racial motivations when creating the Proposition 50 map. Rather, they contest only the relevance of his motivations. The State Defendants' Motion to Dismiss does not mention Mitchell's motivations. In fact, the State Defendants do not even mention Mitchell by name. *See* State Mot. 25 (referring to Mitchell as "the private consultant"). LULAC insists that Mitchell's motivations are irrelevant because the voters did not "underst[and] themselves to be approving a racial gerrymander." LULAC Mot. 9. And DCCC incorrectly portrays Mitchell as a mere "independent consultant," DCCC Mot. 17-18, rather than a "state actor" who "drafted the Proposition 50 maps." Order 89 (Lee, J., dissenting).

Defendants attempt to downplay the Legislature's motivations, but their portrayal of legislators' racially charged remarks (*see* Compl. ¶¶ 78-86) as "out-of-context" (State Mot. 13) does not justify dismissal. The State Defendants focus on Senator Mike McGuire's press release, arguing that his statement about "partisanship" outweighs his statement about "empower[ing] Latino voters." *Id.* (quoting Compl. ¶ 84). Whether partisanship or racial favoritism animated Senator McGuire is a disputed question of fact. The State Defendants also ignore (as does LULAC, *see* LULAC Mot. 19-20) the more damning racially motivated statements made by other legislators, Compl. ¶¶ 78-86, and these statements give rise to a plausible inference that race predominated in the minds of at least some legislators. DCCC at least addresses these statements, characterizing them as "boilerplate puffery about Prop 50's preservation of existing minority voting rights."

17

DCCC Mot. 17. However, many of the statements detailed in the Consolidated Complaint discuss the supposed need for Proposition 50, not the effects of the Proposition 50 map. *E.g.* Compl. ¶ 79 ("A Latino voice in Texas is worth one third of the representation as a white voice … we can't just sit by and let it happen."). At a minimum, these statements give rise to a plausible inference of impermissible racial motivations.

### 2. The Complaint Alleges Circumstantial Evidence That Race Predominated

Circumstantial evidence bolsters the direct evidence showing that race predominated in the drawing of the Proposition 50 map. Circumstantial evidence includes "a district's shape and demographics." *Cooper*, 581 U.S. at 291.

The United States challenges sixteen Hispanic-majority districts as violations of the Equal Protection Clause, and the Complaint alleges specific demographic facts about each of these districts. Compl. ¶¶ 95, 157. Drawing all reasonable inferences in the light most favorable to Plaintiffs, as this Court must at the motion-to-dismiss stage, these facts demonstrate that illicit racial considerations predominated in the drawing of the Proposition 50 map.

According to the Complaint, California purposefully created sixteen Hispanic-majority districts in an effort to increase Hispanic political power. "Statistical analysis confirms that the Proposition 50 map's lines were deliberately drawn to produce racially engineered outcomes." Compl. ¶ 88. The Commission's pre-Proposition 50 map had sixteen Hispanic-majority districts. "In California's efforts to preserve [these] districts, the State engaged in a deliberate practice of passing Hispanic-majority census blocks from one adjacent district to another to preserve the number of Hispanic-majority congressional districts." *Id.* ¶ 95. This "resulted in fourteen Hispanic-majority districts falling in an implausibly narrow band of roughly 52–55% Hispanic CVAP in the Proposition 50 map." *Id.* ¶ 89; *see also id.* ¶¶ 90-93 (detailing how the new Hispanic-majority districts "were drawn to replicate the racial composition of the Commission map's districts"). But other evidence confirms that this tight band was no coincidence. As alleged in the Complaint,

18

California's "'pass the population' tactic … can be explained by [a] 2021 letter from HOPE to the redistricting commission warning against 'overpacked' districts with too many highly concentrated Latino populations." *Id.* ¶¶ 95-96. The letter—which Mitchell expressly relied on when drawing the map—advocated "drawing districts 'between 52% and 54% CVAP.'" *Id.* ¶¶ 96-99. And that is precisely what California did. *Id.*

The Complaint alleges additional facts about several of these racially gerrymandered districts. For example, District 18 "absorb[ed] a 51.4% Hispanic CVAP territory from District 13 and a 70.8% Hispanic CVAP from District 22." Compl. ¶ 98. "These deliberate swaps of racial population enabled District 18 to remain within the deliberately tight band of 52-55% Hispanic CVAP range." *Id.* ¶ 99. "Districts 41 and 42 were completely relocated. Despite being moved elsewhere in the State with a new constituent population, those districts were drawn to deliberately maintain the same proportion of Hispanic population." *Id.* ¶ 102. And District 52 (a Hispanic-majority district) absorbed just enough territory from District 48 to have its Hispanic CVAP population change from 52.0% to 51.7%, preserving its narrow Hispanic majority." *Id.* ¶ 103.

