Lalitha D. Madduri (CA Bar No. 301236)
lmadduri@elias.law
Christopher D. Dodge* (DC Bar No. 90011587)
cdodge@elias.law
Max Accardi* (DC Bar No. 90021259)
maccardi@elias.law
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652
F: (202) 968-4498

Abha Khanna* (WA Bar No. 42612)
akhanna@elias.law
Tyler L. Bishop (CA Bar No. 337546)
tbishop@elias.law
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
T: (206) 656-0177
F: (206) 656-0180

Omar Qureshi (CA Bar No. 323493)
omar@qureshi.law
Max Schoening (CA Bar No. 324643)
max@qureshi.law
**QURESHI LAW PC**
700 Flower Street, Suite 1000
Los Angeles, CA 90017
T: (213) 600-6096
F: (213) 277-8989

*Counsel for Defendant-Intervenor DCCC*

*\* Admitted pro hac vice*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| **DAVID TANGIPA,** *et al.*, | Case Nos. 2:25-cv-10616-JLS-WLH-KKL (Lead); 2:25-cv-11480-JLS-WLH-KKL |
| Plaintiffs, | |
| and | |
| **UNITED STATES OF AMERICA,** | **DEFENDANT-INTERVENOR DCCC'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS THE CONSOLIDATED COMPLAINT** |
| Plaintiff-Intervenor, | |
| v. | |
| **GAVIN NEWSOM, in his official capacity as the Governor of California,** *et al.*, | Hon. Josephine L. Staton |
| | Hon. Kenneth K. Lee |
| Defendants, | Hon. Wesley L. Hsu |
| **DEMOCRATIC CONGRESSIONAL CAMPAIGN COMMITTEE,** *et al.*, | Hearing date: August 19, 2026 |
| Defendant-Intervenors. | Time: 10:00 a.m. |
| | Courtroom: 1 |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ii

ARGUMENT ....................................................................................................................2

I.    Plaintiffs fail to meaningfully defend the scope of their challenges. ....................2

II.   The Tangipa Plaintiffs and United States fail to plausibly allege a
      Fourteenth Amendment violation as to any district. ...........................................5

      A.    The Consolidated Complaint does not plausibly allege direct
            evidence of racial predominance. ..............................................................5

            1.    Plaintiffs admit the Consolidated Complaint alleges
                  nothing about the intent of the California electorate. ...................5

            2.    Plaintiffs' allegations about California legislators do not
                  plausibly suggest racial predominance. ........................................9

            3.    Plaintiffs' allegations about Paul Mitchell do not plausibly
                  suggest racial predominance. ......................................................11

      B.    The Consolidated Complaint does not plausibly allege
            circumstantial evidence of racial predominance. ......................................15

III.  The Noyes Plaintiffs lack standing and have failed to state a plausible
      claim under the Fifteenth Amendment as to any district. ..................................19

      A.    The Noyes Plaintiffs do not even try to allege standing under the
            proper framework. .....................................................................................19

      B.    There is no separate Fifteenth Amendment racial gerrymandering
            claim with a lower threshold of proof than the corresponding
            Fourteenth Amendment claim. ...................................................................21

      C.    The Noyes Plaintiffs have not advanced plausible district-by-
            district allegations of racial intent. ...........................................................24

IV.   The Consolidated Complaint does not adequately plead a VRA § 2
      claim. ..............................................................................................................26

CONCLUSION ..............................................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez*,
585 U.S. 579 (2018) ................................................................................................ 10

*Alaei v. Holder*,
No. 2:15-cv-08906-ODW-JPR, 2016 WL 3024103 (C.D. Cal. May 26, 2016) ......... 22

*Alexander v. S.C. State Conf. of the NAACP*,
602 U.S. 1 (2024) ............................................................................................... *passim*

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
526 U.S. 40 (1999) ................................................................................................... 11

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .............................................................................. 3, 10, 25, 26

*Ass'n for Educ. Fairness v. Montgomery Cnty. Bd. of Educ.*,
617 F. Supp. 3d 358 (D. Md. 2022) ......................................................................... 28

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..................................................................................... 3, 18, 26

*Bethune-Hill v. Va. State Bd. of Elections*,
580 U.S. 178 (2017) .......................................................................................... *passim*

*Ala. Legis. Black Caucus v. Alabama*,
575 U.S. 254 (2015) ......................................................................................... 1, 2, 25

*Brnovich v. Democratic Nat'l Comm.*,
594 U.S. 647 (2021) ................................................................................................. 12

*Brunette v. Humane Society of Ventura County*,
294 F.3d 1205 (9th Cir. 2002) ................................................................................. 11

*Cooper v. Harris*,
581 U.S. 285 (2017) ............................................................................................ 4, 12

*Coto Settlement v. Eisenberg*,
593 F.3d 1031 (9th Cir. 2010) ................................................................................. 14

*Cubanos Pa'lante v. Fla. House of Representatives*,
  766 F. Supp. 3d 1204 (S.D. Fla. 2025)......................................................17, 18

*D.N. ex rel. Jessica N. v. DeSantis*,
  762 F. Supp. 3d 1219 (S.D. Fla. 2024)...........................................................28

*Darling v. Eddy*,
  No. 9:21-cv-00147-DLC, 2023 WL 157712 (D. Mont. Jan. 11, 2023) ...............14, 15

*Davis v. Guam*,
  932 F.3d 822 (9th Cir. 2019) ...........................................................................23

*Giles v. Ashcroft*,
  193 F. Supp. 2d 258 (D.D.C. 2002).................................................................21

*Gill v. Whitford*,
  585 U.S. 48 (2018)....................................................................................*passim*

*Hall v. Virginia*,
  276 F. Supp. 2d 528 (E.D. Va. 2003) ..............................................................19

*Hunter v. Underwood*,
  471 U.S. 222 (1985)................................................................................8, 9, 26

*Harding v. County of Dallas*,
  948 F.3d 302 (5th Cir. 2020) ...........................................................................19

*Karcher v. Daggett*,
  462 U.S. 725 (1983)...................................................................................10, 18

*League of United Latin Am. Citizens v. Abbott*,
  604 F. Supp. 3d 463 (W.D. Tex. 2022) ...........................................................19

*League of United Latin Am. Citizens v. Abbott*,
  No. 3:21-cv-00259-DCG-JES-JVB,
  2022 WL 4545757 (W.D. Tex. Sept. 28, 2022) ..............................................21

*Louisiana v. Callais*,
  146 S. Ct. 1131 (2026)......................................................................................24

*Lucas v. Forty-Fourth General Assembly*,
  377 U.S. 713 (1964)............................................................................................8

*Miller v. Johnson*,
  515 U.S. 900 (1995).........................................................................................22

*N.C. State Conf. of NAACP v. McCrory*,
   831 F.3d 204 (4th Cir. 2016) ................................................................................26

*NAACP v. Wilmington Med. Ctr., Inc.*,
   491 F. Supp. 290 (D. Del. 1980) ..........................................................................27

*Old Person v. Cooney*,
   230 F.3d 1113 (9th Cir. 2000) .............................................................................26

*Page v. Bartels*,
   248 F.3d 175 (3d Cir. 2001) ................................................................................23

*Prejean v. Foster*,
   83 F. App'x 5 (5th Cir. 2003) ..............................................................................23

*Rice v. Cayetano*,
   528 U.S. 495 (2000)............................................................................................23

*Romer v. Evans*,
   517 U.S. 620 (1996).............................................................................................9

*Rose v. Raffensperger*,
   511 F. Supp. 3d 1340 (N.D. Ga. 2021).................................................................21

*United States v. Hays*,
   515 U.S. 737 (1995)........................................................................................4, 20

*Vallejo v. Keller Indep. Sch. Dist.*,
   816 F. Supp. 3d 636 (N.D. Tex. 2026) .................................................................22

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977)......................................................................................27, 28

*Walls v. Sanders*,
   760 F. Supp. 3d 766 (E.D. Ark. 2024) ............................................................27, 28

*Williams v. Hall*,
   No. 1:23-cv-1057, 2025 WL 1553759 (M.D.N.C. Apr. 8, 2025) ........................19, 21

*Prejean v. Foster*,
   227 F.3d 504 (5th Cir. 2000) ...............................................................................23

**Other Authorities**

Brief for the United States, *Tangipa v. Newsom*, No. 25A839
   (U.S. Jan. 22, 2026) ............................................................................................................... 7

In their responses to Defendants' motions to dismiss, each Plaintiff group concedes the core truth at the heart of this case: the predominant intent behind Prop 50 was to create a partisan advantage for Democratic Party candidates. "The United States," according to its brief, "does not dispute and has never disputed that the Proposition 50 map is intended to bolster the performance of the Democratic Party in congressional elections." U.S. Opp. at 2.[1] The Tangipa Plaintiffs likewise acknowledge "the existence of a plausible partisan motivation" for Prop 50, Tangipa Opp. at 19, and the Noyes Plaintiffs begin their brief with the statement that "Governor Newsom proposed a statewide congressional map that could add five non-competitive Democrat[ic] congressional districts, subject to voter approval at a special election," Noyes Opp. at 1.

