**ARNOLD & PORTER KAYE SCHOLER LLP**
SEAN O. MORRIS (SBN 200368)
Sean.Morris@arnoldporter.com
777 South Figueroa Street
44th Floor
Los Angeles, CA  90017
T: (213) 243-4000
F: (213) 243-4199

JOHN A. FREEDMAN
John.Freedman@arnoldporter.com
601 Massachusetts Ave, NW
Washington, DC  20001
T: (202) 942-5000
F: (202) 942-5999

**DEMOCRACY DEFENDERS ACTION**
NORMAN L. EISEN
ANDREW WARREN
SOFIA FERNANDEZ GOLD
JACOB KOVACS-GOODMAN
norman@democracydefenders.org
andrew@democracydefenders.org
sofia@democracydefenders.org
jacob@democracydefenders.org
600 Pennsylvania Ave SE, Unit 15180
Washington, DC 20003
T: (202) 594-9958

**JUSTICE LEGAL STRATEGIES PLLC**
JON M. GREENBAUM (SBN 166733)
jgreenbaum@justicels.com
P.O. Box 27015
Washington, DC 20038
T: (202) 601-8678

*Counsel for Intervenor-Defendant*
*League of United Latin American Citizens*

REPLY BRIEF IN SUPPORT OF INTERVENOR-DEFENDANT LULAC'S MOTION TO DISMISS

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DAVID TANGIPA *et al.*,

               Plaintiffs,

     v.

GAVIN NEWSOM, *et al.*,

               Defendants,

and

LEAGUE OF UNITED LATIN
AMERICAN CITIZENS (LULAC),

               Intervenor-
Defendant.

Case No. 2:25-cv-10616-JLS-WLH-
KKL

**REPLY BRIEF IN SUPPORT OF
INTERVENOR-DEFENDANT
LULAC'S MOTION TO
DISMISS**

Hon. Josephine L. Staton
Hon. Wesley L. Hsu
Hon. Kenneth K. Lee

Hearing Date:  August 19, 2026
Time:         10:00 a.m.
Courtroom:    1

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

ARGUMENT .........................................................................................................3

I.   PLAINTIFFS MUST MEET A DEMANDING BURDEN TO PLAUSIBLY PLEAD RACE RATHER THAN PARTISANSHIP DROVE THE REDISTRICTING PLAN .......................................................................3

II.  PLAINTIFFS FAIL TO REBUT THE FOUR FUNDAMENTAL FLAWS THAT DEMONSTRATE PARTISAN INTENT ...............................................7

   A. Plaintiffs' failure to adequately address the partisan findings and declarations in ACA 8 ............................................................7

   B. Plaintiffs do not adequately address voter intent ...........................8

   C. Plaintiffs' failure to adequately address their contemporaneous statements that Proposition 50 was motivated by partisan intent ...............................12

   D. Plaintiffs' failure to adequately address other admissions in the Consolidated Complaint of partisanship .......................................14

III. PLAINTIFFS' AFFIRMATIVE ALLEGATIONS FAIL TO PLAUSIBLY ALLEGE THAT RACE, NOT PARTISANSHIP, DROVE THE PROPOSITION 50 MAP .................................................................16

   A. Legislator statements ..............................................................16

   B. Statements of Paul Mitchell ....................................................18

   C. Racial targeting allegations .....................................................20

   D. Illustrative Plan.....................................................................22

IV.  THE UNITED STATES AND TANGIPA PLAINTIFFS HAVE NOT PLAUSIBLY ALLEGED A RACIAL GERRYMANDERING CLAIM UNDER THE EQUAL PROTECTION CLAUSE ...........................................24

   A. Plaintiffs have not plausibly alleged that race, and not partisanship, drove Proposition 50..................................................................24

   B. Plaintiffs have not plausibly alleged that race predominated over traditional districting principles ...............................................25

V.   THE UNITED STATES' VOTING RIGHTS ACT CLAIM FAILS BECAUSE IT HAS NOT PLAUSIBLY ALLEGED THE PLAN HAS A RACIALLY DISCRIMINATORY PURPOSE OR EFFECT AGAINST A RACIAL OR ETHNIC GROUP .......................................................................27

VI.  NOYES PLAINTIFFS' CLAIMS ARE NOT LEGALLY COGNIZABLE, AND THEY LACK STANDING ...................................................28

CONCLUSION....................................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. LULAC,*
    146 S. Ct. 418 (2025)..................................................................................4, 8

*Abbott v. LULAC,*
    2026 WL 1127246 (U.S. Apr. 27, 2026).........................................................4

*Abbott v. Perez,*
    585 U.S. 579 (2018)........................................................................................7

*Ala. Legis. Black Caucus v. Alabama,*
    575 U.S. 254 (2015)..............................................................21, 24, 25, 26

*Alexander v. State Conference of the NAACP,*
    602 U.S. 1 (2024)................................................................................*passim*

*Allen v. Milligan,*
    2026 WL 1552756 (U.S. June 2, 2026).............................................4, 8, 22, 23

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)..................................................................................5, 26

*AT&T v. Compagnie Bruxelles Lambert,*
    94 F.3d 586 (9th Cir. 1996) .........................................................................13

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)........................................................................................5

*Bethune-Hill v. Va. State Board of Elections,*
    580 U.S. 178 (2017)..............................................................21, 24, 25, 26

*City of Los Angeles v. County of Kern,*
    462 F. Supp. 2d 1105 (C.D. Cal. 2006)...................................................8, 10, 11

*Cooper v. Harris,*
    581 U.S. 285 (2017)............................................................................*passim*

*Davis v. Guam,*
    932 F.3d 822 (9th Cir. 2019) .......................................................................31

REPLY BRIEF IN SUPPORT OF INTERVENOR-DEFENDANT LULAC'S MOTION TO DISMISS

*Gant v. Wallingford Bd. of Educ.*,
69 F.3d 669 (2d Cir. 1995) ...................................................................................14

*Gomillion v. Lightfoot*,
364 U.S. 339 (1960)..............................................................................................31

*Harper v. Va. State Bd. of Elections*,
383 U.S. 663 (1966)............................................................................................7, 8

*Harrison v. Institutional Gang of Investigations*,
2009 WL 1277749 (N.D. Cal. May 6, 2009)........................................................14

*Hunter v. Erickson*,
393 U.S. 385 (1969) .............................................................................................10

*Hunter v. Underwood*,
471 U.S. 222 (1985)..............................................................................................10

*Lamie v. United States Trustee*,
540 U.S. 526 (2004)................................................................................................7

*Louisiana v. Callais*,
146 S. Ct. 1131 (2026)....................................................................................*passim*

*Lucas v. Forty-Fourth Gen. Assembly*,
377 U.S. 713 (1964)................................................................................................9

*Miller v. Johnson*,
515 U.S. 900 (1995)........................................................................................*passim*

*North Carolina v. Covington*,
585 U.S. 969 (2018)..............................................................................................30

*Perry v. Brown*,
671 F.3d 1052 (9th Cir. 2012) .............................................................................10

*Personnel Administrator of Massachusetts* v. *Feeney*,
442 U.S. 256 (1979)..............................................................................................10

*Romer v. Evans*,
517 U.S. 620 (1996)................................................................................................9

*Shaw v. Hunt*,
517 U.S. 899 (1996)..............................................................................................25

REPLY BRIEF IN SUPPORT OF INTERVENOR-DEFENDANT LULAC'S
MOTION TO DISMISS

*Shaw v. Reno*,
509 U.S. 630 (1993)................................................................................27, 29, 30

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011) .........................................................................6

*Village of Arlington Heights v. Metropolitan Housing Development
Corp.*,
429 U.S. 252 (1977)......................................................................................11, 27

*Washington v. Davis*,
426 U.S. 229 (1976)...........................................................................................27

*Washington v. Seattle School District No. 1*,
458 U.S. 457 (1982)........................................................................................8, 10

*Wilkins v. Lowe*,
2020 WL 3065119 (C.D. Cal. Apr. 21, 2020)...................................................14

## Constitutional Provisions

U.S. Const. amend. XIV .............................................................................26, 28, 30

U.S. Const. amend. XV...............................................................................2, 28, 30

Cal. Const. art. XVIII, XXI ..............................................................................10

## Statutes

52 U.S.C. § 10301..........................................................................................*passim*

## Other Authorities

Federal Rule of Civil Procedure 10(c)....................................................................12

Federal Rule of Civil Procedure 12(b)..................................................................5, 6

REPLY BRIEF IN SUPPORT OF INTERVENOR-DEFENDANT LULAC'S
MOTION TO DISMISS

# INTRODUCTION

The oppositions to the motions to dismiss filed by the United States (Dkt. 264), Tangipa Plaintiffs (Dkt. 263), and Noyes Plaintiffs (Dkt. 262) confirm that LULAC's Motion to Dismiss should be granted. Each Plaintiff acknowledges the partisan motivation behind the Proposition 50 plan but contends that the plan was also a product of race:

> United States: "The United States does not dispute and has never disputed that the Proposition 50 map is intended to bolster the performance of the Democratic Party in congressional elections. However, States may not enact a partisan gerrymander through racially discriminatory means." Dkt. 264 at 2.

