ROB BONTA
Attorney General of California
ANYA M. BINSACCA
LARA HADDAD
Supervising Deputy Attorneys General
RYAN EASON
DAVID GREEN
KIANA HEROLD
JENNIFER E. ROSENBERG
IRAM HASAN
 Deputy Attorneys General
 State Bar No. 320802
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 510-3793
 E-mail:  Iram.Hasan@doj.ca.gov
*Attorneys for Defendants California Governor
Newsom and Secretary of State Weber*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| **DAVID TANGIPA, *et al.*,**<br><br>                                   Plaintiffs,<br><br>          **v.**<br><br>**GAVIN NEWSOM, in his official capacity as the Governor of California, *et al.*,**<br><br>                                   Defendants. | 2:25-cv-10616-JLS-WLH-KKL<br>2:25-cv-11480-JLS-WLH-KKL<br>Three-Judge Court<br><br><br>**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS CONSOLIDATED COMPLAINT** |
| **MITCH NOYES, *et al.***<br><br>                                   Plaintiffs,<br><br>          **v.**<br><br>**GAVIN NEWSOM, in his official capacity as the Governor of California, *et al.*,**<br><br>                                   Defendants. | Date:        August 19, 2026<br>Time:        10:00 a.m.<br>Courtroom:  1<br>Judges:      Hon. Josephine L. Staton, Hon. Kenneth K. Lee, and Hon. Wesley L. Hsu<br>Trial Date:  None Designated<br><br>Action Filed: Nov. 5, 2025 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...........................................................................................................1

ARGUMENT ................................................................................................................. 2

    I.    Tangipa Plaintiffs and Plaintiff-Intervenor Fail to State a Claim Under the Fourteenth Amendment................................................................. 2

        A.    The Presumption of Good Faith for Racial Gerrymandering Claims Applies at Every Stage of Litigation................................................................................. 3

        B.    Tangipa Plaintiffs' and Plaintiff-Intervenor's Failure to Allege Any Facts Regarding Voter Intent Is Fatal to Their Claims. ...................................................................................... 5

        C.    The Facts Tangipa Plaintiffs and Plaintiff-Intervenor Allege Do Not Support a Plausible Racial Gerrymandering Claim. .................................................................... 8

            1.    Rather than suggesting racial predominance, the alleged legislative statements show that the Proposition 50 map was drawn and adopted for partisan purposes. ........................................................... 9

            2.    The alleged circumstantial evidence does not suggest racial predominance. .................................................. 10

            3.    The statements of non-state actor Paul Mitchell do not support allegations of racial predominance. ............ 12

        D.    Tangipa Plaintiffs' and Plaintiff-Intervenor's Continued Failure to Act on Their Discovery Grievances Does Not Move the Needle With Respect to Their Fourteenth Amendment Claim. .................................................................. 14

    II.    Noyes Plaintiffs Fail to Establish Standing ...................................... 15

    III.    Noyes Plaintiffs Fail to State a Claim Under the Fifteenth Amendment ................................................................................... 17

        A.    There Is No Standalone Racial Gerrymandering Cause of Action Under the Fifteenth Amendment ................................. 18

        B.    Noyes Plaintiffs' Claim Is Inconsistent with Fifteenth Amendment Jurisprudence ...................................................... 19

    IV.    Noyes Plaintiffs and Plaintiff-Intervenor Fail to State a Claim Under Section 2 of the Voting Rights Act ....................................... 20

        A.    Noyes Plaintiffs and Plaintiff-Intervenor Do Not Allege That Any Actor Bore an Invidious Discriminatory Purpose................................................................................... 21

        B.    Noyes Plaintiffs and Plaintiff-Intervenor Do Not Allege That the State Denied or Abridged Any Person's Right to Vote ............................................................................... 23

    V.    Governor Newsom Is Not a Proper Party ........................................ 25

CONCLUSION ........................................................................................................... 27

i

# TABLE OF AUTHORITIES

**Page**

CASES

*Abbott v. Perez*
585 U.S. 579 (2018) ................................................................................. 7

*Ala. Legis. Black Caucus v. Alabama*
575 U.S. 254 (2015) ...................................................................... 8, 11, 14

*Alexander v. S.C. Conf. of the NAACP*
602 U.S. 1 (2024) ........................................................................... *passim*

*Alexander v. Sandoval*
532 U.S. 275 ........................................................................................... 18

*Allen v. Milligan*
No. 25A1314, 2026 WL 1552756 (U.S. June 2, 2026) ........................... 3

*Arce v. Douglas*
793 F.3d 968 (9th Cir. 2015) .................................................................. 21

*Arizona v. California*
460 U.S. 605 (1983) ............................................................................... 26

*Ashcroft v. Iqbal*
556 U.S. 662 (2009) ............................................................................... 20

*Backus v. South Carolina*
857 F. Supp. 2d 553 (D.S.C. 2012) ....................................................... 19

*Bell Atlantic Corp. v. Twombly*
550 U.S. 544 (2007) ............................................................................... 12

*Bethune-Hill v. Va. State Bd. of Elec.*
580 U.S. 178 (2017) ............................................................................... 20

*Boardman v. Inslee*
978. F.3d 1092 (9th Cir. 2020) ................................................................ 4

*Brnovich v. Democratic Nat'l Comm.*
594 U.S. 647 (2021) ................................................................................. 8

# TABLE OF AUTHORITIES
## (continued)

**Page**

*City of Mobile, Ala. v. Bolden*
446 U.S. 55 (1980) .......................................................................... 19

*Cooper v. Harris*
581 U.S. 285 (2017) ........................................................................ 10

*Davis v. Guam*
932 F.3d 822 (9th Cir. 2019) .......................................................... 20

*Democratic Nat'l Comm. v. Hobbs*
948 F.3d 989 (9th Cir. 2020) .......................................................... 21

*Democratic Nat'l Comm. v. Reagan*
904 F.3d 686 (9th Cir. 2018) ..................................................... 21, 23

*Disability Rts. S.C. v. McMaster*
24 F.4th 893 (4th Cir. 2022) ........................................................... 26

*Garcia v. Wachovia Mortg. Corp.*
676 F. Supp. 2d 895 (C.D. Cal. 2009) ............................................ 10

*Gill v. Whitford*
585 U.S. 48 (2018) ..................................................................... 16, 17

*Gomillion v. Lightfoot*
364 U.S. 339 (1960) .............................................................. 16, 19, 20

*Gonzalez v. Planned Parenthood of L.A.*
759 F.3d 1112 (9th Cir. 2014) ....................................................... 13

*Higginson v. Becerra*
363 F. Supp. 3d 1118 (S.D. Cal. 2019) ............................................. 4

*Hunter v. Underwood*
471 U.S. 222 (1985) ..................................................................... 6, 7

*Legislature v. Deukmejian*
34 Cal.3d 658 (1983) .................................................................... 6, 7

*Louisiana v. Callais*
146 S.Ct. 1131 (2026) ................................................................*passim*

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Lucas v. Forty-Fourth General Assembly*
377 U.S. 713 (1964) ............................................................................6

*Maya v. Centex Corp.*
658 F.3d 1060 (9th Cir. 2011) ...........................................................26

*McCarron v. County of Ventura*
No. CV 21-5234, 2021 WL 9315371 (C.D. Cal. Dec. 29, 2021).......26

*Mi Familia Vota v. Fontes*
129 F.4th 691 (9th Cir. 2025) ............................................................22

*Miller v. Johnson*
515 U.S. 900 (1995) .........................................................3, 4, 10, 12

*Nat'l Audubon Soc'y, Inc. v. Davis*
307 F.3d 835 (9th Cir. 2002) .............................................................26

*Nichols v. Brown*
859 F. Supp. 2d 1118 (C.D. Cal. 2012)..............................................26

*North Carolina v. Covington*
585 U.S. 969 (2018) ...........................................................................16

*Or. Clinic, PC v. Fireman's Fund Ins. Co.*
75 F.4th 1064 (9th Cir. 2023)............................................................17

*Perry v. Brown*
671 F.3d 1052 (9th Cir. 2012)..............................................................6

*Pers. Adm'r of Mass. v. Feeney*
442 U.S. 256 (1979) ...........................................................................21