Defendants fail to explain how these allegations do not state an equal-protection claim. The State Defendants do not even try. They claim that the Complaint "wholly fails to explain the mismatch between [these allegations] and the relief [Plaintiffs] seek—an injunction of the *entire* fifty-two-district Proposition 50 map." State Mot. 17. They accordingly argue that if this Court "permit[s] either of the Fourteenth Amendment claims to proceed, the scope of those claims should be narrowed to only the districts for which the Court finds the Complaint sufficiently pleads that race predominated in the drawing of those districts." *Id.* This argument addresses only the scope of relief and therefore falls short of establishing that the United States has failed to state a claim.

DCCC insists that the Complaint's "allegations about HCVAP percentages do not plausibly show racial predominance." DCCC Mot. at 24. They emphasize the similarities between the Proposition 50 map and the prior map. The Proposition 50 map had "the

19

*exact same number*" of Hispanic-majority districts "as the Prop 50 map" and that District 18's HCVAP population remained relatively constant between the two maps. *Id.* at 25-26. These allegations of continuity support an inference of racial discrimination. If partisan concerns truly predominated, one would expect changes in the racial composition of each district, not careful racial balancing. DCCC further argues that "Plaintiffs do not plausibly allege, based on the mere presence of districts with slightly altered Latino majorities, that the Prop 50 map was drawn with racial goals in mind, especially given multitude of other redistricting criteria." *Id.* at 25. This highlights the precise reason the Consolidated Complaint should not be dismissed: there is a factual dispute as to whether and to what extent Mitchell considered this "multitude of other redistricting criteria" when drawing the Proposition 50 map. Of course, Mitchell could have testified about this at his deposition, but he instead baselessly invoked legislative privilege over one hundred times.

LULAC attempts to salvage the Proposition 50 map by hiding behind the Legislature's statement of intent in ACA 8. The Legislature declared that "[i]t is the intent of the people that California's temporary maps be designed to neutralize the partisan gerrymandering being threatened by Republican-led states." LULAC Mot. 8 (quoting ACA 8, § 2(n)). Legislatures cannot make discriminatory voting policies constitutional simply by declaring that the policies have a legitimate purpose. *See Harper v. Va. State Bd. of Elections*, 383 U.S. 663 (1966) (holding that poll taxes are unconstitutional despite the legitimate governmental need to collect revenue). The United States has alleged both direct and circumstantial evidence that the Legislature's race-neutral defense of the Proposition 50 map is pretextual. Whether this defense is in fact pretextual is a disputed fact that must be decided at trial. LULAC further argues that the Consolidated Complaint is self-defeating because it alleges the Proposition 50 map is likely to "reduce California's Republican delegation." *Id.* at 13. That misunderstands the relevant legal standard. As LULAC elsewhere recognizes (LULAC Mot. 16), the question in a racial-gerrymandering case is whether race *predominates* in the drawing of a map, not whether race was the sole criterion. *See Cooper*, 581 U.S. at 291; Order 13; *id.* at 72 (Lee, J., dissenting) ("In other

20

words, a state can create a map with the larger goal of political gerrymandering but still run afoul of the Fourteenth Amendment if it relies on race as a predominant factor in drawing certain districts.").

### c) The Complaint Establishes That Proposition 50 Cannot Survive Strict Scrutiny

The Supreme Court has "identified only two compelling interests that permit resort to race-based government action.  One is remediating specific, identified instances of past discrimination that violated the Constitution or a statute.  The second is avoiding imminent and serious risks to human safety in prisons, such as a race riot." *SFFA*, 600 U.S. at 207 (internal citations omitted).  Neither of these interests apply here.  The Complaint does not allege—and Defendants do not identify—any "specific, identified instances" of past discrimination against Hispanic voters in California.  *See* State Mot. 27; *see also* Order 71 (Lee, J., dissenting) ("California today is not like the Deep South of yesteryear.").