These concessions put Plaintiffs in a bind. Because "partisanship and race correlate," to meet their burden of pleading that race "predominated" in the drawing of the Prop 50 map, Plaintiffs must advance plausible allegations that "disentangle race from politics" so as to show "that the former *drove* a district's lines." *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 9 (2024) (emphasis added). And they must advance these allegations on a "district-by-district" basis, *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 191 (2017), rather than attacking the map "as an undifferentiated whole," *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 264 (2015). The Consolidated Complaint fails to do so. It relies almost entirely on cherry-picked statements from Paul Mitchell and California legislators which, in context, serve only to underscore Prop 50's avowedly partisan motivations, and say nothing about the design of specific districts. And although the Consolidated Complaint also attempts to allege circumstantial evidence of intent, those allegations—even if taken as true for the

---

[1] For clarity, DCCC will refer to the Tangipa Plaintiffs' opposition brief, ECF No. 263, as "Tangipa Opp.", the United States's opposition brief, ECF No. 264, as "U.S. Opp.", and the Noyes Plaintiffs' opposition brief, ECF No. 262, as "Noyes Opp." DCCC will also refer to its motion to dismiss, ECF No. 250, as "DCCC Mot.", and the Court's order denying Plaintiffs' preliminary-injunction motions, ECF No. 216, as "PI Order."

1

purposes of this motion—pertain to only a handful of districts and fail to rule out the obvious partisan explanations for the shape of those districts.

The Noyes Plaintiffs face additional problems. Most glaringly, they fail to correct or even acknowledge the complete absence of allegations necessary to establish their standing. Despite the well-worn rule that a racial gerrymandering plaintiff "has standing to assert only that his own district has been so gerrymandered," *Gill v. Whitford*, 585 U.S. 48, 66–67 (2018), the Noyes Plaintiffs *still* refuse to identify which districts they reside and vote in. Unable to meet this extremely modest—but mandatory—pleading bar, the Noyes Plaintiffs labor instead to fabricate a novel Fifteenth Amendment claim from whole cloth, one that relieves them of any duty to assert either district-specific allegations or racial predominance. But no court has ever recognized such a watered-down racial gerrymandering theory, and the Noyes Plaintiffs' failure to identify a cogent legal theory to support their claims alone warrants dismissal.

Finally, Plaintiffs have failed to state a claim under the Voting Rights Act; such claims require plausible allegations of intentional discrimination, which are entirely absent from the Consolidated Complaint.

The Court should dismiss the Consolidated Complaint with prejudice.

## ARGUMENT

### I. Plaintiffs fail to meaningfully defend the scope of their challenges.

Plaintiffs still have no answer to the Supreme Court's clear admonition that racial gerrymandering claims cannot target a map as "an undifferentiated whole," *Alabama*, 575 U.S. at 264 (emphasis omitted), or seek "to invalidate the whole State's . . . districting map," *Gill*, 585 U.S. at 66; *see also* DCCC Mot. at 6–8.

The United States and Tangipa Plaintiffs largely skirt this issue and persist in attacking Proposition 50 or "the map" writ large. Indeed, the Tangipa Plaintiffs' response references "the map" dozens of times and on nearly every page before summarily asserting on page 30 that the Consolidated Complaint contains sufficient allegations for "several challenged districts." Tangipa Opp. at 30. What then follows is merely a two-

2

paragraph discussion of just one district: CD-13. *See id.* at 30–31; *see also* DCCC Mot. at 7 (noting this is the only district for which the Tangipa Plaintiffs have even conceivably made district-specific allegations).

The Tangipa Plaintiffs also briefly suggest that the mapmaker's "overarching methodology" satisfies their pleading burden as to the sixteen Hispanic-majority districts identified in the Consolidated Complaint. *See* Tangipa Opp. at 31. That opaque assertion falls far short of the "district-by-district" analysis the Supreme Court demands. *Bethune-Hill*, 580 U.S. at 191. The Tangipa Plaintiffs cannot even be bothered to identify those sixteen districts in their brief, never mind say a single word about them beyond claiming they were tainted by the mapmaker's "methodology" in unspecified ways. Tangipa Opp. at 31. For example, the only thing the Consolidated Complaint says about CD-34—a heavily Hispanic district in Los Angeles County that changed little as a result of Prop 50—is that the district was within a 52% to 55% Hispanic CVAP band *before* Prop 50, and remained in that same range *after*. *See* ECF No. 240 ("Consol. Compl.") ¶ 95, Tbl. 1. That says quite literally nothing about whether race predominated over other districting criteria as to the drawing of that district. Plaintiffs' "state-wide" allegations about "the [Prop 50 map] as a whole," have "no probative force with respect to their racial-gerrymandering claim[s]" as to that district, *Alexander*, 602 U.S. at 33—or any other district for which Plaintiffs fail to plead specific facts or allege that race predominated over other district criteria. That is particularly so since all agree that California had sixteen Hispanic-majority districts *before* Prop 50, many of which—like CD-34—changed little because of the measure. *See* Consol. Compl. ¶¶ 95, 96 & Tbl. 1. Relying on such a generalized assertion about the mapmaker's "ideology" falls far short of the pleading standard that governs all civil claims. Such "naked assertion[s]" about the mapmaker, without "further factual enhancement" directed towards specific districts, cannot state a racial gerrymandering claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that such "conclusory statements[] do not suffice").

The United States, for its part, appears to contend that the requirement for district-specific allegations is merely a peculiar feature of one Supreme Court decision, namely *Alabama Legislative Black Caucus*. *See* U.S. Opp. at 23–24. But that is clearly wrong. *See, e.g.*, *Alexander*, 602 U.S. at 33; *Bethune-Hill*, 580 U.S. at 191; *Gill*, 585 U.S. at 66; *Cooper v. Harris*, 581 U.S. 285, 291 (2017); *cf. United States v. Hays*, 515 U.S. 737, 744–45 (1995). The United States' misunderstanding leads it to fall back on the notion that it may rely upon statewide evidence *alone* to plausibly allege that *every* Hispanic-majority district in California is an unlawful racial gerrymander, all without alleging specific facts about *any* of those districts beyond observing the unremarkable fact that they are majority Hispanic. *See* U.S. Opp. at 24. But such a boilerplate assertion fails to plausibly allege that "race drove the mapping of district lines" as to any specific district. *Alexander*, 602 U.S. at 11.

Finally, the Noyes Plaintiffs admit that they *are* challenging "*every district*" in the Prop 50 map, Noyes Opp. at 11 (emphasis in original), and with just three individual plaintiffs, *id.* That candid, and significant, admission is based upon the Noyes Plaintiffs' belief that they have discovered a heretofore undiscovered claim lurking in the Fifteenth Amendment—one that conveniently relieves them of annoyances like pleading racial intent or predominance in the drawing of individual district lines or establishing that their individual plaintiffs actually live in a relevant district. *See id.* at 5 (arguing they do not have "to plead that district boundaries were drawn predominantly by race"); *id.* at 10 (claiming standing to challenge "the map"). But as explained below, the Noyes Plaintiffs are severely mistaken in believing that they can plead a watered-down racial gerrymandering claim merely by invoking the Fifteenth Amendment. *Infra* § III.

Simply put, Plaintiffs cannot plead their way into challenging an entire statewide map—or even sixteen districts—based on alleged facts that, even generously construed, concern only a handful of districts. Accordingly, while the Consolidated Complaint must be dismissed for failure to state a claim, the Court at the very least the must narrow the scope of this case to be commensurate with Plaintiffs' sparse pleadings.

## II.  The Tangipa Plaintiffs and United States fail to plausibly allege a Fourteenth Amendment violation as to any district.

Setting aside the overbreadth of their requested relief, the Tangipa Plaintiffs and United States fail to plausibly allege a Fourteenth Amendment claim as to *any* district. These plaintiff groups spend much of their briefs fruitlessly quarreling with this Court's past legal determinations, but even under their preferred legal framing, the Consolidated Complaint simply does not supply a plausible inference that race predominated in the drawing of any district.