> Tangipa Plaintiffs: "Parallel Partisan Objectives Do Not Render the Racial Gerrymandering Claim Implausible." Dkt. 263 at 18.

> Noyes Plaintiffs: "Partisanship may have been the impetus, but race drew legislative districts with deliberate racial outcomes." Dkt. 262 at i.

The problem for Plaintiffs is that the Supreme Court has squarely held in redistricting cases involving race, beginning with *Alexander v. State Conference of the NAACP*, 602 U.S. 1 (2024), that Plaintiffs have the burden of disproving partisan motivation when that motivation, as here, is asserted as a defense. Just last month, the Court emphasized:

> [A]s we have repeatedly made clear, when a State defends a districting scheme on the ground that it was drawn for partisan purposes, plaintiffs have a 'special' burden to overcome. 'To prevail,' the plaintiff 'must disentangle race from politics' by proving 'that the former *drove* a district's lines.' 'That means, among other things, ruling out the competing explanation that political considerations dominated the legislature's redistricting efforts. If either politics or race could explain a district's contours, the plaintiff has not cleared its bar.'

*Louisiana v. Callais*, 146 S. Ct. 1131, 1156-57 (2026) (quoting *Alexander*, 602 U.S. at 9-10) (cleaned up).

As the Court warned in *Alexander* of plaintiffs "repackag[ing] a partisan-

REPLY BRIEF IN SUPPORT OF INTERVENOR-DEFENDANT LULAC'S MOTION TO DISMISS

gerrymandering claim as a racial-gerrymandering claim," 602 U.S. at 21, the Court reiterated in *Callais* that "[i]f race and politics are not disentangled and a § 2 claim is cynically used as a tool for advancing a partisan end, the VRA's noble goal will be perverted." *Callais*, 146 S. Ct. at 1163.

This case is a paradigmatic example of what the Court warned of in *Alexander* and *Callais*. The *Alexander/Callais* requirement of disproving partisan motivation, when combined with the pleading requirements of *Twombly/Iqbal*, requires Plaintiffs to allege well-pleaded facts showing that race, rather than partisanship, explains the motivations behind Proposition 50.

When the governing legal standards are applied, all Plaintiffs fail to state a claim because the relevant record—the Consolidated Complaint and its attachments, as well as judicially noticed documents—is rife with language showing partisan motivation. This includes the four fundamental flaws that LULAC previously outlined, Dkt. 251-1 at 8-14, and additional problems, including the failure to assert well-pleaded facts showing that race predominated over traditional principles and concessions that voters vote along partisan rather than racial lines.

The best Plaintiffs can do is allege that race was *a* consideration—using statements by legislators and the map drawer, allegations of racial targeting, and an expert affidavit showing that the same partisan objective could have been met through a redistricting plan that reduced, instead of maintained, the same number of majority-Hispanic districts. But even in their best light, these allegations do not meet the pleading burden of plausibly disproving partisan motivation. For example, the legislators' and Mitchell's statements attached to the complaints reflect that these legislators were acting out of partisan concerns and that Mitchell understood his task was to create five additional Democratic districts.

Noyes Plaintiffs try to evade the applicable legal standards by asserting novel and unrecognized claims—a racial gerrymandering claim under the Fifteenth

REPLY BRIEF IN SUPPORT OF INTERVENOR-DEFENDANT LULAC'S MOTION TO DISMISS

Amendment, and an intentional discrimination violation of the Voting Rights Act that is not a vote dilution claim—and by asserting that a plaintiff can prevail by showing that race was merely a motivating factor in redistricting. Courts have not recognized such claims; rather, these claims fail. The Noyes Plaintiffs also fail to establish standing.

## ARGUMENT

### I.    Plaintiffs Must Meet a Demanding Burden to Plausibly Plead Race Rather Than Partisanship Drove the Redistricting Plan

As LULAC previously established, Dkt. 251-1 at 17, the Supreme Court in *Alexander* held that where there is a partisan defense in a racial gerrymandering challenge to a redistricting plan, the plaintiffs have the "special challenge[]" of "'disentangl[ing] race from politics' by proving 'that the former drove a district's lines.' That means, among other things, ruling out the competing explanation that political considerations dominated the legislature's redistricting efforts." *Alexander*, 602 U.S. at 9-10.

Since LULAC's opening brief, the Supreme Court in *Callais* reiterated that the same "special burden" applies to plaintiffs in vote dilution cases. *Callais*, 146 S. Ct. at 1156. As in *Alexander*, the Court in *Callais* warned of plaintiffs trying to repackage partisan redistricting as racial redistricting. *Callais*, 146 S. Ct. at 1148, 1163. And *Callais* imposed new requirements for illustrative maps in partisan redistricting cases:

> [I]llustrative maps must meet all the State's legitimate districting objectives, including traditional districting criteria and the State's specified political goals. If the State's aims in drawing a map include a target partisan distribution of voters, a specific margin of victory for certain incumbents, or any other goal not prohibited by the Constitution, the plaintiffs' illustrative maps must achieve these goals just as well.

*Id.* at 1159.

After *Alexander* and before *Callais,* the Supreme Court stayed the three-judge

- 3 -
REPLY BRIEF IN SUPPORT OF INTERVENOR-DEFENDANT LULAC'S MOTION TO DISMISS

district court opinion finding a racial gerrymander in *Abbott v. LULAC,* 146 S. Ct. 418 (2025). Justice Alito, the author of both *Alexander* and *Callais*, wrote a concurring opinion, stating that it was "indisputable—that the impetus for the adoption of the Texas map (like the map subsequently adopted in California) was partisan advantage pure and simple," and that this fact was decisive in granting the stay. *Id.* at 420 (Alito, J., concurring). The Court later summarily reversed the district court's judgment. *Abbott v. LULAC*, 2026 WL 1127246 (U.S. Apr. 27, 2026). Consistent with Justice Alito's statement about the California redistricting in *Abbott*, not a single justice opposed the denial of the stay that the Tangipa Plaintiffs sought after this Court denied their motion for preliminary injunction.

Finally, on June 2, 2026, the Supreme Court issued a per curiam order in *Allen v. Milligan*, 2026 WL 1552756 (U.S. June 2, 2026), where it stayed a three-judge district court's order enjoining Alabama's 2023 redistricting plan, which the district court had found intentionally diluted Black voters' votes. Notably, the Supreme Court found that the district court "did not heed the presumption of legislative good faith." *Id.* at *1. The Court also found that the "mere fact that voters of different races vote for different parties is not relevant to proving racially polarized voting patterns." *Id.* Additionally, it applied the *Callais* requirement that the illustrative map must satisfy all criteria set forth by the Legislature just as well as the challenged plan does. *Id.*

These recent decisions have made clear the requirement of disentangling race from partisanship in both racial gerrymandering and Voting Rights Act claims. Both the United States and Tangipa Plaintiffs cite an earlier Supreme Court racial gerrymandering case, *Cooper v. Harris*, 581 U.S. 285 (2017), to suggest that a racial gerrymandering claim could be cognizable alongside a partisan gerrymander, such as where race serves as the means to a partisan end. *See* Dkt. 264 at 20; Dkt. 263 at 3, 18-19, 30. Some portions of *Cooper*, namely footnotes 1 and 7, arguably suggest

as much. *Id.* at 291 n.1, 308 n.7. But the text preceding those footnotes foreshadowed the formulation outlined in *Alexander* by stating that plaintiffs needed to show that partisanship was subordinated to race, *id.* at 291, and that plaintiffs needed to "disentangle race from politics and prove that the former drove a district's lines." *Id.* at 308 (quotations omitted). In *Alexander*, the Supreme Court adopted the statements in *Cooper*'s text while omitting the footnote language. Justice Kagan, the author of *Cooper*, criticized this jurisprudential change, calling the "special rules to specially disadvantage suits to remedy race-based redistricting" "most dispiriting" and stating that this "altered perspective" misses that a legislature "may have sorted citizens by their race … for no reason other than to achieve partisan gain." *Alexander*, 602 U.S. at 69-70 (Kagan, J., dissenting). Thus, at a minimum, *Alexander* reoriented the inquiry such that where racial intent and partisan intent are present, partisanship is presumptively dominant, and Plaintiffs bear the burden of demonstrating otherwise.