*Reno v. Bossier Parish Sch. Bd.*
520 U.S. 471 (1997) .....................................................................19, 21

*Rice v. Cayetano*
528 U.S. 495 (2000) ...........................................................................20

*Romer v. Evans*
517 U.S. 620 (1996) .............................................................................6

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Rucho v. Common Cause*
588 U.S. 684 (2019) ................................................................................. 9

*S.B. by & through Kristina B. v. California Dep't of Educ.*
327 F. Supp. 3d 1218 (E.D. Cal. 2018) .................................................. 26

*Sanchez v. Off. of State Superintendent of Educ.*
45 F.4th 388 (D.C. Cir. 2022) ................................................................. 4

*Satchell v. Sonic Notify, Inc.*
234 F. Supp. 3d 996 (N.D. Cal. 2017)..................................................... 26

*Shaw v. Reno*
509 U.S. 630 (1993) ................................................................................ 24

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*
600 U.S. 181 (2023) ................................................................................ 24

*Tangipa v. Newsom*
816 F. Supp. 3d 1081 (C.D. Cal. 2026)...........................................*passim*

*Tenn. State Conf. of NAACP v. Lee*
746 F. Supp. 3d 473 (M.D. Tenn. 2024) ................................................. 4

*United States v. Hays*
515 U.S. 737 (1995) .......................................................................... 15, 16

*United States v. Mattson*
600 F.2d 1295 (9th Cir. 1979)................................................................. 27

*United States v. San Jacinto Tin Co.*
125 U.S. 273 (1888) ................................................................................ 27

*Village of Arlington Heights v. Metropolitan Housing Development Corporation*
429 U.S. 252 (1977) ................................................... 7, 17, 21, 23

*Virgin Scent, Inc. v. BT Supplies W., Inc.*
615 F. Supp. 3d 1118 (C.D. Cal. 2022).................................................. 15

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Washington v. Seattle Sch. Dist. No. 1*
    458 U.S. 457 (1982) ...............................................................................7, 8

*Ex parte Young. Ass'n des Eleveurs de Canards et d'Oies du Quebec
    v. Harris*
    729 F.3d 937 (9th Cir. 2013) ...................................................................25

*Ex parte Young*
    209 U.S. 123 (1908) .............................................................................2, 25

**STATUTES**

52 U.S.C. § 10301...............................................................................20, 23

Assembly Bill 604 .......................................................................................10

Assembly Constitutional Amendment 8........................................................9

Election Rigging Response Act .....................................................................1

State Fair Maps Act .....................................................................................13

Voting Rights Act § 2 ..........................................................................*passim*

**CONSTITUTIONAL PROVISIONS**

United States Constitution
    U.S. Const. art. III.................................................................................26
    U.S. Const. amend. XI.......................................................................25, 26
    U.S. Const. amend. XIV .................................................................*passim*
    U.S. Const. amend. XV .................................................................*passim*

California Constitution
    Cal. Const., art. V, § 1 ...........................................................................25
    Cal. Const., art. XVII.............................................................................22
    Cal. Const., art. XXI..............................................................................22
    Cal. Const., art. XXI, § 2(d) .................................................................13

**COURT RULES**

Fed. R. Civ. P. 12(b)(6) .........................................................................3, 4

## INTRODUCTION

"[L]itigants cannot circumvent" the rule "that claims of partisan gerrymandering are not justiciable in federal court" by "dressing [those] claims in racial garb." *Louisiana v. Callais*, 146 S.Ct. 1131, 1158 (2026). In *Callais*, the Supreme Court made clear that when a map is adopted at least in part for partisan reasons, plaintiffs carry a "special burden" of showing that race "*drove* a district's lines" over politics. *Id.* at 1156-57 (quotations omitted). Tangipa Plaintiffs, Noyes Plaintiffs, and Plaintiff-Intervenor ("Challengers") come nowhere close to carrying this burden for the Election Rigging Response Act, whose "stated goal . . . was to . . . pick up an additional five Democratic seats." *Tangipa v. Newsom*, 816 F. Supp. 3d 1081, 1091 (C.D. Cal. 2026). Even assuming the truth of challengers' sparse allegations of race-based intent, the map at issue can clearly be "explain[ed]" by "politics." *Callais*, 146 S.Ct. at 1157. Challengers thus cannot "clear[ their] bar" and their claims should be dismissed. *Id.*

To avoid this consequence, Challengers reject existing law and fabricate new standards. On their Fourteenth Amendment claim, Tangipa Plaintiffs and Plaintiff-Intervenor urge this Court to set aside its legal holdings and findings from the preliminary injunction stage and redouble their effort to mischaracterize the purpose of Proposition 50. They rely on cherry-picked statements by individual legislators and a non-state actor, and continue to treat the intent of those actors as paramount over that of the voters—an approach this Court has rejected.

Noyes Plaintiffs, meanwhile, fail to cure their lack of standing to bring intentional discrimination claims under the Fifteenth Amendment, which does not contemplate their standalone racial gerrymandering claims anyway. Noyes Plaintiffs do not even dispute that they lack standing to bring their claim under Section 2 of the Voting Rights Act ("VRA"), and, like Plaintiff-Intervenor, insist on a discriminatory intent standard that has no basis in that statute or decades of case law interpreting it.

1

Lastly, no Challenger shows that the Governor is a proper party.  Tangipa Plaintiffs waive this issue by failing to respond to Defendants' sovereign immunity argument, and Noyes Plaintiffs fail to demonstrate that Governor Newsom has the specific enforcement authority over Proposition 50 required by *Ex Parte Young*. This same lack of enforcement authority means that this Court cannot order the Governor to address Plaintiff-Intervenor's alleged injuries, undermining Plaintiff-Intervenor's standing as to the Governor.

Defendants' motion to dismiss all claims should be granted and the Governor should be dismissed as a party.

## ARGUMENT

### I. TANGIPA PLAINTIFFS AND PLAINTIFF-INTERVENOR FAIL TO STATE A CLAIM UNDER THE FOURTEENTH AMENDMENT[1]

The Supreme Court recently reinforced the standard for a Fourteenth Amendment racial gerrymandering claim: when "a State defends a districting scheme on the ground that it was drawn for partisan purposes, plaintiffs have a 'special' burden to overcome."  *Callais*, 146 S.Ct. at 1156-57 (quoting *Alexander v. S.C. Conf. of the NAACP*, 602 U.S. 1, 9 (2024)).  Plaintiffs "must 'disentangle race from politics'" and "'rul[e] out the competing explanation that political considerations dominated the legislature's redistricting efforts.'"  *Id*. at 1157 (quoting *Alexander*, 602 U.S. at 9-10).  And it remains true that a plaintiff fails to "'clear[] its bar'" if "'either politics or race could explain a district's contours[.]'"  *Id*.

Tangipa Plaintiffs and Plaintiff-Intervenor have failed to meet their special burden to plead that race predominated in the drawing of the Proposition 50 map.

---

[1] Noyes Plaintiffs claim to bring an "analytically distinct" Fifteenth Amendment claim for "race-based redistricting" that need not meet the Fourteenth Amendment standard.  Noyes Opp'n at 14-15.  Defendants therefore address Noyes Plaintiffs' Fifteenth Amendment claim separately and do not analyze their allegations under the Fourteenth Amendment rubric.

Instead, they continue to rely on inapposite cases and factual allegations stripped of context and attempt to relitigate the legal framework this Court has already established.

### A. The Presumption of Good Faith for Racial Gerrymandering Claims Applies at Every Stage of Litigation.

Challengers fail to allege sufficient facts to overcome the presumption of good faith that applies to their racial gerrymandering claims. *Alexander*, 602 U.S. at 10; *see Tangipa*, 816 F. Supp. 3d at 1103 ("voters, like the legislature, are entitled to a presumption of good faith"). The Supreme Court has repeatedly emphasized the importance of applying this presumption of legislative good faith in redistricting cases, "direct[ing] district courts to draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions." *Alexander*, 602 U.S. at 10; *see also Allen v. Milligan*, Case No. 25A1314, 2026 WL 1552756, at *1 (U.S. June 2, 2026) (holding that district court should have applied presumption, even where it considered Alabama's refusal to comply with an earlier order to remediate racial discrimination to be proof of discriminatory animus). This approach ensures that "'race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines.'" *Alexander*, 602 U.S. at 10 (quoting *Miller v. Johnson*, 515 U.S. 900, 913 (1995)). *Callais* articulated a heightened version of this principle where a State defends a map on partisan grounds and plaintiffs carry a "special burden" to "'disentangle race from politics' by proving 'that the former *drove* a district's lines.'" 146 S.Ct. at 1157 (quoting *Alexander*, 602 U.S. at 9).