Until recently, the Supreme Court "assumed for the sake of argument" that "compliance with the Voting Rights Act provides a [third] compelling reason that may justify the intentional use of race in drawing legislative districts." *Callais*, 146 S. Ct. at 1143 (citing *Cooper*, 581 U.S. at 292-293).  Under this assumption "if a State ha[d] a strong basis in evidence for thinking that the Voting Rights Act require[d] race-based conduct," that was "enough" to justify "the intentional use of race in drawing legislative districts." *Id.* (quotation marks omitted).

Even before *Callais*, Proposition 50 could not survive strict scrutiny.  States had "good reason to believe that § 2 require[d] drawing a majority-minority district" only if "all the *Gingles* preconditions' [were] met." *Cooper*, 581 U.S. at 302 (quotation marks omitted).  But the Hispanic CVAP in California does not satisfy the test set out in *Thornburg v. Gingles*, 478 U.S. 30 (1986), for a minority group that can be the subject of a VRA vote-dilution claim.  Compl. ¶ 158.  *Gingles* announced that Plaintiffs must meet "three threshold conditions for proving vote dilution under § 2." *Cooper*, 581 U.S. at 301.  At least two of those prerequisites—(1) that the "minority group must be 'politically

21

cohesive,'" and (2) that the "white majority must 'vote [] sufficiently as a bloc' to usually 'defeat the minority's preferred candidate," *id.* at 301-302 (quoting *Gingles*, 478 U.S. at 51)—are not satisfied here. Hispanics constitute the plurality of California's population. Compl. ¶ 47. Because "division amongst California voters is attributable primarily to partisan differences, not race," Compl. ¶ 51, Hispanics are not a "politically cohesive" group, and white voters have not "voted as a bloc against Hispanic candidates," *see id.* ¶¶ 48-49. Defendants do not argue otherwise. California therefore could not have had "good reason to believe" that Section 2 required it to draw the Proposition 50 map to empower Hispanic voters.

*Callais* reinforces that the Proposition 50 map cannot survive strict scrutiny. While "[c]ompliance with § 2, as properly construed, *can* provide" "a compelling reason for race-based redistricting," the Court "update[d] the *Gingles* framework [to] realign it with the text of § 2 and constitutional principles." *Callais*, 146 S. Ct. at 1143, 1159 (emphasis omitted and added). Thus, Section 2 "imposes liability only when the circumstances give rise to a strong inference that intentional discrimination occurred." *Id.* at 1156. To create this strong inference, *Gingles* requires a showing that "voters engage in racial bloc voting that cannot be explained by partisan affiliation," such as "intra-party racial-bloc voting." *Id.* at 1159. Again, because (as alleged) that is not true of Hispanics in California, the Proposition 50 map cannot survive strict scrutiny. Compl. ¶¶ 47-52. There is no evidence giving rise to any inference—let alone a strong inference—that California has intentionally discriminated against Hispanic voters.

Because *Callais* instructs that Section 2 does not require California to purposefully craft districts to maximize Hispanic voting power, California's use of race as the predominant factor in the creation of such districts fails strict scrutiny. Defendants do not argue (and have never argued) that the Proposition 50 map satisfies strict scrutiny. They argue only that strict scrutiny does not apply because race was not the predominant factor. *See* Dkt. 113 at 40. That is incorrect for the reasons discussed above. *Supra* at 12-21.

22

#### d) The United States Has Pleaded District-by-District Facts

Each Defendant argues that the Complaint should be dismissed because its allegations lack the requisite district-by-district specificity. They accuse the United States of improperly challenging the Proposition 50 map as an "undifferentiated whole." State Mot. 15; DCCC Mot. 7; LULAC Mot. 18 (quoting *Ala. Legis. Black Caucus*, 575 U.S. at 262). Their arguments rest on a misreading of Supreme Court precedent.

In *Alabama Legislative Black Caucus*, Alabama redrew state legislative districts "to achieve numerous traditional districting objectives, such as compactness, not splitting counties or precincts, minimizing change, and protecting incumbents." 575 U.S. at 259. It also "sought to ensure compliance with federal law, and, in particular, the Voting Rights Act of 1965 … At the time of the redistricting … § 5 of the Act required Alabama to demonstrate that an electoral change, such as redistricting, would not bring about retrogression in respect to racial minorities' 'ability ... to elect their preferred candidates of choice.'" *Id.* (quoting 52 U.S.C. § 10304(b)). Alabama accordingly drew a map that "maintain[ed] roughly the same black population percentage in existing majority-minority districts." *Id.* at 259-260. Plaintiffs alleged that Alabama created a racial gerrymander that would harm minority voters, and the district court dismissed the case. *Id.* at 260-261.