### A.  The Consolidated Complaint does not plausibly allege direct evidence of racial predominance.

As the Supreme Court has made clear, to state a racial gerrymandering claim, a plaintiff must plausibly allege that a "relevant state actor" "subordinated race-neutral districting criteria . . . to racial considerations" in adopting the challenged districts. *Alexander*, 602 U.S. at 7–8 (citations omitted). Here, there are three actors at play: (1) the California electorate, which adopted the Prop 50 map via referendum; (2) the California legislature, which put the map on the ballot; and (3) Paul Mitchell, a third-party consultant who drew a version of the map that was submitted to the legislature. The Consolidated Complaint does not plausibly allege that race predominated over other considerations for any of these actors.

#### 1.  Plaintiffs admit the Consolidated Complaint alleges nothing about the intent of the California electorate.

Because Prop 50 was enacted by referendum, this Court determined that it "must look to the intent of the voters, rather than the legislature" alone, in determining whether race predominated. PI Order at 18. As DCCC pointed out in its motion, the Consolidated Complaint says nothing about the intent of the California electorate. DCCC Mot. at 15–16. Plaintiffs admit as much. *See* Tangipa Opp. at 28 (conceding that "[t]he Complaint omits specific voter-intent allegations as such"); U.S. Opp. at 7–8 (similar). The absence of allegations about "the most relevant state actors," PI Order at 15, warrants dismissal.

Alone among the Plaintiff groups, the Tangipa Plaintiffs try to argue that the Consolidated Complaint plausibly alleges racial intent by the California electorate. *See* Tangipa Opp. at 26–29. They suggest that statements about the map from California legislators and Paul Mitchell reveal the map's "racial design," and their dissemination "shape[d] the electorate's understanding of what Proposition 50 would accomplish." *Id*. at 27. There are two problems with this argument. *First*, as explained below, none of those statements indicates that race predominated in the drawing of the Prop 50 map—in context, the only plausible reading of the statements is that Prop 50 is a partisan measure. *Infra* §§ II.A.2–3. *Second*, and more damningly, the Consolidated Complaint advances no allegations connecting those statements to the electorate or suggesting that the statements would have persuaded any voters that Prop 50 reflected a racial, rather than partisan, redistricting effort. Nor would it be plausible to infer as much; Prop 50 was the subject of an intensely partisan campaign during which California voters were inundated with material from both sides advertising Prop 50's partisan objectives. *See* DCCC Mot. at 15–16. Yet no Plaintiff group alleges that either Prop 50's supporters *or* opponents raised its supposedly racialized character during this three-month campaign window.

The Tangipa Plaintiffs also identify two other statements that, they claim, would have suggested to voters that Prop 50 was a racial measure designed to benefit Hispanics. *See* Tangipa Opp. at 27. But those statements say the opposite. One, a statement in the official Voter Guide from Prop 50's *opponents*, warns that the map would "divide our neighborhoods and *weaken* the voice of communities of color." *Id*. (quoting State RJN Ex. 2 at 17) (emphasis added). Plaintiffs' theory, however, is that Prop 50 unfairly *strengthens* certain minority voices, so this statement only undermines Plaintiffs' allegation.[2] The other, a statement in Prop 50's enacting legislation, affirms that Prop 50

---

[2] The United States also quotes this excerpt of the Voter Guide, but in a more deceptive fashion. It says "the official voter information guide included a description of the

would benefit Democrats "without eroding fair representation for all communities," *id.* (quoting State RJN Ex. 1 at 6), which is both directly at odds with Plaintiffs' theory and does not even mention race.

Unable to identify a single allegation that plausibly suggests racial intent by the California electorate, Plaintiffs instead argue that this Court applied the wrong standard and that the intent of the voters is irrelevant.[3] These arguments amount to an implausible parade of horribles that might result from centering voter intent. The Tangipa Plaintiffs, for instance, suggest that under the Court's standard, "a legislature could hire a consultant to draw racially gerrymandered lines, bury the racial engineering in technical details, present voters with a ballot measure framed entirely around partisan messaging, and thereby insulate the racial design from constitutional review." Tangipa Opp. at 17; *see* U.S. Opp. at 9–10 (advancing a similar argument); Noyes Opp. at 26–29 (advancing a similar argument). But this argument ignores how the referendum process actually works. If a legislature drafted a racial gerrymander, but sold it to the voters as a partisan gerrymander, opponents of the ballot measure would have both the opportunity and the motivation to present arguments about the measure's racial character to the voters. Evidence of such arguments would be probative because it would establish, at a minimum, that voters had race in mind when voting for or against the ballot measure. Thus, a voter-intent standard certainly would not create an evidentiary safe-harbor for racial gerrymandering. Nor are there any allegations in the Consolidated Complaint suggesting voters considered, or were asked to consider, Prop 50's racial implications. As DCCC has highlighted throughout its pleadings, Prop 50 was the subject of an

Proposition 50 map as 'divid[ing] our neighborhoods and weaken[ing] the voice of communities of color,'" U.S. Opp. at 7, but neglects to mention that the statement came from Prop 50's *opponents*.

[3] In doing so, the United States reverses its earlier position taken just months ago; it argued before the Supreme Court that it was "appropriate . . . to treat the voters as the ultimate legislature for purposes of th[e] Court's racial-gerrymandering precedents." Brief for the United States at 20, *Tangipa v. Newsom*, No. 25A839 (U.S. Jan. 22, 2026).

extensive and expensive ballot campaign, with vigorous advocacy on both sides, including by many of the Plaintiffs in this case, such as Assemblyman Tangipa and the California Republican Party. *See generally* DCCC Mot. at 3; PI Order at 37. But *nobody* suggested to voters (or otherwise) that Prop 50 was a racial gerrymander until it became strategic to do so in litigation the day *after* Prop 50 was approved.

The Noyes Plaintiffs suggest the Court committed legal error by relying on voter intent, and that the Supreme Court's opinion in *Lucas v. Forty-Fourth General Assembly* "controls the question." Noyes Opp. at 26 (citing 377 U.S. 713 (1964)); *see also* Tangipa Opp. at 16 (similarly citing *Lucas*).[4] Far from controlling, *Lucas* is simply not relevant. *Lucas* concerned a proposed districting scheme in Colorado, enacted by referendum, that violated the one-person-one-vote rule by apportioning legislative districts based on factors other than population. *See* 377 U.S. at 717–19. There was no question of intent; the proposed scheme violated the rule that "the Equal Protection Clause requires that both houses of a bicameral state legislature must be apportioned substantially on a population basis," a rule that has no intent element, and the Court held that the referendum mechanism could not legalize this mathematical violation of the one-person, one-vote rule. 377 U.S. at 734–35. Here, however, Plaintiffs' claims rest on the discriminatory intent *vel non* of a relevant state actor. The question then becomes whose *intent* the Court must look at to evaluate Plaintiffs' claims. The Court held that the electorate was a relevant actor given its determinative role in adopting Prop 50—a conclusion amply supported by the applicable caselaw. *See* PI Order at 37.

In addition to *Lucas*, the Tangipa Plaintiffs put misplaced reliance on *Hunter v. Underwood* and *Romer v. Evans*. *See* Tangipa Opp. at 15–16 (citing first 471 U.S. 222,

---

[4] Puzzlingly, the Noyes Plaintiffs state that "[t]he effect of a referendum was hardly briefed the last time this issue was before the Court." Noyes Opp. at 26. As the Court knows, the parties amply briefed which state actor's intent was relevant for purposes of addressing Plaintiffs' racial gerrymandering claims, including in the extensive pleadings on Plaintiffs' preliminary injunction motions.