As discussed in LULAC's opening brief, Dkt. 251-1 at 17, plaintiffs must plausibly allege that race, rather than partisanship, drove the districting process, based on the substantive requirements discussed above and the pleading requirements of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). A plaintiff does not satisfy the plausibility standard if there is an "obvious alternative explanation," such as partisanship, under which the defendant would not be liable. *Iqbal*, 556 U.S. at 682; *Twombly*, 550 U.S. at 567. In another redistricting case where partisan motivations are not squarely invoked, a plaintiff may not have to satisfy this burden of disproving partisan motivation. But here, the complaint, its attachments, and several judicially noticed documents put partisan motivation at issue. Moreover, as discussed in LULAC's opening brief, Dkt. 251-1 at 6-7, the Supreme Court in *Miller* made clear that the presumption of legislative good faith is one of the constitutional principles that applies at all stages of redistricting litigation, including for Rule 12(b) motions. *Miller v. Johnson*, 515

U.S. 900, 916-17 (1995). This principle "requires courts to exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race." *Id.*

Neither the United States nor the Noyes Plaintiffs respond meaningfully to the standards applicable at the motion to dismiss stage set forth by LULAC. Citing *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011), the Tangipa Plaintiffs assert that if there are two alternative explanations, one asserted by the plaintiff and one by the defendant, that is sufficient to defeat a motion to dismiss. Dkt. 263 at 18. Additionally, the Tangipa Plaintiffs claim that the "obvious alternative explanation" standard is not applicable because of the specificity of the race allegations in the Consolidated Complaint, Dkt. 263 at 18, and that the presumption of legislative good faith is evidentiary and thus does not apply at the pleading stage. Dkt. 263 at 11-12.

These arguments are unavailing. *Starr* holds that a plaintiff defeats a motion to dismiss when two competing explanations are *equally* plausible, and the court must choose between them. Here, the two explanations—race and partisanship—are not on equal footing. Post-*Alexander*, partisanship is presumed to be the dominant explanation, and Plaintiffs must plausibly allege otherwise. Rather than plausibly alleging the predominance of race, the Consolidated Complaint and its attachments repeatedly recognize that the plan had partisan objectives, offering an obvious alternative explanation: partisanship, not race alone, motivated the plan.

As for the presumption of legislative good faith at the pleading stage, the Court in *Miller* explicitly cited Rule 12(b) in writing, "[a]lthough race-based decisionmaking is inherently suspect, until a claimant makes a showing sufficient to support that allegation the good faith of a state legislature must be presumed." *Miller*, 515 U.S. at 916-17 (citation omitted). Indeed, *Miller* counsels courts to exercise extraordinary caution when assessing whether decisionmakers were motivated by race, and the Court identifies the presumption of legislative good faith as one of the

three reasons for such caution. *Id.* at 916. In other words, the Supreme Court in *Miller* clearly intended the presumption of good faith to apply at the pleading stage. The presumption, with other factors, sets the threshold of pleading sufficiency: whether, given the presumption of good faith, the complaint plausibly alleges that the decisionmakers acted because of race.

## II. Plaintiffs Fail To Rebut The Four Fundamental Flaws That Demonstrate Partisan Intent

LULAC's opening brief sets forth four fundamental flaws that doom Plaintiffs' case because they undermine any claim of discriminatory intent. Dkt. 251-1 at 8-14. Plaintiffs' response is insufficient and confirms dismissal is warranted.

### A. Plaintiffs' failure to adequately address the partisan findings and declarations in ACA 8

As LULAC established, the starting point for determining intent is the text of the challenged act, and ACA 8 includes a series of findings and declarations of the people of the State of California that include numerous expressions of partisan intent. Dkt. 251-1 at 8-9.

Neither Tangipa nor Noyes Plaintiffs address these findings. The United States acknowledges the significance of the referendum's statement of intent, Dkt. 264 at 20, but asserts that whether the findings are pretextual must be decided at trial, citing *Harper v. Va. State Bd. of Elections*, 383 U.S. 663 (1966) for the proposition that "[l]egislatures cannot make discriminatory voting policies constitutional simply by declaring that the policies have a legitimate purpose." Dkt. 264 at 20.

The United States' arguments fall flat. Because statutory text is the starting point in assessing decisionmaker intent, *Lamie v. United States Trustee*, 540 U.S. 526, 539 (2004), it is primary objective evidence in assessing intent, not a secondary consideration, as the United States suggests. And the Supreme Court has repeatedly noted that pretext is not something easily established, particularly given the

REPLY BRIEF IN SUPPORT OF INTERVENOR-DEFENDANT LULAC'S MOTION TO DISMISS

presumption of good faith that applies to redistricting challenges. *Abbott v. Perez*, 585 U.S. 579, 605 (2018) (finding the lower court erred in not applying the presumption when it found intentional discrimination as to a Texas redistricting). Last week, the Supreme Court applied the presumption of good faith again in *Allen*: "As to intentional vote dilution, the District Court did not heed the presumption of legislative good faith, because it interpreted the State's legal disagreement with the court's earlier remedial order as proof of discriminatory animus." *Allen*, 2026 WL 1552756, at *1 (citing *Alexander*, 602 U.S. at 10). And as discussed above, *Miller* makes clear that the presumption applies at the 12(b)(6) stage. *Miller*, 515 U.S. at 916-17.

Here, the partisan intent appears in black and white in ACA 8's findings. That is stronger evidence of motivation than that presented in *Abbott* and *Allen* and is a key distinction from *Harper*, where the state's purported justification (the need to collect revenue) was argued only *post hoc* in court, not on the face of the challenged act. As to Plaintiffs' allegations of racial intent, they are not sufficient here where the Plaintiffs have not disentangled race from partisanship. Thus, the United States' response comes up short.

Plaintiffs' oppositions confirm they cannot overcome this fundamental problem regarding the text of ACA 8 and its numerous explicit references to partisanship, and this in itself is sufficient to grant the motion to dismiss.

### B.    Plaintiffs do not adequately address voter intent

As discussed in LULAC's opening brief, the Consolidated Complaint is silent as to voter intent. Dkt. 251-1 at 9. This is a fundamental flaw: because ACA 8 was enacted through a voter referendum, the collective intent of the voters is an essential part of the constitutional inquiry, and collective intent must be assessed through objective criteria as outlined in *Washington v. Seattle School District No. 1*, 458 U.S. 457, 471-74 (1982), and *City of Los Angeles v. County of Kern*, 462 F. Supp. 2d

1105, 1114 (C.D. Cal. 2006). The text of ACA 8 and the Official Voter Guide, which includes the Title and Official Summary of Proposition 50 and Proponent/Opponent statements, were provided to voters and demonstrate a partisan purpose. Dkt. 251-1 at 10-11.

The United States and Tangipa Plaintiffs explicitly acknowledge that the Consolidated Complaint intentionally omitted allegations of voter intent and incorrectly contend that such allegations are irrelevant. Dkt. 263 at 28; Dkt. 264 at 11. While the Noyes Plaintiffs state that "[i]t is not to say that evidence of voter intent could *never* be relevant to constitutional questions," they contend "voter intent cannot be the *determinative* issue." Dkt. 262 at 29.

Plaintiffs' arguments as to voter intent are wrong. Tangipa and the United States assert that the lack of discriminatory voter intent cannot cure discriminatory legislative action by "laundering" it through referendum, Dkt. 263 at 2; Dkt. 264 at 10, while the Noyes Plaintiffs cite various blatantly discriminatory laws, such as literacy tests, as examples of laws that would be inappropriate to cure through referendum. Dkt. 262 at 28. Noyes and Tangipa Plaintiffs attempt to distinguish the authorities cited by LULAC regarding the assessment of voter intent in a discrimination challenge, because those cases did not turn on voter intent and were citizen-initiated, not legislative-initiated, referenda. Dkt. 263 at 14; Dkt. 262 at 29. Relatedly, each Plaintiff asserts there is no practical way to assess voter intent. Dkt. 264 at 11; Dkt. 263 at 13; Dkt. 262 at 28. LULAC takes each argument in turn.

Regarding the "laundering" argument, it is certainly the case that an illegal or facially discriminatory legislative act cannot be saved by voter referendum. But the cases Plaintiffs cite, Dkt. 262 at 26-28; Dkt. 263 at 15-16; Dkt. 264 at 10, are no help to them here, since they do not involve intent, express intent on the face of the

REPLY BRIEF IN SUPPORT OF INTERVENOR-DEFENDANT LULAC'S MOTION TO DISMISS

referendum, or do not involve a referendum.[1] Conceivably, a plaintiff could overcome the presumption of legislative good faith and show that a legislative body *chose* to submit an issue to voters to avoid a discriminatory intent challenge, either knowing that voters would approve the referendum for their own discriminatory reasons or because they would be misled. But that theory is not plausible here because California law *required* the Legislature to submit any proposed mid-decade redistricting to the voters. Cal. Const. art. XVIII, XXI.