Tangipa Plaintiffs attempt to dismiss the presumption as a mere "evidentiary principle" and argue that it must give way to Rule 12(b)(6)'s plausibility standard and requirement that the Court draw reasonable inferences in Plaintiffs' favor. Tangipa Opp'n at 12. But the presumption of legislative good faith—an essential

3

part of a plaintiff's burden of proof—applies at "various stages of litigation," including the pleading stage and when the Court is "determining whether to permit discovery or trial to proceed." *Miller*, 515 U.S. at 917; *accord Tenn. State Conf. of NAACP v. Lee*, 746 F. Supp. 3d 473, 494 (M.D. Tenn. 2024) (interpreting *Miller* to mean that "the presumption of legislative good faith comprises part of the constitutional test . . . in redistricting cases, including the pleading stage"); *cf. Sanchez v. Off. of State Superintendent of Educ.*, 45 F.4th 388, 395-96 (D.C. Cir. 2022) (finding "no incompatibility between" the "strong presumption of validity" that accompanies rational-basis review and Rule 12(b)(6)'s plausibility standard (citation omitted)).

Courts apply the presumption when determining whether a plaintiff alleging a Fourteenth Amendment racial gerrymandering claim has stated facts sufficient to plead such a claim, even while simultaneously drawing reasonable inferences in favor of the plaintiff. *See, e.g.*, *Higginson v. Becerra*, 363 F. Supp. 3d 1118, 1127 (S.D. Cal. 2019) (finding plaintiff failed to overcome presumption of legislative good faith in drawing of a city council's district lines, even assuming truth of his allegations), *aff'd*, 786 F. App'x 705 (9th Cir. 2019); *see also Tenn. State Conf. of NAACP*, 746 F. Supp. 3d at 494 (citing *Alexander*, 601 U.S. at 10) (presumption "directs district courts to 'draw the inference that cuts in the legislature's favor when confronted with [a complaint's allegations] that could plausibly support multiple conclusions" (alteration in original)); *Boardman v. Inslee*, 978. F.3d 1092, 1119 (9th Cir. 2020) (refusing to "impute upon Washington voters the allegedly invidious motivations of" drafters and supporters of a state initiative).

As explained below, Plaintiffs fail to plausibly allege that race predominated over all other traditional redistricting principles—especially partisanship—and thus cannot establish that their Fourteenth Amendment claims are subject to strict scrutiny.

4

## B.   Tangipa Plaintiffs' and Plaintiff-Intervenor's Failure to Allege Any Facts Regarding Voter Intent Is Fatal to Their Claims.

For good reason, this Court has already determined that the voters who ultimately considered and decided to adopt the Proposition 50 map are the "most relevant state actors[.]" *Tangipa*, 816 F. Supp. 3d at 1099.  And voters' intent is relevant here not because the Legislature's "ultimate source of political authority" is the people in some general sense, *contra* USDOJ Opp'n at 8, but because California voters specifically considered and decided to approve the exact maps at issue here.  The "centrality of voters" in this circumstance—which "distinguishes this case from nearly all precedent on racial gerrymandering"—is why this Court previously held that in this case, "the voters are the most relevant state actors and their intent is paramount." *Tangipa*, 816 F. Supp. 3d at 1098-99.  Plaintiff-Intervenor did not appeal that ruling, and Tangipa Plaintiffs withdrew their appeal. ECF No. 237.

Challengers' complaint does not include allegations that plausibly suggest that voters' predominant purpose in passing Proposition 50 was racial rather than partisan.  To the contrary, the ballot and campaign materials referenced in and attached to the complaint, as well as official ballot materials subject to judicial notice, plainly state Proposition 50's explicitly partisan aims.  State Mot. at 5-6, 12-15; *accord Tangipa*, 816 F. Supp. 3d at 1104.  In the face of this clear indication of partisan motivation, Challengers' failure to plausibly allege that the voters were predominantly motivated by race is fatal to their Fourteenth Amendment claim.  Their arguments for disregarding voter intent, contrary to this Court's prior ruling, are unconvincing.  *See* Tangipa Opp'n at 12-17; USDOJ Opp'n at 2, 6-11.

First, considering voters' intent as the primary inquiry does not create an "untenable loophole," Tangipa Opp'n at 13, that would "shield all unconstitutional legislative districting from judicial review, so long as it is cleansed by voter approval." USDOJ Opp'n at 2.  This Court has already rejected Challengers'

5

similar arguments that looking to voter intent would allow unlawful discrimination to be "laundered through popular referendum and cleansed of its discriminatory purpose," *id.* at 10.  *See Tangipa*, 816 F. Supp. 3d at 1101-02.  As this Court has explained, "the voters and the legislature are not subject to different constitutional standards: under California law, the two possess the same legislative capacity, which is equally limited" by "constitutional limitations," and "[w]hen the voters speak," it is "with the utmost legislative authority."  *Tangipa*, 816 F. Supp. 3d at 1100 (citing *Legislature v. Deukmejian*, 34 Cal.3d 658 (1983)).  And courts "treat[] voters as discerning" members of the "'citizenry [who] make informed choices'" and are capable of evaluating the "campaign and electoral process[.]"  *Tangipa*, 816 F. Supp. 3d at 1101-02.

Of course, as with a legislature, voters can exercise their lawmaking authority in ways that violate the Constitution.  Thus "when voters' discriminatory intent is clear, the courts will strike down laws as violative of the Equal Protection Clause."  *Tangipa*, 816 F. Supp. 3d. at 1102 (citing *Perry v. Brown*, 671 F.3d 1052 (9th Cir. 2012) and *Romer v. Evans*, 517 U.S. 620 (1996)).  But this case is not like *Perry* or *Romer*, both of which involved voter-approved initiatives that blatantly targeted LGBT individuals.  *Romer* addressed a voter-approved state constitutional amendment that stripped protected status based on sexual orientation.  517 U.S. at 624.  And *Perry* struck down Proposition 8, California's voter-approved constitutional amendment that had the "express purpose . . . and effect to eliminate the right of same-sex couples to marry in California."  671 F.3d at 1090.  In each case, the laws at issue were struck down for lack of a rational basis.  Here, by contrast, Proposition 50 is not racially discriminatory on its face, and no one suggests it lacks a rational basis.[2]

---

[2] *Lucas v. Forty-Fourth General Assembly*, 377 U.S. 713, 736-37 (1964), and *Hunter v. Underwood*, 471 U.S. 222 (1985), are similarly inapposite.  *Lucas* involved violation of the one person, one vote guarantee—an impermissible *effect*

6

Nor do administrability concerns weigh against looking to voter intent. Courts commonly consider the intent of voters who approve legislative initiatives or constitutional amendments, for example by examining ballot materials, the text of the legislation, and statements of legislators promoting or opposing the measures, among other sources of evidence. *See* State Mot. at 11-12; *Tangipa*, 816 F. Supp. 3d at 1104 (collecting cases). Consulting campaign and ballot materials does not require an "unworkable" inquiry into every individual voter's subjective motivations. USDOJ Opp'n at 11. That is because the intent that matters is the intent of the relevant decision-making body—whether the electorate or a legislature—*as a whole*. *See*, *e.g.*, *Alexander*, 602 U.S. at 6 (considering whether the "*legislature* was motivated by race as opposed to partisanship" (emphasis added)); *Abbott v. Perez*, 585 U.S. 579, 605 (2018) ("[T]here can be no doubt about what matters: It is the intent of the 2013 Legislature.").