The Supreme Court reversed. The district court "repeatedly referred to the racial gerrymandering claims as claims that race improperly motivated the drawing of boundary lines of the State *considered as a whole*." *Id.* at 262. It did not analyze "individual districts" but instead conducted an "undifferentiated statewide analysis." *Id.* at 264. The Court reversed and remanded for a district-specific analysis. *Id.* It explained that a "racial gerrymandering claim … applies to the boundaries of individual districts. It applies district-by-district. It does not apply to a State considered as an undifferentiated 'whole.'" *Id.* at 262.

*Alabama Legislative Black Caucus* does not necessitate dismissal of the United States' claims. The case concerned defects in the district court's reasoning, not inadequacies in the plaintiffs' pleading. The plaintiffs "relied heavily upon statewide

evidence to prove that race predominated in the drawing of individual district lines" and "sought to prove that the use of race to draw the boundaries of the majority-minority districts affected the boundaries of other districts as well." *Ala. Legis. Black Caucus*, 575 U.S. at 266. The Supreme Court noted that this "evidence is perfectly relevant." *Id.* The Complaint here alleges similar "perfectly relevant" "statewide evidence" such as the racially motivated statements of Mitchell and several legislators. These statements "provide[] evidence that race motivated the drawing of particular lines in multiple districts in the State" and suggests that California "expressly adopted and applied a policy of prioritizing mechanical racial targets above all other districting criteria." *Id.* at 267. In *Alabama Black Legislative Caucus*, the Supreme Court remanded for the district court to apply this evidence "to particular districts." *Id.* at 268. That is precisely what the United States seeks here: an order finding that sixteen specified districts are racial gerrymanders, bolstered in part by "statewide evidence" of "racial targets."

Nothing in *Alabama Legislative Black Caucus* requires the United States "to plead that race predominated in the drawing of all 52 districts." State Mot. 16. All the United States must do at this stage is state "a claim that race was improperly used in the drawing of the boundaries of one or more *specific electoral districts*." *Ala. Black Legis. Caucus*, 575 U.S. at 262-263; *see Harris v. McCrory*, 159 F. Supp. 3d 600, 627 (M.D.N.C. 2016) (holding that "the 2011 Congressional Redistricting Plan is unconstitutional" because plaintiffs proved "that race predominated in CD 1 and CD 12"), *aff'd sub nom. Cooper v. Harris*, 581 U.S. 285 (2017). The United States has done so. *Supra* at 12-22.

## II. The United States Pleaded a Claim of Intentional Discrimination Under the Voting Rights Act

Section 2 of the VRA provides:

> No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to

24

vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

52 U.S.C. § 10301(a).

Like the Equal Protection Clause, Section 2 prohibits intentionally dividing voters up by race. *Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989, 1037-1038 (9th Cir. 2020) (en banc), *rev'd on other grounds sub nom. Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647 (2021). However, while plaintiffs in an equal-protection challenge must show that "race was the predominant factor motivating the legislature's decision," *Miller*, 515 U.S. at 916, plaintiffs in a Section 2 challenge need only show that race was "*a* motivating factor," *Hobbs*, 948 F.3d at 1038 (citation omitted; emphasis altered).[2]  A Section 2 violation also requires a resulting injury. *See Garza v. Cnty. of Los Angeles*, 918 F.2d 763, 769 (9th Cir. 1990).  The allegations in the Complaint establish both that race was a motivating factor for drawing and enacting the Proposition 50 map, and that injury resulted.

### a) The United States Has Alleged that Race was a Motivating Factor

The State Defendants argue that the Complaint should be dismissed because the United States has not established intentional racial discrimination under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). State Mot. 26; *see also* DCCC Mot. 14 n.7.  In *Arlington Heights*, the Supreme Court announced non-exhaustive factors that indicate racially discriminatory intent was a motivating factor for a decision: "(1) the historical background; (2) the sequence of events leading to the enactment, including any substantive or procedural departures from the normal legislative process; (3) the relevant legislative history; and (4) whether the law has a disparate impact on a particular racial group." *Hobbs*, 948 F.3d at 1038 (citing *Arlington*

---

[2] Further, because the same showing of intentional racial discrimination that is "sufficient to constitute a violation of the fourteenth amendment" "is sufficient to constitute a violation of section 2," *McMillan v. Escambia Cnty.*, 748 F.2d 1037, 1046 (5th Cir. 1984), the United States has pleaded a Section 2 claim.