229, 233 (1985), then 517 U.S. 620, 631–32 (1996)). In *Hunter*, the Supreme Court found that a provision in the Alabama Constitution disenfranchising those convicted of minor crimes was racially discriminatory after the state's counsel conceded that "race . . . play[ed] a part in the decisions of those people who were at the constitutional convention" in which the provision was enacted. 471 U.S. at 230 (citation omitted). That concession flowed from the fact that the "delegates to the all-white convention were not secretive about their purpose," with the president of the convention openly proclaiming an intent "to establish white supremacy in this State." *Id.* at 229. And those racial appeals were directed towards the State's electorate. As the state's counsel conceded, "the delegates s[aid] that they are interested in dis[en]franchising blacks," a point which was "really speaking to the galleries, that [is,] attempting to say to the white electorate that must ratify this constitution what is necessary for that white electorate to be convinced of in order to get them to vote for it." *Id*. at 231. In other words, *Hunter* featured precisely the sort of glaring racial appeals to the electorate that are entirely absent here. And in *Romer v. Evans*, the challenged law on its face targeted a specific population (individuals with "homosexual, lesbian or bisexual orientation") by excluding them from protections for minorities. 517 U.S. at 624. The Court held this "bare . . . desire to harm a politically unpopular group" evidenced discriminatory "animosity." *Id*. at 634 (quotations omitted). There was thus no need to look beyond the text of the law to find discriminatory intent. Prop 50, in contrast, contains no such express discriminatory classification to favor or harm a specifically identified class. Far from supporting Plaintiffs' arguments, *Hunter* and *Romer* serve to illustrate the weaknesses of Plaintiffs' case.

**2.      Plaintiffs' allegations about California legislators do not plausibly suggest racial predominance.**

Although the California legislature is also undoubtedly a relevant state actor, Plaintiffs spend little time discussing it. Mostly, their opposition briefs repeat the grab-bag of statements cited in the Consolidated Complaint. But as DCCC explained in its initial motion, each of these statements either (1) accuses *other* states of engaging in

9

racial gerrymandering or (2) asserts that Prop 50 is *not* racially discriminatory because it preserves existing minority rights. *See* DCCC Mot. at 16–17.

Plaintiffs suggest that statements in the first category "discuss the supposed need for Proposition 50, not the effects of the Proposition 50 map." U.S. Opp. at 17–18; *see* Tangipa Opp. at 25; Noyes Opp. at 20–21. Just so: the statements suggest that California "need[ed]" to pass Proposition 50 to elect more Democrats to Congress, U.S. Opp. at 17–18, thus offsetting the corrosive impact of Republican gerrymandering elsewhere. *See generally* DCCC Mot. at 16 (explaining how these statements illustrate Prop 50's partisan aims). The Consolidated Complaint says nothing to undermine this obvious partisan interpretation, much less plausibly allege the conclusion Plaintiffs ask the Court to draw from these statements, namely that the California legislators were expressing a reciprocal desire to engage in racial gerrymandering to follow the example of other states. Thus, nothing about these statements "permit[s] the court to infer" even a faint possibility of misconduct. *Iqbal*, 556 U.S. at 679.

As for the second category of statements, they suggest only that Proposition 50 preserves existing protections for minority rights. Even giving these statements the most extreme possible interpretation—*i.e.*, that some California legislators were strongly motivated to preserve aspects of the prior map—such a motivation is well-recognized and permissible. *Karcher v. Daggett*, 462 U.S. 725, 740 (1983) (recognizing "preserving the cores of prior districts" as a valid criterion); *cf. Abbott v. Perez*, 585 U.S. 579, 603 (2018) (noting that "[p]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful"). Again, nothing in these statements, even interpreted to favor Plaintiffs, suggests that race predominated in the consideration of the California legislature.[5]

---

[5] At times, the Tangipa Plaintiffs seem to direct their attacks not to the Prop 50 map, but to the prior, commission-drawn map whose districts the Prop 50 map retained. *See, e.g.*, Tangipa Opp. at 4 (claiming that Mitchell "incorporated the Commission's VRA

### 3. Plaintiffs' allegations about Paul Mitchell do not plausibly suggest racial predominance.

Plaintiffs focus much of their briefs on statements by Paul Mitchell, the third-party consultant who drafted a version of the Prop 50 map that was submitted to the California legislature. But these arguments fail to overcome the two fatal flaws DCCC pointed out in its motion to dismiss.

*First*, the Consolidated Complaint does not plausibly allege that Mitchell is a "relevant state actor." *Alexander*, 602 U.S. at 8. As Plaintiffs seemingly acknowledge, the only allegation in the Consolidated Complaint connecting Paul Mitchell with the state of California is that Mitchell spoke with the Chief of Staff for the Speaker of the California Assembly. *See* Consol. Compl. ¶ 56; Tangipa Opp. at 23; Noyes Opp. at 19. And though the Consolidated Complaint alleges that Mitchell drafted a version of the Prop 50 map, it also alleges he later provided the draft map to DCCC, which then submitted it to the California legislature. *See* Consol. Compl. ¶¶ 56, 73–74. Those allegations, standing alone, do not establish that Mitchell worked at the behest of the State so as to make him a state actor. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999) ("Action taken by private entities with the mere approval or acquiescence of the State is not state action."). Nor do Plaintiffs make even a token effort to map Mitchell's conduct onto the relevant tests for determining when a private person stands in the State's shoes. *See, e.g.*, *Brunette v. Humane Society of Ventura County*, 294 F.3d 1205, 1210–14 (9th Cir. 2002) (setting forth various tests for determining whether a private individual becomes a state actor).

In their opposition, the Tangipa Plaintiffs state that "[w]hen a State retains a consultant to draw its maps, works directly with that consultant through legislative staff,

rationale"); *id.* at 15 (claiming that Prop 50 "preserv[ed] or enhance[ed] [the prior map's] supposedly VRA-justified racial gerrymander"). The Consolidated Complaint advances no allegations that would support this sleight-of-hand: it does not allege that any of the Hispanic-majority districts in the prior map represented unlawful racial gerrymanders or that they are per se unlawful.

and adopts the consultant's work without meaningful alteration, the consultant's statements are probative of the purpose behind the enacted map." Tangipa Opp. at 23. That summary is telling, because the Consolidated Complaint does not allege that *California* "retained" Paul Mitchell or that it "worked directly with" him in drawing the maps. To the contrary, it alleges that Mitchell chiefly worked through the DCCC to submit his proposed map. *See, e.g.*, Consol. Compl. ¶¶ 56, 73–74. The Consolidated Complaint also says nothing about any changes made after DCCC submitted Mitchell's draft map. *See generally* Consol. Compl. ¶¶ 56–77. Plaintiffs have thus failed to allege Mitchell's state-actor status according to their own proposed standard.

Perhaps recognizing this dearth of allegations, Plaintiffs suggest that mapmakers are *inherently* state actors because they are responsible for "[t]he decision to place voters within or without a particular district." U.S. Opp. at 12; *see* Tangipa Opp. at 23. But the ultimate decision about where to place voters rests with *lawmakers*. Accordingly, Supreme Court precedent does not demand discriminatory intent by the "mapmaker"— it demands intent by the relevant *state actors* charged with adopting a map, and Plaintiffs fall short of plausibly alleging that Mitchell qualifies. *See* DCCC Mot. at 17–19. Supreme Court precedent makes clear that the intent of third parties cannot simply be imputed to the relevant state actors, *cf. Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 689–90 (2021) (explaining "legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents"), a rule that makes particular sense here where most of Mitchell's statements (1) came *after* the Legislature voted and are not alleged to have influenced the Legislature's deliberation; and (2) are not alleged in the Consolidated Complaint to have been widely disseminated to voters or featured in the ballot campaign. The mapmaker cases on which Plaintiffs rely only illustrate how short their allegations fall— in each, there were significantly more tangible connections between the mapmaker and the state legislature which enacted the map. *See Cooper*, 581 U.S. at 295, 299–300 (mapmaker was hired by the state to redraw district lines and drew lines pursuant to

specific instructions from legislators); *Alexander*, 602 U.S. at 19 (map was drawn by a "career employee" of the legislature).

*Second*, Mitchell's statements—on their own, and especially in context—simply do not provide any inference that race predominated *for him* over other considerations—never mind for any state actor.[6] Plaintiffs focus on Mitchell's October 17, 2025 presentation to HOPE, and particularly his statements that the map "will be great for the Latino community . . . in the Central Valley" and that "the number one thing that [he] first started thinking about" in drawing the map was "drawing a replacement Latino majority/minority district in the middle of Los Angeles." U.S. Opp. at 13–14 (citing the Consolidated Complaint and exhibits) (second alteration in original); Tangipa Opp. at 22 (relying on similar statements); Noyes Opp. at 18–19 (same). But Plaintiffs do not even try to address the obvious, partisan explanations for these statements that DCCC pointed out in its motion to dismiss, and which preclude drawing any plausible inference of racial *predominance*. Mitchell's statement about making a Latino district "in the middle of Los Angeles" followed directly from his discussion of how the Prop 50 map "eliminat[es] the Ken Calvert district in Riverside": Mitchell resurrected a Democratic district in Los Angeles that had been eliminated by the Commission in order to erase a district controlled by a Republican incumbent, an expressly partisan move. DCCC Mot. at 26–27 (quoting Consol. Compl. Ex. B at 25:14–26:18). And Mitchell's comments about the Central Valley were in response to an admonition to "keep it nonpartisan" when discussing the impact of the Prop 50 map. *See* DCCC Mot. at 21 (quoting Consol. Compl. Ex. B at

---

[6] In its brief, the United States suggests that "Defendants do not dispute that Mitchell had racial motivations when creating the Proposition 50 map." U.S. Opp. at 17. That is simply untrue. As DCCC explained at length in its initial motion, the statements from Mitchell that Plaintiffs rely on do not provide any inference of racial intent—in context, they underscore Mitchell's plainly partisan goals. *See* DCCC Mot. at 17–19.