*Seattle* and *Kern* address the relevance of voter intent and the workability of assessing it. In *Seattle*, the Court looked to the text, the proponents' statements, and the initiative's effects as objective factors in determining intent. In analyzing whether the initiative was enacted for discriminatory reasons, the Supreme Court then focused on what the *electorate* knew:

> [A]s we have noted, Initiative 350 in fact allows school districts to bus their students "for most, if not all," of the nonintegrative purposes required by their educational policies. The Washington electorate surely was aware of this, for it was "assured" by CiVIC officials that "'99% of the school districts in the state'"—those that lacked mandatory integration programs—"would not be affected by the passage of 350." It is beyond reasonable dispute, then, that the initiative was enacted "because of, not merely in spite of, its adverse effects upon" busing for integration.

---

[1] In *Lucas v. Forty-Fourth Gen. Assembly*, 377 U.S. 713, 734-35 (1964), intent was not at issue because the underlying problem was that the referendum's voting districts violated the one-person, one-vote standard, which is a technical standard in which intent was irrelevant. In *Romer v. Evans*, 517 U.S. 620, 624 (1996) and *Perry v. Brown*, 671 F.3d 1052, 1063-64 (9th Cir. 2012), both of which involved challenges to laws that limited the rights of gay people, the alleged discrimination was on the face of the referendum. *Hunter v. Erickson,* 393 U.S. 385, 389-92 (1969), involved a challenge to a city charter amendment passed by voter referendum involving housing, under which any Akron city ordinance addressing housing discrimination had to be enacted by voter referendum, whereas other ordinances did not; again, there was no need to assess voters' discriminatory intent because the ordinance created a discriminatory structure through its practical "impact." *Hunter v. Underwood*, 471 U.S. 222, 223-24 (1985), did not involve a voter referendum, but a challenge to a felony disenfranchisement statute that was enacted at Alabama's Constitutional Convention of 1901, of which the trial court found a "major purpose" was to disenfranchise Black people; this case is of no import here given that it does not involve a voter referendum and it was part of a larger process that had an indisputably racial purpose.

REPLY BRIEF IN SUPPORT OF INTERVENOR-DEFENDANT LULAC'S MOTION TO DISMISS

*Seattle*, 458 U.S. at 471 (quoting *Personnel Administrator of Massachusetts* v. *Feeney*, 442 U.S. 256, 279 (1979)) (cleaned up). Citing *Seattle*, the court in *Kern* stated that it "may look to the nature of the initiative campaign to determine the intent of the drafters and voters in enacting it," explicitly identifying voter intent as relevant. 462 F. Supp. 2d at 1114. More generally, courts routinely assess the collective intent of a legislative body, even in the absence of express statements by its members. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 268 (1977) (contemporaneous legislative statements are among the relevant sources of intent but not required).

The Tangipa Plaintiffs also assert that voter intent should not be assessed because voters are not drafters but ratifiers, and that only the mapmaker's intent, not that of the voters (or legislators), is relevant. Dkt. 263 at 14. The United States similarly argues that because the mapmaker designs the plan, voter intent is irrelevant. Dkt. 264 at 10. But these arguments are refuted by the very decisions the United States and Tangipa Plaintiffs rely upon. Contrary to Plaintiffs' suggestions, the Supreme Court has held in multiple redistricting cases that, when the legislature adopts a plan, the legislature's intent matters, and the mapmaker's statements and actions are only relevant in assessing legislative intent. For example, in *Cooper* (cited at Dkt. 264 at 6-7; Dkt. 263 at 13), the Court emphasized the legislature's motivation: "[T]he plaintiff must prove that 'race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'" *Cooper*, 581 U.S. at 291 (quoting *Miller*, 515 U.S. at 916). The *Cooper* Court noted evidence from the mapmaker was relevant, but only to the extent it determined legislative intent, with the Court finding that the mapmaker followed the instructions from the legislative committee chairs spearheading the redistricting "to the letter." *Id.* at 299-300. Similarly, in *Alexander*, the Court's opening paragraph identifies the legislature, not the mapmaker, as having

- 11 -
REPLY BRIEF IN SUPPORT OF INTERVENOR-DEFENDANT LULAC'S MOTION TO DISMISS

the constitutional responsibility for map drawing: "The Constitution entrusts state legislatures with the primary responsibility for drawing congressional districts, and redistricting is an inescapably political enterprise." 602 U.S. at 6. The *Alexander* Court discussed the mapmaker's actions only in the context of determining legislative intent: the mapmaker drew a map "that reflected the legislature's priorities" and achieved "the legislature's partisan objectives." *Id*. at 14. The Plaintiffs' asserted designer/ratifier distinction fails when scrutinized.

Rather, the throughline of these decisions is that the relevant intent belongs to the body that adopts the map—those whose votes give it legal effect—not the individual who drafts it. Of course, this case is different in that two groups needed to vote on the Proposition 50 map for it to take effect: the legislators and the voters. Thus, the intent of both voters and legislators matters.

And, as outlined in the LULAC initial brief, Dkt. 251-1 at 9-11, the text of ACA 8, the Title and Official Summary of Proposition 50, and the Proponent/Opponent Statements within the Voter Guide—the information used to assess voter intent—show that Proposition 50 was driven by partisan intent. Plaintiffs do not seriously contest what these documents convey. The Tangipa Plaintiffs note only that ACA 8 states that it will not "erod[e] fair representation for all communities" and that the section of the Voter Guide covering the "Argument Against Proposition 50" states that the map would "divide our neighborhoods and weaken the voice of communities of color." Dkt. 263 at 27. These examples do not reflect a racial intent on behalf of decisionmakers, and even if they did, they pale in comparison to the explicit repeated references to partisanship.

## C.    Plaintiffs' failure to adequately address their contemporaneous statements that Proposition 50 was motivated by partisan intent

As detailed in LULAC's opening brief, Dkt. 251-1 at 11-13, when the Assembly was debating Proposition 50, Plaintiff Tangipa delivered a floor statement criticizing its partisan motivation. He did not mention race. Because the transcript is

attached to the Consolidated Complaint, it is part of the pleading for all purposes under Rule 10(c) of the Federal Rules of Civil Procedure. Accordingly, the lead Plaintiff's own contemporaneous characterization of the measure as partisan is a well-pleaded fact to be accepted as true, and one that Plaintiffs cannot now contradict to manufacture a racial-predominance inference.

Tangipa Plaintiffs offer several responses. Citing *AT&T v. Compagnie Bruxelles Lambert*, 94 F.3d 586 (9th Cir. 1996), they assert that "where Defendants rely on exhibit language that they contend contradicts the Complaint, the Court must still draw all reasonable inferences from documentary evidence in Plaintiffs' favor, including inferences about the meaning of that language." Dkt. 263 at 11. Second, they claim that Tangipa was only "criticizing the majority party, not making a deliberate factual concession about map-drawing methodology." Dkt. 263 at 29. Third, citing three cases, they contend that "an exhibit containing a legislative debate transcript does not transform every characterization within it into a binding judicial admission." *Id*. Fourth, they note that Tangipa made his statement two months before "Mitchell publicly disclosed his racial methodology for the first time." *Id.*

These responses are unavailing. First, *AT&T* does not stand for the proposition that Tangipa claims. *AT&T* involved conflicting evidence on a personal-jurisdiction motion, where the court drew inferences in the plaintiff's favor between competing submissions; it did not hold that a court must adopt an inference that contradicts an admission the opposing party itself attached to the complaint. *Id.* at 588-89. Second, Tangipa's concession that Democrats admitted the map was motivated by partisan intent is confirmation of the lead Plaintiff's partisan intent, not something to overlook. Moreover, the statement contains Tangipa's own view that there was a partisan motivation. Dkt. 240-6 at 99-101 (referring to "Trump derangement syndrome in this party"). The distinction made by Tangipa Plaintiffs, criticizing the majority rather than conceding partisan map-drawing, is beside the point, because

the content of Tangipa's criticism was that the map was partisan and did not mention race. Third, the three cases cited by Tangipa Plaintiffs do not involve situations where the plaintiff's own statements were being used against them, but rather statements by the opposing party—either the defendant or an employee of the defendant. *See Wilkins v. Lowe*, 2020 WL 3065119, at *5 (C.D. Cal. Apr. 21, 2020) (statement was defendant's characterization of a statement by plaintiff); *Harrison v. Institutional Gang of Investigations*, 2009 WL 1277749, at *2 (N.D. Cal. May 6, 2009) (statements were those of defendants' employees); and *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 674 (2d Cir. 1995) (statements were those of the defendant's school superintendent). Fourth, when Plaintiff Tangipa made the floor statements, his not knowing what Mitchell would say two months later is irrelevant: the floor statement is objective contemporaneous evidence of the enactment's partisan character, and Plaintiff Tangipa's lack of awareness suggests that legislators acted on the partisan record before them, not on Mitchell's later-disclosed statements.

For reasons discussed in the opening brief, this admission fatally undermines Plaintiffs' claims.