To be sure, in addition to the text of an initiative and campaign materials, statements of particular individuals involved in drafting a measure can be relevant to determining the intent of the final decision-making body. In *Alexander*, for example, the Court considered the testimony of the nonpartisan staffer who drew the map. 602 U.S. at 22-23. And in the context of citizen-initiated ballot measures, courts have looked to particular groups that played a role in drafting. *E.g.*, *Washington v. Seattle Sch. Dist. No. 1* (1982) 458 U.S. 457, 463 (considering statements by officials from group that had "drafted a statewide initiative," *id.* at 462). But while evidence from entities that played a role in preparing a measure

---

rather than an impermissible *intent*. Voter intent was therefore irrelevant to the question of whether an Equal Protection violation had occurred. *Hunter* concerned an intentional discrimination claim premised on the theory that a state constitutional provision disenfranchising those convicted of crimes of moral turpitude disenfranchised Black voters. 471 U.S. at 224. That claim was evaluated under the rubric set forth in *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252, 266 (1977), which required showing only that race was *a* motivating factor. *Id.* at 225-28. *Arlington Heights* does not apply to Fourteenth Amendment racial gerrymandering claims, which require a showing that race was the *predominant* motivation.

7

can be relevant, the overall inquiry is still focused on the ultimate decisionmaker. *See Alexander*, 602 U.S. at 20 (evaluating "aim" of "the legislature[]"); *Washington*, 458 U.S. at 471 (assessing information considered by "Washington electorate"); *see also Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 689-90 (2021) (refusing to impute statements of individual legislators to legislature as a whole because "legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents" and "[u]nder our form of government, legislators have a duty to exercise their judgment").

Here, the campaign discourse and ballot materials referenced in the complaint or subject to judicial notice overwhelmingly focus on Proposition 50's partisan aims. *See Tangipa*, 816 F. Supp. 3d at 1104. And as explained below, the handful of cherry-picked statements from individual legislators and third parties involved in the map drafting process do not demonstrate that any of these individuals were predominantly motivated by race, let alone that the Legislature or the electorate were. *See infra* Argument § I.C.1-2.

### C.  The Facts Tangipa Plaintiffs and Plaintiff-Intervenor Allege Do Not Support a Plausible Racial Gerrymandering Claim.

No matter how the Court weighs voter versus legislative intent, the complaint fails to state a Fourteenth Amendment claim. Tangipa Plaintiffs and Plaintiff-Intervenor have not plausibly established that race predominated over all other partisan and race-neutral redistricting principles driving the Legislature's decision to propose the Proposition 50 map to the voters or the voters' decision to adopt it, let alone "that race was improperly used in the drawing of the boundaries of one or more *specific electoral districts*." *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 263 (2015).

8

**1. Rather than suggesting racial predominance, the alleged legislative statements show that the Proposition 50 map was drawn and adopted for partisan purposes.**

As a preliminary matter, no Challenger disputes that the text of Assembly Constitutional Amendment 8, the official summary of ACA 8, and the official arguments for and against Proposition 50 all had an overwhelmingly partisan focus. Indeed, ACA 8's text explained that "[i]t is the intent of the people that California's temporary maps be designed to neutralize the partisan gerrymandering being threatened by Republican-led states without eroding fair representation for all communities." State RJN, Ex. 1 at 6, Findings (n); *see* State Mot. at 5. And while Tangipa Plaintiffs insist that the reference to preserving fair representation for all communities must evidence "the racial design objectives identified in the Complaint," Tangipa Opp'n at 27, the preservation of communities of interest is a core traditional redistricting principle, *see Rucho v. Common Cause*, 588 U.S. 684, 706-07 (2019); *see also* State Mot. at 14.

Second, the complaint and its exhibits do not demonstrate any improper racial purpose and instead offer evidence that amply supports the conclusion that the Legislature relied on constitutionally permissible redistricting criteria to achieve a partisan gerrymander. *See* State Mot. at 13-14. The individual legislators' comments on which Tangipa Plaintiffs and Plaintiff-Intervenor rely are unhelpful to their racial predominance theory. Plaintiffs cite one sentence in each of two multi-page press releases issued by lawmakers that simply noted perceived effects on existing minority districts. *See* Tangipa Opp'n at 7, 27. But they ignore that the press releases show the legislators favored redistricting only to counteract "partisan gerrymanders" in Republican-controlled states "aimed to benefit their party[,]" ECF Nos. 240-9 at 2, 240-10 at 1, and thus cannot be characterized as plausibly showing that race was any legislator's predominant focus. Plaintiffs are entitled to reasonable inferences, but the Court need not blind itself when the text of an exhibit on which Challengers rely undercuts the inference they ask the Court to draw. *See*

9

*Garcia v. Wachovia Mortg. Corp.*, 676 F. Supp. 2d 895, 900 (C.D. Cal. 2009) ("a 'court may disregard allegations in the complaint if contradicted by facts established by exhibits attached to the complaint'").  And as the Supreme Court has repeatedly cautioned, "'[r]edistricting legislatures will . . . almost always be aware of racial demographics,'" *Alexander*, 602 U.S. at 22 (quoting *Miller*, 515 U.S. at 916), "but it does not follow that race predominates in the redistricting process," *Miller*, 515 U.S. at 916.

The remaining cited legislator comments support only the conclusion that California lawmakers thought *another* state's lawmakers (Texas) redistricted predominantly based on race, not that *California itself* was seeking to redistrict predominantly based on race.  *See* Compl. ¶¶ 78-83.  These limited statements do not plausibly show that California voters or the Legislature placed racial considerations over all the other traditional redistricting principles that ACA 8, members of the Legislature, and Paul Mitchell, the map's initial drafter, expressly stated guided the development of the Assembly Bill 604 map.  The statements are also a far cry from those in *Cooper v. Harris*, where the mapmakers, who included members of the legislature, "purposefully established a racial target," "were not coy in expressing that goal" to their colleagues, and did not propose their map to the voters for approval.  581 U.S. 285, 299 (2017).  They are even farther from the facts of *Callais*, where "the State never hid the ball" regarding the fact that the legislature had drawn the map to comply with the VRA, what the Court considered "an 'express acknowledgement that race played a role.'"  146 S.Ct. at 1161 (quoting *Alexander*, 602 U.S. at 8).

### 2. The alleged circumstantial evidence does not suggest racial predominance.

Nor does the alleged statistical evidence relied upon by Tangipa Plaintiffs and Plaintiff-Intervenor save their Fourteenth Amendment claim, whether alone or when considered in conjunction with the statements from legislators and other

individuals. Tangipa Plaintiffs and Plaintiff-Intervenor argue that the existence of sixteen Latino-majority districts in both the prior map and the Proposition 50 map shows racial predominance. Tangipa Opp'n at 1; USDOJ Opp'n at 18. But they have in no way shown that California redistricted for the predominant purpose of maintaining the same racial demographics, that is, for the predominant purpose of changing nothing.

They also argue that Mitchell sought to draw districts having a Latino-majority citizen voting age population ("CVAP") between 52 and 54 percent, claiming that a nonprofit had submitted a letter advocating for this range. Tangipa Opp'n at 26; USDOJ Opp'n at 19. But the nonprofit letter (attached as an exhibit to the complaint), which was submitted years earlier for a different redistricting effort, specifically disclaimed such a general target, ECF No. 240-3 at 4, and proposed this range for only two districts called "STH60 and CDNELA," *id.* at 5—neither of which Tangipa Plaintiffs and Plaintiff-Intervenor challenge or even discuss. The claim that Mitchell nonetheless drew any map lines with this general target at the forefront of all considerations is unfounded speculation.[3] And it says nothing about the intent of either the voters or the Legislature.

Tangipa Plaintiffs also argue that the proposed redistricting map that Defendant-Intervenor DCCC submitted to the Legislature shows that race predominated because the map included racial demographics for different districts. Tangipa Opp'n at 6-7. But DCCC's cover letter enclosing the map explained that the "proposed map was created using traditional redistricting criteria" and served to

---

[3] The complaint does not even allege how many districts fall within a range of 52 to 54 percent. *See Ala. Legis. Black Caucus*, 575 U.S. at 262-63 ("We have consistently described a claim of racial gerrymandering as a claim that race was improperly used in the drawing of the boundaries of one or more *specific electoral districts*.") (emphasis in original). It instead arbitrarily selects distinct ranges, noting that the prior map had more districts in the range of 52 to 58 percent compared to the Proposition 50 map, while the Proposition 50 map has more districts in the range of 52 to 55 percent compared to the prior map. It notes too that the Proposition 50 map has more districts over 61 percent, which cuts against its own position. Compl. at 22, table 1.