25

*Heights*, 429 U.S. at 266-268).    These are non-exhaustive factors, however, not a mechanical checklist that must be satisfied.  *See id.*

The Complaint's factual allegations give rise to a plausible inference that, under the *Arlington Heights* factors, racially discriminatory intent was a motivating factor for drawing and enacting the Proposition 50 map.  First, the sequence of events leading up to the enactment of the Proposition 50 map "so greatly departed from normal procedures that it required amending California's constitution."  Compl. ¶ 163.  "Since 2010, California voters have entrusted an independent commission, rather than the State Legislature," to redraw congressional boundary lines in the year following the decennial national census. *Id.*  ¶¶ 54, 163.  "Yet here, the legislature scrapped the 2021 map after just four years, bypassed the usual mapmakers, and secretly enlisted Mitchell to draw a new map—a map that he has repeatedly and unabashedly attributed to racial favoritism."  *Id.*  ¶ 163.  Also leading up to enactment, Mitchell and several legislators (as reflected in the legislative history) publicly boasted about their racial motives for drawing and enacting the map, emphasizing what they perceived to be a recent "historical background" of racism in Texas and elsewhere.  *See id.* ¶¶ 62-87 (detailing Mitchell's statements and the legislative history of Proposition 50).

The State Defendants argue that the Complaint does not allege a "historical background" of discrimination against "non-Latino and non-Black communities" or establish disparate impact.  State Mot. 27-28.   These factors are not necessary though. First, a historical background that "reveals a series of official actions taken for invidious purposes" is just "*one* evidentiary source" that *can* indicate "whether invidious discriminatory purpose was a motivating factor." *Arlington Heights*, 429 U.S. at 266-267 (emphasis added).   But ultimately, the question is whether California is discriminating against non-Latinos and non-blacks *today*—not whether California discriminated against them in the past.  *See Callais*, 146 S. Ct. at 1162 ("The focus of § 2 must therefore be on current conditions, not on decades-old data relevant to decades-old problems." (quotation marks omitted)).  And second, establishing disparate impact is not necessary for a Section

26

2 intentional-racial-gerrymandering claim, like the United States alleges here.  *See Garza*, 918 F.2d at 770-771.

### b)  The United States Has Established a Resulting Injury

"Even where there has been a showing of intentional discrimination, plaintiffs must show that they have been injured as a result." *Garza*, 918 F.2d at 771.  This requirement of "*some* showing of injury" is not as rigorous as establishing disparate impact, however. *Id.* (emphasis in original); *see id.* ("To impose the requirement [of disparate impact] would prevent any redress for districting which was deliberately designed to prevent minorities from electing representatives in future elections governed by that districting.").

The Complaint's allegations that the Proposition 50 map intentionally sorts voters by race to benefit Latino voters easily meet this standard.  Racially sorting voters "who may have little in common with one another but the color of their skin," "reinforces the perception that members of the same racial group—regardless of their age, education, economic status, or the community in which they live—think alike, share the same political interests, and will prefer the same candidates at the polls." *Shaw v. Reno*, 509 U.S. 630, 647 (1993).  This "causes continued hurt and injury." *Id.* (citation omitted). Additionally, "[w]hen a district obviously is created solely to effectuate the perceived common interests of one racial group, elected officials are more likely to believe that their primary obligation is to represent only the members of that group, rather than their constituency as a whole." *Id.* at 648; *see also* Compl. ¶ 162 ("Just as a map drawn to favor white voters would necessarily harm all other racial groups, a map drawn to favor Latino voters harms all other racial groups.").

Nonetheless, State Defendants argue that the United States' Section 2 claim should be dismissed because the Complaint does "not allege that the Proposition 50 map had an adverse *effect* on any group—a necessary element of an intentional discrimination claim." State Mot. 28 (citing *Alexander*, 602 U.S. at 38-39).  LULAC raises a similar argument. LULAC Mot. 27-30.  These arguments suffer from several fatal flaws.