13

28:8–11).[7] The Tangipa Plaintiffs confusingly say this *supports* their pleadings despite acknowledging that "Mitchell" was "asked" "to set aside the partisan dimension" of Prop 50 to "describe what else the map accomplished." Tangipa Opp. at 23. The illogic of that point is obvious—*Plaintiffs* bear the burden of plausibly alleging the relevant state actors were "motivated by race as opposed to partisanship." *Alexander*, 602 U.S. at 6. A colloquy where the mapmaker is asked to, as the Tangipa Plaintiffs admit, "set aside the partisan dimension," supports no inference on that score.

Unable to address the context of Mitchell's statements, Plaintiffs hide from it, insisting that the Court cannot "resolv[e] competing characterizations of an exhibit" or other factual disputes in Defendants' favor at the motion-to-dismiss stage. Tangipa Opp. at 24; *see* U.S. Opp. at 15. But Ninth Circuit precedent makes clear that the Court must consider materials incorporated into the complaint in evaluating a motion to dismiss. *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010). That requires considering the *entirety* of those materials, rather than just the isolated snippets preferred by Plaintiffs. The "policy concern underlying th[e incorporation] rule is to prevent plaintiffs from surviving a motion to dismiss by deliberately omitting references to, or portions of, documents that weaken or doom their claims," a concern that can be addressed only by permitting the court to consider the entirety of materials incorporated into the pleadings. *Darling v. Eddy*, No. 9:21-cv-00147-DLC, 2023 WL 157712, at *2 (D. Mont. Jan. 11, 2023). Here, Plaintiffs attempt just that, relying almost entirely on a few isolated soundbites from a third party's public presentation which, in context, confirm Mitchell's predominantly partisan motivations—and thereby undercut the plausibility of Plaintiffs' pleading-by-soundbite. The Court need not "resolve competing

---

[7] In its opposition, the United States alludes to Paul Mitchell's invocation of legislative privilege and his production of a privilege log that supposedly shows "communications with legislators and their staff." U.S. Opp. at 15–16. But no such communications are alleged in or incorporated into the Consolidated Complaint, so Plaintiffs cannot rely on them to survive a motion to dismiss.

14

characterizations" of those remarks or draw factual inferences in Defendants' favor to dismiss Plaintiffs' claims; the remarks on their face "doom [Plaintiffs'] claims." *Darling*, 2023 WL 157712, at *2.

**B.    The Consolidated Complaint does not plausibly allege circumstantial evidence of racial predominance.**

Plaintiffs' circumstantial allegations of racial predominance are equally weak. As Plaintiffs' briefs make clear, their circumstantial evidence consists almost entirely of the allegations that the Prop 50 map has the same number of Hispanic-majority districts as the previous congressional map, with HCVAP percentages in approximately the same range. *See* U.S. Opp. at 18–19 ("According to the Complaint, California purposefully created sixteen Hispanic-majority districts in an effort to increase Hispanic political power."); Tangipa Opp. at 26 ("The Proposition 50 map thus deliberately replicated the Commission map's racial structure . . . ."); Noyes Opp. at 21 (citing "[t]his uniform percentage in an identical number of Hispanic-majority districts as the prior Congressional district map" as circumstantial evidence of discriminatory intent).

But Plaintiffs never answer a basic question: how does the number of Hispanic-majority districts in the Prop 50 map evince predominant racial intent? There are, after all, the same number of Hispanic *voters* reflected in the Prop 50 map as the prior commission map, because both maps rely on the same data from the 2020 Census. It is therefore not surprising that the Prop 50 map includes the same number of Hispanic-majority districts. The United States suggests that "continuity" between the Prop 50 map and the prior map "support[s] an inference of racial discrimination" because "[i]f partisan concerns truly predominated, one would expect changes in the racial composition of each district[.]" U.S. Opp. at 20. That argument is deeply confused. For one, the United States *admits* that the Prop 50 map achieves its expressly partisan goal of adding five Democratic leaning seats. U.S. Opp. at 2. So its argument about what "one would expect" to see in such a map is nothing more than quarreling about *how* the Prop 50 achieves its nakedly partisan goals. *See Alexander*, 602 U.S. at 6 (noting that race and partisanship

15

are often correlated and that "a legislature may pursue partisan ends when it engages in redistricting").

Further still, the Consolidated Complaint itself shows that there *were* significant changes in many of the Hispanic-majority districts. Table 1, for instance, shows that Prop 50 increased the number of districts with over 61% Hispanic CVAP, reduced the number of districts with 55% to 58% Hispanic CVAP, and moved another Hispanic-majority district to below 52% Hispanic CVAP. *See* Consol. Compl. at 22 Tbl. 1. Many of these alterations demonstrably served partisan ends, such as by eliminating Republican Ken Calvert's district. *See* Consol. Compl., Ex. B at 25:14–26:8. And although Plaintiffs suggest that the number of Hispanic-majority districts and the HCVAP percentages in those districts is somehow connected to a recommendation from HOPE, *see* U.S. Opp. at 18–19, Tangipa Opp. at 25–26, Noyes Opp. at 21–22, their own allegations do not square with this theory for the reasons DCCC explained in its motion. *See* DCCC Mot. at 24–26. Among other problems, while the HOPE letter recommended creating districts with HCVAP percentages "between 52% and 54%," several of Prop 50's districts fall outside that range, including two with over 61% HCVAP and one below 52% HCVAP. *See* Consol. Compl. ¶¶ 95–96 & 22 Tbl. 1. Plaintiffs' arguments illustrate why the Supreme Court has required a "district-by-district" analysis, *see Bethune-Hill*, 580 U.S. at 191: by lumping districts together into categories, Plaintiffs fail to connect any given district to any sufficiently specific allegation of racial discrimination. At bottom, allegations pled from 30,000 feet about the number of Hispanic-majority districts cannot supply a plausible inference of the district-level intent the Constitution demands.

Plaintiffs also largely ignore DCCC's arguments about the handful of district-specific allegations in the Consolidated Complaint, and thus fall short of their burden to allege facts showing racial predominance as to specific districts. *See id.*

**District 13.** Although Plaintiffs initially dedicated much of their attention to allegations about District 13, they spend little time responding to DCCC's arguments about why claims as to that district must be dismissed. *Compare* Consol. Compl. ¶¶ 117–

16

23 (paragraphs under the heading "District 13 Is an Exemplar of Racial Gerrymandering"), *with* Tangipa Opp. at 30–31 (dedicating two short paragraphs to discussing District 13). Notably, Tangipa Plaintiffs make no effort to overcome the obvious partisan explanation for District 13's design. DCCC Mot. at 22–23. And while they allude in passing to some of District 13's features, they never explain how fleeting discussion of a handful of minute details of the district's lines can plausibly show race predominated in drawing the district when the Prop 50 map actually *reduced* the overall Latino population of District 13. *See Cubanos Pa 'lante v. Fla. House of Representatives*, 766 F. Supp. 3d 1204, 1213 (S.D. Fla. 2025) (dismissing complaint because "generalized language" employed by legislators to refer to "protected[] majority-minority Hispanic districts" failed to "sustain the inference that race predominated in the Legislature's discussions").

*District 18.* Plaintiffs point to the Consolidated Complaint's allegation that "District 18 'absorb[ed] a 51.4% Hispanic CVAP territory from District 13 and a 70.8% Hispanic CVAP [sic] from District 22,'" allowing it to "remain within the deliberately tight band of 52-55% Hispanic CVAP range." U.S. Opp. at 19 (quoting Consol. Compl. ¶¶ 98–99) (alteration in original). But as DCCC explained in its motion, District 18 had essentially the same HCVAP percentage in the prior map, Consol. Compl. at 22 Tbl. 1, and the Consolidated Complaint does not plausibly allege any reason why a mapmaker who sought to expand Latino voting power would simply retain the racial composition of an existing district. DCCC Mot. at 25–26.