### D. Plaintiffs' failure to adequately address other admissions in the Consolidated Complaint of partisanship

As noted in the opening brief, the Consolidated Complaint contains additional admissions. Dkt. 251-1 at 13-14. For example, Plaintiffs allege that California voters vote on partisan, not racial, lines. Dkt. 240 at ¶¶ 49-51. Relatedly, the United States and the Noyes Plaintiffs allege that the Proposition 50 plan will likely reduce the number of Republicans from nine to four, thereby admitting a partisan effect. Dkt. 240 at ¶ 93. These admissions are fatal because they support the obvious alternative explanation that partisanship, not race, drove the adoption of Proposition 50.

The United States and Tangipa Plaintiffs argue that the import of the Consolidated Complaint's allegations that voters vote along partisan, not racial, lines

- 14 -
REPLY BRIEF IN SUPPORT OF INTERVENOR-DEFENDANT LULAC'S MOTION TO DISMISS

is limited to rebutting the argument that majority-Hispanic districts were necessary to further the compelling interest of Section 2 of the Voting Rights Act—the strict scrutiny second step of the racial gerrymandering framework. Dkt. 264 at 21-22. But Plaintiffs cannot cabin the legal significance of their admission. Moreover, before Plaintiffs reach the second step, their allegations must be sufficiently plausible to establish that race was the driving factor behind the plan's adoption. In fact, the Tangipa Plaintiffs' and United States' admissions prevent Plaintiffs from reaching the second step because they show that partisan affiliation, not race, determines how people vote and that the plan had a partisan effect. This admitted partisan effect, combined with all the undisputed statements of partisan intent discussed above, undermines any plausible argument that something other than partisanship was the driving factor.

The Tangipa Plaintiffs make a second argument, shared by the Noyes Plaintiffs: it does not matter whether the plan was motivated by partisan purpose, contending it does not "preclude" finding that race predominated. Dkt. 263 at 29-30; Dkt. 262 at 22, 23. Again, Plaintiffs misunderstand the case law. As discussed above, the Supreme Court's jurisprudence demonstrates that the Court presumes that when race and partisanship are both present, partisanship is presumed to be the dominant motivation. Thus, Plaintiffs must do more than claim that race was used as a means to a partisan end. Moreover, the Consolidated Complaint undermines Plaintiffs' theory that race was used as a tool to achieve a partisan effect because Plaintiffs allege that partisanship, not race, determines how voters vote; thus, partisanship itself does the work to create a partisan effect, not race. Dkt. 240 at ¶¶ 49-51, 93.

\*    \*    \*

Plaintiffs' failure to rebut these four fundamental flaws is fatal to their case because it prevents them from plausibly alleging that race, not partisanship, drove the decision of voters and legislators to enact the Proposition 50 map.

REPLY BRIEF IN SUPPORT OF INTERVENOR-DEFENDANT LULAC'S MOTION TO DISMISS

### III.    Plaintiffs' Affirmative Allegations Fail to Plausibly Allege That Race, Not Partisanship, Drove the Proposition 50 Map

The fundamental flaws identified above are sufficient to demonstrate that Plaintiffs have not plausibly alleged that race, rather than partisanship, drove the Proposition 50 Map and are sufficient grounds for granting the motion to dismiss. This failure is confirmed by the affirmative allegations and arguments made by Plaintiffs in their opposition briefs.

#### A.    Legislator statements

Plaintiffs selectively cite press and hearing statements of legislators mentioning race with respect to Proposition 50. But the statements (attached to the Consolidated Complaint) are part of larger statements from those legislators indicating that Proposition 50 was a response to improper partisan efforts by President Trump and out-of-state Republicans to gerrymander:

1. *Senate President pro Tempore Mike McGuire* (referenced by Plaintiffs at Dkt. 240 at ¶ 84; Dkt. 262 at 21; Dkt. 263 at 27; Dkt. 264 at 17; Dkt. 240-9 at 2): Senator McGuire's attached press release contains numerous statements regarding partisan intent. The first paragraph states that Democrats are "fighting back against reckless attacks by Trump and Republicans." Dkt. 240-9 at 1. The first bullet point explicitly identifies Proposition 50 as a response to partisan gerrymandering: "The legislation includes a trigger to ensure that maps will take effect only if other states effectuate partisan gerrymandering."  Dkt. 240-9 at 2.

2. *Speaker of the Assembly Robert Rivas* (referenced by Plaintiffs at Dkt. 240 at ¶ 85; Dkt. 263 at 27; Dkt. 264 at 17; Dkt. 240-10 at 1): The subtitle of the attached press release makes clear that California's effort is a partisan response: "As Trump and Republicans rig the vote in Texas and other states, California lawmakers are fighting back."  Dkt. 240-10 at 1. The second bullet notes that the maps will go into effect "only if other states effectuate partisan gerrymanders."  Dkt. 240-10 at 1.

3. *Assemblymember Isaac Bryan* (referenced by Plaintiffs at Dkt. 240 at ¶ 79;

- 16 -

REPLY BRIEF IN SUPPORT OF INTERVENOR-DEFENDANT LULAC'S MOTION TO DISMISS

Dkt. 262 at 20; Dkt. 264 at 17–18; Dkt. 240-5 at 6; Dkt. 240-6 at 49). Assemblymember Bryan's attached statement described the Proposition 50 map as a response to partisan gerrymandering: "These maps will be used through the 2030 congressional term only and—only if Texas and other states enact their partisan gerrymandering, their power grab of their own congressional districts at the behest of the President." Dkt. 240-5 at 7.

4. *Assemblymember Mark Gonzalez* (referenced by Plaintiffs at Dkt. 240 at ¶ 80; Dkt. 262 at 20; Dkt. 264 at 17; Dkt. 240-6 at 40): Assemblymember Gonzalez's attached statements described the legislation as a partisan response to election rigging. *See* Dkt. 240-6 at 39 ("If Texas wants to carve up districts to keep their wannabe dictator in power, we will not bow") and Dkt. 240-6 at 177 ("Reporters aren't grilling Republicans in Texas about who's drawing their maps, even though those maps are blatant gerrymandering designed to silence voters and lock in power . . . , Republicans in Texas, Florida and across the country are actively rigging districts to silence voters and protect Donald Trump, your hero.").

5. *Assemblymember Mark Gibson* (referenced by Plaintiffs at Dkt. 240 at ¶ 81; Dkt. 262 at 18; Dkt. 264 at 17; Dkt. 240-6 at 53): Assemblymember Gibson's attached statement identifies that Proposition 50 has a partisan purpose of standing in the way of President Trump and his power. Dkt. 240-6 at 53.

6. *Senator Sabrina Cervantes* (referenced by Plaintiffs at Dkt. 240 at ¶ 82; Dkt. 240-7 at 75): Senator Cervantes' attached statement describes the partisan context: "What Trump knows is that the only path for Republicans to hold onto the House in the midterms is to change the rules in the middle of the game. That is why in Texas and in other red states, Republican legislators are preparing to redraw their congressional map so that Republican politicians get to choose their voters instead of letting voters choose their representative." Dkt. 240-7 at 75.

7. *Senator Lola Smallwood-Cuevas* (referenced by Plaintiffs at Dkt. 240 at ¶

REPLY BRIEF IN SUPPORT OF INTERVENOR-DEFENDANT LULAC'S MOTION TO DISMISS

83; Dkt. 262 at 20–21; Dkt. 264 at 17; Dkt. 240-8 at 149–50): Senator Smallwood-Cuevas' attached statement says that ACA 8 was a response to partisan efforts: "Californians, we understand that we cannot sit back while these extremists tilt the balance of power under this hand of Donald Trump and unchecked control of Congress. We cannot let this happen. And ACA 8 provides a safeguard. It states that if Texas gerrymanders their maps, California will temporarily adjust ours to level the playing field." Dkt. 240-8 at 150.

8. *Senator Aisha Wahab* (referenced by Plaintiffs at Dkt. 240 at ¶ 86; Dkt. 240-8 at 172). Senator Wahab's attached statement described events in partisan terms: "And I heard multiple times today a number of things - that you know it's wrong, what's being done; and there's zero transparency; and it's a power grab. And I call that into question. So when President Trump calls for Texas to do a partisan mid-decade redraw, which handed themselves plus five GOP seats behind closed doors, is that okay?" Dkt. 240-8 at 172.

These statements reveal that while these legislators referenced race, partisanship was front and center. As *Miller* explains, legislatures will almost always be aware of race. 515 U.S. at 916. But awareness does not establish predominance—the question is whether the legislature and the voters acted because of race, not whether individual legislators mentioned race. Here, the full statements of several identified legislators, including the leaders in both houses, stated that the redistricting would not move forward unless Texas or another state engaged in partisan gerrymandering. That demonstrates that partisanship, not race, was their driving motivation: a partisan counter to partisan redistricting in other states. Plaintiffs' citation of these select statements does not come close to plausibly disentangling race from politics.