11

counteract Republican efforts "to steal congressional seats and rig the election in their favor"—an explicitly partisan motive.  Compl., Ex. D at 1.  And while the proposed map included racial demographics, that does nothing to help Tangipa Plaintiffs.  "Redistricting legislatures will . . . almost always be aware of racial demographics," *Miller*, 515 U.S. at 916, and there is "nothing nefarious" about this awareness, *Alexander*, 602 U.S. at 37.

Tangipa Plaintiffs and Plaintiff-Intervenor give the Court no reason to set aside the presumption of good faith when their own evidence and Plaintiff-Intervenor's concession—"that the Proposition 50 map is intended to bolster the performance of the Democratic Party in congressional elections"—demonstrate a partisan motivation for the Proposition 50 map.  USDOJ Opp'n at 2; *see Callais*, 146 S.Ct. at 1157 ("To prevail, the plaintiff must disentangle race from politics by . . . ruling out the competing explanation that political considerations dominated the legislature's redistricting efforts.") (internal citations and quotation marks omitted).

### 3. The statements of non-state actor Paul Mitchell do not support allegations of racial predominance.

Tangipa Plaintiffs and Plaintiff-Intervenor give this Court no reason to impute the intentions of a non-state actor to a legislature-proposed and voter-approved map.  *See Tangipa*, 816 F. Supp. 3d at 1114 (citing *Miller*, 515 U.S. at 916) (courts "are not directed to look at the motivation behind a *map*, [they] are directed to look at the motivation of the enacting legislature"); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (factual allegations must not be speculative).  Nor do they rebut the argument that Mitchell is not a state actor aside from speculating about his role in the legislative process—allegations that are not included in their complaint.  Tangipa Opp'n at 15; USDOJ Opp'n at 7, 11, 17.[4]

---

[4] Defendants did not focus their opening brief on Mitchell's statements because, as a non-state actor, his intent is not the relevant inquiry here.  State Mot. at 13.  They do not, as Plaintiff-Intervenor postulates, concede "that Mitchell had racial motivations when creating the Proposition 50 map."  USDOJ Opp'n at 17.

In fact, Challengers' own exhibits undermine their allegations and arguments. *See Gonzalez v. Planned Parenthood of L.A.*, 759 F.3d 1112, 1115 (9th Cir. 2014) (courts "need not . . . accept as true allegations that contradict matters properly subject to judicial notice or by exhibit"); *see* State Mot. at 14.  In one of the exhibits attached to the complaint, Mitchell made clear that the first principles which guided his mapdrawing were, at the very outset, those consistent with traditional redistricting principles using the State Fair Maps Act criteria and the Citizens Redistricting Commission's criteria.  ECF No. 240-2 at 22:21-23:7; *see* Cal. Const., art. XXI, § 2(d).  He then described what can only be interpreted as minimizing change, core district preservation, and protecting communities of interest in keeping with additional traditional redistricting principles:  He "kept about 80 percent" of the existing Commission map, making "modest changes . . . to achieve the political goal"—that is, "to create a push back to what Texas was doing, an opportunity for Democrats to pick up five seats, and to counterbalance the five Republican seats in Texas" while "keep[ing] a large number of communities of interest together" and "reduc[ing] the numbers of cities that were split."  ECF No. 240-2 at 26:1-12, 27:7. In public statements included in another of the complaint's exhibits, several legislators also referred to reliance on such traditional criteria, noting, for example, the interest in keeping communities together along with the partisan intent to counteract "partisan gerrymanders" in Republican-controlled states "aimed to benefit their party."  ECF No. 240-9 at 2, 240-10 at 1.  None of these considerations raises constitutional concerns.

Moreover, while Tangipa Plaintiffs and Plaintiff-Intervenor allege that Mitchell and these legislators referred to race, they fail to show that racial considerations *predominated* over all other race-neutral redistricting principles— most notably, partisan advantage—that their own exhibits identify.  They allege, for instance, that Mitchell said he created a Latino majority-minority district and a Latino-influence district and believed the map would be "great for the Latino

13

community." Compl. ¶¶ 65-67. But they never identify the two districts Mitchell referenced. *See Ala. Legis. Black Caucus*, 575 U.S. at 263 (racial gerrymandering claims focus on specific districts). Nor have they shown that Michell's intent can be imputed to the Legislature, let alone the voters.

Tangipa Plaintiffs and Plaintiff-Intervenor's focus on the map-maker's stray comments to an interest group are also unavailing. While Tangipa Plaintiffs seem to invoke Mitchell's comments made at a presentation two weeks before the election as evidence of voter intent, Tangipa Opp'n at 27, context matters: These comments were to an audience of unspecified size, occurred on one occasion, and are not alleged to have been repeated ever again before the election. *Id.*; *accord* Compl. ¶¶ 65-67; ECF No. 240-2. And Mitchell was expressly asked by the presentation moderator to "try[] as much as [he could] to keep [the discussion] nonpartisan" despite acknowledging the clearly partisan focus of Proposition 50. ECF No. 240-2 at 28:8-9. This singular interview before a crowd of unknown size cannot have plausibly played a meaningful part of the public discourse that led to Proposition 50's passage.

### D. Tangipa Plaintiffs' and Plaintiff-Intervenor's Continued Failure to Act on Their Discovery Grievances Does Not Move the Needle With Respect to Their Fourteenth Amendment Claim.

As Plaintiff-Intervenor notes, in the half a year since the Court ordered Mitchell to produce documents relating to his development of the first draft of the Proposition 50 map, Mitchell has produced many thousands of documents and several privilege logs. USDOJ Opp'n at 15. At least 10,000 of those documents were produced prior to the conclusion of the preliminary injunction hearing in December, months before the Consolidated Complaint was filed. *Id.*

Plaintiff-Intervenor asks the Court to deny dismissal here because of the purported "possible existence of corroborating, improperly withheld documents[.]" *Id.* at 16. But of course, at this stage, the question for this Court is only whether the allegations in the complaint, taken as true, are sufficient to state a

claim, not whether "[m]ore discovery" might "uncover additional evidence that race predominated." *See id.* at 15. In any event, in the nearly six months since the preliminary injunction hearing concluded, no plaintiff has challenged any of the assertions of privilege in Mitchell's logs or otherwise made any attempt to secure a judicial order mandating production of any documents. No plaintiff has sought to compel any members of the Legislature to participate in oral or written discovery since counsel for the Legislature asserted privilege on their behalf in December. No plaintiff has challenged the assertion of legislative privilege. And this Court expressly acknowledged that "legislative privilege is frequently invoked in redistricting cases." *Tangipa*, 816 F. Supp. 3d at 1114 n.14 (declining to infer any "nefarious motives based on invocation of the privilege").

In any case, Tangipa Plaintiffs and Plaintiff Intervenor's desire to embark on a discovery quest is irrelevant to whether their claims are adequately pled. The Court should dismiss the Fourteenth Amendment claims in their entirety.

## II. NOYES PLAINTIFFS FAIL TO ESTABLISH STANDING

Noyes Plaintiffs raise racial gerrymandering claims under the Fifteenth Amendment and Section 2 of the VRA. But they have not plausibly shown that they suffered any cognizable injury because they have not alleged facts showing that their *own* districts have been racially gerrymandered. They do not state the districts they reside in or describe how their districts have been revised. Nor have they offered anything more than conclusory allegations that their right to vote has been denied or abridged based on race, declining even to identify their race. A "generalized grievance against allegedly illegal governmental conduct" is not "sufficient for standing." *United States v. Hays*, 515 U.S. 737, 743 (1995).

Noyes Plaintiffs do not dispute that they lack standing to bring their VRA claim and have thus conceded the point. *See, e.g.*, *Virgin Scent, Inc. v. BT Supplies W., Inc.*, 615 F. Supp. 3d 1118, 1136 (C.D. Cal. 2022).