27

First, State Defendants and LULAC view "effects" too narrowly. They wrongfully presume that race discrimination does not cause injury unless there is "motivation to impose '*adverse* effects upon an identifiable group.'" State Mot. 26 (quoting *Arlington Heights*, 429 U.S. at 266); LULAC Mot. 28 (similar). But Section 2 prohibits *all* "intentional discrimination," regardless of whether a State seeks to help minority voters or hinder them. *Callais*, 146 S. Ct. at 1155-1156; *see SFFA*, 600 U.S. at 206 ("Eliminating racial discrimination means eliminating all of it."). The injury requirement is satisfied when a state has a motive to impose any effects on a racial group—adverse or beneficial. *See SFFA*, 600 U.S. at 229 ("Separate but equal is '*inherently* unequal,' said [*Brown v. Bd. of Educ. of Topeka*, 347 U.S. 483, 495 (1954)]. It depends, says the dissent."). Further, a lack of animus against the disfavored racial groups does not excuse discrimination against them in favor of Hispanic voters. *Contra* LULAC Mot. 28 ("The decisionmakers did not enact Proposition 50 to create an adverse impact upon any racial or ethnic group"). Racial gerrymanders therefore are illegal and cause injury regardless of whether the mapmaker's intent is to empower certain voters or to disenfranchise them. *See generally SFFA*, 600 U.S. 181.

*Alexander* does not change that. *Alexander* instructed that a "plaintiff pressing a vote-dilution claim … must show that the State's districting plan has the purpose *and* effect of diluting the minority vote." *Alexander*, 602 U.S. at 39 (quotation marks omitted). But the United States' Section 2 claim is not a vote dilution claim just because "no registered voter is being denied the right to vote." LULAC Mot. 28. The Complaint alleges that California packed Hispanics into sixteen districts in order to prioritize the voting power of the Hispanic community. California has "balkaniz[ed]" its congressional map, Order 72 (Lee, J., dissenting), and by intentionally placing large Hispanic populations into sixteen specific districts, California necessarily has excluded non-Hispanics from those districts and packed them into the adjacent districts. The United States has alleged a sufficient injury to state a Section 2 claim.

28

### III.    Governor Newsom Cannot Assert Sovereign Immunity Against the United States

Defendant Newsom asserts immunity "from Challengers' claims," including the United States', based on the "Eleventh Amendment to the United States Constitution." State Mot. 29.  The Eleventh Amendment eliminates federal jurisdiction over "suit[s] in law or equity, commenced or prosecuted against one of the United States *by Citizens of another State*." U.S. Const. amend. XI (emphasis added).  Unless an exception applies, it bars private parties from prevailing in lawsuits against a state, its officers, or its instrumentalities. *See, e.g.*, *Lewis v. Clarke*, 581 U.S. 155, 162 (2017).

The Eleventh Amendment does not bar federal lawsuits against states and their officers, however.  "Nothing in the Eleventh Amendment 'has ever been seriously supposed to prevent a state's being sued by the United States.'" *Arizona v. California*, 460 U.S. 605, 614 (1983) (quoting *United States v. Mississippi*, 380 U.S. 128, 140 (1965)); *see, e.g.*, *United States v. Texas*, 143 U.S. 621, 646 (1892).  California claims that it "has not consented to suit" by the United States, but its "consent was given" when it was "admitted into the Union upon an equal footing in all respects with the other states." *Texas*, 143 U.S. at 646.  California's consent to suit means that any other background principles of sovereign immunity, to the extent Governor Newsom invokes them, are also inapplicable. *See PennEast Pipeline Co., LLC v. New Jersey*, 594 U.S. 482, 509-510 (2021) (Gorsuch, J., dissenting) (exploring "two distinct" possible theories of states' "federal-law immunities from suit").

### CONCLUSION

For the foregoing reasons, the Court should deny the Motions to Dismiss.

DATED: May 22, 2026                    Respectfully submitted:

TODD BLANCHE                           JESUS A. OSETE*
Acting Attorney General                Principal Deputy Assistant Attorney General

BILAL A. ESSAYLI                       MATTHEW ZANDI
First Assistant United States Attorney Chief of Staff & Special Counsel

JULIE A. HAMILL                        ANDREW BRANIFF
Assistant United States Attorney       Acting Chief, Appellate Section

United States Attorney's Office        _s/ Greta Gieseke_
                                       DAVID GOLDMAN
                                       JOSHUA R. ZUCKERMAN
                                       GRETA GIESEKE
                                       Attorneys

                                       Civil Rights Division
                                       United States Department of Justice

                                       Attorneys for Plaintiff-Intervenor
                                       UNITED STATES OF AMERICA

---

* Assistant Attorney General Harmeet K. Dhillon is recused from this matter.

30

## **CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for the United States of America certifies that this brief contains 10,063 words, which complies with the word limit of L.R. 11-6.1 and this Court's May 12, 2026, order, Dkt. 257.


Dated: May 22, 2026          *s/Greta Gieseke*
                             Greta Gieseke
                             Attorney