*Districts 41 and 42.* The United States suggests that, "[d]espite being moved elsewhere in the State with a new constituent population, those districts were drawn to deliberately maintain the same proportion of Hispanic population." U.S. Opp. at 19 (quoting Consol. Compl. ¶ 102); *see* Tangipa Opp. at 9. Again, however, these allegations fail to exclude other, more plausible partisan explanations, including the explanation DCCC offered in its motion—moving District 41 into Los Angeles County added Democratic-leaning urban voters to the district, displacing parts of the prior iteration of

District 42, which actually *lost* HCVAP. DCCC Mot. at 26–27; *Cubanos Pa 'lante*, 766 F. Supp. 3d at 1216 (dismissing allegations as to two challenged districts where plaintiffs offered "only conclusory allegations in place of . . . more specific circumstantial evidence").

*Districts 48 and 52.* The United States points to the Consolidated Complaint's allegation that "District 52 (a Hispanic-majority district) absorbed just enough territory from District 48 to have its Hispanic CVAP population change from 52.0% to 51.7%, preserving its narrow Hispanic majority." U.S. Opp. at 19 (quoting Consol. Compl. ¶ 103). Not only does this allegation fail to supply any inference of racial predominance; it is directly contrary to Plaintiffs' entire theory. Plaintiffs contend that Prop 50 attempted to maximize the number of Hispanic-majority districts with HCVAP percentages between 52% and 55%. *See* Consol. Compl. ¶¶ 97–99. They never explain how a decision which *reduced* the HCVAP percentage of a Hispanic-majority district below that threshold supports their theory, never mind how such a districting choice supplies a plausible inference of racial predominance.

*Districts 37 and 43.* The Noyes Plaintiffs allege that the Prop 50 map preserved two "Black influence districts . . . where two Democrat[ic] districts could have been drawn without creating a racial outcome." Noyes Opp. at 23. But the Consolidated Complaint itself supplies a non-racial explanation for those districts: the desire to "preserv[e] the cores of prior districts," which is a "legitimate objective" in redistricting. *Karcher*, 462 U.S. at 740–41. The mere fact that these districts did not change cannot support the assumption that race predominated in the district's drawing.

In short, none of the "circumstantial evidence" of racial predominance alleged in the Consolidated Complaint—even if accepted as true for purposes of Defendants' motions to dismiss—is enough to "rul[e] out the competing explanation that political considerations dominated" the redrawing of these districts. *Alexander*, 602 U.S. at 9; *accord Twombly*, 550 U.S. at 557.

**III. The Noyes Plaintiffs lack standing and have failed to state a plausible claim under the Fifteenth Amendment as to any district.**

The Noyes Plaintiffs spend most of their opposition brief insisting, without authority, that because they have asserted a Fifteenth Amendment claim, they are freed from the usual burdens of alleging standing, racial predominance, or even district-specific allegations. But the Fifteenth Amendment is not such a panacea. To state a Fifteenth Amendment claim against the Prop 50 map, the Noyes Plaintiffs needed to allege that they suffered a concrete injury by having been placed into the specific districts in which they reside, and that racial intent drove the drawing of those specific districts. They made no effort to do so, meaning their claims must be dismissed in full.

**A. The Noyes Plaintiffs do not even try to allege standing under the proper framework.**

Supreme Court precedent is crystal-clear: "a plaintiff who alleges that he is the object of a racial gerrymander—a drawing of district lines on the basis of race—has standing to assert only that his own district has been so gerrymandered." *Gill*, 585 U.S. at 66. This is true regardless of the legal basis for the plaintiff's racial gerrymandering challenge. *See id*.; *see also Hays*, 515 U.S. at 743–44 (Fourteenth Amendment racial gerrymandering claim); *Harding v. County of Dallas*, 948 F.3d 302, 307 (5th Cir. 2020) (claim under Section 2 of the VRA); *Williams v. Hall*, No. 1:23-cv-1057, 2025 WL 1553759, at *3 (M.D.N.C. Apr. 8, 2025) (Fourteenth Amendment, Fifteenth Amendment, and VRA Section 2 racial gerrymandering claims); *League of United Latin Am. Citizens v. Abbott*, 604 F. Supp. 3d 463, 490 (W.D. Tex. 2022) (claim under Section 2 of the VRA). Simply put, "[a] voter lacks standing to challenge a district where he does not reside," whether he brings claims under "Section 2 of the VRA, the Equal Protection Clause of the Fourteenth Amendment, [or] the Fifteenth Amendment," because "[i]n each instance, the alleged harm to any voter arises from the boundaries and composition of the particular district in which the voter resides." *Williams*, 2025 WL 1553759, at *3; *see also Hall v. Virginia*, 276 F. Supp. 2d 528, 531 (E.D. Va. 2003) ("The

19

Supreme Court has repeatedly found that plaintiffs who reside outside a district lack standing to challenge that district on voting rights grounds." (collecting authority)), *aff'd,* 385 F.3d 421 (4th Cir. 2004).

The Consolidated Complaint entirely fails to allege the Noyes Plaintiffs' standing. It does not even bother to identify the districts where the Noyes Plaintiffs reside and vote—a shortcoming the Noyes Plaintiffs' opposition does not address. *See* DCCC Mot. at 8–9. And although there are only three Noyes Plaintiffs, they apparently intend to challenge the constitutionality of "*every district*" in the Prop 50 map. Noyes Opp. at 11. But the Consolidated Complaint does not allege that *any* Noyes Plaintiff has "personally been subjected to a racial classification," *Hays*, 515 U.S. at 745, or that their "own district[s] ha[ve] been . . . gerrymandered," *Gill*, 585 U.S. at 66. Accordingly, they lack standing to challenge any congressional district—much less the map as a whole.

The Noyes Plaintiffs do not even try to argue that they meet this modest standard. Instead, they suggest that "Fifteenth Amendment standing is . . . not limited by geography," so the "Noyes Plaintiffs need not have a residence in any specific individual district to bring their Fifteenth Amendment claim." Noyes Opp. at 11 (citation modified). But the Noyes Plaintiffs cite no authority for their remarkable assertion that the Fifteenth Amendment frees them from the burden to plead the district-specific standing that applies to all racial redistricting challenges. That assertion also flies in the face of the basic principles of standing that courts routinely apply in redistricting cases. As the Supreme Court has cautioned, "a person's right to vote is individual and personal in nature." *Gill*, 585 U.S. at 65 (citation modified). Consequently, an injury to that right "results from the boundaries of the particular district in which [the person] resides," and is thus "district specific." *Id*. at 66. It follows that "[p]laintiffs who complain of racial gerrymandering in their State cannot sue to invalidate the whole State's legislative . . . map[.]" *Id*.; *see also Bethune-Hill*, 580 U.S. at 191 (explaining the "basic unit of analysis for racial gerrymandering claims in general, and for the racial predominance inquiry in particular, is the district"). Courts have uniformly applied these principles to all types of redistricting

claims, including claims brought under the Fifteenth Amendment. *Williams*, 2025 WL 1553759, at *3; *Rose v. Raffensperger*, 511 F. Supp. 3d 1340, 1352 (N.D. Ga. 2021) ("[t]o demonstrate an injury-in-fact" under the Fifteenth Amendment, plaintiffs must show that they "reside and are registered voters in districts where" alleged discrimination occurred); *League of United Latin Am. Citizens v. Abbott*, No. 3:21-cv-00259-DCG-JES-JVB, 2022 WL 4545757, at *4 (W.D. Tex. Sept. 28, 2022) (plaintiffs asserting Fifteenth Amendment claim "lack standing to challenge alleged racial gerrymandering" in any "districts in which they do not reside").

The Noyes Plaintiffs call this long-established standing rule in racial gerrymandering cases "absurd" because it would "require at least 52 different plaintiffs—one from each of California's districts." Noyes Opp. at 11–12. But there is nothing onerous or absurd about such a requirement. To the contrary, it follows directly from foundational standing principles: to challenge every district in a state's legislative map, a plaintiff must be concretely harmed by the shape or composition of each district.