## B.     Statements of Paul Mitchell

Plaintiffs' Consolidated Complaint and oppositions to LULAC's Motion to

Dismiss heavily rely on statements of mapmaker Paul Mitchell. Drawing largely from a transcript of statements Mitchell made in a discussion with HOPE, Dkt. 240-2, Plaintiffs focus on Mitchell's alleged statements that the "number one thing that [he] first started thinking about" was restoring a Hispanic majority district in Los Angeles and that he thought the map would be "great" for the Latino community because it maintained the number of Hispanic majority districts and bolstered certain Latino districts, particularly in the Central Valley. Dkt. 240 at ¶ 63-77; Dkt. 262 at 1-2; Dkt. 263 at 4-6; Dkt. 264 at 12-16. The only Central Valley district Plaintiffs mention is District 13, which the Consolidated Complaint identifies as "an Exemplar of Racial Engineering," whose boundaries "were drawn predominantly to improve Hispanic performance in the district." Dkt. 240 at 30 and ¶ 120; *see also* Dkt. 262 at 23; Dkt. 263 at 15; Dkt. 264 at 13-14.

These allegations do not set forth plausible allegations of racial predominance. First, as discussed supra at II.B, Mitchell's statements and actions are only relevant to the extent they reflect on the intent of the enacting bodies (the Legislature and the voters). Whether he personally had a predominant racial intent is irrelevant.

Second, Mitchell's statements during the HOPE presentation demonstrate he understood his assignment was to create a plan that responded to the Texas partisan gerrymander:

> [A] lot changed after Texas did what they did to, you know, redo their maps responding to President Trump. And the idea of this as being a counterbalance to what Texas was doing became a core kind of idea of this project. . . So even before I started looking at potential maps, that was what I was thinking about…
> I did have some elected officials call me and say, well, if Texas is going to throw away the VRA, we should just throw away the VRA. You should just draw anything you can.

Dkt. 240-2 at 21-22.

> We kept about 80 percent of [the Commission map] the same, but in certain areas we made small, modest changes in order to create a push back to what

Texas was doing, an opportunity for Democrats to pick up five seats, and to counterbalance the five Republican seats in Texas.

Dkt. 240-2 at 26. Mitchell's own words, in a document attached to the Consolidated Complaint, directly contradict Plaintiffs' claim: he understood his assignment, above all else, was to draw a map that responded to Texas and would result in the election of five more Democrats. Other objectives, including race, were subordinate. And this partisan objective was, by Mitchell's own account, antecedent to any district-specific thinking.

Third, the partisan priority Mitchell described is consistent with the legislators' statements about partisan purpose, as well as the plan's effect of creating a net of five additional Democratic districts. Moreover, District 13 is not an "exemplar" of racial redistricting. Although the Complaint alleges its boundaries "were drawn predominantly to improve Hispanic performance," Dkt. 240 at ¶ 120, the Hispanic share of the district's population in fact *decreased*—as LULAC showed in its opening brief, Dkt. 251-1 at 18-19, and Plaintiffs ignore.

Far from establishing racial predominance, Plaintiffs fail to show that Mitchell's statements plausibly indicate he was given a racial rather than a partisan objective.

## C.     Racial targeting allegations

Plaintiffs claim that the Proposition 50 plan has a racial target that demonstrates racial predominance with respect to all sixteen majority-Hispanic districts. They allege that 14 of the 16 majority-Hispanic districts have HCVAP populations within a narrow band and that Mitchell adopted this narrow band from a 2021 letter that HOPE submitted when the Commission redistricted. Dkt. 240 at ¶¶ 64, 88-92; Dkt. 240-3; Dkt. 262 at 21-22; Dkt. 263 at 25; Dkt. 264 at 13-14.

Plaintiffs' allegations fall short of plausibly alleging racial predominance under the governing standards. The Supreme Court has found that an express racial

REPLY BRIEF IN SUPPORT OF INTERVENOR-DEFENDANT LULAC'S MOTION TO DISMISS

target, with other evidence, can support a finding of racial predominance. *Cooper*, 581 U.S. at 300-01. But the case law also makes clear that the claim of racial predominance must be established in the drawing of a specific district, rather than in challenging any district that fell within the target. *Ala. Legis. Black Caucus v. Alabama* ("*ALBC*"), 575 U.S. 254, 259-60, 274-75 (2015) (Alabama's stated goal of not reducing Black population percentage in majority-Black districts could, with other evidence, support a racial gerrymandering claim in particular districts); *Cooper*, 581 U.S. at 300-01 ("an announced racial target that subordinated other districting criteria and produced boundaries amplifying divisions between blacks and whites" supported finding of race predominance); *Bethune-Hill v. Va. State Board of Elections*, 580 U.S. 178, 181, 192-93 (2017) (finding that express racial target of 55% BVAP could support racial predominance in particular districts but declining to hold that the target, on its own, constituted racial predominance).

Indeed, the Supreme Court has been reluctant to infer a racial target in the manner Plaintiffs suggest this Court do here. In *Alexander*, the district court had "inferred a racial motive from the fact that District 1's BVAP stayed around 17%," despite differences in various plans considered for District 1. *Alexander*, 602 U.S. at 20. The Supreme Court found that this was reversible error, particularly in light of partisan motivation and the presumption of good faith. *Id.* The Court also expressed concern that, where race and partisanship correlate, a plaintiff could seek to reverse-engineer "partisan data into racial data and argue that the State impermissibly set a particular BVAP target." *Id.* at 20-21.

Plaintiffs' arguments about racial targets are akin to *Alexander* and unlike *ALBC*, *Bethune-Hill*, and *Cooper*. Like *Alexander*, and unlike the other cases, this case involves a partisanship defense. Moreover, the target Plaintiffs allege is inferred (as in *Alexander*) rather than expressed; there are no allegations that either the Legislature or Mitchell identified a target percentage for majority-Hispanic districts.

REPLY BRIEF IN SUPPORT OF INTERVENOR-DEFENDANT LULAC'S MOTION TO DISMISS

And the supposed source for the percentage target, the HOPE letter, does not hold up as the basis for a statewide target. The HOPE letter does not propose a statewide target, but an optimal range for districts in Los Angeles County: "If these districts were between 52% and 54% Latino CVAP, for instance, they would still be very likely to elect Latino candidates of choice." Dkt. 240-3 at 5. Moreover, the Consolidated Complaint provides three different target ranges. Dkt. 240 at ¶¶ 64, 89, 92. These flaws reflect Plaintiffs' reverse-engineering, not racial targeting.[2] None of this plausibly establishes racial predominance.

### D. Illustrative Plan

Noyes Plaintiffs reference reports from John Morgan stating that he had prepared an Illustrative Map including five additional Democratic districts without considering race. Dkt. 240 at ¶ 135; Dkt. 240-11 at 224-25, 257-58. His plan includes 11 majority-Hispanic districts. Dkt. 240-11 at 255-56. Citing *Alexander* and *Callais*, Noyes Plaintiffs assert that "this Illustrative Map means Noyes Plaintiffs carried their pleading burden of disentangling race from politics." Dkt. 262 at 9.

Noyes Plaintiffs overstate the significance of an illustrative plan under *Alexander* and *Callais* and ignore what *Callais* and *Allen* now require. *Alexander* explained the difficulty plaintiffs face without an alternative map, but it did not state that plaintiffs automatically prevail with one. "Without an alternative map, it is difficult for plaintiffs to defeat our starting presumption that the legislature acted in good faith." *Alexander*, 602 U.S. at 10; *see also id.* at 34-35 (noting that only an alternative map "can 'carry the day'" where there is "'meager direct evidence of a racial gerrymander'") (quoting *Cooper*, 581 U.S. at 322). Similarly, *Callais* states

---

[2] The United States contends that the continuity between the Commission map and the Proposition 50 map—the same number of majority-Hispanic districts—is itself evidence of racial predominance. Dkt. 264 at 19-20. But the logical conclusion of this argument is perverse, suggesting a plan is presumptively race-based unless it changes the number of majority-minority districts. Inferring racial motive from the stability of the racial composition across maps that achieve the partisan goal is precisely the reverse-engineering that *Alexander* forecloses. 602 U.S. at 20-21.

REPLY BRIEF IN SUPPORT OF INTERVENOR-DEFENDANT LULAC'S MOTION TO DISMISS

that an alternative map "may" satisfy the disentanglement burden, not that it necessarily does. *Callais*, 146 S. Ct. at 1157.

Importantly, the Noyes Plaintiffs fail to mention that *Callais* (and now *Allen*) require that an illustrative map perform as well on every measure deemed a criterion by the legislature under the challenged plan. *Callais*, 146 S. Ct. at 1159; *Allen*, 2026 WL 1552756 at *1. And the Illustrative Map does not perform as well for Democrats as the Proposition 50 Map, as Morgan's own analysis reflects. Consider District 13: in 2024, the Democratic and Republican candidates each received 50 percent of the vote, with the Democrat winning. In the Presidential election, Republicans received 51.1% of the vote. The Proposition 50 Map boosts Democratic performance by 3 percentage points. However, in the Illustrative Map, Morgan reverted District 13 to its state in the Commission Map and made it a toss-up district at best for Democrats, rather than a district a Democrat is likely to win. Dkt. 240-11 at 318. This fails the *Callais/Allen* test.