15

As for their Fifteenth Amendment claim, Noyes Plaintiffs do not dispute that they have offered only conclusory allegations that their own right to vote was denied or abridged. *See* State Mot. at 19; *Gill v. Whitford*, 585 U.S. 48, 49 (2018) ("The right to vote is 'individual and personal in nature'"; to have standing, a voter plaintiff must "'allege facts showing disadvantage to themselves as individuals.'"). Instead, they argue that "[a]ny voter in a state" has standing to challenge that state's racially gerrymandered map. Noyes Opp'n at 10. But the Supreme Court has long held that "a plaintiff who alleges that he is the object of a racial gerrymander—a drawing of district lines on the basis of race—has standing to assert only that his own district has been so gerrymandered." *Gill*, 585 U.S. at 66; *see also Hays*, 515 U.S. at 739, 745. The cases that Noyes Plaintiffs cite confirm this. For example, the Supreme Court in *North Carolina v. Covington* explained that "it is the segregation of the plaintiffs—not the legislature's line-drawing as such—that gives rise to their claims[,]" showing that standing is limited "to those legislative districts in which they reside." 585 U.S. 969, 976 (2018); *see* Noyes Opp'n at 10.

Resisting this precedent, Noyes Plaintiffs suggest that the district-specific standing doctrine does not apply when plaintiffs allege racial gerrymandering claims under the Fifteenth Amendment. Noyes Opp'n at 11. The only case Noyes Plaintiffs cite for this argument is *Gomillion v. Lightfoot*, Noyes Opp'n at 11, which involved Black plaintiffs whose own city limits had been redrawn to remove them. 364 U.S. 339, 341 (1960). These plaintiffs were themselves plainly the object of racial line-drawing—something that cannot be said of Noyes Plaintiffs. No matter the claim invoked, plaintiffs seeking review in federal court must show an injury that affects them in a personal and individual way. *See Gill*, 585 U.S. at 65.

Noyes Plaintiffs also suggest that they need not allege which districts they reside in because every district was drawn with racial intent. Noyes Opp'n at 12. But their complaint purports to challenge only some of California's fifty-two districts—sixteen Latino-majority districts and two Black-influence districts.

16

Compl. at ¶¶ 5, 141, 151.  And their purported expert's own illustrative map, which is allegedly race-blind, appears to include several districts that are identical to those in the Proposition 50 map, confirming that they find some districts constitutional. ECF No. 240-11 at 225 ¶ 7, 318-19 (showing several districts that appear unchanged, including districts 11, 12, 15, and 19).  Even had the Noyes Plaintiffs challenged all districts, however, their standing would be limited to claims "assert[ing] only that [their] own district has been so gerrymandered." *Gill*, 585 U.S. at 66.

Lastly, Noyes Plaintiffs argue that they need not be members of a particular racial group to mount a Fifteenth Amendment claim because the Constitution protects all races.  Noyes Opp'n at 12.  But while any race *can* face discrimination and have their right to vote unlawfully denied or abridged, that general principle does not establish that Noyes Plaintiffs had *their* right to vote denied or abridged based on their race.  *Gill*, 585 U.S. at 49 (a voter plaintiff must "allege facts showing disadvantage to themselves as individuals").

### III. NOYES PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE FIFTEENTH AMENDMENT

Noyes Plaintiffs' Fifteenth Amendment claim also fails on the merits.  First, there is no standalone cause of action for racial gerrymandering under the Fifteenth Amendment, as Noyes Plaintiffs incorrectly and repeatedly propose.  *See* Noyes Opp'n at 14.  Second, even if the Fifteenth Amendment did independently recognize racial gerrymandering claims, Noyes Plaintiffs' allegations do not establish a plausible intentional discrimination claim under that Amendment. *Arlington Heights*, 429 U.S. at 266.  The Court should dismiss this claim without leave to amend because no amendment would reconcile Noyes Plaintiffs' attempt to cast aside decades of precedent with current Fifteenth Amendment jurisprudence. *Or. Clinic, PC v. Fireman's Fund Ins. Co.*, 75 F.4th 1064, 1073 (9th Cir. 2023) (a court may dismiss a complaint without leave to amend if it "determines that the

17

allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency").

### A.    There Is No Standalone Racial Gerrymandering Cause of Action Under the Fifteenth Amendment

Noyes Plaintiffs assert the novel argument that the Fifteenth Amendment provides an alternative, less "hard[]" standard for resolving racial gerrymandering claims.  Noyes Opp'n at 15.  According to Noyes Plaintiffs, this novel standard "prohibits drawing congressional maps with any racial intent, goal, or purpose."  Compl. ¶ 143.  They identify *Callais* and *Gomillion* as supporting this position, Noyes Opp'n at 16, but neither does.

*Callais* only discusses the Fifteenth Amendment in the context of that Amendment's authorization to Congress to enact legislation—in that case, the VRA—to "enforce the Amendment's protections."  146 S.Ct. at 1144.  Since Congress "cannot 'enforce a constitutional right by changing what the right is,'" the Court held that "the focus of" Section 2 of the VRA "must be enforcement of the Fifteenth Amendment's prohibition on *intentional* racial discrimination."  *Id*. at 1155 (citation omitted).  Section 2 liability is accordingly imposed "only when the circumstances give rise to a strong inference that intentional discrimination occurred."  *Id*. at 1156.  The Court did not hold or even suggest that the Fifteenth Amendment creates a separate, simpler racial gerrymandering framework like the one Noyes Plaintiffs imagine, or otherwise effect a "tectonic" shift in racial gerrymandering jurisprudence.  Noyes Opp'n at 7.[5]

---

[5] Noyes Plaintiffs seek support from the *Callais* Court's order for supplemental briefing on "[w]hether the State's intentional creation of a second majority-minority congressional district violates the Fourteenth or Fifteenth Amendments to the U.S. Constitution."  Noyes Opp'n at 17-18.  As the Court did not address the latter question in its ruling, however, this briefing order does not support Noyes Plaintiffs' point. *See Alexander v. Sandoval*, 532 U.S. 275, 282 ("[Courts are] bound by holdings, not language.").

18

*Gomillion* similarly does not support Noyes Plaintiffs' theory of a standalone Fifteenth Amendment test. The *Gomillion* petitioners challenged the redrawing of the city boundaries of Tuskegee, Alabama, not the redrawing of a multiple-district legislative map. 364 U.S. at 340. The State intentionally redrew the city boundaries to surgically remove 99 percent of Black voters from the city while retaining 100 percent of the white residents. *Id.* at 341. The Supreme Court found that this action "deprived the petitioners of the municipal franchise and consequent rights." *Id.* at 347. The Court relied on the Fifteenth Amendment because the State intended to, and did, wholly *deny* Black voters of their right to vote in Tuskegee city elections. *Id. Gomillion* is not a case where a racially gerrymandered districting map was struck down merely because a State "used" race, and no court has ever interpreted it that way. *Accord Backus v. South Carolina*, 857 F. Supp. 2d 553, 569-70 (D.S.C. 2012), *aff'd* 568 U.S. 801 (2012).[6]

### B. Noyes Plaintiffs' Claim Is Inconsistent with Fifteenth Amendment Jurisprudence

Even if Noyes Plaintiffs had styled their claim as one for intentional discrimination, their allegations still fall far short of meeting the requirements for that claim. "As the [Supreme] Court has long held, the Fifteenth Amendment bars only state action 'motivated by a discriminatory purpose[.]'" *Callais*, 146 S.Ct. at 1156 (quoting *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 481 (1997)). And that action must result in the denial or abridgment of the "freedom to vote" on account of race. U.S. Const. amend. XV; *City of Mobile, Ala. v. Bolden*, 446 U.S.

---

[6] Although Noyes Plaintiffs do not bring a Fourteenth Amendment claim, they nonetheless seek to undermine the voter-intent framework related to that Amendment by citing to inapposite cases that address Fifteenth Amendment claims, racial discrimination claims under the Fourteenth Amendment, or claims unrelated to redistricting. Noyes Opp'n at 27-29 (citing cases). Those arguments neither absolve Noyes Plaintiffs from litigating within the applicable legal standards, nor do they provide a valid reason for the Court to set aside its preliminary injunction ruling. As discussed, a failure to plead facts regarding voter intent is fatal to racial gerrymandering claims in the context of this case. *See supra*, Argument § I.