In short, because the Noyes Plaintiffs have failed to properly allege that they reside in any specific California district—including any within the subset of districts actually challenged by the Noyes Plaintiffs under Counts III and III, Consol. Compl. ¶¶ 134–52—their claims must be dismissed in full. *See, e.g.*, *Giles v. Ashcroft*, 193 F. Supp. 2d 258, 266 (D.D.C. 2002) (dismissing racial gerrymandering claim where plaintiff failed to plausibly allege living within a challenged district).

## B. There is no separate Fifteenth Amendment racial gerrymandering claim with a lower threshold of proof than the corresponding Fourteenth Amendment claim.

The Noyes Plaintiffs further insist that the Fifteenth Amendment not only relieves them of their burden to allege standing, but also that it creates an "analytically distinct" racial gerrymandering cause of action that—conveniently, yet somehow unknown to all other gerrymandering plaintiffs—relieves them of their burden to allege racial predominance. Noyes Opp. at 14–18. It is difficult to follow the Noyes Plaintiffs'

argument, which features a confused discussion of the legislative history of the Fourteenth and Fifteenth Amendments and a grab-bag of cases. But the bottom line is clear: the Noyes Plaintiffs cite nothing to suggest that the Fifteenth Amendment gives rise to a lower threshold for racial gerrymandering claims. *See id*. The Noyes Plaintiffs' failure to identify a cogent legal theory alone warrants dismissal. *See* DCCC Mot. at 11.

But even if the Court excuses that failure and attempts to construct the Noyes Plaintiffs' Fifteenth Amendment claim for them, their factual allegations are woefully insufficient to support such a claim. *But see Alaei v. Holder*, No. 2:15-cv-08906-ODW-JPR, 2016 WL 3024103, at *4 (C.D. Cal. May 26, 2016) ("The Court has no obligation to manufacture Plaintiff's arguments for her."). As DCCC explained in its motion, the Fifteenth Amendment gives rise to two different types of redistricting challenges, but the Noyes Plaintiffs do not allege the elements of either.

*First*, a plaintiff can assert a "vote dilution" claim, which requires alleging that a state has intentionally drawn districts "to minimize or cancel out the voting potential" of specific racial groups, *Miller v. Johnson*, 515 U.S. 900, 911 (1995) (quotation omitted), causing an "actual discriminatory effect on that group," *Vallejo v. Keller Indep. Sch. Dist.*, 816 F. Supp. 3d 636, 646 (N.D. Tex. 2026) (citation modified). The Noyes Plaintiffs appear to disavow any vote dilution claim. *See* Noyes Opp. at 26 (claiming they "never tried" to advance a vote dilution theory). However, to the extent the Noyes Plaintiffs intended to assert such a claim, the Consolidated Complaint does not even attempt to allege one of its core elements: that the Noyes Plaintiffs belong to a racial group that has suffered an "actual discriminatory effect" due to Prop 50. *Vallejo*, 816 F. Supp. 3d at 646 (citation modified). The Noyes Plaintiffs' failure to allege a racial impact closes the door on any possible vote dilution claim.

*Second*, a plaintiff can advance a traditional racial gerrymandering claim under the Fifteenth Amendment, though that is typically done in combination with a Fourteenth Amendment claim. *See* DCCC Mot. at 13. To advance such a claim, a plaintiff must meet the "especially stringent" standard required to show racial gerrymandering, and in

particular, must show that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without *a particular district*." *Alexander*, 602 U.S. at 7 (quotation omitted) (emphasis added). Such a claim—whether brought under the Fourteenth Amendment, Fifteenth Amendment, or both—thus requires a "district-by-district" analysis, *Bethune-Hill*, 580 U.S. at 191 (citation omitted), that "disentangle[s] race and politics," *Alexander*, 602 U.S. at 6. Courts that have considered Fifteenth Amendment racial gerrymandering claims have applied the same racial-predominance standard that governs Fourteenth Amendment claims. *E.g.*, *Page v. Bartels*, 248 F.3d 175, 192 (3d Cir. 2001) (applying the "predominant factor" test to Fifteenth Amendment claims); *Prejean v. Foster*, 83 F. App'x 5, 11 (5th Cir. 2003) (same).

The Noyes Plaintiffs resist this conclusion, arguing that "[t]he Fifteenth Amendment asks only one question: Did race drive the construction of the map?", while the "Fourteenth Amendment asks more, different, and evidentiarily harder questions." Noyes Opp. at 15. But the Noyes Plaintiffs cite no authority supporting their novel argument. For the most part, they rely on short quotes from Fifteenth Amendment cases in entirely different areas of the law, which involved facially discriminatory statutes. These cases certainly do not inform the proper standard for assessing a Fifteenth Amendment claim *in the redistricting context*—much less in the context of Prop 50, which is undisputedly race-neutral on its face—nor do they suggest that the standard somehow differs from the traditional tests repeatedly affirmed by the Supreme Court.[8]

*Prejean v. Foster* is the only case the Noyes Plaintiffs cite which comes close to suggesting that Fifteenth Amendment racial gerrymandering claims are subject to a different standard. But the only difference it identifies is that "[u]nlike [a] Fourteenth

---

[8] *See, e.g.*, *Davis v. Guam*, 932 F.3d 822, 824 (9th Cir. 2019) (law restricting the franchise in a "political status plebiscite" for Guam to "Native Inhabitants of Guam"); *Rice v. Cayetano*, 528 U.S. 495, 498–99 (2000) (law restricting voting in Hawaii to "native Hawaiians").

Amendment claim, there is no room for a compelling state interest defense" to a Fifteenth Amendment claim. 227 F.3d 504, 519 (5th Cir. 2000). At this stage, no party has asserted a "compelling state interest defense." Rather, DCCC (and other Defendants) argue that Plaintiffs have failed to meet their *prima facie* burden of pleading racial predominance or intent *at all*. And *Prejean* nowhere suggests that the Fifteenth Amendment lowers the Noyes Plaintiffs' *prima facie* burden. In short, the Noyes Plaintiffs fail to show that they have discovered a heretofore unknown Fifteenth Amendment claim subject to a lower standard than the sort of racial redistricting claims recognized by federal courts.[9]

### C. The Noyes Plaintiffs have not advanced plausible district-by-district allegations of racial intent.

While the Consolidated Complaint does not make clear which districts the Noyes Plaintiffs challenge, their opposition indicates they mean to "challenge *every district* as being drawn with racial intent." Noyes Opp. at 12. For the reasons explained above, *supra* §§ I, II.A–B, the Consolidated Complaint cannot possibly support that challenge. For the vast majority of the 52 districts in the Prop 50 map, the Consolidated Complaint says nothing whatsoever—most of the districts are not mentioned by name or number at all, much less plausibly connected to allegations of racial discrimination. As DCCC has emphasized repeatedly throughout its pleadings, racial challenges to redistricting plans

---

[9] Near the outset of their brief, the Noyes Plaintiffs proclaim that the Supreme Court's recent decision in *Louisiana v. Callais* "altered the landscape" of racial gerrymandering claims, and that "[e]verything is different now." Noyes Opp. at 6. But the Noyes Plaintiffs overread *Callais* and far overstate its importance to this case. *Callais*—which involved a Fourteenth Amendment claim—reaffirmed that, "in racial gerrymandering cases, unlike other cases involving claims of racial discrimination, strict scrutiny is triggered only if race 'predominated' in the State's decisionmaking process." 146 S. Ct. 1131, 1143 (2026) (citation omitted). *Callais* thus addressed what happens if strict scrutiny *is* triggered via a showing of racial predominance, and explained the circumstances in which compliance with Section 2 of the Voting Rights Act qualifies as a compelling state interest in the strict-scrutiny analysis. *Id*. at 1153–55. Here, the Consolidated Complaint does not sufficiently allege racial predominance, so *Callais*'s holding has no impact on the applicable legal framework.

must proceed on a "district-by-district" basis, *Bethune-Hill*, 580 U.S. at 191; *see* PI Order at 24. "[T]he basic unit of analysis for racial gerrymandering claims . . . is the district." *Bethune-Hill*, 580 U.S. at 191. Thus, a challenge cannot target a map as "an undifferentiated whole," *Alabama*, 575 U.S. at 264 (emphasis omitted), or seek "to invalidate the whole State's . . . districting map," *Gill*, 585 U.S. at 66. Noyes Plaintiffs thus cannot "challenge every district" in the map without, at minimum, advancing allegations about "every district." Noyes Opp. at 12 (emphasis omitted). Yet that is precisely what they do.