More generally, neither Morgan nor Noyes Plaintiffs allege that the Illustrative Map performs as well on every criterion set forth by the legislature in the Proposition 50 map as *Callais/Allen* requires.

Even if Morgan had presented a map that did as well on every partisan and other metric that was considered in the Proposition 50 map, an illustrative map showing the political goals were achievable without race shows only that race was not necessary to the partisan result; it does not show that race motivated or predominated the plan. Here, the record includes the partisanship findings in ACA 8 and the Voter Guide statements. Against that, a map demonstrating that the partisan goal could have been met differently does not, on its own, disentangle race from politics. Moreover, the Illustrative Map here exemplifies a flaw in the principle underlying the Noyes Plaintiffs' argument. The Illustrative Map reduced the number of majority-Hispanic districts from 16 to 11, compared with the Commission and

REPLY BRIEF IN SUPPORT OF INTERVENOR-DEFENDANT LULAC'S MOTION TO DISMISS

Proposition 50 Maps. It certainly cannot be the case that if the Proposition 50 Plan had reduced the number of majority-Hispanic districts from 16 to between 12 and 15, the Noyes Plaintiffs would have established disentanglement of race from politics. A standard under which the only lawful number of majority-minority districts is the partisan minimum is not a test for racial predominance; no case holds as much.

## IV. The United States and Tangipa Plaintiffs Have Not Plausibly Alleged a Racial Gerrymandering Claim under the Equal Protection Clause

As detailed by LULAC in its opening brief, Dkt. 251-1 at 16-17, Plaintiffs' allegations must be sufficient to satisfy both the race-and-not-partisanship test outlined in *Alexander* and the traditional *Shaw/Miller* test that race predominated over traditional districting principles. Among other things, the allegations must state a claim as to specific electoral districts, *ALBC*, 575 U.S. at 262-63, and the level of analysis is the district as a whole, not particular district lines, *Bethune-Hill*, 580 U.S. at 192. The United States and Tangipa Plaintiffs fail to satisfy either test, let alone both.

### A. Plaintiffs have not plausibly alleged that race, and not partisanship, drove Proposition 50

Given Plaintiffs' acknowledgment that there was partisan intent and the fact that this intent appears throughout the record, *see* supra at II, Plaintiffs cannot satisfy their substantial burden to show that race was the driving factor behind Proposition 50. As discussed in Section I, the recent jurisprudence requires Plaintiffs to disentangle race from partisanship and plausibly allege that race drove the plan. In addition, Plaintiffs must overcome the presumption that decisionmakers acted in good faith.

Partisanship supplies the "obvious alternative explanation" here, based on: the partisan findings in ACA 8; the partisan purpose reflected in the Voter Guide; Tangipa's floor statement; the allegation in the Consolidated Complaint that party,

- 24 -

not race, drives voter decisions; and the plan's addition of five Democratic seats while maintaining the same racial composition. Plaintiffs' affirmative allegations and arguments do not show otherwise: the legislators uniformly attested to a partisan purpose; Mitchell understood his partisan objective; the racial targeting allegations suffer from inconsistency; and the Illustrative Plan does not meet the *Callais* standard and does not show racial motivation given the overwhelming record of partisan motivation.

Contrary to Tangipa Plaintiffs' contention, the Consolidated Complaint fails to plausibly allege that "race, not politics, was 'the criterion that . . . could not be compromised.'" Dkt. 263 at 19 (quoting *Shaw v. Hunt*, 517 U.S. 899, 907 (1996) (*Shaw II*)).

### B.    Plaintiffs have not plausibly alleged that race predominated over traditional districting principles

Both Tangipa Plaintiffs and the United States address only briefly whether their allegations are sufficient to satisfy the *Shaw/Miller* test that traditional districting principles be subordinated to race. Tangipa Plaintiffs cite: (1) *Bethune-Hill,* arguing that alleged "direct" evidence of racial intent based on statements by Mitchell and those of Democratic leadership provides an exception to the subordination requirement; (2) Consolidated Complaint paragraph 126, which contains a general allegation that race predominated over traditional, race-neutral districting principles; and (3) the example of District 13. Dkt. 263 at 31-32. For its part, the United States does not directly address how the Consolidated Complaint satisfies the *Shaw/Miller* test but claims that predominance is evident through: (1) alleged direct evidence of predominant racial intent based on statements from Mitchell and legislators; and (2) alleged circumstantial movement of individual district boundaries and the alleged statewide targeting to keep Hispanic districts at 52-55%. Dkt. 264 at 12-24. The United States does not identify any individual districts where specific traditional districting principles were subordinated to race.

REPLY BRIEF IN SUPPORT OF INTERVENOR-DEFENDANT LULAC'S MOTION TO DISMISS

Instead, it relies on *ALBC* for the proposition that statewide evidence is "perfectly relevant" to district-specific predominance and that it need only state a claim as to "one or more" districts. Dkt. 264 at 14, 23-24.

These arguments fail. As discussed above, the alleged direct evidence regarding Mitchell's statements and the legislature fails to plausibly show that the predominant motivation behind Proposition 50 was racial rather than partisan. As a result, the "*Bethune-Hill* exception" does not apply, and Plaintiffs must sufficiently allege particular districts where traditional districting principles were subordinated to race, which they have not done. The general allegation in paragraph 126 is not sufficient under the *Twombly/Iqbal* pleading standards: "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. District 13 cannot support a predominance argument because the Hispanic population as a whole decreased in the district, which is contrary to Plaintiffs' argument that it was bolstered in violation of the Fourteenth Amendment. With respect to population shifts among districts, aside from District 13, the Consolidated Complaint does not identify any specific traditional districting principle that was subordinated to race in any specific district. As to the United States' argument regarding *ALBC* and statewide evidence, this fails for legal and factual reasons. *ALBC* involved an express, stated racial target, and even there, the Court remanded the case to the district court to determine whether that target and district-specific evidence established claims. *ALBC*, 575 U.S. at 262-64, 274-75. In contrast, as discussed above, the alleged target here is inferred and appears to be reverse-engineered—the precise concern expressed in *Alexander*. As a result, the Consolidated Complaint does not sufficiently allege that race predominated over traditional districting principles.

REPLY BRIEF IN SUPPORT OF INTERVENOR-DEFENDANT LULAC'S MOTION TO DISMISS

**V.    The United States' Voting Rights Act Claim Fails Because it has not Plausibly Alleged the Plan has a Racially Discriminatory Purpose or Effect Against a Racial or Ethnic Group**

LULAC's Opening Brief, Dkt. 251-1 at 26-29, demonstrated that the United States failed to plausibly allege intentional vote dilution claims under the Voting Rights Act because the Consolidated Complaint did not plausibly allege that the "State's districting plan 'has the purpose *and* effect' of diluting the minority vote." *Alexander*, 602 U.S. at 38-39 (quoting *Shaw v. Reno*, 509 U.S. 630, 649 (1993) ("*Shaw*")).

In opposition, the United States claims that the requirements of *Alexander* do not apply because its Voting Rights Act Section 2 claim is not a vote dilution claim but rather is based on packing Hispanic voters into the sixteen Hispanic-majority districts. Dkt. 264 at 28. Implicitly conceding that they have not identified a racial or ethnic group that the Proposition 50 plan harms, the United States cites *Shaw* in asserting the injury of intentionally sorting voters by race to benefit Latinos, and that it is enough to show that the Plan benefits a racial or ethnic group. The United States also claims they have sufficiently alleged a discriminatory purpose under the *Arlington Heights* factors, based on the rushed legislative process and statements by legislators and Mitchell. Dkt. 264 at 25-28.

All these arguments fail. The United States cannot evade *Alexander*. Under *Alexander*, an intentional discrimination challenge involving a redistricting plan requires that there be a purpose to harm an identified racial or ethnic group: a plaintiff "cannot prevail simply by showing that race played a predominant role in the districting process. Rather, such a plaintiff must show that the State 'enacted a particular voting scheme as a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities.'" *Alexander*, 602 U.S. at 38-39 (quoting *Miller*, 515 U.S. at 911). And the plan must have the "'effect' of diluting the minority vote," again reflecting that a racial and ethnic group must be harmed. *Id.* (quoting

*Shaw*, 509 U.S. at 649).

The United States' invocation of *Arlington Heights* does not help. *Arlington Heights* states that "the impact of the official action," "whether it 'bears more heavily on one race than another,' may provide an important starting point" in determining purpose. *Arlington Heights*, 429 U.S. at 266 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)). But the United States does not mention or present the negative impact of the Proposition 50 plan on any race. And the two *Arlington Heights* factors the United States claims the Complaint alleges—the sequence of events leading up to the adoption of Proposition 50 and legislator/mapmaker statements—are instead examples of race entangled with partisanship. Dkt. 264 at 26. For example, the United States cannot plausibly allege that partisan concerns did not dictate the rushed legislative schedule. That does not suffice under *Callais*.