19

55, 65 (1980) (plurality opinion), *superseded by statute on other grounds*. The cases Noyes Plaintiffs cite only reinforce that a plausible Fifteenth Amendment claim must plead facts consistent with this standard. *See Davis v. Guam*, 932 F.3d 822, 843 (9th Cir. 2019) (striking down law that restricted voting on a plebiscite to native inhabitants of Guam); *Rice v. Cayetano*, 528 U.S. 495, 518-24 (2000) (striking down provision of Hawaiian Constitution that excluded persons of certain ancestry from voting in elections selecting trustees to state agency); *Gomillion*, 364 U.S. at 347 (striking down city boundaries that excluded 99 percent of Black voters).

Here, Noyes Plaintiffs did not plead facts plausibly showing that any actor, and certainly not the voters, bore a "discriminatory purpose," *Callais*, 146 S.Ct. at 1155, to deny or abridge the right to vote on account of race, separate from a permissible and inevitable "*aware*[*ness*] of race," *Bethune-Hill v. Va. State Bd. of Elec.*, 580 U.S. 178, 187 (2017). They likewise fail to sufficiently plead that the Proposition 50 map denies or abridges any person's right to vote, much less their own. *See supra* Argument § II. Noyes Plaintiffs' only attempt on this front is to claim that the "use of race abridged and/or denied" their right to vote with no further description. Compl. ¶ 146. But this is no more than a conclusory statement that is "not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Accordingly, the Court should dismiss this claim.

## IV. NOYES PLAINTIFFS AND PLAINTIFF-INTERVENOR FAIL TO STATE A CLAIM UNDER SECTION 2 OF THE VOTING RIGHTS ACT

Noyes Plaintiffs' and Plaintiff-Intervenor's Section 2 claims suffer from a similar and fundamental flaw: they do not allege that the State intended to discriminate against, or that it denied or abridged the right to vote of, any member of a protected class. *See* Compl. The VRA's plain language, *see* 52 U.S.C. § 10301, and decades of case law interpreting it make clear that the absence of such allegations is fatal to a Section 2 claim.

### A.    Noyes Plaintiffs and Plaintiff-Intervenor Do Not Allege That Any Actor Bore an Invidious Discriminatory Purpose

To plead a Section 2 claim, a challenger must allege facts showing that the State plausibly bore an "invidious discriminatory purpose," *Arlington Heights*, 429 U.S. at 266, to impose "adverse effects upon an identifiable group," *Democratic Nat'l Comm. v. Reagan*, 904 F.3d 686, 717 (9th Cir. 2018) (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).  Noyes Plaintiffs and Plaintiff-Intervenor instead assert that a Section 2 claim may be stated by alleging that the State simply considered race, for any purpose, discriminatory or otherwise.  *See* Noyes Opp'n at 25 ("Because California Defendants used race to allocate power, California Defendants violated Section 2."); USDOJ Opp'n at 25 ("Like the Equal Protection Clause, Section 2 prohibits intentionally dividing voters up by race.").

That is not the standard.  Instead, Noyes Plaintiffs and Plaintiff-Intervenor must allege facts sufficient to permit an inference of discriminatory intent under the *Arlington Heights* framework.  *See Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989, 1038 (9th Cir. 2020) (en banc) ("[*Arlington Heights*] provides the framework for analyzing a claim of intentional discrimination under Section 2") *rev'd on other grounds sub nom. Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647 (2021); *Reno*, 520 U.S. at 488 ("In conducting [an inquiry of a jurisdiction's motivation in enacting voting changes], courts should look to our decision in *Arlington Heights* for guidance.").[7]  Though these factors are "non-exhaustive," *Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015), they are the operative rubric for courts to determine whether a State acted with discriminatory intent, *Tangipa*, 816 F. Supp. 3d at 1137.

Noyes Plaintiffs nonetheless contend that *Arlington Heights* is *irrelevant* to their claim.  Noyes Opp'n at 26.  And Plaintiff-Intervenor's tenuous allegations as

---

[7] The factors include (1) the historical background; (2) the sequence of events leading to enactment, including any substantive or procedural departures from the normal legislative process; (3) the relevant legislative history; and (4) whether the law has a disparate impact on a particular racial group.  *Arlington Heights*, 429 U.S. at 266-68; *see* State Mot. at 27.

21

to only one or two of the factors is insufficient to overcome the presumption of good faith and plausibly allege "an objective likelihood of intentional discrimination based on the totality of the circumstances." *Callais*, 146 S.Ct. at 1162.

Plaintiff-Intervenor argues that the first and fourth factors—historical background and disparate impact—are unnecessary. USDOJ Opp'n at 26. And appearing to address the second and third factors, Plaintiff-Intervenor claims that the sequence of events leading up to the enactment of the Proposition 50 map "so greatly departed from normal procedures that it required amending California's constitution." *Id.* (citing Compl. ¶ 163).

But seeking voter approval of constitutional amendments is a normal procedure in California because the State's constitutional design requires voters to approve such amendments. *See* Cal. Const., art. XVII. Moreover, California's redistricting process is set forth in the State's constitution and can only be changed through constitutional amendment. *See* Cal. Const., art. XXI. Thus, the fact that California's constitution was amended does not imply a racially discriminatory intent, nor does it undermine the Legislature's partisan intent behind proposing the amendment that it did, or the voters' partisan intent when approving the amendment. Rather, that the Legislature not only publicly debated Proposition 50, but also put the measure and the district maps themselves before the voters contrasts with other cases in which a legislature's departure from regular procedure stifled public debate over the State's actions. *See, e.g.*, *Mi Familia Vota v. Fontes*, 129 F.4th 691, 728 (9th Cir. 2025) (substantial amendment presented to legislators mere minutes before final passage potentially indicated discriminatory intent).

Ultimately, both Noyes Plaintiffs and Plaintiff-Intervenor rest their Section 2 claims primarily on curated statements from a non-state actor and state legislators that they claim supposedly evince racially discriminatory intent, Noyes Opp'n at 18-21; USDOJ Opp'n at 28; Compl. ¶¶ 63-67, 78-86, and a purported expert report

22

they claim shows that the State attempted to maintain or improve the status quo of Latino and Black voters in the Proposition 50 map, Noyes Opp'n at 21; USDOJ Opp'n at 18-19; Compl. ¶¶ 95, 100, 109, 116, 120, Ex. K.  As discussed above, Plaintiff-Intervenor ignores the intent of the voters as the most relevant actors.  *See supra* Argument § I.B.  And no party contends that either the statements or the expert report reveal an "invidious discriminatory purpose," *Arlington Heights*, 429 U.S. at 266, to impose "adverse effects upon an identifiable group," *Reagan*, 904 F.3d at 717.  Noyes Plaintiffs and Plaintiff-Intervenor merely allege that they demonstrate that the State bore generalized "racial motives" or "used race" in some capacity.  *See generally* Noyes Opp'n; USDOJ Opp'n at 26.  That is insufficient to allege discriminatory intent under Section 2 of the VRA.

**B.    Noyes Plaintiffs and Plaintiff-Intervenor Do Not Allege That the State Denied or Abridged Any Person's Right to Vote**

In addition to their failure to allege that the State bore an invidious discriminatory intent against a protected class, neither Noyes Plaintiffs nor Plaintiff-Intervenor allege that Proposition 50 denied or abridged the right to vote for any member of a protected class.  Such an effect is a necessary element of an intentional discrimination claim.  *See Tangipa*, 816 F. Supp. 3d at 1137 ("To prevail on a § 2 claim, Challengers must show both a *purpose* and an *effect.*"); 52 U.S.C. § 10301 (prohibiting States from imposing voting standards that "*result*[] in a *denial or abridgment*" of right to vote "on account of race or color" (emphasis added)).  This effect may be shown if the political process is not "equally open to participation" by members of a protected class.  52 U.S.C. § 10301.