The Noyes Plaintiffs also attempt to disclaim their burden under *Twombly* and *Iqbal* even as to the handful of districts that the Consolidated Complaint specifically mentions. "DCCC," they complain,

> spends eleven pages attempting to dispute alleged facts. It is as if the DCCC expects Noyes Plaintiffs to have alleged enough facts to blunt every alternative explanation for the allegations of racial intent the DCCC can conjure. Arguing pled facts is not appropriate for a Rule 12 motion.

*Id.* at 24.

That is wrong on all counts. To start, the Supreme Court has made clear that plaintiffs challenging redistricting schemes *do* bear the burden of alleging a theory that, if accepted as true, "rul[es] out the competing explanation that political considerations dominated the legislature's redistricting efforts." *Alexander*, 602 U.S. at 9–10. More fundamentally, "[a]rguing pled facts," Noyes Opp. at 24, is *precisely* the function of a Rule 12(b) motion; Rule 12 exists to test whether the "well-pleaded facts" in the complaint "permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679. And here, they do not, even if they are taken as true.

The Noyes Plaintiffs rely on the same allegations to support their Fifteenth Amendment claim as the other Plaintiff groups use to support their Fourteenth Amendment claims, and they fall short for the same reasons. *First*, the Noyes Plaintiffs rely on allegations about Paul Mitchell's statements, *see* Noyes Opp. at 18–19, but as

explained above, the Consolidated Complaint fails to plausibly allege that Mitchell is a state actor or that the statements, in context, show racial intent. *Supra* § II.A.3. *Second*, the Noyes Plaintiffs cite a grab-bag of statements from California legislators, Noyes Opp. at 20–21, but those statements—drawn from the same set as those cited by the other Plaintiff groups—either accuse *other* states of engaging in racial gerrymandering, or merely affirm that the Prop 50 map will not disadvantage minority voters. *Supra* § II.A.2. *Third*, the Noyes Plaintiffs reference allegations of circumstantial evidence of discrimination, Noyes Opp. at 24–25, but these allegations (which touch, at most, on a small fraction of California's 52 congressional districts) do not provide "factual content that allows the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *supra* §§ I.B. In other words, even accepting the scarce factual allegations of the Noyes Plaintiffs as true, their pleadings are not "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. They therefore must be dismissed.

**IV.    The Consolidated Complaint does not adequately plead a VRA § 2 claim.**

To plead a claim under § 2 of the VRA, Plaintiffs must allege that "racial discrimination [was] . . . a 'substantial' or 'motivating' factor behind enactment of" the Prop 50 map, *Hunter*, 471 U.S. at 228, and the Court must consider any "*actual* non-racial motivations" held by the relevant state actors, *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 221 (4th Cir. 2016). Such claims are similar to other intentional discrimination claims, and under Ninth Circuit precedent, are evaluated under the *Arlington Heights* framework. *See Old Person v. Cooney*, 230 F.3d 1113, 1130–31 (9th Cir. 2000). To apply that framework, the court must consider a set of non-exclusive factors, including whether the challenged decision "bears more heavily on one race than another," "[t]he historical background of the [challenged] decision," "[t]he specific sequence of events leading up to the challenged decision," "[s]ubstantive departures" from "the factors usually considered important by the decisionmaker," and the

26

"legislative or administrative history." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–68 (1977).

The Consolidated Complaint does not contain enough detailed factual allegations to apply this framework—which is a strong indication that Plaintiffs have failed to state a claim. *See, e.g.*, *Walls v. Sanders*, 760 F. Supp. 3d 766, 797 (E.D. Ark. 2024) ("To survive a motion to dismiss under *Arlington Heights*, a plaintiff must allege facts sufficient to allow the Court to draw a reasonable inference that lawmakers acted with a discriminatory intent or purpose when they enacted the law at issue."). The Noyes Plaintiffs, for their part, do not even try to perform an *Arlington Heights* analysis. Instead, they argue that "Arlington Heights [sic] is about evidence," and that they "do not need circumstantial evidence when so much direct evidence of racial intent exists." Noyes Opp. at 26. As noted above, the "direct evidence of racial intent" that the Noyes Plaintiffs allege is not, in fact, direct evidence of racial intent, so the Noyes Plaintiffs' § 2 claim fails for the same reasons as their Fifteenth Amendment claim. *Supra* § III.C.

The United States tries to fit the Consolidated Complaint's allegations into the *Arlington Heights* framework, but its effort is unavailing. *First*, the United States suggests that the "sequence of events leading up to the enactment of . . . Prop 50" was a departure from normal procedures because the Prop 50 map was adopted by the legislature and the voters, while prior maps have been adopted by an independent commission. U.S. Opp. at 26. That is true enough, but the novel circumstances in which Prop 50 was enacted do not suggest any racial motive. *See, e.g.*, *NAACP v. Wilmington Med. Ctr., Inc.*, 491 F. Supp. 290, 313 n.181 (D. Del. 1980) (rejecting argument that departures from normal procedural sequence was evidence of discriminatory intent where departures "were due to factors unrelated to discrimination"), *aff'd*, 657 F.2d 1322 (3d Cir. 1981). To the contrary, the impetus for this particular departure from California's ordinary redistricting process was the same as the impetus for Prop 50 itself—*i.e.*, a desire to gain Democratic Party seats in Congress in the 2026 midterm elections. Nothing about this procedural "departure" can plausibly be interpreted as evidence of racial

motive. *Second*, the United States again cites statements by Mitchell and California legislators as evidence about "their racial motives for drawing and enacting the map." U.S. Opp. at 26. Those statements do not evince racial motives for the reasons DCCC has already explained. *Supra* §§ II.A.2–3.

Otherwise, the United States makes no effort to apply the *Arlington Heights* framework to the Consolidated Complaint's allegations.[10] It tacitly concedes that the Consolidated Complaint says nothing about whether Prop 50 "bears more heavily on one race than another," exists against a "historical background" of pro-Latino or pro-Black discrimination, or reflects a "substantive departure" from the factors ordinarily considered in redistricting. *See Arlington Heights*, 429 U.S. at 266–68. Plaintiffs have therefore failed to meet their 12(b)(6) burden of "alleg[ing] facts sufficient to allow the Court to draw a reasonable inference that lawmakers acted with a discriminatory intent" under the applicable legal framework. *Walls*, 760 F. Supp. 3d at 797 (dismissing claim under the *Arlington Heights* framework).

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Consolidated Complaint.

---

[10] The United States argues that the *Arlington Heights* factors are "non-exhaustive" and "not a mechanical checklist that must be satisfied." U.S. Opp. at 25–26. True enough, but the "complaint facts still must give rise to the inference that" Prop 50 was enacted with "discriminatory intent," an analysis shaped by the *Arlington Heights* factors. *Ass'n for Educ. Fairness v. Montgomery Cnty. Bd. of Educ.*, 617 F. Supp. 3d 358, 368 (D. Md. 2022) (dismissing discrimination claim after analyzing complaint's allegations under the *Arlington Heights* framework), *aff'd*, No. 23-1068, 2026 WL 281028 (4th Cir. Feb. 3, 2026); *D.N. ex rel. Jessica N. v. DeSantis*, 762 F. Supp. 3d 1219, 1234 (S.D. Fla. 2024) (similarly dismissing discrimination claim after subjecting complaint's allegations to an *Arlington Heights* analysis). The Consolidated Complaint's failure to plead any facts related to most of the factors is a strong indication that it does not plausibly state a discrimination claim.

28

Dated: June 12, 2026

Respectfully submitted,

*/s/ Lalitha D. Madduri*
Lalitha D. Madduri (CA Bar No. 301236)
Christopher D. Dodge* (DC Bar No. 90011587)
Max Accardi* (DC Bar No. 90021259)
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652
F: (202) 968-4498
lmadduri@elias.law
cdodge@elias.law
maccardi@elias.law

Abha Khanna* (WA Bar No. 42612)
Tyler L. Bishop (CA Bar No. 337546)
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
T: (206) 656-0177
akhanna@elias.law
tbishop@elias.law

Omar Qureshi (CA Bar No. 323493)
Max Schoening (CA Bar No. 324643)
**QURESHI LAW PC**
700 Flower Street, Suite 1000
Los Angeles, CA 90017
T: (213) 600-6096
omar@qureshi.law
max@qureshi.law

*Counsel for Defendant-Intervenor DCCC*

* *Admitted pro hac vice*

29

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Proposed Intervenor-Defendant DCCC, certifies that this brief contains 9,126 words, which complies with the word limit of Local Rule 11-6.1 as modified by the Court's order.

Dated: June 12, 2026     */s/ Lalitha D. Madduri*
            Lalitha D. Madduri