The United States' Voting Rights Act claim should be dismissed for failure to state a claim.

## VI. Noyes Plaintiffs' Claims are not Legally Cognizable, and They Lack Standing

Noyes Plaintiffs have tried to evade the standards set forth above for racial gerrymandering claims under the Equal Protection Clause and for intentional discrimination vote dilution claims by framing them differently. As to the intentional discrimination Section 2 claim, they argue it is not a vote dilution claim. Dkt. 262 at 26. Regarding their racially gerrymandering claim, they claim that it is brought under the Fifteenth Amendment, not the Equal Protection Clause of the Fourteenth Amendment. Dkt. 262 at 5, 14-16. Claiming to be freed from the standard requirements and declaring that *Callais* "cripples" defendants' arguments, they assert that "[u]nder the Fifteenth Amendment and Section 2 … using race to achieve partisan political advantage with racially engineered districts" is illegal. Dkt. 262 at 6. From there, they claim that they do not need to show district-based standing because their challenge is to "*every district*." Dkt. 262 at 11.

- 28 -
REPLY BRIEF IN SUPPORT OF INTERVENOR-DEFENDANT LULAC'S MOTION TO DISMISS

Noyes Plaintiffs' arguments are not supported by any authority. Since their inception, intentional racial discrimination redistricting challenges have been vote dilution challenges, and racial gerrymandering claims have been Fourteenth Amendment claims, not Fifteenth Amendment claims. *Callais* confirms that those principles and the Noyes Plaintiffs' efforts to circumvent pleading requirements by inventing new causes of action should be rejected. In any event, the Noyes Plaintiffs lack standing because they are limited to challenging districts in which the individual Plaintiffs reside, which are not identified in the Consolidated Complaint.

As discussed in LULAC's opening brief, Dkt. 251-1 at 27-28, the Supreme Court has recognized two types of voting discrimination claims that can be brought under the Fourteenth or Fifteenth Amendments or the Voting Rights Act: vote denial claims, that involve circumstances where a group of voters is denied the right because of their race, and vote dilution cases, where a racial or ethnic group is not denied the right to vote outright, but their vote is diluted in the redistricting process by reducing or nullifying their ability to elect their candidates of choice. Voting discrimination challenges to redistricting plans are vote dilution challenges, not vote denial challenges, because voters are not alleging that they cannot vote but that their votes are diluted.

As to racial gerrymandering claims, they are "analytically distinct" from voting discrimination claims and apply "different analys[es]." *Shaw*, 509 U.S. at 650, 652; *Alexander*, 602 U.S. at 38. They are based on the Equal Protection Clause and involve the question of whether "a reapportionment plan rationally cannot be understood as anything other than an effort to segregate citizens into separate voting districts on the basis of race without sufficient justification." *Shaw*, 509 U.S. at 652.

In *Callais*, the Court addressed both voting discrimination and racial gerrymandering theories. The case involved a racial gerrymandering challenge to a redistricting plan that Louisiana had adopted as a remedy in a Section 2 vote dilution

REPLY BRIEF IN SUPPORT OF INTERVENOR-DEFENDANT LULAC'S MOTION TO DISMISS

case. It led the Court to analyze the requirements for a Section 2 redistricting challenge: "[W]e must understand exactly what § 2 of the Voting Rights Act demands with respect to the drawing of legislative districts." *Callais*, 146 S. Ct. at 1153. In doing so, the Court discussed the history of vote denial and vote dilution claims and described a vote dilution claim as "a claim that a districting scheme impermissibly lessens the weight of the votes of minority voters." *Id.* at 1145. The Court later describes the case before it as a "vote dilution case." *Id.* at 1162. Contrary to authorizing the claim asserted by Noyes Plaintiffs, *Callais* defines voting discrimination challenges to redistricting plans as vote dilution challenges. As to racial gerrymandering, the Court stated that "*the decision before us is based on the Fourteenth Amendment*," specifically its Equal Protection Clause, rather than the Fifteenth Amendment. *Id.* at 1160 n.2. Accordingly, the claims framed by Noyes Plaintiffs are not legally cognizable.

In any event, the Noyes Plaintiffs lack standing because standing for gerrymandering and vote dilution claims is district-based, and they have not identified the districts in which they live. *See* Dkt. 251-1 at 22-23. Notably, while the Noyes Plaintiffs' standing section emphasizes that "[a]ny voter in a state that unconstitutionally uses race to draw a Congressional district map may bring a Fifteenth Amendment challenge to the implementation of the map," Dkt. 262 at 10, the three cases they cite for this proposition are all Fourteenth Amendment racial gerrymandering cases in which the Court applied district-specific standing. *North Carolina v. Covington*, 585 U.S. 969, 976 (2018) ("[P]laintiffs have standing to challenge racial gerrymanders only with respect to those legislative districts in which they reside"); *Shaw*, 509 U.S. at 636; and *Miller*, 515 U.S. at 909. The only Fifteenth Amendment cases Noyes Plaintiffs cite for the proposition that standing is not district-based, Dkt. 262 at 10-11, were vote-denial challenges in which voters could not vote at all and thus are not applicable. *Davis v. Guam*, 932 F.3d 822, 824 (9th

REPLY BRIEF IN SUPPORT OF INTERVENOR-DEFENDANT LULAC'S MOTION TO DISMISS

Cir. 2019) (challenge to "Native Inhabitants of Guam" voter eligibility restriction); *Gomillion v. Lightfoot*, 364 U.S. 339, 340-41 (1960) (challenge by Black voters denied the vote because their residences were fenced out of the city). Thus, the Noyes Plaintiffs have failed to establish standing. Moreover, their claims fail to state a claim on the merits for the reasons discussed above.

## CONCLUSION

For the foregoing reasons, LULAC respectfully requests that the Court dismiss the Consolidated Complaint for failure to state a claim as to all Plaintiffs and for lack of standing as to the Noyes Plaintiffs.

REPLY BRIEF IN SUPPORT OF INTERVENOR-DEFENDANT LULAC'S MOTION TO DISMISS

DATED: June 12, 2026

*/s/ John Freedman*
**ARNOLD & PORTER KAYE
SCHOLER LLP**
SEAN O. MORRIS (SBN 200368)
Sean.Morris@arnoldporter.com
777 South Figueroa Street
44th Floor
Los Angeles, CA  90017
T: (213) 243-4000
F: (213) 243-4199

JOHN A. FREEDMAN
John.Freedman@arnoldporter.com
601 Massachusetts Ave, NW
Washington, DC  20001
T: (202) 942-5000
F: (202) 942-5999

**JUSTICE LEGAL STRATEGIES
PLLC**
JON M. GREENBAUM (SBN 166733)
jgreenbaum@justicels.com
P.O. Box 27015
Washington, DC 20038
T: (202) 601-8678

*Counsel for Intervenor-Defendant
League of United Latin American
Citizens*

Respectfully submitted,

**DEMOCRACY DEFENDERS
ACTION**
NORMAN L. EISEN
ANDREW WARREN
SOFIA FERNANDEZ GOLD
JACOB KOVACS-GOODMAN
norman@democracydefenders.org
andrew@democracydefenders.org
sofia@democracydefenders.org
jacob@democracydefenders.org
600 Pennsylvania Ave SE, Unit
15180
Washington, DC 20003
T: (202) 594-9958

REPLY BRIEF IN SUPPORT OF INTERVENOR-DEFENDANT LULAC'S MOTION TO DISMISS

## CERTIFICATION OF COMPLIANCE WITH LOCAL RULE 11-6.2

The undersigned, counsel for Intervenor-Defendant LULAC, certifies that this brief contains 9,887 words, which complies with the Court's May 28, 2026 Order. Dkt. 267.

/s/ John Freedman
John Freedman

## ATTESTATION PURSUANT TO LOCAL RULE 5-4.3.4

This certifies, pursuant to Local Rule 5-4.3.4, that all signatories to this document concur in its content and have authorized this filing.

/s/ John Freedman
John Freedman

REPLY BRIEF IN SUPPORT OF INTERVENOR-DEFENDANT LULAC'S MOTION TO DISMISS

## CERTIFICATE OF SERVICE

Case Name: **Tangipa et al v. Newsom et al** No.    **2:25-cv-10616-JLS-WLH-KKL**

I hereby certify that on June 12, 2026, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**REPLY BRIEF IN SUPPORT OF INTERVENOR-DEFENDANT LULAC'S MOTION TO DISMISS**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on June 12, 2026, at Washington, D.C.

_____/s/ John A. Freedman_____
Signature

REPLY BRIEF IN SUPPORT OF INTERVENOR-DEFENDANT LULAC'S MOTION TO DISMISS