Instead of alleging facts to demonstrate that the political process is not equally open to one protected class relative to another, Noyes Plaintiffs and Plaintiff-Intervenor argue that they do not have to.  *See* Noyes Opp'n at 26 ("Noyes Plaintiffs allege that by allocating power based on race to preferred racial groups, every other racial group's right to vote has been abridged or denied."); USDOJ

Opp'n at 28 ("The injury requirement is satisfied when a state has a motive to impose any effects on a racial group—adverse or beneficial.").  In addition to the doctrinal problems with that argument, their Section 2 claims are complicated by the fact that there was no discriminatory effect—both parties allege that the Proposition 50 map was drawn to maintain the same number of Latino-majority districts and preserve the status quo.  *See* State Mot. at 26.

Both Noyes Plaintiffs and Plaintiff-Intervenor misrepresent their cited cases to circumvent the plain text of the VRA and support their position that the State's consideration of race in any capacity violates the VRA.  Noyes Plaintiffs only cite a portion of *Callais* stating that minority voters are entitled to the same opportunity as other members of the electorate to contribute their vote to a winning cause.  *See* Noyes Opp'n at 25-26 (citing *Callais*, 146 S.Ct. at 1155).  But this undermines, rather than supports, Noyes Plaintiffs' point.  This language reinforces that to state a Section 2 claim a plaintiff must show that they do not have the same opportunity as the rest of the electorate to contribute their vote to a winning cause, and Noyes Plaintiffs make no allegation to that effect.  *See Callais*, 146 S.Ct. at 1157 ("In short, § 2 imposes liability only when the evidence supports a strong inference that the State intentionally drew its districts to afford minority voters less opportunity because of their race.").

Plaintiff-Intervenor takes a different tack, relying on case law interpreting the Equal Protection Clause of the Fourteenth Amendment rather than cases interpreting the VRA.  *See* USDOJ Opp'n at 27 (citing *Shaw v. Reno*, 509 U.S. 630, 647 (1993) (striking down redistricting map under Equal Protection Clause)), 28 (citing *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 600 U.S. 181, 229 (2023) (striking down college admissions programs under Equal Protection Clause)).  But claims under Section 2 of the VRA and these Fourteenth Amendment cases are "analytically distinct" and follow different analyses.  *See Alexander*, 602 U.S. at 38.

24

With the actual text and principles of the VRA in mind, Noyes Plaintiffs and Plaintiff-Intervenor fail to allege a single fact to show that the Proposition 50 map denies or abridges any person's right to vote. Noyes Plaintiffs assert that "by allocating power based on race to preferred racial groups, every other racial group's right to vote has been abridged or denied." Noyes Opp'n at 26. But this is a legal conclusion, not a factual allegation. Plaintiff-Intervenor claims that non-Latino voters are harmed because "California necessarily has excluded non-Hispanics from [sixteen majority-Latino] districts and packed them into the adjacent districts." USDOJ Opp'n at 28. But despite the use of gerrymandering terminology like "exclude" and "pack," this statement does not allege any harm to any person's right to vote. The allegation boils down to the claim that some non-Latino voters in California reside in districts other than the sixteen majority-Latino districts in the Proposition 50 map. In short, Noyes Plaintiffs and Plaintiff-Intervenor fail to allege a denial or abridgment of the right to vote as required to state a VRA claim.

## V. GOVERNOR NEWSOM IS NOT A PROPER PARTY

Finally, Noyes Plaintiffs and Plaintiff-Intervenor fail to establish that Governor Newsom is a proper defendant in this suit, while Tangipa Plaintiffs fail to oppose the argument and have thus effectively conceded that sovereign immunity bars their claims against him.

Noyes Plaintiffs claim that the Governor lacks immunity under *Ex parte Young*, 209 U.S. 123 (1908), because he was sued in his official capacity for injunctive relief and "under the California Constitution, '[t]he supreme executive power of this State is vested in the Governor.'" Noyes Opp'n at 30 (quoting Cal. Const., art. V, § 1). But it is well established that a "'generalized duty to enforce state law'" is insufficient to invoke *Ex parte Young*. *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 943 (9th Cir. 2013) (Governor "entitled to Eleventh Amendment immunity because his only connection to [the challenged law] is his general duty to enforce California law"). Challengers

instead need to allege that the Governor holds "some connection with the enforcement of the act" that is "fairly direct." *Id.* (internal quotation marks omitted).  They have failed to do so.

Plaintiff-Intervenor argues that the Eleventh Amendment does not bar lawsuits by the federal government against States and their officers, so sovereign immunity does not foreclose its own claims against the Governor.  USDOJ Opp'n at 29 (citing *Arizona v. California*, 460 U.S. 605, 614 (1983)).  But the same lack of enforcement authority that establishes the Governor's immunity from the private claims in this case undermines Plaintiff-Intervenor's (and the other Challengers') standing to sue the Governor.  *See Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011) ("[A] plaintiff must show . . . it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.").  In the sovereign-immunity context, "to be a proper defendant in an action to enjoin an allegedly unconstitutional state law, the governor must have 'a specific duty to enforce' that law."  *Disability Rts. S.C. v. McMaster*, 24 F.4th 893, 901 (4th Cir. 2022); *see Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 847 (9th Cir. 2002) (California governor dismissed due to lack of enforcement ability).  "These principles apply with equal force in the standing context" and are fatal to Plaintiff-Intervenor's claims against the Governor.  *Disability Rts. S.C.*, 24 F.4th at 901; *see also Nichols v. Brown*, 859 F. Supp. 2d 1118, 1131-32 (C.D. Cal. 2012).

"In cases 'where there are multiple defendants and multiple claims,' the plaintiff must demonstrate Article III standing 'as to each defendant and each claim.'"  *Satchell v. Sonic Notify, Inc.*, 234 F. Supp. 3d 996, 1001 n.2 (N.D. Cal. 2017); *see also McCarron v. County of Ventura*, No. CV 21-5234, 2021 WL 9315371, at *3 (C.D. Cal. Dec. 29, 2021).  But here, a favorable decision against the Governor would not redress Challengers' alleged injury, for the Governor has no specific authority over elections administered using the Proposition 50 map.  *See S.B. by & through Kristina B. v. California Dep't of Educ.*, 327 F. Supp. 3d 1218,

26

1235 (E.D. Cal. 2018) (agreeing that "where the official's connection to the challenged action is so attenuated such that relief as to that official would not redress the plaintiff's injuries, that official must be dismissed for lack of redressability under Article III of the U.S. Constitution").  So even if the Plaintiff-Intervenor could defeat the Governor's assertion of sovereign immunity, it still falters on standing.  *See United States v. Mattson*, 600 F.2d 1295, 1300 (9th Cir. 1979) ("'[T]he government must show that, like the private individual, it has such an interest in the relief sought as entitles it to move in the matter'") (quoting *United States v. San Jacinto Tin Co.*, 125 U.S. 273, 285 (1888)).

For these reasons, in addition to those covered above and in Defendants' moving papers, Challengers' claims against the Governor must be dismissed.

## CONCLUSION

Challengers' Complaint should be dismissed in its entirety and the Governor should be dismissed as a defendant.

Dated:  June 12, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
ANYA M. BINSACCA
LARA HADDAD
Supervising Deputy Attorneys General
RYAN EASON
DAVID GREEN
KIANA HEROLD
JENNIFER E. ROSENBERG
Deputy Attorneys General

 /s/ Iram Hasan
IRAM HASAN
Deputy Attorney General
*Attorneys for Defendants California Governor Gavin Newsom and Secretary of State Shirley Weber*

27

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendants California Governor Gavin Newsom and Secretary of State Shirley Weber, certifies that this brief contains 8,820 words, which complies with the Court's May 28, 2026 order enlarging the word limits for the defense parties' reply briefs.  ECF No. 267.

Dated:  June 12, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
ANYA M. BINSACCA
LARA HADDAD
Supervising Deputy Attorneys General
RYAN EASON
DAVID GREEN
KIANA HEROLD
JENNIFER E. ROSENBERG
Deputy Attorneys General


 */s/ Iram Hasan*
IRAM HASAN
Deputy Attorney General
*Attorneys for Defendants California Governor Gavin Newsom and Secretary of State Shirley Weber*